William J. McSherry, Jr., Esq. (WM1194)
Steven D. Greenblatt, Esq. (SG5105)
CROWELL & MORING LLP
153 East 53rd Street
New York, New York 10022
Tel. No.: 212-223-4000
Fax No.: 212-223-4134
Attorneys for Plaintiff



RECEIVE
MAR 2 8 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAN DIEGO COUNTY EMPLOYEES
RETIREMENT ASSOCIATION,

       Plaintiff,

     -against-

NICHOLAS M. MAOUNIS, CHARLES H.
WINKLER, ROBERT W. JONES,
BRIAN HUNTER, and AMARANTH
ADVISORS, LLC,

       Defendants.

**07 CV 2618**

**JUDGE BATTS**

## COMPLAINT

Plaintiff, San Diego County Employees Retirement Association ("SDCERA"), by its attorneys, Crowell & Moring LLP, as and for its Complaint against the defendants, alleges as follows:

## NATURE OF THE ACTION

1. By this action, plaintiff SDCERA, seeks to recover damages pursuant to the federal securities laws and New York and Delaware law for the defendants' fraud, gross negligence, breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, vicarious liability, and breach of contract.

2.     Effective September 1, 2005, SDCERA invested $175 million in Amaranth Partners L.L.C. (the "Fund"), a Connecticut-based hedge fund formed under Delaware's Limited Liability Company Act.

3.     The Fund was founded by defendant Nicholas M. Maounis ("Maounis") and managed by defendant Amaranth Advisors LLC ("Advisors") at the direction of Maounis, and the direction of Advisors's Chief Operating Officer, defendant Charles H. Winkler ("Winkler"), and Advisors's Chief Risk Officer, defendant Robert W. Jones ("Jones"). Advisors's former energy trader, Brian Hunter ("Hunter") is also a defendant in this action.

4.     The essence of this action is that defendants perpetrated an ongoing fraud on SDCERA, before and after SDCERA's investment, by knowingly, intentionally, and falsely misrepresenting that the Fund was a "multi-strategy hedge fund" that invested broadly in at least six different market sectors and utilized sophisticated risk management controls. In truth, the Fund, against its own espoused investment policies, effectively operated as a single-strategy natural gas fund that took very large and highly leveraged gambles and recklessly failed to apply even basic risk management techniques and controls to these gambles. As a result of Defendants' fraud and other misconduct, the Fund collapsed in late-September 2006, resulting in a loss of over $6 billion in Fund value and causing SDCERA to lose more than $150 million.

5.     Defendants' misrepresentations began as part of Advisors's efforts to fraudulently induce SDCERA's investment in the Fund. In March 2005, Maounis, Winkler, and Jones touted Advisors's supposedly rigorous risk control programs specifically to SDCERA and its consultant during SDCERA's due diligence visit. At a meeting on July 21, 2005 at SDCERA's office in San Diego, Maounis represented to SDCERA's board of trustees, playing to the fiduciary duties of the SDCERA board members, as follows: "'[W]hat [the Board] should be looking for in

2

3

managers are multi-strategy managers. . . . The most important thing for us is really to minimize the downside. . . . We don't want to hit home runs, we want to get singles and doubles. So we want to minimize that downside . . . . It's not okay to lose money in the year. And that's really what we try to do . . . . We're targeting high single-digit to low double-digit returns with small volatility. That's what we're targeting." But for these representations, and the promises of security and sophisticated risk management conveyed to SDCERA, SDCERA would not have invested in the Fund.

6.     Having fraudulently induced SDCERA's investment, Defendants' fraud and misrepresentation continued throughout the duration of SDCERA's participation in the Fund. SDCERA was repeatedly assured by defendants that the Fund's exposure to volatile energy markets was being reduced and hedged, and, therefore, in reliance on these assurances, SDCERA continued to hold its investment in the Fund. However, in truth, defendants were not reducing or hedging against the Fund's natural gas exposure, and, instead, were recklessly deepening the Fund's positions in natural gas and disregarding basic risk management principles, actions that eventually caused the collapse of the Fund.

7.     Each of defendants' statements referenced herein was false, the only purpose of which was to induce SDCERA to make and hold a nine-digit investment in the Fund. Beginning in 2005, the Fund, however, was being run, either intentionally or negligently, as a *de facto* single-strategy natural gas fund, placing billions of dollars at risk in highly volatile markets and with no exit strategy. Advisors encouraged Hunter to take such enormous, leveraged positions in natural gas markets that the Fund's own trading volume influenced spreads and prices in these markets. The Net Asset Value ("NAV") that defendants reported for the Fund at year-end 2005 included tens of millions of dollars in unrealized "profit" on natural gas positions and spreads

without any discount for the illiquidity of those positions. Nonetheless, Advisors paid itself a 20%, "performance fee" on this unrealizable "profit" and awarded huge bonuses to those responsible for the operations of the Fund, *i.e.*, Maounis, Winkler, Jones, and Hunter. Hunter alone, upon information and belief, received a $100 million bonus for 2005!

<u>The Reality Of The Fund As a Single-Sector "Long" Gambler In Natural Gas</u>

8.       Beginning in 2005 and continuing through the collapse of the Fund in September 2006, defendants staked out enormous, undisclosed, and extremely risky positions in the natural gas commodity trading markets.  While commodity markets in general are inherently volatile, natural gas is one of the most volatile commodities because its market is relatively small and, thus, prone to illiquidity.  The large, market-controlling positions taken by the Fund heightened the illiquidity and other dangers of these investments.

<u>Leverage Heightens The Risk</u>

9.       Defendants exacerbated the Fund's exposure to the volatile natural gas market by utilizing large amounts of leverage.  For example, upon information and belief, as of January 31, 2006, defendants had allocated about $2.5 billion of the Fund's capital to energy/commodities trading and leveraged that amount by a factor of 6.5 times, creating a total exposure to energy/commodities trading of $16.25 billion.  Defendants took such massive positions in the natural gas market that at one point Hunter reportedly entered into contracts on behalf of the Fund representing more than 50% of the monthly demand for natural gas in the United States.

<u>The Defendants Expressly Misled SDCERA After SDCERA Invested $175 Million</u>

10.       In 2006, defendants specifically and repeatedly maintained to SDCERA that Advisors was not making large directional bets on future movements in energy prices.  In May, June, and August 2006, SDCERA and its consultant were assured that the Fund was decreasing

its positions in natural gas and monetizing its gains, and that Advisors's core energy strategy relied on making "spread trades" such that it bought natural gas for delivery at a future date and then natural gas sold short for delivery at a different date. In this way, defendants maintained that they were betting on the size of the spread between two different natural gas contracts, rather than the overall direction of gas prices. Unbeknownst to SDCERA, however, the Fund's positions in the natural gas market were already so large – and were, in fact, increasing – that they had caused price spreads between various pairs of futures contracts to widen to abnormal levels. Unbeknownst to SDCERA, the Fund's fortunes thus depended upon keeping the price spreads unusually wide. Defendants continued to invest more -- not less -- money in natural gas, directly contrary to the assurances they provided to SDCERA.

11.     Upon information and belief, by the beginning of June 2006, at least 50% of the Fund's capital was allocated to energy trading. At the same time, as noted above, SDCERA was being specifically and directly – but falsely – told by defendants that the Fund would be decreasing the amount of capital allocated to energy trading. Instead, Advisors continued to buy natural gas contracts to maintain the wide spreads and high contract prices that its trading had created.

12.     Upon information and belief, in 2006, defendants increasingly allocated disproportionate amounts of the Fund's capital to the energy portfolio, specifically to Hunter's natural gas trading. In the Spring and Summer of 2006, defendants increased the Fund's allocation to natural gas even after Maounis had personally assured Rocaton and SDCERA that the Fund was reducing its exposure to that market. Winkler and Jones were complicit in Maounis's decisions, by action and inaction, and never informed SDCERA that the Fund was investing so heavily in energy or in natural gas specifically. By May 2006, defendants knew or

should have known that the Fund's natural gas positions were so large relative to the market and the market's illiquidity that they could not exit the Fund's positions without significantly impacting prices. However, instead of planning a controlled unwind, and in an effort to sustain the illusion of profits, defendants sought to ''prop up'' the market and these spreads by taking even larger long positions in natural gas.

