Stephen Senderowitz (SS-3045)
David E. Mollón (DM-5624)
Steven M. Schwartz (SS-4216)
Melissa O'Boyle (MO-9845)
Kristen Grisius (KG-8231)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Defendant Amaranth Advisors L.L.C.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION, | : |
| Plaintiff, | : |
| - against – | : |
| NICHOLAS M. MAOUNIS, CHARLES H. WINKLER, ROBERT W. JONES, BRIAN HUNTER and AMARANTH ADVISORS L.L.C. | : |
| Defendants. | : |

07 Civ. 2618 (DAB)

Oral Argument Requested

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT BY DEFENDANT AMARANTH ADVISORS L.L.C.

**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
(212) 294-6700

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................................................ iv

Preliminary Statement ............................................................................................... 1

Factual Background .................................................................................................. 6

   A.   Structure of the Fund ..................................................................................... 6

   B.   SDCERA's Decision to Invest in the Fund.................................................... 6

   C.   The Fund Achieves Record Gains and then Suffers Substantial Losses .............................. 7

   D.   Winding Down of the Fund ............................................................................ 9

   E.   SDCERA's Complaint.................................................................................... 9

Argument ............................................................................................................... 10

I. SDCERA'S Securities Fraud Claim (Count I) Should be Dismissed for
Failure to State a Claim............................................................................................ 10

   A.   SDCERA's Securities Fraud Claim Based on Alleged Oral Misrepresentations
Should be Dismissed Because Provisions in the Subscription Agreement and
the 2003 PPM Preclude Justifiable Reliance ..................................................... 11

   B.   SDCERA's Securities Fraud Claim Based on Alleged Misrepresentations and
Omissions in the 2003 PPM Fails as a Matter of Law........................................ 12

        1.   The Bespeaks Caution Doctrine Compels Dismissal of SDCERA's Securities
Fraud Claim Based on the 2003 PPM........................................................ 13

            (a)  The Subscription Agreement and the 2003 PPM Fully Disclosed the
Speculative Nature of an Investment in the Fund.............................. 14

            (b)  The 2003 PPM Disclosed the Lack of a Diversification Policy
and that Amaranth Could Invest in any Single Market....................... 15

            (c)  The 2003 PPM Disclosures Regarding the the Fund's
Risk Management Practices............................................................. 17

        2.   SDCERA's Securities Fraud Claim Based on the 2003 PPM Fails
Because it is Premised on Allegations of Corporate Mismanagement....................... 19

i

# TABLE OF CONTENTS
(Continued)

**Page(s)**

C.  The Securities Fraud Claim Fails Because SDCERA has not Alleged Facts
Supporting a Strong Inference of Scienter .........................................................................20

1.  SDCERA Failed to Allege that Amaranth had a Motive to Commit Fraud .............20

2.  SDCERA Failed to Allege Facts Supporting a Strong Inference of
Conscious Misconduct or Recklessness .....................................................................21

II.  SDCERA'S Securities Fraud Claim Should also be Dismissed for Failure
to Plead with Particularity .......................................................................................................21

III.  SDCERA'S Common Law Fraud Claim (Count II) Should be Dismissed .........................23

A.  The Holder Claim is not Recognized in Connecticut ...................................................23

B.  Even if the Court Applies New York Law, SDCERA's Common
Law Fraud Claim Should be Dismissed........................................................................25

1.  SDCERA's Holder Claim Should be Dismissed for Failure to
Adequately Allege Justifiable Reliance .................................................................25

2.  SDCERA's Claim Premised on Alleged Misrepresentations After
June 16, 2006 Fails due to a Lack of Causation ....................................................28

IV.  The Claims for Gross Negligence (Count III) and Breach of
Fiduciary Duty (Count V) are Derivative Claims...................................................................29

V.  Even if the Gross Negligence and Fiduciary Duty Claims are not
Derivative They Should be Dismissed....................................................................................32

A.  Connecticut Does Not Recognize a Claim for Gross Negligence ................................32

B.  SDCERA Fails to State a Claim for Gross Negligence Under
New York or Delaware Law .........................................................................................32

C.  SDCERA Fails to State a Claim for Breach of Fiduciary Duty ....................................33

1.  SDCERA has not Alleged the Existence of a Fiduciary Relationship....................33

2.  SDCERA has not Sufficiently Alleged Breach of any Fiduciary Duty ..................34

# TABLE OF CONTENTS
(Continued)

Page(s)

VI.  SDCERA Fails to State a Claim for Breach of Contract (Count IV) ..................................... 35

    A.   Amaranth is not a Party to the Subscription Agreement and thus the Claim for Breach of that Agreement Should be Dismissed ............................................ 35

    B.   The Parties Expressly Agreed that No Liability Would Exist for Breach of the LLC Agreement ................................................................................................. 36

    C.   Plaintiff Failed to Plead Breach of any Actual Contractual Obligation .......................... 37

    D.   Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law ..................................................................... 38

VII.  SDCERA's Vicarious Liability Claim (Count VII) Should be Dismissed ............................ 39

Conclusion ....................................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABF Capital Management v. Askin Capital Management L.P.*,
  957 F. Supp. 1308 (S.D.N.Y. 1997)............................................................................31

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................................20

*Albert v. Alex Brown Management Services*,
  No. Civ. A 762-N and 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)....... 31-35

*Antigenics, Inc. v. U.S. Bancorp Piper Jeffray, Inc.*,
  No. 03 Civ. 0971, 2004 WL 51224 (S.D.N.Y. Jan. 9, 2004)......................................23

*Ari and Co. v. Regent International Corp.*,
  273 F. Supp. 2d 518 (S.D.N.Y. 2003)........................................................................38

*Azrielli v. Cohen Law Offices*, 21 F.3d 512 (2d Cir. 1994) ................................................13

*Belin v. Weissler*,
  No. 97 Civ. 8787, 1998 WL 391114 (S.D.N.Y. July 14, 1998) ................................11

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................................................10

*Bioski v. Castelano*,
  No. 0115265, 1995 WL 128276 (Conn. Super. Ct. Mar. 20, 1995) ...........................32

*Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, (D. Conn. 2003) ................................32

*Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ......................................10

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ............................................2

*Chanoff  v. U.S. Surgical Corp.*,
  857 F. Supp. 1011 (D. Conn.), *aff'd*, 31 F. 3d 66 (2d Cir. 1994).......................... 24-25

*Computech International, Inc. v. Compaq Computer Corp.*,
  No. 02 Civ. 2628, 2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002) .............................37

*Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230 (2d Cir. 2006)......................................25

*Cromer Finance v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ............................. 24-25

*CVC Claims Litigation LLC v. Citicorp Venture Capital Ltd.*,
  No. 03 Civ. 7936, 2006 WL 1379596 (S.D.N.Y. May 18, 2006)...............................38

## TABLE OF AUTHORITIES
(Continued)

*Daystar Construction Mgmt. v. Mitchell,*
   2006 WL 2053649 (Del. Super. July 12, 2006)...................................................38-39

*Debussy LLC v. Deutsche Bank AG,*
   No. 05 Civ. 5550, 2006 WL 800956 (S.D.N.Y. March 29, 2006)..............................31

*Dietrich v. Harrer,* 857 A.2d 1017 (Del. Ch. 2004) ....................................................29, 31

*Dresner v. Utility Com., Inc.*, 371 F. Supp. 2d 476 (S.D.N.Y. 2005)................................11

*Dunlap v. State Farm Fire & Casualty Co.*, 878 A.2d 434 (Del. 2005)...........................38

*Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.,*
   343 F.3d 189 (2d Cir. 2003)..............................................................................11, 25, 28

*Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.,*
   No. 06 Civ. 5246, 2007 WL 950134 (S.D.N.Y. Mar. 28, 2007) ................................38

*Fin. One, Public Co. Ltd. v. Lehman Brothers Special Finance,*
   414 F.3d 325 (2d Cir. 2005)..........................................................................................24

*First Equity Corp. of Fl. v. Standard & Poor's Corp.*
   869 F.2d 175 (2d Cir. 1989)..........................................................................................10

*Fitzgerald v. Citigroup, Inc.,*
   *No.* 03 Civ. 4305, 2007 WL 582965 (S.D.N.Y. Feb. 26, 2007) ....................................2

*Fitzgerald v. Hudson National Golf Club,*
   11 A.D.3d 426, 783 N.Y.S.2d 615 (2d Dep't 2004)....................................................28

*GlobalNet Finance Com., Inc. v. Frank Crystal & Co.,*
   449 F.3d 377 (2d Cir. 2006)..........................................................................................24

*Goldblatt v. Englander Commc'ns, L.L.C.,*
   No. 06 Civ. 3208, 2007 WL 148699 (S.D.N.Y. Jan. 22, 2007)...................................38

*Greco v. University of Del.*, 619 A.2d 900 (Del. 1993)....................................................39

*Halperin v. eBanker USA.Com, Inc.*, 295 F.3d 352 (2d Cir. 2002).............................13, 19

*Harris v. Provident Life & Accident Insurance Co.,*
   310 F.3d 73 (2d Cir. 2002)............................................................................................38

### TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Harrison v. Rubenstein,*
   No. 02 Civ. 9356, 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) .......................... *passim*

*Hotel Constructors Inc. v. Seagrove Corp.,*
   99 F.R.D. 591 (S.D.N.Y. 1983) ...................................................................................36

*Hudson Venture Partners, LP v. Patriot Aviation Group, Inc.,*
   No. 98 Civ. 4132, 1999 WL 76803 (S.D.N.Y. Feb. 17, 1999) ...................................35

*INA v. Johnson,* 959 F.2d 240 (9th Cir. 1992) ...................................................................37

*In re Alliance N. Am. Government Income Trust Inc. Sec. Litig.,*
   1996 WL 551732 (S.D.N.Y. Sept. 27, 1996)..............................................................19

*In re Citigroup, Inc. Sec. Litig.,* 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ............... 19-20, 22

*In re Goldman Sachs Mutual Funds,*
   No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)..................................30

*In re Hyperion Sec. Litig.,* No. 93 Civ. 7179, 1995 WL 422480
   (S.D.N.Y. July 14, 1995), *aff'd,* 98 F. 3d 2 (2d Cir. 2006) .........................................19

*In re Oracle Corp.,* 867 A.2d 904 (Del. Ch. 2004)...........................................................23

*In re Salomon Analyst Winstar Litig.,*
   No. 02 Civ. 6171, 2006 WL 510526 (S.D.N.Y. Feb. 28, 2006) .................................13

*In re Triarc Cos.,* 791 A.2d 872 (Del. Ch. 2001) ..............................................................30

*In re Walt Disney Co. Derivative Litig.,*
   907 A.2d 693 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. Super. 2006).......................32

*In re Worldcom, Inc. Sec. Litig.,* 382 F. Supp. 2d 549 (S.D.N.Y. 2005) .........................23

*International Bus. Machine Corp. v. Liberty Mutual,*
   363 F.3d 137 (2d Cir. 2004)........................................................................................25

*Kalmanovitz v. G. Heilman Brewing Co., Inc.,*
   595 F. Supp. 1385 (D. Del. 1984), *aff'd,* 769 F.2d 152 (3d Cir. 1985).......................29

*Kalnit v. Eichler,* 264 F.3d 131 (2d Cir. 2001)...........................................................20, 21

*Kaplan v. Aspen Knolls Corp.,* 290 F. Supp. 2d 335 (E.D.N.Y. 2003) ............................37

*Kinsey v. Cendant Corp.,*
   No. 04 Civ. 0582, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ..............................33

