# EXHIBIT  B

**For the Exclusive Use of:** San Diego County Employees
Retirement Association

**Memorandum Number:  153**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# $/\alpha/$Amaranth

## AMARANTH PARTNERS L.L.C.
### (A Delaware Limited Liability Company)

**Minimum Investment:  $5,000,000**

**AMARANTH ADVISORS L.L.C.**
**Manager**

---

**THESE ARE SPECULATIVE SECURITIES**

---

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH POOLS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PERSONS, AN OFFERING MEMORANDUM FOR THIS POOL IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMISSION.  THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A POOL OR UPON THE ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM.  CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY OFFERING MEMORANDUM FOR THIS POOL.

AMARANTH PARTNERS L.L.C. MAY TRADE NON-U.S. FUTURES OR OPTIONS CONTRACTS.   TRANSACTIONS ON MARKETS LOCATED OUTSIDE THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS WHICH OFFER DIFFERENT OR DIMINISHED PROTECTION TO AMARANTH PARTNERS L.L.C. AND ITS PARTICIPANTS.  FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR AMARANTH PARTNERS L.L.C. MAY BE EFFECTED.

**March 2003**

# GENERAL NOTICES

THE LIMITED LIABILITY COMPANY INTERESTS ("INTERESTS") IN AMARANTH PARTNERS L.L.C. (THE "FUND") ARE OFFERED EXCLUSIVELY TO FINANCIALLY SOPHISTICATED, HIGH NET WORTH AND INSTITUTIONAL INVESTORS CAPABLE OF EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE FUND.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM ("MEMOR-ANDUM") CONSTITUTES AN OFFER ONLY TO THE PROSPECTIVE INVESTOR (THE "OFFEREE") NAMED ON THE COVER PAGE OF THIS MEMORANDUM, AND ONLY IF DELIVERY OF THIS MEMORANDUM IS PROPERLY AUTHORIZED BY AMARANTH ADVISORS L.L.C. (THE "MANAGER").

THE OFFEREE, BY ACCEPTING RECEIPT OF THIS MEMORANDUM, AGREES TO TREAT THE INFORMATION CONTAINED HEREIN AS CONFIDENTIAL AND NOT TO DUPLICATE THIS MEMORANDUM OR FURNISH COPIES OF THIS MEMORANDUM TO ANY PERSON OTHER THAN SUCH OFFEREE'S PROFESSIONAL ADVISERS, AND FURTHER AGREES PROMPTLY TO DISPOSE OF THIS MEMORANDUM SHOULD THE OFFEREE DECIDE NOT TO INVEST.

---

NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS CONCERNING THE FUND OR THE INTERESTS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM. THE OFFEREE MUST SUBSCRIBE SOLELY ON THE BASIS OF THE INFORMATION SET FORTH HEREIN.

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE. THE OFFEREE IS URGED TO SEEK INDEPENDENT INVESTMENT, LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF INVESTING IN THE FUND.

---

THE INTERESTS ARE SPECULATIVE, ILLIQUID, INVOLVE SUBSTANTIAL RISK, AND ARE A SUITABLE INVESTMENT ONLY FOR A LIMITED PORTION OF A PORTFOLIO. INVESTORS COULD LOSE ALL OR SUBSTANTIALLY ALL OF THEIR INVESTMENT IN THE FUND.

---

## SEE "RISK FACTORS."

# SECURITIES LAW NOTICES

### NOTICE TO ALL PROSPECTIVE INVESTORS

THE INTERESTS HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AGENCY. THIS IS A PRIVATE OFFERING MADE ONLY PURSUANT TO EXEMPTIONS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT OF 1933.

WHEN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATIONS OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE INTERESTS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.    FURTHERMORE, NONE OF THE FOREGOING AUTHORITIES HAS CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  TO REPRESENT ANYTHING TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY, NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF THE INTERESTS IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER, SOLICITATION OR SALE.

THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT WITH THE CONSENT OF THE MANAGER AND AS PERMITTED UNDER THE SECURITIES ACT OF 1933 AND THE APPLICABLE STATE SECURITIES LAWS.  INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

------

### NOTICE TO FLORIDA INVESTORS

IF THE INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940 (THE "1940 ACT"), A PENSION OR A PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933), THE INVESTOR ACKNOWLEDGES THAT ANY SALE OF THE INTERESTS TO THE INVESTOR IS VOIDABLE BY THE INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

# COMMODITY FUTURES TRADING COMMISSION PRIVACY NOTICE

THE FUND AND THE MANAGER OBTAIN NON-PUBLIC PERSONAL INFORMATION ABOUT INDIVIDUAL MEMBERS IN CONNECTION WITH SUCH MEMBERS' INVESTMENTS IN THE FUND.  SUCH INFORMATION INCLUDES, FOR EXAMPLE, ADDRESS, TELEPHONE NUMBER, E-MAIL ADDRESS, SOCIAL SECURITY NUMBER, "ACCREDITED INVESTOR" AND "QUALIFIED PURCHASER" STATUS AND INFORMATION PERTAINING TO INVESTMENTS IN THE FUND.  NEITHER THE FUND NOR THE MANAGER DISCLOSE NON-PUBLIC PERSONAL INFORMATION ABOUT INDIVIDUAL MEMBERS OR FORMER INDIVIDUAL MEMBERS TO ANY OTHER PERSON OR ENTITY EXCEPT MANAGER PERSONNEL AND THIRD PARTY SERVICE PROVIDERS WHO NEED TO KNOW SUCH INFORMATION IN ORDER TO CARRY OUT THE MANAGER'S AND THE FUND'S OPERATIONS, OR AS OTHERWISE REQUIRED BY LAW (INCLUDING, WITHOUT LIMITATION, BY APPLICABLE ANTI-MONEY LAUNDERING REGULATIONS).   ADDITIONALLY, THE FUND AND MANAGER EACH MAINTAIN PHYSICAL, ELECTRONIC AND PROCEDURAL SAFEGUARDS DESIGNED TO PROTECT INVESTOR RECORDS AND INFORMATION FROM UNAUTHORIZED ACCESS OR USE.

FOR THE AVOIDANCE OF DOUBT, THE FOREGOING PRIVACY POLICY SHALL NOT PREVENT THE FUND OR THE MANAGER FROM DISCLOSING TO APPROPRIATE THIRD PARTIES SUCH INFORMATION AS THE MANAGER MAY DEEM NECESSARY OR ADVISABLE IN ORDER TO COMPLY WITH APPLICABLE ANTI-MONEY LAUNDERING AND OTHER APPLICABLE UNITED STATES OR FOREIGN LAWS AND REGULATIONS.

# AMARANTH PARTNERS L.L.C.

## TABLE OF CONTENTS

**Section**      **Page**

SUMMARY ..................................................................................................................................... 1

THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES .......................................................... 8

    Investment Objective ............................................................................................................. 8
    Investment Strategies ............................................................................................................. 8
    Risk Management ................................................................................................................. 12

MANAGEMENT............................................................................................................................. 12

    Manager ............................................................................................................................. 12
    PPMC................................................................................................................................... 13
    Indemnification of the Manager and PPMC ........................................................................ 13

FINANCIAL AND TAX ALLOCATIONS; EXPENSES ....................................................................... 14

    Financial Allocations of Net Profits and Net Losses .............................................................. 14
    Tax Allocations.................................................................................................................... 14
    Monthly Manager Allocations ............................................................................................. 14
    Annual Profit Allocations .................................................................................................... 15
    Expenses ............................................................................................................................. 16
    Designated Investments ....................................................................................................... 17

BROKERAGE ARRANGEMENTS .................................................................................................... 17

RISK FACTORS ............................................................................................................................. 19

    General Risks....................................................................................................................... 19
    Market Risks........................................................................................................................ 20
    Strategy Risks ...................................................................................................................... 22

CONFLICTS OF INTEREST............................................................................................................. 33

    The Manager ....................................................................................................................... 33
    Securities Lending ............................................................................................................... 34
    Members' Representative ..................................................................................................... 35
    PPMC................................................................................................................................... 35

NET ASSET VALUE ...................................................................................................................... 36

CAPITAL WITHDRAWALS ............................................................................................................. 37

    Capital Withdrawals.............................................................................................................. 37

    Payments in Kind ................................................................................................................. 40

    Special Withdrawal Rights ................................................................................................... 40

    Manager Withdrawals.......................................................................................................... 40

    Distributions......................................................................................................................... 41

    Transfers .............................................................................................................................. 41

FEDERAL INCOME TAX CONSEQUENCES ................................................................................. 41

    Taxation of the Fund and the Members ................................................................................ 41

    Fund Audits.......................................................................................................................... 47

SUBSCRIPTION PROCEDURE ....................................................................................................... 48

    General ................................................................................................................................. 48

    Investor Suitability Standards .............................................................................................. 49

GENERAL ......................................................................................................................................... 49

    Confidentiality; No Solicitation............................................................................................ 49

    Optional Limitation on Voting Rights and/or Equity Ownership ........................................... 50

    Amendments ........................................................................................................................ 50

    Prior Period Items ................................................................................................................ 50

    Reports ................................................................................................................................. 50

    Availability of Documents.................................................................................................... 51

    Access to Information ........................................................................................................... 51

    Money Laundering Prevention ............................................................................................. 51

LEGAL AND ACCOUNTING MATTERS......................................................................................... 52

---

| | |
|---|---|
| Appendix I: | Summary Performance Information |
| Exhibit A: | Fourth Amended and Restated Limited Liability Company Agreement |
| Exhibit B: | Subscription Agreement |

---

**Amaranth Advisors L.L.C.**
**Manager**
**One American Lane**
**Greenwich, Connecticut  06831**

# AMARANTH PARTNERS L.L.C.

## SUMMARY

---

*The following summary is qualified in its entirety by reference to the more detailed information included elsewhere in this Memorandum and in the Fourth Amended and Restated Limited Liability Company Agreement (the "Limited Liability Company Agreement") of the Fund attached hereto as Exhibit A.*

*This Memorandum contains only outline descriptions of the Limited Liability Company Agreement, which is the controlling document. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Limited Liability Company Agreement.*

---

### The Fund

**The Fund**

Amaranth Partners L.L.C. is a private investment fund organized as a Delaware limited liability company.  As of January 1, 2003, the capitalization of the Fund was approximately $445 million.  From September 2000 to December 31, 2002, the Fund's compound annual return to Members, net of all costs as well as the Manager and Profit Allocations, has been 15.9%.

