to obtain, without payment, securities identical to those sold short, be collateralized by a deposit of cash or marketable securities with the lender.  Short selling is subject to a theoretically unlimited risk of loss because there is no limit on how much the price of a security may appreciate before the short position is closed out. There can be no assurance that the security necessary to cover the short position will be available for purchase by the Fund.  In addition, purchasing securities to close out the short position can itself cause the price of the relevant securities to rise further, thereby increasing the loss incurred by the Fund. Furthermore, the Fund may prematurely be forced to close out a short position if a counterparty from which the Fund borrowed securities demands their return, resulting in a loss on what might otherwise have been a profitable position.

**Hedging**

The Manager does not, in general, attempt to hedge all market or other risks inherent in the Fund's positions, and hedges certain risks, if at all, only partially.  Specifically, the Manager may choose not, or may determine that it is economically unattractive, to hedge certain risks — either in respect of particular positions or in respect of the Fund's overall portfolio. The Fund's portfolio composition commonly results in various directional market risks remaining unhedged, although the Manager may rely on diversification to control such risks to the extent that the Manager believes it is desirable to do so.

**Leverage**

The Fund invests on a highly leveraged basis, both through its borrowings and through the significant degree of leverage typically embedded in the derivative instruments in its portfolio.  Losses incurred on the Fund's leveraged investments increase in direct proportion to the degree of leverage employed.  The Fund also incurs interest expense on the borrowings used to leverage its positions.

To the extent the assets of the Fund have been leveraged through the borrowing of money, the purchase of securities on margin or otherwise, the interest expense and other costs and premiums incurred in relation thereto may not be recovered.  If gains earned by the Fund's portfolio fail to cover such costs, the Net Asset Value of the Fund may decrease faster than if there had been no borrowings.

**Trade Execution Risk**

Many of the trading techniques used by the Fund require the rapid and efficient execution of transactions. Inefficient executions can eliminate the small pricing differentials which the Manager seeks to exploit.

**No Formal Diversification Policies**

Although diversification is an integral part of the Manager's overall portfolio risk management process, the Manager is not restricted as to the percentage of the Fund's assets that may be invested in any particular issuer, industry, instrument, market or strategy.  The Fund does not and will not maintain any fixed requirements for diversifying its portfolio among issuers, industries, instruments, markets or strategies. In attempting to maximize the Fund's returns, the Manager may concentrate the holdings of the Fund in those industries, companies, instruments or markets which, in the sole judgment of the Manager, provide the best profit opportunities consistent with the Fund's investment objective. Consequently, a loss in any such concentrated

position could ultimately result in significant losses to the Fund and a proportionately higher reduction in the Net Asset Value of the Fund than if its capital had been spread over a wide number of positions.

**Developing New or Additional Investment Strategies**

The Manager has in the past developed additional trading strategies that it utilizes on behalf of the Fund and intends to develop new strategies in the future. The Manager is not restricted from using the Fund's capital in developing and incubating new strategies, even if the Manager has limited experience in a new strategy. There can be no assurance that the Manager will be successful in implementing these strategies or such other strategies as the Manager may from time to time develop and implement for the Fund or that the Fund will not suffer losses during the development stage.

### *Structural Risks*

**Importance of the Manager**

The Fund must rely on the ability of the Manager to manage the Fund's trading and investment program and the continued availability of the Manager's services to it. The Manager, in turn, is dependent on the services of certain key personnel, and the loss of the services of one or more such professionals could impair the ability of the Manager to provide services to the Fund, and be material and adverse to the Fund, despite the broad range of investment professionals employed by the Manager and its Affiliates.

**Growth in Assets Under Management**

The Manager's total assets under management have increased dramatically in the past year and are currently at record levels. There can be no assurance — particularly given the highly competitive environment for alternative investing strategies — that the Manager will continue to be successful managing significantly increased amounts of capital.

**Restrictions on Capital Withdrawals**

Because Capital Withdrawals are limited and the Interests are not freely tradable, an investment in the Fund is illiquid and involves a high degree of risk. Irrespective of the success or failure of the Manager's strategies, Members' inability to withdraw from the Fund on short notice materially increases the risk of an investment in the Interests because it is not possible to make Capital Withdrawals in order to recognize profits or mitigate losses before such profits may have been eliminated or such losses significantly accelerated. In fact, under certain circumstances, the Fund may suspend Members' ability to make Capital Withdrawals, leaving them fully exposed to the risk of the Fund's performance for an indefinite period of time.

**Effect of Substantial Capital Withdrawals**

Substantial Capital Withdrawals over a short time period could necessitate the liquidation of a significant portion of the Fund's trading positions on materially disadvantageous terms. The Gate and withdrawal fees imposed on Quarterly Withdrawals provides no protection to the Fund from substantial Anniversary Withdrawals or Annual Appreciation Withdrawals.

**Profit Allocation**

The fact that the Manager is compensated primarily based on the trading profits of the Fund may create an incentive for the Manager to make investments on behalf of the Fund that are riskier or more speculative than would be the case in the absence of such compensation. In addition, the allocations received by the Manager are based primarily on realized and unrealized gains and losses of the Fund. As a result, the allocations to the Manager could be made in respect of unrealized gains of the Fund that may never be realized. The Fund's Net Asset Value will normally be calculated by the Manager, whose compensation is based in substantial part on the change in such Net Asset Value. *See "Net Asset Value."*

**Fund Expenses**

The Fund incurs substantial costs in addition to the Manager Allocation and the Profit Allocation. The expenses of the Fund may represent a higher percentage of Net Assets than would be found in many other private investment funds.

Many of the strategies employed by the Fund require frequent trading. Therefore, portfolio turnover, brokerage commissions and other transaction fees and expenses, may vastly exceed those of other trading entities of comparable size and indirectly affect the Fund's earnings.

**"Hot Issue" Trading**

Historically, the Fund has not engaged in "hot issues" trading, but it intends to do so in the future. In the event that the Fund elects to trade "hot issues" in the future, investors that are "restricted persons" under applicable National Association of Securities Dealers, Inc. rules will not be permitted to participate in the returns generated by those trades.

**Valuation Risk; Use of Estimates**

The Manager has the right to value the Fund's positions in such manner as it deems fair. The Fund's Net Asset Value is based to the extent possible on quotes provided by brokers and other competent third-party pricing sources. The fair market value of those investments of the Fund for which a reliable third-party quote is not available or is overruled will be based on other relevant sources deemed reliable by the Manager in its good faith judgment. Investors should note that Net Asset Value calculations of the Fund may be adjusted following the year-end audit. Neither the Manager nor PPMC shall bear any liability if a price, reasonably believed by either of them to be an accurate valuation of a particular direct or indirect investment of the Fund, is subsequently found to be inaccurate.

The Manager Allocation and the Profit Allocation, as well as amounts due to investors upon withdrawal or in connection with distributions, are determined on the basis of estimates.

**Possible Adverse Tax Consequences**

The Fund cannot assure any Member that the Internal Revenue Service or the applicable state, local or foreign tax authorities (collectively, the "Tax Authorities") will accept the tax positions taken by such Member or the Fund. If any Tax Authority successfully contests a tax position taken by the Fund, the Fund or the Members may be liable for tax, interest, additions to tax or penalties and the Members may need to file or amend one or more tax returns to reflect such contested positions. The Manager shall not be liable to the Fund or any Member for any tax

position taken by the Manager with respect to the Fund in good faith and which was not clearly contrary to law when taken.

Members are subject to tax each year on their allocable shares of the Fund's income or gains, if any, whether or not cash or property is distributed by the Fund to them. The tax liability due in respect of such income or gains (if any) could be substantial. Members must either withdraw capital (which they may do only under the limited circumstances described herein) or find other sources of funding to discharge their tax liabilities resulting from their investments in the Fund. The recognition of income, gains and losses in any year for tax purposes may not correspond to, and may, in fact, be greater than, the economic performance of the Fund.

The Fund invests, and the Manager and its Affiliates may establish offices or engage in other activities, in other jurisdictions (including outside the United States). These offices and/or activities of the Fund, the Manager and its Affiliates could result in the Fund, and potentially, certain Members, being subject to taxation in one or more jurisdictions.

The Manager's investment decisions are based primarily upon economic, not tax, considerations, and could result, from time to time, in adverse tax consequences to some or all investors.

Substantially all of the gains (if any) recognized by the Fund are taxed at short-term capital gains or ordinary income rates.

**Risk of Litigation**

In the ordinary course of its business, the Fund may be subject to litigation from time to time.  In addition, the Fund may accumulate substantial positions in the securities of issuers that become involved in proxy contests or other litigation.  As a result of such investments, the Fund could be named as a defendant in a lawsuit or regulatory action.  The outcome of such proceedings, which may materially adversely affect the value of the Fund, may be impossible to anticipate, and such proceedings may continue without resolution for long periods of time.  Any litigation may consume substantial amounts of the Manager's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation.

**Limited Regulatory Oversight**

The Fund is not registered as an investment company under the Investment Company Act of 1940 in reliance upon Section 3(c)(7) thereof, and does not intend to do so. Accordingly, the provisions of the Investment Company Act, which among other things require investment companies to have a majority of disinterested directors, require securities held in custody at all times to be maintained in segregated accounts and regulate the relationship between the investment company and its asset manager, are not applicable to an investment in the Fund. The Manager is not registered as an investment advisor under the Investment Advisers Act of 1940. Nor is the Fund or the Manager subject to comparable regulation in any non-U.S. jurisdiction. Therefore, investors in the Fund do not have the benefits of the protections afforded by, nor is the Fund subject to the restrictions contained in, such registration and regulation.

