**Hybrid and Other Strategies**

Many of the strategies executed by Amaranth combine elements of more than one of the foregoing general strategy types or may represent a completely different strategy type. Often, in the course of implementing a particular strategy an opportunistic trade representing a different trading approach will be made. For example, in seeking to identify a relatively mispriced pair of assets, Amaranth may conclude that an asset is sufficiently over- or underpriced to merit taking an outright directional position.

Amaranth's approach combines a range of different trading techniques, both implementing different strategies in different markets and combining different strategies, in the same or related markets.

Amaranth is continually developing new, and adapting and refining existing, strategies. There is no material limitation on the strategies that Amaranth may apply and no assurance as to which types of strategies may be applied at any one time.

**Energy Trading**

The Fund currently has a significant commitment to energy trading (*i.e.*, trading in electricity, natural gas, oil and related derivative instruments, including options and futures). Energy trading involves certain financial risks that are qualitatively different from those incurred in trading securities and other financial instruments.

The energy markets are susceptible to significant short-term price volatility as a result of a variety of factors, which may include the following: the functioning of facilities necessary to produce, transport, store and deliver physical energy; the inability to store electricity; the condition of efficient operation of power distribution networks; rate and tariff regulation; government ownership or operation of certain trading counterparties; consumer advocacy; weather-related events; governmental intervention; changes in law; international political events; acts of war; terrorist attacks; *force majeure* or other unforeseen events; high trading volumes; unexpected changes in congestion; dislocation in nodal pricing resulting from unexpected market conditions such as outages, and spikes in fuel prices; or other factors such as market illiquidity or disruption, the inability or refusal of a counterparty to perform or the insolvency or bankruptcy of a significant market participant. Furthermore, certain energy markets — in particular, those related to petroleum — are particularly subject to the risk of sudden and dramatic price changes as a result of international political events, acts of war and terrorism and the anticipation of such events. These events are, by their nature, unpredictable, and can cause extreme and sudden price reversals and market disruptions.

In its energy trading, the Fund competes with "asset-based" traders (such as exploration and production companies) that have the competitive advantage of being able to produce all or a portion of the energy they trade, thus reducing their exposure to fluctuating market prices. Unless it invests in energy-producing assets, the Fund will not be able to produce energy and may be required to acquire energy at market prices, resulting in substantial losses, in order to discharge its contractual obligations.

**Third-Party Managers and Third-Party Ventures**

The Fund may invest capital with Third-Party Managers as well as in Third-Party Ventures. All of these investments involve the Fund relying on the performance of third parties,

-51-

thereby increasing the risk of manager misconduct or bad judgment, as well as limiting Amaranth's control over, and knowledge of, the Fund's overall portfolio. Amaranth may not be able to withdraw capital from a Third-Party Manager or Third-Party Venture even in situations where such Third-Party Manager or Third-Party Venture is deviating from announced strategies or risk control policies or has otherwise been materially adversely affected. Furthermore, a Third-Party Manager or Third-Party Venture may deviate significantly from its announced strategies and/or risk control policies without Amaranth's knowledge.

In selecting Third-Party Managers and/or Third-Party Ventures with which to place and/or invest capital, Amaranth relies on a variety of both quantitative as well as qualitative factors, as well as the subjective judgment of its personnel. There can be no assurance as to what factors will be considered in selecting Third-Party Managers or Third-Party Ventures, and poor selection could result in material losses for the Fund.

**Longer-Term Investments**

The Fund has recently been increasing its commitment to Longer-Term Investments, including illiquid and restricted, as well as thinly-traded, securities and other less liquid assets, including, without limitation, investments in private companies and in certain physical commodities.

Amaranth determines the "fair value" of the Fund's Longer-Term Investments for accounting purposes using valuation models and market information. However, the Fund's valuation of its Longer-Term Investments may differ materially from the value ultimately realized upon the liquidation of such investments, particularly as certain of such investments tend to have realization events which cause their value to increase or decrease suddenly in a manner not previously reflected in the Net Asset Value at which investors have recently subscribed and/or Withdrawn.

There is often no trading market for the Fund's Longer-Term Investments, and the Fund might only be able to liquidate these positions, if at all, at disadvantageous prices.

## Certain Instruments Traded

**Equity Securities**

A number of Amaranth's strategies are based on attempting to predict the future price level of different equity or equity-related securities. Numerous inter-related and difficult-to-quantify economic factors, as well as market sentiment, subjective and extraneous political, climate-related and other factors, influence the cost of equities; there can be no assurance that Amaranth will be able to predict future price levels correctly. The Fund's directional equity positions are typically leveraged, and even comparatively minor adverse market movements can result in substantial losses.

**Debt Securities**

The debt securities in which the Fund invests may be subject to price volatility due to various factors including, but not limited to, changes in interest rates, market perception of the creditworthiness of the issuer and general market liquidity. In addition to high investment grade debt securities, the Fund invests in low investment grade or non-investment grade debt securities, which are typically subject to greater market fluctuations and risks of loss of income and

principal than lower yielding, investment grade securities and are often influenced by many of the same unpredictable factors which affect equity prices. In addition to the sensitivity of debt securities to overall interest-rate movements, debt securities involve a fundamental credit risk based on the issuer's ability to make principal and interest payments on the debt it issues. The Fund's investments in debt securities may experience substantial losses due to adverse changes in interest rates and the market's perception of issuers' creditworthiness.

The Fund also invests in certain hybrid debt arrangements, which are subject to risks in addition to overall interest-rate movements and the issuers' ability to pay the debt in accordance with its terms. For example, when the Fund invests in syndicated debt such as loan participations, it is subject to certain additional risks as a result of having no direct contractual relationship with the borrower of the underlying loan. In such circumstances, the Fund generally depends on the lender to enforce its rights and obligations under the loan arrangements in the event of a default by the borrower on the underlying loan and will generally have no voting rights with respect to the issuer, as such rights are typically retained by the lender. Such investments are subject to the credit risk of the lender (as well as the borrower) since they will depend upon the lender forwarding payments of principal and interest received on the underlying loan. There can be no assurance that the lender will not default on its obligations under such arrangements, resulting in substantial losses to the Fund.

**Distressed and High Yield Securities**

The Fund invests in the securities of issuers in weak financial condition, experiencing poor operating results, needing substantial capital investment, perhaps having negative net worth, facing special competitive or product obsolescence problems or involved in bankruptcy or reorganization proceedings. Investments of this type may involve specialized financial and business risks that can result in significant or even total losses. Among the risks inherent in investments in financially troubled issuers is the fact that it is frequently difficult to obtain reliable information as to their true financial condition. The market prices of distressed and high yield securities are subject to abrupt and erratic market movements and excessive price volatility, and unusually wide "bid-ask" spreads.

**Derivatives**

The Fund uses derivative financial instruments, including, without limitation, warrants, options, swaps, convertible securities, notional principal contracts, contracts for difference, forward contracts, futures contracts and options thereon, and may use derivative techniques for hedging and for other trading purposes. The use of derivative instruments involves a variety of material risks, including the extremely high degree of leverage often embedded in such instruments and the possibility of counterparty non-performance as well as of material and prolonged deviations between the theoretical and realizable value of a derivative (*i.e.*, due to nonconformance to anticipated or historical correlation patterns). These anticipated risks (and other risks that may not be anticipated) may make it difficult as well as costly to the Fund to close out positions in order either to realize gains or to limit losses.

Many of the derivatives traded by the Fund are principal-to-principal or "over-the-counter" contracts between the Fund and third parties entered into privately, rather than on an exchange. As a result, the Fund will not be afforded the regulatory and financial protections of an exchange or its clearinghouse (or of the government regulator that oversees such exchange and clearinghouse). In privately negotiated transactions, the risk of the negotiated price deviating

materially from fair value is substantial, particularly when there is no active market available from which to derive benchmark prices.

Many derivatives are valued on the basis of dealers' pricing of these instruments. However, the price at which dealers value a particular derivative and the price which the same dealers would be willing to pay for such derivative should the Fund wish or be forced to sell such position may be materially different. Such differences can result in an overstatement of the Fund's Net Asset Value and may materially adversely affect the Fund in situations in which the Fund is required to sell derivative instruments.   The Fund's use of derivatives and other techniques (such as short sales) for hedging purposes involves certain additional risks, including (i) imperfect correlation between movements in the asset on which the derivative is based and movements in the asset being hedged; and (ii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of the Fund's assets segregated to secure its obligations under derivatives contracts.   By hedging a particular position, the Fund limits the potential gain from an increase in value of such position, but may not achieve a commensurate increase in risk control.

**Credit Default Swaps**

The Fund purchases and sells credit derivatives contracts — primarily credit default swaps — both for hedging and other purposes. The typical credit default swap contract requires the seller to pay to the buyer, in the event that a particular reference entity experiences specified credit events, the difference between the notional amount of the contract and the value of a portfolio of securities issued by the reference entity that the buyer delivers to the seller. In return, the buyer agrees to make periodic payments equal to a fixed percentage of the notional amount of the contract. The Fund may also sell credit default swaps on a basket of reference entities as part of a synthetic collateralized debt obligation transaction.

As a buyer of credit default swaps, the Fund is subject to certain risks in addition to those described under " — Derivatives," above. In circumstances in which the Fund does not own the debt securities that are deliverable under a credit default swap, the Fund is exposed to the risk that deliverable securities will not be available in the market, or will be available only at unfavorable prices, as would be the case in a so-called "short squeeze." In certain instances of issuer defaults or restructurings, it has been unclear under the standard industry documentation for credit default swaps whether or not a "credit event" triggering the seller's payment obligation had occurred.  In either of these cases, the Fund would not be able to realize the full value of the credit default swap upon a default by the reference entity.

As a seller of credit default swaps, the Fund incurs leveraged exposure to the credit of the reference entity and is subject to many of the same risks it would incur if it were holding debt securities issued by the reference entity.  However, the Fund will not have any legal recourse against the reference entity and will not benefit from any collateral securing the reference entity's debt obligations.  In addition, the credit default swap buyer will have broad discretion to select which of the reference entity's debt obligations to deliver to the Fund following a credit event and will likely choose the obligations with the lowest market value in order to maximize the payment obligations of the Fund.

In addition, credit default swaps generally trade on the basis of theoretical pricing and valuation models, which may not accurately value such swap positions when established or when subsequently traded or unwound under actual market conditions.

