immediately following, the proposed Quarterly Withdrawal Date.

Members are required to notify the Fund on a timely basis of the amount and date of any Offsetting Capital Contribution(s).

Withdrawals cannot be made from Post-January 2006 Memorandum Accounts on the basis of Offsetting Capital Contributions prior to the end of the Lock-Up Periods applicable to such Memorandum Accounts.

Quarterly Withdrawals from Four-Year Liquidity Memorandum Accounts may only be offset against Offsetting Capital Contributions which establish Four-Year Liquidity Memorandum Accounts.

If an Offsetting Capital Contribution was to be received prior to the beginning of the Accounting Period immediately following the proposed Quarterly Withdrawal Date but is not timely received, the Withdrawing Member will not be entitled to the benefits of such Offsetting Capital Contribution and such Member's Quarterly Withdrawal will be subject to the Gate and the Quarterly Withdrawal Fee, unless an executed Subscription Agreement, identified by such Withdrawing Member, as well as by the Related Investor submitting such Capital Contribution, as an Offsetting Capital Contribution, is received by the Fund no later than such Quarterly Withdrawal Date. Such Withdrawing Member will also be liable for any costs or expenses incurred in connection with such defaulted Offsetting Capital Contribution.

If an Offsetting Capital Contribution was to be received as of the first business day of either of the two Accounting Periods immediately following such Quarterly Withdrawal Date, then 10% of the Withdrawal proceeds will be retained pending receipt of such Offsetting Capital Contribution. If such Offsetting Capital Contribution is not received by the end of the fifth (5th) business day of the applicable Accounting Period, the 10% of the Withdrawal proceeds so retained will be kept by the Fund as liquidated damages for such Quarterly Withdrawal having been excepted from both the Quarterly Withdrawal Fee and Gate. Each Member is required to acknowledge in such Member's Subscription Agreement that such liquidated damages represent a reasonable estimate of the damage done to the Fund by any such Quarterly Withdrawal having been excepted from both the applicable Quarterly Withdrawal Fee and the Gate.

The Manager may determine, but will be under no obligation, to accept as an Offsetting Capital Contribution a Capital Contribution which is not timely received if the Manager determines that the delay was due to circumstances beyond the control of the investor submitting such Offsetting Capital Contribution.

If a Withdrawing Member claims the benefit of more than one Offsetting Capital Contribution, and certain of such Offsetting Capital Contributions but not others are timely received, such Withdrawing Member will be treated as having not submitted Offsetting Capital Contributions only to the extent of those Offsetting Capital Contributions not timely received.

**Withdrawals by Certain Manager Clients**

Certain Manager Clients may invest directly in the Master Fund and/or one or more Trading Vehicles. Such Manager Clients may, unless the Manager otherwise determines, Withdraw all or a portion of their investments in the Master Fund and/or one or more such Trading Vehicles from time to time without being subject to any of the restrictions imposed on Withdrawals (including the Quarterly Withdrawal Fees and the Gate).

**Allocation of Quarterly Withdrawal Fees**

All Quarterly Withdrawal Fees are deducted from the Withdrawal proceeds retained by the Fund and allocated as Net Income among the Interests of both Classes outstanding immediately following all Withdrawals, Distributions Transfers and Special Allocations effective as of the applicable Quarterly Withdrawal Date (based on such Interests' respective Proportionate Shares as redetermined for this purpose so as to include only the Gross Asset Value of the Interests remaining outstanding after all such Withdrawals, Transfers, Distributions or Special Allocations as of such Quarterly Withdrawal Date, but prior to the acceptance of any new Capital Contributions as of the beginning of the immediately following Accounting Period).

**Annual Appreciation Withdrawals**

Subject to any applicable Lock-Up Period, a Member may make an Annual Appreciation Withdrawal from its Annual Liquidity Memorandum Account(s) as of December 31 of any year. A Member may make an Annual Appreciation Withdrawal in an amount not in excess of the estimated cumulative net increase (other than increases attributable to additional Capital Contributions) in the Gross Asset Value of such Member's Annual Liquidity Interest for the Fiscal Year then ended (reduced, but not below $0, by all Withdrawals from such Annual Liquidity Interest previously made by such Member during such Fiscal Year).

Annual Appreciation Withdrawals may be made as of any given December 31 by notifying the Fund in writing by the immediately preceding November 15.

Annual Appreciation Withdrawals are not subject to any Withdrawal fee.

Appreciation attributable to Annual Liquidity Interests with respect to a given Fiscal Year which is not Withdrawn as of the end of such Fiscal Year is not subsequently eligible for Annual Appreciation Withdrawals.

An Annual Appreciation Withdrawal reduces the balances in the different Annual Liquidity Memorandum Account(s) maintained in respect of each Member as designated by such Member in the applicable Withdrawal request, or, if not so designated, *pro rata* in proportion with the aggregate Gross Asset Value of each Annual Liquidity Memorandum Account maintained with respect to such Member.

Annual Appreciation Withdrawals may not be made with respect to Four-Year Liquidity Interests, and Appreciation attributable to a Member's Four-Year Liquidity Interest cannot be the basis for Annual Appreciation Withdrawals of such Member's Annual Liquidity Interest.

**Mandatory Withdrawals**

The Manager may, in its sole discretion at any time and for any reason, require a Member to Withdraw all of such Member's Interest. Mandatory Withdrawals are not subject to, nor included in calculating, the Gate and are not subject to any fee or charge (including Quarterly Withdrawal Fees), other than applicable Withdrawal Reserves. For the avoidance of doubt, the Manager will have no liability to the Fund or any Member for requiring such Member to Withdraw, provided that the Manager acts in a manner consistent with the standard of care set forth in the Material Contracts.

**Form of Withdrawal Requests**

Withdrawal requests should specify from which Annual Liquidity Memorandum Account(s) and/or Four-Year Liquidity Memorandum Account(s) the proposed Withdrawal is to be made, the proposed Withdrawal Date, whether, in the case of Annual Liquidity Memorandum Accounts with December 31 Anniversary Dates, the Withdrawal is an Anniversary Withdrawal or an Annual Appreciation Withdrawal and either a percentage of the Withdrawing Member's Interest or an absolute dollar amount of such Interest to be Withdrawn.

If a Withdrawal request does not specify whether the related Withdrawal is to be made from the Withdrawing Member's Annual Liquidity Memorandum Account(s) or Four-Year Liquidity Memorandum Account(s), and such Withdrawal request (for example, a Quarterly Withdrawal request) could be applicable to either Class of Memorandum Accounts, such Withdrawal request will be applied first to the Withdrawing Member's Annual Liquidity Memorandum Account(s) and only if all such Annual Liquidity Memorandum Account(s) have been eliminated to such Member's Four-Year Liquidity Memorandum Account(s).

If a Withdrawal request does specify the Class of Memorandum Accounts from which the Withdrawal is to be made, or could only be applicable to one Class, but does not specify the Memorandum Account(s) from which a Withdrawal is to be made, the Withdrawal will be made from all Memorandum Account(s) of the Class of Interest from which a Withdrawal is being made *pro rata* in accordance with their respective Proportionate Shares.

No Withdrawal request will be effective if the Manager determines, on or before the Effective Date of such Withdrawal, to wind up the Fund.

**Limited Waiver Authority; Manager Withdrawals and Payments**

Quarterly Withdrawal Fees may not be waived by the Manager.

The Manager may, but is under no obligation whatsoever to, waive the Gate or increase the level of the Gate with respect to any given Quarterly Withdrawal Date (and may determine to do so for all or a portion of the Withdrawals then requested); provided, that the Manager determines that doing so will not result in portfolio damage or otherwise materially adversely affect the Members as a whole.

The Manager may, but is under no obligation whatsoever to, waive Withdrawal request notice periods; provided, that the Manager determines that doing so will not result in portfolio damage or otherwise materially adversely affect the Members as a whole.

The Manager may make Withdrawals at any time and from time to time.   Such Withdrawals are not subject to, nor included in calculating, the Gate, nor are they subject to any Withdrawal fees.

**Postponing the Determination of Net Asset Value**

The Manager may postpone an Accounting Date, and with it the determination of Net Asset Value, in the event that the Manager determines that a material portion of the Investment Assets held by the Fund (other than Designated Investments) cannot be valued.  In the event that an Accounting Date is postponed, the Fund will give prompt notice of any such postponement to all Members.

**Postponing Effective Dates**

The Manager will postpone any Effective Date (*i.e.*, the effective date of a Withdrawal or Distribution, regardless of the actual date of payment) if the applicable Accounting Date has been postponed. The Manager will also postpone an Effective Date if the Manager determines that: (i) the Fund's investments are committed in such a manner so as not reasonably to permit immediate withdrawal of sufficient funds; (ii) there exists a state of affairs that constitutes circumstances under which liquidation by the Fund of part or all of its investments (other than Designated Investments) is not reasonable or practicable, or would be prejudicial to the Fund; or (iii) not postponing such Effective Date would materially adversely affect the continuing Members.

