# EXHIBIT  D

## FOURTH AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## AMARANTH PARTNERS L.L.C.

This Fourth Amended and Restated Limited Liability Company Agreement ("Agreement") dated as of March 1, 2003, amends and restates the Third Amended and Restated Limited Liability Company Agreement of Amaranth Partners L.L.C. (the "Company") dated as of May 30, 2001, as follows:

### ARTICLE I

### ORGANIZATION

Section 1.1   Name; Manager.  The Company shall continue to do business under the name of "Amaranth Partners L.L.C." Amaranth Advisors L.L.C. (the "Manager") shall continue to act as the manager of the Company.  The Manager may change the name of the Company from time to time, promptly notifying the Members of any such change.

Section 1.2   Purposes.  The Company may engage, directly and indirectly, in all aspects of investing and trading, as well as otherwise participating as an active or passive investor in other investment entities, operating businesses and/or other business enterprises, including those over which no Manager Party (as defined below) has trading or investing authority.  For the avoidance of doubt but not by way of limitation, no limitation is imposed by this Agreement on the investment or trading activities that the Company may employ, and the Company may: trade, borrow, lend, invest in and sell "short" all manner of Investment Assets (as defined below); sponsor, manage, own interests in and/or participate in domestic and foreign subsidiaries and/or Persons (as defined below); engage in the business of acting as a market maker, broker or dealer in all manner of Investment Assets and other property (and contract rights relating thereto); and transact all other businesses and activities as may be desirable, necessary, advisable or incidental to the Company's business of investing and trading, as the Manager may determine.

Section 1.3   Principal Office; Registered Office; Registered Agent.  The principal office of the Company shall be at One American Lane, Greenwich, Connecticut 06831 or at any other location as the Manager may designate.  The registered office of the Company shall be at such location, and its registered agent for service of process shall be such entity, as is set forth in the Certificate of Formation.  The Manager may change the principal office, the registered office and/or the registered agent of the Company from time to time, promptly notifying the Members of any such change.

Section 1.4   Term.  The term of the Company shall continue until the Company is dissolved and wound up as provided in **Section 5.1**.

Section 1.5   Members.  The Members (other than the Manager), in their capacity as such, shall have only the powers specifically enumerated in this Agreement and shall not have any

-1-

control over the business or operations of the Company, any power to bind the Company or any right to remove or replace the Manager.

Section 1.6 <u>Definitions</u>. For the purposes of this Agreement, the following terms — and, as appropriate, derivatives of such terms — shall have the meanings set forth below, unless the context otherwise requires:

"<u>Accounting Date</u>" shall mean: (a) the last day of a calendar month; (b) an Effective Date; (c) the day on which the Company dissolves pursuant to **Article V**; (d) the day as of which the Company's final liquidating Distribution is made following the Company's dissolution; and (e) any other day which the Manager may designate.

"<u>Accounting Period</u>" shall mean the period beginning immediately after an Accounting Date and ending as of the next Accounting Date.

"<u>Act</u>" shall mean the Delaware Limited Liability Company Act.

"<u>Affiliate</u>" of a Person shall mean a Person controlling, controlled by or under common control with, that Person, either directly or indirectly through one or more intermediaries. (For purposes of this definition, the direct or indirect ownership of 20% or more of the voting or equity interests of a Person shall be conclusively presumed to constitute control.)

"<u>Amaranth Intellectual Property</u>" shall mean the Amaranth Proprietary Information and the Amaranth Software.

"<u>Amaranth Proprietary Information</u>" shall mean trading and investment systems, methods, inventions, techniques, strategies, data, algorithms, applications, concepts, designs, discoveries, ideas, improvements, formulae, financial products or services, know-how, models, modifications, processes, trade secrets, or other information and data that are: (A) utilized in the current, or are the basis for future, investment or trading activities used or to be used by any Manager Party or any Manager Client; or (B) are embodied in or are the ideas from which the Amaranth Software is based.

"<u>Amaranth Software</u>" means, without limitation, the proprietary computer programs, data files, databases, and other material related thereto, and all adaptations, modifications, enhancements, improvements, additions, derivative works, and developments thereto or therein that presently exist or that are subsequently created or developed by or on behalf of any of the Manager Parties that: (A) embody the Amaranth Proprietary Information; or (B) are used in connection with the Amaranth Proprietary Information and either are proprietary to the Manager Parties or as to which the Manager Parties have the right to sublicense.

"<u>Anniversary Date</u>" shall mean, with respect to each Capital Contribution made by a Member, each twelve-month anniversary of the last day of the month in which such Capital Contribution was made; provided, that the Manager may at the time a Capital Contribution is made establish, with the consent of the Person making such Capital Contribution, (1) the initial Anniversary Date applicable to all or a portion of such Capital Contribution as a different month-end than would otherwise have been such Anniversary Date, and/or (2) multiple Anniversary Dates and related Memorandum Accounts for such Capital Contribution. The Manager may also

designate a longer period between the Anniversary Dates applicable to one or more existing Memorandum Accounts established with respect to a Member's Capital Account; provided, that such Member shall have an opportunity to withdraw from the Company, without imposition of any withdrawal fee, prior to the effective date of any such designation.

"Anniversary Withdrawal" shall mean a Capital Withdrawal made as of an Anniversary Date pursuant to **Section 4.1(b).**

"Annual Appreciation Withdrawal" shall mean a Capital Withdrawal made as of any December 31 in respect of the Appreciation allocable to a Capital Account pursuant to **Section 4.1(c).**

"Appreciation." See **Section 4.1(c).**

"Bankruptcy" shall mean, with respect to any Person, an adjudication that such Person is bankrupt or insolvent, its admission of its inability to pay its debts as they mature, its making a general assignment for the benefit of creditors, its filing a petition in bankruptcy or a petition for relief under any section of the United States Bankruptcy Code or any other bankruptcy or insolvency statute, or the filing against it of any such petition which is not discharged within 60 days thereafter.

"Capital Account" shall mean, with respect to each Member, the capital account established and maintained on the books of the Company in accordance with this Agreement, subject to adjustment as of each Accounting Date and as of the effective date of each Capital Contribution and Capital Withdrawal by such Member. For all purposes (including financial and tax allocations), each Member shall have a single Capital Account.

"Capital Contribution" shall mean, with respect to each Member, the cash and/or Investment Assets contributed to the Company by that Member, net of any costs or charges imposed on such Capital Contributions, as set forth in the books and records of the Company.

"Capital Withdrawal" shall mean the cash and/or Investment Assets withdrawn from the Company and a Member's Capital Account pursuant to such Member's request, net of any Withdrawal Reserves or any other costs or charges imposed on such Capital Withdrawals.

"Close of Business" shall mean, with respect to Investment Assets traded in different geographical regions, such time as the Manager may determine. For purposes of determining the Net Asset Value of the Company, such Net Asset Value shall be as determined by the Manager as of the closing time of financial markets in New York City (or such other time as the Manager may determine), using the then most recent Close of Business valuations available for Investment Assets traded in other time zones (whether or not the markets in one or more of such time zones remain closed or have reopened subsequent to such most recent Close of Business). For purposes of determining the deadline for receipt of Capital Contributions to be effective as of the beginning of a particular Accounting Period under **Section 3.1**, "Close of Business" shall mean the latest time of day that payments may be credited for value on such day by the Company's designated recipient bank. For purposes of determining the effectiveness of a notice under **Section 8.2**, "Close of Business" shall mean 5:00 P.M., local time, in the location where such notice is delivered.

"Code" shall mean the Internal Revenue Code of 1986.

"Company" shall mean Amaranth Partners L.L.C., the Delaware limited liability company governed by this Agreement. Unless and to the extent that the context otherwise requires, references to the Company shall include references to the Trading Vehicles (or the Company's interests therein, as the case may be).

"Designated Investment." See **Section 3.10(a)**.

"Designated Trader" shall mean each employee of a Manager Party who is a Portfolio Manager or Trader, determined as follows:

> (i) Mr. Nicholas Maounis (or his successor or designee, the "Designating Party") shall designate in writing, at any time and from time to time, one employee as the "Portfolio Manager" for each portfolio or sub-portfolio (as determined by the Manager) of the Company for which such employee has the overall investment management responsibility. An employee may be designated as the Portfolio Manager for more than one portfolio or sub-portfolio.

> (ii) The Designating Party shall designate in writing, at any time and from time to time, as "Traders" those employees who devote substantially all of their business time to trading (as opposed to performing quantitative or fundamental research to develop or support the investment and trading activities), including the execution of purchases and sales of Investment Assets, but not employees whose trading-related functions are ancillary to their primary risk management, treasury or finance (including securities lending or borrowing) functions.

"Designating Party." See the definition of "Designated Trader."

"DI Opt-Out Member" shall mean any Member who notifies the Company in such Member's Subscription Agreement (or by other written notice delivered on or before March 31, 2003, in the case of Persons who were Members prior to such date) that such Member elects not to participate in Designated Investments.

"Distribution" shall mean cash and/or Investment Assets distributed to one or more Members from the Company by the Manager without such Member(s)' request. Distributions can be made at any time and from time to time and need not be made to the Members in accordance with their respective Proportionate Shares.

"DT Bonus" shall mean the bonuses (or portions thereof, as the case may be) paid or payable to a Designated Trader by the Company and/or other Manager Clients but shall exclude his base salary and benefits; provided, however, in the case of an employee who has functioned not only as a Designated Trader but also in other capacities (as determined by the Designating Party), only the portion of the bonuses paid or payable to such employee in his capacity as a Designated Trader (as determined by the Designating Party) shall constitute a DT Bonus. In the event that a Designated Trader is determined by the Designating Party to have functioned in such capacity only for a portion of a Fiscal Year, only the corresponding portion of the bonus paid to

such Designated Trader reflecting his bonus compensation as a Designated Trader (as determined by the Designating Party) shall constitute a DT Bonus.

"Effective Date" shall mean the date — as the same may be postponed as provided in **Section 4.8** — that a Capital Withdrawal or a Distribution is effective, resulting in the Members' respective Proportionate Shares being adjusted accordingly, irrespective of when the proceeds of such Capital Withdrawal or Distribution are paid out by the Company.

"Finally Determined" shall mean found by a court or arbitral tribunal upon entry of a final, non-appealable judgment.

"Fiscal Year" shall mean the calendar year, unless the Manager elects a different fiscal year.

"Gate" shall mean the limitation, imposed pursuant to **Section 4.1(d)(i)**, on the amount of permissible Quarterly Withdrawals as of any Quarterly Withdrawal Date.

"High Water Mark." See **Section 3.3(d)**.

"Interest" shall mean, with respect to any Member, the interest in the Company owned by that Member, including all rights and obligations provided under this Agreement and, to the extent not superseded by this Agreement, under the Act.

"Investment Assets" shall mean all assets, instruments, contracts, rights, derivatives, undertakings, entitlements and other property (real or personal) which may be acquired, traded, held, borrowed, lent, invested in or sold (including short sales), including securities, loans, loan participations, trade claims, commodities, energy contracts, power, currencies, futures contracts, puts and calls, swaps and other derivatives.

"Law" shall mean any law, regulation (proposed, temporary or final), administrative rule or procedure, self-regulatory organization rule or interpretation, or exchange rule or procedure binding upon (as applicable in light of the context) any Member, the Manager, any Manager Party, the Company or any Affiliate of any of the foregoing or to which any of their property is subject.

"LIBOR" shall mean the U.S. Dollar London Interbank Offered Rate for deposits of the specified duration as published in such recognized newspapers or quotation services as may be selected by the Manager at the time of determination.

"Liquidator." See **Section 5.1(b)**.

"Manager" shall mean Amaranth Advisors L.L.C., a Delaware limited liability company, and/or any other Person that is subsequently admitted as a manager of the Company.

"Manager Allocation." See **Section 3.3(c)**.

"Manager Client" shall mean the Company and each other investment advisory client of the Manager or of any Affiliate of the Manager.

"Manager Party" shall mean (a) the Manager, (b) any Affiliate of the Manager, and (c) any owner, principal, director, officer or employee of any of the foregoing; provided that none of Paloma Partners Management Company, its Affiliates or any owner, principal, director, officer or employee of any of the foregoing shall constitute a Manager Party in their capacity as such (although any such owner, principal, director, officer or employee may otherwise constitute a Manager Party due to such Person's relationship with the Manager or one or more of its Affiliates).

"Manager Party Investor" shall mean any Manager Party, any spouse, parent or descendant (including adopted descendants) of any Manager Party that is a natural Person, any Service Provider, or any Person organized or formed by, or Affiliated with, any of the foregoing for tax, estate planning, or charitable purposes, in each case as designated by the Manager in writing.

"Member" shall mean a member of the Company, including the Manager.

"Members' Representative." See **Section 2.7.**

"Memorandum Account" shall mean the bookkeeping accounts established with respect to each Capital Contribution made by a Member, solely for purposes of identifying the Anniversary Dates applicable to the Capital Account balance attributable to such Capital Contribution.

"Monthly Allocation Percentage." See **Section 3.3(c).**

"Net Asset Value" of the Company as of any date shall mean the value (determined pursuant to **Section 3.8**) of the Company's Investment Assets, the Company's interests in Trading Vehicles and the Company's other assets, less (a) all liabilities, costs, and expenses accrued or payable of every kind and nature other than Profit Allocations accrued but not yet allocated and (b) all Reserves. In determining the Company's liabilities, the Manager may estimate expenses of a regular or recurring nature in advance, and may accrue the same into one or more Accounting Periods, any such accrual to be binding and conclusive on all Members, irrespective of whether such accrual subsequently proves to have been incorrect in amount (in which case any adjustments shall be made in the Accounting Period when such error is recognized, except as otherwise provided in **Section 3.11** in the case of Prior Period Adjustments).

"Net Income" shall mean, with respect to any given Accounting Period, the increase in the Net Asset Value of the Company from the beginning to the end of such Accounting Period (calculated without regard for the accrual of Profit Allocations or Manager Allocations).

"Net Loss" shall mean, with respect to any given Accounting Period, the decrease in the Net Asset Value of the Company from the beginning to the end of such Accounting Period (calculated without regard for the reversal of any prior accrual of Profit Allocations or the accrual of Manager Allocations).

"Net New Profit." See **Section 3.3(d).**

-6-

"Person" shall mean any individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated organization, or other entity.

"Prior Period Adjustment" shall mean any item or items of expense, loss, tax, income or gain incurred or accrued during one Accounting Period which arises from claims, events or transactions relating to a prior Accounting Period, including all costs of prosecuting, defending, investigating, settling or otherwise dealing with any of the foregoing, such item or items to be accounted for pursuant to **Section 3.11**.

"Profit Allocation." See **Section 3.3(d)**.