13.     The Fund lacked the risk management controls that Maounis, Winkler, and Jones had described to SDCERA in March and July 2005. In practice, defendants recklessly ignored even the most basic principles of risk management and controls, let alone the risk management defendants represented to SDCERA to induce its investment in the Fund.  Advisor's management, including Maounis, Winkler, and Jones, allowed Hunter, a 32-year old energy trader with a known history of taking excessive risk in volatile markets, to trade remotely from Canada and to take enormous, highly-leveraged, and unhedged positions that endangered the investors' investments in the Fund.

14.     Upon information and belief, defendants either did not conduct standard tests to measure the Fund's natural gas risk exposure, like scenario or stress testing, or ignored the results of such tests. In fact, the size of the Fund's positions relative to the natural gas futures market was such that the market could not absorb any significant liquidating trades by the Fund without such trades effecting the entire market.

15.     Upon information and belief, personnel in Advisor's risk management department who were assigned to oversee Hunter's trades, specifically and repeatedly warned Maounis of the inappropriate risk Hunter was taking, and of the fact that the risk was highly leveraged and not being hedged.  Upon information and belief, contrary to such warnings, Maounis knowingly, recklessly and in violation of his fiduciary duties overrode the risk

department's control recommendations and encouraged Hunter to maintain or increase his bet on

natural gas prices. Upon information and belief, Winkler and Jones were also aware of Hunter's

energy trading, yet they too failed to take steps to prevent Maounis's breach of his duties, and

thereby actively participated in Maounis's breach of fiduciary duty and the similar breach by

Advisors.

### The Collapse Of The Fund

16.     Predictably, when gas prices temporarily turned against the Fund in early

September 2006, the Fund could not exit its positions. The Fund lacked sufficient capital to

cover its losses, and there was no financial counterparty who was willing to assume the positions

Advisors had caused the Fund to accumulate without extracting costly concessions which were

initially unacceptable to the defendants. As a result, by the end of September 2006, Advisors

reported that, due to losses from its energy trading practices, the Fund had lost approximately $6

billion of the $9 billion under the management of Advisors. The attendant margin calls from

Advisors's lenders further constrained the Fund's liquidity, ultimately compelling Advisors to

sell the Fund's entire energy portfolio at a significant discount, and to sell significant additional

assets in the Fund's other portfolios, resulting in even further losses to SDCERA and other

investors.

17.     As noted above, as late as August 2006, defendants Maounis and Advisors were

still telling SDCERA that the risks from the Fund's energy trading portfolio had been

appropriately decreased and hedged. Consequently, SDCERA was kept in the dark as to the

peril which the Fund actually faced and, thus, SDCERA forewent invoking its contractual right

to demand redemption of its investment. When the house of cards into which defendants had

built the Fund came crashing down along with the price of natural gas, SDCERA immediately

demanded redemption. On September 28, 2006, however, Advisors unilaterally suspended

redemptions from the Fund.

<u>JURISDICTION AND VENUE</u>

18.     The claims asserted herein arise under 15 U.S.C. § 78j and New York and

Delaware common law.

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1367 because the claims either involve questions arising under the federal securities laws or are

state-law claims arising out the same transaction or occurrence giving rise to SDCERA's federal-

law claims.    Alternatively, the Court has jurisdiction pursuant to 28 U.S.C. §1332 because the

plaintiff and all of the defendants are citizens of different states, and the amount in controversy

exceeds $75,000.    The governing laws selected in the Fund's Limited Liability Company

Agreement ("LLC Agreement") and Subscription Agreement ("Subscription Agreement") are

Delaware and New York, respectively.

20.     This Court has personal jurisdiction over all of the defendants pursuant to 15

U.S.C. § 78aa, Rule 4(c)of the Federal Rules of Civil Procedure and section 301 of the New

York Civil Practice Law and Rules.

21.     The defendants' trading activities also occurred in part on the New York

Mercantile Exchange ("NYMEX"), which is located in this district.   NYMEX exercised

oversight for those trades and, upon information and belief, before the Fund collapsed, NYMEX

warned Hunter and Advisors to reduce the Fund's exposure to the energy market, a warning

which defendants ignored.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, N.Y. CPLR § 501,

and Section 12(a) of the Subscription Agreement, which expressly permits venue of this dispute

in this district.

## THE PARTIES

23.     Plaintiff SDCERA is an independent association established by California's

County Employees Retirement Law of 1937.  SDCERA collects and invests retirement funds in

order to provide retirement and associated benefits for approximately 33,000 eligible employees,

former employees who are vested, and retirees of the County of San Diego and other

participating employers.  The employees, former employees, and retirees include, among others,

sheriffs, librarians, park rangers, and social workers.  SDCERA, with oversight from its board of

trustees, manages a defined benefit plan qualified under section 401(a) of the Internal Revenue

Code.

24.     Defendant Advisors, a Delaware limited liability company, is the managing

member of the Fund.  The Fund is a private investment fund, known as a "hedge fund," that

issued limited liability interests to investors, including SDCERA, pursuant to Private Placement

Memoranda and Subscription Agreements.  Advisors is registered as a commodity pool operator

with the Commodity Futures Trading Commission, is a member of the National Futures

Association, and, upon information and belief, has been affiliated with SEC-registered broker-

dealers who are members of the National Association of Securities Dealers.  The principal office

of Advisors and the Fund is located in Greenwich, Connecticut.

25.     Defendant Maounis is the co-founder, managing member, principal, President,

and Chief Investment Officer of Advisors.  Upon information and belief, Maounis is a resident of

Greenwich, Connecticut.

26.     Defendant Winkler, an attorney, is the Chief Operating Officer of Advisors, and, upon information and belief, is a resident of Greenwich, Connecticut.

27.     Defendant Jones is Advisors's Chief Risk Officer. Upon information and belief, he also resides in Greenwich, Connecticut.

28.     Defendant Hunter was, at various times, a trader at Advisors or Advisors's co-Portfolio Manager or Portfolio Manager for its energy trading desk. Hunter also headed Advisors's natural gas trading desk. Hunter is no longer employed by Advisors. Hunter is, upon information and belief, a resident of Calgary, Alberta, Canada. Upon information and belief, Hunter's trading activities involved hundreds of millions of dollars of energy trades transacted in this district, cleared in this district, and paid for in this district.

## BACKGROUND

### Duties Owed To SDCERA

29.     By virtue of their fiduciary relationships and contractual obligations, Advisors and its principals, Maounis, Winkler, and Jones, owed SDCERA, as an investor in the Fund, the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to control and manage the Fund and its investments. Maounis, Winkler, Jones, Hunter, and Advisors also had a duty to SDCERA to exercise good faith and diligence in the administration of the affairs of the Fund and in the use and preservation of the Fund's property and assets. As an energy trader, co-Portfolio Manager, and Portfolio Manager at various times throughout the relevant period, Hunter also owed a duty of care in performing his job with the requisite skill and diligence to invest funds in the best interest of Advisors's investors, including SDCERA. All of the defendants also had an obligation to avoid deceit, including material

misstatements of fact, and misleading omissions of facts, in inducing the SDCERA to invest in the Fund and to persuade SDCERA to hold its investment in place.

## Structure Of The Investment

30.     The Fund was structured as an unregistered pooled investment, privately organized and administered by Advisors, a professional investment manager. The Fund was organized to fit within exemptions from the registration requirements of the Securities Act of 1933, the Investment Company Act of 1940, and the Investment Advisors Act. Consistent with these exemptions, sales of interests in the Fund were limited to "qualified purchasers," i.e., individuals or entities like SDCERA having experience with securities investing and which invest at least $10 million in the Fund, thus avoiding certain regulatory requirements that otherwise would apply when issuing securities.