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Kramer v. W. Pac. Industrial, Inc.*, 546 A.2d 348 (Del. 1988)....................................29, 31

*Krock v. Lipsay*, 97 F.3d 640 (2d Cir. 1996) ......................................................24

*Lane v. Jones,*
    No. CV 065001032, 2006 WL 2578712 (Conn. Super. Aug. 21, 2006) ....................39

*Legatski v. Bethany Forest Associate, Inc.,*
    2006 WL 1229689 (Del. Super. Ct. April 28, 2006) .............................................33-34

*Manzo v. Rite Aid Corp*, No. 18451-NC, 2002 WL 31926606
    (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003).........................................32

*Meyercord v. Curry*, 38 A.D.3d 315, 832 N.Y.S.2d 29 (1st Dep't 2007).........................28

*Motrade v. Rizkozaan, Inc.,*
    No. 95 Civ. 6545, 1998 WL 108013 (S.D.N.Y. Mar. 11, 1998) ...............................36

*Muller-Paisner v. TIAA-CREF*, 446 F. Supp. 2d 221 (S.D.N.Y. 2006) ...............20, 21, 23

*Olkey v. Hyperion Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ..........................................13

*Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000)............................................................11

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)......................................................21, 33

*Savoy Record Co. v. Cardinal Export Corp.,*
    15 N.Y.2d 1, 254 N.Y.S.2d 521 (1964) ......................................................................36

*Seybold v. Groenink,*
    No. 06 Civ. 772, 2007 WL 737502 (S.D.N.Y. March 12, 2007)................................29

*Steinman v. Levine*, No. 19107, 2002 WL 31761252
    (Del. Ch. Nov. 27, 2002), *aff'd*, 822 A.2d 397 (Del. 2003) ....................................31-32

*Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000)..................................19

*Tevdorachvili v. Chase Manhattan Bank,*
    103 F. Supp. 2d 632 (E.D.N.Y. 2000) ........................................................................33

*The Pension Committee of the University of Montreal Pension Plan v.*
    *Banc of Am. Secur.*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006)..................................21, 22

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
    845 A.2d 1031 (Del. 2004) ..........................................................................................30

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Travelers Indemnity Co. of Conn. v. Lasco Group, Inc.*,
    204 F. Supp. 2d 639 (S.D.N.Y. 2002)..........................................................................32

*VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003) .............................37

*Walz v. Todd & Honeywell, Inc.*,
    195 A.D.2d 455, 599 N.Y.S.2d 638 (2d Dep't 1993)....................................................35

*Wende v. United Methodist Church*, 6 A.D.3d 1047, 776 N.Y.S.2d 390
    (4th Dep't 2004), *aff'd*, 4 N.Y.3d 293, 794 N.Y.S.2d 282 (2005)...............................39

*Winn v. Schafer*,
    No. 06 Civ. 10170, 2007 WL 1346656 (S.D.N.Y. May 7, 2007)................................32

## STATUTES AND RULES

Fed. R. Civ. P. 9(b) ................................................................................. 21-23, 28

Fed. R. Civ. P. 12(b)(1)......................................................................................32

Fed. R. Civ. P. 12(b)(6)......................................................................................32

Fed. R. Civ. P. 23.1 ...........................................................................................29

Private Securities Litigation Reform Act.................................................... 21-23

6 Del. C. § 18-1101(e) .......................................................................................36

Pursuant to Rules 12(b)(6), 12(b)(1), 23.1 and 9(b) of the Federal Rules of Civil Procedure, Defendant Amaranth Advisors L.L.C. ("Amaranth") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint filed by Plaintiff San Diego County Employees Retirement Association ("SDCERA").

### Preliminary Statement

The investment professionals of SDCERA, led by CEO Brian White, knew exactly what they were getting into when they invested approximately 2.5% of their over $6 billion in capital in Amaranth Partners LLC (the "Fund"). They were consciously investing in speculative and leveraged investment strategies involving volatile and illiquid markets without any diversification requirements. The Fund's offering documents spell out these risks in painstaking detail; indeed, prior to SDCERA's investment, Mr. White signed an agreement plainly stating that SDCERA had read and understood the risks. Simply put, SDCERA took a known risk and lost money. It now seeks to recover, both its initial investment, and unrealized profits earned through the speculative trading that this lawsuit decries. The law, however, requires investors who knowingly make risky investments to take the bad with the good.

By its own admission, SDCERA is a sophisticated investor of pension funds, who invests in hedge funds and is advised by a professional investment advisor. SDCERA manages and invests retirement funds for approximately 33,000 eligible employees, and possesses "experience with securities investing." (Compl. ¶¶ 23, 30). SDCERA is an "accredited investor" under the Securities Act of 1933 and a "qualified purchaser" under the Investment Company Act of 1940.[1] Moreover, SDCERA retained a professional investment advisor,

---

[1] *See* Subscription Agreement signed by SDCERA at S-3, and Schedules A and B thereto. A copy of the Subscription Agreement is annexed hereto as Exhibit A. Private information of SDCERA not relevant to this motion is redacted from the Subscription Agreement.

Rocaton Advisors, L.L.C. ("Rocaton"), to advise SDCERA in selecting hedge fund investments as part of its "Alpha Engine" designed to enhance overall returns.  (Compl. ¶ 38).

Although the Complaint attempts to portray SDCERA as having received misleading information, the documents that SDCERA possessed, relied upon, executed and cited in its Complaint, tell the real – and much different – story.[2]  Indeed, SDCERA concedes that the documents it relied on in deciding to invest disclosed that "investing in the Fund is 'speculative' and involves a high degree of risk, leverage and volatility."  (Compl. ¶ 35).

In September 2005, when SDCERA invested in the Fund, SDCERA and Rocaton were well aware that:  (1) SDCERA could lose all or a substantial part of its investment; (2) the Fund took positions in the highly volatile energy markets and other illiquid investments; (3) absolutely no material limitations existed on Amaranth's investment strategies, diversification, leverage or hedging; and (4) the Fund could invest all or substantially all of its assets in any one market, which would include natural gas derivatives.  The the Subscription Agreement signed by Brian White, CEO of SDCERA, and the 2003 Private Placement Memorandum ("2003 PPM") SDCERA possessed prior to making its investment could not have been clearer or more specific:

> **THE FUND IS A SPECULATIVE INVESTMENT THAT INVOLVES RISK, INCLUDING THE RISK OF LOSING ALL OR SUBSTANTIALLY ALL OF THE AMOUNT INVESTED.**[3]

* * *

---

[2]  For purposes of a motion to dismiss, "a complaint is deemed to include:  any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  *Harrison v. Rubenstein*, No. 02 Civ. 9356, 2007 WL 582955, at *10 (S.D.N.Y. Feb. 26, 2007) (citations omitted) (Batts, J.); *see also Fitzgerald v. Citigroup, Inc.*, No. 03 Civ. 4305, 2007 WL 582965, at *5 (S.D.N.Y. Feb. 23, 2007) (Batts, J.).  Although SDCERA did not attach any exhibits to its Complaint, it relied upon, quoted from, and referenced numerous documents. SDCERA specifically referenced and relied upon in its Complaint all of the documents cited in and attached to this memorandum of law.  Thus this Court may consider them without turning this into a motion for summary judgment. *See Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 152-53 (2d Cir. 2002).

[3]  Ex. A at S-5 (emphasis in original).

2

*The Interests are speculative and illiquid securities involving substantial risk of loss and are suitable for investment only by sophisticated persons for which an investment in the Fund does not represent a complete investment program and <u>who fully understand and are capable of assuming the risks of an investment in the Fund</u>.*[4]

\* \* \*

<u>The Fund does not and will not maintain any fixed requirements for diversifying its portfolio among issuers, industries, instruments, markets or strategies.</u>  In attempting to maximize the Fund's <u>returns, the Manager may concentrate the holdings of the Fund in those industries, companies, instruments or markets which, in the sole judgment of the Manager, provide the best profit opportunities consistent with the Fund's investment objective.</u>  Consequently, a loss in any such concentrated position could ultimately result in significant losses to the Fund and a proportionately higher reduction in the Net Asset Value of the Fund than if its capital had been spread over a wide number of positions.[5]

\* \* \*

The Manager is not subject to any formal diversification requirements, and the Fund's portfolio may from time to time be concentrated in a limited number of positions or strategies.[6]

\* \* \*

By investing in the Fund, subscribers are relying on the discretionary, market judgment of the Manager, trading in a wide range of strategies and markets, <u>without being subject to diversification, leverage or any other form of trading policies.</u>[7]

\* \* \*

*There are no material restrictions on the strategies, leverage, or markets which may be incorporated into the Fund's portfolio or the percentage of the Fund's assets that may be committed to any particular strategy type, market or instrument.*[8]

---

[4] 2003 PPM at 19 (italics in original, underlining added).  A copy of the 2003 PPM is annexed hereto as Exhibit B.

[5] *Id.* at 29-30 (emphasis added).

[6] *Id.* at 8.

[7] *Id.* at 12 (emphasis added).

[8] *Id.* at 11 (emphasis in original).

> The Fund invests in energy-based financial instruments, including, without limitation, exchange-traded and over-the-counter derivatives contracts such as futures, options, swaps and forwards, which have energy commodities (such as crude oil, petroleum products, natural gas and electric power) as their reference asset. Certain of these markets are in developmental stages and may expose the Fund to unusually volatile returns and illiquidity.[9]

The cautionary warnings in the Subscription Agreement and 2003 PPM were repeated over and over after SDCERA made its investment.  In January 2006, SDCERA received a revised Private Placement Memorandum ("2006 PPM") that disclosed many of the same risk factors.  (Compl. ¶ 36).  Moreover, the 2006 PPM amplified the risks of investing in the energy sector.  It stated under the bold type heading "**Energy Trading**":

> The Fund currently has a significant commitment to energy trading (*i.e.*, trading in electricity, natural gas, oil and related derivative instruments, including options and futures).   Energy trading involves certain financial risks that are qualitatively different from those incurred in trading securities and other financial instruments.
>
> The energy markets are susceptible to <u>significant short-term price volatility</u> as a result of a variety of factors . . . .  Furthermore, certain energy markets – in particular, those related to petroleum – are particularly subject to the risk of sudden and dramatic price changes as a result of international political events, acts of war and terrorism and the anticipation of such events.  These events are, by their nature, unpredictable, and can cause extreme and sudden price reversals and market disruptions.[10]

Amaranth continued to advise its investors of "the volatility of natural gas trading," and to emphasize the importance of energy trading in its portfolio.  (Compl. ¶¶ 69-72).  For example, in its investor update letter reporting October 2005 results, Amaranth stated "[o]ur energy portfolio incurred losses in the midst of extreme volatility in the natural gas, power, crude, and energy stock markets during the month."  *See* Ex. G (Compl ¶ 54).  In a March 29,

---

[9] *Id.* at 27.

[10] 2006 PPM at 51 (Compl. ¶ 36) (emphasis added).  A copy of the 2006 PPM is annexed hereto as Exhibit C.