**"Master-Feeder" Structure**

The Fund invests a substantial portion of its assets in Amaranth L.L.C. (the "Master Fund"), a private investment fund organized as a Delaware limited liability company that permits the Fund to pool its capital with other investment funds so as to maximize credit status and negotiating leverage, while also providing economies of scale, eliminating the need for trade allocations and simplifying ongoing administration and operations. The Master Fund implements the Manager's strategies both directly and through trading subsidiaries. References to the Master Fund in this Memorandum include its trading subsidiaries, unless the context otherwise requires.

In situations in which the Master Fund is restricted from investing in a particular investment or strategy, but the Fund itself is not, the Fund may trade directly for its own account or invest in a Trading Vehicle that engages in such investment activity or strategy.  However, the bulk of the Fund's trading is effected through the Master Fund.

References to the "Fund" in this Memorandum include the Master Fund unless the context otherwise requires.

As of January 1, 2003, the capitalization of the Master Fund was approximately $1.7 billion.

## SUMMARY
### (cont.)

**The Offering**

The Fund's limited liability company interests ("Interests") are generally available for issuance as of the beginning of each calendar month.  The minimum initial Capital Contribution by each investor is $5,000,000.

**The Fund's Investment Objective and Strategies**

The investment objective of the Fund is to achieve superior risk-adjusted returns.  The Manager opportunistically employs a wide range of relative value, event-driven, directional and hybrid and other strategies in managing the Fund's portfolio on a global basis.  There are no material limitations on the instruments, markets or countries in which the Fund may invest.

*There can be no assurance that the investment objective of the Fund will be achieved or that its strategies will be successful.  Past performance is not necessarily indicative of future results, and investors must be prepared to lose all or substantially all of their investment in the Fund.*

#### Amaranth Advisors L. L. C.

**The Manager**

Amaranth Advisors L.L.C., a Delaware limited liability company, is the managing member of the Fund.  As of January 1, 2003, the Manager and its Affiliates were managing client accounts with an aggregate capitalization of approximately $2.0 billion.  References to the Manager in this Memorandum include the Manager's Affiliates which provide investment management services to the Fund and the Master Fund (among others), unless the context otherwise requires.

#### Financial Terms

**Monthly Manager Allocation**

A Manager Allocation of a portion of the "Net Income" otherwise allocable to each Member's Capital Account is allocated to the Manager as of the end of each month.  The Manager Allocation is designed to approximate 1.5%, over successive rolling twelve-month periods, of the average month-end balance of each Member's Capital Account (prior to reduction for the accrued Manager Allocation or any accrued Profit Allocation).  If, as of the end of a given month, Net Income was allocated to the Capital Account of a Member during the 12-month period then ended (or such shorter period that such Member has been a Member), a percentage of that Net Income (the "Monthly Allocation Percentage") corresponding to the rolling Manager Allocation will be debited against such Capital Account and credited to the Manager's Capital Account.

## SUMMARY
### (cont.)

**Annual Profit Allocation**

As of each December 31, each Member's Capital Account is subject to a Profit Allocation equal to 20% of the amount by which the balance of such Member's Capital Account, prior to reduction for any accrued Profit Allocation, exceeds the High Water Mark attributable to such Capital Account.   In addition, if a Member makes a Capital Withdrawal, a Profit Allocation (if accrued) is made with respect to the Capital Account balance withdrawn.

The High Water Mark attributable to a Capital Account is the highest balance of such Capital Account as of any preceding December 31, after reduction for the Profit Allocation then made (or a Member's aggregate Capital Contributions, if higher).  The High Water Mark is proportionately reduced whenever a Capital Withdrawal is made.  As of each December 31 that a Profit Allocation is made from a Member's Capital Account, the High Water Mark is reset to the Net Asset Value of such Capital Account after such Profit Allocation is made.

Profit Allocations are calculated separately with respect to each Member, on the basis of each Member's overall Capital Account (not separately with respect to each Capital Contribution made by such Member).

Profit Allocations do not reduce the increases in a Capital Account's balance for purposes of calculating Profit Allocations — *i.e.*, the Manager does not need to "earn back" Profit Allocations previously made in order to generate additional Profit Allocations.

Profit Allocations are calculated separately with respect to each "Designated Investment," irrespective of Members' participation in the Fund's other investments. *See "Designated Investments."*

**Operating Expenses and Transaction Costs**

The Fund pays significant financing, transaction, operating and administrative costs, as well as its allocable share of the Manager's operating, salary, general administrative and overhead costs and expenses. Paloma Partners Management Company ("PPMC") receives substantial payments for providing certain administrative and accounting services to the Fund, including trade confirmation and settlement services, legal support services, financial and tax reporting and counterparty credit analysis. *See "Management"* for a description of the relationship between the Fund and PPMC.

The Fund pays its allocable share of the Manager's personnel costs, including bonus compensation.  However, the Profit Allocations (if any) made in respect of a Fiscal Year are reduced, but not below $0, by the bonuses ("DT Bonuses") paid by the Fund to its Designated Traders in respect of such Fiscal Year so that the sum of the Profit Allocations and the DT Bonuses payable with respect to such Fiscal Year will equal the Profit Allocations that would have been made had the Manager paid the DT Bonuses.

# SUMMARY
## (cont.)

**Placement Fees**  Capital Contributions may be subject to a placement fee, and the Manager reserves the right to pay placement and/or referral fees (both initial and ongoing) to persons who introduce prospective investors.

**"Soft Dollars"**  The Manager may receive certain "soft dollar" research and other services from the Fund's brokers and counterparties. However, the Manager generally disfavors "soft dollar" arrangements, and, in most cases, any such services would merely reduce costs that would otherwise be passed on to the Fund.

*See "Financial and Tax Allocations; Expenses" and "Brokerage Arrangements."*

## Withdrawal Provisions

**Capital Withdrawals**  Upon at least 90 days' written notice to the Fund, a Member may make a Capital Withdrawal (an "Anniversary Withdrawal") of part or all of the Capital Account balance attributable to a given Capital Contribution as of each twelve-month anniversary of the end of the month in which such Capital Contribution was accepted (an "Anniversary Date").

*Anniversary Withdrawals*

*Annual Appreciation Withdrawals*  Upon a written notice given to the Fund not later than November 15 of a given year, a Member may make a Capital Withdrawal (an "Annual Appreciation Withdrawal") as of the following December 31 of any Appreciation realized during such year.

*Quarterly Withdrawals*  Upon at least 45 days' written notice to the Fund, a Member may make a Capital Withdrawal (a "Quarterly Withdrawal") as of any January 31, April 30, July 31 and October 31 (each a "Quarterly Withdrawal Date"), subject to a "gate" restricting the aggregate Capital Withdrawals as of any such date to the sum of (i) 7.5% of the Fund's Net Asset Value as of such Quarterly Withdrawal Date, *plus* (ii) any Capital Contributions (other than Capital Contributions considered to offset Quarterly Withdrawals, as described below, so that such Quarterly Withdrawals are not subject to the "gate" or any withdrawal fee) received by the Fund as of the beginning of the month immediately following such Quarterly Withdrawal Date (the "Gate").

For purposes of the previous sentence, Capital Withdrawals include Anniversary Withdrawals, although Anniversary Withdrawals are not subject to the Gate. In the event that Quarterly Withdrawals plus Anniversary Withdrawals as of any Quarterly Withdrawal Date exceed the Gate, the Anniversary Withdrawals will be paid in full and the Quarterly Withdrawals permitted only to the extent of the positive difference (if any) between the Gate and the aggregate Anniversary Withdrawals then made.