**Regulated Trading Vehicles**

Certain of the Trading Vehicles through which the Fund implements investment strategies are registered as broker-dealers and/or in other capacities. Were such registrations to be revoked or suspended, however, the ability of the Fund to implement certain portions of its strategies could be materially impaired. Such Trading Vehicles are subject to ongoing regulatory oversight, periodic regulatory audits and other rules and restrictions not customarily imposed upon other private investment ("hedge") funds. These restrictions (such as limitations on withdrawals of capital and prohibitions on certain trading and investing techniques) could adversely impact the Fund's ability to pay Capital Withdrawals or its ability to effect certain transactions. The Fund will bear its *pro rata* share of the registered Trading Vehicles' compliance costs.

**Possibility of Additional Government or Market Regulation**

Market disruptions and the dramatic increase in the capital allocated to alternative investment strategies during recent years have led to increased governmental as well as self-regulatory scrutiny of the "hedge fund" industry in general, and certain legislation proposing greater regulation of the industry periodically is considered by the U.S. Congress, as well as the governing bodies of foreign jurisdictions. It is impossible to predict what, if any, changes in regulation applicable to the Fund, the Manager, the markets in which they trade and invest or the counterparties with which they do business may be instituted in the future. Any such regulation could have a material adverse impact on the profit potential of the Fund, as well as required increased transparency as to the identity of the Members.

## CONFLICTS OF INTEREST

*The following potential as well as actual conflicts of interest may materially and adversely affect the Fund. Investors will have no means of determining whether these conflicts are being equitably resolved by the Manager.*

**The Manager**

*General*

The Manager manages and advises accounts other than the Fund. There is no limit on the number of accounts that may be managed or advised by the Manager. The Manager may have financial incentives to favor certain other accounts over the Fund. Even if the Manager does not do so, the Manager would be required to allocate its limited resources among the Fund and the other accounts that the Manager advises.

The Manager may engage in a wide variety of business transactions with parties that provide services to the Fund as well as parties that trade in the same markets as the Fund. The business dealings between Manager Parties and the Fund will be on what the Manager believes to be an arm's-length basis, but the Manager will not necessarily give third parties an opportunity to provide such services on a competitive basis.

Manager Parties and other funds managed by the Manager may engage in transactions directly with the Fund, and may be selling or acquiring the same, or comparable positions as those which the Fund is acquiring or selling at or about the same time. Other accounts directed

by the Manager may be given priority or exclusive access to certain positions and certain of such accounts may materially outperform the Fund.

*Profit Allocations; DT Bonuses; Manager Charges*

The receipt of the Profit Allocation may incent the Manager to trade and invest the Fund's portfolio in a more speculative manner than the Manager would otherwise. The determination by the Manager as to whether an investment professional is a Designated Trader (whose DT Bonuses reduce Profit Allocations) is ultimately subjective, and the Manager may have an incentive to classify certain personnel as not being Designated Traders so that their bonuses for a given Fiscal Year are paid by the Fund (or the Master Fund) without reduction for the Profit Allocations made in respect of such Fiscal Year.

Although the Manager believes that the terms on which the Manager provides administrative, accounting, data processing, research, investment-related and other services to the Fund (the costs of which are passed through to the Fund) are fair, the arrangements between the Fund and the Manager were not negotiated on an arm's-length basis.

From time to time, the Manager may permit certain Members to acquire Interests on different business terms than other Members, provided that doing so does not adversely affect such other Members.

*Valuation*

The Manager is responsible for determining the fair market value of the Fund's assets and liabilities. The Manager has not adopted any strict pricing formula or methodology (except as described under *"Net Asset Value"*). The Manager will determine the Fund's Net Asset Value to the extent possible based on quotes provided by brokers and other competent third-party pricing sources. However, the Manager is authorized to use its own valuations, rather than quotes supplied by independent dealers, if it believes its values are more accurate, in its sole discretion. Overvaluing positions could inflate the value of Members' Capital Accounts as well as the Fund's performance record and the Profit Allocations.

The Manager believes that the method in which it "marks" the Fund's positions is fair, but there can be no assurance that this will be the case. However, this conflict is mitigated by the fact that PPMC and another third-party service provider also value the Fund's and/or the Master Fund's positions; in the event of any inconsistency a consensus is reached on such valuations.

**Securities Lending**

The Fund borrows, and in the future will lend, securities in the ordinary course of its business and may do so not only with third parties but also with other accounts managed by the Manager as well as the PPMC entities. Such transactions among different Manager Clients are not subject to approval by the Members' Representative, but involve potentially material conflicts of interests — *e.g.,* one Manager Client paying securities lending fees to another Manager Client or allocating "hard to borrow" securities to, as well as "calling in" borrowed securities from, various Manager Clients.

The Manager will have different economic interests in different accounts directed by the Manager and its Affiliates and, accordingly, may have incentives to favor certain such accounts over others by causing them to lend securities to, or borrow securities from, the former. Although

-34-

the Manager believes that the terms of the accounts' securities lending activities are competitive and that this lending activity is in the interests of all accounts, there will be no objective review or monitoring of the manner in which the Manager is resolving the potentially material conflicts of interest involved in causing different accounts over which the Manager has direct control to engage in ongoing securities lending transactions with each other.

## Members' Representative

The Fund has established a Members' Representative, a professional services firm that is independent of the Manager and its Affiliates and does not otherwise perform material services for the Manager or the Fund, to provide a mechanism for obtaining (or withholding), when appropriate, the informed consent of the Members to enter into certain transactions which would otherwise be inappropriate or impermissible due to the conflicts of interest involved (for example, the sale of a position by the Fund to another account managed by the Manager). The role of the Members' Representative is not to make investment recommendations or pricing determinations nor to review the merits of any transaction on an objective basis. The Members' Representative is exculpated and indemnified under the Limited Liability Company Agreement to the same extent as the Manager.

Each Member authorizes the Members' Representative to act as its agent for such purpose.

## PPMC

PPMC has an ongoing relationship with the Fund and the Manager. The Chairman, Chief Executive Officer and the sole shareholder of PPMC is S. Donald Sussman. Mr. Sussman is also a minority owner and non-managing member of the Manager.

PPMC is involved in a wide range of different investment operations, including investing in and placing assets under the management of firms that may compete with the Manager and the Fund. Among other things, PPMC provides administrative and accounting services to the Fund, including trade confirmation and settlement services, legal support services, financial and tax reporting and counterparty credit analysis. The administrative and accounting services relationship between PPMC and the Fund may be terminated by either party on 45 days' notice. In addition, private investment companies affiliated with PPMC invest in the Master Fund by means of a separate feeder fund whereby they are subject to similar withdrawal and economic terms as investors in the Fund. An Affiliate of the Manager also manages a separate "managed" account for the benefit of private investment funds affiliated with PPMC (the "PPMC Managed Account") utilizing certain, but not all, of the investment strategies it utilizes on behalf of the Fund. The Manager attempts to trade the strategies that are in both the Fund and the PPMC Managed Account substantially in parallel to the extent possible. However, there can be no assurance that these parallel investment strategies will achieve identical results for both the Fund and the PPMC Managed Account. Finally, a broker-dealer affiliated with PPMC lends securities and provides financing to the Fund. Although the Manager believes that the various relationships with PPMC, the PPMC Managed Account and the other entities affiliated with PPMC are fair, such relationships may involve potential conflicts of interests.

## NET ASSET VALUE

*The following description only summarizes certain of the detailed provisions of the Limited Liability Company Agreement, the terms of which are controlling.*

The Fund's Net Asset Value will be calculated by the Manager as of the last day of each calendar month and at such other times as the Manager may determine (each an "Accounting Date"). The Fund's "Net Asset Value" is calculated taking into account all assets and liabilities of the Fund, including, without limitation, administration, legal, audit and other professional fees and expenses. Net Asset Value will be calculated in U.S. Dollars.

The value of the Fund's interest in the Master Fund will be based on the Master Fund's net asset value, which consists of the value of its assets less its liabilities and is determined in the following manner.

In determining the Net Asset Value of the Fund and the Master Fund:

(a) Listed securities (including securities held "long" as well as sold "short") shall be valued at their last sales price on the date of determination or, if no sales occurred on that date, at the mean between the "bid" and "asked" prices at the close of trading on that date.

(b) Commodity futures contracts traded on an exchange shall be valued at their closing price on the date of determination.

(c) Currency forwards and unlisted Investment Assets shall be valued at the mean between the "bid" and "asked" prices quoted by dealers or other sources of price information that the Manager considers reliable at the close of trading on the date of determination.

(d) All other Investment Assets (including Investment Assets held "long" as well as Investment Assets sold "short") and assets, including interests in Trading Vehicles, shall be assigned such value as the Manager may determine. In determining the value of interests in Trading Vehicles, the Manager may rely upon values furnished by those Trading Vehicles or by any other Persons which the Manager believes are competent to determine those values.

(e) Liabilities and debt obligations of the Fund shall be determined (either singly or in conjunction with their related hedges) by the Manager. All liabilities not otherwise provided for herein shall be assigned such value as the Manager may determine.

(f) The Manager may determine to use a different value for any Investment Asset than would be assigned pursuant to paragraphs (a)–(e) above, if the Manager determines that to do so would better reflect market value.