**Non-U.S. Securities and Emerging Markets**

The Fund trades and invests in securities of companies domiciled or operating in one or more non-U.S. countries and makes other investments in entities located outside the U.S., including in countries that are considered to be "emerging markets." Investing in these securities involves considerations and possible risks not typically involved in investing in securities of companies domiciled and operating in the United States, including instability of some non-U.S. governments, the possibility of expropriation, limitations on the use or removal of funds or other assets, more limited disclosure and access to information from issuers than is customary in the U.S., changes in governmental administration or economic or monetary policy (in the United States or abroad) or changed circumstances in dealings between nations. The application of non-U.S. tax laws (e.g., the imposition of withholding taxes on dividend or interest payments, income taxes and excise taxes) or confiscatory taxation, as well as various other laws and regulations, including anti-money laundering laws, may also affect the Fund's investment in non-U.S. securities and its other investments in entities located outside the U.S. The Fund may incur higher expenses from investment in non-U.S. securities and outside the U.S., in particular, in emerging markets, than from investment in U.S. securities and in non-emerging markets because of the costs that must be incurred in connection with conversions between various currencies and because non-U.S. brokerage commissions may be higher than commissions in the United States. Non-U.S. markets also may be less liquid, more volatile and subject to less stringent governmental supervision than in the United States. The Fund's investments in non-U.S. countries could be adversely affected by other factors not present in the United States, including lack of uniform accounting, auditing and financial reporting standards and potential difficulties in enforcing contractual obligations and in hedging market risk.

**Private Investments; Illiquid Investments; Designated Investments; Estimated Values**

The Fund from to time invests in illiquid and restricted, as well as thinly-traded, instruments (including privately placed securities).   Many of the Fund's Longer-Term Investments are made in such instruments.   There is often no trading market for these investments, and the Fund might only be able to liquidate these positions, if at all, at disadvantageous prices. The Fund may be required to hold such investments despite adverse price movements. In addition, if the Fund makes a short sale of an illiquid holding, it may have difficulty in covering the short sale, resulting in a potentially unlimited loss on that position.

Amaranth values the illiquid investments in the Fund's portfolio in its good faith discretion. Although there can be no assurance that these valuations will accurately predict the price at which an arm's-length buyer would be willing to purchase the investments, these valuations are part of the calculation of the Fund's Net Asset Value.

In certain cases, the Manager may designate certain "Designated Investments" as investments in which only those Members (other than Annual Liquidity Members which elect to be DI Opt-Out Members) which were Members as of the first day of the calendar month when such investments were so designated. Factors considered by the Fund in determining whether to designate an investment as a Designated Investment may include the duration of the investment, the lack of liquidity of the investment, the availability of market inputs and standardized valuation models and the overall materiality of such investment to the Fund. Each Designated Investment will be accounted for separately from all other investments of the Fund. A Member will be required to retain Designated Investment Interests until the related Designated Investment is liquidated, irrespective of whether such Member has otherwise Withdrawn from the Fund. The Fund may be required to hold Designated Investments for several years, if not longer. The Fund

may determine to continue to hold a Designated Investment, notwithstanding the occurrence of a Liquidity Event with respect to such Designated Investment. The determination as to whether to liquidate a Designated Investment, or return part or all of a Designated Investment to the General Portfolio following a Liquidity Event, is in the discretion of Amaranth.

In order to ascertain the Net Asset Value of the Fund, Amaranth will need to use an estimated "fair value" (determined by Amaranth) for its Designated Investments and illiquid investments. Any such "fair value" may differ materially from the value ultimately realized upon the liquidation of these investments. Nevertheless, with respect to Longer-Term Investments that are not Designated Investments, Manager Allocations and Profit Allocations will be made, the participation of new Capital Contributions in the profits and losses of the Fund determined and Withdrawal proceeds calculated based on the Fund's "fair value" determinations.

**Over-the-Counter Energy Transactions**

The Fund invests in energy-based financial instruments, including, without limitation, exchange-traded and over-the-counter derivatives contracts such as futures, options, swaps and forwards, which have energy commodities (such as petroleum products, natural gas and electric power) as their reference asset. Certain of these markets are in developmental stages and may expose the Fund to unusually volatile returns and illiquidity. While these markets have had good profit potential in the past, it is reasonable to expect that trading margins will erode as these markets mature. In addition, as a result of recent events the number of counterparties engaged in energy trading has been reduced, resulting in substantially less liquidity in these markets than has historically been the case.

Energy-based derivatives have the same risks associated with them as other energy-related transactions *(see " — Energy Trading," above)* and derivative financial instruments *(see " — Derivatives," above)* — including a high degree of leverage, deviations between the theoretical and realizable value of the reference commodity and the derivative and imperfections in dealer pricing.

The energy markets in which the Fund will invest can experience periods of illiquidity, and the Fund may choose to invest in joint ventures, private companies, physical assets (*i.e.*, tankers, transmission lines, oil storage facilities and oil and gas producing properties) as well as a variety of other ventures and investments. The foregoing investments may be illiquid and may not have a readily-ascertainable market value.

<u>**Certain Trading and Investing Techniques**</u>

**Model Risk**

Certain of Amaranth's strategies require the use of quantitative valuation models that it has developed over time, as well as valuation models developed by third parties and made available to Amaranth. As market dynamics (for example, due to changed market conditions and participants) shift over time, a previously highly successful model often becomes outdated or inaccurate, perhaps without Amaranth recognizing that fact before substantial losses are incurred. There can be no assurance that Amaranth will be successful in continuing to develop and maintain effective quantitative models, and the necessity of continuously updating these models demonstrates that Amaranth's past successful results may not be representative of the Fund's future performance.

The Fund's model risk extends to the valuation of a number of its less liquid as well as Longer-Term Investments which are made on the basis of internal Amaranth models, taking into account market inputs, where available, and the results of any valuation analyses of independent valuation consultants retained by the Manager, in the absence of any readily-determinable market values. The valuations so determined may differ materially from the value ultimately realized upon the liquidation of such investment.

**Importance of Market Judgment**

Although Amaranth uses quantitative valuation models in evaluating the economic components of certain prospective trades, Amaranth's strategies are by no means wholly systematic; the market judgment and discretion of Amaranth's personnel are fundamental to the implementation of these strategies. The greater the importance of subjective factors, the more unpredictable a trading strategy becomes.

**Exchange Rates**

The Fund invests in securities and instruments denominated in non-U.S. currencies. Such investments are subject to the risk that the value of a particular currency will change in relation to the Dollar. Among the factors that may affect currency values are trade balances, the level of short-term interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. Amaranth may seek to hedge these risks by investing directly in non-U.S. currencies and buying and selling options, futures or forward contracts thereon. The Fund cannot, however, assure any Member that these strategies, if implemented, will be effective.

**Duration of Investment Positions**

Amaranth typically does not know (except in the case of certain options or derivatives positions which have pre-established expiration dates) the maximum — or, often, even the expected (as opposed to optimal) — duration of any particular position at the time of initiation. The length of time for which a position is maintained varies significantly, based on Amaranth's subjective judgment of the appropriate point at which to liquidate a position so as to augment gains or reduce losses.

Many of the Fund's transactions involve acquiring related positions in a variety of different instruments or markets at or about the same time. Frequently, optimizing the probability of being able to exploit the pricing anomalies among these positions requires holding periods of significant length — often many months to a year or more. Actual holding periods depend on numerous market factors which can both expedite and disrupt price convergences. There can be no assurance that the Fund will be able to maintain any particular position, or group of related positions, for the duration required to realize the expected gains, or avoid losses, from such positions.

The Fund's Longer-Term Investments may not have a defined time horizon to the extent that they are based upon the realization of the enterprise value of an investment as it develops and evolves. The longer the duration of an investment by the Fund, the greater the exposure of such position to the risks of general economic changes as well as changes in Amaranth itself.

The Fund's ability to realize value from Longer-Term Investments and other illiquid investments is often dependent on a "valuation" event — an initial public offering, sale,

refinancing, etc. (comparable to a Liquidity Event in the case of Designated Investments). The specific "exit strategy" for a Longer-Term Investment may not be determined at the time that the Fund commits to such Longer-Term Investment, and changing market conditions may preclude the execution of the "exit strategy" that Amaranth might have expected to implement.

The Fund's Designated Investments will be long-term, illiquid positions. Members may have to retain their interest in such investments for years after they have otherwise entirely withdrawn from the Fund and irrespective of changes in their financial status or in general market conditions.

A material component of the Fund's portfolio in which the Annual Liquidity Interests and the Four-Year Liquidity Interests participate may constitute Designated Investments, raising liquidity and valuation considerations for the Fund.

In addition, Third-Party Ventures or Third-Party Managers may themselves make investments that are long-term and illiquid in nature. The Fund's valuation and accounting treatment of such investments may depend on the relevant Third-Party Manager's own treatment of such investments. Therefore, such investments by Third-Party Ventures may not be designated as Designated Investments and, if not so designated, will not be separately counted toward the 15% (or greater, up to 30%) or 30% Designated Investment Ceilings applicable to a Member's Annual Liquidity Interest or Four-Year Liquidity Interest, as the case may be.

**Short Sales**

As an integral part of its trading strategies, the Fund routinely sells securities "short." A short sale is effected by selling a security that the Fund does not own, or selling a security which the Fund owns but that it does not deliver upon consummation of the sale. In order to make delivery to the buyer of a security sold short, the Fund must borrow the security. In so doing, it incurs the obligation to replace that security, whatever its price may be, at the time it is required to deliver it to the lender. The Fund must also pay to the lender of the security any dividends or interest payable on the security during the borrowing period and may have to pay a premium to borrow the security. This obligation must, unless the Fund then owns or has the right to obtain, without payment, securities identical to those sold short, be collateralized by a deposit of cash or marketable securities with the lender. Short selling is subject to a theoretically unlimited risk of loss because there is no limit on how much the price of a security may appreciate before the short position is closed out. There can be no assurance that the securities necessary to cover the short position will be available for purchase by the Fund. In addition, purchasing securities to close out the short position can itself cause the price of the relevant securities to rise further, thereby increasing any loss incurred by the Fund. Furthermore, the Fund may be forced to close out a short position prematurely if a counterparty from which the Fund borrowed securities demands their return, resulting in a loss on what might otherwise have been a profitable position.