If an Effective Date is postponed, the Fund will give prompt notice to all affected Members, and each such Member will have an opportunity to revoke such affected Member's Withdrawal request.

Postponed Withdrawals will have priority as of the rescheduled Effective Date over Withdrawals requested for such Effective Date.

If more than one Effective Date has been postponed at any one time, Withdrawal priority as of the rescheduled Effective Date will be allocated to the postponed Effective Dates in their chronological order.

Postponed Withdrawals are not subject to, or included in calculating, the Gate, and are not subject to Quarterly Withdrawal Fees.

**Payment of Withdrawal Proceeds**

Withdrawal proceeds will be paid in cash, by check or wire transfer or such other permissible method as the Manager may determine, and may be subject to reduction by an amount equal to brokerage commissions or other charges that the Manager determines are likely to be incurred by the Fund to fund such Withdrawal proceeds, and such Withdrawal Reserves as the Manager may determine.

Under normal circumstances, all Withdrawal proceeds will be paid by the Fund to a Withdrawing Member within thirty (30) days of the Effective Date. However, if a Member Withdraws 90% or more of such Member's Interest (not including Designated Investment Interests), the Fund may, but is not obligated to, retain up to 10% of the estimated Withdrawal proceeds otherwise due. The balance, with interest at one-month LIBOR from the end of the calendar month immediately following the Effective Date, will be paid promptly after the completion of the Fund's audit for the Fiscal Year in which such Withdrawal occurred. The amount of Withdrawal proceeds ultimately paid is subject to adjustment (up or down) to reflect the results of the audit.

Withdrawal proceeds may be paid in cash, Investment Assets or any combination of the two.

**Postponing the Payment of Withdrawal Proceeds**

The Manager may postpone the payment of Withdrawal proceeds if the Manager determines that (i) making such payment would result in a violation of Law or a contractual

provision or (ii) liquidating Investment Assets to fund such payment would materially adversely affect the continuing Members. If the payment of Withdrawal proceeds is postponed, the Fund will attempt to liquidate Investment Assets as promptly as Amaranth deems reasonably practicable after the Effective Date in order to fund the payment of such Withdrawal proceeds. Within thirty (30) days of the Effective Date, the Fund will pay out the Withdrawing Member's Proportionate Share of the Fund's cash not used or needed to pay down debt balances (in excess of Reserves maintained by the Fund, which Reserves may be increased in connection with the events giving rise to the Fund's need to postpone the payment of the Withdrawal in question) and the value of the Fund's Investment Assets not needed or used to collateralize the Fund's obligations, less such Member's Proportionate Share of the Fund's liabilities and any applicable Withdrawal Reserves. At least 80% of any postponed Withdrawal proceeds payment will be made within one year of the Effective Date, and the balance as soon as reasonably practicable thereafter.

Withdrawal payments not made by the ninetieth (90th) day following the applicable Effective Date (as such Effective Date may be postponed, as described above) will bear interest at one-month LIBOR from the end of the calendar month immediately following such Effective Date, compounded as of the first day of each calendar month thereafter, until paid.

**Similar Treatment of All Interests**

If an Accounting Date, the Effective Date of Withdrawals and/or the payment of Withdrawals is postponed with respect to any Interests, it will be postponed for all Interests.

**Profit Allocations to be Made Upon Withdrawal**

Any Profit Allocations in respect of Capital Account balances when Withdrawn will be made as of the Effective Date of such Withdrawal.

**Distributions in Kind**

In the event that the Manager intends to pay a Withdrawal or make a Distribution to a Member, in whole or in part, in kind rather than in cash, the Fund will give such Member at least ten (10) days' notice of the proposed in-kind payment (generally describing the Investment Assets to be distributed and any associated liabilities to be assumed). If the Member notifies the Fund within five (5) days of receipt of such notice that receipt of the Investment Assets (or associated liabilities) intended to be paid out to such Member could reasonably be expected to cause such Member to be in violation of Law, the Manager will cause the Fund to sell the Investment Assets intended to be distributed — which sale may be made to one or more of any Manager Party, Manager Client or Trading Vehicle or other Persons (or any combination of the foregoing) and may be made as the Manager may determine, including privately. In such case, the Manager needs make no representation as to how long a delay there might be before such sale will be effected and whether there will be a single sale for the entirety of such Investment Assets or more than one sale, each for a part of such Investment Assets. No interest will accrue on any amounts due to the affected Member pending such sale(s), provided that the Manager will cause the Fund to distribute the proceeds of such sale(s) promptly following receipt.

Any Investment Assets distributed in kind will be valued in accordance with the Fund's valuation policies as of the date of distribution, and any difference between such value and the Fund's carrying value for such Investment Assets will be deemed to constitute income or loss to the Fund.

**Distributions**

As a general matter, the Manager intends to reinvest the income and capital gains of the Fund. The Manager may, however, at any time cause the Fund to make a Distribution to the Members. Any such Distributions need not be made *pro rata* in accordance with the Members' Proportionate Shares. Distributions, if any, will be made in cash, Investment assets or a combination of the two as the Manager may, in its sole discretion, determine.

**Transfers**

Interests may be Transferred only upon the execution and delivery of a Subscription Agreement (or other written instrument satisfactory to and accepted by the Fund) by the Transferee. No Transfer will be registered if the Transferee is not qualified to invest in the Fund directly or without the consent of the Manager.

Post-January 2006 Interests generally may not be Transferred prior to the end of the applicable Lock-Up Period (unless the Manager determines that such Transfer would not result in an Impermissible Event).

Interests Transferred on or after February 1, 2006 will generally be subject to the same Lock-Up Period in the hands of the Transferee as if such Interests had initially been issued as of the date of the Transfer.

Annual Liquidity Interests or Four-Year Liquidity Interests when Transferred remain Annual Liquidity Interests or Four-Year Liquidity Interests, as the case may be, in the hands of the Transferee.

When Annual Liquidity Memorandum Account balances held by a Member as a DI Opt-Out Member are Transferred to a DI Opt-Out Member, or to a Person which has not previously been a Member, such Transferee may elect to be a DI Opt-Out Member with respect to such Transferred Annual Liquidity Interest. However, if the Transferor is a Member which is not a DI Opt-Out Member with respect to the Transferred Annual Liquidity Interest, the Transferee may not elect to be a DI Opt-Out Member with respect to the Transferred Annual Liquidity Interest.

Profit Allocations are made upon the Transfer of Interests, except (unless the Manager otherwise determines) in the case of Transfers of Interests by a Member to a Related Investor, in which case such Profit Allocations remain outstanding in respect of the Transferred Interests and are calculated through the immediately following December 31 as if the Transfer had not occurred.

Subject to the consent of the Manager, Members may be permitted to Transfer Designated Investment Interests separately from their Annual Liquidity and Four-Year Liquidity Interests. Any such Transfer will only be permitted if the Manager determines that such Transfer would not constitute an Impermissible Event.

**Exchanges**

A Member may, with the consent of the Manager, exchange all or a portion of the balance in an Annual Liquidity Memorandum Account for a balance in a Four-Year Liquidity Memorandum Account and *vice versa* as of the same dates and upon the same notice that such Member could make Anniversary Withdrawals and Four-Year Anniversary Withdrawals, as the

case may be, from the Memorandum Account out of which the exchange is being made — no such exchanges being permitted with respect to Post-January 2006 Interests prior to the end of the applicable Lock-Up Period.

Exchanges are treated as Withdrawals from the Class out of which, and new Capital Contributions to the Class into which, the exchange is made (*e.g.*, causing a Profit Allocation to be made upon the Withdrawal, and a new Lock-Up Period to begin upon the Capital Contribution).

## CERTAIN INCOME TAX CONSEQUENCES

**Certain United States Tax Considerations**

The following is a summary of the material federal income tax considerations that may be relevant to a United States taxpayer which invests in the Fund, based upon the Internal Revenue Code of 1986, as amended (the "Code"), judicial decisions and administrative regulations and rulings, all as in effect as of the date of this Memorandum and all of which are subject to change. Since the tax consequences of an investment in the Fund will vary from Member to Member based on each Member's individual income tax circumstances, this summary does not attempt to discuss all the federal income tax consequences of such an investment. Nor does this summary purport to describe the tax consequences of all instruments in which the Fund may invest or trade. Prospective investors should not consider the contents of this summary as legal or tax advice, and should consult their own tax advisers concerning the tax consequences of investing in the Fund.