"Proportionate Share" shall mean, with respect to each Member and each Accounting Period, the fraction the numerator of which is the Capital Account balance (not including any amounts attributable to Designated Investments and without reduction for Profit Allocations accrued but not yet allocated) of such Member as of the first day of such Accounting Period and the denominator of which is the aggregate Capital Account balances (not including any amounts attributable to Designated Investments and without reduction for Profit Allocations accrued but not yet allocated) of all the Members as of the first day of such Accounting Period.

"Quarterly Withdrawal." See **Section 4.1(d)(i)**.

"Quarterly Withdrawal Date" shall mean January 31, April 30, July 31 and October 31.

"Reserves" shall mean reserves (funded or unfunded) established by the Manager pursuant to **Section 3.12**.

"Service Provider" shall mean any Person, including any Manager Party, who provides any form of services to the Company or to a Trading Vehicle, as an employee or consultant, including accounting, administration, back office, operations, legal, compliance, treasury, finance (including securities lending and borrowing), investment analysis and research (quantitative and fundamental), risk management, and information systems and technology.

"Special Allocations" shall mean the allocations of certain items of Net Income and Net Loss among the Members in a manner not *pro rata* in accordance with their Proportionate Shares, as contemplated by **Section 3.4**.

"Subscription Agreement" shall mean the agreement whereby each Member (other than the Manager) subscribes for an Interest.

"Tax Items" shall mean items of income, gain, loss, expense, deduction and credit determined for income tax reporting purposes.

"Trading Vehicles" shall mean any Person in which the Company directly or indirectly holds an interest and whose trading and investing is directed by a Manager Party.

"Treasury Regulations" shall mean the regulations (final, proposed and/or temporary) of the Department of the Treasury and/or Internal Revenue Service promulgated under or in respect of the Code.

"Voting Rights." See **Section 8.11**.

"Withdrawal Reserve" shall mean the reserve that may be established in the case of any Capital Withdrawal to cover expenses anticipated to be incurred in liquidating Investment Assets in order to fund such Capital Withdrawal as well as any such other contingencies as the Manager may determine to be associated with such Capital Withdrawal.

Section 1.7 Rules of Interpretation.

(a) References to sections shall be to sections of this Agreement unless otherwise specified.

(b) Article and section headings herein have been inserted for convenience of reference only, are not a part of this Agreement and shall not be used in construing this Agreement.

(c) The words "include" and "including" and words of similar import when used in this Agreement shall not be limiting but shall rather be deemed to be followed by the words "without limitation."

(d) Unless the context of this Agreement otherwise requires (i) words using singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," herein," "hereby" and derivative or similar words refer to the entire Agreement, (iii) the masculine gender shall include the feminine and neuter, (iv) any reference to a Law, agreement or a document shall be deemed to also refer to any amendment, supplement or replacement thereof, and (v) whenever this Agreement refers to a number of days, such number shall refer to calendar days unless such reference specifies business days.

(e) Terms defined in this Agreement by reference to any other agreement, document or instrument shall have the meanings assigned to them in such agreement, document or instrument whether or not such agreement, document or instrument is then in effect.

(f) No provision of this Agreement shall be construed in favor of or against any Person by reason of the extent to which any such Person or its Affiliates, employees or counsel participated in the drafting thereof.

## ARTICLE II

## MANAGEMENT

Section 2.1 Authority of the Manager.

(a) The Manager shall have full and complete charge of all affairs of the Company. The management and control of the Company's business and its assets shall rest exclusively with the Manager. The Manager shall have all of the rights and powers that can be granted to a manager under the Act and as otherwise provided by Law, and any action taken on behalf of the Company by the Manager shall constitute the act of and bind the Company.

(b) The Manager shall be required to devote only such time and attention to the conduct of the business and affairs of the Company as the Manager determines to be necessary or advisable.

(c) For the avoidance of doubt and without limiting the generality of the powers conferred upon it by **Section 2.1(a)**, the Manager is expressly authorized to do the following for or on behalf of the Company: (i) make all investment and trading decisions with respect to the acquisition and disposition (including short sales) of Investment Assets, and all other manner of investments, including exercising any right of the Company with respect to any Investment Asset; (ii) incur all manner of obligations as well as guarantee the obligations of any other Person; (iii) sign contracts, checks, drafts, and other orders for the payment of Company funds; (iv) own, lease, sell, assign, or otherwise dispose of any assets, property and liabilities on terms and conditions as the Manager may determine; (v) open, maintain, and close one or more accounts (including bank, brokerage, margin and clearing accounts) and enter into arrangements to self-clear transactions with financial and commercial institutions (including clearing and depository institutions); (vi) borrow funds, Investment Assets or other property and utilize any other form of financing or leverage on a secured or unsecured, as well as on a segregated or non-segregated, basis and mortgage, pledge, assign, or otherwise hypothecate any one or more of the Company's properties or assets to secure any such borrowing; (vii) hold Investment Assets in nominee or street name; (viii) lend monies, Investment Assets and other assets or otherwise provide any other form of financing or leverage on a secured or unsecured, as well as on a segregated or non-segregated, basis; (ix) negotiate and enter into all manner of derivatives and other investment, financial and risk management instruments (whether or not exchange-traded), as well as registration rights, placement, selling and financing agreements, private placement and securities purchase agreements, shareholders' agreements, structured products, repurchase agreements, reverse repurchase agreements, securities lending and hypothecation agreements, counterparty agreements, and all other forms of investment, financial and commercial agreements, contracts and undertakings; (x) employ or otherwise engage the services of such agents, brokers, Designated Traders, consultants, advisors, employees, and other Service Providers as the Manager deems necessary or advisable and cause the Company to pay such compensation, including performance-based and incentive compensation, to the foregoing as the Manager may determine, subject to **Section 3.3(d)**; (xi) commence or defend any litigation involving the Company or the Manager, including a voluntary case under Bankruptcy Law on behalf of the Company, retain legal counsel in connection therewith, and pay from the assets of the Company any and all liabilities and expenses (including attorneys', investigators' and consultants' fees and expenses) incurred in connection therewith; (xii) compromise, settle and/or accept judgments with respect to any claims made by or against the Company; (xiii) obtain, at the Company's expense, insurance for the Company and the Manager Parties; (xiv) enter into, organize, contribute assets to, participate in or otherwise deal with the organization of, and invest in, Trading Vehicles and other Persons (including any other Person in which any Manager Party or Manager Client has an economic interest as an owner, participant or service provider); (xv) register the Company and/or one or more Trading Vehicles (A) as a "broker-dealer" with the Securities and Exchange Commission as well as cause the Company and/or such Trading Vehicle(s) to become members of a national securities exchange, of the National Association of Securities Dealers, Inc. and/or such other self-regulatory organizations as the Manager deems necessary or advisable, and (B) in any other capacity or capacities as the Manager deems necessary or advisable; (xvi) appoint and consult with the Members' Representative; (xvii)

establish Reserves and Withdrawal Reserves; (xviii) incur and pay or reimburse expenses of the Company and the Manager Parties (including the Company's *pro rata* share of the Manager Parties' direct and indirect general and administrative expenses and overhead, such as compensation, bonuses, rent, depreciation, research and quotation services, and technology costs and licensing fees); (xix) prepare and file, at the Company's expense, all Company tax returns and other legal, governmental and administrative registrations and filings and to make (or not make) all tax elections the Manager deems advisable; (xx) prepare, execute, file, and deliver any documents related to any of the foregoing; and (xxi) generally, to act or decline to act for the Company in all matters.

Section 2.2 <u>Manager's Determinations</u>. (a) Whenever the Manager is to determine or decide any matter relating to this Agreement or the Company, such determination or decision shall be in the sole and absolute discretion of the Manager. All determinations or decisions made by the Manager pursuant to or in connection with this Agreement, if made in good faith, shall be conclusive and binding on all Members.

(b) Each Member acknowledges and agrees that the determination of which employees constitute Designated Traders, as well as the portion of such employees' activities and/or the portion of the applicable Fiscal Year in which such employees were properly so classified, involves a subjective determination by the Designating Party. Recognizing the conflict of interest involved in this determination, each Member agrees that the Designating Party's determination of which employees are classified as Designated Traders, as well as of the portion (if less than all) of each Designated Trader's bonus that should be classified as a DT Bonus and the portion (if less than all) of each applicable Fiscal Year in respect of which such employees are so classified, shall be binding and conclusive in the absence of bad faith or manifest error, and no Designating Party or Manager Party shall have any liability for such determination, subject to **Section 2.8**.

Section 2.3 <u>Brokerage and Dealing Arrangements</u>. The Manager may cause the Company to enter into brokerage and dealing arrangements pursuant to which the Company pays transaction costs in an amount greater than would be incurred if another broker or dealer were used. The Manager may also receive products and other services from the brokers and/or dealers through which the Company executes transactions. In certain cases, such arrangements may fall outside of the safe harbor for fiduciaries' use of "soft dollar" payments established by Section 28(e) of the Securities Exchange Act of 1934; provided, in each case, that the Manager believes that these arrangements are reasonable and consistent with the Company's objectives.

Section 2.4 <u>Allocation of Investment Opportunities</u>.

(a) The Manager shall use reasonable efforts to allocate or rotate investment opportunities among the different Manager Clients in a manner that the Manager deems equitable (giving due consideration to the differences among the various accounts directed by the Manager).

(b) The Manager shall be permitted to aggregate orders for the Company with orders for other Manager Clients, notwithstanding that the effect of such aggregation may operate to the disadvantage of the Company.

(c) The Members acknowledge and agree that by reason of the other business activities of one or more of the Manager Parties, the Manager may not be able, or may determine not, to initiate a transaction for the Company that the Manager would otherwise have initiated for the Company.

Section 2.5 Permitted Transactions.

(a) Subject to the provisions of **Section 8.20**, nothing in this Agreement shall limit the right of any Member or Manager Party to organize, engage in or possess an interest in, directly or indirectly, other business ventures or investments of any nature or description for its own account (including engaging in transactions involving Investment Assets owned by, or of the same type owned by, the Company), independently or with others, including any investment in any aspect of the investment and trading business or any other business engaged in by the Company, and none of the Company, any other Member or any other Manager Party shall have any rights in or to such investment or independent venture or the income or profits derived therefrom.

(b) Any Manager Party, Member and any of their respective Affiliates may invest and trade for their personal accounts.

(c) Any Manager Party may invest and trade for any other Manager Client accounts.

(d) Any Manager Party, Member and any of their respective Affiliates may act as a Service Provider and receive compensation for doing so.

(e) Any Manager Party may render investment advisory and other services to other Persons with respect to Investment Assets which advice is identical, dissimilar or contrary to the advice that the Manager provides to the Company.

(f) The principles of the doctrine of "corporate opportunity" or other similar rights or claims shall not apply to any Manager Party's dealings with the Company or third parties.

(g)    (i) Any Manager Party may act as a trader for or render portfolio management services to Trading Vehicles (including Trading Vehicles of which the Company is the sole owner or member), and such Manager Party (as well as any other manager of such Trading Vehicles) may receive a share of the profits and/or a fee based on the performance, and/or a percentage of the assets or capital, as well as being reimbursed for expenses incurred in connection with the investment and trading management, of such Trading Vehicles.

(ii) If the Manager allocates Company capital to a Trading Vehicle pursuant to arrangements under which the Manager or an Affiliate of the Manager receives a share of the profits and/or a fee based upon the performance of the Trading Vehicle and/or a percentage of the assets or capital of the Trading Vehicle (in each case, not including expense reimbursements), the Manager shall, as reasonably practicable, make provision (including waiving or otherwise adjusting the Manager Allocations and Profit Allocations) so that the sum of the (A) Manager Allocations and Profit Allocations, plus (B) such share of profits and/or

-11-

fees received by the Manager is not in excess of the amounts the Manager would have received if there had been no such arrangement(s) with such Trading Vehicles; provided, that the Manager is expressly authorized to make such adjustments over time so that during certain Accounting Periods (and Fiscal Years) the aggregate amounts received by the Manager may be increased as a result of any such arrangement(s), without any need of the Manager subsequently making a retroactive adjustment to such aggregate amounts in respect of either former or continuing Members.

(h) The Company may borrow and/or lend monies or purchase, sell, borrow and/or lend Investment Assets from and to Persons selected by the Manager, which may include Manager Parties and/or Manager Clients.

(i) The Manager may cause the Company, and any other Manager Party or Manager Client, to engage in all manner of transactions with any other Manager Party or Manager Client or the Company, including joint ventures, "master/feeder" structures, principal-to-principal, "riskless principal," "agency cross" and agency transactions in Investment Assets, repurchase agreements, reverse repurchase agreements, lendings, borrowings, guarantees and swaps and other derivative transactions. For the avoidance of doubt, the Manager shall — subject to the consent of the Members' Representative in cases in which the Manager seeks such consent — have full authority to cause the Company, any Manager Party and any Manager Client to enter into all manner of commercial, investing, lending, borrowing or trading transactions with the Company, any Manager Party and any Manager Client, including joint ventures, participations or other business combinations or arrangements, irrespective of whether such transactions increase the Company's risk of loss, liability or costs (including tax costs) and irrespective of whether the economic or tax attributes are shared on a *pro rata* basis.

Section 2.6  Loans to Members.

(a) The Manager may, but shall be under no obligation whatsoever to, cause the Company to make loans to Members, including to Manager Party Investors and to certain Members but not others. Any such loan shall not exceed 50% of such Member's Capital Account balance (as estimated by the Manager) as of the date such loan is made. All loans to Members shall bear interest at one-year LIBOR plus 2.00% per annum, compounded as of each June 30 and December 31, and shall be mandatorily prepaid in full in the event that the principal plus accrued interest equals or exceeds 75% of the borrowing Member's Capital Account balance (as estimated by the Manager), as of any month-end occurring during the period when such loan is outstanding.

(b) All loans to Members shall, when past due (giving due consideration to any provisions made for adding accrued interest to principal), bear interest until paid in full at the lower of (i) the greater of (A) LIBOR plus 8% and (B) 18% per annum and (ii) the highest rate permitted by Law (in each case, compounded each June 30 and December 31).

(c) Any loan made by the Company to a Member shall be with full recourse against such Member and shall be secured by a first priority security interest in such Member's Capital Account.

(d) The Manager may require that any Member obtaining a loan from the Company execute and deliver such documentation as the Manager may deem necessary or advisable with respect to any loan, as well as that such Member obtaining a loan from the Company undertake subsequently to provide further assurances, upon the request of the Manager of such Member's ability to repay such loan.

(e) All expenses incurred by the Company in extending a loan to a Member shall be borne by such Member.

(f) All loans to Members shall become due in full upon notice from the Manager that the Company is to dissolve.