31.     In order to invest in the Fund, SDCERA became a party to the Fund's LLC Agreement and received a Confidential Private Placement Memorandum ("PPM") dated March 2003. SDCERA also purchased an interest in the Fund pursuant to the Subscription Agreement. The LLC Agreement provided that Advisors had the sole power to manage and operate all aspects of the Fund's investing and trading. The PPM stated that Maounis managed and operated the Fund and was "responsible for all investment functions (including the allocation of the Fund's capital among the various trading strategies employed by the Manager [Advisors]), as well as the overall management and supervision of the Manager [Advisors]."

32.     The PPM and LLC Agreement describe various methods by which Members may make withdrawals from the Fund. The three primary methods of withdrawal set out in the PPM and LLC Agreement are Anniversary Withdrawals, Annual Appreciation Withdrawals, and

Quarterly Withdrawals, all of which permit withdrawal on permitted dates without regard to the

length of time the investor has been invested in the Fund.

The Purportedly Diverse And Risk-Controlled Nature Of The Investment

33.    In the PPM, during due diligence discussions in March 2005, and at the July 2005

face-to-face meeting with the plaintiff's board discussed above, Maounis, Winkler, Jones, and

Advisors marketed the Fund to SDCERA as a diverse, multi-strategy hedge fund with sound risk

management practices.  In March 2005, Maounis, Winkler, Jones, and Advisors told SDCERA

that the Fund's risk control programs were proactive such that the risk management team worked

directly with portfolio managers in deciding what investments to make (i.e., in designing and

implementing the composition of the Fund's investment portfolio in the first instance), and

therefore was "proactive," not merely "reactive."

34.    The PPM states that the Fund is a multi-strategy investment fund focused on at

least six diverse investment areas:  convertible-bond arbitrage, merger arbitrage, equity

long/short, statistical arbitrage, and credit arbitrage.  Further, the Fund purportedly used three

types of investment strategies:  relative value, event-driven and directional, which the PPM

described in detail.

35.    The PPM lists general "risk factors" that may affect the value of an investment.

The document discloses that investing in the Fund is "speculative" and involves a high degree of

risk, leverage, and volatility.  However, the PPM also repeatedly assures potential investors such

as SDCERA that the Fund uses diversification, hedging, and other sound risk control procedures.

For example:

The Fund is a *multi-strategy* price investment company that employs a
*diverse group of trading strategies* . . . The Fund trades globally in a
*broad range* of equity and debt securities, derivatives and other financial
instruments.

***Risk management is integral*** to the Manager's [Advisors's] goal of identifying investment opportunities having superior risk/reward parameters. Accordingly, the Manager seeks to ***continuously monitor the risk parameters and expected volatility of the Fund's overall portfolio and attempts to prevent over-concentration of the portfolio in any particular asset, strategy or market.***

[Even when a risk is not hedged, the Manager may nevertheless] ***instead rely on diversification to control such risk.***

[Advisors employs a] Chief Risk Officer [Jones, with experience at Goldman Sachs in the development of] ***risk-limited portfolio management techniques.***

Certain of the Manager's strategies require the use of ***quantitative valuation models*** that it has developed over time, as well as valuation models developed by third-parties and made available to the Manager. ***[There is a] necessity of continuously updating these models . . . .***

***[D]iversification is an integral part of the Manager's overall risk management process . . . .***

(Emphases added.)

36.     SDCERA relied upon the attenuated PPM representations in making and holding its investment in the Fund. Even the amended PPM distributed by Advisors in January 2006 reaffirmed many of the representations in the March 2003 PPM as set forth above.

37.     The PPM omits material information and misrepresents the true nature of the risk defendants intended to employ in their management of the Fund – *i.e.*, it failed to disclose that Advisors would cease (or had ceased by the time plaintiff made its investment) operating the Fund as a diverse multi-strategy fund with sound risk controls (including the type of controls specifically promised in the PPM), that it would become (or had already by then become) a highly-concentrated natural gas fund, so much so that Advisors would allow a single trader, with a known history of taking excessive risk in volatile markets, to trade without supervision or an exit strategy, placing the Fund's entire capital at risk.  Indeed, upon information and belief, by

the end of June 2006, the Fund's investment in energy was 125% greater than its investment in all of the other "strategies" combined.

<u>SDCERA's Decision To Invest In The Fund</u>

38.     In August 2002, SDCERA entered into a Consulting Engagement and Advisory Agreement with Rocaton Advisors, L.L.C. ("Rocaton"), pursuant to which Rocaton provided SDCERA investment advice. In July 2004, SDCERA and Rocaton expanded this engagement to include hedge fund consulting in anticipation of including hedge funds as part of SDCERA's Alpha Engine." The Alpha Engine is a collection of value-adding strategies that provides the opportunity for enhancing returns and efficiency through prudent, risk-controlled diversification. The Alpha Engine uses swap contracts on the Standard & Poor 500 index to track the performance of that portion of the U.S. stock market, to which strategy return from hedge fund managers was later added. The program has always placed great emphasis on the control of risk as a primary objective.

39.     In late-December 2004 or early-2005, Rocaton introduced the Fund to SDCERA. Rocaton rated the Fund as a "buy" due, upon information and belief, to Advisors's representations regarding the Fund's diverse and complimentary set of investment strategies, and its rigorous risk management controls. Upon information and belief, Advisors represented to SDCERA that Advisors employs a sophisticated and independent risk management team; that Jones viewed his position as being more than that of a "compliance" position and that the Rocaton actively worked with each sector head in creating a portfolio with the most attractive risk/reward profile given each portfolio manager's view; and that Advisors's continued use of a protective option portfolio to hedge the imbedded tails of their core strategies should create a less volatile fund which was also less susceptible to sharp market dislocations.

40.     With respect to Advisors' investment philosophy and process, upon information and belief, Advisors represented to Rocaton that Advisors was founded as a multi-strategy hedge fund that endeavors to maximize absolute returns on a risk-adjusted basis; that Advisors manages multi-strategy assets through a process that combines dynamic capital allocation and bottom-up position selection overlaid with real-time risk management; that capital allocation is reviewed weekly in an investment committee meeting that includes the head of each strategy, Jones, and Maounis; that those strategies with the greatest opportunity set and offering the most attractive risk-adjusted opportunities receive capital at the expense of strategies with less appealing opportunities and/or risk profiles; that all capital allocation decisions are made within well-defined risk and expected parameters; that strategies and positions will receive or lose capital provided the capital allocation decision does not violate the Fund's predefined  risk budget; that Advisors also employs a dedicated risk management team headed by Jones and charged with monitoring risk at both the multi-strategy and individual strategy level; and that as a further risk-management measure, Advisors continuously maintains three to five percent (3-5%) of the portfolio in a basket of protective puts designed to insulate the portfolio from a wide range of market dislocations.

41.     Upon information and belief, Rocaton Advisors, L.L.C. ("Rocaton") met with Advisors several times. In March 2005, SDCERA's in-house investment professionals, Chief Investment Officer David Deutsch ("Deutsch") and Assistant Chief Investment Officer Lisa Needle ("Needle"), visited Advisors's offices and operations in Connecticut as part of SDCERA's due diligence process. Maounis, Winkler, and Jones met with Deutsch and Needle at that time. A representative of Rocaton also participated in SDCERA's meeting with Advisors in Connecticut at that time.

42.     During this March 2005 meeting, Advisors introduced the portfolio managers of the Fund's assets to discuss the various portfolio manager's strategies.  As part of this presentation, Advisors represented that "energy trading" was only one of five substantial sectors that the Fund was pursuing.

43.     At this meeting, Advisors also touted the Fund's superior risk management controls, emphasizing the size of the Fund's 14-member risk management team, three (3) of whom were supposedly specifically assigned to energy trading.  Maounis, as well as Winkler and Jones, further assured SDCERA that the risk management team was not just a reactive team, but a proactive one as well.  SDCERA's representatives were told that the risk control team not only had an oversight role, but that it worked in conjunction with the portfolio managers to minimize risk in a proactive manner in the development of the Fund's investments.  To further demonstrate the credibility, effectiveness, and sophistication of the risk control team, SDCERA's representatives were specifically shown Advisor's risk control area, as well as the trading area and other portions of Advisor's Connecticut facilities.