4

2006 e-mail to investors reporting that the Portfolio Manager of the Fund's energy trading desk was leaving, Amaranth advised investors that "energy trading is a <u>core</u> <u>strategy</u> at Amaranth." *See* Ex. H (Compl. ¶ 69) (emphasis added). In reporting its April 2006 results, Amaranth stated that the Fund's earnings for the month were the "best" to date, and advised investors that "extreme volatility in the energy markets is primarily responsible for our out-performance" and that "[o]ur energy and commodities portfolios generated outsized returns due to unusual volatility across crude oil, natural gas and metals businesses." *See* Ex. J (Compl. ¶ 71).[11]

At the end of the day, to enhance its returns, SDCERA, a sophisticated investor, made an inherently risky investment. It invested in a hedge fund in the face of warnings regarding risk, volatility, leverage, illiquidity and the lack of any strict diversification requirements. SDCERA gladly reaped the benefits of taking this investment risk as the Fund substantially increased in value in late 2005 and early 2006. Despite seeing first-hand the volatility caused by trading in the energy markets, SDCERA did not seek to withdraw its capital. Eventually, however, dramatic price movements in natural gas prices caused the Fund substantial losses and SDCERA lost the profits it previously had enjoyed, as well as a significant portion of its initial investment. SDCERA took a known risk and lost, and now it asks this Court to turn back the clock to allow it to recover its investment <u>and</u> unrealized profits. The Court should not permit SDCERA to use this litigation as insurance for the calculated risk it took and its losses.

---

[11]   The monthly investor update letters relied upon in SDCERA's Complaint (Exs. F, G, J and K) also repeated the warnings that an investment in the Fund "is speculative and involves a high degree of risk," that "investors could lose all or substantially all of their investment" in the Fund, that "[t]here is no material limitation on the strategies the Funds may implement or on the markets or instruments in which they may trade" and that the Funds "are a suitable investment only for financially sophisticated investors who are independently capable of evaluating the merits and risks of the Funds."

### Factual Background

**A.**     **Structure of the Fund**

SDCERA is a member of the Fund, an investment fund organized as a Delaware limited liability company, with its principal place of business in Connecticut. (Compl. ¶ 2). As part of a "master fund/feeder fund structure," the Fund and two other investment companies (the "Feeder Funds") are shareholders of a separate entity, Amaranth LLC (the "Master Fund"). Each of the Feeder Funds, including the Fund, contributed a substantial portion of its capital to the Master Fund, which invested the pooled capital in equity and debt securities, commodities, derivatives and other financial instruments. *See* Ex. B at 1. Amaranth, a Delaware limited liability company, with its principal place of business in Connecticut (Compl. ¶ 24), is the Managing Member of the Fund and provides investment management services to both the Fund and to the Master Fund. *See* Ex. B at 2.[12]

**B.**     **SDCERA's Decision to Invest in the Fund**

In July 2004, SDCERA decided to expand its investment portfolio, and to invest in hedge funds as part of its "value-adding strategies" providing for "the opportunity for enhancing returns." (Compl. ¶ 38). SDCERA's term for these investments, "Alpha Engine," is a term of art for investments designed to beat the market. In connection with this expansion, Rocaton suggested to SDCERA that it consider investing in the Fund. (*Id.* ¶ 39). On September 1, 2005, SDCERA entered into the Subscription Agreement by which it purchased an interest in the Fund for $175 million. (*Id.* ¶¶ 2, 31). In the Subscription Agreement, SDCERA represented that it "has relied solely on the information contained in the [2003 PPM] in deciding whether to invest in the Fund" and agreed that "the only disclosures for which the Fund or any Manager

---

[12] *See also* Fourth Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), a copy of which is annexed hereto as Exhibit D.

Party accepts any responsibility relating to the Subscriber's investment are those set forth in the [2003 PPM]." *See* Ex. A at S-2, S-3 (emphasis added).  Moreover, SDCERA, the Fund and Amaranth executed a side letter agreement, also signed by SDCERA CEO Brian White, which provides that information regarding the Fund's business and assets that is typically provided to investors need not be disclosed to SDCERA.  Instead, SDCERA agreed that certain information would be provided to SDCERA's investment advisor, Rocaton, and kept confidential from SDCERA's investment staff and Board.  (Compl. ¶ 51); *see* Ex. E.

Prior to making its investment, SDCERA received the 2003 PPM, which contained numerous risk disclosures, some of which are detailed above.  (Compl. ¶ 31).  It specifically advised SDCERA that "the Fund invests in energy-based financial instruments," and stressed that its energy investments "may expose the Fund to unusually volatile returns and illiquidity." *See* Ex. B at 27.  The 2003 PPM disclosed that "there are no material restrictions on the strategies, leverage, or markets which may be incorporated into the Fund's portfolio or the percentage of the Fund's assets that may be committed to any particular strategy type, market or instrument." *Id.* at 11; *see also id.* at 8, 20-21, 27.  Further, the 2003 PPM disclosed that the "Manager is continually developing new, and adapting and refining existing, strategies.  There is no material limitation on the strategies which the Manager may apply and no assurance as to which types of strategies may be applied at any one time." *Id.* at 23.

## C.    The Fund Achieves Record Gains and then Suffers Substantial Losses

The Fund earned positive results in the fall of 2005, including an approximate 6% return in the first month of SDCERA's investment (September 2005). *See* Ex. F (Compl. ¶ 55). Indeed, SDCERA admits it was aware of "tens of millions of dollars in unrealized 'profit' on natural gas positions and spreads" as of year-end 2005.  (Compl. ¶ 7).  SDCERA could have realized this profit by requesting an annual appreciation withdrawal by November 15, 2005. *See*

7

Ex. B at 37. It did not do so. SDCERA could have made a quarterly withdrawal in January 2006, by giving notice by December 15, 2005. *See id.* at 38. Again, it did not do so.[13]

The Fund continued its record of profitable results in early 2006. In April 2006, it earned returns close to 12%, and had year-to-date returns approaching 25%, due in large part to market volatility in its energy portfolio, particularly natural gas. (Compl. ¶¶ 71-72). *See* Exs. I, J. SDCERA's initial investment of $175 million had grown to over $244 million; in just eight months SDCERA had a rate of return of almost 40%. *See* Ex. I. If it had been uncomfortable with this obvious volatility, SDCERA could have reduced its invested capital by giving notice before mid-March 2006 that it wanted to make a quarterly withdrawal in April 2006. *See* Ex. B at 38. Once again, it did not do so.

In May 2006, the Fund lost approximately 10% of its net asset value, due again in large part to the volatility of the natural gas market. (Compl. ¶¶ 71, 73, 76). *See* Ex. K. On June 2, 2006, two weeks prior to SDCERA's June 16, 2006 deadline to request a July 31, 2006 quarterly withdrawal, Amaranth disclosed to SDCERA that the Fund had experienced such losses (Compl. ¶ 72), and on June 7, 2006, Amaranth so advised Rocaton (*Id.* ¶ 73). Rocaton confirmed the losses to SDCERA on June 13, 2006. (*Id.*). Having seen first hand the extreme volatility with its investment, up 40% in eight months, up 12% in April 2006, down 10% in May 2006, SDCERA had yet another opportunity to withdraw its capital by giving notice before June 16, 2006. But again, it chose not to do so.

In September 2006, the Fund suffered substantial losses as a result of dramatic price movements in the natural gas market. (*Id.* ¶¶ 85, 87). On September 18, 2006, SDCERA issued a written request to withdraw its investment. (*Id.* ¶ 89). On September 29, 2006,

---

[13] There were three possible withdrawal options, anniversary withdrawals, annual appreciation withdrawals, and quarterly withdrawals. *See* Ex. B at 4.

Amaranth informed investors, in accordance with the terms of the LLC Agreement, that all such withdrawals were "temporarily suspended." (*Id.* ¶ 94).  SDCERA does not contend that the suspension of withdrawal requests was in any way improper.

### D.     Winding Down of the Fund

After meeting with representatives of all investors who requested such a meeting, Amaranth decided that it was in the best interest, and indeed the desire, of investors to proceed with an orderly sale of the Master Fund's assets (*i.e.*, investments) and to make a series of *pro rata* distributions of cash to the Feeder Funds, which in turn would make a series of *pro rata* cash distributions to their investors, including SDCERA.  As a result, the Fund has made, and is continuing to make, cash distributions to its investors.  To date, SDCERA has received approximately $61 million as a result of these distributions.  (*Id.* ¶ 94).

### E.     SDCERA's Complaint

SDCERA, the only Fund investor to commence (or even threaten) litigation, filed its Complaint on March 29, 2007.  The Complaint asserts six claims against Amaranth: federal securities fraud (Count I), common law fraud (Count II), gross negligence (Count III), breach of contract (Count IV), breach of fiduciary duty (Count V) and vicarious liability (Count VII).[14]  In essence, the Complaint alleges that the Fund was mismanaged because Amaranth operated a "single-strategy natural gas fund" that took very large and highly leveraged positions instead of operating a "multi-strategy hedge fund." (*Id.* ¶¶ 4, 7-9, 33, 37, 56).  But as Amaranth repeatedly and unequivocally disclosed, and as SDCERA well knew, Amaranth had full discretion to invest the Fund's assets in volatile and illiquid investments on a leveraged basis, including by concentrating investments in one strategy without any diversification or hedging.  These risks

---

[14] Count VI for aiding and abetting breach of fiduciary duty is not asserted against Amaranth, and Count VIII is only asserted against Mr. Hunter.

were specifically disclosed in the 2003 PPM and were well known to SDCERA.  In short,

SDCERA's investment lost value, not due to any improper conduct by Amaranth, but rather

because the market turned against the Fund's positions.  Accordingly, the Complaint against

Amaranth should be dismissed in its entirety.  *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955,

1964-69 (2007) (to survive a motion to dismiss the complaint must allege facts showing

plausibility of entitlement to relief, not just a mere possibility).

## **Argument**

## I.   **SDCERA'S SECURITIES FRAUD CLAIM (COUNT I) SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM**

To state a claim for securities fraud under Section 10(b) of the Securities

Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, "a plaintiff must plead that in

connection with the purchase or sale of securities, the defendant acting with scienter, made a

false material representation or omitted to disclose material information and that the plaintiff's

reliance on the defendant's action caused [plaintiff] injury." *Harrison*, 2007 WL 582955, at \*12

(quoting *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir. 2000)) (citations omitted).[15]

SDCERA alleges four distinct categories of misrepresentations and omissions

prior to its initial investment:  (1) alleged oral misrepresentations made in March 2005 (Compl.

¶¶ 4, 33, 41-43, 48); (2) alleged oral misrepresentations made at a July 21, 2005 SDCERA Board

meeting (Compl. ¶¶ 5, 33, 44); (3) alleged oral misrepresentations made at some unspecified

time to SDCERA's investment advisor, Rocaton (Compl. ¶¶ 39-41, 45); and (4) alleged written

---

[15]  SDCERA's securities fraud claim is limited only to alleged misrepresentations and omissions <u>in connection with its original investment</u>.  (Compl. ¶¶ 97-100).  SDCERA does not – and cannot – assert a federal securities fraud claim based on its failure to exercise its right to withdraw its capital.  *See e.g., Blue Chips Stamps v. Manor Drug Stores,* 421 U.S. 723, 743 (1975) (addressing standing requirements for Section 10(b) claims and concluding that plaintiff must be an actual purchaser or seller of a security); *First Equity Corp. of Fl. v. Standard & Poor's Corp.,* 869 F.2d 175, 180 n.2 (2d Cir. 1989) (noting that *Blue Chip* provided that plaintiffs suing under Section 10(b) cannot recover for losses resulting from "decisions to hold or refrain from trading").

misrepresentations in and omissions from the 2003 PPM (Compl. ¶¶ 33-37). As discussed

below, none of the alleged oral or written statements or omissions are actionable.[16]

    A.    **SDCERA's Securities Fraud Claim Based on Alleged Oral
Misrepresentations Should be Dismissed Because Provisions in the
Subscription Agreement and the 2003 PPM Preclude Justifiable Reliance**

        SDCERA must demonstrate that it reasonably relied on the alleged oral

misrepresentations. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d

189, 195 (2d Cir. 2003). A plaintiff who has executed an agreement specifically disavowing

reliance on any source outside the contract or other offering documents, cannot, as a matter of

law, establish that its reliance on any other statements was reasonable. *See, e.g.*, *Rissman v.