# SUMMARY
## (cont.)

| | |
|---|---|
| ***Quarterly Withdrawals (cont.)*** | The Quarterly Withdrawals permitted under the Gate will be allocated *pro rata* among the Members requesting such Quarterly Withdrawals based on their respective Capital Account balances (without giving effect to any Capital Withdrawals — Anniversary or Quarterly — requested as of such Quarterly Withdrawal Date), not based on the respective amounts of the Quarterly Withdrawals requested. |
| | All Quarterly Withdrawals are subject to a 2.5% withdrawal fee, payable to the Fund. |
| | Neither the Gate nor the 2.5% withdrawal fee applies to Quarterly Withdrawals offset by Capital Contributions made by investors associated with the Members requesting the Quarterly Withdrawals within one month before or two months after the proposed Quarterly Withdrawal Date. |
| | All Members may make Anniversary Date, Annual Appreciation and/or Quarterly Withdrawals on the permitted withdrawal dates without regard to the length of time they have been invested in the Fund. |
| | *See "Capital Withdrawals."* |
| **Payment of Capital Withdrawals** | Capital Withdrawal proceeds shall generally be paid within 30 days of the Effective Date, unless a Member withdraws 90% or more of such Member's Capital Account, in which case the Fund may, but shall not be obligated to, retain 10% of the estimated Capital Withdrawal proceeds otherwise due until completion of the Fund's audit for the current Fiscal Year. |
| **Postponement of Capital Withdrawals** | The Manager may postpone the effective date of Capital Withdrawals if, among other things, a material portion of the Fund's assets cannot then be valued, if the Manager believes that postponing such effective date would materially adversely affect the continuing Members and in certain other circumstances. |
| | The Manager may also delay the payment of Capital Withdrawals if payment would result in a violation of Law or contract or if liquidating Investment assets to fund such payment would materially adversely affect the continuing Members. |
| **Distributions** | The Fund may make distributions from time to time, but has not done so to date, and the Manager has no present intention of making any such distributions. |
| **Transfers** | Interests may only be transferred with the Manager's consent. |

## SUMMARY
### (cont.)

### Designated Investments

**Designated
Investments**

From time to time, the Fund may make a "Designated Investment" in which the Manager determines (at or within 30 days of the date such investment is made) that only persons who are Members at the time such investment is made will participate. Such Members will retain their interests in the Designated Investment until it is liquidated (whether or not such Members have otherwise withdrawn from the Fund). Manager Allocations and Profit Allocations will be calculated separately with respect to each such Designated Investment.

No Member will participate in Designated Investments which would, on a cumulative basis, require capital allocations from such Member's Capital Account — determined at the time that each Designated Investment is "designated" and after reduction of the amount of such attributable capital allocation by the amount of all distributions received by such Member in respect of Designated Investments (net of all associated Profit Allocations) — in excess of 10% of such Member's Capital Account balance.

Members may opt out of participating in Designated Investments by notifying the Fund in their Subscription Agreements (or by other written notice delivered on or before March 31, 2003, in the case of Members who were Members prior to such date). Members which have previously opted out of participating in Designated Investments may subsequently opt to participate in all future Designated Investments upon irrevocable notice to the Manager.

### Members' Representative

**Members'
Representative**

A Members' Representative — a professional services firm that is independent of the Manager and its Affiliates and does not otherwise perform material services for the Manager or the Fund — will be used from time to time as a means of providing (or withholding) the investor consent required for the Fund to enter into certain transactions which would otherwise be inappropriate or impermissible due to the conflicts of interest involved (for example, the sale of a position by the Fund to another account managed by the Manager). All Members, by subscribing for their Interests, consent to the Members' Representative having such authority.

*See "Conflicts of Interest."*

### General

**Office**

The principal office of the Fund and the Manager is located at One American Lane, Greenwich, Connecticut 06831; telephone number (203) 422-3300.

**Fiscal Year**

The fiscal year of the Fund is the calendar year.

# SUMMARY
## (cont.)

| | |
|---|---|
| **Auditors** | Ernst & Young LLP. |
| **Counsel** | Sidley Austin Brown & Wood acts as counsel to the Manager. |
| **Reports** | The Fund sends to each Member, on a monthly basis, estimates of the Fund's performance and of the increase or decrease in such Member's Capital Account during the preceding month, as well as such other information as the Manager may deem appropriate. |
| | Members receive audited annual financial statements and all tax information relating to their investment in the Fund necessary for federal income tax purposes. |
| **Tax Filings** | Members may be required to make a "tax shelter" notice filing relating to their investment in the Fund together with their annual tax returns. |

### Suitability/Risk Factors

| | |
|---|---|
| **Suitability** | **All prospective investors, either individually or together with their professional advisers, must have the financial sophistication and expertise to evaluate the merits and risks of an investment in the Fund.** |
| **Risk Factors** | **The Interests are a speculative and illiquid investment. Investors must be prepared to lose all or substantially all of their investment in the Fund.** In addition to the risks associated with the Fund's complex and leveraged trading strategies, the risks associated with an investment in the Fund include: (1) credit risks; (2) market risk; (3) legal risks; (4) operational risk; (5) documentation risk; (6) liquidity risk; (7) systemic risk; (8) concentration risk; and (9) settlement risk. |

---

**SEE "RISK FACTORS."**

## THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES

**Investment Objective**

The Fund's investment objective is to achieve superior risk-adjusted returns. The manager is Amaranth Advisors L.L.C. As of January 1, 2003, the Fund's capitalization was approximately $445 million. Summary performance information for the Fund is attached to this Memorandum as Appendix I. *Past results are not necessarily indicative of future performance. There can be no assurance that the Fund will meet its objectives or avoid substantial losses. See "Risk Factors."*

**Investment Strategies**

*General*

The Fund is a multi-strategy private investment company that employs a diverse group of trading strategies. Among the principal trading approaches implemented by the Fund are: convertible-bond arbitrage, merger arbitrage, equity long/short, statistical arbitrage, options arbitrage and credit arbitrage, including investment grade, high-yield and distressed securities.

The Fund trades globally in a broad range of equity and debt securities, derivatives and other financial instruments. These instruments may include, for example, common and preferred stocks, bonds, loans, trade claims, bank deposits and currencies, as well as futures, forward contracts, swaps (including interest rate swaps, credit default swaps and asset swaps) and options (including options on stocks, bonds, credit default swaps and interest rate swaps).

Asset allocations among strategies are based on the Manager's ongoing analysis of prevailing market conditions. The Fund does not focus on, nor is its trading limited to, any geographic area, industry sector, issuer credit rating or issuer market capitalization level. The Manager is not subject to any formal diversification requirements, and the Fund's portfolio may from time to time be concentrated in a limited number of positions or strategies.

The Fund's strategies can, generally, be separated into three categories: relative value, event-driven and directional. There are no clear dividing lines among these categories, and any strategy employed by the Fund may be cross-categorized to the extent its guiding logic is multidisciplinary.

*Relative Value Strategies*

Relative value strategies seek to profit from the relative mispricing of related assets: for example, convertible bonds and the common stock underlying the conversion option, other options and futures and their underlying reference assets, debt instruments of the same issuer or of different issuers (including credit default swaps on the issuer(s)) with different maturities or yields, and the common stock of different issuers in the same sector. These strategies may be highly quantitative and based on theoretical or historical pricing relationships. Because they focus on capturing value from the relative mispricing of related assets, relative value strategies can generate returns independent of overall movements in the global level of debt or equity prices, although many of these strategies in fact are constructed with a long or short equity or debt bias. Because the mispricings that these strategies exploit tend to be small in absolute terms, these strategies frequently use leverage (which could be substantial) in an attempt to increase returns. The use of leverage creates risks of "credit squeezes" and the adverse effects of

discretionary margin increases by dealers and counterparties to which many strategies are not subject.

Few relative value strategies involve pure arbitrage, in which a profit will inevitably be recognized if the position can be held until maturity (for example, mispricing between a stock index future and the underlying stock index, each of which necessarily will have the same value at the expiration of the future). Moreover, it is typical of relative value strategies not to, and the Manager does not, hedge all the risks of each strategy, due to the associated costs, and certain risks cannot be effectively hedged.  Relative value strategies are all (even in the case of pure arbitrage) subject to the fundamental risk that aberrational market prices, even if correctly identified, will not revert to fair value during the period that the Fund is able to maintain its positions.

### Event-Driven Strategies

Event-driven strategies concentrate on the profit potential created by major corporate events: for example, mergers, acquisitions, restructurings, bankruptcies, liquidations, etc.  Unlike relative value strategies, which emphasize the (theoretically compelled) quantitative relationship among different but related assets, event-driven strategies are highly issuer- and transaction-specific and rely more on fundamental research and judgment than on mathematical precision. Positions are taken which will be profitable if a particular event comes to pass, while a variety of techniques are used to mitigate the risk that the event does not happen.   The uncertainty associated with the event is not quantifiable in the same sense as a deviation between a theoretical and an actual price level, which creates an added dimension of risk.

Event-driven strategies are dependent on market conditions conducive to major corporate events.  For example, the probability of a merger being consummated is generally higher during a "bull" market.  A basic distinction among event-driven strategies is whether a position will be established prior to, or only after, the announcement of a proposed transaction.     "Pre-announcement" event-driven investing involves not only the risk of eventual non-consummation but also the risk that the anticipated "event" will never be announced in the first place.  In the case of merger arbitrage, the Manager may, but generally does not, engage in "pre-announcement" strategies.

### Directional Strategies

Directional strategies attempt to predict near- to mid-term absolute movements in the prices of equities, debt instruments or other assets.   Price forecasting may be based on fundamental analysis of an issuer or industry (which may be based on subjective evaluation of the strength of management, the prospects for the business or other factors), specific expertise in a particular technological or scientific niche, quantitative analysis of value indicators (such as price/earnings ratios, "free cash flow" and EBITDA), econometric models in which issuers are treated as fungible, or other fundamental or technical analysis appropriate to a particular situation. Although diverse in their methods, these strategies have in common that they attempt to predict future prices based not on relative mispricing or on the happening of a particular event that will itself define value, but rather on the belief that the market will come to realize the "fair" value of an asset.  These strategies are subject to the risk that the traders will have incorrectly identified fair value or that such fair value will not be reflected in market value within the time horizon of the strategy.

Although certain directional strategies — for example, buying growth equities — are largely dependent on overall market movements, others attempt to reduce the impact of market conditions by establishing both long and short positions. Whiles uch "beta neutral" or "beta reduced" strategies may, to a certain extent, be characterized as relative value strategies, the hallmark of these strategies is the identification of assets which the Manager believes the market will revalue, and the elimination through hedging of the factors which may cause the market not to do so.