The Manager is expressly authorized to make all financial (and the related tax) allocations, as well as to determine all Net Asset Values, based on estimates and unaudited financial information. Furthermore, the Manager shall not be obligated to restate allocations or Net Asset Value determinations previously made in order to reflect the difference between

estimated and final allocations and Net Asset Values, but rather may,but shall have no obligation to, reflect such difference entirely in the Accounting Period in which it is recognized.

The Manager may postpone the determination of Net Asset Value (and the applicable Accounting Date) in the event that the Manager determines that a material portion of the Investment Assets held by the Fund cannot be valued. In such event, the Manager shall give prompt notice of any such postponement to all Members.

## CAPITAL WITHDRAWALS

*The following description only summarizes certain of the detailed provisions of the Limited Liability Company Agreement, the terms of which are controlling.*

### Capital Withdrawals

#### 12-Month Anniversary Withdrawals

A Member may make an Anniversary Withdrawal of all or a portion of its Capital Account attributable to a particular Capital Contribution as of each anniversary of the last day of the month in which such Capital Contribution was made by notifying the Manager in writing at least 90 days prior to the proposed Withdrawal Date.

A separate Memorandum Account is tracked in each Member's Capital Account to record the balance in such Capital Account attributable to each Capital Contribution made by such Member. Increases and decreases in the balance of a Member's Capital account are allocated *pro rata* among the Memoranda Accounts maintained in respect of such Capital Account in accordance with the balance in each, as are Manager Allocations, Profit Allocations and allocations of capital to Designated Investments (although the Manager may make such adjustments in any other manner it deems to be reasonable).

The Manager may at the time a Capital Contribution is made establish, with the consent of the investor making such Capital Contribution, that (1) the initial Anniversary Date applicable to all or a portion of such Capital Contribution be a different month-end than what would otherwise have been such Anniversary Date and/or (2) multiple Memorandum Accounts and Anniversary Dates be associated with such Capital Contribution.

#### Annual Appreciation Withdrawals

A Member may make an Annual Appreciation Withdrawal as of December 31 of any year (each such day also being a "Withdrawal Date") in an amount equal to the amount estimated by the Manager to represent the cumulative net increase (other than increases attributable to Capital Contributions) in the balance of that Member's Capital Account for the calendar year then ended (reduced, but not below $0, by all Capital Withdrawals previously made during such year) by notifying the Manager in writing by November 15. Capital Withdrawals shall reduce the Memorandum Account(s) maintained in the Member's Capital Account as designated by the Member at the time of the notice, or, if not so designated, *pro rata* in proportion with the balance in each such Memorandum Account.

*Quarterly Withdrawals*

A Member may make Quarterly Withdrawals, as of the last day of each January, April, July and October of any year, of all or a portion of its Capital Account by notifying the Manager in writing at least 45 days prior to the proposed Quarterly Withdrawal Date, subject to the limitations described below. If the aggregate requests for Quarterly Withdrawals and Anniversary Withdrawals for any Quarterly Withdrawal Date exceed the Gate applicable to such Quarterly Withdrawal Date — *i.e.*, the sum of (i) 7.5% of Net Asset Value on such date, *plus* (ii) any Capital Contributions made as of the beginning of the month immediately following such date (other than Capital Contributions which cause Quarterly Withdrawals not to be subject to the Gate or the withdrawal fee, as described below), then the Fund shall limit Quarterly Withdrawals. The Fund will only permit aggregate Quarterly Withdrawals in an amount equal to the excess (if any) of the Gate over the aggregate Anniversary Withdrawals then made. Any such amount shall be allocated *pro rata* among the Members requesting Quarterly Withdrawals in accordance with their respective Capital Account balances prior to any then effective or requested Capital Withdrawals (not in accordance with the amounts of their respective Quarterly Withdrawal requests). In the event that a Member has made Quarterly Withdrawal Requests for less than the maximum dollar amount available for Quarterly Withdrawals by such Member, the available amount not withdrawn by such Member will be made available (again, on the basis of respective Capital Account balances) for withdrawal by the other Members submitting Quarterly Withdrawal Requests. Notwithstanding the Gate, all Anniversary Withdrawals will be permitted, irrespective of amount.

All Quarterly Withdrawals are subject to a withdrawal fee of 2.5% of the amount so withdrawn. All Quarterly Withdrawal fees are deducted from the amount withdrawn and retained by the Fund.

Neither the Gate nor the 2.5% withdrawal fee applies to Quarterly Withdrawals offset by Capital Contributions made by investors associated with the Members requesting the Quarterly Withdrawals within one month before or two months after the proposed Quarterly Withdrawal Date.

*Other Withdrawal Provisions*

The Manager may, at its sole discretion, waive part or all of any of the above notice periods, or agree to different Withdrawal Dates with respect to any Member, but may not waive withdrawal fees in the case of Quarterly Withdrawals.

Withdrawal requests must specify the Member's full name and address and the U.S. Dollar amount of capital to be withdrawn. No withdrawal will be effective if the Fund is dissolved on or prior to the Withdrawal Date.

Although a Member who elects to withdraw, or who receives a distribution equal to, all of its Capital Account will be deemed to have retired as of the effective date of such withdrawal, such Member may be allocated certain tax items for periods after the year of such full withdrawal in order to make certain equitable Capital Account adjustments.

The Manager, at its sole discretion and for any reason, may require any Member to retire from the Fund at any time on not less than 30 days' notice, such retirement to be effective on the date specified in such notice.

*Postponing Accounting Dates*

The Manager may postpone an Accounting Date in the event that the Manager determines that a material portion of the assets held by the Company cannot be valued. In the event that an Accounting Date is postponed, the Manager shall give prompt notice of any such postponement to all Members.

*Postponing Effective Dates*

The Manager may postpone any Effective Dates (*i.e.*, the date as of which a Member's Capital Account will reflect the payment of a Capital Withdrawal or Distribution, regardless of the actual date of payment) in the event that the Manager determines that either (i) the applicable Accounting Date has been postponed; (ii) Fund capital is committed in such a manner so as not reasonably to permit immediate withdrawal of sufficient funds; (iii) there exists a state of affairs that the Manager determines constitutes circumstances under which liquidation by the Fund of part or all of its investments is not reasonable or practicable, or would be prejudicial to the Fund; or (iv) the Manager determines that not postponing such Effective Date would materially adversely affect the continuing Members.

*Payment of Withdrawals*

Withdrawal proceeds will be paid in cash, by check or wire transfer, or in securities or both, as the Manager may at its sole discretion determine and may be subject to (i) a charge, if applicable, to be determined at the sole discretion of the Manager, for the expenses of liquidating a proportionate share of the Fund's assets and (ii) other reserves and contingencies as the Manager, at its sole discretion, deems appropriate.

Under normal circumstances, all of the withdrawal proceeds will be paid by the Fund to a withdrawing member within 30 days of the relevant Withdrawal Date. However, if a Member withdraws 90% or more of such Member's Capital Account (not including amounts allocable to Designated Investments), the Fund may, but is not obligated to, retain 10% of the Capital Withdrawal to be paid, with interest from the end of the calendar month immediately following the Effective Date of such Capital Withdrawal at a rate equal to the LIBOR rate then in effect. The balance shall be paid promptly after the completion of the Fund's audit for the Fiscal Year in which such Capital Withdrawal occurred. The amount of withdrawal proceeds is subject to adjustment (up or down) to reflect any revision of the relevant Capital Account balance as a result of the audit. Withdrawal proceeds or the part thereof that is paid in cash will be paid in U.S. Dollars, unless the Fund otherwise agrees.

The Manager may delay the payment of Capital Withdrawal proceeds if the Manager determines that (i) making such payment would result in a violation of Law or contract or (ii) liquidating Investment Assets to make such payment would materially adversely affect the remaining Members. If the payment of Capital Withdrawal Proceeds is delayed, the Fund will attempt to liquidate Investment Assetsas promptly as the Manager deems practicable after the Effective Date in order to pay the postponed Capital Withdrawal. Within 30 days of the Effective Date, the Company will pay out the withdrawing Member's proportionate share of the Fund's free cash and the fair market value of the Fund's unencumbered marketable securities, less such Member's proportionate share of the Company's liabilities and Withdrawal Reserves (if any). At least 80% of any postponed Capital Withdrawal will be paid within one year of what would otherwise have been its Effective Date and the balance as soon as reasonably practicable thereafter. Capital Withdrawal payments which are delayed beyond the 90th day following the

applicable Effective Date (as such Effective Date may be postponed as provided herein) shall bear interest at one-month LIBOR from the end of the calendar month immediately following such Effective Date, compounded as of the first day of each calendar month thereafter, until paid.

### Payments in Kind

In the event that the Manager intends to make a Capital Withdrawal or Distribution to a Member, in whole or in part, in kind rather than in cash, the Manager shall give such Member at least ten days' notice of the proposed in-kind payment (generally describing the assets to be distributed). If the Member notifies the Manager within five days of receipt of such notice from the Manager that receipt of the Investment Assets intended to be paid out to such Member could reasonably be expected to cause such Member to be in violation of any law, the Manager shall cause the Fund to sell the Investment Asset intended to be distributed — which sale may be made to a Manager Party or Trading Vehicle and may be made privately, as the Manager may determine. In such case, the Manager need make no representation as to how long a delay there might be before such sale will be effected and whether there will be a single sale for the entirety of such Investment Assets or more than one sale, each for a part of such Investment Assets. No interest shall accrue on any amounts due to the affected Member pending such sale(s), provided, that the Manager shall cause the Fund to distribute the proceeds of such sale(s) promptly following receipt. Any Investment Assets distributed in kind shall be valued in accordance with the Fund's valuation policies as of the date of distribution, and any difference between such value and the Fund's carrying value for such Investment Assets shall be deemed to constitute income or loss to the Fund.