**Securities Lending**

The Master Fund borrows and may lend securities in the ordinary course of its business with third parties as well as with other Manager Clients. Some of the Master Fund's stock borrowing and lending activities are conducted with Amaranth Securities L.L.C. ("ASLLC"), a broker-dealer registered with the SEC and wholly owned by the Fund.

Third parties and any Manager Client entities that borrow securities from the Fund may not be able to return these securities on demand (possibly causing the Fund to default on its

obligations to other parties), or may default on the payment obligations owed to the Fund in connection with such securities loans, potentially resulting in substantial losses to the Fund. *See "Conflicts of Interest — Securities Lending."*

**Hedging**

Amaranth does not, in general, attempt to hedge all market or other risks inherent in the Fund's positions, and hedges certain risks only partially, if at all. Specifically, Amaranth may choose not to hedge certain risks or determine that hedging is economically unattractive — either in respect of particular positions or in respect of the Fund's overall portfolio. The Fund's portfolio composition commonly results in various directional market risks remaining unhedged, although Amaranth may rely on diversification to control such risks to the extent that Amaranth believes it is desirable to do so, but the Fund is not subject to any formal diversification policies.

Amaranth may not have the ability to hedge the Fund's Longer-Term Investments, illiquid investments or Third-Party Ventures. In fact, in the case of the Fund's Third-Party Ventures, Amaranth may have limited knowledge of the underlying positions held by such Third-Party Ventures and therefore may not have a basis on which to establish any hedging positions.

Amaranth will enter into hedging transactions with the intention of reducing or controlling risk. Even if Amaranth is successful in doing so, the hedging will reduce the Fund's returns. Furthermore, it is possible that hedging strategies will not be effective in controlling risk, due to unexpected non-correlation (or even positive correlation) between the hedging instrument and the position being hedged, increasing rather than reducing both risk and losses.

To the extent that Amaranth hedges, its hedges will not be static but rather will need to be continually adjusted based on Amaranth's assessment of market conditions, as well as the expected degree of non-correlation between the hedges and the portfolio being hedged. The success of Amaranth's hedging strategies will depend on Amaranth's ability to implement such strategies efficiently and cost-effectively, as well as on the accuracy of Amaranth's ongoing judgments concerning the hedging positions to be acquired by the Fund.

**Leverage**

The Fund invests on a highly leveraged basis, both through its borrowings and through the significant degree of leverage typically embedded in the derivative instruments in its portfolio. Losses incurred on the Fund's leveraged investments increase in direct proportion to the degree of leverage employed. The Fund also incurs interest expense on the borrowings used to leverage its positions.

To the extent that the assets of the Fund have been leveraged through the borrowing of money, the purchase of securities on margin or otherwise, the interest expense and other costs and premiums incurred in relation thereto may not be recovered. If gains earned by the Fund's portfolio fail to cover such costs, the Net Asset Value of the Fund may decrease faster than if it had not engaged in such borrowing transactions.

**Loans to or from the Offshore Fund**

In situations in which the Master Fund is limited from investing in a particular investment or strategy, the Fund may do so directly or through a Trading Vehicle that engages in such investment activity or strategy. In certain transactions, the Fund may borrow from or provide

debt financing to, either directly or indirectly through the Master Fund or through one or more Trading Vehicles owned by one or more of the Other Feeder Funds and/or the Master Fund, to one or more of the Other Feeder Funds, in addition to making direct investments in, a Trading Vehicle owned by one or more of the Other Feeder Funds, or through other financial structures designed to address Law, tax or other considerations. Such loans or borrowings, although made on an arm's-length basis, leverage the Fund's exposure to such investment or strategy (if the Fund is a borrower) while also requiring the Fund to pay interest to the Other Feeder Funds, and may not have the potential to generate an equity-level return for the Fund (if the Fund is a lender) while the repayment of any such loan would be without recourse to the particular investment made with the proceeds of such loan.

**Trade Execution Risk**

Many of the trading techniques used by the Fund require the rapid and efficient execution of transactions. Inefficient executions can eliminate the small pricing differentials that Amaranth seeks to exploit and impact, possibly materially, the profitability of the Fund's positions.

**Trading Error Risk**

Trading errors are an intrinsic factor in any complex investment process, and will occur, notwithstanding the execution of due care and special procedures designed to prevent such errors. If trading errors do occur, they are for the account of the Fund, unless they are the result of conduct inconsistent with the standard of care set forth in the Material Contracts.

**No Formal Diversification Policies**

Although diversification is an integral part of Amaranth's overall portfolio risk management process, Amaranth is not restricted as to the percentage of the Fund's assets that may be invested in any particular issuer, industry, instrument, market or strategy. The Fund does not and will not maintain any fixed requirements for diversifying its portfolio among issuers, industries, instruments, markets, sectors or strategies. In attempting to maximize the Fund's returns, Amaranth may concentrate the holdings of the Fund in those industries, companies, instruments or markets that, in the sole judgment of Amaranth, provide the best profit opportunities consistent with the Fund's investment objective. Consequently, a loss in any such concentrated position could ultimately result in significant losses to the Fund and a proportionately higher reduction in the Net Asset Value of the Fund than if its capital had been spread over a wide number of positions.

**Environmental Protection Issues**

Physical energy and commodity trading deals in products which can cause material and long-lasting environmental damage. Ground contamination, oil spills at sea, PCB pollution and other similar events present potentially significant risks and liabilities for physical energy traders. Moreover, these liabilities may attach simply on the basis of the current or prior ownership of an energy-related asset by the Fund, irrespective of whether the Fund itself was responsible for the contamination or pollution in question.

**Developing New or Additional Investment Strategies**

Amaranth is continually developing and refining new strategies. The Fund allocates a portion of its capital to developing strategies. These strategies may lose all or most of the capital

allocated to them and such capital, even if not lost, may become illiquid for substantial periods of time. The performance of such strategies is not generally reflected in the past performance of the Fund. Amaranth is not restricted from using the Fund's capital in developing and incubating new strategies, even if Amaranth has limited experience in a new strategy. There can be no assurance that Amaranth will be successful in implementing these strategies or such other strategies as Amaranth may from time to time develop and implement for the Fund or that the Fund will not suffer losses during the development stage.

**Structural Risks**

**Importance of Amaranth**

The Fund must rely on the ability of Amaranth to manage the Fund's trading and investment program and the continued availability of Amaranth's services. Amaranth, in turn, is dependent on the services of certain key personnel, and the loss of the services of one or more such professionals could impair the ability of Amaranth to provide services to the Fund, and be material and adverse to the Fund, despite the broad range of investment professionals made available to the Fund by Amaranth.

**Third-Party Ventures**

The Fund may participate in Third-Party Ventures. Amaranth's level of control over each Third-Party Venture will vary from investment to investment, and may be subject to significant limitations. Such Third-Party Ventures, under certain circumstances, may involve risks not present in direct investing, including, for example, the possibility that one or more of the Fund's co-venturers or partners might become bankrupt, or may have economic or business interests or goals which are inconsistent with those of the Fund, or the possibility that such co-venturers or partners may be in a position to take action contrary to the Fund's best interests. It may also be difficult for the Fund to liquidate its interest in a Third-Party Venture.

**Longer-Term Investments**

The Fund may allocate a significant portion of its capital to Longer-Term Investments. *See " — Strategy Risks — Longer-Term Investments," above.* These positions are typically illiquid and must be valued based on Amaranth's internal valuation models. Amaranth also must be careful to ensure that the liquidity of the Fund's underlying portfolio is not inconsistent with the overall liquidity provided to all of its Members. One of the principal purposes of the Fund's issuing Four-Year Liquidity Interests is to create an equity base for the Fund which can support substantial Longer-Term Investments. Memorandum Accounts that are subject to the Lock-Up Period also will contribute to a more stable equity base that can support Longer-Term Investments. Even if the Fund's overall equity base can — following the introduction of the Four-Year Liquidity Interests — support a substantial commitment to Longer-Term Investments, the value of such Longer-Term Investments may not be realized in a time frame that benefits holders of Annual Liquidity Interests. Conversely, in the event that the Fund must liquidate a significant portion of its portfolio, investments in Third-Party Ventures and Longer-Term Investments may be difficult or impossible to liquidate, and the liquidation of more liquid positions prior to the liquidation of Third-Party Ventures and Longer-Term Investments may be more advantageous to holders of Annual Liquidity Interests and disadvantageous to holders of Four-Year Liquidity Interests.

### Growth in Assets Under Management

Amaranth's total assets under management have increased dramatically. There can be no assurance — particularly given the highly competitive environment for alternative investing strategies — that Amaranth will continue to be successful managing significantly increased amounts of capital.

Amaranth may, in its discretion, elect in the future to impose periodic limitations on the amount of new Capital Contributions that it will accept in either Class of Interests.

### Restrictions on Withdrawals

Because Withdrawals are limited and the Interests are not freely tradable, an investment in the Fund is illiquid and involves a high degree of risk. Irrespective of the success or failure of Amaranth's strategies, Members' inability to Withdraw from the Fund on short notice materially increases the risk of an investment in the Interests because it is not possible to make Withdrawals in order to recognize profits or mitigate losses before such profits may have been eliminated or such losses significantly accelerated. In fact, under certain circumstances, the Fund may suspend Members' ability to make Withdrawals, leaving them fully exposed to the risk of the Fund's performance for an indefinite period of time.

Designated Investment Interests (both as attributable to Annual Liquidity Memorandum Accounts and to Four-Year Liquidity Memorandum Accounts) may not be Withdrawn by Members, and will remain outstanding until the related Designated Investment is liquidated or returned to the Fund's General Portfolio, in the discretion of Amaranth, following the occurrence of a Liquidity Event with respect to each Designated Investment.

### Effect of Substantial Withdrawals

Substantial Withdrawals from the Master Fund (which might be made by other Manager Clients for reasons unrelated to the Fund), or from the Fund, over a short time period could necessitate the liquidation of a significant portion of the Fund's trading positions on materially disadvantageous terms. The Gate, the Annual Liquidity Quarterly Withdrawal Fees imposed on Annual Liquidity Quarterly Withdrawals, the Four-Year Liquidity Quarterly Withdrawal Fees imposed on Four-Year Liquidity Quarterly Withdrawals and the inability of the Four-Year Liquidity Interests to make Annual Appreciation Withdrawals provide no protection to the Fund from substantial Annual Liquidity Annual Appreciation Withdrawals, Anniversary Withdrawals and/or Four-Year Liquidity Withdrawals (or from Withdrawals by other Manager Clients that would potentially disrupt the Master Fund's portfolio).