\*     \*     \*     \*

Any discussion of U.S. federal tax issues set forth in this Memorandum is written in connection with the promotion and marketing by the Fund of the transactions described in this Memorandum. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. federal tax penalties that may be imposed on such person. Each investor should seek advice based on its particular circumstances from an independent tax advisor

\*     \*     \*     \*

*Tax Classification of the Fund*

The Manager has been advised by Sidley Austin LLP that the Fund will be treated as a partnership for federal income tax purposes and not as an association taxable as a corporation or as a "publicly-traded partnership"; provided that (i) the Fund does not have more than 100 Members taking into account the attribution rules relating to "publicly traded partnerships" in the Treasury Regulations promulgated under Section 7704 of the Code, or (ii) at least 90% of the gross income generated by the Fund constitutes "qualifying income" (that is interest, income and gains from stocks, debt securities, and, in the case of entities a principal activity of which is the buying and selling of such assets, commodities not held as inventory, or futures, forwards and options with respect to such items). The Manager expects that (i) the Fund will not have more than 100 Members and (ii) over 90% of the Fund's gross income will constitute "qualifying income." Accordingly, the Fund should not be treated as a corporation even if it is a publicly traded partnership within the meaning of Section 7704 of the Code. This conclusion is not binding on the Internal Revenue Service ("IRS") or on any court, and there can be no assurance that the IRS will not assert that the Fund should be treated as an association taxable as a corporation or as a "publicly traded partnership" taxable as a corporation.

If it were determined that the Fund should be classified for federal income tax purposes as an association taxable as a corporation (as a result of a change in law, changes in IRS ruling guidelines or administrative positions, a change in facts or otherwise), income and losses of the Fund would be reflected on its own tax return rather than being passed through to the Members, and the Fund would be required to pay income tax at corporate income tax rates on its net

ordinary income and capital gains, thereby substantially reducing the amount of cash available for investment or for Distribution to the Members. Furthermore, all or a portion of any Distributions made by the Fund to the Members could be treated as ordinary dividend income regardless of the source from which they were generated. The following discussion assumes that the Fund will be treated as a partnership for federal income tax purposes.

*Taxation of Members*

The Fund, classified as a partnership, will not be subject to federal income tax. Each Member will be required to report on its federal income tax return such Member's allocable share of the Fund's income, gains, losses, deductions, credits and other items for the Fund's taxable year ending with or within the Member's taxable year, whether or not any Distribution of cash or other property is made to the Member in that year.

At the end of each taxable year, items of Fund income, expense, gain, loss and deduction, as determined for federal income tax purposes, will be allocated among the Members which held Interests during such taxable year. A Member's distributive share of such items for federal income tax purposes generally is determined by the allocations made pursuant to the Limited Liability Company Agreement, unless the items so allocated do not have "substantial economic effect" and are not in accordance with the Members' Interests. Under the Limited Liability Company Agreement, tax allocations (other than in connection with Withdrawals) are generally made in a manner consistent with the financial allocations made to the Members' Capital Accounts and therefore either should have substantial economic effect or should be in accordance with the Members' Interests.

The federal, state, local and foreign income tax consequences to Members depend, in large part, on the particular strategies that the Fund and the Master Fund employ and on how long the Members own their respective Interests. A Member's distributive share of the Fund's tax items may result in unfavorable tax consequences either because of their effect at the Fund level or because of their effect upon other aspects of the Member's tax situation. These items may include capital losses, which generally are deductible only against capital gains, investment interest, the deductibility of which by non-corporate Members may be limited or deferred, items subject to the "at-risk" or "passive loss" rules, and other items. For example, if the Fund reports ordinary income and an equal amount of capital losses that a Member cannot offset with other capital gains, the Member would be taxed on the ordinary income even though the Fund realized no economic gain.

Because the Fund or Master Fund may engage in complex trading strategies and may purchase or enter into financial instruments or securities of which proper tax classification or tax treatment may be unclear, a federal, state, local or foreign tax authority may challenge the Fund's or Master Fund's tax positions (including, but not limited to, the timing of income, the classification of income as capital or ordinary, and whether the Fund or Master Fund is subject to taxes or required to withhold tax on income). The tax positions taken by the Fund or the Master Fund may not be accepted by the IRS, foreign, state, or local tax authorities. If the IRS or other Tax Authority should successfully contest a tax position taken by the Fund or the Master Fund, Members may need to amend their federal, state, and local tax returns or the Fund or the Master Fund may be subject to withholding or other taxes, interest, and possibly penalties.

*Limitations on Deductibility of Fund Losses by Members*

The amount of any Fund loss that a Member is entitled to include on its income tax return is limited to such Member's adjusted tax basis for its Interest as of the end of the Fund's taxable year in which such loss occurred. Generally, a Member's adjusted tax basis for its Interest is the amount paid for such Interest reduced (but not below zero) by such Member's share of losses and expenses, and any Distributions made to such Member, and increased by such Member's share of the Fund's income, including gains, and additional Capital Contributions.

*Cash Distributions*

Cash received from the Fund by a Member as a Distribution (including Withdrawals) generally is not reportable as taxable income by such Member, except to the extent such Distribution exceeds a Member's adjusted tax basis for its Interest. Any such excess is taxable to such Member as gain from the sale or exchange of such Interest. Allocations of Fund income increase the tax basis for a Member's Interest at the end of the taxable year. Cash Distributions during the taxable year could result in taxable gain to a Member even though no gain would result if the same cash Distributions were made following the Fund's allocation of income at the end of the taxable year.

A cash distribution in redemption of all of a Member's Interest should result in the recognition of gain or loss for federal income tax purposes. Such gain or loss will be equal to the difference, if any, between the amount of such distribution and the Member's adjusted tax basis for such Interest (including such Member's distributive share of the Fund's income or loss for the year of such distribution).

*Mark-to-Market Election*

The Master Fund elected as a trader in securities and commodities to mark-to-market its Investment Assets held at the end of each taxable year. The mark-to-market rules require a trader making the election to recognize gain or loss with respect to the securities held in connection with its trade or business of trading in securities and commodities at the end of each taxable year as if the trader sold the securities for their fair market value on the last business day of the taxable year. The Fund's allocable share of any gain or loss on the applicable Investment Assets is treated as ordinary income or loss. The Fund has not made such mark-to-market election as a trader in securities and commodities. As a result, some of the discussion that follows reflects certain tax aspects that may be applicable to the Fund and not to the Master Fund or *vice versa* as the mark-to-market election may impact the application of those items.

*Structured Securities*

The Fund invests in structured securities the tax treatment of which depends on the specific securities purchased. The tax treatment of a particular security might be uncertain. In general, a security might be treated as: (i) a partnership interest in the issuer of the security; (ii) ownership of an undivided interest in the assets held by the issuer; (iii) an interest in an association taxable as a corporation or in a "publicly-traded partnership"; or (iv) debt of the issuer or another entity. If any such security is treated as a partnership interest, the Fund will be required to take into account its allocable share of income, gain, loss, deductions and credits of the issuing partnership. Similarly, if any such security is treated as an undivided interest in the underlying assets of the issuer, the Fund will be required to recognize any income, gain, loss or deduction attributable to the ownership of such assets. Under either of these characterizations,

the Fund's allocable share of certain expenses could be subject to limitations on deductibility (*see* "— *Limited Deduction for Certain Expenses*" and "— *Limitation on Deductibility of Interest on Investment Indebtedness*," below). If any such security is treated as an interest in an association taxable as a corporation or in a "publicly traded partnership," the issuer will be subject to tax at rates applicable to corporations, and the Fund will be taxed in the same manner as a shareholder in a corporation. *See — Qualified Dividend Income*," below. If any such security is treated as debt, the Fund may recognize interest income, original issue discount or market discount. *See* "— *Original Issue Discount*" and "— *Market Discount*," below.

### Gain or Loss on Section 1256 Contracts

The Fund's Investment Assets may include certain futures and forward contracts as well as certain non-equity options traded on United States exchanges ("Section 1256 Contracts"). Under the mark-to-market system of taxing Section 1256 Contracts, any unrealized profit or loss on positions in such Section 1256 Contracts that are open as of the end of a taxpayer's fiscal year is treated as if such profit or loss had been realized for tax purposes as of such time. In general, 60% of the net gain or loss which is generated by transactions in Section 1256 Contracts is treated as long-term capital gain or loss and the remaining 40% of such net gain or loss is treated as short-term capital gain or loss.

### Tax on Capital Gains and Losses

The maximum tax rate for non-corporate taxpayers on adjusted net capital gain is 15% for most gains recognized and in taxable years beginning on or before December 31, 2008. Adjusted net capital gain is generally the excess of net long-term capital gain (the net gain on capital assets held for more than 12 months, including 60% of gain on Section 1256 Contracts) over net short-term capital loss (the net loss on capital assets held for 12 months or less, including 40% of loss on Section 1256 Contracts). Capital losses are deductible by non-corporate taxpayers only to the extent of capital gains for the taxable year plus $3,000. Net short-term capital gain (*i.e.*, net gain on assets held for 12 months or less, including 40% of gain on Section 1256 Contracts) is subject to tax at the same rates as ordinary income.

In general, a non-corporate taxpayer is not permitted to carry back a capital loss to prior taxable years. However, if a non-corporate taxpayer incurs a net capital loss for a year, the portion thereof, if any, that consists of a net loss on Section 1256 Contracts may, at the election of the taxpayer, be carried back three years and deducted only against net capital gain for such year to the extent that such gain includes net gains on Section 1256 Contracts included in the taxpayer's income for such year. Losses so carried back are deemed to consist of 60% long-term capital loss and 40% short-term capital loss. To the extent that such losses are not used to offset gains on Section 1256 Contracts in a carryback year, they will carry forward indefinitely as losses on Section 1256 Contracts in future years.