(g) Any Member that has a loan outstanding agrees that (i) all Distributions and Capital Withdrawals that would otherwise be received by such Member from the Company shall first be allocated to pay off such outstanding loan, whether or not such loan is then due and payable; and (ii) at any time when a loan to such Member becomes due, the Manager may debit such Member's Capital Account (immediately, or as of the next following calendar month-end or quarter-end, as the Manager may deem reasonably practicable) in the full amount then due (including interest and any associated expenses) if the Member does not repay the full amount of such loan within 3 business days after the date when due. To the extent that a loan is repaid by debiting a Member's Capital Account (other than from the proceeds of a Capital Withdrawal made at the request of the borrowing Member), a 2.5% withdrawal fee shall be imposed on the amount of such debit as if such debit were a Quarterly Withdrawal (any such debit not to be subject to or included in calculating any Gate otherwise allocable as of the date such debit is made).

Section 2.7  Members' Representative.

(a) The Members' Representative (who may be one or more Members, Service Providers or appraisers, in each case who are not Affiliates of any Manager Party and who do not perform other material services for the Company or the Manager) shall be appointed by the Manager, subject to the negative consent of Members holding a majority of the Voting Rights not held by any Manager Party. The Members' Representative shall have the authority, as representative and agent of the Members, to give or withhold consent to, or approve or disapprove, any transaction submitted to the Members' Representative by the Manager, and each Member authorizes the Members' Representative to act as such Member's agent and representative in reviewing any transactions presented to such Members' Representative. All Members agree that the Manager's disclosure to the Members' Representative of a given transaction, and the Members' Representative's determination that a given transaction involving one or more Manager Parties or Manager Clients and the Company appears to be on arm's-length terms, shall constitute disclosure to each Member and each Member's good and sufficient informed consent for purposes of Section 206(3) of the Investment Advisers Act of 1940 and any other applicable Law.

(b) The same Members' Representative may serve in such capacity for the Company as well as for other Manager Clients.

-13-

(c) The Members' Representative shall be appointed for a fixed term of forty-eight consecutive calendar months; provided, that any such Person may be reappointed for any number of successive terms.

(d) The Members' Representative shall be entitled to charge fees for its services payable by the Company and to be reimbursed for its expenses by the Company and any other Manager Clients for which the Members' Representative performs such services.

(e) The Members' Representative shall be entitled to exculpation and indemnity as if such Members' Representative were a Manager Party as provided in **Sections 2.8 and 2.9**.

(f) All Manager Parties shall be absolutely protected in relying on actions taken by the Members' Representative, including both consenting and withholding consent to any transaction submitted to the Members' Representative by the Manager.

Section 2.8  Manager Parties' Liabilities.

(a) No Manager Party shall be personally liable for the return or payment of all or any portion of the capital of or profits allocable to any Member, it being expressly agreed that any return of capital or payment of profits made pursuant to this Agreement shall be made solely from the assets of the Company (which shall not include any right of contribution from any Manager Party).

(b) No Manager Party shall have any liability to the Company, any Member or any former Member for: (i) any act performed, or the omission to perform any act, within the scope of the power and authority conferred on the Manager by this Agreement and/or by the Act, except by reason of acts or omissions of a Manager Party Finally Determined to constitute fraud, bad faith, gross negligence or reckless or intentional misconduct; (ii) the termination of the Company and this Agreement pursuant to the terms hereof; (iii) the performance by a Manager Party of, or the omission by a Manager Party to perform, any act which such Manager Party reasonably believed to be consistent with the advice of attorneys, accountants or other professional advisers to the Company or to such Manager Party with respect to matters relating to the Company; (iv) the conduct of any Person selected or engaged by such Manager Party other than in bad faith; or (v) any tax imposed on the Company or the Members in any jurisdiction, or any costs incurred in respect of a tax audit or similar procedure.

(c) No Manager Party shall have any liability to the Company, any Member or any former Member for conduct Finally Determined to have constituted a violation of Law, provided that such Manager Party reasonably believed such conduct to be in the interest of the Company at the time of such conduct.

Section 2.9  Manager Parties' Indemnification.

(a) The Company shall indemnify, defend, and hold harmless each Manager Party and, as the Manager may determine, the agents, advisors, and consultants of the Company (each also an "Indemnified Party"), from and against any loss, cost, expense, liability, fees (including attorneys' fees and expenses), and damages suffered or sustained by such Indemnified Party by reason of any acts or omissions, or alleged acts or omissions, arising out of the activities of an

-14-

Indemnified Party, reasonably believed by such Indemnified Party to be on behalf of the Company or in furtherance of the interests of the Company, provided that those acts or omissions are not Finally Determined to constitute conduct for which such Indemnified Party would be subject to liability under the standard of liability set forth in **Section 2.8**.

(b) An Indemnified Party shall be entitled to receive advances from the Company to cover the cost of defending any claim or action against such Indemnified Party; provided, that such Indemnified Party enters into a written agreement that all such advances shall be repaid to the Company (without interest) if it is Finally Determined that such Indemnified Party is not entitled to indemnity under **Section 2.9(a)**.

(c) The rights of an Indemnified Party to indemnification shall survive the dissolution of the Company and the death, withdrawal, declaration of legal incapacity, dissolution or Bankruptcy of such Indemnified Party.

Section 2.10 <u>Withdrawals by the Manager; Substitution of Managers; "Key Person"</u> Events.

(a) The Manager may withdraw all or any part of its Capital Account at any time without notice to the Members (and without being subject to withdrawal fees or the Gate).

(b) The Manager may withdraw from the Company, without any breach of this Agreement or the Manager's fiduciary duty hereunder, upon not less than 60 but not more than 100 days' prior written notice to the Members.

(c) If at any time prior to January 1, 2005, neither Nicholas Maounis nor S. Donald Sussman is in control, directly or indirectly, of the Manager, the Manager shall so notify each Member (the "<u>Key Person Notice</u>"), and each Member may withdraw, in whole or in part, from the Company by giving written notice to the Manager no later than 30 days after the date of the Key Person Notice. The Effective Date of any such withdrawal shall be the last day of the month in which the Member's notice is received if such notice is received by the Company on or before the 15th day of the month and otherwise as of the end of the immediately following month. The Manager may, but shall have no obligation to, consent in writing to a different Effective Date or notice period than otherwise required by this **Section 2.10(c)**. Capital Withdrawals under this provision shall be subject to all other provisions of this Agreement affecting Capital Withdrawals, other than those applicable solely in respect of Annual Appreciation Withdrawals and Quarterly Withdrawals.

(d)  (i)  One or more additional or substitute Manager(s) may be admitted to the Company by the Manager without the consent of any other Member, provided that such additional or substitute Managers are Affiliates of the Manager, in which case the Manager shall promptly notify the Members of such additional or substituted Managers.

(ii) One or more additional or substitute Manager(s) who are not Affiliated with the Manager may be admitted as additional or substitute Manager(s) only with the consent of a majority of the Voting Rights.

-15-

(iii) The admission of an additional or substitute Manager shall not be cause for dissolution of the Company, and all the Members shall continue to be subject to the provisions of this Agreement in all respects subsequent to such admission.

## ARTICLE III

## CAPITAL ACCOUNTS; FINANCIAL AND TAX ALLOCATIONS

Section 3.1 <u>Admission of Additional Members; Capital Contributions</u>.

(a)      Subject to **Section 3.1(b)**, the Manager may, at any time and from time to time, admit one or more additional Members to the Company or permit Members to make additional Capital Contributions, without the consent of the other Members. Capital Contributions may be made in cash and/or Investment Assets as the Manager may determine. Each Member that contributes Investment Assets agrees to furnish the Manager with such information as the Manager requests regarding such Investment Assets.

(i) An Interest may be issued prior to the receipt of the associated Capital Contribution, provided that such Capital Contribution is received by the Close of Business on the 5th business day of the Accounting Period as of the beginning of which such Interest is issued. If such Capital Contribution is not received by Close of Business on such 5th business day, the Interest shall be cancelled.

(ii) Without limiting any other remedy available to the Company, if a Person fails, in part or in whole, to make a Capital Contribution by the Close of Business on the 5th business day after the beginning of the Accounting Period as of which such Capital Contribution was due to be received so that the Interest (or portion thereof) corresponding to such Capital Contribution is cancelled, the Manager may, but shall have no obligation to, take any action, at the expense of the Company, which the Manager may deem necessary or advisable in an attempt to collect from such Person the amount of any expense and/or loss that would have been allocated to the Capital Account of such Person prior to such cancellation, as well as the costs and expenses incurred in connection with such collection and default; provided, that the Manager may determine to allocate all or part of such expense and/or loss (and shall allocate any gain) among the current Members *pro rata* in accordance with their respective Proportionate Shares in effect for the then current Accounting Period.

(iii) Upon admission to the Company, each new Member shall agree, by written Subscription Agreement or another instrument or instruments satisfactory to the Manager, to be bound by and subject to all of the terms and conditions of this Agreement.

(iv) The amount of each new Member's initial Capital Contribution shall be set forth in such new Member's Subscription Agreement. Existing Members who make additional Capital Contributions need not complete a new Subscription Agreement for each additional new Capital Contribution, unless otherwise

-16-

requested by the Manager; provided, however, all agreements, covenants, representations and warranties made by the Member in its original Subscription Agreement shall be deemed to be ratified and remade at the time such Member makes an additional Capital Contribution.

(v) Under no circumstances shall the Manager have any obligation to accept any Capital Contribution from any Person, whether or not an existing Member.

(vi) No Member shall have any pre-emptive rights or rights of first refusal with respect to the issuance of any Interests.

(b) No Member shall be admitted if doing so would cause the Company: (i) to be treated as an association taxable as a corporation for income tax purposes; (ii) to be treated as a "publicly-traded partnership" for income tax purposes; (iii) not to qualify for any applicable exclusion from registration as an "investment company" under the Investment Company Act of 1940; (iv) not to qualify for any applicable exclusion from, or exemption promulgated under, the Commodity Exchange Act; (v) to be considered to hold "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974; or (vi) to violate any Law or contractual provision. In the event that any such Member is admitted to the Company, such Member's admission shall be null and void *ab initio* (except to the extent that the other Members have been damaged by such admission, in which case such Member's Capital Account shall be debited with the amount of any such damage), irrespective of whether the Manager had expressly consented thereto. For the avoidance of doubt, no Manager Party shall have any liability to the Company or any Member for admitting any Member in violation of this **Section 3.1(b)**, subject to **Section 2.8**.

(c)     (i) A charge may be made to a Member's Capital Account equal to the Manager's estimate of the commissions and other charges that may be incurred by the Company or the Trading Vehicles in connection with the Company's acquisition of Investment Assets with the proceeds of any or all of such Member's Capital Contribution; provided, that prior to accepting any such Capital Contribution, such Member shall be informed of the approximate amount of such charge and be given an opportunity to elect not to make such Capital Contribution.

(ii) No charge shall be imposed under **Section 3.1(c)(i)** on any Capital Contribution made in connection with a Prior Period Adjustment.

(d) The admission of additional Members shall not cause the dissolution of the Company, and all the Members shall continue to be subject to the provisions of this Agreement in all respects subsequent to such admission.

(e) Members shall not receive interest on their Capital Contributions. The interest, if any, earned on a Capital Contribution received from a Member or prospective Member prior to the beginning of the Accounting Period as of which the corresponding Interest is issued shall be retained as a general asset of the Company.

Section 3.2 <u>Limited Liability of Members</u>. No Member (including the Manager) shall be personally liable for or subject to any liability or obligation whatsoever of the Company.

-17-

Irrespective of whether one or more Members may have deficit Capital Accounts, no Member(s) shall have any obligation to make any Capital Contribution with respect to such deficit(s), and no such deficit(s) shall be considered a debt owed by any such Member(s) to the Company or to any other Member(s) for any purpose whatsoever.

Section 3.3  Capital Accounts and General Financial Allocations.

(a)    (i) Each Member's Proportionate Share shall be adjusted as of the beginning of each Accounting Period to reflect any Capital Contributions then effective, any Capital Withdrawals or Distributions effective as of the immediately preceding Accounting Date and any other applicable Capital Account adjustments.

(ii) On each Accounting Date, subject to any Special Allocation to be made to fewer than all of the Members pursuant to **Section 3.4**, the Capital Account of each Member shall be credited or charged, as the case may be, with that Member's Proportionate Share of Net Income or Net Loss (including any withdrawal fees then charged in respect of Quarterly Withdrawals), prior to accrual of the Manager Allocation and/or Profit Allocation for the Accounting Period then ended; provided, however, if the Capital Account of any Member is reduced to zero, no further Net Loss shall be allocated to that Member's Capital Account.

(b) The Proportionate Shares used in allocating Net Income and Net Loss pursuant to **Section 3.3(a)** shall not be adjusted so as to compensate those Members which do not participate in a Special Allocation for the use of their capital in acquiring the Investment Assets in respect of which such Special Allocation is made.

(c) There shall be allocated to the Manager a portion of the Company's Net Income otherwise allocable to the Capital Account of each Member determined in the following manner. If, as of the end of a month, Net Income was allocated to the Capital Account of such Member during the 12-month period then ended, a varying percentage (the "Monthly Allocation Percentage") of that Net Income (the "Manager Allocation") shall be debited as of the end of the month from the Capital Account of such Member (and credited to the Capital Account of the Manager). Manager Allocations shall be determined by the Manager as of the end of each month; provided, however that the Manager Allocations allocated from the Capital Account of a Member for any month, when added together with all prior Manager Allocations allocated from such Member's Capital Account since such Member's admission, shall not exceed the sum of the products of (i) 0.125% and (ii) the Capital Account balance of that Member as of the end of each month following such Member's admission (prior to reduction for the accrued Manager Allocation or for any accrued Profit Allocation, including any Profit Allocation made as of the end of such month). For purposes of this **Section 3.3(c)**, with respect to a Member who acquired its Interest from another Person by way of an assignment or transfer (whether or not for consideration), the Manager Allocations and Capital Account balances shall include the Manager Allocations and Capital Account balances used in determining the foregoing products attributable to the portion of the Interest assigned or transferred prior to such assignment or transfer.

-18-

(d)    (i) As of each December 31 and as of the date of dissolution of the Company, the Manager shall be entitled to receive an allocation (the "Profit Allocation") of a portion of the Net Income otherwise allocable to the Capital Account of each Member during the Fiscal Year (including a partial Fiscal Year) then ended equal to 20% of any Net New Profit then allocable to the Capital Account of such Member, subject to adjustment as provided in this **Section 3.3** as appropriate. All Capital Contributions made by the same Member shall be considered part of the same Capital Account, and any Profit Allocation attributable to such Capital Account shall be based upon any cumulative Net New Profits determined in respect of such Capital Account as a whole, not separately in respect of the different Capital Contributions made to (and corresponding Memorandum Accounts established within) such Capital Account.

(ii) "Net New Profit" shall equal the amount by which such Member's Capital Account (calculated after debiting such Member's Account in respect of any Manager Allocation for such month but without regard to any accrued Profit Allocation) exceeds the High Water Mark attributable to such Capital Account. Net New Profit shall be calculated separately with respect to each Member's Capital Account. In calculating Net New Profit attributable to a Member's Capital Account, the profits and losses attributable to Designated Investments shall be excluded because the Profit Allocations with respect to the Designated Investments shall be calculated separately as provided in **Section 3.10(d)**.