44.     On July 21, 2005, Maounis personally attended and made a presentation about Advisors and the Fund to SDCERA's Retirement Investment Board in San Diego, California.  During his presentation, Maounis stressed the myriad strategies that Advisors purportedly employed: "'We have expertise for example in technology, utilities, financial services, insurance, healthcare, consumer products, and cyclicals . . . and we also have a convertible trading team.'" Maounis also said that "'what [the Board] should be looking for in managers are multi-strategy managers'" like Advisors.  Playing to the fiduciary duties of SDCERA's Board members, Maounis made the following statements to the Board regarding Advisors's methods for avoiding risk: "'When we analyze a bond or a stock, we're not looking for a 500, uh, a five times return on

investment. We want to make investments where if we spend a million dollars, we're going to make a million and a half dollars back. We want to make that decision because that decision is in fact in the best interest of our investors. . . . *The most important thing for us is really to minimize the downside* . . . . *We don't want to hit home runs, we want to get singles and doubles. So we want to minimize that downside* . . . . *It's not okay to lose money in the year. And that's really what we try to do* . . . . *We're targeting high single-digit to low double-digit returns with small volatility. That's what we're targeting.*" (Emphases added.) Finally, Maounis further firmly assured SDCERA's Board that "*we have a fiduciary responsibility to our investors* . . . ." (Emphasis added.)

45. Indeed, throughout the due diligence period, Advisors repeatedly represented the Fund as being a highly diversified multi-strategy hedge fund with a sophisticated and independent risk management team and a broad base of diversified strategies with a global focus. SDCERA was told that Advisors's risk management team works with the portfolio managers for each of the strategies in constructing their portfolios. This, in turn, purportedly allowed the portfolio managers to be more cognizant of the sizes of their positions and the risk they were taking and this helped them to construct their portfolios more intelligently.

Brian Hunter

46. Upon information and belief, Hunter joined Advisors in 2004 as a natural gas trader. Upon information and belief, Maounis, with the approval, knowledge, and participation of Winkler and Jones, hired Hunter in bad faith, knowing Hunter's history at Hunter's previous employer, Deutsche Bank. Upon information and belief, Hunter began working for Deutsche Bank in 2001, and during a single week in December 2003, Hunter's group at Deutsche Bank lost $51.2 million, eliminating more than 70% of the Bank's energy trading profits for that year.

Upon information and belief, Deutsche Bank consequently demoted Hunter from head trader to analyst and denied him a bonus for 2003 based on the net losses by the energy group. Upon information and belief, Hunter left Deutsche Bank in April 2004 and subsequently filed a lawsuit in New York Supreme Court claiming that Deutsche Bank constructively fired him.

47.    Upon information and belief, Hunter initially was very successful at Advisors. Upon information and belief, Hunter accounted for the vast majority of the Fund's energy portfolio's profits in 2004 and 2005. In particular, in 2005, Hurricane Katrina shocked the natural gas market and positively affected Hunter's trades for that year. Upon information and belief, Hunter's compensation for 2005 was $75 million to $100 million, making him the highest paid trader at Advisors and, according to *Trader* magazine, one of the highest paid traders in the industry. Upon information and belief, in April 2005, Advisors's competitor, SAC Capital Advisors LLC, offered Hunter a $1 million bonus to join that fund. Upon information and belief, Maounis and Advisors were eager to retain their "star" energy trader because the Fund's convertible bonds, credit bets, and equity positions were not performing well. Upon information and belief, for this reason, Maounis guaranteed Hunter a $10 million retention bonus and made other concessions, including allowing Hunter to leave Greenwich and trade remotely from his native Canada.

48.    When SDCERA's representatives visited Greenwich during due diligence in March 2005, they met with certain portfolio managers and were given the portfolio managers' written biographies – but SDCERA was not provided with any information on Hunter by Maounis, Winkler, or Jones at this meeting . Because Hunter did not hold the title of Portfolio Manager during the pre-investment due diligence period, no one from SDCERA met with Hunter or even knew about him until 2006, when Advisors announced that Hunter would replace Harry

Arora as the Portfolio Manager for the Fund's energy desk. This announcement was misleading, as set forth below.

49.     At no time during the due diligence period did Maounis, Winkler, Jones, or Advisors provide any information to SDCERA about Hunter. Consequently, SDCERA had no knowledge of Hunter's background, training, experience, or role at the Fund before investing in the Fund.

50.     Effective September 1, 2005, in reliance on Advisors's representations during the due diligence process, including the representations made by Maounis, Winkler, and Jones to Deutsch and Needle at the March 2005 meeting and the statements made by Maounis personally to SDCERA's Board at its July 21, 2005 Board meeting, the Subscription Agreement was executed and SDCERA invested $175 million in the Fund, thereby becoming a "member" of the Fund.

51.     As a condition precedent to investing in the Fund, Advisors required that all investors keep confidential certain operating information that Advisors provided to investors. A side letter agreement (the "Confidentiality Agreement") was therefore prepared and became effective September 1, 2005, which permitted Rocaton to receive certain information regarding the Fund's business and assets on behalf of SDCERA. Upon information and belief, but for the misrepresentations made by defendants to Rocaton, Rocaton would have warned SDCERA of the truth regarding the unacceptable risks associated with investing or holding its investment in the Fund.

Background In Natural Gas Trading

52.     Natural gas is sold as a commodity. Commodity markets are inherently volatile, meaning the price of commodities can change often and drastically. Natural gas is one of the

most volatile commodities on the market. It is not only continuously volatile, but also highly volatile; it can have several days of 150% annualized volatility, and then retreat to 40% annual volatility. Natural gas futures are even more volatile than natural gas commodity contracts.

53.     Given this volatility, risk management operations and an exit strategy are essential components of natural gas trading. Typically, top-level management is responsible for setting guidelines and risk limitations, and the risk management team is responsible for ensuring that traders comply with those directives and do not expose a firm to excessive risk. Risk management operations rely on statistical, mathematical, and financial tools to ensure that risk exposure is kept under control.

54.     Maounis acknowledged the volatility of natural gas trading and emphasized to investors (including SDCERA) certain ways that Advisors purportedly controlled the risk of such trading. In November 2005 correspondence to the Fund's investors with an update on October 2005 performance, Maounis stated that natural gas markets have "pull-backs and volatile movements from time to time," and that, therefore, Advisors "continue[s] to play these markets largely from a relative value perspective, with great reliance on both options and spread transactions." In fact, these statements did not accurately characterize Advisors's natural gas investments.

The Defendants' Extremely Reckless Trading Practices

55.     In September 2005, Advisors reported the best month in the Fund's history due to Hurricane Katrina's positive effect on Advisor's energy trading positions. Hurricane Katrina, however, was an extreme event. On October 10, 2005, during a conference call among representatives of Advisors and Rocaton, Advisors stated that it would reduce capital attributed to energy trading from 36% to 25%. That reduction, however, never happened.

56.     Maounis had the ultimate authority to make decisions regarding the Fund's capital allocation.  Despite marketing the Fund as a multi-strategy fund, Maounis allocated a disproportionate amount of the Fund's capital to Hunter's natural gas trading in 2005 and 2006. Upon information and belief, Maounis did not discuss allocation decisions with his portfolio managers.  Upon information and belief, Maounis discussed capital allocation issues on an almost daily basis at lunch with Winkler.  Indeed, Winkler was intimately involved in all of Advisors's operations and key decisions.  According to former Advisors's employees, Winkler "needed to approve everything" and was "extremely fastidious" in the way he ran Advisors's operations.