Rissman,* 213 F.3d 381, 384 (7th Cir. 2000) ("non-reliance clauses in [investment contracts]

preclude any possibility of damages under federal securities law for prior oral statements.").

Indeed, courts in this Circuit consistently have dismissed securities fraud claims based on

express non-reliance provisions contained in the offering documents. *See, e.g., Dresner v. Util.

Com, Inc.,* 371 F. Supp. 2d 476, 491-92 (S.D.N.Y. 2005) (dismissing securities fraud claim, in

part, because a non-reliance clause in agreement rendered plaintiff's reliance on prior oral

statements unreasonable as a matter of law); *see also Belin v. Weissler*, No. 97 Civ. 8787, 1998

WL 391114, at *7-8 (S.D.N.Y. July 14, 1998) (claim for oral misrepresentation in connection

with investment in limited partnership dismissed because plaintiff represented in subscription

agreement that he relied solely on information in partnership agreement). This particularly is

true where, as here, the plaintiff is a sophisticated investor. *See Emergent*, 343 F.3d at 195

(dismissing securities fraud allegations because reliance on oral misrepresentations was not

reasonable given existence of the non-reliance provision and sophistication of investor).

---

[16] In addition to the reasons set forth below, the alleged oral misrepresentations regarding management of the Fund
(Compl. ¶¶ 33, 39-41) also fail to state a claim because allegations of corporate mismanagement are not actionable
under the federal securities laws. *See infra* 19-20.

In executing the Subscription Agreement, SDCERA represented that it "has relied solely on the information contained in the [2003 PPM] in deciding whether to invest in the Fund (irrespective of any other materials and information furnished to [SDCERA] in connection with such investment)." *See* Ex. A at S-2 (emphasis added).  SDCERA further agreed that:

> The Subscriber …. understands that the only disclosures for which the Fund or any Manager Party accepts any responsibility relating to the Subscriber's investment are those set forth in the [2003 PPM].[17]

The 2003 PPM contained the following non-reliance clause:

> **THE OFFEREE MUST SUBSCRIBE SOLELY ON THE BASIS OF THE INFORMATION SET FORTH HEREIN.**[18]

As a matter of law, these non-reliance provisions foreclose SDCERA's securities fraud claim based on any alleged oral misrepresentations made to SDCERA or Rocaton prior to SDCERA's investment in the Fund.

**B.**     **SDCERA's Securities Fraud Claim Based on Alleged Misrepresentations and Omissions in the 2003 PPM Fails as a Matter of Law**

SDCERA asserts that the 2003 PPM contains three types of alleged misstatements and omissions.  First, that Amaranth misrepresented the Fund as having "sound risk management practices."  Second, that Amaranth failed to disclose "the true nature of the risk" arising from an investment in the Fund.  Third, that Amaranth falsely advertised the Fund as a diversified multi-strategy hedge fund.  (Compl. ¶¶ 33-37).  The securities fraud claim is based on allegations that subsequent to SDCERA's investment, Amaranth failed to operate the Fund in accordance with the strategies detailed in the 2003 PPM.  The bespeaks caution doctrine precludes this claim, and allegations of corporate mismanagement simply are not actionable under the securities laws.

---

[17] Ex. A at S-2-3 (emphasis added).

[18] Ex. B at i (emphasis in original).

12

1.    **The Bespeaks Caution Doctrine Compels Dismissal of
        SDCERA's Securities Fraud Claim Based on the 2003 PPM**

To state a claim under Section 10(b), a plaintiff must allege that a

misrepresentation or omission is "material." A statement or omission is material "if there is a

substantial likelihood that a reasonable person would consider it important in deciding whether

to buy or sell [securities]." *Halperin v. eBanker USA.Com, Inc.,* 295 F.3d 352, 357 (2d Cir.

2002) (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir. 1994)).  Under the well-

recognized bespeaks caution doctrine, "[c]ertain alleged misrepresentations . . . are immaterial as

a matter of law because it cannot be said that any reasonable investor could consider them

important in light of the adequate cautionary language set out in the same offering." *Id.*

(citations omitted).  Accordingly, courts have concluded that:

> when cautionary language is present, we analyze the allegedly
> fraudulent materials in their entirety to determine whether a
> reasonable investor would have been misled.  The touchstone of
> the inquiry is not whether isolated statements within a document
> were true, but whether defendants' representations or omissions,
> considered together and in context, would affect the total mix of
> information and thereby mislead a reasonable investor regarding
> the nature of the securities offered.

*Id.* at 357. (citations omitted).

Under the bespeaks caution doctrine, securities fraud claims must be dismissed

where "the cautionary language explicitly warns of or directly relates to the risk that brought

about a plaintiff's loss." *In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL

510526, at *11 (S.D.N.Y. Feb. 28, 2006); *see also Halperin,* 295 F.3d at 360 (granting motion to

dismiss because offering memoranda "when read in their entirety . . . not only bespeak caution,

they shout it from the rooftops"); *Olkey v. Hyperion Term Trust, Inc.,* 98 F.3d 2, 8 (2d Cir. 1996)

(granting motion to dismiss based on extensive cautionary language in prospectus).

The bespeaks caution doctrine clearly applies here because the offering documents repeatedly warned SDCERA that:  (1) its investment was speculative; (2) the Fund did not have a formal diversification policy, and could invest entirely in one market, which would include natural gas, and could invest on a leveraged basis in volatile and illiquid markets; and (3) the risk management practices, including hedging, were discretionary and fluid.  These are the precise risks about which SDCERA now asserts it was somehow misled.

### (a)     The Subscription Agreement and the 2003 PPM Fully Disclosed the Speculative Nature of an Investment in the Fund

Despite SDCERA's allegation that Amaranth failed to disclose the "true nature of the risk" related to its investment in the Fund, even a cursory review of the Subscription Agreement and the 2003 PPM demonstrates that both documents fully alerted SDCERA to the many risks attendant to its investment.  The front page of its Subscription Agreement and the 2003 PPM each announced that **"THESE ARE SPECULATIVE SECURITIES."**  *See* Exs. A and B (emphasis in original).  This was just the beginning of the cautionary language.  The Subscription Agreement contained the following provisions:

> All investors must have a high level of financial sophistication and be able to evaluate the merits and risks of a specialized, non-traditional, investment vehicle such as the Fund, including the risk of losing one's entire investment.[19]

> \* \* \*

> **THE FUND IS A SPECULATIVE INVESTMENT THAT INVOLVES RISK, INCLUDING THE RISK OF LOSING ALL OR SUBSTANTIALLY ALL OF THE AMOUNT INVESTED.**[20]

---

[19] Ex. A at 1 (under subscription instructions).

[20] *Id.* at S-5 (emphasis in original).

The 2003 PPM – which, as discussed *supra*, SDCERA agreed was the sole basis for its investment – also warned SDCERA that:

> **THE INTERESTS ARE SPECULATIVE, ILLIQUID, INVOLVE SUBSTANTIAL RISK, AND ARE A SUITABLE INVESTMENT ONLY FOR A LIMITED PORTION OF A PORTFOLIO. INVESTORS COULD LOSE ALL OR SUBSTANTIALLY ALL OF THEIR INVESTMENT IN THE FUND.** [21]

Clearly, the speculative nature of the risk and the possibility of substantial losses expressly were disclosed to SDCERA.

### (b)    The 2003 PPM Disclosed the Lack of a Diversification Policy and that Amaranth Could Invest in any Single Market

SDCERA alleges that the 2003 PPM misrepresented the Fund as a multi-strategy hedge fund that had an obligation to diversify its strategy mix, when in fact it was highly concentrated in natural gas trading. (Compl. ¶ 35). SDCERA disingenuously cites selected language from the 2003 PPM to support this assertion. When viewed in its entirety, however, the 2003 PPM specifically disclosed to SDCERA that Amaranth had no formal diversification policy, that there were no material limitations on its investment strategy, and that the Fund could invest all, or a significant portion, of its capital in one industry, market or strategy, which would include the volatile natural gas market, as well as illiquid investments.

The 2003 PPM specifically disclosed under the bold-faced heading "**No Formal Diversification Policies**":

> The Fund does not and will not maintain any fixed requirements for diversifying its portfolio among issuers, industries, instruments, markets or strategies.  In attempting to maximize the Fund's returns, the Manager may concentrate the holdings in the Fund in those industries, companies, instruments or markets which, in the

---

[21] Ex. B at i (emphasis in original).

> sole judgment of the Manager, provide the best profit opportunities consistent with the Fund's investment objective. Consequently, a loss in any such concentrated position could ultimately result in significant losses to the Fund and a proportionately higher reduction in the Net Asset Value of the Fund than if its capital had been spread over a wide number of positions.[22]

The 2003 PPM further disclosed:

> The Manager is not subject to any formal diversification requirements, and the Fund's portfolio may from time to time be concentrated in a limited number of positions or strategies.[23]
>
> * * *
>
> *There are no material restrictions on the strategies, leverage, or markets which may be incorporated into the Fund's portfolio or the percentage of the Fund's assets that may be committed to any particular strategy type, market or instrument.*[24]

The 2003 PPM also disclosed the potential liquidity risks of the Fund's investments under a

boldfaced heading "**Private Investments and Illiquid Investments**":

> The Fund from [time] to time invests in illiquid and restricted, as well as thinly-traded, securities (including privately placed and restricted securities). There may be no trading market for these securities, and the Fund might only be able to liquidate these positions, if at all, at disadvantageous prices. As a result, the Fund may be required to hold such securities despite adverse price movements. In addition, if the Fund makes a short sale of an illiquid security, it may have difficulty in covering the short sale, resulting in a potentially unlimited loss on that position.[25]

The volatility risk of Amaranth's investment strategy also was prominently disclosed in the 2003

PPM under the bold faced heading "**Volatility**":

> The prices of the instruments traded by the Manager have been subject to periods of excessive volatility in the past, and such periods can be expected to recur. . . .While volatility can create

---

[22] *Id.* at 29-30 (emphasis added).

[23] *Id.* at 8.

[24] *Id.* at 11 (emphasis in original).

[25] *Id.* at 26.

> profit opportunities for the Fund, it can also create the specific risk,
> in the case of the Fund, that historical or theoretical pricing
> relationships will be disrupted, causing what should otherwise be
> comparatively low risk positions to incur losses.[26]

These disclosures are the precise issues on which SDCERA bases its claims.

**(c)    The 2003 PPM Disclosures Regarding
the Fund's Risk Management Practices**

Although SDCERA uses the catchphrase "sound risk management practices"

throughout its Complaint, that phrase is not included anywhere in the 2003 PPM.  SDCERA

generally alleges that Amaranth promised to utilize effective risk management practices to

minimize, if not eliminate, the risk of investing in the Fund.  However, the 2003 PPM

demonstrates that Amaranth disclosed the fact that its risk management practices, including any

hedging, were discretionary and constantly changing.