### Hybrid and Other Strategies

The alternative investment field has, in recent years, seen a proliferation of new strategies and techniques as well as of instruments available for trading. The relative value, event-driven and directional strategy categories are generally adequate to characterize the currently active strategies employed by the Manager and others, but these categories may not be sufficient to describe all techniques currently employed by or new techniques to be employed by the Manager in the future. The Manager will implement strategies incorporating elements of relative value, event-driven and directional approaches, as well as such other opportunistic investment tactics, as the Manager's principals may consider advantageous from time to time.

### Illustrative Trading Techniques

Certain of the specific trading techniques that have been historically used for the Fund are outlined below for illustrative purposes. The following does not purport to a complete list of all trading strategies employed by the Manager, and certain of the Fund's trades may involve a combination of, or a departure from, these strategies. At different times, the Fund may employ certain, all or none of the following strategies, and may also employ numerous other legally permissible trading techniques, including strategies involving materially higher levels of risk than any of the following.

- Convertible-Securities Arbitrage: Buying "long" a convertible security and selling "short" the underlying stock into which the convertible security may be converted and/or another of the issuer's debt instruments (or a credit default swap on the issuer) in anticipation of profiting from a relative mispricing among them.

- Merger Arbitrage: Investing in the securities of publicly-traded companies involved in prospective mergers, acquisitions, cash tender offers, exchange offers or corporate recapitalizations in the expectation of profiting from the difference between the price of such securities at the inception of the investment and the price of such securities in expectation of or upon consummation of the event.

- Long/Short Trading: Buying "long" a stock or basket of stocks and selling "short" a stock or basket of stocks in anticipation of profiting from changes in the price differential between the respective long and short positions. Historically, the Fund's long/short book has been confined to the utilities and technology sectors, but the Manager anticipates that additional sectors will be added in the future.

- Statistical Arbitrage: One form of statistical arbitrage used by the Fund is buying "long" a security (or basket of securities) and selling "short" a related security, option, or futures contract (or basket of securities, options or futures) when the relative prices of such securities, options or futures deviate from their historical relationship in anticipation of

profiting from a reversion in the prices of such securities, options, or futures to their historical relationship.

- Capital-Structure Arbitrage: Buying "long" and selling "short" different classes of securities of the same issuer in anticipation of profiting from a relative mispricing among them. One particular form of capital-structure arbitrage involves buying "long" a fixed-income security of an issuer and entering into a credit default swap, which calls for payment to the Fund of the principal amount of the fixed-income security against that security's delivery in the event that the issuer suffers a "credit event" (essentially, an event tantamount to default on its debt). Another form of capital-structure arbitrage involves buying "long" an issuer's equity and selling "short" that issuer's debt, in the expectation that the equity is underpriced relative to the debt.

- Warrant/Option Arbitrage: Buying "long" a warrant (or similar derivative) and selling "short" the stock purchasable upon exercise of the warrant in anticipation of profiting from a relative mispricing between them.

- Directional Equity and Corporate Debt: Trading in equity or corporate debt instruments using technical or fundamental analysis or a combination thereof in anticipation of profiting from movements in the prices of these assets. Such investments may be concentrated in specific industry sectors and may include short- or long-term investments, as well as investments in investment grade or distressed debt or equity.

Examples of other types of trading strategies include purchasing equity securities in companies that are being privatized in order to profit from an increase in the price of such securities, currency and commodities trading and energy trading and arbitrage.

The Fund may engage in derivatives trading (including commodity and credit-related derivatives trading) both for hedging and for investment purposes.

Any number of variations on the foregoing, or any other, strategies may be implemented. For example, instead of selling stock short, the Fund may sell short stock futures or other instruments expected to act in a manner similar to stock. In addition, as related opportunities arise, the Fund may take inverse positions to the ones described above (e.g., going "short" a convertible bond and "long" the underlying stock when the price relationship of such securities warrants).

Generally, the instruments traded by the Fund are publicly-traded, although from time to time securities, including non-publicly-traded securities, may be purchased or sold in private transactions. Certain of the Fund's investments may be subject to holding requirements of one or two years or much longer, during which period the Fund will be unable to liquidate such investments.

The Fund invests in other trading entities controlled by the Manager (such as the Master Fund) and may co-invest together with other investment advisers in entities whose portfolios and strategies are determined by a collaborative decision-making process.

*There are no material restrictions on the strategies, leverage, or markets which may be incorporated into the Fund's portfolio or the percentage of the Fund's assets that may be committed to any particular strategy type, market or instrument. The Fund's portfolio will differ materially over time and the strategies implemented are continually evolving as well as changing.*

**Risk Management**

Risk management is integral to the Manager's goal of identifying investment opportunities having superior risk/reward parameters. Accordingly, the Manager seeks to continuously monitor the risk parameters and expected volatility of the Fund's overall portfolio and attempts to prevent over-concentration of the portfolio in any particular investment asset, strategy or market. However, the Manager does not, in general, attempt to hedge all market or other risks inherent in the Fund's portfolio, and hedges certain risks, if at all, only partially. Specifically, the Manager may determine that it is economically unattractive, or otherwise undesirable, to hedge certain risks (either with respect to particular positions or the Fund's overall portfolio) and instead rely on diversification to control such risks.

*By investing in the Fund, subscribers are relying on the discretionary, market judgment of the Manager, trading in a wide range of strategies and markets, without being subject to diversification, leverage or any other form of trading policies.*

**PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN FINANCIAL, LEGAL AND TAX ADVISERS REGARDING THEIR INDIVIDUAL CIRCUMSTANCES AND THE SUITABILITY OF AN INVESTMENT IN THE FUND.**

**MANAGEMENT**

**Manager**

Amaranth Advisors L.L.C., a Delaware limited liability company, is the manager of the Fund. The Manager is responsible for managing and operating the Fund, including the formulation and implementation of its investment and trading policies and strategies, and has full discretionary investment management authority over the Fund and the Master Fund. The managing member and president of the Manager is Nicholas M. Maounis, who together with wholly-owned entities is the majority owner of the Manager.

Since September 2000, Mr. Maounis has been the Chief Investment Officer of the Manager, responsible for all investment functions (including the allocation of the Fund's capital among the various trading strategies employed by the Manager), as well as the overall management and supervision of the Manager. From 1990 until December 31, 2002, Mr. Maounis was employed by PPMC. At PPMC, Mr. Maounis was responsible for supervising a team of traders and trading assistants — many of whom are now employed by the Manager — managing a variety of arbitrage portfolios in the U.S., Japanese, European and Canadian markets. In addition, Mr. Maounis was personally responsible for trading a large convertible-arbitrage portfolio for PPMC. An Affiliate of the Manager continues to manage arbitrage portfolios on behalf of a separately managed account associated with PPMC. From 1989 to 1990, Mr. Maounis was employed by Angelo, Gordon & Co., a U.S. investment company, where he managed a convertible-arbitrage portfolio. From 1985 to 1989, Mr. Maounis was employed by LF Rothschild, Unterberg, Tobin, a U.S. broker-dealer, where he developed a convertible-arbitrage trading program and became a senior vice-president in charge of all convertible-arbitrage trading. Mr. Maounis graduated from the University of Connecticut in 1985 with a Bachelor of Science degree in Finance.

Other principal personnel include:

Charles H. Winkler — Charles Winkler joined the Manager in July 2001 as its Chief Operating Officer. Mr. Winkler is responsible for managing all of the non-trading aspects of the firm, as well as its Service Provider, financing, counterparty and bank relationships. From 1996 to 2001, Mr. Winkler was Senior Managing Director and Chief Operating Officer for Citadel Investment Group, L.L.C., a multi-strategy firm that engages in many of the same relative value and event-driven investment and trading strategies as the Manager. In that capacity, Mr. Winkler was responsible for the management of Citadel's accounting, treasury, administration, compliance, investor relations, legal, marketing, back-office, operations and human resources departments, and was a member of the firm's Management Committee and Chairman of the firm's Operations Committee. Prior to joining Citadel in 1996, Mr. Winkler was a Partner with the Chicago law firm of Neal Gerber & Eisenberg. His 17-year legal practice focused on providing tax and corporate counseling to investment advisers and private investment firms. Mr. Winkler graduated with Highest Honors from Emory University in 1976, receiving a Bachelor's degree in Business Administration in Accounting, and from Northwestern University School of Law, receiving a Juris Doctor in 1979.

Robert Jones — Robert Jones serves as the Manager's Chief Risk Officer. After graduating from Harvard College (1984 *cum laude* in Economics), Mr. Jones joined Fischer Black's group at Goldman, Sachs & Co. to develop proprietary arbitrage strategies and risk-limited portfolio management techniques. After co-authoring 2 papers with Dr. Black, Mr. Jones joined Goldman's equity arbitrage trading unit to run a listed and OTC derivatives book. In 1988, NYSE Chairman, John Phelan, invited Mr. Jones to assist him in evaluating and addressing operational risks exposed during the 1987 crash. In 1989, Mr. Jones joined PPMC where he managed an international derivative arbitrage portfolio. He and Mr. Maounis worked together for 4 years managing arbitrage portfolios for the private investment funds associated with PPMC. Prior to joining the Manager in September 2001, Mr. Jones led Stradivarius Capital, a firm he founded to help quantitatively oriented hedge funds to identify and manage sources of performance uncertainty.

Mr. Maounis and other Manager personnel have substantial personal investments in the Fund. Mr. Maounis and the other Manager personnel may, without notice, withdraw any portion of their personal investments in the Fund in accordance with the terms of the Limited Liability Company Agreement on the same basis as any other investor.