### Special Withdrawal Rights

In the event that neither Nicholas Maounis nor S. Donald Sussman is in control of a Manager of the Fund at any time prior to January 1, 2005, the Manager will notify each Member (the "Special Withdrawal Notice"), and each Member may withdraw, in whole or in part, from the Fund, without charge, by giving written notice to the Manager which must be received by the Manager no later than 30 days after the date of the Special Withdrawal Notice. The effective date of any such withdrawal shall be the last day of the month in which the Member's notice is received if such notice is received by the Manager on or before the fifteenth day of the month and otherwise as of the end of the month which follows.

### Manager Withdrawals

The Manager may assign its interest in the Fund to an Affiliate at any time without notice to the Members.

The Manager may withdraw all or any part of its Capital Account at any time without notice to the Members.

The Manager may withdraw from the Fund, without any breach of the Limited Liability Company Agreement or the Manager's fiduciary duty thereunder, upon not less than 60 but not more than 100 days' prior written notice to the Members.

One or more additional or substitute managers may be admitted to the Fund by the Manager without the consent of any other Member; provided, that such additional or substitute managers are Affiliates of the Manager. The Manager may also admit one or more Persons who are not Affiliated with the Manager as additional managers only with the consent of a majority of

the Voting Rights. The admission of an additional or substitute Manager shall not be cause for dissolution of the Fund and all the Members shall continue to be subject to the provisions of the Limited Liability Company Agreement in all respects.

**Distributions**

As a general matter, the Manager intends to reinvest income and capital gains of the Fund. The Manager may at any time cause the Fund to make a distribution to the Members, including the Manager, if appropriate, of such amount as the Manager may determine. Any such distribution need not be *pro rata*. Distributions, if any, will be paid in cash, or securities or both as the Manager may, at its sole discretion, determine.

**Transfers**

Transfers are permitted only with the consent of the Manager and pursuant to an applicable exemption from registration under the Securities Act of 1933.

## FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of the material federal income tax considerations that may be relevant to a United States taxpayer which invests in the Fund, based upon the Internal Revenue Code of 1986, as amended (the "Code"), judicial decisions and administrative regulations and rulings, all as in effect as of the date of this Memorandum and all of which are subject to change. Since the tax consequences of an investment in the Fund will vary from Member to Member based on each Member's individual income tax circumstances, this summary does not attempt to discuss all the federal income tax consequences of such an investment. Nor does this summary purport to describe the tax consequences of all instruments in which the Fund may invest or trade. Prospective investors should not consider the contents of this summary as legal or tax advice, and should consult their own tax advisers concerning the tax consequences of investing in the Fund.

**Taxation of the Fund and the Members**

*Tax Classification of the Fund*

The Manager has been advised by Sidley Austin Brown & Wood that the Fund will be treated as a partnership for federal income tax purposes and not as an association taxable as a corporation or as a "publicly-traded partnership"; provided that (i) the Fund does not have more than 100 Members taking into account the attribution rules relating to "publicly traded partnerships" in the Treasury Regulations promulgated under Section 7704 of the Code, or (ii) at least 90% of the income generated by the Fund constitutes "qualifying income" (that is interest, income and gains from stocks, debt securities, and, in the case of entities like the Fund a principal activity of which is the buying and selling of such assets, commodities not held as inventory, or futures, forwards and options with respect to such items). The Manager expects that over 90% of the Fund's income will constitute "qualifying income." Accordingly, the Fund should not be treated as a corporation even if it is a publicly traded partnership within the meaning of Section 7704 of the Code. This conclusion is not binding on the Internal Revenue Service ("IRS") or on any court, and there can be no assurance that the IRS will not assert that the Fund should be treated as an association taxable as a corporation or as a "publicly-traded partnership" taxable as a corporation.

If it were determined that the Fund should be classified for federal income tax purposes as an association taxable as a corporation (as a result of a change in law, changes in IRS ruling guidelines or administrative positions, a change in facts or otherwise), income and losses of the Fund would be reflected on its own tax return rather than being passed through to the Members, and the Fund would be required to pay income tax at corporate income tax rates on its net ordinary income and capital gains, thereby substantially reducing the amount of cash available for investment or for distribution to the Members. Furthermore, all or a portion of any distributions made by the Fund to the Members could be treated as ordinary dividend income regardless of the source from which they were generated. The following discussion assumes that the Fund will be treated as a partnership for federal income tax purposes.

### *Taxation of Members*

The Fund, classified as a partnership, will not be subject to federal income tax. Each Member will be required to report on its federal income tax return such Member's allocable share of the Fund's income, gains, losses, deductions, credits and other items for the Fund's taxable year ending with or within the Member's taxable year, whether or not any distribution of cash or other property is made to the Member in that year.

At the end of each taxable year, items of Fund income, expense, gain, loss and deduction, as determined for federal income tax purposes, will be allocated among the Members which held Interests during such taxable year. A Member's distributive share of such items for federal income tax purposes generally is determined by the allocations made pursuant to the Limited Liability Agreement, unless the items so allocated do not have "substantial economic effect" and are not in accordance with the Members' Interests. Under the Limited Liability Agreement, tax allocations are generally made in a manner consistent with the financial allocations made to the Members' Capital Accounts and therefore either should have substantial economic effect or should be in accordance with the Members' Interests.

The federal, state, local and foreign income tax consequences to Members depend, in large part, on the particular strategies that the Fund and the Master Fund employ and on how long the Members own their respective Interests. A Member's distributive share of the Fund's tax items may result in unfavorable tax consequences either because of their effect at the Fund level or because of their effect upon other aspects of the Member's tax situation. These items may include capital losses, which generally are deductible only against capital gains, investment interest, the deductibility of which by non-corporate Members may be limited or deferred, items subject to the "at-risk" or "passive loss" rules, and other items. For example, if the Fund reports ordinary income and an equal amount of capital losses that a Member cannot offset with other capital gains, the Member would be taxed on the ordinary income even though the Fund realized no economic gain.

Because the Fund or Master Fund may engage in complex trading strategies and may purchase or enter into financial instruments or securities of which proper tax classification or tax treatment may be unclear, a federal, state, local or foreign tax authority may challenge the Fund's or Master Fund's tax positions (including, but not limited to, the timing of income, the classification of income as capital or ordinary, and whether the Fund or Master Fund is subject to withholding taxes or required to withhold tax on income). The tax positions taken by the Fund or the Master Fund may not be accepted by the IRS, foreign, state, or local tax authorities. If the IRS or other Tax Authority should successfully contest a tax position taken by the Fund or the Master Fund, Members may need to amend their Federal, state, and local tax returns or the Fund or the Master Fund may be subject to withholding or other taxes, interest, and possibly penalties.

*Limitations on Deductibility of Fund Losses by Members*

The amount of any Fund loss that a Member is entitled to include on its income tax return is limited to such Member's adjusted tax basis for its Interest as of the end of the Fund's taxable year in which such loss occurred. Generally, a Member's adjusted tax basis for its Interest is the amount paid for such Interest reduced (but not below zero) by such Member's share of losses and expenses, and any distributions made to such Member, and increased by such Member's share of the Fund's income, including gains.

*Cash Distributions*

Cash received from the Fund by a Member as a distribution generally is not reportable as taxable income by such Member, except to the extent such distribution exceeds a Member's adjusted tax basis for its Interest. Any such excess is taxable to such Member as gain from the sale or exchange of such Interest. Allocations of Fund income increase the tax basis for a Member's Interest at the end of the taxable year. Cash distributions during the taxable year could result in taxable gain to a Member even though no gain would result if the same cash distributions were made following the Fund's allocation of income at the end of the taxable year.

A cash distribution in redemption of all of a Member's Interest will result in the recognition of gain or loss for federal income tax purposes. Such gain or loss will be equal to the difference, if any, between the amount of such distribution and the Member's adjusted tax basis for such Interest (including such Member's distributive share of the Fund's income or loss for the year of such distribution).

*Mark to Market Election*

The Master Fund elected as a trader in securities and commodities to mark to market its Investment Assets held at the end of each taxable year. The mark to market rules require a trader making the election to recognize gain or loss with respect to the securities held in connection with its trade or business of trading in securities at the end of each taxable year as if the trader sold the securities for their fair market value on the last business day of the taxable year. The Fund's allocable share of any gain or loss on the applicable Interests is treated as ordinary income or loss. The Fund has not made such mark-to-market election as a trader in securities and commodities. As a result, some of the discussion that follows reflects certain tax aspects that may be applicable to the Fund and not to the Master Fund or *vice versa* as the mark-to-market election may impact the application of those items.