### Differential Withdrawal Terms

The differential Withdrawal terms applicable to Annual Liquidity Interests and Four-Year Liquidity Interests could have adverse consequences that may be material for certain Members from time to time. For example, Annual Liquidity Interests could be Withdrawn in time to avoid a major Net Asset Value decline during a period when certain holders of Four-Year Liquidity Interests may not be eligible to make Withdrawals with respect to their Four-Year Liquidity Interests. The fact that Pre-February 2006 Interests are not subject to a Lock-Up Period could in certain circumstances adversely affect, potentially materially, the Post-January 2006 Interests.

**Profit Allocations**

The fact that Amaranth is eligible to receive Profit Allocations may create an incentive for Amaranth to make investments on behalf of the Fund that are riskier or more speculative than would be the case in the absence of such priority allocation of Net New Profit. In addition, the Profit Allocations received by Amaranth are calculated on the basis of the unrealized, as well as the realized, gains and losses of the Fund. As a result, the Profit Allocations could be made to Amaranth in respect of unrealized gains of the Fund that may never be realized.

As Profit Allocations are calculated separately with respect to the Annual Liquidity Interest and the Four-Year Liquidity Interest held by the same Member, a Member that invests in both Classes could be subject to a substantial Profit Allocation even though the Net Asset Value of such Member's overall investment in the Fund has declined.

**Fund Expenses**

The Fund incurs substantial costs in addition to the Manager Allocation and the Profit Allocation. The expenses of the Fund may be higher than those incurred by other businesses or by other hedge fund managers. Certain Allocable Expenses paid by the Fund may not benefit the Fund and may benefit other Manager Clients and/or Manager Parties.

Certain of the strategies employed by the Fund require frequent trading, increasing portfolio turnover, brokerage commissions and other transaction fees and expenses.

Fund capital allocated to Third-Party Managers and Third-Party Ventures will be subject to a "layering" of fees, as such Third-Party Managers and other advisers or managers participating in such Third-Party Ventures may themselves charge management and/or performance-based fees in addition to the Manager Allocations and Profit Allocations paid by the Fund to Amaranth. In the event that the Fund pays a management and/or performance-type fee to a Third-Party Manager or in connection with a Third-Party Venture, then the management and/or performance-type fee will be accounted for using the following principles: (i) if the management and/or performance-type fee is paid by the Fund to an entity that is not affiliated with the Manager, it will be treated as an expense of the Fund (of which Amaranth effectively bears a share due to the fact that the expenses of the Fund reduce the Net New Profit on which the Profit Allocation is calculated); (ii) if the Fund pays a management and/or performance-type fee to an entity owned 100% by the Manager, then the management and/or performance-type fee will reduce, dollar-for-dollar, the Profit Allocation made by the Fund to the Manager (or be treated as DT Bonuses); and (iii) if the Fund pays a management and/or performance-type fee to an entity owned in part by the Manager, then the management and/or performance-type fee paid to such entity will be bifurcated such that the amount received by the unaffiliated entity (which will be treated as an expense of the Fund), and the amount received by the Manager (which will reduce, dollar-for-dollar, the Profit Allocation made by the Fund to the Manager). *See "Financial and Tax Allocations; Expenses — Operating Expenses and Transaction Costs."*

**"New Issue" Trading**

The Fund trades in "new issues" (initial public offerings of equity securities). Certain Members will be limited, under applicable National Association of Securities Dealers, Inc. ("NASD") rules, from participating in the profits and losses generated by "new issues." In addition, the Fund may limit the participation of certain Members in "new issues" to an extent not required by the NASD. Members may receive "new issue" allocations disproportionate to such

Members' respective Proportionate Shares and will not be compensated in any respect for any such disproportionate allocations.

**Valuation Risk; Use of Estimates**

The Manager values the Fund's and the Master Fund's positions. Such valuations will affect the Manager Allocations and Profit Allocations received by the Manager, as well as any bonuses payable to Amaranth employees (including the DT Bonuses payable to the Designated Traders).

The Fund's Gross and Net Asset Values are based, to the extent possible, on quotes provided by brokers and other competent third-party pricing sources. However, certain valuations cannot be made on the basis of third-party pricing sources. The fair market value of those investments of the Fund for which a reliable third-party quote is not available is based on other relevant sources deemed reliable by Amaranth in its good faith judgment. To the extent that there is a pricing uncertainty beyond acceptable tolerances, the final authority ultimately rests with the Manager to resolve such uncertainty. The Fund may, in the future, retain one or more additional independent valuation consultants to verify Amaranth's methodology for determining Net Asset Values and the resultant Net Asset Values of certain Longer-Term Investments that Amaranth will utilize for determining Net Asset Value.

Gross and Net Asset Values are determined on the basis of estimates made in accordance with GAAP. Amaranth will not bear any liability if a price, reasonably believed by it to be an accurate valuation of a particular direct or indirect investment of the Fund, is subsequently found to be inaccurate.

Amaranth must depend on the valuations furnished to Amaranth by the Third-Party Managers to which Amaranth allocates Fund capital as well as in respect of certain of its Third-Party Ventures. In the case of its passive investments with certain Third-Party Managers and in certain Third-Party Ventures, Amaranth will have no means of verifying the valuations provided to the Fund, and such valuations may be subject to material correction and/or restatement over time.

The Fund will value certain of its Longer-Term Investments on the basis of internal Amaranth models, the results of any valuation analyses of independent valuation consultants retained by Amaranth, and the market judgment of Amaranth personnel. There can be no assurance that such models and/or market judgment will generate Net Asset Values that correspond to the value ultimately realized upon the liquidation of such Longer-Term Investments. As the Fund invests to an increasing extent in Third-Party Ventures, Longer-Term Investments, Designated Investments and other illiquid investments, there is a risk that Capital Contributions to and Withdrawals from the Fund relative to the timing of realization events will result in economic dilution to investors as the valuation of such investment is subject to changing materially over short periods of time.

**Possibility of Qualified Audit Report**

The Fund's increasing commitment to Third-Party Ventures, Longer-Term Investments, Designated Investments and other illiquid investments may result in the possibility, albeit remote, of the Fund not being able to determine the "fair value" of a material component of its portfolio. This could result in the auditors' report on the Fund's financial statements being qualified with respect to their departure from the "fair value" requirements of GAAP.

### Regulatory and Tax Risks

**Risk of Litigation**

In the ordinary course of business, the Fund may be subject to litigation from time to time. In addition, the Fund may accumulate substantial positions in the securities of issuers that become involved in proxy contests or other litigation. As a result of such investments, the Fund could be named as a defendant in a lawsuit or regulatory action. The outcome of such proceedings, which may materially adversely affect the value of the Fund, may be impossible to anticipate, and such proceedings may continue without resolution for long periods of time. Any litigation may consume substantial amounts of Amaranth's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation.

**Limited Regulatory Oversight**

The Fund is not registered as an investment company under the Investment Company Act of 1940 (the "Investment Company Act") or any comparable regulatory requirements, and does not intend to so register. Accordingly, the provisions of such regulations, which among other things generally require investment companies to have a majority of disinterested directors, require securities held in custody at all times to be maintained in segregated accounts and regulate the relationship between the investment company and its asset manager, are not applicable to an investment in the Fund. Neither the Fund nor the Master Fund is subject to regulation comparable to the Investment Company Act or the Advisers Act in any non-U.S. jurisdiction. Therefore, investors in the Fund do not have the benefit of the protections afforded, nor is the Fund subject to the restrictions imposed, by such registration and regulation.

The Manager is not registered as an investment adviser under the Advisers Act. Affiliates of Amaranth are registered in the category of Investment Counsel and Portfolio Manager and Limited Market Dealer with the OSC and with the FSA under Part IV of the U.K. Financial Services and Markets Act 2000.

**Material Increase in the Regulation of "Hedge Fund" Investment Advisers**

The Hedge Fund Advisers Registration Rule will require, with certain exceptions, substantially all "hedge fund" advisers to register by February 2006 with the SEC as "investment advisers" under the Advisers Act. Registration under the Hedge Fund Advisers Registration Rule can be expected to materially increase the cost of the affected advisers' compliance programs as well as create the unquantifiable but potentially material risk of the SEC taking exception to certain practices commonly used by various advisers, potentially including practices utilized by Amaranth. If Amaranth were required or determined it advisable to discontinue certain of these practices, the consequences to the Fund could be material. It is impossible to predict the effects that the Hedge Fund Advisers Registration Rule could have on Amaranth's operations and on the Fund, but such effects could be material and adverse.

Amaranth has notified the Fund that it does not intend to register with the SEC as an investment adviser by February 2006, although it reserves the right to register at a later date. Amaranth is exempted from such registration due to the Lock-Up Period imposed on Post-January 2006 Interests. *Prospective investors must not rely on Amaranth becoming registered as an "investment adviser" in determining whether to invest in the Interests.*

**Regulated Trading Vehicles**

Certain of the Trading Vehicles through which the Fund implements its investment strategies are registered as broker-dealers and/or in other capacities with, or are eligible for an exemption from registration with, regulatory authorities in the U.S., Canada, the United Kingdom, Singapore and other regulatory authorities. Were such registrations or exemptions to be revoked, reversed or suspended, however, the ability of the Fund to implement certain portions of its strategies could be materially impaired. Such Trading Vehicles are subject to ongoing regulatory oversight, periodic regulatory audits and other rules and restrictions not customarily imposed upon other private investment ("hedge") funds. These restrictions (such as limitations on redemptions and prohibitions on certain trading and investing techniques) could adversely impact the Fund's ability to pay Withdrawals or its ability to effect certain transactions. The Fund will indirectly bear its *pro rata* share of the registered Trading Vehicles' compliance costs.

Certain Third-Party Managers may be subject to substantial regulation in respect of certain investments and/or as advisers, broker-dealers, managed futures advisers or otherwise. Any such regulation could impede and/or make materially more expensive a Third-Party Manager's operations, to the material detriment of the Fund. In addition, in the event that a Third-Party Manager fails to comply with applicable regulations, the results could be materially adverse — on both a financial and reputational level — for persons investing with such Third-Party Manager, including the Fund.

In order to engage in certain energy strategies, the Fund or a subsidiary will be required to register or maintain registration with the Federal Energy Regulatory Commission as a "power marketer," and may be subject to registration or be regulated in certain other capacities (both in the U.S. and abroad). Maintaining necessary registrations and satisfying any applicable audit and/or reporting obligations may be challenging and costly.