### Straddles

Offsetting securities' positions held by the Fund may constitute "straddles." Straddles are defined to include "offsetting positions" in actively traded personal property. As such, losses may be deferred, and all or a portion of any short- or long-term capital gain from certain "straddle" transactions may be recharacterized as ordinary income. For purposes of applying the above rules restricting the deductibility of losses with respect to offsetting positions held by the Fund, if a Member takes into account gain or loss with respect to a position held by the Fund, the Member will be treated as holding the Fund's position, except as otherwise provided in the

regulations. Accordingly, positions held by the Fund may limit the deductibility of realized losses sustained by a Member with respect to positions held for his own account or through other investment funds, and positions held by a Member for his own account or through other investment funds may limit his ability to deduct realized losses sustained by the Fund.

### Original Issue Discount

The Fund may hold or purchase debt instruments that are issued with "original issue discount" which will be includable in the taxable income of Members in the Fund in each year that the Fund owns such debt instruments. The rules concerning original issue discount (Sections 1271-1275 of the Code) are complex, and a complete discussion of such rules is beyond the scope of this summary. Generally, the term "original issue discount" means the excess of the stated redemption price at maturity of the debt obligation (*i.e.*, all payments due under the debt obligation other than payments of stated interest meeting certain requirements) over its issue price. A Member will be required to include in income its allocable share of the amount of original issue discount accrued, on a constant-yield basis, with respect to a debt obligation held by the Fund. The computation of original issue discount may be adjusted based on certain prepayment assumptions regarding assets held by the issuer of the security.

### Market Discount

The Fund may hold or purchase bonds that are subject to the "market discount" provisions contained in Sections 1276-1278 of the Code. These rules generally provide that if a holder acquires a debt instrument at a discount from, in general, its stated redemption price at maturity which equals or exceeds one-fourth of one percent (0.25%) of the principal amount times the number of remaining complete years to maturity, and thereafter disposes of such an instrument, the lesser of (a) the gain realized or (b) the portion of the market discount which accrued while the debt instrument was held by such holder will be treated as interest income at the time of the disposition.

The market discount rules also provide that a holder of any debt instrument who acquired such instrument at a market discount may be required to defer the deduction of a portion of the interest on any indebtedness incurred or continued to purchase or carry such instrument until the market discount is recognizable upon a subsequent disposition of the debt instrument.

### Amortizable Bond Premium

If the Fund purchases a bond at a cost which, generally, is in excess of the amount payable on maturity, the excess may constitute amortizable bond premium which the Fund may elect to treat as a reduction in interest income.

### Adjustment to Conversion Price

Treasury regulations promulgated under Section 305 of the Code treat a holder of convertible securities as having received a constructive distribution where the conversion price of such securities is adjusted to reflect certain taxable distributions with respect to stock into which such convertible securities are convertible. Thus, the Fund may be taxable on constructive dividends under certain circumstances where an adjustment is made to the conversion price of a convertible security held by the Fund.

*Constructive Sales*

The Code treats certain common financial transactions as "constructive sales" of related appreciated property that is stock, a partnership interest or certain debt instruments. For example, a short-against-the-box transaction (*i.e.*, a short sale of stock where the taxpayer also holds the stock) will be treated as a constructive sale of appreciated stock sold short. A futures or forward transaction or a total return swap may also give rise to a constructive sale of the related appreciated property. A constructive sale will accelerate gain but not loss. The Code provides special rules to prevent the application of the constructive sale rule if: (i) the transaction is closed within 30 days after the end of the taxable year (*i.e.*, the offsetting positions are closed); (ii) the appreciated financial position is held for 60 days following the date the transaction is closed; and (iii) at no time during such 60-day period is the holder's risk of loss with respect to such financial position reduced.

*Qualified Dividend Income*

Qualified dividend income received in taxable years beginning on or before December 31, 2008 is subject to a 15% tax in the case of individuals. Generally, qualified dividend income is dividends received from U.S. corporations and from certain foreign corporations, including foreign corporations whose shares are listed on an established securities market in the United States, provided that the holder has held the shares unhedged for a minimum holding period. Qualified dividend income does not include payments "in lieu of" dividends received from stock lending transactions nor dividends received on stock to the extent the taxpayer is obligated to make related payments with respect to substantially similar or related property (*e.g.*, a short sale of such stock). It is not expected that the trading and investment activities of the Master Fund and the Fund will result in any material amount of qualified dividend income being allocated to Members.

*Passive Foreign Investment Company*

As part of its trading strategy, the Fund may own stock in non-U.S. corporations, which may include passive foreign investment companies ("PFIC"), for federal income tax purpose. The Code provides rules for PFICs for which a "qualified electing fund" ("QEF") election is made by a United States shareholder. A shareholder making a QEF election would be required currently to include in gross income, and each United States person that is a shareholder of a QEF by reason of an interest in a domestic pass-through entity would be required to currently include its *pro rata* share of, the shareholder's *pro rata* share of the earnings and profits of the PFIC, whether or not distributed. Amounts included in income under a QEF election would be treated as long-term capital gain to the extent of the PFIC's net capital gain, and the balance as ordinary income. Losses, however, would not pass through currently to the shareholder.

Although the Fund may make QEF elections for a PFIC owned by it, Members cannot make this election for stock held by the Fund or the Master Fund. The Fund may not receive sufficient information from such PFIC to make a QEF election. Under the passive foreign investment companies rules, this may result in Members having to treat all gain and certain "excess distributions" as ordinary income subject to tax (without taking into account deductions or losses from other sources) at the highest rate of tax applicable to the ordinary income of the Member, plus an interest charge (at the rate applicable to tax underpayments), under rules that allocate such gain or distributions ratably over a holder's holding period, a potential adverse tax result.

*Limited Deduction for Certain Expenses*

The Fund believes that the Fund and the Master Fund will both be considered for federal income tax purposes to be engaged in a trade or business as a trader in securities and commodities. To the extent that the Fund and Master Fund is a trader in securities, federal tax laws permit Members who are individuals to deduct their share of expenses of that trading entity under Section 162 of the Code as business expenses rather than as non-business miscellaneous itemized deductions, which as to individuals are deductible on a limited basis under Section 67(c) of the Code. Whether the Fund or the Master Fund is a trader in securities and commodities depends on the facts and circumstances that relate to its activities. If the expenses (other than interest) of the Fund and the Master Fund were considered miscellaneous itemized deductions under Section 67(c) of the Code, those expenses would be deductible by a non-corporate taxpayer for income tax purposes only to the extent that those expenses, when combined with its other expenses deductible under Section 67(c) of the Code for the year, exceed 2% of its adjusted gross income (and would not be deductible at all for alternative minimum-tax purposes). The deductible portion of those expenses is further reduced by an amount equal to the lesser of (i) 3% of an individual's adjusted gross income that exceeds a threshold amount; and (ii) 80% of the amount of the individual taxpayer's miscellaneous itemized deductions otherwise allowable for that taxable year. The IRS could also contend that the Profit Allocation and the Manager Allocation constitute fees subject to the foregoing limitations.

*Syndication Fees*

Neither the Fund nor the Members will be entitled to any deduction for any placement and/or referral fees paid to Persons who introduce prospective investors.

*Limitation on Deductibility of Interest on Investment Indebtedness*

Non-corporate Members may be subject to certain limitations on the deductibility of interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.

*Passive Activity Rules*

The investment activities of the Fund do not constitute a "passive activity," with the result that losses resulting from a Member's "passive activities" cannot be offset against the Fund's income.

*State and Local Taxes*

In certain cases, the Fund may be subject to entity-level state and local taxes in states in which the profits of the Fund are deemed to be sourced or may be required to withhold taxes in respect of income or gain allocable to Members. Each Member may be required to report and pay state and local tax on such Member's distributive share of the profits of the Fund in the state and municipality in which the Member resides and/or other jurisdictions in which income is earned by the Fund.

### Fund Audits

The tax treatment of Fund items is determined at the Fund level rather than at the Member level. The Manager is the "Tax Matters Partner" of the Fund with the authority to determine the Fund's response to an audit. The limitations period for assessment of deficiencies and claims for refunds with respect to items related to the Fund is generally 3 years after the Fund's return for the taxable year in question is filed, and the Manager has the authority to, and may, extend such period with respect to all Members. Certain tax positions which the Manager may elect to take on behalf of the Fund may increase the chance that the Fund's return will be audited. If an audit results in an adjustment, all Members, current and former, may be required to pay additional tax, interest and, possibly, penalties. There can be no assurance that the Fund's tax return will not be audited by the IRS or that no adjustments to such returns will be made as a result of such an audit.