(iii) (1)    A Member's "High Water Mark" shall initially be its Capital Contribution upon admission to the Company, unless the Member was first admitted to the Company by virtue of acquiring its Interest from another Member (with or without consideration), in which case the High Water Mark shall be such Member's Capital Account balance at the time of admission (any Profit Allocation accrued in respect of the transferred Interest to be made as of the date of transfer).

(2)    An existing Member's High Water Mark shall be increased at the time that it makes an additional Capital Contribution, acquires an Interest from another Member and/or is credited with the proceeds of a Designated Investment by the amount of the Capital Contribution, the balance in the Capital Account associated with such acquired Interest and/or such proceeds. As of December 31 of each year, if the balance of a Member's Capital Account, after all Capital Account adjustments have been made for the year, exceeds such Member's then-current High Water Mark, such Member's High Water Mark shall be increased to the amount of its Capital Account balance.

(3)    The High Water Mark attributable to a Member's Capital Account shall be proportionately reduced whenever such Member makes a Capital Withdrawal or receives a Distribution, by multiplying such

High Water Mark by the fraction the numerator of which is the balance in such Member's Capital Account immediately following such Capital Withdrawal or Distribution and the denominator of which is the balance in such Member's Capital Account immediately prior to such Capital Withdrawal or Distribution. The High Water Mark attributable to a Member's Capital Account shall be reduced in the same manner whenever such Member assigns or transfers all or a part of its Interest.

(4)     When capital is allocated to a Designated Investment, the amount of such allocation shall proportionately reduce the High Water Mark attributable to such Capital Account in the event that the balance in such Capital Account is less than the High Water Mark attributable to such Capital Account immediately prior to such allocation. In the event that such balance is in excess of such High Water Mark, no Profit Allocation shall be made as a result of such allocation, and such High Water Mark shall be reduced by the dollar amount of such allocation (not proportionately).

(iv) If a Member makes a Capital Withdrawal or receives a Distribution at a time when Net New Profits are allocable to such Member's Capital Account, a Profit Allocation shall be made in an amount equal to the total Profit Allocation that would have been made had the Effective Date been a December 31 (and assuming that the Profit Allocation is not reduced by DT Bonuses payable in respect of the Fiscal Year then ended), multiplied by the fraction the numerator of which is the amount of such Capital Withdrawal or Distribution, as the case may be, and the denominator which is the balance in such Capital Account immediately preceding such Capital Withdrawal or Distribution, as the case may be (in each case prior to reduction for the accrued Profit Allocation). If a Member transfers or assigns all or any part of its Interest, a Profit Allocation shall be made in an amount equal to the total Profit Allocation that would have been made had the effective date of such assignment or transfer been a December 31 (and assuming that the Profit Allocation is not reduced by DT Bonuses payable in respect of the year ending on such December 31), multiplied by the fraction the numerator of which is the amount of such Capital Account associated with the assigned or transferred Interest, as the case may be, and the denominator of which is the balance in such Capital Account immediately preceding such assignment or transfer (in each case prior to reduction for the accrued Profit Allocation).

(v) DT Bonuses paid or payable with respect to a particular Fiscal Year by the Company (or portions thereof—including for this purpose, the Company's *pro rata* share of DT Bonuses paid or payable by any Trading Vehicle in which the Company has an interest—shall reduce (but not below $0) the aggregate amount of Profit Allocations otherwise made to the Manager in respect of the Fiscal Year in question. The Company shall pay its *pro rata* share (together with other affected Manager Clients) of DT Bonuses, whether or not in excess of the amount of any such Profit Allocations. Such DT Bonuses shall reduce any such Profit

Allocations which would otherwise have been made (but not below $0) so that the sum of all Profit Allocations made to the Manager with respect to the Fiscal Year in question when added to the DT Bonuses payable by the Company with respect to such Fiscal Year shall not be more than the amount of the Profit Allocation that would have been made had the Company's *pro rata* share of such DT Bonuses been paid by the Manager and not the Company (so as not to reduce Net New Profits on which such Profit Allocation is calculated). For the avoidance of doubt, any such reduction of the Company's *pro rata* share of the Profit Allocations that would otherwise be made in respect of a Fiscal Year shall in no respect reduce the DT Bonuses payable in respect of such Fiscal Year, although such Profit Allocations may themselves be reduced to $0.

(vi) In the event that the Company's *pro rata* share of DT Bonuses in respect of a given Fiscal Year exceeds the sum of the Profit Allocations that would otherwise have been made for such Fiscal Year, the amount of such excess shall not be offset against Profit Allocations that would otherwise be made in respect of future Fiscal Years, although such excess shall reduce Net Income or increase Net Loss, as the case may be.

(vii) If the Profit Allocations with respect to a Fiscal Year are reduced by the Company's *pro rata* share of DT Bonuses with respect to such Fiscal Year as provided in this **Section 3.3(d)**, then the Proportionate Share of Net Income of each Manager Party Investor permitted under **Section 3.3(e)** to invest in the Company without being subject, in whole or in part, to a Profit Allocation shall be increased, or its Proportionate Share of Net Loss shall be reduced, by such Manager Party Investor's *pro rata* share (as determined by the Manager) of such DT Bonuses. Such increase or decrease, as the case may be, shall be reallocated to the other Members (other than the Manager) in accordance with their respective Proportionate Shares so that the respective Proportionate Shares of Net Income or Net Loss with respect to such Fiscal Year of each Manager Party Investor and each other Member shall be the same as they would have been had the Company's *pro rata* share of such DT Bonuses been paid by the Manager and not by the Company.

(viii) Profit Allocations made as a result of a Capital Withdrawal or Distribution or in connection with an assignment or transfer shall be made from the affected Member's remaining Capital Account (and shall be deemed to be included as part of the Capital Withdrawal or Distribution), unless the Manager otherwise determines.

(ix) Any withdrawal fees assessed as of the end of an Accounting Period, as provided in **Section 4.1(c)**, shall be allocated to the Capital Accounts of all Members after all other Capital Withdrawals and Distributions then made have been accounted for. Such fees and charges shall increase the balance in the remaining Capital Accounts for all purposes hereunder, including calculation of the Manager Allocation and any Profit Allocation then to be allocated.

(e)    (i) The Manager may, but shall be under no obligation to, permit Manager Party Investors to invest in the Company without being subject — in part or in whole and for such period or permanently, as the Manager may, in each case, determine — to a Manager Allocation and/or a Profit Allocation. In such case, Manager Allocations and/or Profit Allocations (as well as the High Water Marks and Net New Profits used in calculating Profit Allocations) need not be determined for such Manager Party Investors.

(ii) If a Manager Party Investor was initially permitted to invest in the Company without being subject to a Profit Allocation but subsequently becomes so subject, such Manager Party Investor's High Water Mark shall initially equal such Manager Party Investor's Capital Account balance as of the beginning of the Accounting Period as of which such Capital Account first becomes subject to a Profit Allocation.

Section 3.4  Special Allocations.

(a) The Manager may, but shall have no obligation to, designate one or more of the Company's Investment Assets as generating increases and/or decreases in Net Asset Value or designate one or more items of Net Income or Net Loss which shall be Specially Allocated among the Members in a manner other than *pro rata* in accordance with their respective Proportionate Shares, if the Manager determines that such Special Allocation is necessary or advisable due to Law, tax or other considerations. Each Member agrees to furnish the Manager with such information as the Manager may from time to time request to determine whether any such Special Allocations are necessary or advisable. The Manager may, but shall have no obligation to, cause the Company to compensate Members not permitted to participate in a Special Allocation for the use of the portion of their capital allocable to acquiring the Investment Asset(s) giving rise to such Special Allocation.

(b) Special Allocations with respect to a particular item shall be made among the Members participating in such Special Allocations of that particular item *pro rata* in accordance with their respective Proportionate Shares.

Section 3.5  Tax Allocations.

(a) For each Fiscal Year, Tax Items shall be allocated for income tax purposes among the Members in such manner as to reflect equitably amounts credited or debited to each Member's Capital Account for the current and prior Fiscal Years (or relevant portions thereof). Allocations under this **Section 3.5** shall be made pursuant to the principles of Section 704(b) and 704(c) of the Code, and Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and (g), 1.704-1(b)(4)(i) and 1.704-3(e), as applicable, or the successor provisions to such Code Sections and Treasury Regulations. Notwithstanding anything to the contrary in this Agreement, there shall be allocated to the Members such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(b) If the Company realizes gains (including short-term capital gains or any other type of trading gains) for Federal income tax purposes ("gains") for any Fiscal Year during or as of the

end of which one or more Positive Basis Members (as defined below) withdraw from the Company pursuant to **Article IV**, the Manager may elect to allocate such gains as follows: (i) to allocate such gains among such Positive Basis Members, *pro rata* in proportion to the respective Positive Basis (as defined below) of each such Positive Basis Member, until either the full amount of such gains shall have been so allocated or the Positive Basis of each such Positive Basis Member shall have been eliminated, and (ii) to allocate any gains not so allocated to Positive Basis Members to the other Members in such manner as shall equitably reflect the amounts allocated to such Members' Capital Accounts.

(c)  As used herein, (i) the term "Positive Basis" shall mean, with respect to any Member and as of any time of calculation, the amount by which its Interest as of such time exceeds its "adjusted tax basis," for Federal income tax purposes, in its Interest as of such time (determined without regard to any adjustments made to such "adjusted tax basis" by reason of any transfer or assignment of such Interest, including by reason of death, and without regard to such Member's share of the liabilities of the Company under Section 752 of the Code), and (ii) the term "Positive Basis Member" shall mean any Member who completely withdraws from the Company (including by operation of **Section 4.4(b)**) and who has Positive Basis as of the Effective Date of the Distribution or Capital Withdrawal attributable to such withdrawal, but such Member shall cease to be a Positive Basis Member at such time as it shall have received allocations pursuant to clause (i) of the preceding paragraph equal to its Positive Basis as of the Effective Date of its withdrawal.

(d)  Determination by Manager of Certain Financial Matters.  Without limiting the generality of **Section 2.2(a)**, all matters concerning the valuation of Investment Assets and other assets and liabilities of the Company, the allocation of profits, deductions, gains and losses among the Members, including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Manager, whose determination shall be final and conclusive as to all of the Members.  The Manager shall determine the manner of applying any such provisions that are unclear or not equitable, and it shall also determine the manner of applying any such provisions in circumstances in which more than one method of application would be consistent with Law or equitable.

(e)  Adjustments to Take Account of Interim Year Events.  If the Code or Treasury Regulations require a withholding or other adjustment to the Capital Account of a Member or some other interim year event occurs necessitating in the Manager's judgment an equitable adjustment, the Manager shall make such adjustments in the determination and allocation among the Members of capital, income and expense items, Proportionate Shares, Tax Items, accounting procedures or such other financial or Tax Items as shall equitably take into account such interim year event and applicable provisions of Law, and the determination thereof by the Manager shall be final and conclusive as to all of the Members.

(f)  In the case of Special Allocations, Prior Period Adjustments, Designated Investments and any other non-*pro rata* allocations of capital, income and expense items to fewer than all Members as provided herein, the Manager shall allocate the associated Tax Items so as equitably to reflect the affected Members' respective economic gains and losses from such allocations.

-23-

(g) Tax allocations shall be made between the transferee and transferor of an Interest so as to reflect as closely as practicable the economic gain or loss experienced by each during the Fiscal Year in which the transfer occurred.

(h) In addition to the exculpation provided by **Section 2.8(c)**, no Manager Party shall have any liability to the Company or any Member for any tax allocation made or tax position taken unless the such Manager Party knew such tax allocation (or tax position) was in violation of this Agreement, and/or such tax position was in clear violation of Law, when made.

Section 3.6 <u>Consistent Tax Reporting</u>. Except as otherwise agreed to in writing by the Manager, all Members, including former Members, shall report all Tax Items (including the character and timing of such Tax Items) related to the Company in a manner consistent with the manner in which such Tax Items are reported by the Company.

Section 3.7 "<u>Tax Matters Partner</u>."

(a) For purposes of Section 6231(a)(7) of the Code, or any corresponding provision of any future Law, the "Tax Matters Partner (Member)" of the Company shall be the Manager.

(b) The Manager shall also have the power to make or revoke all tax elections and determinations for the Company and to take any and all actions necessary or permitted under the Code, the regulations promulgated thereunder, or other applicable law to effect those elections, determinations and allocations. All elections, determinations and allocations by the Manager shall be binding upon all Members and their respective successors, assigns and heirs.

(c) The Manager shall have comparable authority in respect of any state, local or foreign tax, tax law or tax claim relating to the Company and the Members as the Manager has under the Code as the Tax Matters Partner.

(d) The cost of any examination or audit of, and of any adjustment to, a Member's tax return shall be borne solely by the affected Member.

(e) The Manager shall be entitled to be reimbursed for all expenses incurred by the Manager in performing its services as Tax Matters Partner, as well as to be indemnified for liabilities and losses incurred in performing such services, subject to the standard set forth in **Section 2.8**.

Section 3.8 <u>Determination of Net Asset Value</u>.

(a) In determining the Net Asset Value of the Company, the following principles shall apply:

> (i) Listed securities (including securities held "long" as well as sold "short") shall be valued at their last sales price on the date of determination or, if no sales occurred on that date, at the mean between the "bid" and "asked" prices at the close of trading on that date;

(ii) Commodity futures contracts traded on an exchange shall be valued at their closing price on the date of determination;

(iii) Currency forwards and unlisted Investment Assets shall be valued at the mean between the "bid" and "asked" prices quoted by dealers or other sources of price information that the Manager considers reliable at the close of trading on such date;

(iv) All other Investment Assets (including Investment Assets held "long" as well as Investment Assets sold "short") and assets, including interests in Trading Vehicles, shall be assigned such value as the Manager may determine. In determining the value of interests in Trading Vehicles, the Manager may rely upon values furnished by those Trading Vehicles or by any other Persons which the Manager believes are competent to determine those values;

(v) Liabilities and debt obligations of the Company shall be determined (either singly or in conjunction with their related hedges) by the Manager. All liabilities not otherwise provided for herein shall be assigned such value as the Manager may determine; and

(vi) The Manager may determine to use a different value for any Investment Asset than would be assigned pursuant to **paragraphs (i)–(v)** above, if the Manager determines that to do so would better reflect market value.

(b) For the avoidance of doubt and in no respect by way of limitation of **Section 3.9**, the Manager shall be absolutely protected in relying on the valuations furnished to the Manager by third parties, provided that such third-party reliance is not in bad faith.

(c) Valuations of the Company's Investment Assets shall be made as of Close of Business the final business day of the Accounting Period in question, and items of income and expense which the Manager believes may reasonably be estimated in advance shall be accrued as of the Close of Business on such business day through the Close of Business on the final calendar day of such Accounting Period.