57.     In apparent reliance on Hunter's trading results in 2005, Maounis continued to allocate a large amount of capital to Hunter's natural gas trading in 2006, apparently hoping for a repeat performance.  In 2006, Maounis agreed that Hunter was to receive 15% of his gains (with the extra five percent (5%) to come from Advisors's incentive fee), a departure from the compensation package offered to other portfolio managers who were paid approximately the industry standard of 7% to 12% of their gains.  Upon information and belief, Winkler was knowledgeable about and participated in all of these decisions relating to Hunter's compensation. None of these decisions was disclosed to SDCERA.

58.     Upon information and belief, with Maounis's and Advisors's blessing and knowledge, Hunter made increasingly larger and riskier natural gas trades with the increased capital Advisors and Maounis allocated to him in 2006.  Upon information and belief, Hunter's positions became so large during the Spring of 2006 that Amaranth effectively was the natural gas spread market.  As further explained in an article published in *HedgeWorld USA, Inc.* in 2006, "The natural gas market is not that big. [Amaranth] had billions of dollars levered. The

notional amount they commended [sic] was tens of billions of dollars. . . . All hedge funds knew they were dominating the spread."

59.     According to the non-profit organization, Industrial Energy Consumers of America ("IECA"), at one point Advisors controlled at least 100,000 contracts, or the equivalent of one trillion cubic feet of natural gas, representing 54% of the monthly demand in the United States.  The actual number is likely higher because many of Advisors's trades were OTC trades whose positions did not have to be declared and may therefore not have been included in the IECA's calculations.

60.     Upon information and belief, Advisors imposed no size thresholds, concentration limits, or other measures to constrain Hunter's accumulation of natural gas.

61.     In addition to betting heavily on the spread between March and April 2007 natural gas prices, Hunter replicated this basic "spread trade" for every available March and April, from 2008 to 2012.

62.     In natural gas commodity trading, spreading the trades over multiple calendar years does not render the positions diversified because the contracts for different years can move in the same direction.  Instead, taking far-forward positions often amounts to a liquidity trap because far-forward market trades are often conducted over-the-counter and have significantly fewer traders, making them more difficult to exit than natural gas contracts for months close at hand.  Maounis, Winkler, Jones, and Advisors allowed Hunter to take reckless and extreme far-forward positions despite knowing, and repeatedly being warned of, the risks of taking such positions.

63.     Hunter's trading strategy was reckless and fundamentally flawed.  Upon information and belief, Hunter was temporarily able to move the price of natural gas spreads

artificially with the huge positions that the other defendants permitted him to take, contributing to great increases in unrealized profit and manager and trader compensation. Upon information and belief, Hunter's positions, combined with the illiquid nature of the market, allowed him to maintain or widen the spread of his own trades on NYMEX. In other words, because Hunter was buying so many of the contracts, the large spread price was supported, even increased, by Hunter's purchases, resulting in Advisors reporting huge paper profits for the Fund. Had Advisors not permitted Hunter to be in the market purchasing so many of the same contracts, the price for the contracts would not have been nearly as high. In other words, Hunter used investors' funds to help Advisors report large paper profits which were used to scalp advisory fees on illusory "profits." Upon information and belief, because Hunter's positions were heavily leveraged, the prices could only be supported as long as the Fund's lenders were willing to lend the Fund money to buy the contracts. When the financing was no longer available, Hunter could no longer prop up the price of his spread trades through additional purchases, and the market would inevitably collapse, which is exactly what happened in September 2006.

64.    Compounding the risk created by Hunter's undisclosed trading practices was the absence of the represented risk management and controls. Contrary to the other defendants' representations of the Fund's strict adherence to risk controls, upon information and belief, no formal written risk control policies were provided to portfolio managers, and, accordingly, no written risk management manuals were to be found on the energy traders' desks.

65.    Defendants apparently imposed little or no risk control on the energy portfolio, particularly as compared to risk controls for other portfolios of the Fund. Upon information and belief, for example, with regard to its emerging markets portfolio, Jones ensured that the portfolio manager knew how much capital every trade cost the Fund. Jones required the

maintenance of ten percent (10%) cost-of-risk capital against emerging market trades. By way of example, if the emerging markets portfolio manager wanted to make a $100 trade, the Fund would spend $1 to make the trade and then set aside $9 in a money market account, making $10 the amount of risk capital for that trade. This way, if the investment were to go down, the Fund still had a comfortable cushion against future declines. Without this cushion, the Fund would be out of capital, at least against those trades. Upon information and belief, at the direction of Maounis, Winkler, and Jones, however, Hunter was not held to any such standards of risk capital controls.

66.     Jones's and Advisor's other risk management personnel were well aware of, and apparently approved, Hunter's large positions in natural gas contracts. Upon information and belief, Hunter's trading positions were tracked internally and were marked to market daily (and were regularly reconciled). Upon information and belief, other former employees of Advisors also directly questioned Maounis and Jones about Hunter's trading practices, and these warnings were also ignored by Maounis, Winkler, and Jones.

67.     Moreover, Hunter's positions required the posting of margin collateral that had to be adjusted regularly as the market value of the outstanding positions fluctuated. Upon information and belief, energy trades by Hunter were regularly reconciled by "a team of people."

68.     Veteran commodity traders and risk management personnel also utilize scenario analyses to evaluate worst-case outcomes. If such analyses had been conducted for Hunter's trades, such analyses would have examined what the range of natural gas spread relationships had been in the past. A scenario analysis would have shown that the price spreads between pairs of natural gas contracts had been highly volatile in the past and that a dramatic compression of those spreads was not an extremely rare event. Wild price movements such as those that

24

occurred in September 2006 were neither a rare, nor even a "highly improbable," event based on this history, and should have been anticipated by the defendants.

### Post-Investment False And Misleading Statements

69.     On March 29, 2006, Advisors announced by email that Harry Arora, the Portfolio Manager of its Energy trading desk, was leaving Advisors and would be replaced by Hunter. The email was sent by Steven Johnson and stated: "'We wanted to let you know that Harry Arora decided to leave Amaranth last night.  Although we are all sad to see Harry go, we wish him the best of luck in whatever he chooses to do next.  The energy team that Amaranth assembled under the leadership of Harry and Brian Hunter is among the strongest in the industry, and we expect the team's great success to continue under Brian's leadership.  Over the past four years, our energy trading business has grown from a small, two-person team into a 21-person trading desk, distributed across three offices, with associated risk management, back-office and technology support.  As you all know, energy trading is a core strategy at Amaranth, and we will continue to devote all necessary resources to ensure the strategy's continued success.''

70.     Lisa Needle of SDCERA spoke to Steven Johnson at Advisors about Arora's departure and Hunter's new role in a telephone conversation on April 4, 2006.  During this telephone call, Johnson reassured Needle as to Hunter's importance to the Fund; however, Advisors failed to disclose the following material information, including "red flags" about Hunter that were known to Maounis, Winkler, Jones, and Advisors:

(a)     Maounis hired Hunter despite knowing that Hunter was constructively fired by his previous employer when his group lost $51.2 million in one week, eliminating more than 70% of that employer's energy trading annual profits;

(b)     as discussed above, Advisors's risk management personnel had warned of the excessive risk associated with Hunter's trading practices, and their warnings were ignored; and

(c)     Arora told Advisors and Maounis before leaving the employ of Advisors that he was "uncomfortable with [the] size and concentration " of Hunter's trading.

71.     SDCERA's investment staff received the April 2006 statement of its account in late-May 2006. The statement showed that in April alone, the Fund's value had increased more than 13%. SDCERA's Needle was concerned about the amount of the increase and called Advisors's Johnson on June 2, 2006 to voice her concerns. Johnson made the following representations during the call which were intended to allay Needle's concerns:

(a)     the April gain was followed by a ten percent (10%) loss in Fund value in May;

(b)     the volatility was caused by "an extreme tail event" (i.e., an event that will either almost certainly happen or not happen) in the movement of natural gas prices;

(c)     Advisors was having the Fund cash out of its energy positions to reduce risk; and

(d)     Advisors was going to "move conservatively to capitalize the risk of the positions on [the Fund's] books."