SDCERA quotes the 2003 PPM as explaining that "certain of the Manager's

strategies require the use of quantitative valuation models" (Compl. ¶ 35).   SDCERA

conveniently omits the remainder of the paragraph which specifically explained the inherent

risks in those models:

> Certain of the Manager's strategies require the use of quantitative
> valuation models that it has developed over time, as well as
> valuation models developed by third-parties and made available to
> the Manager.  As market dynamics (for example, due to changed
> market conditions and participants) shift over time, a previously
> high successful model often becomes outdated or inaccurate,
> perhaps without the Manager recognizing that fact before
> substantial losses are incurred.  There can be no assurance that the
> Manager will be successful in continuing to develop and maintain
> effective quantitative models, and the necessity of continuously
> updating these models demonstrates that the Manager's past
> successful results may not be representative of the Fund's future
> performance.[27]

---

[26] *Id.* at 21.

[27] *Id.* at 27 (emphasis added).

The 2003 PPM disclosed under the bold-faced heading **"Hedging"**:

> The Manager does not, in general, attempt to hedge all market or other risks inherent in the Fund's positions, and hedges certain risks, if at all, only partially. Specifically, the Manager may choose not, or may determine that it is economically unattractive, to hedge certain risks - either in respect of particular positions or the Fund's overall portfolio. The Fund's portfolio composition commonly results in various directional market risks remaining unhedged, although the Manager may rely on diversification to control such risks to the extent that the Manager believes it desirable to do so.[28]

The 2003 PPM also disclosed under the bold-faced heading "**Risk Management**":

> *By investing in the Fund, subscribers are relying on the discretionary, market judgment of the Manager, trading in a wide range of strategies and markets, without being subject to diversification, leverage or any other form of trading policies.*[29]

Finally, the 2003 PPM disclosed:

> The Manager is continually developing new, and adapting and refining existing, strategies. There is no material limitation on the strategies which the Manager may apply and no assurance as to which types of strategies may be applied at any one time.[30]

In light of these detailed disclosures, no reasonable investor – much less a highly sophisticated one like SDCERA -  could have misunderstood the risks of investing in the Fund. Brian White executed the Subscription Agreement on behalf of SDCERA, expressly representing that SDCERA "has been furnished a copy of the [2003 PPM] and has carefully read and understands the [2003 PPM], has evaluated the risks … including the risks set forth in the [2003 PPM] … and has relied solely on the information contained in the [2003 PPM] in deciding whether to invest in the Fund."[31]  Thus, for SDCERA to assert that the volatility of the Fund's

---

[28] *Id.* at 29.

[29] *Id.* at 12  (emphasis in original).

[30] *Id.* at 23.

[31] *See* Ex. A at S-2.

investments (Compl. ¶ 7), the Fund's leverage (*Id.*), the number of natural gas positions (*Id.* ¶ 85), the lack of hedging (*Id.* ¶ 87) and the illiquidity of the investments (*Id.* ¶ 88) were not disclosed is ludicrous.  Like the offering memoranda in *Halperin*, the Subscription Agreement and 2003 PPM, when read in their entirety, "not only bespeak caution, they shout it from the rooftops." *Halperin,* 295 F.3d at 360; *see In re Hyperion Sec. Litig.*, No. 93 Civ. 7179, 1995 WL 422480, at *5-7 (S.D.N.Y. July 14, 1995), *aff'd*, 98 F. 3d. 2 (2d Cir. 1996) (investment strategy and risks were disclosed in prospectus thereby precluding <u>material</u> misrepresentations necessary to sustain federal securities claim).  Accordingly, SDCERA fails to state a claim for securities fraud based on alleged misrepresentations in, and omissions from, the 2003 PPM.[32]

## 2.    SDCERA's Securities Fraud Claim Based on the 2003 PPM Fails Because it is Premised on Allegations of Corporate Mismanagement

SDCERA's Section 10(b) claim fails for an additional reason:  it is nothing more than a claim of corporate mismanagement, which is defective as a matter of law.  As this Court recently stated, "[i]t is well-established by now that Section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception." *Harrison,* 2007 WL 582955, at *13 (citations omitted).  Another recent case, *In re Citigroup, Inc. Sec. Litig.,* 330 F. Supp. 2d 367 (S.D.N.Y. 2004), contained allegations comparable to those here.  Plaintiff alleged that Citigroup had structured and participated in transactions that were inconsistent with its publicized risk management policies. *Id.* at 375.  The court granted Citigroup's motion to dismiss stating:

---

[32] SDCERA cannot (and apparently does not) assert that the statements in the 2003 PPM were false and misleading when made, or even in September 2005, when SDCERA made its initial investment.  To state a claim under Section 10(b), SDCERA must specify, each alleged fraudulent statement or omission, and explain why it is false or misleading. *See Harrison*, 2007 WL 582955, at *12.  In that connection where the alleged "misstatement or omission conflict with the plain language of the prospectus, the prospectus controls." *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000).  Consequently, where, as here, "'an offering document exactly states the cautionary 'fact' that the plaintiff claims has been covered up or misrepresented, no § 10(b) claim will lie.'" *In re Alliance N. Am. Gov't Income Trust Inc. Sec. Litig.*, 1996 WL 551732, at *8 (S.D.N.Y. Sept. 27, 1996) (citation omitted).

> Plaintiff's section 10(b) claim here – that participation in such transactions was inconsistent with Citigroup's stated risk management policies and historical business practices – amounts to nothing more than a charge that Citigroup's business was mismanaged. Such allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b).

*Id.* The Court concluded that "[t]he securities laws were not designed to provide an umbrella cause of action for the review of management practices, nor is 'fraud by hindsight' a viable basis upon which to challenge management practices that ultimately result in losses." *Id.* at 372; *see Harrison*, 2007 WL 582955 at * 13 (allegations of mismanagement do not state a claim for securities fraud). Accordingly, SDCERA's securities fraud claim, which essentially is based on Amaranth's alleged mismanagement, should be dismissed.

### C.   The Securities Fraud Claim Fails Because SDCERA has not Alleged Facts Supporting a Strong Inference of Scienter

To state a claim for securities fraud, SDCERA must allege that Amaranth had "an intent to deceive, manipulate or defraud." *Muller-Paisner v. TIAA-CREF,* 446 F. Supp. 2d 221, 228 (S.D.N.Y. 2006) (citations omitted) (Batts, J.). A plaintiff must allege facts that give rise to a strong inference of scienter "either (a) by alleging facts that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir. 2001) (citations omitted); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir. 1995).

### 1.   SDCERA Failed to Allege that Amaranth had a Motive to Commit Fraud

SDCERA's Complaint alleges no facts that even suggest Amaranth had a motive to commit fraud. It is well-established that "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and

personal benefit to the individual defendants resulting from the fraud." *Kalnit,* 264 F.3d at 139 (citation omitted).  SDCERA fails to make any such allegation.[33]

### 2. SDCERA Failed to Allege Facts Supporting a Strong Inference of Conscious Misconduct or Recklessness [34]

To support a strong inference of reckless behavior, a plaintiff must allege facts showing that the defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Muller-Paisner,* 446 F. Supp. 2d at 228 (citation omitted).  SDCERA's allegations wholly fail to raise a strong inference that Amaranth recklessly induced SDCERA's investment.  SDCERA's Complaint asserts <u>only</u> "extremely reckless" trading practices <u>after</u> SDCERA's investment.  (Compl. ¶¶ 55-84).  Completely absent from the Complaint are any allegations that before September 1, 2005, when SDCERA made its investment, Amaranth engaged in any reckless conduct.  Thus, SDCERA's securities fraud claim should be dismissed.[35]

## II. SDCERA'S SECURITIES FRAUD CLAIM SHOULD ALSO BE DISMISSED FOR FAILURE TO PLEAD WITH PARTICULARITY

Securities fraud actions are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil

---

[33] The passing reference to fees and bonuses (Compl. ¶ 7) is precisely the type of purported motive that the Second Circuit concluded did not satisfy the scienter requirement. *See Kalnit*, 264 F.3d at 139.

[34] Conscious misconduct "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information . . . or knowing sale of a company's stock at an unwarranted discount." *The Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secur.*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006).  SDCERA does not assert that Amaranth engaged in any illegal behavior.  Rather, SDCERA appears to rely solely on an assertion that Amaranth was "reckless," but this assertion also fails.

[35] SDCERA appears to assert that Amaranth was "reckless" in misrepresenting the nature of the risk associated with its investment, or by failing to warn SDCERA that it may expand its energy trading portfolio.  (Compl. ¶ 37). However, as discussed at length above, the Subscription Agreement and the 2003 PPM absolutely disclosed to SDCERA, prior to SDCERA's investment, the nature and quality of the risk SDCERA was taking by investing in the Fund. *See supra* at 11-19.  Such disclosures belie any claim of recklessness. *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (disclosure of financial problems contradicts allegation of reckless behavior).

Procedure 9(b).  To plead a material misrepresentation or omission under the PSLRA and Rule 9(b), the Complaint cannot be based on conclusory allegations but rather must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, <u>if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed</u>." *Pension Comm.,* 446 F. Supp. 2d at 179-80 (citing 15 U.S.C. § 78u-4(b)(1)(B)) (emphasis added); *see Harrison,* 2007 WL 582955, at *12 (citations omitted) (Batts, J.).

SDCERA's allegations are conclusory, and for the most part made "upon information or belief" without any explanation of the factual basis for such a belief.  For example, SDCERA alleges without any stated factual basis that "[t]he Fund lacked risk management and controls," and "in practice, defendants recklessly ignored even the most basic principles of risk management and controls."  (Compl. ¶ 13).  SDCERA further asserts without any foundation that "the Fund, against its own espoused investment policies, effectively operated as a single-strategy natural gas fund that took very large and highly leveraged gambles and recklessly failed to apply even basic risk management techniques to these gambles."  (*Id.*  ¶ 4).  Without expressly stating it, SDCERA's position seems to be that, because the Fund lost money, the risk management and trading strategies must have been misrepresented.  That is simply absurd, and certainly is insufficient to sustain the claim in light of the heightened pleading requirements of the PSLRA and Rule 9(b).  *See Citigroup*, 330 F. Supp. 2d at 379.

SDCERA's excessive reliance "upon information and belief" further demonstrates the deficiency of its pleading.  Virtually every paragraph in the Complaint alleging fraudulent conduct is based "upon information and belief," but fails to state with particularity the facts on which such belief is based. (Compl. ¶¶  9, 11, 12, 14, 15, 37, 39, 40, 41, 46, 47, 51, 56, 57, 58,

60, 63, 64, 65, 66, 67, 71, 74, 75, 78, 83).  Accordingly, the Complaint fails to satisfy the

heightened pleading requirements of the PSLRA and Rule 9(b).  *See Antigenics, Inc. v. U.S.*

*Bancorp Piper Jeffray, Inc.*, No. 03 Civ. 0971, 2004 WL 51224, at *4 (S.D.N.Y. Jan. 9, 2004).

**III.    SDCERA'S COMMON LAW FRAUD CLAIM
        (COUNT II) SHOULD BE DISMISSED**

        SDCERA alleges that Amaranth fraudulently induced SDCERA to invest in the

Fund (mirroring its securities fraud claim), <u>and</u> fraudulently induced SDCERA not to withdraw

its investment.  (Compl. ¶¶ 101-08).  Because the elements of common law fraud are

substantially identical to those governing federal securities fraud, SDCERA's common law claim

for fraudulently inducing SDCERA's initial investment should be dismissed on the exact same

grounds as the securities fraud claim.  *See Harrison,* 2007 WL 582955, at * 20; *Muller-Paisner,*

446 F. Supp. 2d at 227-29.  As detailed below, SDCERA's common law fraud claim based on its

failure to withdraw its capital, *i.e.*, its holder claim, also fails to survive this motion to dismiss.