## PPMC

PPMC is the administrator of the Fund and, in that capacity, provides certain administrative, back-office, and accounting services to the Fund, including trade confirmation and settlement services, legal support services, financial and tax reporting and counterparty credit analysis. The relationship between PPMC and the Fund may be terminated by either party on 45 days' notice. *See "Financial and Tax Allocations; Expenses,"* for a description of the fees payable to PPMC.

### Indemnification of the Manager and PPMC

The principals, members, directors, officers and employees of the Manager (the "Manager Parties") will not, absent fraud, bad faith, gross negligence or reckless or intentional misconduct on their part, be liable to the Fund or to any Member for any act or omission in the course of, or in connection with, the services rendered by them for or on behalf of the Fund or for

any loss or damage which the Fund may sustain or suffer as the result or in the course of the discharge by the principals, members, directors, officers or employees of the Manager Parties of their duties to the Fund.

The Fund has agreed to indemnify each Manager Party and, as the Manager may determine, the agents (including PPMC), advisers, and consultants of the Fund from and against any loss, cost, expense, liability, fees (including attorneys' fees and expenses), and damages (other than those resulting from fraud, gross negligence or reckless or intentional misconduct on the part of such persons) which may be imposed on, incurred by or asserted against any of them in performing their obligations or duties for or on behalf of the Fund.

## FINANCIAL AND TAX ALLOCATIONS; EXPENSES

### Financial Allocations of Net Profits and Net Losses

The Manager will establish a separate Capital Account for each Member. Each Capital Account will be adjusted to reflect such Member's share of the Fund's net profits or losses, Fund expenses, allocations to the Manager, Capital Contributions and Capital Withdrawals.

The Fund's net profits and losses are allocated as of the last day of each calendar month among the Members, including the Manager, in proportion to their Capital Account balances at the beginning of such month. Net profits and net losses of the Fund are calculated according to generally accepted accounting principles and include net unrealized profits and losses on securities positions as of the end of each fiscal period. All calculations of net profits and net losses are made after deducting all general, administrative and other operating expenses of the Fund.

Certain items of Fund profits, losses, income, gain or expense may be specially allocated to certain Members, not to the Members as a group. Typically, special allocations result from regulatory or legal requirements prohibiting certain investors from participating (even indirectly through investing in the Fund) in certain transactions (for example, "hot issues"). However, the Manager may cause the Fund to make such special allocations as the Manager deems necessary or advisable in the interest of the Fund as a whole.

### Tax Allocations

The Fund allocates tax items generally in accordance with the financial allocations made to the Members. However, in the event that a Member withdraws during a Fiscal Year, such Member will receive a priority allocation of gain or loss, as appropriate, so as to equalize the Capital Account and tax basis account balance of the portion of such Member's Capital Account withdrawn.

### Monthly Manager Allocations

In lieu of the typical percentage-of-assets "management fee," a portion of the "Net Income" otherwise allocable to each Member's Capital Account is allocated to the Manager as of the end of each month. The Manager Allocation is designed to approximate 1.5%, over successive rolling twelve-month periods, of the average month-end balance of each Member's Capital Account (prior to reduction for the accrued Manager Allocation or any accrued Profit Allocation). If, as of the end of a given month, Net Income has been allocated to the Capital Account of a Member during the 12-month period then ended (or such shorter period as that

-14-

Member has been a Member), a corresponding Monthly Allocation Percentage will be debited against such Capital Account and credited to the Manager's Capital Account.

Investments in the Fund of certain designated principals and associates of the Manager are not subject to the monthly Manager Allocations.

**Annual Profit Allocations**

As of each December 31, each Member's Capital Account is subject to a Profit Allocation equal to 20% of the amount by which the balance, prior to reduction for any accrued Profit Allocation, of such Member's Capital Account exceeds the High Water Mark attributable to such Capital Account.

The High Water Mark attributable to a Capital Account is the highest balance of such Capital Account as of any preceding December 31, after reduction for the Profit Allocation then made (or a Member's aggregate Capital Contributions, if higher). The High Water Mark is proportionately reduced whenever a Capital Withdrawal, distribution or transfer is made. As of each December 31 that a Profit Allocation is made from a Member's Capital Account, the High Water Mark is reset to the Net Asset Value of such Capital Account after such Profit Allocation is made.

Proportionate Profit Allocations are made whenever a Capital Withdrawal, distribution or transfer is made from a Capital Account other than as of a December 31. The amount of such proportionate Profit Allocation equals the Profit Allocation which would have been made from the Capital Account as a whole were the date of such Capital Withdrawal, distribution or transfer a December 31, *multiplied by* the fraction the numerator of which is the amount of such Capital Withdrawal, distribution or transfer and the denominator of which is the balance in such Capital Account immediately prior to such Capital Withdrawal, distribution or transfer (in each case, prior to reduction for the accrued Profit Allocation).

Profit Allocations made as a result of a Capital Withdrawal, distribution or transfer shall reduce the remaining balance in a Member's Capital Account (and be considered a part of such Capital Withdrawal, distribution or transfer), unless the Manager otherwise determines.

Profit Allocations are calculated separately with respect to each Member, on the basis of each Member's overall Capital Account (not separately with respect to each Capital Contribution made by such Member).

Profit Allocations do not reduce increases in Net Asset Value for purposes of calculating subsequent Profit Allocations --- that is, a Member's Capital Account does not have to "earn back" Profit Allocations previously made in order to generate additional Profit Allocations.

Accrued Profit Allocations do not, prior to actual allocation, reduce the value of a Member's Capital Account for purposes of the proportional allocation of net profits or net losses among the Members' respective Capital Accounts.

The Profit Allocations that would otherwise be made in respect of a Fiscal Year are reduced (but not below $0) so that the sum of the Profit Allocations and the amount of DT Bonuses paid by the Fund (including its *pro rata* share of DT Bonuses paid by the Master Fund) in respect of such Fiscal Year equal the Profit Allocations that would have been made had the Manager paid all such DT Bonuses.

Profit Allocations are calculated separately with respect to each Designated Investment, irrespective of Members' participation in the Fund's other investments. Allocations of capital to Designated Investments proportionately reduce the High Water Mark attributable to a Member's Capital Account if the balance in such Capital Account is below such High Water Mark, and reduce such High Water Mark on a dollar-for-dollar basis (with no Profit Allocation being made) if such balance is in excess of such High Water Mark.

The Capital Accounts of certain designated principals and associates of the Manager are not subject to Profit Allocations or affected by the share of DT Bonuses paid by the Fund.

## Expenses

The Fund bears the cost of the fees and expenses of the auditors and legal advisors to the Fund and the Manager, the cost of printing and distributing periodic and annual reports and statements and all other operating other expenses of any nature related to the business of the Fund. The Fund also bears its allocable share of the Manager's operating, general, administrative and overhead costs or expenses, including, without limitation, salaries, bonuses and benefits for Manager personnel, rent, communication equipment, depreciation, information systems, quotation services, investment research services, data feeds, software and licensing fees and other overhead expenses (such expenses, collectively, the "Allocable Expenses"). The Allocable Expenses paid by the Fund fluctuate with its returns, as a result of incentive bonuses paid to Manager personnel that are tied to the investment performance, in whole or in part, of the Fund or the Master Fund. During 2001 and 2002, the Allocable Expenses borne by the Members (other than the Manager), net of the effect of the Profit Allocation and DT Bonuses (which reduce the Profit Allocation), approximated 1.7% and 1.5%, respectively, of the average Net Asset Value of the Fund for those Fiscal Years. Allocable Expenses reduce the increases in Net Asset Value on the basis of which Profit Allocations are made to the Members, and DT Bonuses are paid net of costs and expenses (including Allocable Expenses). Accordingly, in profitable years the Manager and the Designated Traders effectively absorb up to 20% of the Allocable Expenses through reductions in the Profit Allocation and DT Bonuses.

DT Bonuses payable by the Fund (including the Fund's *pro rata* share of DT Bonuses payable by the Master Fund) to the Designated Traders of the Manager in respect of a Fiscal Year reduce the Profit Allocations (but not below $0), that would otherwise be made in respect of such Fiscal Year. The reduction of the Profit Allocations is calculated so that the sum of the DT Bonuses payable by the Fund and the aggregate of the Profit Allocations made with respect to such Fiscal Year equals the Profit Allocations that would have been made had the DT Bonuses been payable by the Manager (so as not to reduce the balance in a Member's Capital Account on which the Profit Allocation is calculated). In general, Profit Allocations in respect of subsequent Fiscal Years are not affected by DT Bonuses in a prior Fiscal Year unless such DT Bonuses exceed the Profit Allocations that would otherwise have been made in respect of such prior Fiscal Year, in which case the Manager will need to "earn back" the amount of such excess before generating additional Profit Allocations.

Designated Traders are a strictly limited group of investment professionals who either (i) are the portfolio managers having overall investment management responsibility — not only trading authority — for each portfolio or sub-portfolio implemented by the Manager on behalf of the Fund or (ii) devote substantially all of their business time to the execution of purchases and sales of Investment Assets for the Fund's portfolio, as opposed to performing research (fundamental or quantitative), securities lending or borrowing, treasury, risk management, investor relations or other services for the Manager. Notwithstanding the number of portfolio

managers employed by the Manager, there will be only one investment professional designated as the portfolio manager for each portfolio or sub-portfolio, and one investment professional may be designated as being the portfolio manager for more than one portfolio or sub-portfolio. The Manager's determination of which of its personnel constitute "Designated Traders" (certain Manager personnel may be so designated in respect of a portion of their bonuses or for only a portion of the Fiscal Year) is binding absent bad faith.

The Fund bears a portion of the expenses and charges incurred by the Master Fund including, in addition to those described above, its organizational and ongoing expenses such as brokerage and custodial fees and expenses, auditing and pricing expenses, administration fees and expenses, legal fees (including in respect of the Manager) and extraordinary expenses, based on the ratio of the Fund's holdings in the Master Fund to the total capital of the Master Fund.