*Structured Securities*

The Fund invests in structured securities the tax treatment of which depends on the specific securities purchased. The tax treatment of a particular security might be uncertain. In general, a security might be treated as: (i) a partnership interest in the issuer of the security; (ii) ownership of an undivided interest in the assets held by the issuer; (iii) an interest in an association taxable as a corporation or in a "publicly-traded partnership"; or (iv) debt of the issuer or another entity. If any such security is treated as a partnership interest, the Fund will be required to take into account its allocable share of income, gain, loss, deductions and credits of the issuing partnership. Similarly, if any such security is treated as an undivided interest in the underlying assets of the issuer, the Fund will be required to recognize any income, gain, loss or deduction attributable to the ownership of such assets. Under either of these characterizations, the Fund's allocable share of certain expenses could be subject to limitations on deductibility (*see*

-43-

*"— Limited Deduction for Certain Expenses"* and *"— Limitation on Deductibility of Interest on Investment Indebtedness,"* below). If any such security is treated as an interest in an association taxable as a corporation or in a "publicly-traded partnership," the issuer will be subject to tax at rates applicable to corporations, and the Fund will be taxed in the same manner as a shareholder in a corporation. *See "— Distributions on Stock,"* below. If any such security is treated as debt, the Fund may recognize interest income, original issue discount or market discount. *See "— Original Issue Discount" and "— Market Discount,"* below.

### *Gain or Loss on Section 1256 Contracts*

The Fund's Investment Assets may include certain futures and forward contracts as well as certain dealer equity options traded on United States exchanges ("Section 1256 Contracts"). Under the mark-to-market system of taxing Section 1256 Contracts, any unrealized profit or loss on positions in such Section 1256 Contracts that are open as of the end of a taxpayer's fiscal year is treated as if such profit or loss had been realized for tax purposes as of such time. In general, 60% of the net gain or loss which is generated by transactions in Section 1256 Contracts is treated as long-term capital gain or loss and the remaining 40% of such net gain or loss is treated as short-term capital gain or loss.

### *Straddles*

Offsetting securities' positions held by the Fund may constitute "straddles". Straddles are defined to include "offsetting positions" in actively traded personal property. The tax treatment of straddles is governed by Sections 1092 and 1258 of the Code, which, in certain circumstances, override or modify the provisions of Sections 988 and 1256 of the Code. As such, losses may be deferred, and all or a portion of any short- or long-term capital gain from certain "straddle" transactions may be recharacterized as ordinary income. For purposes of applying the above rules restricting the deductibility of losses with respect to offsetting positions held by the Fund, if a Member takes into account gain or loss with respect to a position held by the Fund, the Member will be treated as holding the Fund's position, except as otherwise provided in the regulations. Accordingly, positions held by the Fund may limit the deductibility of realized losses sustained by a Member with respect to positions held for his own account or through other investment funds, and positions held by a Member for his own account or through other investment funds may limit his ability to deduct realized losses sustained by the Fund.

### *Original Issue Discount*

The Fund may hold or purchase debt instruments that are issued with "original issue discount" which will be includable in the taxable income of investors in the Fund in each year that the Fund owns such debt instruments. The rules concerning original issue discount (Sections 1271-1275 of the Code) are complex, and a complete discussion of such rules is beyond the scope of this summary. Generally, the term "original issue discount" means the excess of the stated redemption price at maturity of the debt obligation (*i.e.*, all payments due under the debt obligation other than payments of stated interest meeting certain requirements) over its issue price. An investor will be required to include in income its allocable share of the amount of original issue discount accrued, on a constant-yield basis, with respect to a debt obligation held by the Fund. The computation of original issue discount may be adjusted based on certain prepayment assumptions regarding assets held by the issuer of the security.

*Market Discount*

The Fund may hold or purchase bonds that are subject to the "market discount" provisions contained in Sections 1276-1278 of the Code.  These rules generally provide that if a holder acquires a debt instrument at a discount from, in general, its stated redemption price at maturity which equals or exceeds one-fourth of one percent (0.25%) of the principal amount times the number of remaining complete years to maturity, and thereafter disposes of such an instrument, the lesser of (a) the gain realized or (b) the portion of the market discount which accrued while the debt instrument was held by such holder will be treated as interest income at the time of the disposition.

The market discount rules also provide that a holder of any debt instrument who acquired such instrument at a market discount may be required to defer the deduction of a portion of the interest on any indebtedness incurred or continued to purchase or carry such instrument until the market discount is recognizable upon a subsequent disposition of the debt instrument.

*Amortizable Bond Premium*

If the Fund purchases a bond at a cost which, generally, is in excess of the amount payable on maturity, the excess may constitute amortizable bond premium which the Fund may elect to treat as a reduction in interest income.

*Adjustment to Conversion Price*

Treasury regulations promulgated under Section 305 of the Code treat a holder of convertible securities as having received a constructive distribution where the conversion price of such securities is adjusted to reflect certain taxable distributions with respect to stock into which such convertible securities are convertible.  Thus, the Fund may be taxable on constructive dividends under certain circumstances where an adjustment is made to the conversion price of a convertible security held by the Fund.

*Constructive Sales*

The Code treats certain common financial transactions as "constructive sales" of related appreciated property that is stock, a partnership interest or certain debt instruments.  For example, a short-against-the-box transaction (*i.e.*, a short sale of stock where the taxpayer also holds the stock) will be treated as a constructive sale of appreciated stock sold short. A futures or forward transaction or a total return swap may also give rise to a constructive sale of the related appreciated property.  A constructive sale will accelerate gain but not loss. The Code provides special rules to prevent the application of the constructive sale rule if: (i) the transaction is closed within 30 days after the end of the taxable year (*i.e.*, the offsetting positions are closed); (ii) the appreciated financial position is held for 60 days following the date the transaction is closed; and (iii) at no time during such 60-day period is the holder's risk of loss with respect to such financial position reduced.

*Distributions on Stock*

Cash distributions received by the Fund with respect to stock held by it will be taxable as ordinary income to the extent that the distributing corporation has either current or accumulated earnings and profits for tax purposes. Distributions in excess of the distributing corporation's current or accumulated earnings and profits will be treated as a return of capital and will reduce

the basis in such stock, thus increasing the gain (or decreasing the loss) which may be realized on a sale, redemption or exchange of such stock. To the extent such distributions exceed the basis in the stock, such excess will be taxed as capital gain. Generally, a distribution paid in stock of the distributing corporation with respect to common stock does not result in the recognition of gross income by the recipient.

### Passive Foreign Investment Company

As part of its trading strategy, the Fund owns stock in non-U.S. corporations, which may include passive foreign investment companies ("PFIC"), for federal income tax purpose. The Code provides rules for PFICs for which a "qualified electing fund" ("QEF") election is made by a United States shareholder. A shareholder making a QEF election would be required currently to include in gross income, and each United States person that is a shareholder of a QEF by reason of an interest in a domestic pass-through entity would be required to currently include its pro rata share of, the shareholder's pro rata share of the earnings and profits of the PFIC, whether or not distributed. Amounts included in income under a QEF election would be treated as long-term capital gain to the extent of the PFIC's net capital gain, and the balance as ordinary income. Losses, however, would not pass through currently to the shareholder.

Although the Fund may make QEF elections for a PFIC owned by it, Members cannot make this election for stock held by the Fund or the Master Fund. The Fund may not receive sufficient information from such PFIC to make a QEF election Under the passive foreign investment companies rules, this may result in Members having to treat all gain and certain "excess distributions" as ordinary income subject to tax (without taking into account deductions or losses from other sources) at the highest rate of tax applicable to the ordinary income of the Member, plus an interest charge (at the rate applicable to tax underpayments), under rules that allocate such gain or distributions ratably over a holder's holding period, a potential adverse tax result.

## General Tax Considerations

### Limited Deduction for Certain Expenses

The Fund believes that the Fund and the Master Fund will both be considered for federal income tax purposes to be engaged in a trade or business as a trader in securities and commodities. To the extent that the Fund and Master Fund is a trader in securities, federal tax laws permit Members who are individuals to deduct their share of expenses of that trading entity under Section 162 of the Code as business expenses rather than as non-business miscellaneous itemized deductions, which as to individuals are deductible on a limited basis under Section 67(c) of the Code. Whether the Fund or the Master Fund is a trader in securities depends on the facts and circumstances that relate to its activities. If the expenses (other than interest) of the Fund and the Master Fund were considered miscellaneous itemized deductions under Section 67(c) of the Code, those expenses would be deductible by a non-corporate taxpayer for income tax purposes only to the extent that those expenses, when combined with its other expenses deductible under Section 67(c) of the Code for the year, exceed 2% of its adjusted gross income (and would not be deductible at all for alternative minimum-tax purposes). The deductible portion of those expenses is further reduced by an amount equal to the lesser of (i) 3% of an individual's adjusted gross income that exceeds a threshold amount; and (ii) 80% of the amount of the individual taxpayer's miscellaneous itemized deductions otherwise allowable for that taxable year. The IRS could also contend that the Profit Allocation and the Manager Allocation constitute fees subject to the foregoing limitations.

*Syndication Fees*

Neither the Fund nor the Members will be entitled to any deduction for any placement and/or referral fees paid to persons who introduce prospective investors.

*Limitation on Deductibility of Interest on Investment Indebtedness*

Non-corporate Members may be subject to certain limitations on the deductibility of interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.

*Passive Activity Rules*

The investment activities of the Fund do not constitute a "passive activity," with the result that losses resulting from a Member's "passive activities" cannot be offset against the Fund's income.

*Disclosure of Reportable Transactions*

Recent Treasury pronouncements directed at abusive tax shelter activity, generally applicable to transactions entered into on or after January 1, 2003, appear to apply to certain transactions not conventionally regarded as tax shelters. Temporary and proposed regulations (the "Disclosure Regulations") require taxpayers to disclose on IRS Form 8886 their direct participation or indirect participation (including, for instance, a taxpayer's participation as a partner in a partnership) in a "reportable transaction" for each taxable year in which the taxpayer's federal income tax liability is affected by its participation in the reportable transaction. A "reportable transaction" includes, among others, certain transaction resulting in, or reasonably expected to result in, a taxpayer claiming a loss under Section 165 of the Code. In addition to the disclosure requirements applicable to reportable transactions, organizers and sellers of the reportable transaction are required to maintain records including investor lists containing identifying information and to furnish those records to the IRS upon demand.