**Possibility of Additional Government or Market Regulation**

Market disruptions and the dramatic increase in the capital allocated to alternative investment strategies during recent years have led to increased governmental as well as self-regulatory scrutiny of the "hedge fund" industry in general. The SEC recently adopted the Hedge Fund Advisers Registration Rule under the Advisers Act, as described in greater detail above under " — *Material Increase in the Regulation of 'Hedge Fund' Investment Advisers.*" In addition, legislation proposing greater regulation of the "alternative investment" industry periodically is considered by the Congress, as well as the governing bodies of non-U.S. jurisdictions. It is impossible to predict what, if any, changes in regulation applicable to the Fund, Amaranth, the markets in which they trade and invest or the counterparties with which they do business may be instituted in the future. Any such regulation could have a material adverse impact on the profit potential of the Fund, as well as require increased transparency as to the identity of the Members.

**The Fund and/or the Master Fund Could be Subject to Net Income Tax in Certain Jurisdictions**

Although Amaranth intends generally to structure the investments of the Master Fund to avoid the Master Fund being subject to net income tax by the U.S. and other countries or other local jurisdictions, Amaranth is not obligated to do so. As a result, certain investments of the Fund and/or the Master Fund may cause the Fund (but generally not the Members) to be subject to net income taxes in one or more countries or other local jurisdictions.

**Possible Adverse Tax Consequences**

The Fund cannot assure any Member that the Internal Revenue Service or the applicable state, local or foreign tax authorities (collectively, the "Tax Authorities") will accept the tax positions taken by such Member or the Fund. If any Tax Authority successfully contests a tax position taken by the Fund, the Fund or the Members may be liable for tax, interest, additions to tax or penalties and the Members may need to file or amend one or more tax returns to reflect such contested positions. The Manager shall not be liable to the Fund or any Member for any tax position taken by the Manager with respect to the Fund in good faith and which was not clearly contrary to law when taken.

Members are subject to tax each year on their allocable shares of the Fund's income or gains, if any, whether or not cash or property is distributed by the Fund to them. The tax liability due in respect of such income or gains (if any) could be substantial. Members must either withdraw capital (which they may do only under the limited circumstances described herein) or find other sources of funding to discharge their tax liabilities resulting from their investments in the Fund. The recognition of income, gains and losses in any year for tax purposes may not correspond to, and may, in fact, be greater than, the economic performance of the Fund.

The Fund invests, and the Manager and its Affiliates may establish offices or engage in other activities, in other jurisdictions (including outside the United States). These offices and/or activities of the Fund, the Manager and its Affiliates could result in the Fund, and potentially, certain Members, being subject to taxation in one or more jurisdictions.

The Manager's investment decisions are based primarily upon economic, not tax, considerations, and could result, from time to time, in adverse tax consequences to some or all investors.

Substantially all of the gains (if any) recognized by the Fund are taxed at ordinary income rates.

**Tax Determinations by Third-Party Managers**

In placing capital with a Third-Party Manager, the Fund will become subject to such Third-Party Manager's tax determinations regarding the proper tax treatment of its strategies. Such determinations could be incorrect or improper, perhaps indirectly subjecting the Fund to substantial costs. Conversely, such determinations could be overly conservative, causing the Fund to pay unnecessary taxes.

**Accounting Changes Could Make Certain Strategies Obsolete**

In response to the *Enron* bankruptcy and other highly publicized losses resulting at least in part from improper accounting methods, a number of accounting initiatives have been launched by the auditing professional standards board. Certain of these proposed initiatives could render obsolete trading strategies which have been used routinely for many years. For example, one proposal would have required the issuers of convertible bonds to mark-to-market the option component embedded in these securities. Had this proposal been adopted, convertible bond issuance would likely have declined materially, as the volatility of the option value would be directly impact the issuer's income statement. Other changes affecting consolidation, the valuation of over-the-counter, out-of-the-money options and other matters could adversely affect the viability of certain aspects of the Fund's strategies.

-67-

**Revised Regulatory Interpretations Could Make Certain Strategies Obsolete**

        In addition to proposed and actual accounting changes, there have recently been certain well-publicized incidents of regulators unexpectedly taking positions which prohibited strategies which had been implemented in a variety of formats for many years.  In the current unsettled regulatory environment, it is impossible to predict if future regulatory developments might adversely affect the Fund.

## BROKERAGE ARRANGEMENTS

The Master Fund maintains numerous brokerage and custody arrangements with banks and other established financial institutions. Certain of the Master Fund's assets held by custodians are segregated from the custodians' own property, while other Master Fund assets held as collateral or margin may not be recoverable in the event of the custodian's insolvency. *See "Risk Factors — General Risks — Counterparties and Brokers."*

In negotiating commission rates, the Manager takes into account the financial stability and reputation of a broker and the quality of the investment research, investment strategies, special execution capabilities, clearance, settlement, custody, recordkeeping and other services provided by such broker (as described more fully below), even though the Master Fund may or may not in any particular instance be the direct or indirect beneficiary of the research or other services provided.

In selecting brokers or dealers to execute transactions for the Master Fund and other clients, the Manager does not solicit competitive bids and has no obligation to seek the lowest available commission cost. While the Manager generally disfavors the use of "soft dollar" services, the Manager does not always negotiate "execution only" commission rates. Services which may be provided to the Manager by the Master Fund's brokers may include, without limitation, in addition to research, services such as special execution capabilities, clearance, settlement, net pricing, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, online access to computerized data regarding clients' accounts, performance measurement data, consultations, economic and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, financial strength and stability, efficiency of execution and error resolution, quotation services, the availability of stocks to borrow for short sales, referral of prospective investors, custody, travel, recordkeeping and similar services, as well as paying for a portion of the Master Fund's or the Manager's costs and expenses of operation, such as newswire and data processing charges, quotation services, subscription fees to periodicals and other reasonable expenses incurred by the Manager in performing services on behalf of the Master Fund.

The "soft dollar" services received from brokers as a result of the Master Fund's transactions may be used by the Manager in servicing other accounts, and not all such services may be used by the Manager in connection with the Master Fund. In certain cases, such arrangements, although all related to the Manager's administration and investment management of the Master Fund, may fall outside of the safe harbor for fiduciaries' use of "soft dollar" services established by Section 28(e) of the Securities Exchange Act of 1934 ("Section 28(e)"); provided, in each case, that the Manager believes that these arrangements are equitable and consistent with the Master Fund's objective.

The foregoing list of "soft dollar" services which may be received by the Manager is extensive because of the diverse range of the possible services which the Master Fund's brokers provide. However, as a matter of policy the Manager disfavors the use of "soft dollar" services, preferring the Master Fund's brokers to focus on the quality of their execution while the Manager obtains the services which might otherwise be provided by the Master Fund's brokers elsewhere, from persons specializing in such services.

Although not prohibited from doing so, the Manager does not intend to enter into any arrangement in which the Master Fund is required to allocate either a stated dollar amount or stated percentage of its brokerage business to any broker for any minimum time period.

Such "soft dollar" services as Amaranth may receive will, in general, reduce the Allocable Expenses that would otherwise be payable by the Master Fund.

The Third-Party Managers with which the Fund invests, as well as the Third-Party Ventures in which the Fund participates, may make use of "soft dollar" services, and any additional transaction expenses incurred in order to obtain such services — unlike in the case of any "soft dollar" services obtained by the Manager — would generally constitute incremental expenses to the Fund. Such "soft dollar" services may fall outside of the "safe harbor" provisions of Section 28(e). Each Member, as a condition of investing in the Fund, consents to such "soft dollar" arrangements and, if applicable, to Amaranth consenting to such arrangements on behalf of the Fund.

Amaranth assumes no responsibility for the actions or omissions of any broker or dealer selected by Amaranth in compliance with the standard of care provided in the Material Contracts.

## CONFLICTS OF INTEREST

*The following potential, as well as actual, conflicts of interest may
materially and adversely affect the Fund.*

*Members will have no means of determining whether these conflicts
are being equitably resolved. Members are not
represented separately by counsel.*

### Amaranth

*General*

Amaranth currently manages and advises accounts other than the Fund and may, in the future, manage and advise additional accounts. There is no limit on the number of accounts that may be managed or advised by Amaranth. Amaranth may have financial incentives to favor certain other accounts over the Fund. Even if Amaranth does not have such financial incentives, Amaranth is required to allocate its limited resources among the Fund and the other accounts that Amaranth advises.

Amaranth may engage in a wide variety of business transactions with parties that provide services to the Fund as well as parties that trade in the same markets as the Fund. The business dealings between Manager Parties and the Fund will be on what Amaranth believes to be an arm's-length basis, but Amaranth will not necessarily give third parties an opportunity to provide such services on a competitive basis.

By reason of the other business activities of one or more of the Manager Parties, Amaranth may not be able, or may determine not, to initiate a transaction for the Fund that Amaranth would otherwise have initiated for the Fund.

Manager Parties and other funds managed by Amaranth may engage in transactions directly with the Fund, and may be selling or acquiring the same or comparable positions as those that the Fund is acquiring or selling at or about the same time. In addition, Manager Parties may invest in certain transactions in which Manager Clients do not invest, or in which they are prevented from investing, due to Law, tax or other constraints (or other reasons), and part or all of the Manager Parties' costs from participating in such transactions may be paid by Manager Clients as Allocable Expenses. Other accounts directed by Amaranth may be given priority or exclusive access to certain positions, and certain of such accounts may materially outperform the Fund. Amaranth may in its sole discretion determine, for Law, tax or other considerations, that certain investments should be made by some and not by other Manager Clients, and Amaranth may be subject to conflicts of interest when allocating capital and Allocable Expenses among Manager Clients to address these situations. In addition, Amaranth may cause certain Manager Clients to participate in certain investments or in a different manner from other Manager Parties as a result of Law, tax or other considerations. For example, one Manager Client may participate in an investment opportunity through the purchase of an equity interest while another Manager Client participates in such opportunity through the extension of credit. Consistent with Amaranth's approach to risk management, the Fund may from time to time borrow from or provide debt financing to one or more of the Other Feeder Funds to enable the Fund or the Other Feeder Funds to participate, to a limited extent, in transactions in which the Fund or the Other Feeder Funds cannot invest on an equity basis due to Law, tax or other considerations. Such loans or borrowings, although made on an arm's length basis, leverage the Fund's exposure to

such investment strategy (if the Fund is a borrower) while also resulting in the Fund paying interest to the Other Feeder Funds, and may not have the potential to generate an equity level return for the Fund (if the Fund is a lender) while the repayment of any such loan would be without recourse to the particular investment made with the proceeds of such loan. Due to the different manner in which they participate, there are different economic consequences to different Manager Clients participating in the same investment opportunity.