### Reportable Transactions

A participant in a "reportable transaction" is required to disclose its participation in such transaction by filing Form 8886 ("Reportable Transaction Disclosure Statement"). In addition, a "material advisor" with respect to such transaction is required to (i) maintain a list containing certain information with respect to such transaction (including the participants with respect to whom the material advisor acted in such capacity) and (ii) file a return setting forth information identifying and describing the transaction and any information describing any potential tax benefits expected to result from the transaction. The failure to comply with such rules can result in substantial penalties.

The Manager cannot predict whether any of the Fund's transactions will subject it, the Fund or any of the Members to the aforementioned requirements. However, if the Manager (or any other material advisor) determines that any such transaction causes it or the Fund to be subject to the aforementioned requirements, the Manager (or any other material advisor) will, and will cause the Fund to, fully comply with such requirements. Prospective investors should consult with their tax advisors regarding the applicability of these rules to their investment in the Fund.

## Certain United Kingdom Tax Considerations

Each of the Fund and the Master Fund has been organized outside of the U.K. The Manager intends to conduct the affairs of the Fund (and the directors of the Master Fund intend to conduct its affairs) in such a way that the central control and management of each of the Fund and the Master Fund is situated outside of the U.K. for U.K. tax purposes. On that basis, none of the Fund or the Master Fund is resident in the U.K. for U.K. tax purposes.

Amaranth provides discretionary investment management services to the Fund and the Master Fund in the U.K. Generally, a discretionary investment manager in the U.K. managing Investment Assets of a non-U.K. fund would be regarded under U.K. domestic law as constituting a permanent establishment of that fund in the U.K. to the extent that such investment manager acts on behalf of that fund and has and habitually exercises authority to do business on behalf of that fund in the U.K. A non-U.K. fund trading in the U.K. through a permanent establishment would generally be subject to U.K. corporation tax at rates up to (currently) 30% in respect of its chargeable profits attributable to the U.K. permanent establishment. This general rule is subject to the U.K. domestic law "investment manager" exemption. Where the conditions of the investment manager exemption are satisfied, the U.K. investment manager is not regarded as constituting a permanent establishment of the non-U.K. fund in the U.K.

With regard to the Fund and the Master Fund, two key aspects of the investment manager exemption are firstly that Amaranth must act on behalf of the Fund or Master Fund in an "independent" capacity and secondly that the requirements of the "20% rule" are met.

Amaranth intends to conduct the affairs of each of the Fund and Master Fund in such a way that the independence test will be satisfied in respect of the Fund and Master Fund. However, some of the factors which dictate whether Amaranth falls within the independence test safe harbors are outside of the Manager's control. The 20% rule will be satisfied in respect of the Fund and the Master Fund because persons other than persons connected with Amaranth are directly or indirectly beneficially entitled to 80% or more of the chargeable profits of the Fund and the Master Fund.

The Fund and the Master Fund may be liable to U.K. income tax in respect of U.K. source income where such tax is deducted at source.

**Certain Singapore Tax Considerations**

A portion of the assets of the Fund and the Master Fund is actively managed by Amaranth in Singapore. Generally, a discretionary investment manager in Singapore managing funds for a foreign fund would be regarded as constituting the fund's permanent establishment in Singapore, under domestic regulations in the absence of any double tax treaty or an exception under Singapore's Income Tax Act and its regulations. The Monetary Authority of Singapore has announced, in a circular released in 2002, that specified income derived by a foreign investor from specified investments managed by any fund manager in Singapore will be exempt from tax in Singapore with effect from May 3, 2002. Therefore, Amaranth does not expect a material portion of the income of the Fund or the Master Fund to be exposed to income tax in Singapore, provided the Fund and the Master Fund qualify as foreign investors under the Singapore tax regulations.

As a result, the Fund and the Master Fund are restricted as to the amount of funds they can accept from persons that are treated as a Singapore tax residents or otherwise as not being investors foreign to Singapore. For this purpose the definition of the term "foreign investor" excludes those that — (i) have a permanent establishment in Singapore (other than a fund manager), (ii) carry on business in Singapore, (iii) beneficially own more than 20% of a Singapore company's issued capital, or (iv) have 20% or more of their issued share capital beneficially owned, directly or indirectly by a company falling in categories (i) to (iii) above, unless approval is obtained from the Singapore Ministry of Finance.

**Certain Canadian Tax Considerations**

A portion of the assets of the Fund and the Master Fund is actively managed by Amaranth in Canada ("Canadian Advisor"). Although there may be a risk that this activity in Canada could result in the Fund or the Master Fund being considered to carry on business in Canada and to thereby become subject to Canadian income tax on income from this activity, the Canadian tax rules provide that neither the Fund nor the Master Fund will be treated as carrying on business in Canada provided that the Canadian Advisor limits its activity to the provision of "designated investment services" as defined in the Canadian tax rules. Amaranth intends that the activity of the Canadian Advisor will be limited to the provision of "designated investment services" to the Fund and the Master Fund, and Amaranth intends that it will not otherwise cause the Fund or the Master Fund to be considered to carry on business in Canada. However, the meaning of "designated investment services" and the interpretation of the Canadian tax rules is

not clear in some circumstances. In the event that Canadian tax authorities were to conclude either (i) that the activity of the Canadian Advisor amounts to the Fund or Master Fund carrying on business in Canada and does not fall within "designated investment services" or (ii) that the Fund or the Master Fund otherwise carries on business in Canada independently of the Canadian Advisor, the Fund or the Master Fund would be subject to Canadian income tax on net income attributable to its business carried on in Canada.

### The Fund or the Master Fund May be Subject to Net Income Tax in Certain Jurisdictions

Amaranth may determine that it is in the best interests of the Fund for the Fund or the Master Fund to be subject to net income tax in certain jurisdictions due to the perceived profit potential of certain transactions justifying the Fund or the Master Fund participating even on an after-tax basis.

### Other Jurisdictions

Dividends and certain types of interest income on various Investment Assets held by the Fund or the Master Fund will be subject to withholding tax at their source. Certain gains earned by the Fund or the Master Fund on its investments in various jurisdictions outside the United States or the Cayman Islands may also be subject to tax in such jurisdictions. The Fund or the Master Fund may make investments on a global basis. The activities of the Fund, the Master Fund and/or the Manager and its Affiliates could subject the Fund (and, potentially, certain Members) to tax in one or more jurisdictions. Any such tax could apply to all Fund income, not only that derived from the jurisdiction asserting such tax.

EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH AND MUST RELY ON SUCH PROSPECTIVE INVESTOR'S OWN TAX ADVISERS REGARDING THE TAX CONSEQUENCES OF INVESTING IN THE FUND.

## INVESTMENTS BY EMPLOYEE BENEFIT PLANS

**General**

The following section sets forth certain consequences under the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Code which a fiduciary of an "employee benefit plan" as defined in and subject to ERISA or of a "plan" as defined in and subject to Section 4975 of the Code who has investment discretion should consider before deciding to invest the plan's assets in the Fund (such "employee benefit plans" and "plans" being referred to herein as "Plans," and such fiduciaries with investment discretion being referred to herein as "Plan Fiduciaries"). The following summary is not intended to be complete, but only to address certain questions under ERISA and the Code that are likely to be raised by the Plan Fiduciary's own counsel.

In general, the terms "employee benefit plan" as defined in ERISA and "plan" as defined in Section 4975 of the Code together refer to any plan or account of various types which provides retirement benefits or welfare benefits to an individual or to an employer's employees and their beneficiaries. Such plans and accounts include, but are not limited to, corporate pension and profit-sharing plans, "simplified employee pension plans," KEOGH plans for self-employed individuals (including partners), individual retirement accounts described in Section 408 of the Code and medical benefit plans.

Each Plan Fiduciary must give appropriate consideration to the facts and circumstances that are relevant to an investment in the Fund, including the role an investment in the Fund plays in the Plan's investment portfolio. Each Plan Fiduciary, before deciding to invest in the Fund, must be satisfied that investment in the Fund is a prudent investment for the Plan, that the investments of the Plan, including the investment in the Fund, are diversified so as to minimize the risks of large losses and that an investment in the Fund complies with the governing documents of the Plan and related trust.

EACH PLAN FIDUCIARY CONSIDERING ACQUIRING AN INTEREST MUST CONSULT ITS OWN LEGAL AND TAX ADVISERS BEFORE DOING SO.

**Restrictions on Investments by Benefit Plan Investors**

A regulation issued under ERISA contains rules for determining when an investment by a Plan in an entity will result in the underlying assets of the entity being assets of the Plan for purposes of ERISA and Section 4975 of the Code (*i.e.*, "plan assets"). Those rules provide that assets of an entity will not be plan assets of a Plan that purchases an interest therein if the investment by all "benefit plan investors" is not "significant" or certain other exceptions apply. The term "benefit plan investors" includes all Plans (*i.e.*, all "employee benefit plans" as defined in and subject to ERISA and all "plans" as defined in and subject to Section 4975 of the Code); all "employee benefit plans" and "plans" as defined in but not subject either to ERISA or Section 4975 of the Code; and all entities that hold "plan assets" due to investments made in such entities by already described benefit plan investors. In addition, all or a portion of an investment made by an insurance company using assets from its general account may be treated as a benefit plan investor. Investments by benefit plan investors will be deemed not significant if benefit plan investors own, in the aggregate, less than 25% of the total capital of each class of equity interests of the entity (determined by not including the investments of persons with discretionary authority or control over the assets of such entity, of any person who provides investment advice for a fee (direct or indirect) with respect to such assets, and "affiliates" (as defined in the regulations

issued under ERISA) of such persons; provided, however, that under no circumstances are investments by benefit plan investors excluded from such calculation).