(d) Capital Withdrawals and Distributions shall, after the Effective Date thereof (as the same may be postponed pursuant to the terms of this Agreement), be deemed to have been paid out of the Company on such Effective Date, and shall no longer be included in either the Company's assets or liabilities.

(e) In determining the Net Asset Value of the Company, no value shall be ascribed to good-will or any other intangible asset of the Company.

(f) Notwithstanding that the Company may pay (either directly or as a reimbursement) for the personal property and fixed assets utilized by a Manager Party in connection with providing services to the Company and/or other Manager Clients (such as furniture, fixtures and equipment), that the book value of such personal property and fixed assets may be included in the calculation of the Net Asset Value of the Company and that depreciation on such property and assets may reduce the Net Asset Value of the Company, the Members hereby acknowledge

and agree that the Company does not, and the Manager or another Manager Party does, have the legal title and the right to use and retain such personal property and fixed assets.

    Section 3.9  Use of Estimates.  The Manager is expressly authorized to make all financial (and the related tax) allocations provided for hereunder, as well as to determine all Net Asset Values, based on estimates and/or unaudited financial information.  Furthermore, the Manager shall not be obligated to restate allocations, fee payments, charges or Net Asset Value determinations previously made in order to reflect the difference between estimated and final Net Asset Values, but rather may, but shall have no obligation to, reflect such difference entirely in the Accounting Period in which such difference is determined.

    Section 3.10  Designated Investments.

    (a)      (i) The Manager may from time to time designate certain investments ("Designated Investments") made by the Company — but only at the time of the acquisition of such investments or within 30 days thereafter — as investments in which only those Members (other than DI Opt-Out Members) who were Members as of the date of acquisition shall participate.

             (ii) Allocations of capital to Designated Investments shall reduce the Memorandum Account(s) maintained for the Capital Account of each Member (other than DI Opt-Out Members) *pro rata* in accordance with the respective balances in such Memorandum Account(s) as of the date of such allocation or in such other manner as the Manager may permit.

             (iii) Capital allocated to Designated Investments shall be excluded from the Members' Capital Account balances until each such Designated Investment is liquidated.

    (b) All Members (other than DI Opt-Out Members) agree that their participation in each Designated Investment attributable to their respective Capital Accounts shall continue, for both financial and tax purposes, until such Designated Investment has been liquidated, irrespective of whether a Member otherwise withdraws from the Company.  Designated Investments shall be accounted for separately from all other investments of the Company.

    (c) The economic terms on which the Members (other than DI Opt-Out Members) participate in a Designated Investment attributable to their respective Capital Accounts shall be the same as contemplated herein.  The level of such Member's participation in the respective Designated Investments in which such Member participates shall be determined by the Proportionate Shares of all Members (other than DI Opt-Out Members) as of the respective dates as of which each such Designated Investment is acquired (irrespective of whether such Designated Interest is not so designated for up to 30 days thereafter).

    (d) Profit Allocations to be made in respect of each Designated Investment attributable to the Capital Account of each Member (other than a DI Opt-Out Member) shall be calculated independently of the affected Member's participation in the other investments of the Company, based on the economic gains (if any) recognized on such Designated Investment in excess of the capital allocated from such Capital Account to such Designated Investment.  After the sum of

(i) proceeds from such Designated Investment have been paid into a Member's Capital Account as contemplated by **Section 3.11(g)**, and (ii) any Distributions made to such Member from such Designated Investment, equal the amount of the capital allocated to such Designated Investment, a Profit Allocation equal to 20% of any additional proceeds from such Designated Investment shall be made to the Manager's Capital Account as such additional proceeds are received.

(e)    (i) If a Member has otherwise withdrawn from the Company and is only a Member by virtue of an interest in one or more Designated Investments, such Member shall no longer be subject to the monthly Manager Allocation after the Effective Date of the Capital Withdrawal or Distribution associated with such withdrawal. Rather, as of the end of each month following such Effective Date, such Member shall be charged a monthly fee ("<u>Monthly Management Fee</u>") equal to: (i) 0.125% multiplied by (ii) the amount by which the capital allocated from such Member's Capital Account to each such Designated Investment exceeds the sum of (A) the proceeds of each such Designated Investment that have been previously paid into a Member's Capital Account as contemplated by **Section 3.11(g)**, and (B) any Distributions previously made to such Member from each such Designated Investment.

(ii) The Monthly Management Fee payable with respect to the remaining Designated Investments in which such Member is participating in the circumstances provided in the previous paragraph shall accrue (without interest) and shall be deducted and paid as promptly as practicable solely from the proceeds received in connection with such Designated Investments prior to Distributing any portion of such proceeds to the Member. If such amounts are insufficient to pay all or any portion such Monthly Management Fee not previously paid, the Member shall not be held liable for the unpaid portion.

(f) DI Opt-Out Members shall not participate in Designated Investments, and no Member shall, without such Member's consent, participate in Designated Investments that would, on a cumulative basis, require capital allocations from such Member's Capital Account in excess of 10% of the balance in such Member's Capital Account. For these purposes, the percentage of a Member's Capital Account allocated to Designated Investments shall be calculated by determining the percentage allocation of the balance of such Member's Capital Account (including the capital allocated to Designated Investments attributable to such Capital Account, subject to reduction as contemplated by **Section 3.10(e)(ii)**) made to each Designated Investment as of the date of each such allocation, and adding such percentages.   The sum of such percentages shall be reduced by the percentage increase in each Member's Capital Account (calculated as set forth in this **Section 3.10(f)**) resulting from the proceeds of all Designated Investments paid into such Member's Capital Account as contemplated by **Section 3.10(g)**, calculating the percentage of such Member's Capital Account represented by such Distributions as of the date such proceeds are received. In the event that allocating capital in accordance with a Member's Proportionate Share to a Designated Investment would result in such capital allocation from such Member's Capital Account exceeding the foregoing 10% limit, such capital shall not be so allocated, and such Member's participation in such Designated Investment shall be correspondingly reduced (unless such Member otherwise consents).

(g) The proceeds of all Designated Investments shall be paid into Members' Capital Accounts and accounted for as Capital Contributions (unless a Member has previously entirely withdrawn from the Company, in which case such proceeds shall be paid directly to such Member) after deducting any related Profit Allocation.

(h) Each DI Opt-Out Member acknowledges that it shall not have any interest in any profit or losses from any Designated Investment, or any claim to being compensated as a result of not participating therein.

(i) Each DI Opt-Out Member may irrevocably elect not to be a DI Opt-Out Member with respect to all future Designated Investments by so notifying the Manager.

Section 3.11 <u>Prior Period Adjustments</u>.

(a) Each Member agrees to pay, irrespective of whether such Member remains a Member, or permit the Manager to deduct from such Member's Capital Account, as the case may be, the amount of any Prior Period Adjustment that the Manager determines to be due from such Member or former Member. If a Prior Period Adjustment (or portion thereof) can be specifically identified as attributable to the Interest of a Member or a former Member, then the Manager shall use reasonable efforts to allocate such Prior Period Adjustment to, and collect such Prior Period Adjustment from, such Member (by Capital Account debit or otherwise) or former Member. Otherwise, the Manager shall use reasonable efforts to allocate each Prior Period Adjustment to the current or former Members (each, a "<u>Prior Period Member</u>") who were Members during the Accounting Period(s) to which such Prior Period Adjustment relates. Each Prior Period Member shall be liable for such portion of each such Prior Period Adjustment as is proportionate to such Prior Period Member's Proportionate Share, or average Proportionate Shares, for the relevant prior Accounting Period(s). However, in no event shall any provision of this **Section 3.11** require any Member or former Member to make a Capital Contribution to repay to the Company any amounts in excess of the Capital Withdrawals or Distributions made to such Member or former Member.

(b) Any part of a Prior Period Adjustment that cannot, as determined by the Manager, practicably be collected from Prior Period Members shall be allocated to the Capital Accounts of the current Members *pro rata* in accordance with their respective Proportionate Shares in effect for the then current Accounting Period.

(c) The Manager may, but shall have no obligation to, take, at the expense of the Company, any action which the Manager may deem necessary or advisable in an attempt to collect the amount of any Prior Period Adjustment, as well as the costs and expenses related to such collection, from or to the affected Prior Period Members. In no event shall the Manager be liable for any failure of the Company to receive Prior Period Adjustments from a Prior Period Member or for the Manager declining to prosecute any claim therefore.

(d) No Prior Period Adjustments, not specifically associated with a Member or former Member, shall be subject to the special allocation provisions of this **Section 3.11** unless the amount of such Prior Period Adjustment exceeds 2.5% of the Net Asset Value of the Company as of the date that such Prior Period Adjustment would otherwise be specially allocated pursuant

to this **Section 3.11**. For such purposes, a given Prior Period Adjustment shall include all items relating to the same or related causes occurring at or about the same time, as the Manager may determine.

(e) Notwithstanding the foregoing provisions of this **Section 3.11**, in the event that a Prior Period Adjustment results in income or gain to rather than a cost or a liability for the Company, such income or gain, irrespective of amount, shall be allocated solely among the Persons who are Members as of the time or times such income or gain is so received, in accordance with such Members' Proportionate Shares during the Accounting Period(s) when so received.

(f) Notwithstanding the foregoing provisions of this **Section 3.11**, any adjustment to Profit Allocations made pursuant to **Section 3.3(d)(vi)** shall be made only prospectively, not as a Prior Period Adjustment.

Section 3.12 <u>Reserves</u>.

(a) The Manager may from time to time establish such Reserves as the Manager may determine to reflect contingent, uncertain, established or other potential liabilities. Reserves shall reduce the Company's Net Asset Value (which reductions may be specially allocated among fewer than all Members, as the Manager may determine), and when Reserves are reversed the remaining balance shall increase the Company's Net Asset Value (or the Capital Account balances of fewer than all Members, as the Manager may determine); provided, that the Manager may determine to allocate reversals of a Reserve not to the Members at the time of such reversal but rather to the Members at the time such Reserve was established.

(b) In addition to Reserves established pursuant to **Section 3.12(a)**, the Manager may, at the time that any Capital Withdrawal is made by a Member, establish Withdrawal Reserves with respect to such Capital Withdrawal in an attempt to ensure that the Company is not adversely affected by such Capital Withdrawals.

## ARTICLE IV

## CAPITAL WITHDRAWALS

Section 4.1 <u>Capital Withdrawals</u>.

(a) A Memorandum Account shall be established as a bookkeeping entry in a Member's Capital Account each time that a Capital Contribution is made by such Member solely for purposes of identifying the Anniversary Dates provided for the Capital Account balance attributable to such Capital Contribution. The balance in each Memorandum Account established for a Capital Account shall be adjusted by the Net Income and Net Loss allocated to such Capital Account on each Accounting Date *pro rata* in accordance with the respective balance in each such Memorandum Account as of the beginning of the Accounting Period then ended. The Manager shall allocate the expenses, Manager Allocations, Profit Allocations and other Capital Account adjustments attributable to a Member's Capital Account among the

Memorandum Account(s) maintained for such Capital Account in such manner as the Manager may determine.

(b) A Member may, upon at least 90 days' written notice to the Company, make a Capital Withdrawal (an "Anniversary Withdrawal"), as of the Anniversary Date attributable to a Memorandum Account established in respect of each Capital Contribution made by such Member, of an amount up to the balance in such Memorandum Account (thereby reducing such balance by the amount of such Anniversary Withdrawal).

(c)    (i)   A Member may, by written notice given to the Company not later than November 15 of any Fiscal Year, make a Capital Withdrawal (an "Annual Appreciation Withdrawal") as of December 31 of such Fiscal Year in an amount not to exceed the amount estimated by the Manager to represent the cumulative net increase ("Appreciation") in such Member's Capital Account balance since the later to occur of: (i) the most recent December 31, or (ii) the date such Member was first admitted as a Member, reduced (but not below $0), in either case by any Capital Withdrawals previously made during the Fiscal Year then ending.

(ii) An Annual Appreciation Withdrawal shall reduce the Memorandum Account(s) maintained for the affected Member's Capital Account in such manner as the Member may designate in such Member's notice of such Capital Withdrawal, or if no such designation is made, *pro rata* in accordance with the respective balances in such Memorandum Account(s).

(d)    (i)   A Member may, upon at least 45 days' written notice to the Company, make a Capital Withdrawal (a "Quarterly Withdrawal"), as of any Quarterly Withdrawal Date, of all or a portion of such Member's Capital Account; provided, that if requests for Anniversary Withdrawals, Distributions under **Section 8.12** and Quarterly Withdrawals for any Quarterly Withdrawal Date total more than the sum of: (A) 7.5% of the aggregate Capital Account balances (prior to reduction for any accrued Manager Allocations or Profit Allocations) of the Members (other than the Manager) on any such Quarterly Withdrawal Date, plus (B) the aggregate Capital Contributions made as of the beginning of the Accounting Period following such Quarterly Withdrawal Date, other than Capital Contributions which cause a Quarterly Withdrawal not to be subject to such limitation or to any withdrawal fee as provided in **Section 4.1(d)(iv)** (such sum, the "Gate"), the Company shall limit Quarterly Withdrawals to the extent provided in **Section 4.1(d)(ii)** below.

(ii) In the event that the Manager receives Quarterly Withdrawal requests under this **Section 4.1(d)**, with respect to a Quarterly Withdrawal Date which, when combined with the Anniversary Withdrawal requests and requests for Distributions under **Section 8.12** for the same Effective Date, total in excess of the Gate, such Quarterly Withdrawals shall be permitted only to the extent of the positive difference (if any) between the Gate and the aggregate amount of such Anniversary Withdrawals and Distributions under **Section 8.12**. In such event,

the amount of available Quarterly Withdrawals shall be allocated among the Members then requesting Quarterly Withdrawals in accordance with their respective Proportionate Shares (and, for the avoidance of doubt, not by the amount of their respective Quarterly Withdrawal requests). In the event that a Member has requested a Quarterly Withdrawal under this **Section 4.1(d)** of less than the maximum dollar amount of the Quarterly Withdrawal that such Member would then be entitled to make, the shortfall shall increase the aggregate Quarterly Withdrawals that may be made by the other Members submitting Quarterly Withdrawal requests in accordance with their respective Proportionate Shares. For the avoidance of doubt, Anniversary Withdrawals and Distributions under **Section 8.12** are not subject to the Gate.

(iii) A Quarterly Withdrawal shall reduce the Memorandum Account(s) maintained for the affected Member's Capital Account in such manner as such Member may designate in such Member's Quarterly Withdrawal request, or if no such designation is made, *pro rata* in accordance with the respective balances in such Memorandum Account(s).

(iv) Quarterly Withdrawals are subject to a withdrawal fee of 2.5% of the amount withdrawn. All such withdrawal fees shall be deducted from the amount withdrawn and retained by the Company. Such withdrawal fees may not be waived by the Manager or the Company. For the avoidance of doubt, Anniversary Withdrawals and Distributions under **Section 8.12** are not subject to withdrawal fees.