These false representations were, upon information and belief, known by and authorized by Maounis, Winkler, Jones, and Advisors, even though they knew at the time that they were completely false. Yet, these representations reasonably satisfied Needle, and were relied upon (as defendants intended) by SDCERA in continuing to hold its investment in the Fund and not exercising its withdrawal rights under the Fund's documents at that time.

72.     In written correspondence to all investors, which Rocaton received on May 15, 2006, Advisors and Maounis explained that the April profits were due to "extreme volatility in the energy markets" and that "[a]s volatility increased during the month, we took the opportunity to reduce exposure in our natural gas … portfolio[] and realized profits." This last statement was also false.

73.     In telephonic communications with Rocaton on June 7, 2006, Advisors, Maounis, Jones, and Hunter represented the following (which Rocaton then relayed to SDCERA's Needle on June 13, 2006):

(a)     the primary driver of the drawdown was an "unprecedented" dry-up in liquidity in the natural gas market in the final two weeks of the month while Advisors was attempting to unwind its natural gas spreads through profit-taking and asset relocation;

(b)     the relationship between natural gas and fuel oil inverted as had never happened before;

(c)     as a result, Advisors had significantly recalibrated its risk models to incorporate this previously unforeseen degree of illiquidity and the inverse relationship between natural gas and fuel oil; and

(d)     as a further result, Advisors would be reducing its notional energy exposure by approximately 50%.

74.     Upon information and belief, each of the statements in subparagraphs 73(a), (b), (c), or (d) was false (as Maounis, Winkler, Jones, Hunter and Advisors were aware). These statements, however, were relied upon by SDCERA in holding its investment and not considering exercise of its withdrawal rights.

75.    Advisors's statements to Needle and Rocaton, as alleged in paragraphs 79 through 81, were false and misleading, upon information and belief, because:

(a)    Advisors was not cashing the Fund out of its energy positions. In fact, as of June 30, 2006, the Fund had increased its energy trading positions to 6,671 contracts and had 56% (or $4.76 billion) of its capital allocated to energy trading (indeed, the leverage ratio of that capital was 4.52, making $ 21.5 billion the notional value of the energy trades);

(b)    the Fund's paper profits in natural gas were significant, but they could not be realized because there was no possible exit due to the Fund's positions being too large for the market;

(c)    in order to raise cash, Maounis, Winkler, and Jones had the Fund's other traders, in areas like stocks and convertible bonds, reduce their positions, thereby increasing the Fund's exposure to Hunter's trades; and

(d)    Advisors had allowed Hunter to acquire such enormous, leveraged positions in the natural gas markets that Hunter influenced spreads and prices with his own trades.

Because Advisors had not provided position-level transparency to its investors, SDCERA could not see that the Fund's natural gas positions were massive as compared to the prevailing open interest in the exchange-traded futures market.

76.    SDCERA found out after the June 16, 2006 withdrawal deadline that in May 2006, the Fund experienced its worst loss since inception and that Hunter's natural gas trading book accounted for a majority of the loss. Rocaton received Advisors's May 2006 performance report describing the May losses on June 22, 2006, which was later in the month than normal and after the June 16, 2006 withdrawal request deadline. (Pursuant to the Confidentiality Agreement,

SDCERA's staff did not receive the report until even later.) In the report, Advisors and Maounis said that the losses were "a humbling experience" that supposedly led Advisors to "recalibrate how [they] assess risk in this business." However, there was no such recalibration; indeed, Hunter's response, endorsed by Maounis, Winkler, Jones, and Advisors, was basically to place even more and more natural gas trades.

77. In accordance with the LLC Agreement, June 16, 2006 was the final day for SDCERA to provide notice to make a quarterly withdrawal on July 31, 2006. Unaware of defendants' actual trading practices, including the losses in May 2006, and relying on Advisors's assurances that it was reducing the risk of the Fund's natural gas trading, SDCERA did not notify Advisors to withdraw its investment by the June 16 deadline. Had SDCERA known the truth, it would have requested a withdrawal of all of its assets in the Fund as of July 31, 2006, or earlier.

78. On August 10, 2006, Rocaton participated in a telephone conference with Maounis, Winkler, Jones, Hunter, and Advisors, during which defendants continued to represent falsely that:

(a) following the events of Spring 2006, during which Advisors's energy strategy experienced a sharp reversal or drawdown, Advisors had dramatically reduced the notional exposure (and increased the capital support requirements) of Advisors's energy strategy;

(b) this reduction in exposure was done as senior management recalibrated their expectations of how volatile and illiquid the strategy could become at stress points;

(c) the result of this recalibration was a roughly 50% to 60% reduction in notional energy and commodities exposure; and

(d)     Advisors's risk management personnel had spent significant time investigating the proper size of its positions in the natural gas market.

Upon information and belief, the context for these statements by Defendants was Rocaton's concerns about Advisors's plans to offer a stand-alone Global Energy & Commodities fund and the impact that such an offering could have on the liquidity of the Fund's energy investments.

79.     Then, in mid-August 2006, MotherRock, an unrelated hedge fund that traded in natural gas, collapsed and lost one-half of its value. On August 14, 2006, SDCERA's Needle contacted Advisors's Johnson about the Fund's investments in natural gas, and during that telephone conversation, Johnson falsely reassured Needle that the risk in the Fund's energy portfolio was ably managed and that Advisors was reducing the Fund's energy exposure. The true facts were known to Maounis, Winkler, Jones, Hunter and Advisors. Nevertheless, during the call, Johnson made the following specific intentional misrepresentations in order to allay Needle's concerns:

(a)     the Fund had a liquidity crisis in May, but in June things had snapped back in line;

(b)     50% of Advisors's risk budget for the Fund was allocated to energy;

(c)     Advisors had a 50-person risk management team, with three (3) people devoted solely to energy;

(d)     Advisors's risk management was focused on "fat tails" and "stress tests" regarding its energy exposure;

(e)     the Fund was invested in long-term energy futures;

(f)     65% of the energy investments were in natural gas, but that going forward, that amount would be reduced to 30-40%;

(g)     the Fund was short on summer gas, and long on winter gas;

(h)     the expected volatility of these gas positions was "cheap," meaning it could be controlled at a low price; and

(i)     Advisors was "long in the wings," meaning it was adequately hedged.

80.     In written correspondence to all investors, which Rocaton received on August 18, 2006, Advisors and Maounis, with, upon information and belief, the knowledge and participation of Winkler and Jones, similarly falsely reassured investors that with regard to the Fund's natural gas book, "we have taken steps since May to reposition our [natural gas] holdings . . . we are targeting a smaller allocation for natural gas in the future."

81.     Defendants' statements during the August 10, 2006 telephone call with Rocaton, the August 14, 2006 telephone call with Needle, and in the written correspondence to Rocaton received on August 18, 2006 were false and misleading for the following reasons:

(a)     Advisors took risks much greater than those expressed or implied by defendants' representations.

(b)     Advisors had not properly hedged Hunter's bets.

(c)     Advisors did not require Hunter to properly hedge his bets on his March and April spread trades from 2006 through 2012.

(d)     Instead of reducing its exposure to the energy market, the Fund was acquiring some of MotherRock's energy positions during the same month when Johnson told Needle that the Fund was reducing its exposure to energy.

(e)     The Fund's natural gas positions were so enormous that in many cases the Fund was the market, making the Fund's positions so illiquid that there was no party with whom to trade out of the positions. To the extent that there were any third parties, many of them were

"physical-market" participants who had taken positions to hedge risks intrinsic to their business, and as defendants knew, were therefore unlikely to unwind their trades. This is a characteristic of the natural gas futures market that is well-known to experienced natural gas traders.

82.     The facts set forth in paragraph 81 were never disclosed to SDCERA.

83.     Upon information and belief, in August 2006, managers at NYMEX became concerned over the size of the Fund's positions in natural gas and informed Advisors that the Fund's positions were too large. Advisors purportedly agreed to reduce its positions. NYMEX's warning, however, was never conveyed to SDCERA or Rocaton, and Advisors continued to trade on ICE and OTC, where the continuing enormity of its position could not be easily tracked.