        **A.    The Holder Claim is not Recognized in Connecticut**

        There exists a conflict between the laws of New York, Delaware and Connecticut

regarding SDCERA's holder claim.  New York and Delaware recognize the right to pursue

holder claims; Connecticut does not.  *Compare In re Worldcom, Inc. Sec. Litig.,* 382 F. Supp. 2d

549, 559 (S.D.N.Y. 2005) (citation omitted) ("New York recognizes a claim for fraud where

investors were induced to retain securities in reliance on a defendant's misrepresentations") and

*In re Oracle Corp.*, 867 A.2d 904, 932 n. 118 (Del. Ch. 2004) (Delaware law "is in tension with

federal law" because it recognizes the possibility of a holder's recovery)*, with Chanoff v. U.S.*

*Surgical Corp.,* 857 F. Supp. 1011, 1018 (D. Conn.),  *aff'd*, 31 F. 3d 66 (2d Cir. 1994) (under

Connecticut law "claims for damages based on the plaintiffs' failure to sell or hedge their stock

are too speculative to be actionable").[36]  In light of this conflict, a choice of law analysis must be

undertaken and federal courts apply the choice of law rules of the forum state.  *See GlobalNet*

*Fin. Com., Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 382 (2d Cir. 2006).

        For tort claims, New York applies an "interest analysis" to determine the

jurisdiction with the most significant relationship to the occurrence and parties in the litigation.[37]

The principal place of business of both Amaranth and the Fund is Connecticut, and all of the

individual defendants worked at Amaranth's Connecticut office. (Compl. ¶¶ 2, 24-28).[38]  The

vast majority of the facts relating to the holder claim occurred in Connecticut.  The risk

management team operated in Connecticut, and Amaranth monitored trading activities in or from

Connecticut.  Further, the alleged post-investment misrepresentations were made through emails,

telephone conversations and documents emanating from Amaranth's Connecticut offices.

(Compl. ¶¶ 69-81).  Indeed, many of the conversations challenged in the Complaint were

between Amaranth and Rocaton, who also was located in Connecticut.  Therefore, Connecticut

law governs the holder claim.  *See, e.g., GlobalNet*, 449 F.2d at 384 (where, as here, parties are

domiciled in different states, the place where the alleged tort occurred will almost always be

determinative); *Cromer Finance v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (applying

---

[36]  SDCERA asserts that New York and Delaware law govern this action.  (Compl. ¶ 1).  Accordingly, Amaranth will not address the law of California (SDCERA's domicile) because it agrees with SDCERA that California law does not apply.

[37] It is well-settled that a contractual choice of law provision generally does not apply to tort claims. *See Fin. One, Public Co. Ltd. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 334-35 (2d Cir. 2005) (noting reluctance of New York courts to construe contractual choice of law clauses to encompass extra-contractual causes of action and that "no reported New York cases present such a broad clause").  The contractual choice of law provisions in this case (Ex. A at S-9 (New York law) and Ex. D at 46 (Delaware law)) only govern the contract and are not broad enough to encompass tort claims.  *Id.; see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) ("Under New York law, a choice of law provision indicating the *contract* will be governed by a certain body of law does not dispositively determine that law which will govern a claim of *fraud* arising incident to the contract.")  (emphasis in original) (citing numerous cases).

[38] Hunter worked full-time in Connecticut until he began also to trade from Amaranth's Calgary Alberta office in the Spring of 2006.  (Compl. ¶ 47).

New York law to fraud claim brought by investors in a hedge fund because that is where alleged fraud occurred through dissemination of financial information to investors all over the world).[39] As Connecticut does not recognize holder claims Count II should be dismissed.

**B.      Even if the Court Applies New York Law, SDCERA's**
         **Common Law Fraud Claim Should be Dismissed**

To state a claim for common law fraud, the plaintiff must allege, among other things, justifiable reliance upon the alleged misrepresentation and that the plaintiff's injury was caused by the defendant's misrepresentation. *See Harrison*, 2007 WL 582955, at * 20.[40]   The Complaint fails on both counts.

**1.      SDCERA's Holder Claim Should be Dismissed for**
         **Failure to Adequately Allege Justifiable Reliance**

In assessing the reasonableness of a plaintiff's alleged reliance, "we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Crigger v. Fahnestock & Co., Inc.,* 443 F.3d 230, 235 (2d Cir. 2006) (quoting *Emergent Capital,* 343 F.3d at 195).   The essence of SDCERA's holder claim is that Amaranth's alleged misrepresentations and omissions caused SDCERA to forego withdrawal of its investment by the June 16, 2006 deadline for a July 31, 2006 quarterly withdrawal. (Compl. ¶ 77). Following SDCERA's September 1, 2005 investment, however, Amaranth reiterated the risks in the Subscription Agreement and the 2003 PPM.  Amaranth repeatedly emphasized "the volatility of natural gas trading" and the importance of energy trading to its portfolio. *See*  Exs. F, G, H, J and K.

---

[39] No fraudulent conduct is alleged to have occurred in Delaware, and the only conduct alleged to have occurred in New York was trading on the New York Mercantile Exchange. (Compl. ¶ 21).

[40] If Connecticut law does not apply, New York law would be applicable because New York is the forum state. *Int'l Bus. Mach. Corp. v. Liberty Mut.*, 363 F.3d 137, 143 (2d Cir. 2004).

In September 2005, Amaranth reported the best month in the Fund's history due to the impact of Hurricane Katrina on the Fund's energy trading positions. (Compl. ¶ 55). In that same investor communication, Amaranth specifically disclosed that 36% of the Fund's capital was dedicated to "volatility/energy trading" – a substantially higher percentage of capital than was dedicated to any other strategy. *See* Ex. F. The investor update letter reporting October 2005 results, stated "[o]ur energy portfolio incurred losses in the midst of extreme volatility in the natural gas, power, crude, and energy stock markets during the month.," and again noted that 36% of the Fund's capital was allocated to "volatility/energy trading." *See* Ex. G. Yet, SDCERA never made a capital or appreciation withdrawal. *See supra* 7-9.

Disclosures regarding the volatility and the importance of the Fund's energy portfolio continued in 2006. In January 2006, Amaranth issued the 2006 PPM which reiterated the focus on and risks of energy trading. *See* Ex. C at 51 (Compl. ¶ 36). In a March 29, 2006 e-mail to investors reporting that the Portfolio Manager of the Fund's energy trading desk was leaving, Amaranth nevertheless assured investors that "energy trading is a core strategy at Amaranth." (Compl. ¶ 69). *See* Ex. H (emphasis added). Reporting its April 2006 results, Amaranth stated that the Fund's earnings for the month of April were the "best" to date, and advised investors that "extreme volatility in the energy markets is primarily responsible for our out-performance." (Compl. ¶ 72). The report stated that 34% of the Fund's capital was allocated to energy. *See* Ex. J. Similarly, SDCERA's April 2006 account statement indicated that its investment increased in value by 12% in April alone, and almost $70 million (40%) in the eight months since it invested in the Fund. (Compl. ¶ 71). *See* Ex. I. Then, in May 2006, the Fund experienced substantial losses (10%), largely due to natural gas trading. (Compl. ¶ 71). On June 2, 2006, two weeks before SDCERA's June 16, 2006 deadline to withdraw its capital, Amaranth

disclosed these losses and advised SDCERA that the losses were caused by volatility in natural gas prices.  (*Id.* ¶¶ 71-72).  On June 7, 2006 Amaranth informed Rocaton of these losses, who confirmed the reason for the losses to SDCERA on June 13, 2006.  (*Id.* ¶ 73).[41]

In the face of all these disclosures regarding the volatility of the energy markets, the concentration of the Fund's portfolio in natural gas and the impact on the Fund and the value of SDCERA's investment, SDCERA did not withdraw its capital.  *See supra* 7-9.  Now SDCERA maintains that it did not withdraw its $175 million investment (or millions of dollars in profit) based on vague, isolated statements allegedly made by Amaranth that it planned, at some unstated time, and in some unstated manner, to "'move conservatively' to capitalize the risk of the positions on [the Fund's] books" and that it "would be reducing its notional energy exposure by approximately 50%."  (*Id.* ¶¶ 71, 73).  SDCERA's purported reliance on such general open-ended statements simply is not justifiable in light of the sophistication of SDCERA and Rocaton and their knowledge of:  (1) the disclosed risks; (2) the Fund's consistent dedication to energy trading as a "core strategy;" and (3) the intense volatility experienced from natural gas investments.  Moreover, as a sophisticated investor, SDCERA was well aware that any reduction of the Fund's energy portfolio would take time to implement (indeed, SDCERA does not allege that Amaranth indicated any timetable for its reduction).

In sum, given the broader context of information available to SDCERA, SDCERA's purported reliance on vague, isolated statements regarding reduction in the Fund's energy portfolio, as the rationale for not withdrawing its investment prior to June 16, 2006

---

[41]   SDCERA alleges "that it found out after the June 16, 2006 withdrawal deadline that in May 2006, the Fund experienced its worst loss since inception and that Hunter's natural gas trading book accounted for a majority of the loss." (Compl. ¶ 76).  That assertion, however, contradicts paragraphs 72 and 73 of the Complaint detailed above in which SDCERA admits that in early June 2006 SDCERA was aware of both the fact and the cause of the losses. Further, the May update received after June 16, 2006 showed virtually the same amount of capital allocated to energy as in the prior month, and virtually the same as when SDCERA first invested. *See* Exs. F, J, K.

27

simply is not reasonable as a matter of law.  Accordingly, SDCERA's holder claim should be

dismissed.  *See Emergent*, 343 F.3d at 195-96 (reliance not reasonable where sophisticated

plaintiff had access to information regarding critical facts of which it now complains); *Fitzgerald*

*v. Hudson Nat'l Golf Club*, 11 A.D.3d 426, 428, 783 N.Y.S.2d 615, 616 (2d Dep't 2004) (alleged

grievance could not support fraud claim because it was unreasonable in light of general nature of

statements and non-reliance provision in offering summary).[42]

### 2.   SDCERA's Claim Premised on Alleged Misrepresentations After June 16, 2006 Fails due to a Lack of Causation

To state a claim for common law fraud, a plaintiff must allege "both that

defendant's misrepresentation induced plaintiff to engage in the transaction in question

(transaction causation) and that the misrepresentations directly caused the loss about which

plaintiff complains (loss causation)." *Meyercord v. Curry,* 38 A.D.3d 315, 316, 832 N.Y.S.2d

29, 30 (1st Dep't 2007) (dismissing fraud claim because plaintiff could not have changed his

position or suffered a loss based on alleged misrepresentations).

For purposes of its holder claim, the operative date is June 16, 2006, "the final

day for SDCERA to provide notice to make a Quarterly Withdrawal on July 31, 2006." (Compl.

¶ 77).  After the deadline passed, the next opportunity for SDCERA to withdraw its investment

would have been on September 30, 2006, after the Fund sustained heavy losses.[43]  SDCERA has

not – and cannot – allege that misrepresentations made after June 16, 2006 somehow prevented it

from requesting withdrawal of its investment by the June 16, 2006 deadline or that SDCERA

could have changed its position after June 16, 2006, but before the Fund suffered its September

---

[42] The lack of any specificity regarding the timing of the alleged reduction in energy exposure also compels dismissal of the holder claim pursuant to Rule 9(b).  *See supra* at 22-23.