In addition to the Allocable Expenses paid to the Manager, the Fund pays PPMC and its affiliates for providing certain administrative and accounting services to the Fund and the Master Fund, as well as fees and expenses incurred in the borrowing and lending of securities and the costs implicit in financing transactions. *See "Risk Factors"* and *"Conflicts of Interest."*

**Designated Investments**

From time to time, the Fund may make a "Designated Investment" in which the Manager determines (at or within 30 days of the date such investment is made) that only persons who are Members at the time such investment is made will participate. Such Members will retain their interests in the Designated Investment until it is liquidated (whether or not such Members have otherwise withdrawn from the Fund). Manager Allocations and Profit Allocations will be calculated separately with respect to each such Designated Investment.

No Member will participate in Designated Investments which would, on a cumulative basis, require attributable capital allocations from such Member's Capital Account — determined at the time that each Designated Investment is "designated" and after reduction of the amount of such attributable capital allocation by the amount of all distributions received by such Member in respect of Designated Investments (net of all associated Profit Allocations) — in excess of 10% of such Member's Capital Account balance.

Members may opt out of participating in Designated Investments by notifying the Fund in their Subscription Agreements (or by other written notice delivered on or before March 31, 2003, in the case of Members who were Members prior to such date). Members which have previously opted out of participating in Designated Investments may subsequently opt to participate in all future Designated Investments upon irrevocable notice to the Manager.

## BROKERAGE ARRANGEMENTS

The Fund maintains numerous brokerage and custody arrangements with banks and other established financial institutions. Certain of the Fund's assets held by custodians are segregated from the custodians' own property, while other Fund assets held as collateral or margin may not be recoverable in the event of the custodian's insolvency. *See "Risk Factors."*

In negotiating commission rates, the Manager takes into account the financial stability and reputation of the broker, and the quality of the investment research, investment strategies, special execution capabilities, clearance, settlement, custody, recordkeeping and other services provided by such broker (as described more fully below), even though the Fund may or may not

in any particular instance be the direct or indirect beneficiary of the research or other services provided.

In selecting brokers or dealers to execute transactions for the Fund and other clients, the Manager does not solicit competitive bids and has no obligation to seek the lowest available commission cost. While the Manager generally disfavors the use of "soft dollar" services, the Manager does not always negotiate "execution only" commission rates. Services which may be provided to the Manager by the Fund's brokers may include, without limitation, in addition to research, services such as special execution capabilities, clearance, settlement, net pricing, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, on-line access to computerized data regarding clients' accounts, performance measurement data, consultations, economic and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, financial strength and stability, efficiency of execution and error resolution, quotation services, the availability of stocks to borrow for short sales, referral of prospective investors, custody, travel, recordkeeping and similar services, as well as paying for a portion of the Fund's or the Manager's costs and expenses of operation, such as newswire and data processing charges, quotation services, periodical subscription fees and other reasonable expenses incurred by the Manager in performing services on behalf of the Fund.

The "soft dollar" services received from brokers as a result of the Fund's transactions may be used by the Manager in servicing other accounts, and not all such services may be used by the Manager in connection with the Fund.

The foregoing list of "soft dollar" services which may be received by the Manager is extensive because of the diverse range of the possible services which the Fund's brokers provide. However, as a matter of policy the Manager discourages the use of "soft dollar" services, preferring the Fund's brokers to focus on the quality of their execution while the Manager obtains the services which might otherwise be provided by the Fund's brokers elsewhere, from persons specializing in such services. In certain cases, such arrangements, although all related to the Manager's administration and investment management of the Fund, may fall outside of the safe harbor for fiduciaries' use of "soft dollar" payments established by Section 28(e) of the Securities Exchange Act of 1934; provided, in each case, that the Manager believes that these arrangements are equitable and consistent with the Fund's objectives.

Although not prohibited, the Manager does not intend to enter into any arrangement in which the Fund is required to allocate either a stated dollar amount or stated percentage of its brokerage business to any broker for any minimum time period.

Such "soft dollar" services as the Manager may receive will, in general, reduce the pass-through expenses of the Manager's operations that would otherwise be allocable to the Fund.

The Manager assumes no responsibility for the actions or omissions of any broker or dealer selected by the Manager in good faith.

In accordance with applicable regulations, the Manager may allocate futures trades made pursuant to investment strategies to be used for the Fund and certain other accounts managed by the Manager (in which Manager Parties may have an interest) after execution. These allocations will be made so that all accounts managed by the Manager are treated fairly and non-preferentially over time. The Manager reviews these allocations to ensure that they are made in a

manner consistent with the investment strategy in question. Due to confidentiality concerns, investors will not be permitted to review such allocations.

## RISK FACTORS

*The Interests are speculative and illiquid securities involving substantial risk of loss and are suitable for investment only by sophisticated persons for which an investment in the Fund does not represent a complete investment program and who fully understand and are capable of assuming the risks of an investment in the Fund. The following considerations, which do not purport to be a complete list of all risks involved in an investment in the Fund, should be carefully evaluated before investing in the Fund.*

### General Risks

*An investment in the Fund involves a high degree of risk. The Fund cannot assure any Member that its investment objective will be met or that such Member will not lose all or substantially all of such Member's investment.*

**Past Performance**

The past performance of speculative trading strategies such as those implemented by the Fund is not necessarily indicative of their future results.

**Possible Positive Correlation with Stock and Bonds**

One of the goals in incorporating a non-traditional investment such as the Fund into a portfolio is to provide a potentially valuable element of diversification. However, there can be no assurance, particularly during periods of market disruption and stress when the risk control benefits of diversification may be most important, that the Fund will, in fact, be negatively correlated with a traditional portfolio of stocks and bonds.

**Counterparties and Brokers**

The financial institutions and counterparties, including banks and brokerage firms, with which the Fund trades or invests, may encounter financial difficulties and default on their obligations to the Fund. Any such default could result in material losses to the Fund.

**Custody Risk**

The Fund does not control the custodianship of its securities. The banks or brokerage firms selected to act as custodians may become insolvent, causing the Fund to lose all or a portion of the funds or securities held by those custodians.

**Financing Arrangements; Availability of Credit**

The use of leverage is an integral part of the Fund's strategies, and the Fund depends on the availability of credit in order to finance its portfolio. There can be no assurance that the Fund will be able to maintain adequate financing arrangements under all market circumstances. As a general matter, the banks and dealers that provide financing to the Fund can apply essentially discretionary margin, haircut, financing, security and collateral valuation policies. Changes by banks and dealers in such policies, or the imposition of other credit limitations or restrictions,

whether due to market circumstances or governmental, regulatory or judicial action, may result in large margin calls, loss of financing, forced liquidation of positions at disadvantageous prices, termination of swap and repurchase agreements and cross-defaults to agreements with other dealers.   Any such adverse effects may be exacerbated in the event that such limitations or restrictions are imposed suddenly and/or by multiple market participants at or about the same time.  The imposition of such limitations or restrictions could compel the Fund to liquidate all or part of its portfolio at disadvantageous prices.

### Reliance on Corporate Management and Financial Reporting

Many of the strategies implemented by the Fund rely on the financial information made available by the issuers in which the Fund invests.  The Manager has no ability to independently verify the financial information disseminated by the likely thousands of issuers in which the Fund invests and is dependent upon the integrity of both the management of these issuers and the financial reporting process in general.   Recent events have demonstrated the material losses which investors such as the Fund can incur as a result of corporate mismanagement, fraud and accounting irregularities.

### Competition; Potential Strategy Saturation

The Fund competes with numerous other private investment funds as well as other investors, many of which have resources substantially greater than the Fund's.

The amount of capital committed to "alternative investment strategies" has increased dramatically during recent years.  At the same time, market conditions have become significantly more adverse to many of such strategies than they were in previous years.  The profit potential of the Fund may be materially reduced as a result the "saturation" of the alternative investment field.

### Changing Market Conditions

Certain changes in general market conditions — for example, a decline in the corporate issuance of equity-linked securities (*e.g.*, convertible bonds) — could materially reduce the Fund's profit potential.

## Market Risks

*Certain market conditions are materially more favorable to certain of the Manager's strategies than others. The Manager has no ability to control or predict such market conditions.*

### Market Risks In General

All of the Manager's strategies are subject to some dimension of market risk: directional price movements, deviations from historical pricing relationships, changes in the regulatory environment, changes in market volatility, "flights to quality," "credit squeezes," etc.   The Manager's style of alternative investing (including its relative value trading) may be no less speculative than traditional investing strategies.  On the contrary, due in part to the degree of leverage which certain of the Manager's strategies employ, these strategies have from time to time incurred sudden and dramatic losses.

The diversification of the Fund's positions and strategies may not always be significant and, even if significant, may not provide meaningful risk control, even though it may reduce the

Fund's profit potential as a result of certain strategies being unprofitable while others are profitable.

The particular or general types of market conditions in which the Fund may incur losses or experience unexpected performance volatility can not be predicted, and the Fund may materially underperform other investment funds with substantially similar investment objectives and approaches.

**Volatility**

The prices of the instruments traded by the Manager have been subject to periods of excessive volatility in the past, and such periods can be expected to recur. Price movements are influenced by many unpredictable factors, such as market sentiment, inflation rates, interest rate movements and general economic and political conditions.

While volatility can create profit opportunities for the Fund, it can also create the specific risk, in the case of the Fund, that historical or theoretical pricing relationships will be disrupted, causing what should otherwise be comparatively low risk positions to incur losses. On the other hand, the lack of volatility can also result in losses for certain of the Fund's strategies that profit from price movements.