Investors should be aware that the Fund intends to comply with such disclosure and investor list maintenance requirements if it determines that the requirements apply. **Investors should consult their own tax advisers concerning any possible disclosure and listing obligations with respect to their investment.**

*State and Local Taxes*

In certain cases, the Fund may be subject to entity-level state and local taxes in states in which the profits of the Fund are deemed to be sourced. There can be no assurance that the Fund's position will be sustained, if challenged. Each Member may be required to report and pay state and local tax on such Member's distributive share of the profits of the Fund in the state and municipality in which the Member resides and/or other jurisdictions in which income is earned by the Fund.

**Fund Audits**

The tax treatment of Fund items is determined at the Fund level rather than at the Member level. The Manager is the "Tax Matters Partner" of the Fund with the authority to determine the Fund's response to an audit. The limitations period for assessment of deficiencies

-47-

and claims for refunds with respect to items related to the Fund is generally 3 years after the Fund's return for the taxable year in question is filed, and the Manager has the authority to, and may, extend such period with respect to all Members. Certain tax positions which the Manager may elect to take on behalf of the Fund may increase the chance that the Fund's return will be audited. If an audit results in an adjustment, all Members, current and former, may be required to pay additional tax, interest and, possibly, penalties. There can be no assurance that the Fund's tax return will not be audited by the IRS or that no adjustments to such returns will be made as a result of such an audit.

## SUBSCRIPTION PROCEDURE

*The minimum initial investment is $5,000,000, although the Manager, in its discretion, may waive this minimum investment requirement. The Manager reserves the right to reject any subscription in whole or in part as well as to terminate, suspend or postpone the offering of the Interests at any time without notice.*

### General

The Fund will accept subscriptions for Interests as of the first day of each calendar month (each a "Subscription Date"), and all Capital Contributions are due on the first business day of such month. The Manager may accept or reject Capital Contributions at any time, provided that any Capital Contribution which is not received by the end of the fifth business day of the applicable month will be rejected, and the defaulting subscriber will be responsible for compensating the Fund for any losses sustained by it in connection with such cancellation.

The Interests are offered by the Fund. Neither the Fund nor the Manager receives commissions or other compensation from the sale of Interests. A subscription for Interests may be subject to a placement fee (disclosed to the subscriber in advance). In addition, the Manager reserves the right to pay placement and/or referral fees (both initial and ongoing) to persons who introduce subscribers.

In order to subscribe for Interests, a properly completed Subscription Agreement in the form attached as Exhibit B or otherwise provided to investors by the Fund (if an investor is making an initial Capital Contribution to the Fund) or a written subscription request indicating the name of the investor and the additional Capital Contribution (if an investor is making a subsequent investment in the Fund) must be received and accepted by the Fund prior to the relevant Subscription Date. Procedures and requirements for the delivery of Subscription Agreements and Capital Contributions to the Fund are contained in the Subscription Agreement or will otherwise be provided to investors by the Fund. All subscriptions are irrevocable.

Investors whose subscriptions are accepted will not be credited with any interest earned on subscription payments received prior to the issuance of their Interests; rather, any such interest will become a general asset of the Fund. All Subscription Agreements and Capital Contributions must be delivered to the Fund in accordance with the instructions contained in the Subscription Agreement. If a subscription is rejected, any subscription funds tendered will be promptly returned to the subscriber, together with any interest actually earned on such funds. *Investors should not transmit their subscription funds until the Manager has confirmed the acceptance of their subscriptions.*

The minimum initial Capital Contribution that will be accepted from a new Member is $5 million. The Manager, at its sole discretion, may reduce or waive this minimum amount with

respect to any Member. There is no minimum incremental Capital Contribution. Capital Contributions must be made in U.S. Dollars, unless the Manager permits Capital Contributions to be made in securities, in which case such Capital Contribution will be the fair market value of the contributed securities as of the Subscription Date as determined by the Manager in accordance with the valuation principles described in the Section of this Memorandum entitled "Net Asset Value."

If, in the opinion of the Manager, the Fund's investment of Capital Contributions received from a Member will cause the Fund to incur brokerage commissions or other charges, the Fund may charge the estimated amount of such commissions or charges to the Capital Account of such Member.

**Investor Suitability Standards**

The Interests are offered exclusively on a private basis to a limited number of qualified institutional and high net worth investors. All investors must be "accredited investors," as defined in Regulation D under the Securities Act of 1933 and "qualified purchasers," as defined in the Investment Company Act of 1940. Each prospective investor must represent and warrant in its Subscription Agreement that, among other things, it has reviewed and understands the risks of an investment in an Interest and has the financial knowledge and experience to evaluate such investment. In addition to being financially sophisticated, each prospective investor must be able to bear the substantial risks of an investment in an Interest, including the loss of an entire investment.

PROSPECTIVE INVESTORS MUST CONSULT THEIR OWN TAX, LEGAL AND FINANCIAL ADVISERS WITH RESPECT TO THEIR INDIVIDUAL CIRCUMSTANCES AND THE SUITABILITY OF AN INVESTMENT IN THE FUND.

## GENERAL

*The following description only summarizes certain of the detailed provisions of the Limited Liability Company Agreement, the terms of which are controlling.*

**Confidentiality; No Solicitation**

Each Member agrees that such Member will not distribute any information regarding the Manager or the Fund without the express written approval of the Manager and that such Member's investment in the Fund, as well as all information concerning the Manager and the Fund, including the performance of such Member's investment and the Fund, must be maintained on a strictly confidential basis.

Each Member agrees that such Member and its Affiliates and related parties will not, directly or indirectly, solicit, suggest, induce or encourage any current or former officer or employee of the Manager to seek employment or business opportunities elsewhere or not to devote such person's full and undivided business time to such person's activities as an officer or employee of the Manager. Each Member also agrees not to permit the hiring of any current or former officer or employee of the Manager by any other investment firm if such investment firm is incubated or "seeded" by the Member and/or its Affiliates and related parties if such current or former officer or employee acts as a portfolio manager or trader.

**Optional Limitation on Voting Rights and/or Equity Ownership**

The Limited Liability Company Agreement permits investors who wish to do so, or are prohibited by law (for example, the Bank Holding Company Act) from holding voting rights and/or equity interests in excess of specified levels to so limit their voting rights and equity interests.

**Amendments**

The Limited Liability Company Agreement may be amended with the consent of the Manager and the vote of Members holding more than 50% of the outstanding Voting Interests; provided, that no amendment may reduce the Capital Account of any Member, without the prior written consent of such Member.

The written or affirmative consent of Members is not required; either "negative consent" by failure to object in writing after 20 days' notice of a proposed amendment, or "implied consent" by failure to make a complete Capital Withdrawal after the Manager gives such Member notice of a proposed amendment and an opportunity to make a complete Capital Withdrawal without imposition of any withdrawal fee, is sufficient to constitute consent.

The Limited Liability Company Agreement may be amended on the basis of the consent of certain Members who are permitted to opt not to be bound by the terms of the amendment (which Members' Capital Accounts may subsequently be distributed to them on a non-*pro rata* basis over time).

The Manager may, without the consent of the Members, modify or amend any provision of the Limited Liability Company Agreement for legal, regulatory or tax reasons as well as to make any change not materially adverse to the interests of all of the Members.

**Prior Period Items**

In the event that the Fund at any time becomes subject to a liability or loss (or series of related liabilities or losses) which relates to a prior Accounting Period and which exceeds 2.5% of the Capital Accounts of all Members as of the date that such liability or loss becomes due (other than items specifically associated with a Member), the Manager will use reasonable efforts to allocate such liability or loss in part or entirely to the persons (or the transferees of the persons) who were Members in the prior period with respect to which the liability or loss relates (including former Members). If the Manager is unable to collect any portion of the liability or loss, or such liability or loss is below the 2.5% threshold, such amount will be allocated among the current Members, irrespective of whether they were Members during the prior period to which such liability or loss relates. No Member shall be liable for Prior Period Items in any amount exceeding such Member's investment in the Fund, *plus* any amounts previously distributed to, or withdrawn by, such Member (without interest).

**Reports**

The Fund will furnish to each Member a report of the Fund's estimated performance as soon as practicable after the end of each month, as well as an estimate of the increase or decrease in such Member's Capital Account during the preceding month, and such other information as the Manager may deem appropriate. As soon as practicable after the end of each fiscal year of the Fund, the Fund will furnish to each Member a report as of the end of that fiscal year, and will

include the following information; (i) the audited balance sheet and income statement of the Fund; (ii) the Member's closing Capital Account balance; (iii) the percentage change in the Net Asset Value of the Fund during the latest fiscal year; and (iv) a copy of Schedule K-1 to the Fund's federal income tax return for the preceding year, in a form sufficient to enable that Member to determine its share, for federal, state and local income tax purposes, of all items of Fund income, gain, loss, deduction, preference and credit.

Because the positions and strategy of the Fund are complex and preparing financial statements and tax returns may depend upon information from third parties, the Fund may not be able to deliver to the Members financial statements and Schedule K-1 to the Fund's federal income tax return before the original time that Members are required to file their federal, state and local income tax returns without extensions. Therefore, Members may need to obtain one or more extensions of time to file their tax returns.