The Fund may invest in Trading Vehicles and in Third-Party Ventures or with Third-Party Managers in respect of which Amaranth or its Affiliates are entitled to receive asset- and/or performance-based compensation (as well as expense reimbursements). Although Amaranth will, as reasonably practicable, waive, adjust or offset the Management and Profit Allocations made by the Fund to Amaranth in order to avoid multiple levels of fees with respect to such investments, the determinations of the amount of such waiver, adjustment or offset will be made by Amaranth, and investments in such Trading Vehicles may result in greater compensation being payable to Amaranth than had such investment not been made. *See "Financial and Tax Allocations; Expenses — Operating Expenses and Transaction Costs."*

The principles of the doctrine of "corporate opportunity" or other similar rights or claims do not apply to any Manager Party's dealings with the Fund, any Member (in such Member's capacity as such) or any third party.

### *Profit Allocations; DT Bonuses; Allocable Expenses*

The Manager's eligibility to receive the Profit Allocation may incent Amaranth to trade and invest the Fund's portfolio in a more speculative manner than Amaranth otherwise would, including, for example, overweighting the portion of the Fund's portfolio invested in Longer-Term Investments or illiquid investments.

The determination by Amaranth as to whether an investment professional is a Designated Trader (whose DT Bonuses reduce Profit Allocations) is ultimately subjective, and Amaranth has financial incentives to classify certain personnel as not being Designated Traders so that their bonuses for a given Fiscal Year do not reduce the Profit Allocations made as of the end of such Fiscal Year.

Amaranth has a financial incentive to designate investments as Designated Investments, as the Profit Allocation is calculated separately with respect to each Designated Investment.

Although the Manager believes that the terms on which Amaranth provides administrative, accounting, data processing, research, investment-related, technology and other services to the Fund and the Master Fund (the costs of which are passed through to the Fund) are fair, the arrangements among Amaranth International, the Manager, Amaranth Group, the Master Fund and the Fund involve inherent conflicts of interest.

The allocation of the Allocable Expenses among the different Manager Clients, including the Fund, involves certain subjective determinations by Amaranth, which may involve conflicts of interest. The Fund will be subject in certain cases to paying Allocable Expenses which do not benefit the Fund and which do benefit other Manager Clients and/or Manager Parties.

*Different Business Terms*

From time to time, Amaranth may recommend to the Manager that it permit certain Members to acquire Interests on more favorable business terms than other Members, provided that doing so does not adversely affect such other Members.

*Valuation*

The Manager determines the fair market value of the assets and liabilities of both the Fund and the Master Fund. The Manager has not adopted any strict pricing formula or methodology (except as described under *"Net Asset Value; Designated Investments"*). The Manager determines the value of the Master Fund's Investment Assets to the extent possible based on quotes provided by brokers and other competent third-party pricing sources. However, The Manager is authorized, in its sole discretion, to use its own valuations, rather than quotes supplied by independent dealers, if the Manager believes that its valuations are more accurate. Overvaluing positions could inflate the value of the Members' respective Interests as well as the Fund's performance record and the Profit Allocations made to the Manager.

The Fund's Longer-Term Investments may not have a readily-determinable market value. The Manager will value these positions using internal Amaranth models, the analyses of independent valuation consultants as well as the Manager's market judgment, and will have the same conflict of interest in doing so as described in the preceding paragraph.

The Manager believes that the method in which it "marks" the Master Fund's positions is fair, but there can be no assurance that this will be the case.

The Fund may, in the future, retain independent valuation consultants to verify Amaranth's methodology for determining the Net Asset Values of certain Longer-Term Investments.

## Different Withdrawal Terms

The difference between the Withdrawal terms of the Annual Liquidity Interests and Four-Year Liquidity Interests, as well as between the Pre-February 2006 Interests and the Post-January 2006 Interests, could, in certain situations, have an adverse effect on certain Members. The Fund has a conflict of interest in permitting Members to invest in the Fund on different Withdrawal terms, as doing so permits Amaranth to raise capital as well as implement strategies which the Fund might not otherwise be able to accommodate (and thereby potentially increase the fees received by Amaranth), despite the increased risk to investors. In addition, the fact that Pre-February 2006 Interests are not subject to a Lock-Up Period could in certain circumstances adversely, potentially materially, affect the Post-January 2006 Interests.

Amaranth attempts to ensure that the liquidity of the Fund's underlying portfolio is not inconsistent with the overall liquidity provided to all of its Members. One of the principal purposes of the Fund's issuing Four-Year Liquidity Interests is to create an equity base for the Fund which can support substantial Longer-Term Investments.

Even if the Fund's overall equity base can — combining the effects of the introduction of the Four-Year Liquidity Interests and the Lock-Up Period for Post-January 2006 Interests — support a substantial commitment to Longer-Term Investments, the value of such Longer-Term Investments may not be realized in a time frame which benefits many holders of Annual

Liquidity Interests. In addition, in the event that the Fund must liquidate a significant portion of its portfolio, investments in Third-Party Ventures and Longer-Term Investments may be difficult or impossible to liquidate, and the liquidation of the Fund's more liquid positions prior to the liquidation of Third-Party Ventures and Longer-Term Investments in order to pay Annual Liquidity Withdrawals may be disadvantageous to holders of Four-Year Liquidity Interests.

**Securities Lending**

The Master Fund borrows and lends securities in the ordinary course of its business and may do so with third parties as well as with other Manager Clients. Such transactions among different Manager Clients are not subject to approval by the Members' Representative, but involve potentially material conflicts of interest — *e.g.*, one Manager Client paying securities lending fees to another Manager Client or allocating "hard to borrow" securities to, as well as "calling in" borrowed securities from, such Manager Client.

ASLLC, wholly-owned by the Fund, acts as an intermediary (and principal) to (i) borrow securities from third parties to on-lend to the Master Fund to cover the Master Fund's "short" positions and (ii) borrow securities from the Master Fund to on-lend to third parties and thereby provide the Master Fund with financing for its long positions. ASLLC engages in these activities on an arms-length basis, documented by market standard agreements, and charges a market-based spread. In participating in such securities lending and borrowing activities, ASLLC acts as a counterparty to the Master Fund, without any fiduciary duties to it, and would, if necessary, enforce the terms of its borrowing and lending arrangements with the Master Fund on an arm's-length basis.

Amaranth itself has only a small, indirect interest in ASLLC (through Amaranth's investment in the Fund). However, Amaranth may have a conflict of interest in causing the Fund to enter into stock lending arrangements with ASLLC as Amaranth may itself profit indirectly from the spreads earned by ASLLC.

Amaranth has different economic interests in different Manager Clients, and, accordingly, may have incentives to favor one account over another in connection with the securities lending activities described above. Although Amaranth believes that the terms of the Manager Clients' securities lending activities are competitive, and that this lending activity is in the interests of all Manager Clients, there is no objective review or monitoring of the manner in which Amaranth resolves the potentially material conflicts of interest involved in causing different Manager Clients to engage in ongoing securities lending transactions with each other.

**Other Lending**

The Fund may participate in certain transactions as a borrower or provider of debt financing, either directly or indirectly through the Master Fund or one or more Trading Vehicles owned by the Fund or the Master Fund borrowing from or lending capital to one or more other Manager Clients, in each case either directly or through financial structures designed to address Law, tax or other considerations.

**"Trading Errors"**

In the course of carrying out trading and investing responsibilities on behalf of the Fund, Amaranth personnel may make "trading errors" — *i.e.*, errors in executing specific trading instructions. Examples of trading errors include: (i) buying or selling an Investment Asset at a

price or quantity that is inconsistent with the specific trading instructions generated by a particular strategy; or (ii) buying rather than selling a particular Investment Asset (and *vice versa*).  Trading errors are an intrinsic factor in any complex investment process, and will occur notwithstanding the exercise of due care and special procedures designed to prevent trading errors.  Trading errors are, therefore, distinguishable from errors in judgment, due diligence or other factors leading to a specific trading instruction being generated, as well as from unauthorized trading or other improper conduct by Amaranth personnel.   Consequently, Amaranth will (unless Amaranth otherwise determines) treat all trading errors (including those which result in losses and those which result in gains) as for the account of the Fund, unless they are the result of conduct by Amaranth which is inconsistent with the standard of care set forth in the Material Contracts.

**Members' Representative**

Arthur F. Bell & Associates, L.L.C., a public accounting firm independent of Amaranth and which does not otherwise perform material services for Amaranth or the Fund, serves as the Members' Representative in order to provide a mechanism for obtaining (or withholding), when appropriate, the informed consent of the Members required for the Fund to enter into certain transactions which would otherwise be inappropriate or impermissible due to the conflicts of interest involved (for example, the sale of a position by the Fund to another Manager Client). The role of the Members' Representative is not to make investment recommendations or pricing determinations or to review the merits of any transaction on an objective basis.  The Members' Representative is exculpated and indemnified under the Limited Liability Company Agreement. The Members' Representative acts in the same capacity for other Manager Clients.

Each Member, by subscribing for Interests, authorizes the Members' Representative to act as its agent for such purpose.

## NET ASSET VALUE; DESIGNATED INVESTMENTS

*The following only summarizes certain of the detailed provisions*
*of the Limited Liability Company Agreement, the terms of which are controlling.*

**Net Asset Value**

The Fund's Gross Asset Value and Net Asset Value are calculated by Amaranth, subject to the ultimate oversight of the Manager, as of the last day of each calendar month and at such other times as the Manager may determine (each, an "Accounting Date"). The Fund's Net Asset Value is calculated taking into account all assets and liabilities of the Fund, including, without limitation, Allocable Expenses, administration, legal, audit and other professional fees and expenses. Gross Asset Value and Net Asset Value are calculated in Dollars.

The value of the Fund's interest in the Master Fund is based on the Master Fund's net asset value. In determining the Net Asset Value of the Fund, which consists of the value of its assets less its liabilities, and that of the Master Fund, the following valuation principles will be utilized:

(a)     Listed securities (including securities held "long" as well as sold "short") are valued at their last sales price on the date of determination or, if no sales occurred on that date, at the mean between the "bid" and "asked" prices at the Close of Business on that date.