In order to avoid causing the assets of the Fund to be "plan assets," the Manager intends to restrict the aggregate investment by benefit plan investors to under 25% of the total capital of each Class of Interest — not including any investments of Amaranth, any person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Fund, and any entity (other than a benefit plan investor) that is directly or indirectly through one or more intermediaries controlling, controlled by, or under common control with any of such entities (including an entity for which Amaranth provides investment advice), and each of the principals, officers, and employees of any of the foregoing entities who has the power to exercise a controlling influence over the management or policies of such entity or of the Fund. Furthermore, because the 25% test is ongoing, it not only restricts additional investments by benefit plan Members, but also can cause the Fund to require that existing benefit plan Members make Withdrawals in the event that other Members do so. If rejection of Capital Contributions or such required Withdrawals are necessary, as determined by the Manager, to avoid causing the assets of the Fund to be "plan assets," the Manager will effect such rejections or Withdrawals in such manner as the Manager, in its sole discretion, determines.

### Ineligible Investors

In general, Interests may not be acquired with the assets of a Plan if any Manager Party, the Members' Representative, any person who introduces prospective investors to the Fund, any of their respective Affiliates or any of their respective employees either: (i) has investment discretion with respect to the investment of such plan assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such plan assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such plan assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Except as otherwise set forth, the foregoing statements regarding the consequences under ERISA and the Code of an investment in the Fund are based on the provisions of the Code and ERISA as currently in effect, and the existing administrative and judicial interpretations thereunder. No assurance can be given that administrative, judicial, or legislative changes will not occur that may make the foregoing statements incorrect or incomplete.

ACCEPTANCE OF CAPITAL CONTRIBUTIONS ON BEHALF OF PLANS IS IN NO RESPECT A REPRESENTATION BY AMARANTH, ANY MANAGER PARTY, THE FUND OR ANY OTHER PARTY RELATED TO THE FUND THAT THIS INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY ANY PARTICULAR PLAN OR THAT THIS INVESTMENT IS APPROPRIATE FOR ANY PARTICULAR PLAN.   THE PERSON WITH INVESTMENT DISCRETION SHOULD CONSULT WITH HIS OR HER ATTORNEY AND FINANCIAL ADVISERS AS TO THE PROPRIETY OF AN INVESTMENT IN THE FUND IN LIGHT OF THE CIRCUMSTANCES OF THE PARTICULAR PLAN.

## SUBSCRIPTION PROCEDURE

*The minimum initial investment is $10,000,000 to the Annual Liquidity Interests and $10,000,000 to the Four-Year Liquidity Interests, although the Manager may waive these minimum investment requirements.   The Manager reserves the right to reject any Capital Contribution in whole or in part as well as to terminate, suspend or postpone the offering of the Interests at any time without notice.*

### General

The Manager will generally accept Capital Contributions, and all Capital Contributions are generally due, as of the first day of each calendar month (each, a "Dealing Day").  However, the Manager may accept or reject Capital Contributions at any time, provided that any Capital Contribution which is not received by the end of the fifth (5th) Business Day of the Accounting Period as of the beginning of which such Capital Contribution is due will be rejected, and the defaulting subscriber will be responsible for compensating the Fund for any losses sustained by it in connection with such default.

All Subscription Agreements are subject to acceptance by the Fund.

The Interests are offered by the Fund.  Neither the Fund nor any Manager Party receives commissions or other compensation from the sale of Interests.  Capital Contributions may be subject to a placement fee (disclosed to the subscriber in advance).  In addition, Amaranth reserves the right to pay placement and/or referral fees (both initial and ongoing) to persons who introduce subscribers.

In order to subscribe for an Interest, a properly completed Subscription Agreement in the form provided to investors by the Fund (if an investor is making an initial Capital Contribution) must be received and accepted by the Manager prior to the beginning of the relevant Accounting Period.  Procedures and requirements for the delivery of Subscription Agreements and Capital Contributions to the Fund are contained in the Subscription Agreement or will otherwise be provided to investors by the Fund. All Subscription Agreements, once submitted, are irrevocable.

Investors whose Subscription Agreements are accepted will not be credited with any interest earned on Capital Contributions received prior to the issuance of their Interests; rather, any such interest will become a general asset of the Fund (attributable *pro rata* to both Classes, irrespective of the Class for which the Capital Contribution was submitted).  If a Subscription Agreement is rejected, any Capital Contribution tendered will be promptly returned to the subscriber, without interest. *Investors should not transmit their Capital Contributions until the Manager has confirmed the acceptance of their respective Subscription Agreements.*

Capital Contributions must be made in cash, unless the Manager permits Capital Contributions to be made in Investment Assets, in which case such Capital Contributions will be valued at the fair market value, as determined by the Manager in accordance with the valuation principles described in the Section of this Memorandum entitled *"Net Asset Value; Designated Investments,"* of the contributed Investment Assets as of the beginning of the respective Accounting Periods as of which such Capital Contributions are effective.

If, in the opinion of the Manager, the Fund's investment of the proceeds of a Capital Contribution will cause the Fund to incur brokerage commissions or other charges, the Fund may charge the estimated amount of such commissions or charges to the Capital Account balance attributable to such Capital Contribution.  The Fund has not to date assessed any such commissions or charges.

**Possible Offering Restrictions**

The Manager may, from time to time, determine to restrict the issuance of the Interests of either or both Classes, to issue only Interests of one Class or to suspend the offering of either or both Classes altogether.  No investor should subscribe for an Interest in reliance on such investor's ability to make additional Capital Contributions to either Class in the future.

In an effort to ensure a continuing, stable investor base, the Manager may determine to institute a "hard" or "soft" closing of the Fund to new Capital Contributions using any method adopted by the Manager in its sole discretion.  For example, the Manager may require that additional Capital Contributions from investors holding Interests comprising a significant portion of the Fund's Gross Asset Value be made solely as Four-Year Liquidity Capital Contributions. The Manager may from time to time adjust any such procedures as market conditions and/or investment opportunities warrant.

**No Alteration of Subscription Agreement**

No attempt to revise, delete, strike, sticker or otherwise modify the text of the Subscription Agreement will be accepted, and any attempt by a prospective investor or anyone acting on behalf of a prospective investor to modify the Subscription Agreement will be void. Only such changes as may be expressly agreed upon by the Fund and Amaranth in a separate written instrument executed by the Fund and Amaranth will be valid.  By submitting a Subscription Agreement, each prospective investor consents to the Fund accepting such Subscription Agreement on the basis that any changes proposed by the prospective investor to such Subscription Agreement are null and void.

## GENERAL

*The following, when describing the provisions of the Limited Liability Company Agreement, only summarizes such provisions, which are detailed and the terms of which are controlling.*

### Material Contracts

The following material contracts ("Material Contracts") relate to the operation of the Fund. These contracts may be inspected (without charge) during normal business hours at the Manager's office in Greenwich, Connecticut. Prospective investors are urged to carefully review the Material Contracts in their entirety.

- *Fifth Amended and Restated Limited Liability Company Agreement of the Fund dated January 31, 2006.*

- *Subscription Agreement between the Fund and each Member.*

- *Restated Articles of Association of the Master Fund.*

- *Amended and Restated Administrative Services Agreement between the Fund and Amaranth Group dated as of June 1, 2004.*

This Memorandum and any supplement to it, any interim financial statements and the audited financial statements of the Fund are also available for inspection and copying by prospective investors as well as existing Members at the Manager's office (subject to customary undertakings of confidentiality). All Members will be conclusively presumed to have consented to the Material Contracts and this Memorandum by subscribing for an Interest.

### Confidentiality; No Solicitation

Each Member agrees that such Member will not distribute any information regarding Amaranth or the Fund's investment activities without the express written approval of the Manager and that such Member's investment in the Fund, as well as all information concerning Amaranth and the Fund, including the performance of such Member's investment and the Fund, must be maintained on a strictly confidential basis.

Each Member agrees that such Member and its Affiliates and related parties will not, directly or indirectly, solicit, suggest, induce or encourage any current or former officer or employee of Amaranth to seek employment or business opportunities elsewhere or not to devote such person's full and undivided business time to such person's activities as an officer or employee of Amaranth. Each Member also agrees not to permit the hiring of any current or former officer or employee of Amaranth by any other investment firm if such investment firm is incubated or "seeded" by the Member and/or its Affiliates and related parties if such current or former officer or employee acts as a portfolio manager or trader.