(v) A Quarterly Withdrawal shall not be subject to either the Gate provided in **Section 4.1(d)(i)** or the 2.5% withdrawal fee provided in **Section 4.1(d)(iv)** to the extent that during the period commencing one calendar month immediately preceding, and ending two calendar months immediately following, the Effective Date of such Quarterly Withdrawal, the Company has accepted or the Manager determines that it is reasonable to conclude that the Company shall accept, Capital Contribution(s) in at least the amount of such Quarterly Withdrawal from Members which have indicated or the Manager reasonably believes shall indicate in their Subscription Agreements that they are submitting their subscriptions in conjunction with such Quarterly Withdrawal and that they are either Affiliates of the Member making such Quarterly Withdrawal or an account managed by or under common management with such Member or its Affiliates. If such Capital Contribution(s) are not received prior to the beginning of the Accounting Period immediately following the proposed date of such Quarterly Withdrawal, the Company shall retain (without imputation of interest) 10% of the Quarterly Withdrawal proceeds that would otherwise have been distributed pursuant to **Section 4.6**, pending receipt of such Capital Contribution(s). If such additional Capital Contributions are not received within 5 business days of the date when due, the Company shall retain such 10% of such Quarterly Withdrawal proceeds as liquidated damages in respect of the withdrawal fee not collected pursuant to **Section 4.1(d)(iv)**, as well as the Gate not applied pursuant to **Section 4.1(d)(i)** in respect of such Capital Withdrawal (the Members acknowledge that such

liquidated damages represent a reasonable estimate of the damage done to the Company by such Capital Withdrawal having been excepted from both the Gate and the withdrawal fee).

(e) Any Capital Withdrawal shall be reduced by any Withdrawal Reserves established pursuant to **Section 3.12(b)** with respect to such Capital Withdrawal.

(f) The Manager may from time to time consent to different Effective Dates or notice periods.

(g) No Capital Withdrawal shall be effective if the Manager determines, on or before the scheduled Effective Date of such Capital Withdrawal, to dissolve the Company. Any Capital Withdrawal notices pending at the time that the Manager determines to dissolve the Company shall be rescinded *ab initio* and have no further force or effect.

(h) For the avoidance of doubt, (i) except as expressly provided herein, no Member shall be entitled to make a Capital Withdrawal or to withdraw from the Company, and no Member shall have the right to demand a return of such Member's Capital Contribution(s), and (ii) the maximum amount that a Member may withdraw from such Member's Capital Account as of any Effective Date is the net balance in such Capital Account after reduction for the Manager Allocation as well as the Profit Allocation and all other Capital Account adjustments that would have been made from such Capital Account had the Effective Date been a December 31 (and assuming that the Profit Allocation is not reduced by DT Bonuses payable in respect of the Fiscal Year then ended).

Section 4.2    Distributions.    The Manager may at any time determine to make Distributions to one or more Members. Distributions need not be made *pro rata* to Members in accordance with their respective Proportionate Shares, and may be made to certain Members and not to others. A Distribution shall reduce the Memorandum Account(s) maintained for the affected Member's Capital Account *pro rata* in accordance with the respective balances in such Memorandum Account(s) or in such other manner as the Manager may determine.    No withdrawal fees shall be assessed on any Distributions, nor shall Distributions be subject to or included in calculating any Gate, but Distributions shall otherwise be treated in the same manner as Capital Withdrawals for purposes of determining Profit Allocations and all other purposes of this Agreement.

Section 4.3    Transfers.

(a) No Member (other than the Manager) has the right to substitute an assignee as a Member in its place or to grant to any other Person any beneficial interest (vested or contingent) in such Member's Interest without the prior written consent of the Manager. Any transfer, assignment, pledge or encumbrance of part or all of any Interest, including by operation of law, shall require the prior written consent of the Manager; provided, that any transfer, assignment, pledge or encumbrance which would cause the Company: (i) to be treated as an association taxable as a corporation for income tax purposes; (ii) to be treated as a "publicly-traded partnership" for income tax purposes; (iii) not to qualify for any applicable exclusion from registration as an "investment company" under the Investment Company Act of 1940; (iv) not to

-32-

qualify for any applicable exclusion from, or exemption promulgated under, the Commodity Exchange Act; (v) to be considered to hold "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974; or (vi) to violate any Law or contractual provision, shall, in each case, be null and void *ab initio* (except to the extent that the other Members have been damaged by such transfer, in which case the transferee's Capital Account shall be debited with the amount of any such damage), irrespective of whether the Manager consents thereto. For the avoidance of doubt, no Manager Party shall have any liability to the Company or any Member for permitting any transfer in violation of this **Section 4.3(a)**, subject to **Section 2.8.**

(b) All transferees of an Interest shall be required to execute and deliver a Subscription Agreement as well as such other instruments and further assurances as the Manager may require. Transferors and transferees of an Interest may, as determined by the Manager, be required to pay expenses incurred in effectuating any transfer, assignment, pledge or encumbrance.

(c) The Manager's consent to any assignment, pledge or encumbrance of an Interest shall constitute consent to the assignee or pledgee becoming a substituted Member pursuant to the terms of such assignment, pledge or encumbrance, upon satisfaction of **Sections 4.3(a) and (b).**

(d) Any transferee of any part of an Interest shall be treated for all purposes hereunder as if such transferee were the alter ego of the transferor, except that any accrued Profit Allocation shall be made from the Capital Account transferred as of the date of transfer. In all other respects the transfer shall have no effect on the Company's ability to treat the transferee as if the transferee were the transferor and the transfer had never occurred (including in respect of Prior Period Adjustments relating to periods before the transfer). For the avoidance of doubt, a transferee of all or any part an Interest may only itself be a DI Opt-Out Member if the transferor were a DI Opt-Out Member.

Section 4.4 <u>Withdrawal of a Member</u>.

(a) If a Member's entire Capital Account (including any remaining Withdrawal Reserve balance) has been withdrawn or Distributed to such Member, such Member shall be deemed to have withdrawn from the Company. Upon the withdrawal of a Member, such Member shall no longer be entitled to any rights hereunder, other than the right to receive the proceeds of such Member's final Capital Withdrawal or Distribution, and tax information as well as audited financial statements for the Fiscal Year in which such withdrawal occurs. Such Member's obligations under **Section 3.11** shall, however, survive, as shall the other provisions contemplated by **Section 8.19.**

(b) The Manager may cause a Member to withdraw from the Company at any time, by giving 30 days' prior written notice to such Member; provided, however, the Manager may give less notice (or none at all) if the Manager deems it necessary or advisable. For the avoidance of doubt, no Manager Party shall have any liability to the Company or any Member for causing a Member to withdraw or for doing so on providing less than 30 days' prior written notice, subject to **Section 2.8.**

(c) The withdrawal of a Member shall not effect a dissolution of the Company, and the remaining Members shall continue the Company pursuant to this Agreement.

Section 4.5 <u>Effective Date of Capital Withdrawals and Distributions</u>. As of the Effective Date of any Capital Withdrawal or Distribution, the Capital Account balances subject to such Capital Withdrawal or Distribution (not including balances attributable to Designated Investments) shall cease to participate in the Net Income and Net Losses of the Company, irrespective of the time or times that the proceeds of such Capital Withdrawal or Distribution are paid out.

Section 4.6 <u>Payment of Capital Withdrawal and Distribution Proceeds</u>.

(a)     (i)     Payments of Capital Withdrawal or Distribution proceeds shall be made by check, wire transfer or such other permissible method as the Manager may determine. Subject to the provisions of **Section 4.7** below, payments of Capital Withdrawals shall be paid within 30 days after the Effective Date unless a Member withdraws 90% or more of such Member's Capital Account (not including amounts allocable to Designated Investments), in which case the Company may, but shall not be obligated to, retain up to 10% of the estimated Capital Withdrawal; such interest from the end of the calendar month following the Effective Date at one-month LIBOR as in effect as of the beginning of each calendar month shall be paid promptly after the completion of the Company's audit for the Fiscal Year in which such Capital Withdrawal occurred.

(ii) If, upon conclusion of the Company's audit for the Fiscal Year in which a Capital Withdrawal or Distribution was paid, the Manager determines that the Capital Withdrawal or Distribution paid was in excess of the withdrawing Member's Capital Account as of the Effective Date, the withdrawing Member shall repay the excess to the Company. Conversely, if the Manager determines that the amount paid to a withdrawing Member was less than the withdrawing Member's Capital Account as of the Effective Date, the Company shall pay the shortfall to the withdrawing Member. Any payment required by virtue of this paragraph shall be accompanied by interest from the end of the calendar month following the Effective Date to the date of payment, at a rate equal to one-month LIBOR as of the beginning of each calendar month.

(b) The Manager may deduct from any Capital Withdrawal or Distribution proceeds otherwise payable to any Member any amount, including loans, extraordinary expenses and taxes, believed by the Manager to be owed by such Member to the Company or by the Company on behalf of such Member.

(c) The Manager may deduct from any Capital Withdrawal an amount equal to the brokerage commissions and other charges that the Manager determines are likely to be incurred by the Company to liquidate the withdrawing Member's Interest, and such Withdrawal Reserves as the Manager may determine.

(d) The Manager may pay out the proceeds of Capital Withdrawals or Distributions in cash, Investment Assets or any combination of the foregoing. In the course of Distributing Investment Assets, the Manager may cause the Company to assign the liabilities associated with

an Investment Asset distributed to a Member to such Member, and such Member must assume such liabilities.

(e) In the event that the Manager intends to make a Capital Withdrawal or Distribution payment to a Member, in whole or in part, in Investment Assets rather than in cash, the Manager shall give such Member at least 10 days' notice of the proposed in-kind payment (generally describing the Investment Assets to be distributed and any associated liabilities to be assumed). If the Member notifies the Manager within 5 days of receipt of such notice from the Manager that receipt of the Investment Assets (or associated liabilities) intended to be paid out to such Member could reasonably be expected to cause such Member to be in violation of any Law, the Manager shall cause the Company to sell the Investment Asset intended to be distributed — which sale may be made to a Manager Party or Trading Vehicle and may be made privately, as the Manager may determine. In such case, the Manager need make no representation as to how long a delay there might be before such sale will be effected and whether there will be a single sale for the entirety of such Investment Assets or more than one sale, each for a part of such Investment Assets. No interest shall accrue on any amounts due to the affected Member pending such sale(s), provided, that the Manager shall cause the Company to distribute the proceeds of such sale(s) promptly following receipt. Any Investment Assets distributed in kind shall be valued in accordance with **Section 3.8** as of the date of distribution, and any difference between such value and the Company's carrying value for such Investment Assets shall be deemed to constitute income or loss to the Company.

(f) Payment of the proceeds of the sale(s) of Investment Assets otherwise to be Distributed to Members as contemplated by **Section 4.6(e)** shall constitute full and complete discharge of the obligations of the Manager and the Company with respect to such Distributions. The Manager shall have no liability for sale(s), as contemplated by **Section 4.6(e)**, of Investment Assets that would otherwise have been distributed to Members, or for the price(s) realized in connection with such sale(s), provided that the Manager did not act in bad faith.

Section 4.7 <u>Postponing Accounting Dates</u>. The Manager may postpone an Accounting Date in the event that the Manager determines that a material portion of the Investment Assets held by the Company cannot be valued. In the event that an Accounting Date is postponed, the Manager shall give prompt notice of any such postponement to all Members.

Section 4.8 <u>Postponing Effective Dates</u>.

(a) An Effective Date shall be postponed if: (i) the applicable Accounting Date has been postponed pursuant to **Section 4.7**; (ii) Company capital is committed in such a manner so as not reasonably to permit immediate withdrawal of sufficient funds; (iii) there exists a state of affairs that the Manager determines constitutes circumstances under which liquidation by the Company of part or all of its investments is not reasonable or practicable, or would be prejudicial to the Company; or (iv) the Manager determines that not postponing such Effective Date would materially adversely affect the continuing Members.

(b) Capital Account balances that would otherwise have been withdrawn as of a scheduled Effective Date shall continue to participate in the Net Income and Net Losses of the

Company in the event that such Effective Date is postponed until the rescheduled Effective Date.

(c) In the event that an Effective Date is postponed, the Manager shall give prompt notice of any such postponement to all affected Members. Each Member who had submitted a Capital Withdrawal request for such Effective Date may revoke all (but not part) of such Capital Withdrawal request, without being subject to any fee or charge, by notice to the Manager within 5 business days of such Member's receipt of such notice of postponement from the Manager.

(d)     (i)   The Manager shall reschedule any postponed Effective Date to the nearest practicable calendar month-end, as and when determined by the Manager. Any Capital Withdrawal made as of a rescheduled Effective Date shall be subject to no withdrawal fees or Gate, and if only a portion of the Capital Withdrawals or Distributions so postponed may, in the Manager's determination, be permitted as of a subsequent calendar month-end, the amount which each affected Member shall be entitled to withdraw shall be determined *pro rata* based on such affected Members' respective Capital Account balances immediately prior to the Effective Date as initially scheduled.

(ii) Postponed Capital Withdrawals shall have priority as of their rescheduled Effective Date over Capital Withdrawals requested to be effective as of such Effective Date.

(iii) If more than one Effective Date has been postponed at any one time, Capital Withdrawal priority as of the rescheduled Effective Date shall be allocated to the postponed Effective Dates in their order of occurrence.

(e) The Manager shall have no liability for postponing any Effective Date, provided that the Manager did not act in bad faith in doing so.

Section 4.9  Postponing Capital Withdrawal Payments.

(a) Even if Accounting Dates and Effective Dates are not postponed, the Manager may postpone the payment of any Capital Withdrawal proceeds if the Manager determines that: (i) making such payment would result in a violation of any Law or contractual provision, or (ii) liquidating Investment Assets in order to fund such payment would materially adversely affect the other Members.

(b) If the payment of Capital Withdrawal proceeds is postponed:

(i) The Manager shall attempt to liquidate Investment Assets as promptly as it deems reasonably practicable after the Effective Date in order to fund the payment of the Capital Withdrawal so postponed;

(ii) Within 30 days following the Effective Date, the withdrawing Member shall be entitled to receive an amount equal to (1) its Proportionate Share of (A) the Company's cash not used or needed to pay down debit balances (in excess of Reserves maintained by the Company, which Reserves may be increased in

-36-

connection with the events giving rise to the Company's need to postpone the payment of Capital Withdrawals), and (B) subject to **Section 4.6(e)**, the fair market value of its Investment Assets not needed or used to collateralize the Company's obligations; less (2) its applicable Withdrawal Reserves, if any, and its Proportionate Share of the Company's liabilities;

(iii) The Company shall pay the balance due to the withdrawing Member from time to time, within 30 days after the Company receives the proceeds from the liquidation of that portion of the Investment Assets representing the withdrawing Member's Proportionate Share, but only to the extent that those proceeds plus the amount that the withdrawing Member received pursuant to subsection (ii) of this **Section 4.9(b)** exceed its applicable Withdrawal Reserves, if any, and such withdrawing Member's Proportionate Share of the Company's liabilities. Notwithstanding the foregoing, the Company shall pay at least 80% of the amount due to a withdrawing Member within one year following the Effective Date, and the balance shall be paid as soon as the Manager deems reasonably practicable thereafter; and

(iv) Capital Account balances that would otherwise have been withdrawn as of a scheduled Effective Date shall not participate in Net Income and Net Losses of the Company after such Effective Date in the event that the payment of Capital Withdrawal proceeds, but not such Effective Date, is postponed.