84.     Hunter's enormous gamble would have paid off only if there were a particularly cold winter or a difficult hurricane season. Instead, weather reports indicated that Fall 2006 would be a mild hurricane season, followed by a mild winter. Natural gas prices continued to fall, and Hunter's spread positions collapsed. Hunter's bets on the spread price of March and April 2008 and 2009 natural gas contracts collapsed as those spreads narrowed. All of these adverse consequences were preventable and foreseeable and would have been identified had Maounis, Winkler, Jones, and Advisors employed the risk controls represented to SDCERA in March and July 2005 and promised in the PPM.

### The Collapse And The Aftermath

85.     The Fund began incurring huge losses in natural gas trades on Monday, September 11, 2006. That week, the Fund lost about $3.2 billion or 35% of its assets, with a loss of $560 million on Thursday, September 14, 2006, when natural gas prices fell ten percent (10%) in a single day. Historically, a ten percent (10%) drop in price for natural gas is not a large

32

amount, but what was large, and what hurt the Fund, was the number of positions it held relative to its capital base. The Fund's losses increased to $6.6 billion by month's end.

86.     On September 12, 2006, while at a Four Seasons restaurant, Winkler reportedly boasted that his fund had a 25% year-to-date return. Two days later, he attended a Goldman Sachs conference where he similarly talked up his fund to prospective investors – the same day that the Fund lost $560 million!

87.     After the collapse in mid-September 2006, Hunter no longer had access to capital to prop up his trades, and, upon information and belief, the spread between the March and April 2007 futures contracts fell from $2.49 during the last week of August 2006 to $1.15 by September 15, 2006.  By September 28, 2006, the spread fell to 42 cents.  Had Advisors required Hunter to properly hedge his trades, for example, by purchasing put options, then the Fund would have had cover when market prices dropped.  Instead, upon information and belief, Jones, with the knowledge and participation of Maounis and Winkler, had the Fund liquidate its positions in convertible bonds, equities, and European loans to meet margin calls on Hunter's energy trades.  But despite this drastic action, the Fund was still short of the cash it needed to meet all of the margin calls on its energy trades.

88.     As the market learned about the Fund's problems, its liquidity dried up, worsening its problems amid enormous margin calls.  As noted above, Defendants had formulated no exit strategy for the Fund's positions.  This failure was particularly devastating given the illiquid nature of the natural gas positions.

89.     On September 18, 2006, SDCERA issued a written request for full redemption.

90.     In the meantime, the Fund's losses kept mounting, and Advisors sent an email to its investors on September 20, 2006 estimating that as of September 19, 2006, the Fund had suffered month-to-date losses of 65% and year-to-date losses of 55%.

91.     Upon information and belief, later that same day, September 20, 2006, Advisors, Maounis, and Winkler accepted an offer for the Fund's natural gas positions from JP Morgan Chase ("JP Morgan") and Citadel Investment Group L.L.C. ("Citadel"). Upon information and belief, the sale cost the Fund approximately $5 billion, with $2.5 billion due to trading losses and $2 to $2.5 billion in concession fees demanded by JP Morgan and Citadel.

92.     With the sale to JP Morgan and Citadel, the Fund's losses swelled to $6 billion, making $420 million the average daily loss for September 2006.

93.     Despite these huge losses and the fact that Advisor's's risk control measures were proven to be practically nonexistent for energy trading, on September 22, 2006, during a telephone conference with all investors, Maounis continued to believe that investors would support the Fund, telling investors: "We have every intention of continuing business."

94.     On September 29, 2006, however, Advisors announced to investors that all redemption requests payable on September 30 and October 31, 2006, including SDCERA's request, were "temporarily suspended." To date, SDCERA's redemption requests have not been honored. The Fund has, however, commenced making liquidating distributions. To date, SDCERA has received approximately $61 million. SDCERA is informed and believes that the remaining balance of its capital account is less than $15 million.

95.     Had the defendants disclosed the true risks involved in the Fund, SDCERA either would have never invested in it in the first place, or would have exercised its withdrawal rights long before the Fund's collapse. Alternatively, had defendants adequately managed risk as

represented, the Fund would have been able to withstand the fall in prices in mid-September

2006.   Defendants, however, had leveraged the Fund's trading positions, instead of the Fund's

capital base, and had not adequately hedged their bets, so the Fund did not have enough cash to

meet withdrawals and margin calls, and investors like SDCERA lost most of their capital.

<u>COUNTS</u>

<u>COUNT I</u>

(Violation Of 15 U.S.C. § 78j, Section 10 Of the Securities and
Exchange Act Of 1934, and Rule 10b-5 Promulgated Thereunder)
(Against Maounis, Winkler, Jones, And Advisors)

96.      Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1

through 95 above as if fully set forth at length herein.

97.      In order to induce SDCERA to invest in the Fund, Defendants Maounis, Winkler,

Jones, and Advisors made several misrepresentations of material fact on which SDCERA relied.

These misrepresentations were made in March 2005 in Greenwich, Connecticut and in the PPM,

as described above.   Additionally, Maounis and Advisors made the misrepresentations at the July

21, 2005 Board meeting, as described above.   At the time each of these representations was

made, defendants specifically knew that the representations were false and intended that

SDCERA would rely on their false representations in deciding whether to invest in the Fund.

Some of the communications containing these misrepresentations were effected by means of the

United States mail and interstate telephone systems.

98.      In addition to these material misrepresentations of fact, Maounis, Winkler, Jones,

and Advisors also knowingly and intentionally omitted to disclose material facts which were

necessary to make the representations made, in light of the circumstances under which they were

made, not misleading, including those described above.

99.     In reasonable reliance upon the false and misleading representations and

omissions described above concerning facts of which SDCERA was not aware, SDCERA was

induced to, and did, invest $175 million in the Fund.  But for the defendants' misrepresentations

and omissions, SDCERA would not have invested in the Fund.

100.    As a direct result of this scheme or artifice to defraud SDCERA, SDCERA has

suffered compensatory damages in excess of $150 million, in an exact amount to be determined

at trial.

<u>COUNT II</u>
(For Common Law Fraud)
(Against Maounis, Winkler, Jones, And Advisors)

101.    Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1

through 95 and 97 through 100 above as if fully set forth at length herein.

102.    In making their statements to SDCERA's representatives at the March 2005

meeting, Maounis, Winkler, Jones, and Advisors knowingly and intentionally made the

misrepresentations and omitted to state material facts to SDCERA alleged above in order to

induce a large investment in the Fund by SDCERA.

103.    In making his presentation to SDCERA's Board on July 21, 2005, Maounis

knowingly and intentionally made the misrepresentations and omitted to state material facts to

SDCERA alleged above in order to induce a large investment in the Fund by SDCERA.

104.    SDCERA reasonably relied upon the statements referenced herein in determining

to invest $175 million in the Fund.

105.    In its communications with SDCERA and Rocaton after the investment was

made, including but not limited to the communications on March 29, 2006, April 4, 2006, May

15, 2006, June 2, 2006, June 7, 2006, June 22, 2006, August 14, 2006, and August 18, 2006,

described above, Advisors, at the direction and with the knowledge of Maounis, Winkler, and Jones, knowingly and intentionally made the misrepresentations and omitted to state material facts to SDCERA alleged herein in order to induce SDCERA to continue to hold its investment and not exercise its withdrawal rights.

106.    SDCERA reasonably relied on these post-investment misrepresentations and omissions when it did not give notice of its intention to withdraw its investment, as it was authorized to do under the Fund's organizational documents.

107.    SDCERA has suffered compensatory damages in excess of $150 million, in an exact amount to be determined at trial.

108.    In committing their fraud as alleged, Maounis, Winkler, Jones, and Advisors acted in reckless disregard for the truth, in conscious disregard for SDCERA's rights, and with malice and oppression so as to justify an award of punitive damages.

## COUNT III
### (For Gross Negligence)
### (Against Advisors, Maounis, Winkler And Jones)

109.    Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1 through 95, 97 through 100 and 102 through 108 above as if fully set forth at length herein.