[43] After June 16, 2006, SDCERA's first opportunity to withdraw its capital would have been its Anniversary Date. As the 2003 PPM explained, Anniversary Withdrawals are valued based on the assets in the Fund "on the last day of the month" in which SDCERA invested.  In this case that would have been September 30, 2006, *i.e.*, after the Fund sustained its heavy losses.  *See* Ex. B at 37.

losses. Accordingly, SDCERA's fraud claim based on purportedly false statements made after June 16, 2006 fails for lack of both transaction and loss causation. (Compl. ¶¶ 75-82, 105).[44]

## IV.   THE CLAIMS FOR GROSS NEGLIGENCE (COUNT III) AND BREACH OF FIDUCIARY DUTY (COUNT V) ARE DERIVATIVE CLAIMS

Amaranth, the Fund and the Master Fund are each corporate entities. SDCERA's gross negligence and breach of fiduciary duty claims belong to those entities and thus are derivative in nature. Consequently, SDCERA is barred from maintaining them unless it first makes an appropriate pre-suit demand or pleads with particularity specific facts excusing such a demand as futile. *See* Fed. R. Civ. P. 23.1.[45] Because the Complaint neither alleges that any demand was made nor alleges facts sufficient to show demand is excused, the gross negligence and breach of fiduciary duty claims should be dismissed.

Despite the clear derivative nature of these claims, SDCERA purports to assert them in its individual capacity, on its own behalf. However, the fact that SDCERA did not label the causes of action as derivative is irrelevant. *See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del. 1988); *Kalmanovitz v. G. Heilman Brewing Co., Inc.*, 595 F. Supp. 1385, 1399 (D. Del. 1984), *aff'd*, 769 F.2d 152 (3d Cir. 1985). Regardless of the labels attached to the claims, "the court must look at all the facts of the complaint and determine for itself whether a direct claim exists." *Dietrich v. Harrer*, 857 A.2d 1017, 1027-28  (Del. Ch. 2004).[46]

---

[44] The alleged misrepresentation in the March 29, 2006 e-mail also cannot be the basis for any fraud claim. (Compl. ¶¶ 69, 105). SDECRA fails to allege that any statement in the e-mail was false or misleading. Far from being false or misleading, this e-mail put every single investor on notice (to the extent they were not already on notice) of how large Amaranth's energy trading practice had become (21-person trading team), and how dedicated Amaranth was to pursuing energy trading as a "core strategy." *See* Ex. H.

[45]  Federal Rule of Civil Procedure 23.1 also requires SDCERA's Complaint to be verified, which it was not.

[46]  No choice of law analysis is necessary because the standards to determine whether a claim is derivative are the same in each of the relevant states. We focus on Delaware law because under the internal affairs doctrine only the state of incorporation has the authority to regulate a corporation's internal affairs, *i.e.*, matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders, because otherwise a corporation could be faced with conflicting demands. *See Seybold v. Groenink*, No. 06 Civ. 772, 2007 WL 737502, at *5 (S.D.N.Y. March 12, 2007).

In determining whether a claim is direct or derivative, the court examines: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). As one court recently explained:

> Where the substantive nature of the alleged injury is such that it falls directly on the corporation as a whole and collectively, but only secondarily, upon its stockholders as a function of and in proportion to their pro rata investment in the corporation, the claim is derivative in nature and may be maintained only on behalf of the corporation.

*In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567, 2006 WL 126772, at *5 (S.D.N.Y. Jan. 17, 2006) (citing *In re Triarc Cos.*, 791 A.2d 872, 878 (Del. Ch. 2001)) (applying Delaware law).

The gravamen of SDCERA's gross negligence and breach of fiduciary duty claims is that Amaranth allegedly mismanaged assets of the Fund resulting in a decline in the value of the Fund. For example, SDCERA alleges that Amaranth "failed to control risk," disregarding SDCERA's rights "as an investor" and that as a result "investors like SDCERA lost most of their capital." (Compl. ¶¶ 95, 110). SDCERA further alleges that Amaranth breached its purported fiduciary duty by "failing to properly manage the Fund, failing to exercise proper risk management and control over Hunter…" and "concentrating the Fund's exposure in the natural gas sector." (Compl. ¶¶ 65, 66, 117). SDCERA alleges that as a result "the Fund came crashing down along with the price of natural gas." (Compl. ¶ 17). These are allegations of mismanagement resulting in only indirect injury to investors, such as SDCERA.

Indeed, the Complaint asserts that the alleged misconduct caused the Fund to lose over $6 billion in value, $150 million of which was allocable to SDCERA's investment. (Compl. ¶ 4). Accordingly, any recovery on these claims must be shared proportionately by all

of the Fund's investors, and not simply go to SDCERA.    As recently explained by one court in

language equally applicable here:

> The claim here is that Deutsche Bank's poor management of the
> Trust's assets injured the shareholders by obliterating the value of
> their investment in the Trust. This injury flows to the shareholders
> only indirectly, because the harm to shareholders, if any, is by
> means of diminution of the value of the securities they hold. A
> claim for diminution of the value of shares is an indirect harm....
> Because injury alleged by a diminution of investment value is
> indirect and contingent upon injury to the corporation the claim is
> derivative.

*Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550, 2006 WL 800956, at *3 (S.D.N.Y. March

29, 2006); *see also ABF Capital Mgmt. v. Askin Capital Mgmt. L.P.,* 957 F. Supp. 1308, 1332

(S.D.N.Y. 1997) (a breach of fiduciary duty claim by hedge fund investors was derivative as "the

nub of the problem is that the investors' injury flows not from what happened to them ... but

from what happened to [the fund] (it failed, making their stock worthless")) (applying Delaware

law) (citations omitted); *Kramer v. W. Pac. Ind.*, 546 A.2d 348, 351-54 (Del. Super. 1988) (it is

settled in Delaware that claims alleging corporate mismanagement resulting in drop in

company's value are classic derivative claims); *Albert v. Alex Brown Mgmt. Services*, No. Civ. A

762-N and 763-N, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) (claims for gross

negligence and failure to properly manage company are "clearly derivative"); *Dietrich*, 857 A.2d

at 1027-28 (directors alleged mismanagement of a corporation was a derivative claim).

   As the gross negligence and breach of fiduciary duty claims are quintessential

derivative claims, SDCERA was required either to make a pre-suit demand or to plead facts

excusing demand.[47]  SDCERA did neither. Accordingly, the two claims should be dismissed.

*See Steinman v. Levine*, No. 19107, 2002 WL 31761252, at *12 (Del. Ch. Nov. 27, 2002), *aff'd*,

---

[47] SDCERA's gross negligence and breach of fiduciary duty claims are not simply derivative; they are "double
derivative" because they really allege direct harm only to the Master Fund, and indirect harm (a) to the Fund by
virtue of its investment in the Master Fund and (b) to SDCERA by virtue of its investment in the Fund.

822 A.2d 397 (Del. 2003); *Manzo v. Rite Aid Corp*, No. 18451-NC, 2002 WL 31926606, at *5-6

(Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003).[48]

## V.   EVEN IF THE GROSS NEGLIGENCE AND FIDUCIARY DUTY CLAIMS ARE NOT DERIVATIVE THEY SHOULD BE DISMISSED

### A.   Connecticut Does Not Recognize a Claim for Gross Negligence

Even if the gross negligence claim were direct, not derivative, it would still be

defective as a matter of law.  Under Connecticut law no cause of action exists for gross

negligence.  *See Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 176 (D. Conn. 2003)

("Connecticut does not recognize gross negligence as a separate basis of liability") (citing

*Decker v. Roberts*, 125 Conn. 150, 157 (1939)); *Bioski v. Castelano*, No. 0115265, 1995 WL

128276, at *2 (Conn. Super. Ct. Mar. 20, 1995) (granting motion to dismiss gross negligence

claim as such claims are not recognized under Connecticut law).[49]  As a result, SDCERA's gross

negligence claim should be dismissed.

### B.   SDCERA Fails to State a Claim for Gross Negligence Under New York or Delaware Law

If the Court applies New York or Delaware law, SDCERA still fails to state a

gross negligence claim.  To sufficiently plead gross negligence, SDCERA must allege conduct

that smacks of intentional wrongdoing and was of an aggravated character.  *See In re Walt

Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. Super.

2006).  SDCERA's own Complaint demonstrates that Amaranth did not act in such a manner.

---

[48] In these circumstances some courts dismiss the derivative claims pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction (*i.e.* standing) while others dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  *See Winn v. Schafer*, No. 06 Civ. 10170, 2007 WL 1346656, at * 3 (S.D.N.Y. May 7, 2007).  Either way, however, the claims must be dismissed.

[49] There exists a substantive law conflict because New York and Delaware recognize claims for gross negligence. *See Travelers Indem. Co. of Conn. v. Lasco Group, Inc.*, 204 F. Supp. 2d 639, 644-45 (S.D.N.Y. 2002); *Albert*, 2005 WL 2130607, at *8.

SDCERA states that Amaranth had a "14-member risk management team" (Compl. ¶ 43), that there existed "personnel in Amaranth's risk management department who were assigned to oversee Hunter's trades" and that the risk department made "control recommendations." (*Id.* ¶ 15). Further, the Complaint states that "Hunter's trading positions were tracked internally and were marked to market daily (and were regularly reconciled)" by "a team of people." (*Id.* ¶¶ 66, 67). Having such procedures demonstrates that Amaranth's conduct was not reckless or smacking of intentional wrongdoing necessary for gross negligence.

Moreover, as detailed above, both before and after SDCERA's investment, Amaranth specifically disclosed the risks of investing in the Fund, including the lack of any diversification or hedging requirements, the volatility and illiquidity of Fund investments, and the leverage associated with the Fund's positions. Similarly, Amaranth had complete discretion regarding risk management techniques and allocation principles. *See supra* at 11-19. Disclosure of the precise risks at issue belies any notion of reckless disregard or intentional wrongdoing. *See Rombach*, 355 F.3d at 176. Accordingly, SDCERA's gross negligence claim should be dismissed. *See Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005) (denying leave to amend complaint to add gross negligence claim because allegations were insufficient for the "heightened standard" for gross negligence); *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 644 (E.D.N.Y. 2000) ("heated language and indignation will not suffice" for the necessary conduct for a gross negligence).

### C.    SDCERA Fails to State a Claim for Breach of Fiduciary Duty

#### 1.    SDCERA has not Alleged the Existence of a Fiduciary Relationship

Under Delaware law, the elements of a claim for breach of fiduciary duty are: (1) that a fiduciary duty exists and (2) that a fiduciary breached that duty. *See Legatski v. Bethany*

33

*Forest Assoc., Inc.*, 2006 WL 1229689, at *3 (Del. Super. Ct. April 28, 2006). [50]   Delaware law

provides that a fiduciary relationship may arise "where the party in whom 'trust and confidence'

is placed has superior knowledge of or a higher degree of expertise in the matter covered by the

contract, then the relationship between those parties is fiduciary in nature." *Id.* at *5.   The

Complaint does not adequately allege a breach of fiduciary duty claim.

      The Subscription Agreement and the 2003 PPM make clear that SDCERA is not

relying on Amaranth to provide any investment advice. *See* Ex. A at S-2; Ex. B at i, 12.   Indeed,

SDCERA had a "Consulting Engagement and Advisory Agreement" with Rocaton "pursuant to

which Rocaton provided SDCERA investment advice." (Compl. ¶ 38).   Indeed, Rocaton was

specifically engaged for "hedge fund consulting in anticipation of including hedge funds as part

of SDCERA's Alpha Engine" (*id.*) and "Rocaton introduced the Fund to SDCERA" as a

potential investment. (*Id.* ¶ 39).   Amaranth had no obligation to provide investment advice to

SDCERA, and thus Amaranth did not owe any  fiduciary duty to SDCERA.