**Stagnant Markets**

Although volatility is one indication of market risk, certain of the investment strategies employed by the Manager rely for their profitability on market volatility contributing to the mispricings which they are designed to identify. In periods of trendless, stagnant markets and/or deflation, alternative investment strategies have materially diminished prospects for profitability.

**Lack of Liquidity**

Despite the generally heavy volume of trading in most of the instruments traded by the Fund, the market for some of these instruments may have limited liquidity. Lack of liquidity can make it economically unfeasible for the Fund to recognize profits on open positions or to close out open positions against which the market is moving. In addition, illiquidity can disrupt the historical price relationships on which the Manager's relative value and directional strategies are based as the fewer transactions that take place the greater the risk of market values not reflecting true pricing relationships or fair value.

**Market Disruptions**

The Fund may incur major losses in the event of disrupted markets and other extraordinary events in which historical pricing relationships (on which the Manager bases a number of its trading positions) become materially distorted. The risk of loss from pricing distortions is compounded by the fact that in disrupted markets many positions become illiquid, making it difficult or impossible to close out positions against which the markets are moving.

The financing available to the Fund from its banks, dealers and other counterparties is typically reduced in disrupted markets. Such a reduction may result in substantial losses to the Fund. In 1994 and again in 1998 a sudden restriction of credit by the dealer community resulted in forced liquidations and major losses for a number of private investment funds applying strategies similar to those implemented by the Fund. Market disruptions caused by unexpected

political, military and terrorist events may from time to time cause dramatic losses for the Fund, and such events can result in otherwise historically low-risk strategies performing with unprecedented volatility and risk.

**Strategy Risks**

*There can be no assurance that what is perceived by the Manager as an investment opportunity will not, in fact, result in substantial losses due to one or more of a wide variety of factors. From time to time, the economic viability of an entire strategy may deteriorate, due to an excessive concentration of investors implementing the same approach or general economic events that disrupt the source of profits which the strategy seeks to exploit (for example, by disrupting historical pricing relationships). The Fund can only be successful if the Manager is able to invest successfully, and there can be no assurance that this will be the case.*

***Certain Strategy Types***

**Multi-Strategy Approach**

Although historically the Fund's core portfolio has been concentrated in a variety of relative value or arbitrage strategies, there are no material limitations on the instruments, markets or countries in which the Manager may invest or on the investment strategies which it may employ on behalf of the Fund, and the Fund has significant exposure to event-driven and directional as well as hybrid strategies. In fact, many of the relative value and event-driven investment strategies used by the Fund have inherently directional characteristics; for example, certain statistical equity arbitrage strategies involve trading portfolios of long and short equity positions based on valuation techniques which are equally applicable to directional strategies. The Manager believes that its opportunistic directional investing can provide significant, incremental profit potential over time as a natural outgrowth and complement to the Manager's relative value and event-driven approaches. Directional investing is subject to all the risks inherent in incorrectly predicting future price movements. Often these price movements will be determined by unanticipated factors, and even if the determining factors are correctly identified, the Manager's analysis of those factors may prove inaccurate — in each case, potentially leading to substantial losses.

**Relative Value Strategies**

The success of the Fund's relative value trades is dependent on the Manager's ability to exploit relative mispricings among interrelated instruments. Although relative value positions are considered to have a lower risk profile than directional trades as the former attempt to exploit price differentials not overall price movements, relative value strategies are by no means without risk. Mispricings, even if correctly identified, may not converge within the time frame within which the Fund maintains its positions. Even pure "riskless" arbitrage—which is rare—can result in significant losses if the arbitrage is not able to be sustained (due, for example, to margin calls) until expiration. The Fund's relative value strategies are subject to the risks of disruptions in historical price relationships, the restricted availability of credit and the obsolescence or inaccuracy of its or third party valuation models. Market disruptions may also force the Fund to close out one or more positions. Such disruptions have in the past resulted in substantial losses for funds employing relative value strategies.

A major component of the Fund's relative value trading involves spreads between two or more positions. To the extent the price relationships between such positions remain constant, no

-22-

gain or loss may occur. Such positions do, however, entail a substantial risk that the price differential could change unfavorably and, due to the leveraged nature of the Fund's trading, result in increased losses. In addition, changes in the shape of the yield curve can cause significant changes in the profitability of hedging or spreading operations. In the event of an inversion of the yield curve, the reversal of the interest differential between investments of different maturities can make previously profitable hedging techniques unprofitable for the Fund.

### "Event Driven" Investing

The Fund invests in positions whose profitability depends on the result of some significant corporate event, for example, a merger, tender offer, exchange offer or liquidation. Corporate events are affected by numerous factors—including not only market movements but also regulatory intervention, shareholders' consent and changes in interest rates and economic outlook—that can have a particularly adverse effect on even the most apparently safe risk arbitrage investments. The risk of non-consummation in such transactions is high, and unexpected outcomes can lead to substantial losses.

### Directional Trading

Certain of the positions taken by the Manager are designed to profit from forecasting absolute price movements in a particular instrument.  Predicting future prices is inherently uncertain and the losses incurred, if the market moves against a position, will often not be hedged.  The speculative aspect of attempting to predict absolute price movements is generally perceived to exceed that involved in attempting to predict relative price fluctuations.

### Hybrid and Other Strategies

Many of the strategies executed by the Manager combine elements of more than one of the foregoing general strategy types. Often, in the course of implementing a particular strategy an opportunistic trade representing a different trading approach will be made.  For example, in seeking to identify a relatively mispriced pair of assets, the Manager may conclude that an asset is sufficiently over- or underpriced to merit taking an outright directional position.

The Manager's approach combines a range of different trading techniques, both implementing different strategies in different markets and combining different strategies, in the same or related markets.

The Manager is continually developing new, and adapting and refining existing, strategies.  There is no material limitation on the strategies which the Manager may apply and no assurance as to which types of strategies may be applied at any one time.

### *Certain Instruments Traded*

### Equity Securities

A number of the Manager's strategies are based on attempting to predict the future price level of different equity or equity-related securities.  Numerous inter-related and difficult-to-quantify economic factors, as well as market sentiment, subjective and extraneous political, climate-related and terrorist factors, influence the cost of equities; there can be no assurance that the Manager will be able to predict future price levels correctly.  The Fund's directional equity

positions are typically leveraged, and even comparatively minor adverse market movements can result in substantial losses.

### Debt Securities

The debt securities that the Fund invests in are interest-rate sensitive and may be subject to price volatility due to various factors including, but not limited to, changes in interest rates, market perception of the creditworthiness of the issuer and general market liquidity. In addition to high investment grade debt securities, the Fund invests in low investment grade or non-investment grade debt securities, which are typically subject to greater market fluctuations and risks of loss of income and principal than lower yielding, investment grade securities and are often influenced by many of the same unpredictable factors which affect equity prices. In addition to the sensitivity of debt securities to overall interest-rate movements, debt securities involve a fundamental credit risk based on the issuer's ability to make principal and interest payments on the debt it issues. The Fund's investments in debt securities may experience substantial losses due to adverse changes in interest rates and the market's perception of issuers' creditworthiness.

The Fund also invests in certain hybrid debt arrangements, which are subject to risks in addition to overall interest-rate movements and the issuers' ability to pay the debt in accordance with its terms. For example, when the Fund invests in syndicated debt such as loan participations, it is subject to certain additional risks as a result of having no direct contractual relationship with the borrower of the underlying loan. In such circumstances, the Fund generally depends on the lender to enforce its rights and obligations under the loan arrangements in the event of a default by the borrower on the underlying loan and will generally have no voting rights with respect to the issuer, as such rights are typically retained by the lender. Such investments are subject to the credit risk of the lender (as well as the borrower) since they will depend upon the lender forwarding payments of principal and interest received on the underlying loan. There can be no assurance that the lender will not default on its obligations under such arrangements, resulting in substantial losses to the Fund.

### Distressed and High Yield Securities

The Fund invests in the securities of issuers in weak financial condition, experiencing poor operating results, needing substantial capital investment, perhaps having negative net worth, facing special competitive or product obsolescence problems or involved in bankruptcy or reorganization proceedings. Investments of this type may involve specialized financial and business risks that can result in significant or even total losses. Among the risks inherent in investments in financially troubled issuers is the fact that it is frequently difficult to obtain reliable information as to their true financial condition. The market prices of distressed and high yield securities are subject to abrupt and erratic market movements and excessive price volatility, and unusually wide "bid–ask" spreads.

### Derivatives

The Fund uses derivative financial instruments, including, without limitation, warrants, options, swaps, convertible securities, notional principal contracts, contracts for difference, forward contracts, futures contracts and options thereon, and may use derivative techniques for hedging and for other trading purposes. The use of derivative instruments involves a variety of material risks, including the extremely high degree of leverage often embedded in such instruments and the possibility of counterparty non-performance as well as of material and prolonged deviations between the actual and the theoretical value of a derivative (*i.e.*, due to

nonconformance to anticipated or historical correlation patterns). In addition, the markets for certain derivatives are frequently characterized by limited liquidity, which can make it difficult as well as costly to the Fund to close out positions in order either to realize gains or to limit losses.

Some of the derivatives traded by the Fund are principal-to-principal or "over-the-counter" contracts between the Fund and third parties entered into privately, rather than on an established exchange. As a result, the Fund will not be afforded the regulatory protections of an exchange or its clearinghouse (or of a government regulator that oversees the exchange or clearinghouse) if a counterparty fails to perform. In privately negotiated transactions, the risk of the negotiated price deviating materially from fair value is substantial, particularly when there is no active market available from which to derive benchmark prices.