**Availability of Documents**

The description and summaries of documents in this Memorandum do not purport to be complete; investors should refer to the actual documents for a complete statement and to understand their terms and conditions.

The Manager invites each prospective Member to meet with it to discuss a potential investment in the Fund.

All the information furnished in this Memorandum is as of the date hereof, unless otherwise indicated.

**Access to Information**

The Manager will answer all reasonable inquiries from prospective investors or their representatives concerning the Fund, the Manager and other matters related to the offering of the Interests; provided, that the Manager will not disclose any confidential or proprietary information, including information concerning the Manager's proprietary investment techniques and the identity of any investors in the Fund or other Manager Clients.

**Money Laundering Prevention**

Federal regulations and executive orders administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC web site at www.treas.gov/ofac. Each prospective investor must represent and warrant in the Subscription Document that, among other things, neither the prospective investor, nor any person controlling, controlled by, or under common control with, the prospective investor, nor any person having a beneficial interest in the prospective investor, or for whom the prospective investor is acting as agent or nominee in connection with its investment in the Fund, is a country, territory, person or entity named on an OFAC list, or is a person or entity that resides or has a place of business in a country or territory named on such lists. The Manager will not accept any investment from an investor if it cannot make the representation described in the preceding sentence.

In addition to OFAC restrictions, prospective investors and Members will be required to provide all information and documentation requested by the Fund or the Manager to comply with U.S. anti-money laundering laws and regulations as well as, possibly, comparable laws and regulations in other jurisdictions. This is an evolving area of the law, and the full extent of the disclosures which may be required cannot be predicted.

## LEGAL AND ACCOUNTING MATTERS

Sidley Austin Brown & Wood has acted as counsel for the Manager in connection with the preparation of this Memorandum. Sidley Austin Brown & Wood may continue to advise the Manager in matters relating to the operation of the Fund — including, without limitation, on matters relating to the Manager's fiduciary obligations to Members — on an ongoing basis.

Ernst & Young LLP serves as the independent certified public accountants for the Fund.

## APPENDIX I

### AMARANTH PARTNERS L.L.C. PERFORMANCE SUMMARY

| Period | Rate of Return for Period | Year to Date Return | Capital |
|--------|---------------------------|---------------------|---------|
| September-00 | 1.77% | 1.77% | $79,568,251 |
| October-00 | 1.54% | 3.34% | |
| November-00 | (1.01)% | 2.29% | |
| December-00 | 1.83% | **4.17%** | $59,762,267 |
| | | | |
| January-01 | 4.92% | 4.92% | |
| February-01 | 1.21% | 6.19% | |
| March-01 | 0.79% | 7.03% | $77,333,861 |
| April-01 | 2.07% | 9.24% | |
| May-01 | 1.99% | 11.42% | |
| June-01 | (0.42)% | 10.95% | $86,422,093 |
| July-01 | 0.23% | 11.21% | |
| August-01 | 1.49% | 12.86% | |
| September-01 | (0.92)% | 11.82% | $104,991,186 |
| October-01 | 1.56% | 13.57% | |
| November-01 | 3.43% | 17.46% | |
| December-01 | 3.59% | **21.69%** | $123,800,962 |
| | | | |
| January-02 | 2.38% | 2.38% | |
| February-02 | 0.05% | 2.43% | |
| March-02 | 1.05% | 3.51% | $274,522,857 |
| April-02 | 0.27% | 3.79% | |
| May-02 | 0.03% | 3.82% | |
| June-02 | (2.24)% | 1.49% | $339,609,416 |
| July-02 | (0.33)% | 1.16% | |
| August-02 | 0.53% | 1.69% | |
| September-02 | 1.61% | 3.33% | $356,770,560 |
| October-02 | 2.19% | 5.59% | |
| November-02 | 3.26% | 9.04% | |
| December-02 | 2.08% | **11.30%** | $400,384,146 |

Past performance is not necessarily indicative of future results. All returns are net to the Members (after all operating expenses and transaction costs, as well as the Manager and Profit Allocations).

The rates of return are unaudited, although the information in the above table relating to Fiscal Years 2000 and 2001 is derived from the Fund's audited financial statements for such years. The audited annual, and unaudited interim, financial statements of the Fund are available upon request.

**For the Exclusive Use of:** San Diego County Employees Retirement Association
**Memorandum Number:  153**

# SUPPLEMENT TO THE
# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
# DATED MARCH 2003

# /α/Amaranth

## AMARANTH PARTNERS L.L.C.
### (A Delaware Limited Liability Company)

### Minimum Investment:  $10,000,000

### AMARANTH ADVISORS L.L.C.
### Manager

### THESE ARE SPECULATIVE SECURITIES

This is a Supplement to the Confidential Private Placement Memorandum dated March 2003 of Amaranth Partners L.L.C.   References to the "Memorandum" contained in the Confidential Private Placement Memorandum, the Limited Liability Company Agreement and the Subscription Agreement for the Fund mean the Confidential Private Placement Memorandum as amended and supplemented by this Supplement.  Capitalized terms used herein have the same meanings as in the Confidential Private Placement Memorandum. You should read the accompanying Confidential Private Placement Memorandum, which gives the specific terms of the offered Interests in the Fund.

### Increase in Minimum Investment

Notwithstanding anything to the contrary set forth in the Confidential Private Placement Memorandum, the Subscription Agreement or any other documents relating to the Fund, the minimum initial Capital Contribution by each investor has been increased from $5,000,000 to $10,000,000.

### Selected Financial Information

As of December 1, 2003, the capitalization of the Fund was approximately $780 million. From September 1, 2000 to November 30, 2003, the Fund's compound annual return to Members, net of all costs as well as the Manager and Profit Allocations, has been 16.17%.  Summary performance information is attached to this Supplement as Appendix A.  Past results are not necessarily indicative of future performance.  There can be no assurance that the Fund will meet its objectives or avoid substantial losses.  See *"Risk Factors"* in the accompanying Confidential Private Placement Memorandum.

### December 2003

As of December 1, 2003, Amaranth was managing client accounts with an aggregate capitalization of approximately $4 billion.

### Redomiciling of the Master Fund

Amaranth L.L.C., the Master Fund in which the Fund invests a substantial portion of its assets, is transferring its domicile from the State of Delaware to the Cayman Islands, effective as of December 31, 2003, under the name "Amaranth LLC." Following this transfer, Amaranth Advisors L.L.C. will no longer be the managing member of the Master Fund, but it will continue to have plenary authority over the Master Fund's trading and investing activities.

The registered office of the Master Fund will be Amaranth LLC, c/o Dundee Leeds Management Services (Cayman) Ltd., 2nd Floor, Waterfront Centre, 28 N. Church Street, George Town, Grand Cayman, Cayman Islands, British West Indies.

### The Amaranth Long/Short Equity Funds

Amaranth Advisors L.L.C. is also the manager for Amaranth Global Equities LLC ("AGELLC"), and Amaranth International is the trading advisor for Amaranth Global Equities Master Fund Limited (the "Amaranth Global Equities Master Fund" and, together with AGELLC, the "Amaranth Global Equities Funds"), which began operations in December 2003. The Amaranth Global Equities Funds concentrate on investments, both long and short, ing lobal equities and equity-linked instruments and related options. Prior to beginning to manage the Amaranth Global Equities Funds, Amaranth has effectively been managing only a single, multi-strategy portfolio. Managing different portfolios raises conflicts of interest with respect to the allocation of expenses, resources and trading opportunities that Amaranth has not previously had to resolve. See *"Conflicts of Interest"* in the accompanying Confidential Private Placement Memorandum.

The Fund will invest in the Amaranth Global Equities Master Fund, but also will continue to implement long/short strategies directly for its own account. The Fund's long/short strategies may be implemented with different risk and volatility parameters than those implemented by the Amaranth Global Equities Master Fund.

Expenses borne by the Fund will include the Fund's allocable share of expenses incurred by the Amaranth Global Equities Master Fund to the same extent as described under *"Financial and Tax Allocations; Expenses"* in the Confidential Private Placement Memorandum.

### Amaranth Group Inc.

Beginning on January 1, 2004, Amaranth Group Inc. will perform all of the services previously provided by PPMC and described under *"Management"* and *"Conflicts of Interest"* in the Confidential Private Placement Memorandum, pursuant to an Administrative Services Agreement that includes customary compensation and indemnification provisions. All of the other relationships among PPMC, PPMC's affiliates, the Fund and the Manager will have terminated by January 1, 2004. An entity controlled by S. Donald Sussman will remain a minority owner and non-managing member of the Manager.

### Members' Representative

Arthur F. Bell & Associates L.L.C., an independent public accountant, was duly selected and approved as the Members' Representative of the Fund. See *"Summary – Members' Representative"* and *"Conflicts of Interest"* in the Confidential Private Placement Memorandum for additional information about the Members' Representative.

### CFTC Matters

The Fund currently intends to withdraw from registration as a "commodity pool operator" with the Commodity Futures Trading Commission by the end of 2004 pursuant to a recently adopted exemption available to Amaranth based on the institutional nature of its investor base. This de-registration will, technically, cause the Fund to no longer be operated as a "commodity pool," but will have no practical effect on the operation of the Fund.