(b)     Commodity futures contracts traded on an exchange are valued at their closing price on the date of determination.

(c)     Currency forwards and unlisted Investment Assets are valued at the mean between the "bid" and "asked" prices quoted by dealers or other sources of price information that Amaranth considers reliable at the close of trading on the date of determination.

(d)     All other Investment Assets (including Investment Assets held "long" as well as Investment Assets sold "short") and assets, including interests in Trading Vehicles, are assigned such values as Amaranth may determine. In determining the value of interests in Trading Vehicles, Amaranth may rely upon values furnished by those Trading Vehicles or by any other Persons which Amaranth believes are competent to determine those values.

(e)     Liabilities and debt obligations of the Master Fund are determined (either singly or in conjunction with their related hedges) by Amaranth. All liabilities not otherwise provided for herein are assigned such value as Amaranth may determine.

(f)     Amaranth may determine to use a different value for any Investment Asset than would be assigned pursuant to paragraphs (a)–(e) above, if Amaranth determines that to do so would more accurately reflect market value.

-76-

Amaranth will determine the manner of applying the foregoing valuation principles in circumstances in which they are unclear or not equitable, and Amaranth will also determine the manner of applying such principles in circumstances in which more than one method of application would be equitable or consistent with Law.

Amaranth will be absolutely protected in relying on the valuations furnished to Amaranth by third parties — including independent valuation consultants, Third-Party Managers and Third-Party Ventures — provided that such reliance is consistent with the standard of care set forth in the Material Contracts.

The Manager is expressly authorized to determine all Gross Asset Values and Net Asset Values, based on estimates and unaudited financial information. Furthermore, the Fund is not obligated to restate Gross Asset Value or Net Asset Value determinations previously made in order to reflect the difference between estimated and final Gross Asset Values and Net Asset Values, but rather may, but has no obligation to, reflect such difference entirely in the Accounting Period in which the amount of such difference is determined.

The Manager may, but has no obligation to, delay the determination of Net Asset Value as of any Accounting Date — and the associated Effective Dates for Distributions and Withdrawals, as applicable — if the Manager determines that, as of such Accounting Date a material portion of the Fund's Investment Assets (other than Designated Investments) cannot be valued. In such event, the Fund will give notice as soon as reasonably practicable of any such postponement to all Members.

**Designated Investments**

From time to time, the Manager may determine at or within thirty (30) days of the date that a given investment is made that such investment should be designated as a Designated Investment. Only persons who are Members (other than DI Opt-Out Members) as of the first day of the calendar month during which such Designated Investment is so designated will be issued a separate Designated Investment Interest (a separate Class of Interests) in respect of each such Designated Investment, and such Members will retain such Designated Investment Interest (tracked as an Annual Liquidity Interest and/or Four-Year Liquidity Interest, as the case may be) — whether or not such Members have otherwise Withdrawn all of their Interests — until such Designated Investment is liquidated or Amaranth determines, in its discretion, to return all or a portion of the underlying assets of such Designated Investment to the General Portfolio.

Manager Allocations and Profit Allocations are calculated separately with respect to each Designated Investment.

The aggregate issuance price of a Member's Annual Liquidity Designated Investment Interests may not exceed 15% of the Gross Asset Value (including in such Gross Asset Value the Designated Investment Interests attributable to such Member's Annual Liquidity Interest valued at cost) of such Member's Post-January 2006 Annual Liquidity Interest (unless such Member specifies a higher percentage, not to exceed 30%, in such Member's Subscription Agreement), and the aggregate issuance price of a Member's Four-Year Designated Investment Interests may not exceed 30% of the Gross Asset Value (including in such Gross Asset Value the Designated Investment Interests attributable to such Member's Four-Year Liquidity Interest valued at cost) of such Member's Four-Year Liquidity Interest. The Designated Investment Ceiling for Pre-February 2006 Annual Liquidity Interests is 10%, rather than 15%.

The 30% Designated Investment Ceiling for Four-Year Liquidity Interests may not be increased.

The positive difference, if any, between (i) the Designated Investment Ceiling applicable to each Memorandum Account maintained for a Member's different Classes of Interests and (ii) the percentage of the capital attributable to such Memorandum Account which has been allocated to Designated Investments, as such percentage is reduced (but not below 0%) by the net liquidation proceeds and/or the fair value of the underlying assets of Designated Investments which have been returned to such Memorandum Account from Designated Investments, is referred to as such Memorandum Account's "Remaining Designated Investment Capacity." Members of both Classes will participate *pro rata* in accordance with the respective aggregate Remaining Designated Investment Capacities of their Annual Liquidity Interests, on the one hand, and Four-Year Liquidity Interests, on the other hand, in all Designated Investments as made.

If a Member holds both an Annual Liquidity Interest and a Four-Year Liquidity Interest, the Designated Investment Ceiling and Remaining Designated Investment Capacity are calculated separately with respect to each such Interest.

A Member may not opt out of participating in Designated Investments with respect to such Member's Four-Year Liquidity Interest. A Member may opt-out of participating in Designated Investments with respect to such Member's Annual Liquidity Interest. A Member wishing to do so must so indicate in such Member's initial Subscription Agreement for an Annual Liquidity Interest.

A Member which is not a DI Opt-Out Member with respect to any of such Member's Annual Liquidity Memorandum Accounts cannot become a DI Opt-Out Member with respect to any Memorandum Account established with respect to any additional Annual Liquidity Capital Contributions made by such Member.

Each Member holding an Annual Liquidity Interest as a DI Opt-Out Member may irrevocably elect not to be a DI Opt-Out Member with respect to such Annual Liquidity Interest (but only with respect to all of such Member's Annual Liquidity Interest) as to all future Designated Investments by so notifying the Fund.

While no Member may be a DI Opt-Out Member with respect to such Member's Four-Year Liquidity Interest, a Member which has opted-out of participating in Designated Investments with respect to such Member's Annual Liquidity Interest is not precluded from investing in a Four-Year Liquidity Interest.

When capital is allocated to a Designated Investment, it is deducted from the aggregate Memorandum Accounts maintained for a Member with respect to such Member's Annual Liquidity Interest, on the one hand, and Four-Year Liquidity Interest, on the other hand, *pro rata* in accordance with the aggregate Remaining Designated Investment Capacity of such Member's Annual Liquidity Interest and Four-Year Liquidity Interest, as the case may be. These *pro rata* capital deductions are then deducted from such Member's Annual Liquidity Memorandum Account (in the case of capital deducted from such Member's Annual Liquidity Interest) or Four-Year Liquidity Memorandum Account (in the case of capital deducted from such Member's Liquidity Interest), with the Anniversary Date or Four-Year Anniversary Date, as the case may be, immediately preceding the date that such deductions are made. If the Remaining Designated Investment Capacity of such Annual Liquidity Memorandum Account or Four-Year Liquidity

Memorandum Account is reduced to 0%, the remaining deductions are made from the Annual Liquidity Memorandum Account or Four-Year Liquidity Memorandum Account, as the case may be, with the immediately prior Anniversary Date or Four-Year Anniversary Date.

If a Member's Annual Liquidity Remaining Designated Investment Capacity, on the one hand, or Four-Year Liquidity Remaining Designated Investment Capacity, on the other hand, has been reduced to 0%, any Designated Investment allocation otherwise attributable to such Member's Annual Liquidity Interest or Four-Year Liquidity Interest, as the case may be, will be added to the Designated Investment allocations to be made from such Member's Four-Year Liquidity Interest or Annual Liquidity Interest, as the case may be. If a Member's overall Remaining Designated Investment Capacity has been reduced to 0%, any Designated Investment allocations that would otherwise be made from such Member's Interest will be made from the other Members' Interests (both Annual Liquidity Interests and Four-Year Liquidity Interests), *pro rata* in accordance with such Interests' respective Remaining Designated Investment Capacities.

When the net liquidation proceeds, and/or underlying assets in the case of a Liquidity Event, are returned to the General Portfolio from a Designated Investment, such net liquidation proceeds are allocated to a Member's Annual Liquidity Memorandum Account (in the case of net liquidation proceeds or underlying assets attributable to Annual Liquidity Memorandum Accounts) or Four-Year Liquidity Memorandum Account (in the case of net liquidation proceeds or underlying assets attributable to Four-Year Liquidity Memorandum Accounts) with the soonest occurring Anniversary Date or Four-Year Anniversary Date which is no less than one hundred (100) days or one hundred and thirty (130) days, as the case may be, after such net liquidation proceeds and/or underlying assets are received (so that such net liquidation proceeds or the dollar amount of such underlying assets are eligible for Withdrawal as of the next available Anniversary Date or Four-Year Anniversary Date, subject to compliance with the required notice period for such a Withdrawal).

If a Member has no Annual Liquidity Memorandum Account or Four-Year Liquidity Memorandum Account at the time that the net liquidation proceeds and/or the underlying assets attributable to a Designated Investment's Annual Liquidity Memorandum Account or Four-Year Liquidity Memorandum Account, as the case may be, are received, such net liquidation proceeds or the fair value of such underlying assets will be paid out directly to such Member.

The net liquidation proceeds and/or the fair value of the underlying assets of a Designated Investment when returned to the General Portfolio will be subject to the remaining Lock-Up Period that would have been attributable to the Memorandum Account balances from which the capital allocations to such Designated Investment were originally made, unless the Manager determines that it is necessary to treat such net liquidation proceeds or underlying assets as new Capital Contributions (*i.e.*, resulting in the issuance of Post-January 2006 Interests subject to a Lock-Up Period) under the Hedge Fund Advisers Registration Rule.

The Manager will have discretion over whether to return the underlying assets of a Designated Investment to the General Portfolio following a Liquidity Event with respect to such Designated Investments.

In the event that a Member no longer holds an Interest participating in the General Portfolio, the Manager may, but shall have no obligation whatsoever to, negotiate on behalf of the Fund to purchase all or a portion of such Member's remaining Designated Investment Interests. Any such Designated Investment Interests acquired by the Fund will be acquired with funds from the General Portfolio and will be allocated among the continuing Members *pro rata* in

accordance with their respective Remaining Designated Investment Capacities. The amounts allocated to purchase such remaining Designated Investment Interests will be accounted for as if such amounts constituted additional direct investments in the affected Designated Investment(s) by the Fund.