### Optional Limitation on Voting Rights and/or Proportionate Shares

The Limited Liability Company Agreement permits investors who wish to do so, or are prohibited by law (for example, the Bank Holding Company Act) from holding Voting Rights and/or Proportionate Shares in excess of specified levels to limit their Voting Rights and Proportionate Shares (in the aggregate, in respect of each Class considered separately). Voting

Rights waived by a Member will reduce the aggregate number of Voting Rights outstanding. Maintaining a limit on a Member's Proportionate Share will involve required Withdrawals or non-*pro rata* Distributions. Such required Withdrawals or non-*pro rata* Distributions will not be subject to, or used in calculating, the Gate, and will not be subject to any Withdrawal fee.

### Amendments

The Limited Liability Company Agreement may be amended with the consent of the Manager and the vote of Members holding more than 50% of the outstanding Voting Rights (or of the affected Member); provided, that no amendment may reduce the Capital Account balance of any Member, without the prior written consent of such Member, adversely affect the limited liability of the Members under Law or cause the Fund not to be treated as a partnership under the Code (unless doing so would increase the net after-tax return of the Fund's trading to investors).

The written or affirmative consent of Members is not required; either "negative consent" by failure to object in writing after 20 days' notice of a proposed amendment, or "implied consent" by failure to make a complete Withdrawal after the Manager gives such Member notice of a proposed amendment and an opportunity to make a complete Withdrawal without imposition of any Withdrawal fee, is sufficient to constitute consent.

The Limited Liability Company Agreement may be amended on the basis of the consent of certain Members who are permitted to opt not to be bound by the terms of the amendment (which Members' Capital Accounts may subsequently be Distributed to them on a non-*pro rata* basis over time).

The Manager may, without the consent of the Members, modify or amend any provision of the Limited Liability Company Agreement in order to correct errors and ambiguities, to avoid an Impermissible Event, for Law or tax reasons as well as to make any change not materially adverse to the interests of the Members as a whole.

### Prior Period Items

In the event that the Fund at any time becomes subject to a liability or loss (or series of related liabilities or losses) which relates to a prior Accounting Period and which exceeds 2.5% of the Net Asset Value of the Fund as of the date that such liability or loss becomes due (other than items specifically associated with a Member), the Manager will use reasonable efforts to allocate such liability or loss in part or entirely to the persons (or the transferees of the persons) who were Members in the prior period with respect to which the liability or loss relates (including former Members). If the Manager is unable to collect any portion of the liability or loss, or such liability or loss is below the 2.5% threshold, such amount will be allocated among the current Members, irrespective of whether they were Members during the prior period to which such liability or loss relates. No Member shall be liable for Prior Period Items in any amount exceeding such Member's investment in the Fund, *plus* any amounts previously distributed to, or withdrawn by, such Member (without interest).

### Reports

The Fund will furnish to each Member a report of the Fund's estimated performance as soon as practicable after the end of each month, as well as an estimate of the increase or decrease in such Member's Capital Account (separately reporting the Net Asset Value of such Member's Annual Liquidity Interest and Four-Year Liquidity Interest) during the preceding month, and such

other information as the Manager may deem appropriate. As soon as practicable after the end of each Fiscal Year, the Fund will furnish to each Member a report as of the end of that Fiscal Year, and will include the following information: (i) the audited balance sheet and income statement of the Fund; (ii) the Member's closing Capital Account balance with respect to both Classes of Interests; (iii) the percentage change in the Net Asset Value of such Member's Interest(s) during the latest Fiscal Year; and (iv) a copy of Schedule K-1 to the Fund's federal income tax return for the preceding Fiscal Year, in a form sufficient to enable that Member to determine its share, for federal, state and local income tax purposes, of all items of Fund income, gain, loss, deduction, preference and credit.

Because the positions and strategy of the Fund are complex and preparing financial statements and tax returns may depend upon information from third parties, the Fund may not be able to deliver to the Members financial statements and Schedule K-1 to the Fund's federal income tax return before the time that Members are otherwise required to file their federal, state and local income tax returns without extensions. Therefore, Members may need to obtain one or more extensions of time to file their tax returns.

**Availability of Documents**

The description and summaries of documents in this Memorandum do not purport to be complete; investors should refer to the actual documents for a complete statement and to understand their terms and conditions.

**Access to Information**

The Manager invites each prospective Member to meet with the Manager to discuss a potential investment in the Fund.

The Manager will answer all reasonable inquiries from prospective investors or their representatives concerning the Fund, the Manager and other matters related to the offering of the Interests; provided, that the Manager will not disclose any confidential or proprietary information, including information concerning the Manager's proprietary investment techniques and the identity of any investors in the Fund or other Manager Clients.

**Investor Suitability Standards**

Investors in the Fund must be "accredited investors," as defined in Regulation D under the Securities Act of 1933, and "qualified purchasers," as defined in the Investment Company Act. Each prospective investor must represent and warrant in its Subscription Agreement that, among other things, such prospective investor has reviewed and understands the risks of an investment in the Fund and has the financial knowledge and experience to evaluate such investment. In addition to being financially sophisticated, each prospective investor must be able to bear the substantial risks of an investment in the Fund, including the loss of an entire investment.

PROSPECTIVE INVESTORS MUST CONSULT THEIR OWN TAX, LEGAL AND FINANCIAL ADVISERS WITH RESPECT TO THEIR INDIVIDUAL CIRCUMSTANCES AND THE SUITABILITY OF AN INVESTMENT IN THE FUND.

**Money Laundering Prevention**

Federal regulations and executive orders administered by the Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC web site at www.treas.gov/ofac. Each prospective investor must represent and warrant in the Subscription Agreement that, among other things, neither the prospective investor, nor any person controlling, controlled by, or under common control with, the prospective investor, nor any person having a beneficial interest in the prospective investor, or for whom the prospective investor is acting as agent or nominee in connection with its investment in the Fund, is a country, territory, person or entity named on an OFAC list, or is a person or entity that resides or has a place of business in a country or territory named on such lists. The Manager is not required to accept any investment from an investor if it cannot make the representation described in the preceding sentence.

In addition to OFAC restrictions, prospective investors and Members may be required to provide other information and documentation requested by the Fund or Amaranth to comply with anti-money laundering laws and regulations as well as, possibly, comparable laws and regulations in other jurisdictions. This is an evolving area of the law, and the full extent of the disclosures which may be requested cannot be predicted.

## LEGAL AND ACCOUNTING MATTERS

Sidley Austin LLP has acted as counsel for Amaranth in connection with the preparation of this Memorandum. Sidley Austin LLP may continue to advise Amaranth on matters relating to the operation of the Fund — including, without limitation, on matters relating to Amaranth's fiduciary obligations to Members — on an ongoing basis.

Ernst & Young LLP serves as the independent certified public accountants for the Fund.

*The Members have not been represented by separate counsel or other advisers or agents in negotiating the business terms of the Fund or of this offering of the Interests.*

# APPENDIX

## AMARANTH PARTNERS LLC
### PERFORMANCE SUMMARY FOR ANNUAL LIQUIDITY INTERESTS
*(The performance history for Four-Year Liquidity Interests,*
*which are subject to a lower percentage Profit Allocation, will differ.)*

| Month | Rate of Return for Period | Year to Date Return | Beginning of Month Capital |
|-------|---------------------------|---------------------|----------------------------|
| September-00 | 1.77% | 1.77% | $79,568,251 |
| October-00 | 1.54% | 3.34% | |
| November-00 | (1.01)% | 2.29% | |
| December-00 | 1.83% | 4.17% | $59,762,267 |
| | | | |
| January-01 | 4.92% | 4.92% | |
| February-01 | 1.21% | 6.19% | |
| March-01 | 0.79% | 7.03% | $77,333,861 |
| April-01 | 2.07% | 9.24% | |
| May-01 | 1.99% | 11.42% | |
| June-01 | (0.42)% | 10.95% | $86,422,093 |
| July-01 | 0.23% | 11.21% | |
| August-01 | 1.49% | 12.86% | |
| September-01 | (0.92)% | 11.82% | $104,991,186 |
| October-01 | 1.56% | 13.57% | |
| November-01 | 3.43% | 17.46% | |
| December-01 | 3.59% | 21.69% | $123,800,962 |
| | | | |
| January-02 | 2.38% | 2.38% | |
| February-02 | 0.05% | 2.43% | |
| March-02 | 1.05% | 3.51% | $274,522,857 |
| April-02 | 0.27% | 3.79% | |
| May-02 | 0.03% | 3.82% | |
| June-02 | (2.24)% | 1.49% | $339,609,419 |
| July-02 | (0.33)% | 1.16% | |
| August-02 | 0.53% | 1.69% | |
| September-02 | 1.61% | 3.33% | $356,770,560 |
| October-02 | 2.19% | 5.59% | |
| November-02 | 3.26% | 9.04% | |
| December-02 | 2.08% | 11.30% | $400,384,146 |