(c) Capital Withdrawal payments which are delayed beyond the 90th day following the applicable Effective Date (as such Effective Date may be postponed as provided herein) shall bear interest at one-month LIBOR from the end of the calendar month immediately following such Effective Date, compounded as of the first day of each calendar month thereafter, until paid or, if sooner, the date the Company dissolves.

## ARTICLE V
## DISSOLUTION

Section 5.1 Dissolution.

(a) The Company shall be dissolved only upon the occurrence of one of the following events:

(i) The withdrawal, Bankruptcy, or dissolution of the last remaining Manager, unless the business of the Company is continued within 90 days following the occurrence of such event by the vote or written consent of a majority of the Voting Rights; or

(ii) If the Manager so elects (which it may do without prior notice and without any violation of this Agreement or of the Manager's fiduciary obligations to other Members).

(b)     (i)  Upon dissolution of the Company for any reason, the Company shall continue in existence for the purpose of winding up its affairs, and the assets of the Company shall be liquidated by the Manager.

(ii)  If the Manager is unable or unwilling to act, the property and business of the Company shall be liquidated by such other Person elected by the vote or consent, by any of the methods provided in **Section 8.6**, of a majority of the Voting Rights (the Manager or such other Person presiding over the dissolution and liquidation of the Company being referred to in this **Article V** as the "<u>Liquidator</u>"). The Liquidator shall be entitled to reasonable compensation for its services in winding up the business of the Company and liquidating its assets and shall be indemnified for expenses and losses incurred by it in performing such services, subject to the standard set forth in **Section 2.9**).

(iii)  The Liquidator may postpone notice of the dissolution or proposed dissolution of the Company to Members and/or third parties until such time as the Manager determines that doing so would not adversely affect the Company or any Member.

(c)  As soon as the Liquidator deems reasonably practicable after the dissolution of the Company, the Company's assets shall be liquidated and distributed in the following manner and order of priority to the extent permitted by applicable Law:

(i)  The claims of all creditors of the Company which are not Members shall be paid and discharged;

(ii)  The claims of all creditors of the Company which are Members shall be paid and discharged; and

(iii)  Any income, gain, or loss during the period of winding up shall be allocated to the Members in accordance with **Article III**, and the Members shall share in the remaining assets of the Company *pro rata*, in accordance with their respective positive Capital Account balances.

(d)  Subject to the provisions of **Section 4.6(e)**, the Liquidator shall determine whether any assets of the Company shall be liquidated through sale or, alternatively, shall be distributed to the Members in kind.

(e)  Upon the dissolution of the Company, neither the name of the Company nor its good-will, if any, shall be considered to be an asset of the Company, such name and its derivatives to be the sole property of the Manager or its Affiliates, as provided in **Section 8.16**. No value shall be placed on the Company name or good-will for the purpose of liquidation and Distribution or for any other purpose during the continuation of the Company.

(f)  In the event that the Company is liquidated, Distributions shall be made only to Members with positive Capital Accounts, in compliance with applicable Treasury Regulations.

(g) All Distributions shall be subject to any Reserves and/or Withdrawal Reserves that the Liquidator may establish.

(h) Any Distributions that would otherwise be made to a Member shall be retained by the Company (for Distribution to the Members) to the extent of any amounts owed by such Member, including in respect of any loans extended by the Company to such Member.

(i) Upon dissolution of the Company, no Member shall have any obligation (other than as may arise under **Section 3.11**) to make any Capital Contribution with respect to any deficit Capital Account balance, and no such deficit shall be considered a debt owed by any such Member to the Company or to any other Member for any purpose whatsoever.

(j) Upon dissolution of the Company, any Manager Party may acquire assets (including Investment Assets) held by the Company at such prices as the Liquidator may deem to be arm's-length (and/or as approved by the Members' Representative).

Section 5.2 <u>Payment of Dissolution Proceeds</u>. Dissolution proceeds shall be paid out in the same manner as Capital Withdrawal and Distribution proceeds pursuant to **Section 4.6**; provided, that the Liquidator may determine to pay out all or part of any dissolution proceeds not directly to the Members but rather to a liquidating trust. The date of any such payment to a liquidating trust shall constitute the end of the Company's final Accounting Period, irrespective of when the liquidating trust is itself dissolved, and the Manager shall be entitled to continue to be reimbursed for the expenses incurred by it in managing the liquidating trust as well as to receive Manager Allocations with respect thereto (for the avoidance of doubt, no Profit Allocations shall be made from any such liquidating trust, the final Profit Allocation to be determined as of the date that such distribution is made from the Company to such liquidating trust).

## ARTICLE VI

### EXPENSES; ANCILLARY FEES

Section 6.1 <u>Company Expenses</u>.

(a) The Company shall bear all expenses referred to in **Section 2.1(c)**, all indemnification expenses referred to in **Section 2.9**, and all expenses of any nature related to the Company's operations and business (including the retention and attraction of capital).

(b) The Manager may cause certain expenses or services of the Company to be paid or provided by a Manager Party or Service Provider, in which event the Company shall pay or reimburse that Manager Party or Service Provider for the Company's share of those expenses or services, as the Manager may determine. To the extent that a Manager Party makes a profit from providing services to the Company such as those ordinarily provided in the course of the Manager serving in such capacity, the amounts allocated to the Manager under **Section 3.3(c) or 3.3(d)** shall be reduced dollar for dollar by the amount of such profit (as determined by the Manager); however, in no event shall the amounts allocated to the Manager under **Section 3.3(c)**

**or 3.3(d)** be reduced below zero, and such reduction shall not apply to any other services provided by the Manager or any Manager Party to the Company on an arm's-length basis.

(c) In the event that a Member requests any services, information or other items not provided generally to all Members, the Manager may deduct from such Member's Capital Account the costs of providing the foregoing. The Manager shall inform a Member making any such request of the estimated cost of complying with such request before doing so.

Section 6.2 <u>Ancillary Fees</u>. The Manager Parties shall be entitled to retain any and all ancillary fees — *e.g.*, directors', financial advisory, origination and placement fees — which may be received by them in the course of the Company's trading and investing activities, without reduction for any amounts allocated to the Manager under **Section 3.3(c) or 3.3(d)** or otherwise due to the Manager Parties from the Company.

## ARTICLE VII

## BOOKS OF ACCOUNT; REPORTS

Section 7.1 <u>Books of Account</u>.

(a) The Company shall keep its books of account at its principal place of business (or at such other location as the Manager may designate) using a method of accounting selected by the Manager, provided that Capital Accounts shall be maintained in accordance with the terms of this Agreement.

(b) Members may inspect the books of account of Amaranth Partners L.L.C. during normal business hours at the office of the Company for a valid, non-commercial, equitable purposes relating to such Member's status as a member or as required by Law. Members' inspection rights shall not include the right to copy any books or records, shall be limited to the financial ledgers of Amaranth Partners L.L.C, and shall specifically not include the right to inspect: (i) trading records; (ii) the Company's or any Trading Vehicle's portfolio at any point in time; (iii) proprietary information relating to the strategies implemented by the Manager on behalf of the Company and the Trading Vehicles; or (iv) the names or other identifying features of other Members.

(c) Any inspection of the Company's records shall be permitted only upon reasonable prior notice (no fewer than 10 business days) to the Manager and shall be at the expense of the Member requesting such inspection.

(d) The accounts of the Company shall be audited (at the expense of the Company) as of the close of each Fiscal Year by a nationally recognized independent public accounting firm selected by the Manager.

Section 7.2 <u>Reports</u>.

(a) As soon as practicable after the end of each Fiscal Year, the Company shall furnish to each Member:

(i) the audited balance sheet and income statement of the Company as of the end of and for such Fiscal Year;

(ii) such Member's Capital Account as of the end of such Fiscal Year;

(iii) the percentage change in the Member's Capital Account balance during the latest such Fiscal Year; and

(iv) a copy of Schedule K-1 to the Company's federal income tax return for the fiscal year, in a form sufficient to enable the Member to determine its share, for federal income tax purposes, of all items of Company income, deduction, gain, loss, preference and credit.

(b) The Members acknowledge that they have been informed that the Company may not be able to deliver financial statements and Schedule K-1 to the Company's federal income tax return to each Member prior to the time each such Member is required to file such Member's federal income tax returns without extensions. The Members understand that they may be required to obtain one or more extensions of the time to file their federal, state and local income tax returns.

## ARTICLE VIII

### MISCELLANEOUS

Section 8.1  Binding Effect; Creditors.

(a) This Agreement shall be binding upon and inure to the benefit of the Members, the parties indemnified hereunder and their respective successors, permitted assigns, heirs and legal representatives.

(b) None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of any Member or of the Company. No creditor who makes a loan to a Member or to the Company may have or acquire, solely as a result of making such loan, any Interest or interest in the profits or property of the Company, other than such Interest or interest in the profits or property of the Company that may be expressly granted to such creditor, with the written consent of the Manager, pursuant to the terms of such loan.

Section 8.2  Notices.  All notices under this Agreement shall be in writing and shall be deemed to have been duly given if (a) personally delivered (with receipt thereof acknowledged in writing), (b) sent by facsimile (receipt confirmed) or e-mail (receipt confirmed), (c) if mailed by pre-paid certified mail, return receipt requested or (d) sent by reputable overnight courier (receipt confirmed), in each case to the parties at the following addresses (or at such other address as the Company or a Member may have specified to the other by notice as provided herein):

(a) If to the Company or the Manager, to One American Lane, Greenwich, Connecticut 06831; facsimile number: (203) 422-3533; e-mail: notices@amaranthllc.com.

(b) If to a Member, to such Member at the address set forth in such Member's Subscription Agreement or other written instrument acceptable to the Manager.

(c) Notices given in accordance with this **Section 8.2** shall be deemed given on the date of receipt, if delivered personally, by facsimile or by e-mail, on the first business day after being sent by a reputable courier service and on the third business day after being posted. Notices of Capital Withdrawals shall be deemed given only when actually received by the Company.

(d) Any notice required hereunder need not be prior notice unless expressly so specified. Any notice period specified herein shall end on the Close of Business on the day that is the prescribed number of days following the first day of the relevant period, unless that day is not a business day, in which case, as of the next succeeding business day.

Section 8.3   Counterparts; Facsimiles; Power of Attorney.

(a) This Agreement may be executed in counterparts with the same effect as if the parties had all executed the same copy.

(b) Facsimiles of executed documents shall, for all purposes of this Agreement and all transactions into which the Company enters, have the same force and effect as executed originals.

(c) This Agreement may be executed by power-of-attorney embodied in a Subscription Agreement or other written instrument with the same effect as if the parties executing the Subscription Agreement or other written instrument had all executed the same copy.

Section 8.4   Entire Agreement.   This Agreement, together with the Subscription Agreement executed and delivered by each Member (other than the Manager), sets forth the entire understanding of all the parties with respect to its subject matter and supersedes all prior agreements and undertakings with respect hereto, except that the foregoing shall not supersede any agreement between any employee or consultant of a Manager Party and such Manager Party or between any Service Provider and a Manager Party or a Manager Client.

Section 8.5   Amendment.

(a)   (i) This Agreement may be amended or modified at any time with the consent of the Manager and of a majority of the Voting Rights. The consent of Members other than the Manager may be given through any of the methods provided in **Section 8.6**.

(ii) The Manager, without obtaining the consent of any Member, may amend this Agreement for any of the following purposes: (A) in order to correct ambiguities, defects, inconsistencies and typographical errors; (B) in any respect that does not materially adversely affect the rights of the Members as a whole; (C) to avoid any event described in **Section 4.3**; and (D) in whatever manner the Manager may determine to be necessary or advisable in order for this Agreement and the Company to comply with Law or any contractual provision.

(iii) Any Member may give effective consent to a proposed amendment but opt not to be subject to such amendment (other than an amendment that does not require the consent of any Member pursuant to **Section 8.5(a)(ii)**) by providing written notice to the Manager within the period specified in the amendment proposal. In any such case, the amendment shall not be effective with respect to such Member, and the Manager shall be expressly authorized to make non-*pro rata* Distributions to such Member at such times and in such amounts as the Manager may determine in its sole discretion.

(iv) Notwithstanding the foregoing, no amendment may be made to this Agreement without the unanimous consent of the Members (given by any of the methods set forth in **Section 8.6**) if such amendment would (A) adversely affect the limited liability of the Members under applicable Law; or (B) cause the Company to cease to be treated as a partnership for federal income tax purposes (unless doing so would increase the net after-tax return of the Company's trading to investors).

(v) The Manager shall promptly notify all Members of all amendments.

(b) Each Member agrees that this Agreement may be amended as provided in **Section 8.5(a)**, irrespective of whether such amendment diminishes such Member's rights hereunder; provided, that without such Member's consent, no Member's Capital Account may be reduced by any such amendment.

(c) Each Member agrees that the Manager may execute, on its behalf, any agreement, instrument or document containing any amendment approved as provided in **Section 8.5(a)** in any manner contemplated by **Section 8.6** pursuant to the power of attorney granted to the Manager in **Section 8.10**.

(d) Any amendment approved as provided in **Section 8.5(a)** shall be treated as if such amendment had been approved by all Members, irrespective of whether fewer than all Members voted (including as contemplated by **Section 8.6**) in favor of such amendment.

Section 8.6  Consent of the Members.

Without limitation of **Section 2.7**, whenever the Members are asked to vote on or consent to any action relating to the Company, including any amendment or modification to this Agreement, whether or not requiring unanimous consent, a Member may vote in favor of or give consent to such action through any of the following methods, each of which shall be equally effective for all purposes:

(a) by giving notice to the Manager within the period specified in the notice of such action, or if no such period is specified, within 20 days of receiving notice of such action ("affirmative consent");

(b) if the Manager receives no notice of objection from such Member within 20 days of giving notice to such Member of such action ("negative consent"); or

-43-

(c) if, after the Manager gives such Member notice of such action and an opportunity to make a Capital Withdrawal of all of such Member's Capital Account, without imposition of any withdrawal fee, prior to the effective date of such action, such Member does not make such a Capital Withdrawal ("implied consent").

Section 8.7 Waivers.

(a) The failure of any Member to insist upon strict performance of any covenant or obligation hereunder, irrespective of the length of time for which such failure continues, shall in no respect waive such Member's right to demand strict compliance in the future.