110.    By Advisors's, Maounis's, Winkler's and Jones's failure and/or refusal to control for risk and adequately monitor Hunter's activities, despite knowledge of both Hunter's history and the excessive risk and growing volatility of Hunter's investments concentrated in one sector, Advisors, Maounis, Winkler, and Jones acted with reckless and deliberate disregard of SDCERA's rights as an investor that had entrusted its funds to them.

Advisors's, Maounis's, Winkler's, and Jones's gross negligence caused SDCERA

to suffer compensatory damages in excess of $150 million, in an exact amount to be determined

at trial.

## COUNT IV
### (For Breach Of Contract)
### (Against Advisors)

112.    Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1

through 95, 97 through 100, 102 through 108 and 110 through 111 above as if fully set forth at

length herein.

113.    In order to invest in the Fund, SDCERA entered into the Subscription Agreement

and LLC Agreement with Advisors. Pursuant to these contracts and the PPM, Advisors agreed

to allocate capital and manage the Fund as if it were a diverse multi-strategy hedge fund with

sound risk management policies. By concentrating the Fund's exposure in the energy sector, and

by failing to manage the Fund properly by, *inter alia*, failing to exercise proper risk controls,

Advisors willfully and knowingly breached the terms of its contracts with SDCERA, as well as

the covenant of good faith and fair dealing implied in every contract.

114.    As a result of the foregoing willful misconduct and breach of contract, SDCERA

has suffered compensatory damages in excess of $150 million, in an exact amount to be

determined at trial.

## COUNT V
### (For Breach Of Fiduciary Duty)
### (Against Advisors, Maounis, Winkler, And Jones)

115.    Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1

through 95, 97 through 100, 102 through 108, 110 through 111 and 113 through 114 above as if

fully set forth at length herein..

116.     Advisors, Maounis, Winkler, and Jones owed SDCERA, as an investor and member in the Fund, a fiduciary duty, which encompassed a duty to act honestly, openly, fairly, and in the best interests of SDCERA.

117.     By failing to properly manage the Fund, failing to exercise proper risk management and control over Hunter, concentrating the Fund's exposure in the natural gas sector, and by deliberately misleading SDCERA as to the Fund's investment strategies and risk controls before and after SDCERA made its investment, Advisors, Maounis, Winkler, and Jones intentionally, knowingly, and in bad faith breached their fiduciary duties to SDCERA.

118.     As a result of the bad faith breach of their fiduciary duties, SDCERA has suffered compensatory damages in excess of $150 million, in an exact amount to be determined at trial.

119.     In committing their breach of their fiduciary duties as alleged herein, Maounis, Winkler, Jones, and Advisors acted in reckless disregard for the truth, in conscious disregard for SDCERA's rights, and with malice and oppression so as to justify an award of punitive damages.

COUNT VI
(For Aiding And Abetting Breach Of Fiduciary Duty)
(Against Hunter, Winkler, And Jones)

120.     Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1 through 95, 97 through 100, 102 through 108, 110 through 111, 113 through 114 and 116 through 119 above as if fully set forth at length herein..

121.     Advisors and Maounis owed a fiduciary duty to SDCERA as alleged above in Count V. By failing to properly manage the Fund, failing to exercise proper risk management and control over Hunter, concentrating the Fund's exposure in the natural gas sector, and by deliberately misleading SDCERA as to the Fund's investment strategies and risk control, Advisors and Maounis breached their fiduciary duties to SDCERA.

122.    By knowingly investing and trading in excessively risky and volatile investments, knowingly failing to adequately protect against excessive losses, investing excessive amounts in natural gas trades, operating with inadequate risk controls, and participating in telephone conference calls and meetings with SDCERA or SDCERA's representatives in which the other defendants knowingly and intentionally made fraudulent misrepresentations and omissions, Hunter actively participated in, assisted in, and also had actual knowledge of the other defendants' breaches of their fiduciary duties to SDCERA.

123.    By knowingly failing to adequately protect against excessive losses, permitting Hunter to invest excessive amounts in natural gas trades, permitting Advisors, Maounis, and Hunter to operate without adequate risk controls, and participating in telephone conference calls and meetings with SDCERA or SDCERA's representatives in which the other defendants knowingly and intentionally made fraudulent misrepresentations and omissions, Winkler and Jones actively participated in, assisted in, and also had actual knowledge of the breaches of fiduciary duties to SDCERA by Advisors and Maounis.

124.    As a result of the other defendants' bad faith breaches of their fiduciary duties as alleged herein, and Hunter's, and Winkler's, and Jones's acts and omissions in aiding and abetting these breaches, SDCERA has suffered compensatory damages in excess of $150 million, in an exact amount to be determined at trial.

125.    In aiding and abetting the other defendants' breaches of their fiduciary duties to SDCERA as alleged herein, Hunter, Winkler, and Jones acted in reckless disregard for the truth, in conscious disregard for SDCERA's rights, and with malice and oppression so as to justify an award of punitive damages.

COUNT VII
(For Vicarious Liability Upon The Doctrine Of Respondeat Superior)
(Against Advisors, Maounis, Winkler, And Jones)

126.    Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1 through 95, 97 through 100, 102 through 108, 110 through 111, 113 through 114, 116 through 119 and 121 through 125 above as if fully set forth at length herein..

127.    At all times relevant to this litigation, Hunter was an employee acting within the scope of employment by Advisors and its principals Maounis, Winkler, and Jones, and in the furtherance of Advisors's business.  As Hunter's employers, Advisors, Maounis, Winkler, and Jones are responsible for the wrongful acts and omissions of Hunter as alleged herein.

128.    Advisors, as well as Maounis, Winkler, and Jones, as Hunter's supervisors and principals of Advisors, exercised authority over the course and conduct of Hunter's employment. As such, Advisors, Maounis, Winkler, and Jones are responsible for Hunter's acts and trading practices within the scope of Hunter's employment.

129.    As a result of Hunter's acts within the scope of his employment with Advisors, as alleged above, SDCERA has suffered compensatory damages in excess of $150 million, in an exact amount to be determined at trial.

COUNT VIII
(For Gross Negligence)
(Against Hunter)

130.    Plaintiff SDCERA repeats and realleges the allegations set forth in paragraphs 1 through 95, 97 through 100, 102 through 108, 110 through 111, 113 through 114, 116 through 119, 121 through 125 and 127 through 129 above as if fully set forth at length herein..

131.    By his position and scope of employment as an energy trader, co-Portfolio Manager, and Portfolio Manager for Advisors, Hunter owed a duty of care in performing his job with the requisite skill and diligence to invest funds in the best interest of Advisor's investors, including SDCERA.  As alleged herein, Hunter acted with gross negligence in breach of his duties to SDCERA.

132.    As a direct and proximate result, SDCERA has suffered compensatory damages in excess of $150 million, in an exact amount to be determined at trial.

PRAYER FOR RELIEF

WHEREFORE, SDCERA seeks judgment as follows:

1.      Awarding SDCERA all compensatory damages it suffered, including lost profits, consequential and incidental damages, as a result of the wrongful conduct of Defendants, in an amount to be determined at trial.

2.      Awarding SDCERA punitive damages in a just amount for Defendants' willful and wanton conduct.

3.      Awarding SDCERA pre-judgment and post-judgment interest.

4.      Awarding SDCERA its costs, expenses and attorneys' fees incurred in connection with this action.

5.    Awarding SDCERA such other and further relief as the Court finds just and

proper.

Dated: New York, New York
March 29, 2007

CROWELL & MORING LLP

By: _____
William J. McSherry, Jr. (WJM1194)
Steven D. Greenblatt (SG5105)
153 East 53rd Street
New York, New York 10022
Tel. No.: 212-223-4000
Fax No.: 212-223-4134

CROWELL & MORING LLP
Steven P. Rice
Queena Hu
3 Park Plaza, 20th Floor
Irvine, California 92614
Tel. No.: 949-263-8400
Fax No.: 949-263-8414

Attorneys for Plaintiff San Diego County
Employees Retirement Association

43