### 2.   SDCERA has not Sufficiently Alleged Breach of any Fiduciary Duty

      SDCERA also has not sufficiently plead breach of any putative duty.   SDCERA

alleges breaches of the duty of care.[51]   Liability for breaching the duty of care "is predicated

upon concepts of gross negligence." *Albert*, 2005 WL 2130607, at *4.   Under Delaware law,

"[g]ross negligence has a stringent meaning" involving "a devil-may-care attitude or indifference

to duty amounting to recklessness." *Id.*   Gross negligence "has been defined as a reckless

indifference to or a deliberate disregard of the whole body of stockholders or actions which are

---

[50]  Delaware law controls pursuant to the internal affairs doctrine. *See supra* at 29 n.46.

[51]  SDCERA does not allege that Amaranth in any way benefited personally from any of the conduct alleged to be a breach of fiduciary duty.  Accordingly, such allegations do not imply a breach of the duty of loyalty. *See Albert*, 2005 WL 2130607, at *5 (allegations that managers of a fund violated their fiduciary duty by allowing withdrawals from the fund did not invoke the duty of loyalty as the complaint did not allege the managers benefited personally in allowing the withdrawals).

without the bounds of reason." *Id.* (citation omitted).  As detailed above (*supra* at 32-33),

SDCERA has not plead conduct rising to the level of gross negligence.  SDCERA knew that

Amaranth had complete discretion as to its risk management techniques, diversification, trading

strategies, and allocation principles, and any purported failure to exercise them in the manner

SDCERA would, in hindsight, have liked does not constitute a breach of fiduciary duty.

Accordingly, the fiduciary duty claim should be dismissed. *See Albert*, 2005 WL 2130607, at *4

(failure to execute "discretionary power" does not result in a breach of fiduciary duty).

## VI.   SDCERA FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT (COUNT IV)

### A.   Amaranth is not a Party to the Subscription Agreement and thus the Claim for Breach of that Agreement Should be Dismissed

Amaranth signed the Subscription Agreement solely on behalf of the Fund, as

Manager. *See* Ex. A at execution page 10.  "It is well settled that when an agent acts on behalf of

a disclosed principal, the agent will not be personally liable for a breach of contract unless there

is clear and explicit evidence of the agent's intention to be bound . . . ." *Walz v. Todd &*

*Honeywell, Inc.*, 195 A.D.2d 455, 455, 599 N.Y.S.2d 638, 639 (2d Dep't 1993) (citations

omitted).[52]  For example, in dismissing breach of contract claims against individual defendants,

one court stated that "[u]nder New York law, it is well settled that an individual who signs a

contract on behalf of a corporation, indicates her representative capacity on the contract, and

exhibits no intention to assume personal liability for the corporation's breaches is not subject to

personal liability." *Hudson Venture Partners, LP v. Patriot Aviation Group, Inc.*, No. 98 Civ.

4132, 1999 WL 76803, at *6 (S.D.N.Y. Feb. 17, 1999) (citing *Motrade v. Rizkozaan, Inc.*, No.

95 Civ. 6545, 1998 WL 108013, at *8 (S.D.N.Y. Mar. 11, 1998)).  This principle applies equally

---

[52] The Subscription Agreement contains a clause providing that the laws of the State of New York govern the contract. *See* Ex. A at S-9.

when the agent signing the contract is a corporation rather than an individual. *See Savoy Record*

*Co. v. Cardinal Export Corp.*, 15 N.Y.2d 1, 6-7, 254 N.Y.S.2d 521, 525 (1964) (by signing as

Agent on behalf of Armonia, defendant made it clear it was not to be liable on the contract);

*Hotel Constructors Inc. v. Seagrove Corp.*, 99 F.R.D. 591, 592 (S.D.N.Y. 1983) (agent not liable

on a contract signed on behalf of fully disclosed principal). Consequently, SDCERA's claim for

breach of the Subscription Agreement should be dismissed.

**B.     The Parties Expressly Agreed that No Liability
         Would Exist for Breach of the LLC Agreement**

Amaranth is a party to the LLC Agreement, and SDCERA became a party to the

LLC Agreement by virtue of executing the Subscription Agreement. (Compl. ¶ 31). Under the

Delaware Limited Liability Act:

> A limited liability company agreement may provide for the
> limitation or elimination of any and all liabilities for breach of
> contract and breach of duties (including fiduciary duties) of a
> member, manager or other person to a limited liability company or
> to another member or manager or to another person that is a party
> to or is otherwise bound by a limited liability company agreement;
> provided that a limited liability company agreement may not limit
> or eliminate liability for any act or omission that constitutes a bad
> faith violation of the implied contractual covenant of good faith
> and fair dealing.

6 Del. C. § 18-1101(e). [53]  The LLC Agreement provides that:

> No Manager Party shall have any liability to the Company, any
> Member or any former Member for: (i) any act performed, or the
> omission to perform any act, within the scope of the power and
> authority conferred on the Manager by this Agreement and/or by
> the Act, except by reason of acts or omissions of a Manager Party
> Finally Determined to constitute fraud, bad faith, gross negligence
> or reckless or intentional misconduct . . . . [54]

---

[53] The LLC Agreement contains a clause providing that the laws of the State of Delaware govern the contract. *See* Ex. D. at 46.

[54] Ex. D at 14.

The LLC Agreement expressly precludes liability against Amaranth as Manager for breach of contract, and thus the claim for breach of the LLC Agreement should be dismissed.

### C.   Plaintiff Failed to Plead Breach of any Actual Contractual Obligation

"[A] claim for breach of contract must allege, at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages." *Kaplan v. Aspen Knolls Corp.*, 290 F. Supp. 2d 335, 337 (E.D.N.Y. 2003) (citing *Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628, 2002 WL 31398933, at *2 (S.D.N.Y. Oct. 24, 2002)). "That is, 'the complaint must plead the terms of the agreement upon which defendant's liability rests.'" *Id.* (quoting *Posner v. Minn. Min. & Mfg. Co.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989)); *see VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Nowhere in the Complaint does SDCERA allege any specific term of the Subscription Agreement or the LLC Agreement that was allegedly breached. SDCERA alleges only that, pursuant to these contracts, Amaranth:

> agreed to allocate capital and manage the Fund as if it were a diverse multi-strategy hedge fund with sound risk management policies. By concentrating the Fund's exposure in the energy sector, and by failing to manage the Fund properly by, *inter alia*, failing to exercise proper risk controls, [Amaranth] willfully and knowingly breached the terms of the contracts with SDCERA . . . .

(Compl. ¶ 113). There is no such contractual obligation in either agreement, and SDCERA's Complaint points to none. Indeed, the cautionary language and discretion given to Amaranth regarding investment strategy detailed above is the antithesis of any such contractual obligation. Consequently, SDCERA's breach of contract claim should be dismissed.[55]

---

[55] SDCERA does not and cannot assert a breach of contract claim based on the 2003 PPM. *See INA v. Johnson*, 959 F.2d 240 (9th Cir. 1992).

**D.**     **Plaintiff's Claim for Breach of the Implied Covenant of**
            **Good Faith and Fair Dealing Fails as a Matter of Law**

"New York law does not recognize a separate cause of action for breach of the

implied covenant of good faith and fair dealing when it is based on the same facts as the breach

of contract claim." *Goldblatt v. Englander Commc'ns, L.L.C.*, No. 06 Civ. 3208, 2007 WL

148699, at *5 (S.D.N.Y. Jan. 22, 2007) (citing *Harris v. Provident Life & Accident Ins. Co.*, 310

F.3d 73, 81 (2d Cir. 2002)); *Ari and Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522

(S.D.N.Y. 2003)). "A claim for breach of the implied covenant can be maintained

simultaneously with a breach of contract claim only if the damages sought by the plaintiff[s] for

breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from

breach of contract." *Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, No. 06 Civ. 5246,

2007 WL 950134, at *6 (S.D.N.Y. Mar. 28, 2007) (citations and internal quotation marks

omitted); *see also Goldblatt*, 2007 WL 148699, at *5 (dismissing claim as redundant) (citation

omitted). Here, the allegation that Amaranth violated the implied covenant of good faith and fair

dealing is alleged in the very same count as the express breach of contract claim, and is based

upon the exact same conduct as the express breach of contract claim.

Moreover, a claim for breach of the implied covenant of good faith and fair

dealing "cannot be used to circumvent the parties' bargain, or create a 'free floating duty . . .

unattached to the underlying legal document.'" *Dunlap v. State Farm Fire & Casualty Co.*, 878

A.2d 434, 441 (Del. 2005) (footnotes and citations omitted). The implied covenant of good faith

is violated only "when a party to a contract acts in a manner that, although not expressly

forbidden by the contractual provision, would deprive the other of the right to receive the

benefits under the agreement." *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03

Civ. 7936, 2006 WL 1379596, at *5 (S.D.N.Y. May 18, 2006) (Batts, J.); *see Daystar Constr.*

*Mgmt. v. Mitchell*, 2006 WL 2053649, at \*8-9 (Del. Super. July 12, 2006).  Here, the LLC

Agreement expressly states that "no limitation is imposed by this Agreement on the investment

or trading activities that the Company may employ . . . ." *See* Ex. D at 1.  SDCERA got exactly

what it bargained for – an investment in a volatile hedge fund that made leveraged and illiquid

investments and had no trading restrictions, diversification requirements or hedging obligations.

Therefore, SDCERA's allegation that Amaranth breached the implied covenant of good faith by

concentrating in the energy sector and by failing to manage the Fund properly is precluded by

Amaranth's complete discretion over trading activities as set forth in the LLC Agreement.

Consequently, the Court should dismiss SDCERA's claim for a breach of the implied covenant

of good faith.

## VII.   SDCERA's VICARIOUS LIABILITY CLAIM (COUNT VII) SHOULD BE DISMISSED

The vicarious liability claim should be dismissed because "[a] viable cause of

action against the employee . . . is a condition precedent to imputing vicarious liability for such

negligence to the employer pursuant to the theory of *respondeat superior*." *Greco v. Univ. of

Del.,* 619 A.2d 900, 903 (Del. 1993).  Therefore, "where the alleged basis for the liability of an

employer is the negligence of an employee, the employer cannot be held liable unless the

employee is shown to be liable." *Id.; see also Wende v. United Methodist Church,* 6 A.D.3d

1047, 1052, 776 N.Y.S.2d 390, 395 (4th Dep't 2004), *aff'd*, 4 N.Y. 3d 293, 794 N.Y.S.2d 282

(2005) ("In the absence of any wrongful or actionable underlying conduct by [the employee],

there can be no imposition of vicarious liability against any alleged employer or principal");

*Lane v. Jones*, No. CV 065001032, 2006 WL 2578712, at \*3 (Conn. Super. Aug. 21, 2006)

(absent cause of action against employee, vicarious liability claim against employer must be

stricken).  For the reasons discussed above, and the individual defendants' memoranda,

39

SDCERA has failed to state a claim against Mr. Hunter. Thus, SDCERA's vicarious liability claim against Amaranth based on Mr. Hunter's conduct should be dismissed.

## Conclusion

For all the foregoing reasons, and those stated in the memoranda submitted by the other defendants, Amaranth respectfully requests that this Court dismiss all claims asserted against it (Counts I-V and VII), and grant such other relief as this Court deems just and proper.

Dated: New York, New York
    June 7, 2007

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: /s/ David E. Mollón

    Stephen Senderowitz (SS-3045)
    David E. Mollón (DM-5624)
    Steven M. Schwartz (SS-4216)
    Melissa O'Boyle (MO-9845)
    Kristen Grisius (KG-8231)

200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Defendant Amaranth Advisors L.L.C.*

40