Many derivatives are valued on the basis of dealers' pricing of these instruments. However, the price at which dealers value a particular derivative and the price which the same dealers would actually be willing to pay for such derivative should the Fund wish or be forced to sell such position may be materially different. Such differences can result in an overstatement of the Fund's Net Asset Value and may materially adversely affect the Fund in situations in which the Fund is required to sell derivative instruments. The Fund's use of derivatives and other techniques (such as short sales) for hedging purposes involves certain additional risks, including: (i) dependence on the ability to predict movements in the price of the asset being hedged; (ii) imperfect correlation between movements in the asset on which the derivative is based and movements in the asset being hedged; and (iii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of the Fund's assets segregated to secure its obligations under derivatives contracts. In addition, by hedging a particular position, the Fund may limit any potential gain from an increase in value of such position.

**Credit Default Swaps**

The Fund purchases and sells credit derivatives contracts — primarily credit default swaps — both for hedging and other purposes. The typical credit default swap contract requires the seller to pay to the buyer, in the event that a particular reference entity experiences specified credit events, the difference between the notional amount of the contract and the value of a portfolio of securities issued by the reference entity that the buyer delivers to the seller. In return, the buyer agrees to make periodic payments equal to a fixed percentage of the notional amount of the contract. The Fund may also sell credit default swaps on a basket of reference entities as part of a synthetic collateralized debt obligation transaction.

As a buyer of credit default swaps, the Fund is subject to certain risks in addition to those described under " — Derivatives," above. In circumstances in which the Fund does not own the debt securities that are deliverable under a credit default swap, the Fund is exposed to the risk that deliverable securities will not be available in the market, or will be available only at unfavorable prices, as would be the case in a so-called "short squeeze." In certain instances of issuer defaults or restructurings, it has been unclear under the standard industry documentation for credit default swaps whether or not a "credit event" triggering the seller's payment obligation had occurred. In either of these cases, the Fund would not be able to realize the full value of the credit default swap upon a default by the reference entity.

As a seller of credit default swaps, the Fund incurs leveraged exposure to the credit of the reference entity and is subject to many of the same risks it would incur if it were holding debt securities issued by the reference entity. However, the Fund will not have any legal recourse

against the reference entity and will not benefit from any collateral securing the reference entity's debt obligations. In addition, the credit default swap buyer will have broad discretion to select which of the reference entity's debt obligations to deliver to the Fund following a credit event and will likely choose the obligations with the lowest market value in order to maximize the payment obligations of the Fund.

### Non-U.S. Securities

The Fund trades and invests in securities of companies domiciled or operating in one or more non-U.S. countries. Investing in these securities involves considerations and possible risks not typically involved in investing in securities of companies domiciled and operating in the United States, including instability of some non-U.S. governments, the possibility of expropriation, limitations on the use or removal of funds or other assets, changes in governmental administration or economic or monetary policy (in the United States or abroad) or changed circumstances in dealings between nations. The application of non-U.S. tax laws (*e.g.*, the imposition of withholding taxes on dividend or interest payments, income taxes and excise taxes) or confiscatory taxation may also affect the Fund's investment in non-U.S. securities. The Fund may incur higher expenses from investment in non-U.S. securities than from investment in U.S. securities because of the costs that must be incurred in connection with conversions between various currencies and because non-U.S. brokerage commissions may be higher than commissions in the United States. Non-U.S. securities markets also may be less liquid, more volatile and less subject to governmental supervision than in the United States. The Fund's investments in non-U.S. countries could be adversely affected by other factors not present in the United States, including lack of uniform accounting, auditing and financial reporting standards and potential difficulties in enforcing contractual obligations.

### Private Investments and Illiquid Investments

The Fund from to time invests in illiquid and restricted, as well as thinly-traded, securities (including privately placed and restricted securities). There may no be no trading market for these securities, and the Fund might only be able to liquidate these positions, if at all, at disadvantageous prices. As a result, the Fund may be required to hold such securities despite adverse price movements. In addition, if the Fund makes a short sale of an illiquid security, it may have difficulty in covering the short sale, resulting in a potentially unlimited loss on that position.

The Manager values the illiquid securities in the Fund's portfolio in its good faith discretion. Although there can be no assurance that these valuations will accurately predict the price at which an arm's-length buyer would be willing to purchase the securities, these valuations are part of the calculation of the Fund's Net Asset Value, which is the basis on which investors invest or withdraw from the Fund (as well as the basis for calculating the Manager and Profit Allocations).

Designated Investments may represent up to 10% of a Member's Capital Account (unless a Member opts out of participating in Designated Investments altogether). A Member will be required to participate in such Designated Investments irrespective of whether such Member has otherwise withdrawn from the Fund, and the Fund may be required to hold Designed Investments for several years, if not longer.

**Over-the-Counter Energy Transactions**

The Fund invests in energy-based financial instruments, including, without limitation, exchange-traded and over-the-counter derivatives contracts such as futures, options, swaps and forwards, which have energy commodities (such as crude oil, petroleum products, natural gas and electric power) as their reference asset. Certain of these markets are in developmental stages and may expose the Fund to unusually volatile returns and illiquidity. While these markets have had good profit potential in the past, it is reasonable to expect that trading margins will erode as these markets mature. In addition, as a result of recent events the number of counterparties engaged in energy trading has been reduced, resulting in substantially less liquidity in these markets than has historically been the case.

In the exchange-traded, over-the-counter, regional transmission organization and independent system operator markets, disruptions can occur due to government intervention, changes in law, terrorist attacks, force majeure or other unforeseen events, high trading volumes, unexpected changes in congestion, dislocation in nodal prices resulting from unexpected market conditions such as outages, extreme weather, spikes in fuel prices or other factors such as market illiquidity or disruption, the inability or refusal of a counterparty to perform, insolvency or bankruptcy of a significant market participant. In addition, energy-based derivatives have the same risks associated with them as other derivative financial instruments (see "— Derivatives," above), including a high degree of leverage, deviations between actual and theoretical value of the reference commodity and the derivative and imperfections in dealer pricing.

### *Certain Trading and Investing Techniques*

**Model Risk**

Certain of the Manager's strategies require the use of quantitative valuation models that it has developed over time, as well as valuation models developed by third-parties and made available to the Manager. As market dynamics (for example, due to changed market conditions and participants) shift over time, a previously highly successful model often becomes outdated or inaccurate, perhaps without the Manager recognizing that fact before substantial losses are incurred. There can be no assurance that the Manager will be successful in continuing to develop and maintain effective quantitative models, and the necessity of continuously updating these models demonstrates that the Manager's past successful results may not be representative of the Fund's future performance.

**Importance of Market Judgment**

Although the Manager uses quantitative valuation models in evaluating the economic components of certain prospective trades, the Manager's quantitative strategies are by no means wholly systematic; the market judgment and discretion of the Manager's personnel are fundamental to the implementation of these strategies. The greater the importance of subjective factors, the more unpredictable a trading strategy becomes.

**Exchange Rates**

The Fund invests in securities and instruments denominated in non-U.S. currencies. Such investments are subject to the risk that the value of a particular currency will change in relation to the U.S. Dollar, which is the base currency of the Fund. Among the factors that may affect currency values are trade balances, the level of short-term interest rates, differences in relative

values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. The Manager may seek to hedge these risks by investing directly in non-U.S. currencies and buying and selling options, futures or forward contracts thereon. The Fund cannot, however, assure any Member that those strategies, if implemented, will be effective.

**Duration of Investment Positions**

The Manager typically does not know (except in the case of certain options or derivatives positions which have pre-established expiration dates) the maximum — or, often, even the expected (as opposed to optimal) — duration of any particular position at the time of initiation. The length of time for which a position is maintained varies significantly, based on the Manager's subjective judgment of the appropriate point at which to liquidate a position so as to augment gains or reduce losses.

Many of the Manager's transactions involve acquiring related positions in a variety of different instruments or markets at or about the same time. Frequently, optimizing the probability of being able to exploit the pricing anomalies among these positions requires holding periods of significant length — often many months to a year or more. Actual holding periods depend on numerous market factors which can both expedite and disrupt price convergences. There can be no assurance that the Fund will be able to maintain any particular position, or group of related positions, for the duration required to realize the expected gains, or avoid losses, from such positions.

**Securities Lending**

The Fund borrows and will in the future lend securities on an ongoing basis in the regular course of its investing. In doing so, the Fund may lend securities to, or borrow securities from, other accounts managed by the Manager as well as to third parties. This operation (i) generates income for the Fund, and (ii) gives the Fund access to "hard to borrow" securities held by other accounts managed by the Manager that could not be obtained from third parties. It is not anticipated that any of these securities lending transactions will be reviewed by the Members' Representative or any third party, although these transactions involve potentially material conflicts of interest.

Third parties, as well as other accounts managed by the Manager, that will borrow securities from the Fund may not be able to return these securities on demand (possibly causing the Fund to default on its obligations to other parties) and may also default on the payment obligations owed to the Fund in connection with such securities loans, potentially resulting in substantial losses to the Fund.

**Short Sales**

As an integral part of its trading strategies, the Fund routinely "sells securities short." A short sale is effected by selling a security which the Fund does not own, or selling a security which the Fund owns but which it does not deliver upon consummation of the sale. In order to make delivery to the buyer of a security sold short, the Fund must borrow the security. In so doing, it incurs the obligation to replace that security, whatever its price may be, at the time it is required to deliver it to the lender. The Fund must also pay to the lender of the security any dividends or interest payable on the security during the borrowing period and may have to pay a premium to borrow the security. This obligation must, unless the Fund then owns or has the right