————————

**THE INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF THE INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE FUND AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE INVESTOR RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE. THIS AUTHORIZATION OF TAX DISCLOSURE IS RETROACTIVELY EFFECTIVE TO THE COMMENCEMENT OF THE FIRST DISCUSSIONS BETWEEN THE FUND OR ITS REPRESENTATIVES AND THE INVESTOR REGARDING THE TRANSACTIONS CONTEMPLATED HEREIN.**

**APPENDIX A**
**AMARANTH PARTNERS L.L.C. PERFORMANCE SUMMARY**

| Period | Rate of Return for Period | Year to Date Return | Capital |
|--------|---------------------------|---------------------|---------|
| September-00 | 1.77% | 1.77% | $79,568,251 |
| October-00 | 1.54% | 3.34% | |
| November-00 | (1.01)% | 2.29% | |
| December-00 | 1.83% | 4.17% | $59,762,267 |
| | | | |
| January-01 | 4.92% | 4.92% | |
| February-01 | 1.21% | 6.19% | |
| March-01 | 0.79% | 7.03% | $77,333,861 |
| April-01 | 2.07% | 9.24% | |
| May-01 | 1.99% | 11.42% | |
| June-01 | (0.42)% | 10.95% | $86,422,093 |
| July-01 | 0.23% | 11.21% | |
| August-01 | 1.49% | 12.86% | |
| September-01 | (0.92)% | 11.82% | $104,991,186 |
| October-01 | 1.56% | 13.57% | |
| November-01 | 3.43% | 17.46% | |
| December-01 | 3.59% | 21.69% | $123,800,962 |
| | | | |
| January-02 | 2.38% | 2.38% | |
| February-02 | 0.05% | 2.43% | |
| March-02 | 1.05% | 3.51% | $274,522,857 |
| April-02 | 0.27% | 3.79% | |
| May-02 | 0.03% | 3.82% | |
| June-02 | (2.24)% | 1.49% | $339,609,416 |
| July-02 | (0.33)% | 1.16% | |
| August-02 | 0.53% | 1.69% | |
| September-02 | 1.61% | 3.33% | $356,770,560 |
| October-02 | 2.19% | 5.59% | |
| November-02 | 3.26% | 9.04% | |
| December-02 | 2.08% | 11.30% | $400,384,146 |
| | | | |
| January-03 | 3.20% | 3.20% | |
| February-03 | 2.35% | 5.62% | |
| March-03 | 0.16% | 5.79% | $470,827,405 |

|               |          |         |               |
|---------------|----------|---------|---------------|
| April-03      | 1.34%    | 7.21%   |               |
| May-03        | 1.90%    | 9.24%   |               |
| June-03       | 0.65%    | 9.95%   | $513,328,725  |
| July-03*      | (0.35%)  | 9.56%   |               |
| August-03*    | 0.64%    | 10.26%  |               |
| September-03* | 1.11%    | 11.49%  | $623,227,896  |
| October-03*   | 2.17%    | 13.90%  |               |
| November-03*  | 1.25%    | 15.33%  |               |

* The rates of return for Amaranth Partners L.L.C. for these periods include the returns from "new issues" (formerly known as "hot issues"), as defined in the regulations of the National Association of Securities Dealers, Inc ("NASD"). Pursuant to the NASD regulations, not all investors are eligible to receive income from "new issues." The returns for Amaranth Partners L.L.C. for such periods without the inclusion of "new issue" returns are as follows:

| Period       | Rate of Return for Period | Year to Date Return |
|--------------|---------------------------|---------------------|
| July-03      | (0.56)%                   | 9.33%               |
| August-03    | 0.64%                     | 10.03%              |
| September-03 | 1.12%                     | 11.26%              |
| October-03   | 2.10%                     | 13.60%              |
| November-03  | 1.25%                     | 15.02%              |

**Past performance is not necessarily indicative of future results. All returns are net to the Members (after all operating expenses and transaction costs, as well as the Manager and Profit Allocations).**

**The rates of return from September 2000 through December 2002 are audited, but those for 2003 are currently unaudited. The audited annual and unaudited interim financial statements of the Fund are available upon request.**

and clause (iii) of this **paragraph (h)** shall not be deemed to include an account in which any of the persons included in clauses (i) or (ii) of this **paragraph (h)** has a financial or ownership interest if the account was established for the benefit of bona fide public customers (e.g., insurance company general and separate investment accounts and bank trust accounts).

or

(i)   The Subscriber (i) has acted as a finder in respect of the public offering of any "NASD-Restricted Issue" or has acted in a fiduciary capacity to the managing underwriter of any such offering, including acting as an attorney, accountant or financial consultant to any such managing underwriter; or (ii) is supported to a material extent, directly or indirectly, by any of the foregoing.

or

(j)   The Subscriber is (i) a senior officer of a bank, savings and loan institution, insurance company, investment company, investment advisory firm or any other institutional type account (including hedge funds, investment partnerships, investment corporations, and investment clubs), domestic or foreign; (ii) a person in the securities department of, or an employee or a person who may influence or whose activities directly or indirectly involve or are related to the function of buying or selling securities for, any bank, savings and loan institution, insurance company, investment company, investment advisory firm or other institutional type account, domestic or foreign; or (iii) supported to a material extent, directly or indirectly, by any of the foregoing.

or

(k)   The Subscriber is (i) a member of the immediate family of any person described in **paragraph (d)(ii)**, but is not supported directly or indirectly to a material extent by such person; or (ii) a member of the immediate family of any person described in **paragraphs (d)(i)** or **(d)(ii)** who does not contribute, directly or indirectly, to the support of the Subscriber.

or

(l)   The Subscriber is a member of the NASD or any other domestic broker-dealer acting for the account of any person included in any of **paragraphs (i) - (k)**.

or

(m)   The Subscriber is a domestic bank, domestic branch of a foreign bank, trust company or other conduit acting for the account of any person included in **paragraphs (i) - (k)**.

or

(n)   The Subscriber is a foreign broker-dealer or bank acting for the account of any person included in **paragraphs (i) - (k)**.

or

(o)   The Subscriber is an employee benefit plan qualified under ERISA and is sponsored by a domestic or foreign entity (other than a domestic or foreign broker-dealer) that is engaged in financial services activities, including, but not limited to, a bank, insurance company, investment adviser or other money manager, and the plan is designed primarily for the benefit of persons included in **paragraphs (i) - (k)**.

---

in the member multiplied by the percentage interest of such person in such entity.

or

(p)   The Subscriber is an account or investment fund (including an employee benefit plan) in which persons included in *paragraphs (i) - (o)* have a financial or ownership interest; provided, however, that this *paragraph (p)* shall not be deemed to include the following types of accounts or investment funds:

    (i)   domestic or foreign accounts or investment funds in respect of which the Subscriber furnishes the Fund a written representation from the Subscriber's counsel or from the Subscriber's independent certified public accountant to the effect that no person included in **paragraphs (i) - (o)** is allocated any "NASD-Restricted Issues" profits or losses by such account or fund.

    (ii)   employee benefit plans that are qualified under ERISA and are not described in **paragraph (e) or (f).**

    (iii)   investment companies registered as such under the Company Act.

    (iv)   foreign investment funds in respect of which the Subscriber will furnish the Fund a written certification prepared by counsel or by an independent certified public accountant as described under **paragraph (w).**

**The Subscriber is an "Unrestricted" Person if any of the paragraphs (q) - (x) applies to the** Subscriber:

(q)   The Subscriber is a member of the NASD or any other domestic broker-dealer and is not acting for its own account or for the account of any person included in any of *paragraphs (a) - (p).*

or

(r)   The Subscriber is a domestic bank, domestic branch of a foreign bank, trust company or other conduit acting for the account of a person not included in *paragraphs (a) - (p).*

or

(s)   The Subscriber is a foreign broker-dealer or bank acting for the account of a person not included in *paragraphs (a) - (p).*

or

(t)   The Subscriber is an employee benefit plan qualified under ERISA and is not described in paragraph (e) or (f).

or

(u)   The Subscriber is an investment company registered as such under the Company Act.

or

(v)   The Subscriber is a domestic or foreign account or investment fund in which no person included in *paragraphs (a) - (p)* has a financial or ownership interest, or in respect of which the Subscriber furnishes the Fund a written representation from the Subscriber's counsel or from the Subscriber's independent certified public accountant to the effect that no person included in *paragraphs (a) - (p)* is allocated any "NASD-Restricted Issues" profits or losses by such account or fund.

<u>or</u>

    *(w)   The Subscriber is a "foreign investment company" within the meaning of NASD Conduct Rule IM-2110-1(l)(6). (If the Subscriber qualifies under this **paragraph (w)**, the Subscriber will be required to furnish to the Company a written certification prepared by counsel admitted to practice before the highest court of any Stateo f the United States or the foreign jurisdiction in which the Subscriber is organized (or by an independent certified public accountant licensed to practice in any State of the United States or such foreign jurisdiction) stating that:  (i) the Subscriber has 100 or more investors; (ii) securities of the Subscriber are listed on a foreign exchange or are authorized for sale to the public by a foreign regulatory authority; (iii) in the case of each "NASD-Restricted Issue" in which the Subscriber has invested, the Subscriber did not, at the time of its purchase thereof, invest more than 5% of its assets in such "NASD-Restricted Issue"; and (iv) no person who owns more than 5% of the shares of the Subscriber is a member of the NASD, acting for its own account, or the account of a person included in any of **paragraphs (d), (h), (i), (j)**).*

<u>or</u>

    *(x)   None of **paragraphs (a) - (w)** applies to the Subscriber.*