In determining whether, and at what price (if any), to acquire such remaining Designated Investment Interests, the Manager will consider, among other factors, the cash position of the Fund, the extent to which such acquisition would deplete the Remaining Designated Investment Capacities of the continuing Members, the effects of such acquisition on the diversification of the Fund's Designated Investment portfolio and such other factors as the Manager may deem relevant. The fact that the Fund has acquired remaining Designated Investment Interests from a certain Member will in no respect obligate the Fund to do so again from such Member, or to do so, either at the same time or in the future, from any other Member.

Any acquisition of remaining Designated Investment Interests by the Fund would only be made if the Manager determined that such acquisition would not constitute an Impermissible Event.

A "Liquidity Event" is an event, including a public offering or listing of securities of an issuer of a Designated Investment, which results in the existence of a reliable third-party source of actionable prices on a sufficiently frequent basis such that the Manager is able to determine that all or a portion of the underlying assets of such Designated Investment may be returned to the General Portfolio. Following a Liquidity Event with respect to a Designated Investment, the Manager may, but has no obligation to, return all or a portion of the underlying assets of such Designated Investment to the General Portfolio. Examples of a Liquidity Event may include: (i) in the case of a Designated Investment consisting of preferred stock of a private issuer, the public offering or listing of such issuer's common stock; and (ii) in the case of a Designated Investment consisting of the common stock of a private issuer, the public offering or "spin-off" of shares of a division of such issuer.

## WITHDRAWALS

*The following summarizes certain of the detailed provisions of the Limited Liability
Company Agreement, the terms of which are controlling.*

### Pre-February 2006 Interests; Post-January 2006 Interests

Pre-February 2006 Interests and Post-January 2006 Interests, whether Annual Liquidity
Interests or Four-Year Liquidity Interests, are subject to the same Withdrawal provisions, as
described below (although the Four-Year Liquidity Interests have materially more restrictive
Withdrawal provisions than the Annual Liquidity Interests). However, Post-January 2006
Interests (*i.e.*, Interests issued on or after February 1, 2006), whether Annual Liquidity Interests
or Four-Year Liquidity Interests, will be subject to an initial "Lock-Up Period" ending on the last
day of the 25th calendar month after their issuance.

### Memorandum Accounts

A separate Memorandum Account is tracked in respect of Annual Liquidity Capital
Account balances with different Anniversary Dates, Four-Year Liquidity Capital Account
balances with different Four-Year Anniversary Dates, Capital Account balances still subject to
their applicable Lock-Up Periods, Capital Account balances subject to different Designated
Investment Ceilings and other Classes of Interests which differ from one another in respect of
certain business terms.  The Memorandum Accounts are used initially to record the Capital
Account balance of each Class attributable to each Capital Contribution made by a Member, and
subsequently to allocate increases and decreases in the Gross Asset Value and the Net Asset
Value of such Capital Account balances, as well as Manager Allocations, Profit Allocations,
Allocable Expenses and other expenses, among such Capital Account balances so that at any
point in time, the Gross Asset Value and the Net Asset Value of each Member's Interest subject
to different business terms are clearly determined.  In general, increases and decreases in the
Gross Asset Value of a Member's Interest of each Class are allocated *pro rata* among the
Memorandum Accounts maintained in respect of such Interest in accordance with the Gross Asset
Value of the Capital Account balances in each such Memorandum Account.  However, certain
items — for example, DT Bonuses — are allocated differently (in the case of DT Bonuses, *pro
rata* in accordance with the annual Net New Profit attributable to each Memorandum Account).
The Manager may make such adjustments to the method by which allocations are made to the
Memorandum Accounts as the Manager may deem reasonable.

### Anniversary Withdrawals

#### *Annual Liquidity Interests*

Following expiration of the Lock-Up Period for Post-January 2006 Interests, a Member
may make an Anniversary Withdrawal of all or a portion of the Annual Liquidity Memorandum
Account established with respect to a particular Capital Contribution as of each 12-month
anniversary, or "Anniversary Date," of the end of the month in which the Capital Contribution
establishing such Memorandum Account was made, by notifying the Fund in writing at least
ninety (90) days prior to the proposed Withdrawal Date.

The Manager may establish, with the consent of the affected Member, that (i) the
Anniversary Date applicable to all or a portion of the Annual Liquidity Memorandum Account
established as of a given date be a different month-end than what would otherwise have been such

-81-

Anniversary Date and/or (ii) multiple Annual Liquidity Memorandum Accounts with different Anniversary Dates be established with respect to a given Annual Liquidity Capital Contribution; provided, however, that no Withdrawals may be made from a Post-January 2006 Annual Liquidity Memorandum Account prior to the expiration of the Lock-Up Period for such Memorandum Account.

The Manager may increase the period of time before a Member may Withdraw all or a portion of the balance in an Annual Liquidity Memorandum Account by changing the Anniversary Date applicable to such Annual Liquidity Memorandum Account, but only if the affected Member is given an opportunity to Withdraw from such affected Annual Liquidity Memorandum Account prior to the effectiveness of such change; provided, however, that any such change, as well as the attendant right to make Withdrawals, will be effective only after any applicable Lock-Up Period.

In the event that a Member makes Annual Liquidity Capital Contributions at more than one time, the Annual Liquidity Memorandum Accounts established with respect to such Capital Contributions may have different Anniversary Dates and will have different Lock-Up Periods.

### Four-Year Liquidity Interests

Upon at least one hundred and twenty (120) days' prior written notice to the Fund, a Member may make a Four-Year Anniversary Withdrawal of all or a portion of the balance in the Four-Year Liquidity Memorandum Account established with respect to a particular Four-Year Liquidity Capital Contribution as of each Four-Year Anniversary Date applicable to such Memorandum Account.

The Four-Year Anniversary Date attributable to a Four-Year Liquidity Memorandum Account will be agreed upon between the Fund and each Member at the time that the applicable Four-Year Liquidity Capital Contribution, and will be a month-end on or after the 40th and on or before the 56th month-end after the beginning of the month as of which such Four-Year Liquidity Capital Contribution was made.

The Manager may increase the period of time before a Member may Withdraw all or a portion of the balance in a Four-Year Liquidity Memorandum Account by changing the Four-Year Anniversary Date applicable to such Memorandum Account, but only if the affected Member is given an opportunity to Withdraw from such affected Four-Year Liquidity Memorandum Account prior to the effectiveness of such change; provided, however, that any such change, as well as the attendant right to make Withdrawals, will be effective only after any applicable Lock-Up Period.

In the event that a Member makes Four-Year Liquidity Capital Contributions at more than one time, the Four-Year Liquidity Memorandum Accounts established by such Capital Contributions may have different Four-Year Anniversary Dates and will have different Lock-Up Periods.

## Quarterly Withdrawals

### Quarterly Withdrawals: The Gate

Subject to the Lock-Up Period applicable to all Post-January 2006 Interests, upon at least forty-five (45) days' prior written notice to the Fund, a Member may make an Annual Liquidity

Quarterly Withdrawal and/or a Four-Year Quarterly Withdrawal as of any Quarterly Withdrawal Date (*i.e.,* January 31, April 30, July 31 and October 31), subject to a "Gate" restricting the aggregate Quarterly Withdrawals of both Classes combined as of any Quarterly Withdrawal Date to *the sum of* (i) 7.5% of the aggregate Gross Asset Value of all outstanding Interests (for the avoidance of doubt, not including Designated Investment Interests), other than Interests held by the Manager, *and* (ii) any Capital Contributions (other than Offsetting Capital Contributions, as described below) received by the Fund as of the beginning of the month immediately following such Quarterly Withdrawal Date, *minus* (iii) *the sum of* any Anniversary Withdrawals and Four-Year Anniversary Withdrawals made as of such Quarterly Withdrawal Date.

In the event that *the sum of* (i) the aggregate Quarterly Withdrawals of both Classes *and* (ii) the aggregate Anniversary Withdrawals and Four-Year Anniversary Withdrawals as of any Quarterly Withdrawal Date exceeds the Gate, the Anniversary Withdrawals and Four-Year Anniversary Withdrawals will be paid in full, and the Quarterly Withdrawals will be permitted only to the extent of the positive difference (if any) between the Gate and the aggregate of all Anniversary Withdrawals and Four-Year Anniversary Withdrawals then made.

The Quarterly Withdrawals permitted under the Gate will be allocated *pro rata* among all of the Members requesting Quarterly Withdrawals as of the applicable Quarterly Withdrawal Date *pro rata* in accordance with such Members' respective Proportionate Shares of both Classes combined, without distinguishing between the Classes (for the avoidance of doubt, not including Designated Investment Interests and without giving effect to any Withdrawals — Anniversary or Quarterly — requested as of such Quarterly Withdrawal Date), not based on the amount of their respective Quarterly Withdrawal Requests.

### Annual Liquidity Quarterly Withdrawal Fee

All Annual Liquidity Quarterly Withdrawals are subject to a Quarterly Withdrawal Fee of 2.5% of the net amount Withdrawn from the applicable Annual Liquidity Memorandum Account(s), payable to the Fund.

### Four-Year Liquidity Quarterly Withdrawal Fee

All Four-Year Liquidity Quarterly Withdrawals are subject to Quarterly Withdrawal Fees which vary depending on how long after the commencement of the current Four-Year Commitment Period for the applicable Four-Year Liquidity Memorandum Account from which the related Quarterly Withdrawals are made. The Quarterly Withdrawal Fee, payable to the Fund, with respect to Four-Year Liquidity Interests, is: 10.0% through the end of the first 13 months of each applicable Four-Year Commitment Period, 7.5% through the end of the next 13 months, 5.0% through the end of the next 13 months and 2.5% for the remaining period until the Four-Year Anniversary Date ending such Four-Year Commitment Period, in each case of the net amount Withdrawn from the applicable Four-Year Liquidity Memorandum Account(s).

### Offsetting Capital Contributions

Neither the Gate nor any Quarterly Withdrawal Fees apply to a Quarterly Withdrawal made by a Member to the extent that such Quarterly Withdrawal is offset by Offsetting Capital Contributions from such Member or any Related Investor accepted by the Fund (or, if the Manager so determines, by another Manager Client that invests all or a portion of its capital in the Master Fund and/or one or more Trading Vehicles) effective as of the beginning of the Accounting Period ending with, or as of the beginning of either of the two Accounting Periods