# APPENDIX

## AMARANTH PARTNERS LLC
## PERFORMANCE SUMMARY FOR ANNUAL LIQUIDITY INTERESTS
### (cont.)

| Month | Rate of Return for Period | Year to Date Return | Beginning of Month Capital |
|-------|---------------------------|---------------------|----------------------------|
| January-03 | 3.20% | 3.20% | |
| February-03 | 2.35% | 5.62% | |
| March-03 | 0.16% | 5.79% | $470,827,405 |
| April-03 | 1.34% | 7.21% | |
| May-03 | 1.90% | 9.24% | |
| June-03 | 0.65% | 9.95% | $513,328,725 |
| July-03 | (0.35)% | 9.56% | |
| August-03 | 0.64% | 10.26% | |
| September-03 | 1.11% | 11.49% | $623,227,896 |
| October-03 | 2.17% | 13.90% | |
| November-03 | 1.25% | 15.33% | |
| December-03 | 1.34% | 16.87% | |
| | | | |
| January-04 | 1.75% | 1.75% | |
| February-04 | 0.62% | 2.37% | |
| March-04 | 0.65% | 3.04% | $885,902,455 |
| April-04 | (0.49)% | 2.53% | |
| May-04 | (0.29)% | 2.23% | |
| June-04 | (0.04)% | 2.19% | $1,000,056,473 |
| July-04 | 0.76% | 2.96% | |
| August-04 | 0.21% | 3.18% | |
| September-04 | 1.12% | 4.33% | $1,012,992,033 |
| October-04 | 1.05% | 5.43% | |
| November-04 | 2.06% | 7.60% | |
| December-04 | 1.55% | 9.27% | $1,126,052,718 |

## APPENDIX

### AMARANTH PARTNERS LLC
### PERFORMANCE SUMMARY FOR ANNUAL LIQUIDITY INTERESTS
(cont.)

| Month | Rate of Return for Period | Year to Date Return | Beginning of Month Capital |
|-------|--------------------------|---------------------|----------------------------|
| January-05 | (0.08)% | (0.08)% | |
| February-05 | 0.16% | 0.08% | |
| March-05 | 0.57% | 0.66% | $1,121,026,151 |
| April-05 | (2.18)% | (1.54)% | |
| May-05 | (1.80)% | (3.31)% | |
| June-05 | 2.90% | (0.50)% | $1,012,209,744 |
| July-05 | 1.91% | 1.40% | |
| August-05 | 4.06% | 5.52% | |
| September-05 | 5.82% | 11.66% | $1,255,322,415 |
| October-05 | (0.60)% | 10.99% | |
| November-05 | 2.80% | 14.10% | |

Past results are not necessarily indicative of future performance. All returns are net to the Members (after all operating expenses and transaction costs, as well as the Manager Allocations and Profit Allocations). The returns above include any income from "new issues" (formerly "hot issues"), as defined in the regulations of the National Association of Securities Dealers, Inc. Particular Members' returns will vary from the returns of the Fund due to the timing of Capital Contributions and Withdrawals, a Member's eligibility to receive income from "new issues" and/or certain non-U.S. futures contracts, etc.

The Monthly Rates of Return from September 2000 through December 2004 have been audited, but those for 2005 are currently unaudited. The audited annual and unaudited interim financial statements of the Fund are available upon request. Performance information that is unaudited is subject to adjustment.

The Monthly Rates of Return are those of Annual Liquidity Interests which are subject to a 20% Profit Allocation, rather than the 15% Profit Allocation attributable to the Four-Year Liquidity Interests.

The Annual Liquidity Interests and Four-Year Liquidity Interests are subject to the same Manager Allocations, which are reflected in the Monthly Rates of Return.

**THE INTERESTS HAVE BEEN PRIVATELY OFFERED AND CANNOT
BE TRANSFERRED WITHOUT THE CONSENT OF THE MANAGER
AND COMPLIANCE WITH APPLICABLE SECURITIES
LAW EXEMPTIONS.**

# AMARANTH PARTNERS L.L.C.

**FOURTH AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**

**Dated as of March 1, 2003**

**AMARANTH ADVISORS L.L.C.
Manager**

# AMARANTH PARTNERS L.L.C.

## FOURTH AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT

### TABLE OF CONTENTS

**Section**

**Page**

### ARTICLE I

### ORGANIZATION

Section 1.1  Name; Manager................................................................................................1
Section 1.2  Purposes......................................................................................................1
Section 1.3  Principal Office; Registered Office; Registered Agent ............................1
Section 1.4  Term.............................................................................................................1
Section 1.5  Members ......................................................................................................1
Section 1.6  Definitions ...................................................................................................2
Section 1.7  Rules of Interpretation. ...............................................................................8

### ARTICLE II

### MANAGEMENT

Section 2.1  Authority of the Manager............................................................................8
Section 2.2  Manager's Determinations.........................................................................10
Section 2.3  Brokerage and Dealing Arrangements.......................................................10
Section 2.4  Allocation of Investment Opportunities....................................................10
Section 2.5  Permitted Transactions..............................................................................11
Section 2.6  Loans to Members......................................................................................12
Section 2.7  Members' Representative. .........................................................................13
Section 2.8  Manager Parties' Liabilities......................................................................14
Section 2.9  Manager Parties' Indemnification.............................................................14
Section 2.10  Withdrawals by the Manager; Substitution of Managers; "Key Person"
          Events.........................................................................................................15

### ARTICLE III

### CAPITAL ACCOUNTS; FINANCIAL AND TAX ALLOCATIONS

Section 3.1  Admission of Additional Members; Capital Contributions........................16
Section 3.2  Limited Liability of Members....................................................................17
Section 3.3  Capital Accounts and General Financial Allocations. ...............................18

## TABLE OF CONTENTS
### (Cont.)

<u>Section</u>                                                                                          <u>Page</u>

Section 3.4  Special Allocations. ................................................................................................22
Section 3.5  Tax Allocations..........................................................................................................22
Section 3.6  Consistent Tax Reporting .........................................................................................24
Section 3.7  "Tax Matters Partner."..............................................................................................24
Section 3.8  Determination of Net Asset Value.............................................................................24
Section 3.9  Use of Estimates .......................................................................................................26
Section 3.10  Designated Investments. .........................................................................................26
Section 3.11  Prior Period Adjustments........................................................................................28
Section 3.12  Reserves. .................................................................................................................29

## ARTICLE IV

## CAPITAL WITHDRAWALS

Section 4.1  Capital Withdrawals..................................................................................................29
Section 4.2  Distributions..............................................................................................................32
Section 4.3  Transfers. ..................................................................................................................32
Section 4.4  Withdrawal of a Member. .........................................................................................33
Section 4.5  Effective Date of Capital Withdrawals and Distributions ........................................34
Section 4.6  Payment of Capital Withdrawal and Distribution Proceeds. ....................................34
Section 4.7  Postponing Accounting Dates....................................................................................35
Section 4.8  Postponing Effective Dates. ......................................................................................35
Section 4.9  Postponing Capital Withdrawal Payments.................................................................36

## ARTICLE V

## DISSOLUTION

Section 5.1  Dissolution.................................................................................................................37
Section 5.2  Payment of Dissolution Proceeds ..............................................................................39

## ARTICLE VI

## EXPENSES; ANCILLARY FEES

Section 6.1  Company Expenses.....................................................................................................39
Section 6.2  Ancillary Fees ...........................................................................................................40

**TABLE OF CONTENTS**
**(Cont.)**

**Section**

**Page**

**ARTICLE VII**

**BOOKS OF ACCOUNT; REPORTS**

Section 7.1  Books of Account. ..................................................................................................40
Section 7.2  Reports. ...................................................................................................................40

**ARTICLE VIII**

**MISCELLANEOUS**

Section 8.1  Binding Effect; Creditors. .......................................................................................41
Section 8.2  Notices ....................................................................................................................41
Section 8.3  Counterparts; Facsimiles; Power of Attorney. ........................................................42
Section 8.4  Entire Agreement .....................................................................................................42
Section 8.5  Amendment. .............................................................................................................42
Section 8.6  Consent of the Members. .........................................................................................43
Section 8.7  Waivers. ...................................................................................................................44
Section 8.8  No Partition. .............................................................................................................44
Section 8.9  Meetings. ..................................................................................................................44
Section 8.10  Power of Attorney....................................................................................................44
Section 8.11  Voluntary Limitation on a Member's Voting Rights................................................45
Section 8.12  Voluntary Limitation on a Member's Ownership Share...........................................45
Section 8.13  Further Information and Documents........................................................................46
Section 8.14  GOVERNING LAW; VENUE. ................................................................................46
Section 8.15  Matters Not Provided For; Compliance with Law...................................................47
Section 8.16  "Amaranth" Name and Amaranth Intellectual Property ..........................................47
Section 8.17  Severability .............................................................................................................47
Section 8.18  Indirect Action ........................................................................................................47
Section 8.19  Survival...................................................................................................................48
Section 8.20  Confidentiality; No Solicitation. .............................................................................48