(b) No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder, shall constitute a consent to or waiver of any other breach or default in the performance of the same or of any other obligation hereunder.

Section 8.8 No Partition.

(a) Each Member irrevocably waives any right that such Member might otherwise have had to maintain any claim for partition with respect to any property of the Company or to compel any sale or appraisal of any Company asset or any sale or appraisal of a deceased Member's Interest.

(b) The Members shall not hold undivided interests in any asset of the Company, but rather an interest in the Company itself, which shall for all purposes be considered to constitute personal property.

Section 8.9 Meetings.

(a) Although not contemplated or required, Company meetings may be called by the Manager, at the expense of the Company, to consider any Company matter upon which the Members may be entitled to vote or for any other purpose related to the business of the Company.

(b) For the avoidance of doubt, no Manager Party shall have any liability to the Company or any Member for any failure to call a meeting under this **Section 8.9**, subject to **Section 2.8**.

Section 8.10 Power of Attorney. Each Member hereby irrevocably constitutes and appoints the Manager to be such Member's true and lawful attorney, in such Member's name, place, and stead, to make, execute, acknowledge, file and publish, as the Manager may deem necessary or advisable:

(a) any certificates and other instruments that may be required to be filed by the Company under the laws of the State of Delaware or any other governmental authority having jurisdiction, or which the Manager shall deem necessary or advisable to file;

-44-

(b) any certificate or other instruments amending or modifying the Certificate of Formation of the Company to evidence any changes in that Certificate in accordance with the terms of this Agreement;

(c) any certificates or other instruments that may be required to effect the dissolution and termination of the Company and the cancellation of the Certificate of Formation of the Company;

(d) this Agreement and any amendment to this Agreement that the Manager is authorized to make in accordance with the terms of this Agreement;

(e) any documents required in connection with brokerage or other accounts of the Company; and

(f) any other documents which the Manager may deem necessary or advisable for the conduct of the business of the Company.

This power of attorney is coupled with an interest, and all Members will collectively rely on the effectiveness hereof. This power of attorney shall be irrevocable and shall survive the death or disability of a Member and any assignment of the whole or any part of the Interest held by a Member and shall be binding upon the assignee thereof.

Section 8.11  Voluntary Limitation on a Member's Voting Rights.

(a) Each Member's "Voting Rights" shall be preliminarily determined as equal to the fraction, expressed as a percentage, the numerator of which is the balance in such Member's Capital Account as of the beginning of the month of determination and the denominator of which is the aggregate balances in all Members' Capital Accounts as of the beginning of the month of determination.

(b) In the event that a Member indicates in such Member's Subscription Agreement or by other written notice to the Manager that such Member does not wish to hold Voting Rights in excess of a certain percentage (which may be 0%) of the aggregate Voting Rights, the Manager by accepting such Subscription Agreement or other written notice shall agree to such Member waiving, in whole or in part, what would otherwise have been such Member's Voting Rights. The Voting Rights so waived shall thereupon be deemed to be held by the other Members, subject to whatever limitation on their Voting Rights they may elect by the same process, *pro rata* in accordance with their respective Voting Rights (after giving effect to all other limitations imposed on the Voting Rights of such Members).

Section 8.12  Voluntary Limitation on a Member's Ownership Share.  A Member may, in such Member's Subscription Agreement or by other written notice to the Manager, elect to have the Company make Distributions to such Member as of the next month-end in an amount so that such Member's Capital Account balance shall not exceed 24.9% percent (or any other specified percentage acceptable to the Manager) of the aggregate Capital Account balance of all Members. No withdrawal charges or Gate shall be imposed upon any such Distributions.

Section 8.13 <u>Further Information and Documents</u>.  Each Member hereby undertakes to furnish to the Manager any additional information that the Manager may deem necessary or advisable in order that (a) the Company or the Manager and any of their respective Affiliates may comply with applicable Law, (b) the Company may invest in any Trading Vehicle, or (c) the Company or any Trading Vehicle may open and maintain an account or accounts with securities or commodity brokerage firms, and to execute and deliver such other agreements, documented statements of interest and holdings, powers of attorney, and other instruments as the Manager deems necessary or advisable for such purpose, provided that the same are not inconsistent with the terms and provisions of this Agreement and do not increase the liabilities or obligations of such Member beyond that provided for in this Agreement.

Section 8.14 <u>GOVERNING LAW; VENUE</u>.

(a) THIS AGREEMENT IS MADE PURSUANT TO AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT OR ANY SUBSCRIPTION AGREEMENT IS EXECUTED BY ANY MEMBER OR PROSPECTIVE MEMBER OR THE LOCATION OF ANY OFFICE, VENTURE OR OPERATION OF THE COMPANY OR ANY MEMBER. ANY ACTION OR PROCEEDING BROUGHT BY ANY MANAGER PARTY AGAINST ONE OR MORE MEMBERS OR THE COMPANY RELATING IN ANY RESPECT TO THIS AGREEMENT, THE OPERATION OF THE COMPANY OR THE OFFERING OF THE INTERESTS MAY, AND ANY ACTION OR PROCEEDING BROUGHT BY ANY OTHER PARTY AGAINST ANY MANAGER PARTY OR THE COMPANY RELATING IN ANY RESPECT TO THIS AGREEMENT, THE OPERATION OF THE COMPANY OR THE OFFERING OF THE INTERESTS SHALL, BE BROUGHT AND ENFORCED IN THE CITY, COUNTY AND STATE OF NEW YORK OR (TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR) IN THE COURTS OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND THE MEMBERS AND THE COMPANY IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH STATE AND FEDERAL COURTS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.  THE MEMBERS AND THE COMPANY IRREVOCABLY WAIVE ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO LAYING THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE COURTS OF THE CITY, COUNTY AND STATE OF NEW YORK OR IN THE COURTS OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(b) EACH MEMBER HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM AGAINST ANY MANAGER PARTY OR THE COMPANY RELATING IN ANY WAY TO THIS AGREEMENT, THE OPERATION OF THE COMPANY OR THE OFFERING OF THE INTERESTS.

(c) EACH MEMBER HEREBY AGREES THAT SERVICE OF PROCESS MAY BE EFFECTED ON SUCH MEMBER IN THE SAME MANNER AS NOTICES ARE GIVEN PURSUANT TO SECTION 8.2.

Section 8.15 Matters Not Provided For; Compliance with Law.

(a) The Manager shall be empowered to decide any question arising with respect to the Company or this Agreement, and to make such provisions as the Manager deems to be in, or not opposed to, the interests of the Company, but which are not specifically set forth herein.

(b) In addition to the authority granted the Manager pursuant to **Section 8.15(a)**, the Manager may, but shall have no obligation to, take any action that the Manager deems necessary or advisable to ensure that the Company is not in violation of Law or in breach of any contractual provision, including amending this Agreement. The Manager shall not, however, be liable or responsible for any such violation or breach, subject to **Section 2.8**.

(c) To the extent permissible by Law, in the case of any inconsistency between this Agreement and the Act, the provisions of this Agreement shall control.

Section 8.16 "Amaranth" Name and Amaranth Intellectual Property. Neither the Company nor any Member in such Member's capacity as such shall have, in the absence of a written agreement with the Manager or its designee(s) to the contrary, any title to or right to use the name "Amaranth," or any derivative thereof or any trademark used in connection with the name "Amaranth." In addition, neither the Company nor any Member in such Member's capacity as such shall have, in the absence of a written agreement with the Manager or its designee(s) to the contrary, any title to, interest in, or right to use any Amaranth Intellectual Property nor shall such Amaranth Intellectual Property become the property of the Company or any Member. The Amaranth Intellectual Property does not belong to the Company or any Trading Vehicle, but rather is made available to the Company by one or more Managing Parties which retain full ownership rights in such Amaranth Intellectual Property, regardless of the fact that such items may be paid for, directly or indirectly, by the Company or a Trading Vehicle. Amaranth Advisors L.L.C. covenants, however, that so long as it or any of its Affiliates is a manager of the Company, the Company shall have a royalty-free license to use the Amaranth Intellectual Property solely in connection with the business activities of the Company, which license shall not be transferable or assignable.

Section 8.17 Severability. In the event that any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that such provision, as so modified, shall no longer be held to be invalid or unenforceable. Any such modification, invalidity or unenforceability shall be strictly limited both to such provision and to such jurisdiction, and in each case to no other. Furthermore, in the event of any such modification, invalidity or unenforceability, this Agreement shall be interpreted so as to achieve the intent expressed herein to the greatest extent possible in the jurisdiction in question and otherwise as set forth herein.

Section 8.18 Indirect Action. Each Member agrees that it is of the essence to this Agreement that no Member be permitted to do indirectly — by the use of Affiliates, agents, agreements, contracts, reciprocal business dealings or any other means — that which such Member has herein agreed not to do directly. Furthermore, it is the express intent of all Members that all Members shall comply in all respects with the substantive purposes of this

Agreement and that technical compliance shall constitute a breach hereof to the extent that it contravenes or does not fully achieve such substantive purposes.

Section 8.19 Survival. Those agreements and undertakings set forth herein which by their terms contemplate that they shall survive the withdrawal of a Member or the termination of the Company shall do so.

Section 8.20 Confidentiality; No Solicitation.

(a) Each Member acknowledges that the business and assets of the Company and the Manager Parties are confidential and involve a wide range of proprietary information, including trade secrets and financial or commercial information, and that disclosure of any such information may cause competitive harm to the Company and/or the Manager Parties.

(b) All information with respect to such business and assets shall be presumed confidential and proprietary unless the Manager otherwise so indicates in writing. Each Member covenants that, except with the prior written consent of the Manager, it has and it shall at all times keep confidential and not, directly or indirectly, disclose, divulge, furnish or make accessible to anyone, or use in any manner that would be adverse to the interests of the Company or any Manager Party, any confidential or proprietary information to which such Member has been or shall become privy relating to the business or assets of the Company or of any of the Manager Parties except with the written approval of the Manager or except for information that is otherwise publicly available (other than information made publicly available by a Member relying on this exemption in disclosing such information) or required to be disclosed by Law; provided, that before any disclosure of information otherwise subject to this **Section 8.20(b)** on the grounds that such information has otherwise become public or is required by Law, the Member proposing to make such disclosure shall so inform the Manager and shall give the Manager, to the greatest extent reasonably practicable, an opportunity to contest whether such information has in fact otherwise been made public or is required by Law to be disclosed. Such Member shall only disclose such information if, and to the extent that, such disclosure is affirmatively determined to be permitted on the basis of such information otherwise having been made public or the disclosure being required by Law. A Member may, however, share such information with such Member's investment advisers, beneficial owners, accountants, attorneys, and spouses ("Permitted Confidants"); provided, that such Member's Permitted Confidants undertake to hold such information strictly confidential to the same extent set forth herein, and not in any manner or respect to use any of such information for their personal gain; and provided further, that each Member accepts full liability for any unauthorized use or disclosure of such information by such Member's Permitted Confidants. In no event shall any Member (other than the Manager) disclose to other Members or other Persons, or make available any information that would identify the Investment Assets or the investment or trading strategies of any Manager Party or Manager Client, including the Company.

(c) Without limiting the generality of the foregoing, confidential and proprietary information shall include, (i) the identities of the Trading Vehicles in which the Company invests its assets and of personnel of the Company and the Managing Parties, (ii) the specific investment techniques utilized by the Company, (iii) any information regarding a Member, (iv) the performance record of the Company, and any other financial results or data of the

Company, (v) any communication from any Manager Party or any of its representatives or Affiliates and (vi) the Amaranth Intellectual Property. For the avoidance of doubt, no Member (other than the Manager) may provide information concerning the Company to any party that it has reason to believe shall disseminate such information in any form.

(d) Notwithstanding any other provision of this Agreement, the Manager may keep confidential from the Members any information (i) the Manager reasonably believes to be in the nature of trade secrets, (ii) the disclosure of which the Manager reasonably believes is not in the best interest of the Company or could damage the Company or its business, or (iii) which the Company is required by Law or agreement to keep confidential; provided that the fact that the Manager has disclosed certain information shall not imply that such information does not constitute information described in clauses (i)-(iii) above.

(e) Each Member covenants and agrees that until the 24th calendar month-end after such Member withdraws as a Member, such Member (including such Member's Affiliates and related parties) shall not, directly or indirectly, without the prior written consent of the Manager, knowingly (i) hire, retain, solicit, procure or suggest that any other Person hire, retain or solicit any current or former officer or employee of, or of any Person directly or indirectly sponsored by, any Manager Party, (ii) suggest to any current officer or employee of a Manager Party that he or she leave the employ of, or cease providing services to, a Manager Party or a Manager Client, or (iii) if such Member (including such Member's Affiliates and related parties), directly or indirectly, acts as or provides or will provide "seed capital" to or otherwise incubate, support, sponsor or promote the activities of any investment manager or advisor other than on behalf of a Manager Party (an "Associated Management Company"), in any manner whatsoever, permit (or allow the Associated Management Company to permit) a current or former officer or employee (or sponsored Person) of a Manager Party to provide portfolio or investment management or trading services in any capacity whatsoever (other than on behalf of a Manager Party) for the benefit of such Associated Management Company or one or more private investment funds managed or sponsored, directly or indirectly, in whole or in part, by such Associated Management Company. Each Member further agrees that if any current or former officer or employee of, or any Person directly or indirectly sponsored by a Manager Party, contacts such Member (including such Member's Affiliates and related parties) or any Associated Management Company related to such Member, directly or indirectly, seeking employment or investment capital, such Member shall notify the Manager in writing. Each Member associated with an Associated Management Company as contemplated in the prior sentence, shall inform such Associated Management Company of their obligations hereunder and take whatever reasonable action is required to give effect to such Member's obligations hereunder. A "former officer or employee" shall not, for purposes of this Section 8.20(e), include any person that was not employed or sponsored by any Manager Party during the 24-month period prior to the date of determination; provided, however, solely for purposes of this Section 8.20(e) Paloma Partners Management Company ("PPMC") shall be considered to be a Manager Party until December 31, 2004 with respect to any individual who was both employed by PPMC prior to January 1, 2003 and by any other Manager Party after December 31, 2002.

(f) Each Member agrees that the Company and Manager would be subject to potentially irreparable injury as a result of any breach by such Member of the covenants and agreements set forth in this Section 8.20, and that monetary damages would not be sufficient to compensate or

make whole either the Company or the Manager for any such breach.  Accordingly, each Member agrees that the Company and Manager, separately or together, shall be entitled to equitable and injunctive relief, on an emergency, temporary, preliminary and/or permanent basis, to prevent any such breach or the continuation thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**MANAGER**

AMARANTH ADVISORS L.L.C.

By: _____

    Name: Nicholas Maounis
    Title:  President

**THE MEMBERS**
By:  Amaranth Advisors L.L.C.
    Attorney-in-fact

By: _____

    Name  Nicholas Maounis
    Title:  President