William J. McSherry, Jr. (WM1194)
Steven D. Greenblatt (SG5105)
CROWELL & MORING LLP
153 East 53rd Street
New York, New York 10022
Tel. No.:  212-223-4000
Fax No.:  212-223-4134

Attorneys for Plaintiff
San Diego County Employees Retirement Association

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| -against- | ) ) | 07 Civ. 2618 (DAB) |
| NICHOLAS M. MAOUNIS, CHARLES H. WINKLER, ROBERT W. JONES, BRIAN HUNTER, and AMARANTH ADVISORS, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ v

PRELIMINARY STATEMENT .................................................................... 1

STATEMENT OF FACTS ............................................................................ 7

ARGUMENT ............................................................................................. 17

I.   The Applicable Legal Standards ........................................................ 17

    A.   Regardless Of The Claim, The Court Must Accept As True All Factual Allegations In SDCERA's Complaint ...................................... 17

    B.   For Its Non-Fraud Claims, SDCERA Need Only Allege Facts Establishing Plausible Grounds For Relief .................................... 18

    C.   SDCERA's Fraud Claims Must Meet The Heightened Pleading Standards Of FRCP 9(b) And PSLRA ........................................... 19

II.   SDCERA's Complaint States Claims Against The Fraud Defendants For Violations Of Section 10(b) Of The Securities Exchange Act Of 1934 And SEC Rule 10b-5 (Count I) ........................................................................................... 20

    A.   SDCERA's Justified Reliance And Materiality Allegations Are Unaffected By The Risk Disclosures In The 2003 PPM And the Subscription Agreement ............. 22

        1.   The So-Called "Non-Reliance" Clauses of the 2003 PPM Do Not Preclude SDCERA's Justified Reliance On The Fraud Defendants' Misrepresentations ....................................................... 22

        2.   The Fraud Defendants' Material Misrepresentations Are Not Shielded By The "Bespeaks Caution" Doctrine ........................ 23

            a.   The 2003 PPM Expressly Limits The Fraud Defendants' Supposedly Unqualified Discretion. .................................. 25

            b.   The Picture Of The Fund Painted By The 2003 PPM Was Materially Different From The Reality Of Its Operation. ................... 28

    B.   SDCERA's Complaint Alleges Facts Supporting A Strong Inference That Each Of The Fraud Defendants Acted With Scienter .............. 31

        1.   SDCERA's Complaint Contains Allegations Of Improper Motive That Give Rise To A Strong Inference Of Scienter ............... 32

        2.   The Complaint Contains Allegations Of the Defendants' Recklessness That Also Give Rise to a Strong Inference of Scienter ............... 33

    C.   SDCERA's Securities Fraud Claims Are Pled With Particularity ............ 35

        1.   The Bases For SDCERA's Allegations Made "On Information And Belief" Are Expressly Set Forth In, Or Reasonably Inferred From, The Complaint ....................................................... 36

i

2.  The Complaint Pleads Individual Misrepresentations By Maounis, Winkler, And Jones With Particularity......................................................... 38

3.  Maounis's July 2005 Misrepresentations Are Not Excused as "Opinions Not Sincerely Held"............................................................ 40

D.  SDCERA's Securities Fraud Claim Alleges Much More Than Mere "Corporate Mismanagement" ........................................................... 42

III. SDCERA's Complaint States Claims For Common Law Fraud Against The Fraud Defendants (Count II) ........................................................................ 43

A.  SDCERA's Complaint States Common Law Fraud-In-The-Inducement Claims Against The Fraud Defendants ................................................... 43

B.  SDCERA's Complaint Also States Common Law Fraud-Holder Claims Against The Fraud Defendants ........................................................... 43

1.  Connecticut Law Does Not Bar SDCERA's Common Law Fraud - Fraud-Holder Claims ................................................................. 44

2.  In the Event of a Conflict of Laws, California Law Would Govern SDCERA's Common Law Fraud-Holder Claims ........................................ 46

3.  SDCERA's Common Law Fraud-Holder Claims Are Well-Pled ................. 47

a.  The post-investment misrepresentations are alleged in the Complaint with requisite particularity.............................................. 47

b.  Whether information disclosed by the Fund during 2006 was sufficient to alert SDCERA to the Defendants' reckless trading is a question of fact not appropriate for adjudication on a motion to dismiss. ............ 49

c.  Neither the Fund's monthly performance updates nor the 2006 PPM apprised SDCERA of the true nature of the Fund's operations.......... 50

(1) The September 2005 Update merely continued and reinforced the misrepresentations of the 2003 PPM............... 51

(2) The October 2005 Update merely continued and reinforced the misrepresentations of the 2003 PPM............... 52

(3) The 2006 PPM suffered from the same infirmities as its predecessor........................................................... 53

(4) The April 2006 Update merely continued and reinforced the misrepresentations of the 2003 PPM............... 55

(5) The Impact of the May 2006 Amaranth Update was expressly diminished by the Defendants' June 2006 misrepresentations. ................................................... 56

d.  SDCERA's Complaint Also Adequately Pleads Causation For Its Common Law Fraud-Holder Claims.................................... 57

4.  SDCERA's Allegations Of Misrepresentations And Omissions After June 16, 2006  Are Actionable .................................................. 59

IV. SDCERA's Claims For Gross Negligence (Counts III & VIII), Breach Of Fiduciary Duty (Count V), And Aiding and Abetting Breach Of Fiduciary Duty (Count VI) Are Not Derivative .................................................................................................. 59

    A.  The Delaware Supreme Court Has Expressly Disavowed The "Special Injury" Test  For Determining Whether A Claim Is Derivative Or Direct ........................... 60

    B.  The Gravamen Of SDCERA's Claims Is Defendants' Fraudulent Misrepresentations And Omissions Made Directly And Individually To SDCERA ................................................................................................ 62

    C.  The Structure And Operation Of The Fund Also Render SDCERA's Claims Direct, Not Derivative ............................................................................ 65

V.  The Complaint States Valid Gross Negligence Claims Against All Defendants.................. 67

    A.  Delaware Or New York Law, Not Connecticut Law, Applies To SDCERA's Gross  Negligence Claims ....................................................................... 68

        1.  Connecticut In Fact Recognizes A Gross Negligence Claim ....................... 68

        2.  Delaware Law Is Applicable To SDCERA's Gross Negligence Claim Under The Internal Affairs Doctrine ....................................................... 69

    B.  The Complaint Alleges Facts That State Valid Gross Negligence Claims Against All Defendants ............................................................................ 70

        1.  SDCERA Has Alleged More Than Enough Facts To State A Valid Gross Negligence Claim Against All Defendants...................................... 71

        2.  Winkler Was Reckless In His Representations, Oversight And Decisions Regarding Hunter ........................................................... 73

        3.  Hunter's Reckless Trading Was Grossly Negligent And In Breach of Duties He Owed to SDCERA ......................................................... 74

    C.  Limited Disclaimers Regarding Portfolio Risk Do Not Shield Defendants From Liability For Their Reckless Conduct............................................... 75

    D.  SDCERA's Gross Negligence Claim Is Not Barred By The Economic Loss Doctrine ............................................................................................ 77

VI. Count V Of The Complaint States A Claim For Breach Of Fiduciary Duty Against The Fraud Defendants.......................................................................... 79

    A.  Advisors Owed Fiduciary Duties to SDCERA...................................... 79

        1.  Advisors's Fiduciary Duties To SDCERA Arose From Its Position As Managing Member Of The Fund.................................................... 80

        2.  Advisors's Total Control of the Fund Created a Special Relationship of Trust, and Thus, a Fiduciary Duty............................................... 80

    B.  Maounis, Winkler, And Jones Each Owed SDCERA Fiduciary Duties As Officers Of Advisors .................................................................... 82

    C.  SDCERA Had a Special Relationship of Trust With Each of Maounis, Winkler, and Jones, Individually ................................................................. 83

    D.  The Fraud Defendants  Breached The Duty Of Care ................................. 85

    E.  The Fraud Defendants Breached The Duty Of Candor ............................ 86

    F.  The Fraud Defendants Breached The Duty Of Good Faith And Fair Dealing ........... 86

    G.  The LLC Agreement Does Not Limit Advisors's Fiduciary Duties ......................... 87

    H.  SDCERA's Fiduciary Duty Claims Do Not Duplicate Its Fraud Claim ................... 87

VII. Count VI Of The Complaint States claims for aiding and abetting breach of fiduciary duty against Winkl...

    A.  SDCERA Has Alleged Winkler's Knowing Participation in Advisors's And Maounis's Breaches Of Their Fiduciary Duties ...................................... 89

    B.  SDCERA Has Also Adequately Alleged Its Aiding and Abetting Breach Of Fiduciary Duty Claim Against Jones ..................................... 90

    C.  SDCERA Has Also Adequately Alleged That Hunter Aided and Abetted All Of The Fraud Defendants' Breaches Of Their Fiduciary Duties To SDCERA ......... 91

VIII. Count VI of the Complaint States a Claim Against Advisors for Breach Of Contract (Count IV)    92

    A.  By Acknowledging And Directly Benefiting From The Subscription Agreement, Advisors Is Bound By It Terms ........................................... 92

        1.  The Subscription Agreement Must Be Interpreted In Conjunction With The 2003 PPM ...................................................... 93

        2.  Advisors Breached The Subscription Agreement By Failing To Honor Its Disclosures In The 2003 PPM ........................................ 94

    B.  The LLC Agreement's Limitation Of Liability Clause Does Not Excuse Advisors's Breach ...................................................... 95

    C.  SDCERA's Breach Of The Implied Covenant Of Good Faith And Fair Dealing Claim Is Distinct From Its Breach Of Contract Claim ............................... 96

IX. The Complaint States Claims For Vicarious Liability Against The Fraud Defendants (Count VII) ...................................................................... 97

    A.  Advisors, As Hunter's Employer, Is Vicariously Liable For His Torts Within The Scope Of His Employment ...................................... 97

    B.  As Maounis, Winkler, And Jones Directed, Controlled, Or Permitted Hunter's Torts, They Are Also Vicariously Liable ...................................... 98

X.  Alternatively, SDCERA Should Be Granted Leave To Amend Its Complaint ................... 99

CONCLUSION ...................................................................... 101

# <u>TABLE OF AUTHORITIES</u>

## CASES

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308 (S.D.N.Y. 1997)........61, 65

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ........................................ 100

*Adler v. Berg  Harmon Assocs.*, 892 F. Supp. 98 (S.D.N.Y. 1995) ............................ 39

*Albert v. Alex Brown Mgmt. Servs., Inc.*, Nos. Civ.A. 762-N & 763-N, 2005 WL
   2130607 (Del. Ch. Aug. 26, 2005) .........................................................63, 65, 85

*Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488 (S.D.N.Y. 1996)...................... 59

*Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40 (2d Cir. 1991) .....................23, 24, 50

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999).................... 93

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79
   (S.D.N.Y. 2004)............................................................................................. 88

*Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143 (Del. Ch.
   2003) ............................................................................ 63, 64, 65, 66, 67

*AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266 (2d Cir. 1992)..............................46, 47

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, Nos. 05-5132-cv, 05-2593-cv, 2007 WL
   1989336 (2d Cir. July 11, 2007).................................................................. 18

*Babcock v. Jackson*, 12 N.Y.2d 473 (1963)............................................... 46

*BKM Enters., Inc. v. Budget Modular Workstations, Inc.*, No. CV054008900S, 2007
   WL 806275 (Conn. Super. Ct. Feb. 21, 2007) ..................................... 77

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)................................................... 51

*Bass v. World Wrestling Fed'n Entm't, Inc.*, 129 F. Supp. 2d 491 (E.D.N.Y. 2001) ................. 69

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007)................................................ 18

*Bello v. Barden Corp.*, 180 F. Supp. 2d 300 (D. Conn. 2002)................................... 69

*Bergeron v. Philip Morris, Inc.*, 100 F. Supp. 2d 164 (E.D.N.Y. 2000) .................... 46

*Birger v. Tuner*, 104 Misc. 2d 63 (N.Y. Civ. Ct. 1980) ......................................... 93

*Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del. 1970) .................................................. 61

*Brasby v. Morris*, No. C.A. 05C-10-022-RFS, 2007 WL 949485 (Del. Super. Ct. Mar. 29, 2007) ................................................................................................77, 78

*Cocchiola Paving, Inc. v. Peterbuilt of S. Conn.*, No. CV010168579S, 2003 WL 1227557 (Conn. Super. Ct. Mar. 3, 2003) ............................................................ 77

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2003) ................................... 3

*Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994) ....................44, 45

*Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689 (Del. Ch.), *rev'd on other grounds,* 311 A.2d 870 (Del. 1973) ...........................................................................81, 83

*Connell v. Hayden*, 443 N.Y.S.2d 383 (N.Y. Sup. Ct. 1981) .................................... 97

*CooperVision, Inc. v. Intek Integration Techs., Inc.*, 7 Misc. 3d 592, 600 (N.Y. Sup. Ct. 2005) ...................................................................................................... 95

*Coronado Dev. Corp. v. Millikin*, 22 N.Y.S.2d 670 (Sup. Ct. N.Y. County 1940) .................... 64

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) ....................................................... 73

*CVC Claims Litig. L.L.C. v. Citicorp Venture Capital Ltd.*, No. 03 Civ 7936, 2006 WL 1379596 (S.D.N.Y. May 18, 2006) ............................................................. 96

*DeAngelis v. Lutheran Med. Ctr.*, 445 N.Y.S.2d 188 (N.Y. App. Div. 1981)............................ 74

*Decker v. Roberts*, 3 A.2d 855 (Conn. 1939)......................................................68, 69

*Devaney v. Chester*, 813 F.2d 566 (2d Cir. 1987)................................................... 100

*Dieterich v. Harrer*, 857 A.2d 1017 (Del. Ch. 2004) ............................................... 62

*Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146 (Del. Ch. 2006) .............................. 87

*Dubary v. Irish*, 542 A.2d 711 (Conn. 1988)........................................................ 69

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ............................................21, 88

*Emergent Capital Inv. Mgmt., L.L.C. v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) .................................................................................................22, 58

*Erickson v. Pardus*, 127 S. Ct. 2197 (2007) ....................................................... 18

*Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004) .......................................................... 32

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325 (2d Cir. 2005) ..........................................................................................................69, 70

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ................................................................................................................ 70

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. L.L.C.*, 376 F. Supp. 2d 385 (S.D.N.Y. 2005) ........................................................................................................ 64

*Gelfman v. Weeden Investors, L.P.*, 859 A.2d 89 (Del. Ch. 2004) .............................. 71

*Glorioso v. Police Dep't of Burlington*, 826 A.2d 271 (Conn. Super. Ct. 2003) ........................ 68

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) .................................................... 24

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160 (Del. 2002) .............. 85

*Grace v. Morgan*, No. Civ.A. 03C05260JEB, 2004 WL 26858 (Del. Super. Ct. Jan. 6, 2004) ..........................................................................................................80, 81

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002) ............................. 24

*Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734 (Conn. 2005) .............................. 71

*Hartford Fire Ins. Co. v. Leninski*, No. CV970396097S, 2002 WL 31513608 (Conn. Super. Ct. Oct. 29, 2002) ........................................................................................ 77

*Higazy v. Millennium Hotel & Resorts, CDL (NY) L.L.C.*, 346 F. Supp. 2d 430 (S.D.N.Y. 2004) ........................................................................................................ 97

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) ..................................................................................24, 28. 29, 30

*In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862 (S.D. Tex. 2002) ....................... 41

*In re Bigmar, Inc.*, No. Civ.A. 19289-NC, 2002 WL 550469 (Del. Ch. Apr. 5, 2002) .........80, 86

*In re Cencom Cable Income Partners, L.P. Litig.*, No. C.A. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000) ............................................................................................ 65

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ...................... 42

*In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ................................................................................................ 61

*In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F. Supp. 533 (S.D.N.Y. 1980)............... 59

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................ 42

*In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526 (S.D.N.Y. Feb. 28, 2006)................................................................................................ 24

*In re Triarc Cos.*, 791 A.2d 872 (Del. Ch. 2001) .................................................................... 61

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005).................................... 86

*Ins. Co. of N. Am. v. Johnson*, 959 F.2d 240 (1992) .................................................................. 94

*Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137 (2d Cir. 2004)....................45, 69

*Internet Law Library, Inc. v. Southridge Capital Mgmt., L.L.C.*, 223 F. Supp. 2d 474 (S.D.N.Y. 2002).................................................................................................39, 49

*Jaywyn Video Products, Ltd. v. Servicing All Media, Inc.*, 179 A.D.2d 397.............................. 93

*Kalnit v. Eichler*, 85 F. Supp. 2d 232 (S.D.N.Y. 1999)............................................................ 100

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) .......................................................................... 32

*Katz v. Emmett*, 641 N.Y.S.2d 131 (N.Y. App. Div. 1996)........................................................ 79

*Keams v. Tempe Technical Inst., Inc.*, 993 F. Supp. 714 (D. Ariz. 1997)................................... 99

*Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ................................................................................................................... 71

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)....................................................... 46

*Kostiuk v. Queally*, 267 A.2d 452 (Conn. 1970)........................................................................ 69

*Kuczynski v. McLaughlin*, 835 A.2d 150 (Del. Super. Ct. 2003)................................................ 74

*Lasker v. N.Y. State Elec. & Gas  Corp.*, 85 F.3d 55 (2d Cir. 1996)........................................... 41

*Legatski v. Bethany Forest Assoc., Inc.*, No. 03C-10-011-RFS, 2006 WL 1229689 (Del. Super. Ct. Apr. 28, 2006) ..................................................... 79, 81, 84, 85, 88

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) ...................................................................36, 100

*Madison Real Estate Immobbielien-Anlagegesellschaft Beschrankt Haftende KG v. Geno One Fin. Place L.P.*, No. Civ.A.1928-N, 2006 WL 456779 (Del. Ch. Feb. 22, 2006) ............................................................................................................ 81

*Madison Realty Partners 7, L.L.C. v. AG ISA, L.L.C.*, No. CIV.A. 18094, 2001 WL 406268 (Del. Ch. Apr. 17, 2001)............................................................................ 77

*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) ...........................................................82, 88

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) .................................................... 89

*McMahon v. New Castle Assoc.*, 532 A.2d 601 (Del. Ch. 1987)................................ 81

*Metro. Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121 (Del. 2004) ................................................................................................................... 88

*Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir. 1993)................................ 22

*Meyer v. Holley*, 537 U.S. 280 (2003)........................................................................ 98

*Miller v. Am. Real Estate Partners, L.P.*, No. CIV.A.16788, 2001 WL 1045643 (Del. Ch. Sept. 6, 2002) ........................................................................................... 85

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007) .............................18, 33

*Morse v. Weingarten*, 777 F. Supp. 312 (S.D.N.Y. 1991).......................................... 47

*Muller-Paisner v. TIAA-CREF*, 446 F. Supp. 2d 221 (S.D.N.Y. 2006)...................... 35

*Natural Res. Corp. v. Royal Res. Corp.*, 427 F. Supp. 880 (S.D.N.Y. 1977)............. 46

*Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41 (2d Cir. 1997) ......................... 47

*PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) ......................................... 94

*Patton v. Simone*, 626 A.2d 844 (Del. Super. Ct. 1992)............................................ 75

*People v. Toomey*, 203 Cal. Rptr. 642 (Cal. Ct. App. 1984) ................................97, 99

*Quintel Corp. v. Citibank, N.A.*, 596 F. Supp. 797 (S.D.N.Y. 1984)......................... 20

*Rahl v. Bande*, 328 B.R. 387 (S.D.N.Y. 2005) ......................................................... 88

*Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334 (S.D.N.Y. 2005).............. 69

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ................................................ 76

*Ronan Assocs., Inc. v. Local 94094A-94B*, 24 F.3d 447 (2d Cir. 1994)...................................... 94

*Roselink Investors L.L.C. v. Shenkman*, 386 F. Supp. 2d 209 (S.D.N.Y. 2004)........................ 47

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ................................................18, 50

*Rozani v. Sanofi S.A.*, 899 F.2d 195 (2d Cir. 1990) ................................................ 100

*Sack v. Low*, 478 F.2d 360 (2d Cir. 1973) ................................................ 46

*San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996)........................................................................ 41

*Sempra Energy Trading Corp. v. Algoma Steel, Inc.*, No. 00 Civ. 9227 (GEL), 2001 WL 282684 (S.D.N.Y. Mar. 22, 2001)................................................ 95

*Seybold v. Groenink*, No. 06 Civ. 772, 2007 WL 737502 (S.D.N.Y. Mar. 12, 2007) ...........70, 79

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith*, 495 F.2d 228 (2d Cir. 1974)...................... 20

*Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ...................................... 36

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994).................................. 35

*Small v. Fritz Cos.*, 132 Cal. Rptr. 2d 490 (Cal. 2003) ........................................44, 45

*Solar Cells, Inc. v. True N. Partners, L.L.C.*, No. Civ.A. 19477, 2002 WL 749163 (Del. Ch. Apr. 25, 2002) ................................................................ 80

*Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365 (N.Y. 1992) .................................... 71

*Sonet v. Timber Co., L.P.*, 722 A.2d 319 (Del. Ch. 1998)........................................ 87

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001)................. 42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007)................................passim

*Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997) ................................. 22

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)....................60, 61, 65

*VGS, Inc. v. Castiel*, No. C.A. 17995, 2000 WL 1277372 (Del. Ch. Aug. 31, 2000), *aff'd*, 781 A.2d 696 (Del. 2001)...................................................... 80

x

*Ventres v. Goodspeed Airport, L.L.C.*, 881 A.2d 937 (Conn. 2005) ..................................... 97, 99

*Xerion Partners I L.L.C. v. Resurgence Asset Mgmt., L.L.C.*, 474 F. Supp. 2d 505
   (S.D.N.Y. 2007) ................................................................................................. 35, 36, 39

*Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276 (S.D.N.Y. 1991) .................................. 92

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(2) (2000) ............................................................................................... 31

17 C.F.R. § 240.10b-5 (2007) ...................................................................................... 20, 21, 29

## FEDERAL RULES

Fed .R. Civ. P. 8(a)(2) (2006) ................................................................................................. 18

Fed.  R. Civ. P. 15(a) (2006) ................................................................................................... 99

Fed. R. Civ. P. 9(b) (2006) ............................................................................................... 47, 88

## PRELIMINARY STATEMENT

In approximately 140 pages of briefing in support of five separate Motions to Dismiss[1] SDCERA's Complaint, none of the defendants, Amaranth Advisors L.L.C. ("Advisors"), Nicholas M. Maounis ("Maounis"), Charles H. Winkler ("Winkler"), Robert W. Jones ("Jones"), and Brian Hunter ("Hunter"), dispute the three central facts in this case:  **first**, that prior to SDCERA's September 2005 investment of $175 million in Amaranth Partners LLC ("Amaranth" or the "Fund"), Advisors, Maounis, Winkler, and Jones (together, the "Fraud Defendants") expressly portrayed the Fund as a multi-strategy, risk-managed investment that eschewed the promise of "home run" returns from risky gambles in favor of modest gains achieved through diversification, hedging and active risk management; **second**, that just one year later, in September 2006, the Fund self-destructed, losing $6.6 billion dollars of its investors' money in an unprecedented and humiliating public meltdown because it had indeed chased after home-run returns by gambling – and losing – the vast majority of its assets on long-shot, un-hedged bets in the notoriously volatile natural gas futures markets; and **third**, that in the time between SDCERA's investment and the Fund's collapse, the defendants repeatedly and specifically told SDCERA that the Fund was not over-concentrated in energy investments, which they described as both risk-controlled and ever-decreasing as a percentage of the Fund's overall investments across a well-managed and diversified portfolio.

This case is thus not, as the defendants suggest, merely about an unhappy investor looking for someone to blame.  On the contrary, SDCERA was prepared to accept the general

---

[1] This Memorandum addresses only the defendants' substantive arguments.  Hunter's jurisdictional challenge is addressed in Plaintiff's Memorandum in Opposition to Defendant Brian Hunter's Motion to Dismiss Complaint for Lack of Personal Jurisdiction.

risks associated with investing, and even the specific risks of the Fund that were disclosed to it. It justifiably relied, however, on the defendants' express promises that these risks would be actively managed, and more importantly, that as an investor in the Fund, it would <u>not</u> be exposed to certain risks, particularly the very risk that ultimately brought down the fund, over-exposure of the Fund's portfolio to a single, high-risk, volatile investment.  This case is thus about <u>how</u> and <u>why</u> SDCERA's investment was lost.  As alleged in the Complaint, SDCERA's investment in the Fund would never have even occurred – and would certainly have been withdrawn – but for the Fraud Defendants repeated misrepresentation of the Fund as risk managed, diversified, and conservative.  In reality, with Hunter's complicit assistance, the Fund was nothing more than a high-stakes, high-risk bet on a reckless strategy of total, un-hedged commitment to speculative and highly-leveraged trades in a notoriously volatile commodity market.   That is not the investment that SDCERA signed up for, and its losses are a direct result of the defendants' fraud, recklessness, and other breaches of duties owed to SDCERA.

Defendants' Motions should be denied because they are each based on nothing more than the exaggerated effects of manifestly inadequate risk disclosures and non-existent pleading technicalities, none of which merits dismissal of SDCERA's well-pled and meritorious claims.

### SDCERA's Fraud Claims are Well-Pled

Counts I and II of the Complaint assert causes of action for securities and common law fraud, respectively, against the Fraud Defendants as a result of their making numerous material misstatements and omissions by which SDCERA was induced to invest and remain an investor in the Fund, including:

- **Maounis** sold the Fund to SDCERA as a conservative investment offering reasonable returns from a multi-strategy portfolio.  Diversification, hedging and other risk controls would offset the risks of each investment, and the Fund would avoid over-concentration of its assets in any one volatile investment or market. Similar representations were repeated after SDCERA's

investment as well.  Maounis, however, was actually approving the reckless concentration of the Fund's assets in volatile natural gas futures, using the "home run" returns he was generating on paper to prop up the Fund's lackluster performance, and allowing Hunter to continue the Fund's risky, undisclosed gambles without any limits on his trading.  (*See, e.g.,* Compl. at ¶¶ 41-44, 56-58, 60, 75)

- **Winkler** was present for many of Maounis' misrepresentations both before and after SDCERA's investment, and either echoed or failed to contradict them.  As Chief Operating Officer, Winkler had an active role in the Fund's management and had approved the Fund's reckless natural gas trading and the elimination of risk controls from the energy trading portfolio.  Winkler, however, never disclosed that he knew the representations he, Maounis and others were making as to the Fund's operation and its risk controls were materially false.  (*See, e.g.,* Compl. at ¶¶ 5, 7, 12, 13, 33, 41-43, 48, 49, 56, 57, 62, 66, 70, 78, 79, 98)

- **Jones,** the Fund's Chief Risk Officer, was also present for and echoed or was silent as to many of Maounis' misrepresentations.  Jones, like Winkler, was aware that the information concerning the Fund's operations that was being presented to SDCERA was materially false.  In addition, Jones never disclosed the elimination of the Fund's usual risk controls on the energy trading portfolio, which he, himself, had recklessly, and expressly authorized. (*See, e.g.,* Compl. at ¶¶ 60, 64-68, 70, 73, 78, 79, 98)

- **Advisors** is responsible for each of the misrepresentations of its officers as described above, other oral misstatements by its personnel, and for the misstatements and omissions made in the 2 Private Placement Memoranda ("PPMs")[2] provided to SDCERA and in other related documents.  Chief among these are express commitments to use meaningful risk controls, including at a minimum, diversification and hedging, in order to prevent over-concentration of the Fund's assets in volatile investments.  Advisors, however, had already expressly abandoned diversification and risk control, and had allowed the Fund's reckless concentration in natural gas futures.  (*See, e.g.*, Compl. at ¶¶ 33-37, 71, 79)

    Each of the defendants ignore the limited effect of the risk disclosures that were made to

SDCERA, given the context in which they were made.  Read alongside the Fraud Defendants'

contemporaneous statements assuring risk management and diversification in the Fund,

SDCERA cannot reasonably be said to have been notified of the risk of the defendants'

---

[2] Copies of both the March 2003 PPM ("2003 PPM") and January 2006 PPM ("2006 PPM") are attached as Ex. A and B, respectively to the Affidavit of Christina Burgos filed herewith ("Burgos Aff.").  Both documents as well as others attached as exhibits thereto, were exhibits to Advisors's Mem. and were also referenced in the Complaint (Burgos Aff. Ex. K).  The Court may thus consider these documents without converting Defendants' motions into motions for summary judgment.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2003).

fraudulent and reckless conduct.  To the contrary, both PPMs expressly represented that Advisors simply would not allow over-concentration in volatile futures to the point that a single market's temporary movement could bring down the Fund.  SDCERA's reliance on each of the material misrepresentations made by Maounis, Winkler, Jones and Advisors was justified.

The Complaint alleges the misrepresentations themselves, and the facts from which a strong inference of scienter can be drawn, with requisite particularity.  Maounis, Winkler, Jones and Advisors are each alleged to have made at least one specific, material misstatement or omission on at least one specific occasion, and to have had personal knowledge of the falseness of the statement or of the need to correct a false material statement or impression conveyed to SDCERA.  There is also no merit in the defendants' choice-of law arguments as to SDCERA's common law fraud claims, all of which are actionable under any applicable State law.

### None of the Counts of the Complaint Assert Derivative Claims

Counts III, V, VI and VIII of the Complaint allege claims for gross negligence (against all defendants) breach of fiduciary duty (against the Fraud Defendants) and aiding and abetting breach of fiduciary duty (agains Hunter, Winkler, and Jones).  Contrary to defendants' assertions, these causes of action are not derivative claims (i.e., alleging injury to and seeking recovery on behalf of the Fund, not SDCERA, individually).  The Complaint alleges that specific misrepresentations were made to SDCERA, and that the resulting injuries were also demonstrably particular to SDCERA, and were separate and apart from any injury to Fund, itself.  Under such circumstances, the law is clear that SDCERA has standing to bring individual, direct claims against the defendants.  Moreover, both the nature of SDCERA's particular claims, as well as the structure of the Fund itself, allow injuries to pass through the Fund and impact SDCERA as an individual victim and real party in interest.

**Neither Connecticut Law nor Defective Risk Disclosures**
**<u>Merit Dismissal of SDCERA's Gross Negligence Claims</u>**

SDCERA's gross negligence claims (Counts III and VIII) arise out of the Fraud

Defendants' reckless mismanagement of the Fund, and Hunter's own reckless trading.

Defendants again incorrectly assert these claims are governed and barred by Connecticut law.

Connecticut allows plaintiffs to assert both gross negligence claims as well as claims for a

defendant's wanton or reckless breach of duty.  As such, the conduct alleged in Counts III and

VIII of the Complaint is just as actionable under Connecticut law as it is under the laws of New

York, California or Delaware.  Should Connecticut law be applied to these claims, SDCERA is

still entitled to the benefit of all reasonable inferences capable of being drawn from the facts of

its Complaint, and its otherwise well-pled claim should not be dismissed.  Similar inferences

drawn from the Complaint also negate the contention that these claims are barred by the

"economic loss doctrine."  Read as a whole, the Complaint alleges the defendants' reckless

trading began at least as early as SDCERA's due diligence on the investment, i.e., before any

contract existed on which an application of the doctrine could be predicated.

**<u>Advisors, Maounis, Winkler and Jones Breached Their Fiduciary Duties</u>**

Count V of the Complaint alleges that each of the Fraud Defendants also breached

fiduciary duties owed to SDCERA as an investor-member of the Fund.  Maounis, himself, said it

best during a presentation to SDCERA's board on July 21, 2005:  "We have a fiduciary

responsibility to our investors[.]"  (Compl. At ¶ 44).  Under the governing Delaware law, that

fiduciary responsibility specifically includes a duty of complete candor owed by Advisors and its

officers (including Maounis, Winkler and Jones).  Each of the Fraud Defendants breached this

duty, as well as duties of care and good faith when they concealed from SDCERA the true extent

of the Fund's reliance upon long-shot gambles and risky speculation in one of the most volatile markets in existence.  Neither the defective risk disclosures in the PPMs, the similarly obtuse monthly performance updates sent to investors, nor any other disclosure or provision of any document disclaimed these duties or put SDCERA on notice that they were being breached.

### Winkler, Jones and Hunter also Aided and Abetted Breaches of Fiduciary Duty

Count VI of the Complaint alleges that Hunter, Winkler and Jones aided and abetted the particular breaches of fiduciary duties committed by Advisors and Maounis.  Advisors was the designated Fund manager and Maounis controlled Advisors.  By diverting Fund assets to Hunter for use in his reckless trading schemes and  concealing the same from SDCERA, Maounis and Advisors breached their fiduciary duties of candor, care and good faith.  As Advisors's Chief Risk Officer, however, Jones was complicit in allowing Hunter's wild speculation to swallow the Fund whole.  Similarly, as Advisors's Chief Operating Officer, Winkler was expressly privy to the Fund's operations and specifically aware of Hunter's reckless trading and Maounis' sanctioning of it.  Through their silence and complicity, they are guilty of aiding and abetting Maounis' and Advisors's breaches, as is Hunter, who's reckless speculation was the direct source of the Fund's collapse.

### Advisors is Estopped from Denying it Breached its Contractual Obligations

Count IV of the Complaint asserts that Advisors also breached contractual obligations to SDCERA through its mismanagement of the Fund.  Advisors is a party to the LLC Agreement, which incorporates both the Subscription Agreement and 2003 PPM by reference. Independently, however, Advisors is also bound to the terms of the Subscription Agreement – including the representations made in the 2003 PPM, which was incorporated therein by reference – by virtue of being an intended beneficiary of the Agreement.  Advisors specifically

6

breached its obligation to SDCERA, as expressly defined in the 2003 PPM, to employ appropriate risk controls in its management of the Fund, and to prevent the Fund's over-concentration in any particular volatile investment.

### Advisors, Maounis, Winkler and Jones are Vicariously Liable for Hunter's Torts

Count VII asserts claims for vicarious liability as to the Fraud Defendants, who are each personally responsible for Hunter's gross negligence.  Advisors – Hunter's employer – is, of course liable for damages caused by his torts committed in the scope of his employment. Maounis, Winkler and Jones, however, because of their direct involvement and complicity in Hunter's torts may, by virtue of supervisory culpability, also be held liable for the consequences of Hunter's gross negligence.

### STATEMENT OF FACTS

In September 2006, Amaranth collapsed after losing over $6 billion worth of value as a result of its reckless accumulation of untradable positions in the notoriously risky and volatile natural gas futures markets.  (Compl. at ¶ 4.)  SDCERA was one of many investors who watched as millions of dollars of their investments abruptly disappeared in what was, to date, one of the largest implosions ever of a hedge fund.  (Compl. at ¶ 23.)  Large as it was, the reasons for the Fund's collapse were surprisingly simple.  Beginning in 2005, Advisors, as Manager of the Fund, had allowed its lead energy trader, defendant Brian Hunter, to make increasingly larger and riskier bets on the difference between the price of natural gas futures in two given months (the "spread").  (Compl. at ¶¶ 58, 61-62.)  When the notoriously volatile natural gas futures market temporarily shifted unfavorably, Hunter's positions were by then so large, leveraged, and so utterly unprotected by risk management controls, that the Fund could not settle its losses without liquidating its remaining assets.  (Compl. at ¶¶ 52, 87.)

The Fund collapsed in September 2006 for four reasons in particular:

**Hunter's gambles didn't pay off**.  Natural gas prices temporarily turned against the positions Hunter had taken for the Fund in early September 2006, prompting margin calls from the lenders which had financed Advisors's highly leveraged trading.  (Compl. at ¶ 85.)

**Hunter's gambles were enormous**.  Hunter traded so heavily that Advisors was directed by the New York Mercantile Exchange ("NYMEX") to reduce the number of contracts it held pursuant to Commodity Futures Trading Commission ("CFTC") volume limitations.  (Compl. at ¶¶ 55-59, 83.)  Volume, however, was Hunter's goal:  he was manipulating the spread price by executing large trades, using volume swings of his own making to trick the market into moving. (Compl. at ¶ 63.)  Rather than reduce Advisors's positions, Hunter shifted his trades to the unregulated ICE exchange, where he could trade without being noticed.  (Compl. at ¶ 83.)  When the market turned, Advisors owned so many natural gas positions that it effectively <u>was</u> the market, and there were no buyers for its rapidly devaluing contracts.  (Compl. at ¶81.)

**Hunter's trades were highly leveraged.**  Mounting losses and margin calls dried up Advisors's access to capital.  (Compl. at ¶¶ 87-88.)  Hunter could no longer trick the market with volume trades, so the value of Advisors's positions continued to slide.  (Compl. at ¶ 87.)

**The risks of Hunter's trading were not controlled**.  Hunter's trading was made possible by the other defendants' waiver of the Fund's risk management policies.  Jones personally allowed Hunter to trade without adhering to risk controls imposed on other Fund portfolios.  (Compl. at ¶¶ 65-66.)  Maounis and Winkler's diversion of the Fund's assets to Hunter ignored diversification, allowed over-concentration of the Fund's assets in a volatile market, and bet the Fund's future on the natural gas market spread.  (Compl. at ¶¶ 87-88.)

For SDCERA, the collapse of the fund was particularly shocking, not only because of the amount of its investment, but because the defendants expressly induced its investment by

promising that these very conditions would not be allowed to exist under their management.

**Defendants' Initial Oral Misrepresentations**

In or about January 2005, SDCERA's investment advisor, Rocaton Advisors, L.L.C.

("Rocaton") recommended that it invest in the Fund.  (Compl. at ¶ 39.)  Rocaton informed

SDCERA that Advisors representatives stated, among other things, that:

- Advisors's risk management team, including defendant Jones, actively managed the Fund's investment strategies, both at the multi-strategy and individual strategy level;

- The Fund was operated as a multi-strategy, diversified hedge fund with an emphasis on investing in strategies that offered the best balance of opportunity and risk control;

- Risk management was an integral component of capital allocation decision-making, with all such decisions begin made within will-defined risk parameters, including that strategies that exceed a predetermined risk budget for the fund will be de-funded as necessary.

(Compl. at ¶¶ 39, 40.)

Each such statement was false and known to be false by the defendants when made.

(Compl. at ¶¶ 4, 7.)  Specifically, beginning no later than 2005, the Fund was being run as a *de facto* single-strategy natural gas fund, placing billions of dollars at risk in highly volatile markets

without having the represented risk controls in place.  (Compl. at  ¶¶ 7-8, 13-16.)

Further misrepresentations followed.  In March 2005, SDCERA's representatives

traveled to Advisors's offices in Connecticut to continue SDCERA's due diligence review of the

Fund.  (Compl. at ¶41.)  Defendants Maounis, Winkler and Jones each met with SDCERA and

each repeated many of the same misrepresentations previously made to Rocaton.  (Compl. at ¶¶

41-42.)  In particular, Maounis, Winkler and Jones each told SDCERA that the Fund used a

diversified, multi-strategy investment approach combined with the proactive participation of the

risk management team working with the Fund's portfolio managers as two of the principal means

of managing the Fund's overall exposure to investment risk.  (Compl. at ¶¶ 42-43.)

These portrayals of the risk management characteristics of the Fund were known by each

of the Fraud Defendants then to be inaccurate.  (Compl. at ¶¶ 4, 7, 13-16.)  Hunter had already

been hired at the time of this meeting, and had already begun – with the knowledge and consent

of the Fraud Defendants, his reckless and uncontrolled spread trading.  (Compl. at ¶¶ 47-48.)

The Fraud Defendants also omitted material information at the March 2005 meeting.

SDCERA's representatives were neither introduced to nor told anything about Hunter.  (Compl.

at ¶¶ 42, 48-49.)  The Fraud Defendants' failure to disclose Hunter's employment by Advisors

was a material omission since Hunter's background was directly relevant to the level of risk

faced by potential Fund investors.  In particular, only months prior to his 2004 arrival at

Advisors, Hunter was demoted by his former employer Deutsche Bank, and his year-end bonus

withheld, after Hunter's energy trading group lost $51.2 million during a single week in

December 2003.  (Compl. at ¶ 46.)

Advisors and SDCERA next met on July 21, 2005 when Maounis spoke to SDCERA's

Board of Trustees.  (Compl. at ¶¶ 5, 44.)  Again, Maounis emphasized risk management,

conservative strategies, and diversification as reasons why SDCERA should invest in the Fund:

> **What [the Board] should be looking for** in managers are multi-strategy managers.
> . . .The most important thing for us is really to minimize the downside. . . . **We don't
> want to hit home runs, we want to get singles and doubles.  So we want to
> minimize that downside.  . . . It's not okay to lose money in the year.  And that's
> really what we try to do. . . . We're targeting high-single digit to low double digit
> returns with small volatility.**  That's what we're targeting.

(Compl. at ¶ 44.) (emphasis added)

Maounis concluded his presentation by assuring SDCERA's Board that "we have a

fiduciary responsibility to our investors."  (Compl. at ¶ 44.)

Maounis's statements to the SDCERA Board were false and misleading.  (Compl. at ¶¶ 4,

7-8, 13-16.) By no later than April 2005, Maounis was already relying upon Hunter's reckless

trades to prop up the Fund's overall weaknesses.  (Compl. at ¶ 47.)  Pitching the fund as he did,

all the while knowing the extent to which its profits came from reckless and uncontrolled trading in the most volatile and speculative of commodities, was materially misleading.

### Defendants' Written Misrepresentations in the Fund Documents

In reliance on these misrepresentations, and on the Amaranth Partners L.L.C. Subscription Agreement ("Subscription Agreement"),[3] the 2003 PPM, and the Amaranth Partners LLC Amended and Restated Limited Liability Company Agreement ("LLC Agreement"), the most current version of which as of September 2005 was the Fourth Amended and Restated Limited Liability Company Agreement ("Fourth LLC Agreement"),[4] (together, the "Fund Documents"), SDCERA invested $175 million in the Fund.  (Compl. at ¶ 50.)

While the Fund Documents contained a variety of risk disclosures, and affirmations of investment management discretion delegated to Advisors and its personnel, each such provision was expressly qualified by the Fund Documents' descriptions of its risk management policies, which portrayed the Fund as a materially different – and far safer investment than SDCERA was actually making.  Specifically, the 2003 PPM repeated the same or similar false promises of diversification as a primary tool for achieving risk management that were initially made by the Fraud Defendants.  (Compl. at ¶¶ 34-37.)  The most prominent misrepresentation appeared under the sub-heading, "**Risk Management**" (emphasis original):

> **Risk management is integral** to the Manager's goal of identifying investment opportunities having superior risk/reward parameters.  Accordingly, the **Manager seeks to continuously monitor the risk parameters and expected volatility of the Fund's overall portfolio and attempts to prevent over-concentration of the**

---

[3] Burgos Aff., Ex. C.

[4] Burgos Aff., Ex. D.  The Fifth Amended and Restated Limited Liability Company Agreement dated January 31, 2006 ("Fifth LLC Agreement") is Ex. E to the Burgos Aff.

**portfolio in any particular investment asset, strategy or market**.  However, the
Manager does not, in general, attempt to hedge all market or other risks inherent in
the Fund's portfolio, and hedges certain risks, if at all, only partially.  Specifically,
the Manager may determine that it is economically unattractive or otherwise
undesirable to hedge certain risks (either with respect to particular positions or the
Fund's overall portfolio) **and instead rely on diversification to control such risks**.

Burgos Aff., Ex. A at p. 12 (emphasis added, italics original).

This clause was materially misleading.  When SDCERA received the 2003 PPM,
defendants were already allowing Hunter to trade without <u>any</u> risk controls.  (Compl. at ¶¶ 64-
65.)  Moreover, far from the continuous monitoring of volatility and risk promised, the
defendants were actually encouraging concentration of the Funds' assets in volatile energy
markets.  (Compl. at ¶¶ 56-58, 66.)  Finally, the clause falsely states that Advisors will use <u>either</u>
hedging or diversification for risk management.  Jones, however, was already willfully excluding
Hunter's trading from all risk controls, while Maounis, Winkler and Jones were actively
encouraging the Fund's over-accumulation of natural gas spread positions, and providing Hunter
with the capital and leverage to build recklessly large trading positions.  (*Id*.)

Each of Advisors's expressions of risk control colored the context of every risk
disclosure made to SDCERA.  Combined with the defendants' promises of risk management,
volatility monitoring, and the prevention of over-concentration, these disclosures actually
reinforced the Defendants' commitment to maintaining a balanced portfolio in order to avoid the
risk of  concentration in a single, volatile investment.  (Compl. at ¶ 35.)

**Defendants' Post-Investment Misrepresentations**

The defendants further duped SDCERA into leaving its capital investment within the
Fund, ultimately to its serious detriment when the Fund collapsed.  (Compl. at ¶¶ 85-94.)  In
October 2005, Advisors sent a letter, signed by Maounis, to the Fund's investors purporting to
describe the Fund's September 2005 performance.  *See* Amaranth September 2005 Update

("September 2005 Update").[5]  The September 2005 Update listed energy trading as one of many Fund strategies.  It gave no indication of the potential these investments had to completely destabilize the Fund.  *Id.*  Moreover, on October 10, 2005, during a conference call between Advisors and Rocaton, Advisors stated capital allocated to energy trading would be reduced, further reinforcing the perception of a limited role for these investments in the Fund.  (Compl. at ¶ 55.)  These statements were materially false and misleading.  The promised reduction never happened, and the defendants were at that time increasing the capital at Hunter's disposal.  (*Id.*)

The Amaranth October 2005 Update ("October 2005 Update")[6] also buried discussion of energy trading in the middle of several paragraphs describing the performance of other investments.  *Id.*  As to energy trading, the Update discussed a loss due to "extreme volatility in the natural gas, power, crude, and energy stock markets," but indicated that in light of this volatility, the Fund would take a cautious approach to future energy trading thus again expressly reinforcing the impression that the Fund was well insulated from destabilizing risks.  *Id.*  These statements (and omissions as to the Fund's true exposure to such risks) were false and misleading and known to be so by each of the defendants.  (Compl. at ¶¶ 56-58, 66.)

In January 2006, the Fund released the 2006 PPM, which reinforced the overall impression that risk management was an integral and continuously monitored part of this multi-strategy fund.  In particular, the 2006 PPM again emphasized Advisors's use of risk controls in its fund management, such as limiting the Fund's exposure to volatility and over-concentration by employing diversification and hedging.  Significantly, the language in the 2006 PPM's  "**Risk Management**" section was almost entirely unchanged from that found in the 2003 PPM.  The

---

[5] Burgos Aff., Ex. F.

[6] Burgos Aff., Ex. G.

overall pattern of the document remained as well, i.e. its reservation of investment discretion to

Advisors, its description of generic and specific risks, and its commitment to risk adjusted

returns and risk management.  *Compare* Burgos Aff, Ex. A *with* Ex. B.  Energy trading was

mentioned in both the new and old PPMs, but so were many other strategies.  *Id*. The 2006 PPM

was thus materially misleading for the same reasons as its predecessor.

Defendants March 29, 2006 email from Advisors's Steven Johnson to the Fund's

investors was also misleading.[7]  It announced that Harry Arora, Advisors's portfolio manager for

energy trading, "decided to leave Amaranth last night," and would be replaced by Hunter.

(Compl. at ¶ 69.)  No mention was made, however, of the fact that Mr. Arora's departure was

related to his and other risk management personnel's disapproval of Hunter's trading.  (Compl. at

¶ 70.)  Nor was Hunter's Deutsche Bank background discussed, i.e., his enormous energy trading

losses.  (*Id*.)  These were material omissions, since this information  would have directly

impacted SDCERA's overall risk assessment of the Fund, particularly its exposure to risky

energy trading.

In late-May 2006, SDCERA's received the statement of its own Fund account for the

month of April 2006 ("April Statement"), which revealed that in April, alone, the Fund's value

had increased more than 13%.[8]  (Compl. at ¶ 71.)  SDCERA called Advisors's Johnson on June

2, 2006 to voice concerns about the amount of the increase.  (*Id.*)  Johnson attempted to allay

SDCERA's concerns by stating that Advisors was having the Fund cash out of its energy

positions to reduce risk, and would "move conservatively to capitalize the risk of the positions on

[the Fund's] books."  (*Id.*)  These reassurances were mirrored by Maounis' own reassuring

---

[7] Burgos Aff., Ex. H.

[8] Burgos Aff., Ex. I.

statements in the April 2006 Update, received in mid-May by Rocaton.[9]

Advisors, Maounis, Winkler and Jones each made similar statements or omissions during a call with Rocaton on June 7, 2006, less than two weeks before what would be the last deadline for SDCERA to withdraw its capital before the Fund's collapse, and in the May 2006 Update,[10] received by SDCERA and Rocaton after the withdrawal notice deadline had already passed.  The defendants explained the May losses, saying that there had been an "unprecedented" dry-up in liquidity in the natural gas market in the final two weeks of the month while Advisors was attempting to unwind its natural gas spreads; that the relationship between natural gas and fuel oil inverted as had never happened before; that as a result, Advisors had significantly recalibrated its risk models to incorporate these developments; and that Advisors would be reducing its notional energy exposure by approximately 50%.  (Compl. at ¶ 73.)

All of the June 2006 statements were false and misleading and known to be so when made.  (Compl. at ¶¶ 71, 74-75.)  As of June 30, 2006, Advisors had actually <u>increased</u> its energy trading positions to the point where it had 56% (or $4.76 billion) of its capital allocated to energy trading.  (Compl. at ¶ 75.)  The Fraud Defendants were each aware of this fact, yet none of them informed SDCERA.  (Compl. at ¶¶ 74 – 76.)  Finally, these misrepresentations perpetuated the false impression of the Fund as a multi-strategy, risk-controlled fund that avoided volatility and concentration in particular markets.  (Compl. at ¶ 77.)  SDCERA justifiably relied on each of the Fraud Defendants' misrepresentations up through the June 16 capital withdrawal deadline, and thus retained its investment in the Fund.  (Compl. at ¶ 77.)

---

[9] Burgos Aff., Ex. J.

[10] Burgos Aff., Ex. K.

**Defendants' Misrepresentations on the Eve of the Fund's Collapse**

By the end of June, Hunter's trading positions were so large, they had become illiquid – there was simply no exit for the Fund from its positions. (Compl. at ¶ 75.) Faced with the need to raise cash but unable to liquidate Hunter's energy trades, Advisors, at the direction of Maounis, Winkler and Jones, sold off other investments, thereby decreasing diversification further, and increasing the Fund's exposure to Hunter's reckless trades. (Compl. at ¶ 75.) Then, on an August 10, 2006 call with Rocaton, the Fraud Defendants falsely represented that Advisors had dramatically reduced the Fund's notional exposure and previously increased capital support of Advisors's energy strategies. (Compl. at ¶ 78.) The Fraud Defendants each also maintained that Advisors's risk management personnel had spent significant time investigating the proper size of its positions in the natural gas market. (*Id.*)

On August 14, 2006, after the mid-August collapse of an unrelated hedge fund that traded in natural gas, SDCERA contacted Advisors's Johnson to ask about the Fund's natural gas investments. (Compl. at ¶ 79.) Johnson again falsely reassured SDCERA that there was no cause for concern. (*Id.*) In particular, Johnson stated that the Fund's energy portfolio was ably managed and that Advisors was reducing the Fund's energy exposure. (*Id.*) Finally, Johnson described the volatility of the Fund's existing gas positions as controlled, and that the Fund was "long in the wings," hedge fund jargon for adequately hedged. (*Id.*) Maounis echoed these statements in the July 2006 Update, which Rocaton received on August 18, and in which Maounis similarly described the Fund's supposed "reposition[ing] of our [natural gas] holdings," and "targeting [of] a smaller allocation for natural gas in the future." (Compl. at ¶ 80.)

The Fraud Defendants had in fact allowed the Fund to invest in far riskier positions than those expressed or implied by their representations. (Compl. at ¶ 81.) Hunter's energy trades

had increased, not decreased, and had not been properly hedged. (Compl. at ¶ 81.) Jones expressly waived any such risk controls for Hunter's trades, and this waiver was authorized by Maounis and approved of by Winkler. (Compl. at ¶¶ 56-58, 66.) Finally, the Fund was no longer in a position to decrease the size of its energy portfolio – the Fund was the market, there were no counterparties, and Hunter's positions had thus become illiquid. (Compl. at ¶ 81.)

### SDCERA's Damages

SDCERA had relied on the misrepresentations of the defendants in initially investing with the Fund, and later, in electing to remain invested in the Fund. Following the Fund's collapse, on September 18, 2006, SDCERA issued a written request for full redemption of its capital. (Compl. at ¶ 89.) The Fund's losses continued to mount, however, as Advisors and the other defendants continued to grapple with the illiquidity of Hunter's portfolio. (Compl. at ¶ 90.) On September 29, 2006, after finding distress buyers for Hunter's entire natural gas portfolio, Advisors announced to the Fund's investors that all redemption requests payable on September 30 and October 31 – including SDCERA's – were "temporarily suspended." (Compl. at ¶ 94.) To date, SDCERA's redemption requests have not been honored in full, and SDCERA has lost nearly two-thirds of its original $175 million investment. (*Id.*)

### ARGUMENT

## I.    THE APPLICABLE LEGAL STANDARDS

### A.    Regardless Of The Claim, The Court Must Accept As True All Factual Allegations In SDCERA's Complaint

Defendants move to dismiss SDCERA's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") for failure to state a claim. In ruling on defendants' motions, the Court must employ two different standards of review to determine if SDCERA's claims survive dismissal. First, the Court must evaluate SDCERA's claims for gross negligence, breach

of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and vicarious liability against defendants under FRCP 8(a)(2), which simply requires, as discussed further below, that SDCERA provide a "plain statement" of its claim alleging plausible grounds for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965-66 (2007).  On the other hand, to test the sufficiency of SDCERA's securities law and common-law fraud claims against the Fraud Defendants, the Court must find that SDCERA has satisfied the heightened pleading standards of FRCP 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), also discussed below. *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 580 (S.D.N.Y. 2007).

Regardless of the type of claim and its corresponding legal standard on a motion to dismiss, however, the Court in its analysis must accept all of the factual allegations in SDCERA's complaint as true. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007); *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007).  Furthermore, the Court must consider SDCERA's complaint in its entirety, as well as any other sources ordinarily examined when ruling on a motion to dismiss, including documents referred to in the Complaint. *Tellabs*, 127 S. Ct. at 2509; *Roth*, 489 F.3d at 509.

### B.   For Its Non-Fraud Claims, SDCERA Need Only Allege Facts Establishing Plausible Grounds For Relief

FRCP 8 requires SDCERA to provide "a short and plain statement of [its] claim" establishing that it is entitled to relief.  Fed .R. Civ. P. 8(a)(2).  This statement need only provide Defendants with fair notice of the claims and their bases. *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) .  SDCERA's Complaint must provide "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, Nos. 05-5132-cv, 05-2593-cv, 2007 WL 1989336, at *5 (2d Cir. July 11, 2007)  (*quoting Twombly*, 127 S. Ct. at 1965).  Accordingly, to survive dismissal, SDCERA must be found to have alleged

"enough facts to state a claim to relief that is plausible on its face." *See Twombly*, 127 S. Ct. at 1974. While allegations giving rise to mere speculation and possibility are insufficient, a complaint alleging facts raising a reasonable expectation that discovery will reveal evidence supporting plaintiff's claims will survive a motion to dismiss. *See id.* at 1965.

The Complaint provides defendants with fair notice of its claims and their grounds. SDCERA has thus met its pleading burdens as to its claims for gross negligence, breach of contract, breach of fiduciary duty, aiding and abetting of fiduciary duty, and vicarious liability.

### C.    SDCERA's Fraud Claims Must Meet The Heightened Pleading Standards Of FRCP 9(b) And PSLRA

On a motion to dismiss for failure to state a claim, the sufficiency of SDCERA's fraud allegations must meet the requirements of FRCP 9(b), while the securities fraud allegations must also comply with the PSLRA. *See ATSI Commc'ns*, 2007 WL 1989336, at *6. Under FRCP 9(b), SDCERA must plead both fraud causes of action with particularity, meaning that it must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 2007 WL 1989336, at *6.

Likewise, SDCERA's Complaint must also fulfill the heightened pleading standards of the PSLRA. *Id.* Under these standards, SDCERA must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs*, 127 S. Ct. at 2508; *ATSI Commc'ns*, 2007 WL 1989336, at *6. To satisfy a "strong inference" of scienter, SDCERA must allege facts showing that the Fraud Defendants had the motive and opportunity to commit fraud, or that there is strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* In determining whether SDCERA has

19

satisfied this requirement, the Court must consider "*all* of the facts alleged, taken collectively" – not just any one allegation in isolation. *Tellabs*, 127 S. Ct. at 2509.  While the Court must take into account plausible opposing inferences in its determination, where, as here, a plaintiff has provided a cogent inference of scienter, at least as compelling as any opposing inference that could be drawn, the complaint will survive a motion to dismiss.  *Id*. at 2509-10.

While the PSLRA requires SDCERA to meet its heightened standards, private securities actions under the PSLRA remain "'an indispensable tool with which defrauded investors can recover their losses' – a matter crucial to the integrity of domestic capital markets." *Tellabs*, 127 S. Ct. at 2508 n.4 (emphasis added).  Indeed, the very purpose of Section 10(b) and Rule 10b-5 is "to protect the investing public and to secure fair dealing in the securities markets by promoting full disclosure of inside information so that an informed judgment can be made by all investors who trade in such markets." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith*, 495 F.2d 228, 235 (2d Cir. 1974) (emphasis added).  These protections adhere not only to the unsophisticated investor, but also to the sophisticated investor.  *Quintel Corp. v. Citibank, N.A.*, 596 F. Supp. 797, 801 (S.D.N.Y. 1984).

As to each of its securities and common-law fraud claims, SDCERA has specified the fraudulent statement at issue, identified its speaker or sponsor, provided the time and place of the statement, and explained why the statement was fraudulent.  *See, infra*, Section II(C). Furthermore, SDCERA has alleged sufficient facts from which a strong inference of scienter may be derived, namely both motive and opportunity, and recklessness.  *See, infra*, Section II(B).

## II.   SDCERA'S COMPLAINT STATES CLAIMS AGAINST THE FRAUD DEFENDANTS FOR VIOLATIONS OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 10B-5 (COUNT I)

Under Section 10(b) of the Securities Exchange Act of 1934, it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe[.]" 15 U.S.C. § 78j(b) (2000).  In accordance with Section 10(b), Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder declares it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5 (2007).

The elements that a plaintiff must allege in order to assert a claim for securities fraud are that the defendant (1) made a "material misrepresentation or omission" (2) with "scienter," i.e., with intent or recklessness, (3) "a connection with the purchase or sale of a security," which was (4) relied on by the plaintiff, who (5) suffered an economic loss, which was (6) caused by the allegedly fraudulent misrepresentation or omission.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

The Fraud Defendants' motions each challenge the sufficiency of SDCERA's Complaint's allegations of justified reliance, materiality, and scienter, as well as the particularity with which the misrepresentations themselves are pled.[11]  The Fraud Defendants also seek to escape liability by mischaracterizing SDCERA's securities fraud claim as being premised solely upon allegations of "corporate mismanagement."  In each case, however, the Fraud Defendants' arguments are premised on distortions of the actual allegations of the Complaint and provide no basis for dismissing Count I.

---

[11]    None of the Fraud Defendants challenges the sufficiency of the Complaint's allegations as to loss causation or that the misrepresentations or omissions alleged were in conjunction with the sale or purchase of a security.

A.     **SDCERA's Justified Reliance And Materiality Allegations Are Unaffected By The Risk Disclosures In The 2003 PPM and the Subscription Agreement**

SDCERA's Complaint contains numerous allegations of justified reliance on the Fraud Defendants' misrepresentations as to the multi-strategy nature of the Fund and its use of risk controls, including the utilization of investment diversification as a primary tool to minimize the portfolio's overall volatility and risk.  (*See, e.g.*, Compl. ¶¶ 17, 36, 50, 71, 74, 77.)  The Fraud Defendants contend, however, that any justified reliance on the identified pre-investment misrepresentations was precluded by the merger clauses, risk disclosures, and managerial discretion clauses present in the 2003 PPM and the Subscription Agreement.  *See* Advisors's Mem. at pp. 12-19; Maounis's Mem. at pp. 15-17; Winkler's Mem. at p. 2; Jones's Mem. at pp. 12-14.  When viewed within the larger context of the Fund Documents and the Fraud Defendants' oral representations to SDCERA, however, these clauses simply did not apprise SDCERA of the true nature of the Fund, which was a much riskier and vastly different enterprise than such clauses conveyed.  *See Emergent Capital Inv. Mgmt., L.L.C. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (whether plaintiff has pled reasonable reliance element of securities fraud cause of action must be assessed in light of the context of the entire transaction).

1.     **The So-Called "Non-Reliance" Clauses of the 2003 PPM Do Not Preclude SDCERA's Justified Reliance On The Fraud Defendants' Misrepresentations**

Clauses that generally disavow reliance on extra-contractual sources (so-called "non-reliance" clauses) are ordinarily unenforceable against a plaintiff, such as SDCERA, alleging that it was fraudulently induced to enter into the agreement at issue.  *See Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997) (holding that a general merger clause does not preclude parol testimony where a claim is based on fraud in the inducement).  Such clauses will only be held to bar a claim for fraud in the inducement where they are accompanied by "explicit

disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993).

In this case, SDCERA has alleged that it was fraudulently induced to invest in the Fund by the Fraud Defendants' misrepresentations that the Fund employed a multi-strategy investment approach and other risk controls to minimize the portfolio's overall potential for loss.  (Compl. ¶ 97.)  Nothing in either the 2003 PPM or the Subscription Agreement constitutes an "explicit disclaimer" of liability for these particular misrepresentations.  On the contrary, these misrepresentations are echoed throughout the 2003 PPM in a series of clauses that affirm the Fraud Defendants' obligations to attempt to minimize volatility and over-concentration of the Fund's investments, and to do so by employing a wide variety of investment strategies in a wide variety of investment asset classes and markets.  (*See*, *e.g.*, *id.* at ¶ 35 (quoting from the 2003 PPM, i.e., "The Fund is a <u>multi-strategy</u> price investment company that employs a <u>diverse group of trading strategies</u> . . . . Risk management is <u>integral</u> to the Manager's goal[, and] the manager seeks to <u>continuously monitor</u> the risk parameters and expected volatility of the Fund's overall portfolio and attempts to <u>prevent over-concentration</u> of the portfolio in any particular asset, strategy or market.").)

In other words, far from disclaiming the particular pre-contractual misstatements alleged by SDCERA in this case, the 2003 PPM restates and supports them.  Consequently, SDCERA's justified reliance on the Fraud Defendants' misrepresentations made before its investment in the Fund is not precluded by the "non-reliance" clauses identified by the Fraud Defendants.

**2.     The Fraud Defendants' Material Misrepresentations Are Not Shielded By The "Bespeaks Caution" Doctrine**

The materiality of an alleged misrepresentation is a question of fact and thus not ordinarily appropriate for adjudication on a Rule 12(b)(6) motion to dismiss.  *See Allen v.*

*Westpoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (reversing district court's determination that misrepresentation was immaterial because "[u]nder New York Law, [a]s a general rule, it presents a question of fact for the jury to determine whether [a nondisclosure] was a material one or not" (internal quotes omitted)) (*quoting Chiodo v. Garramone*, 175 N.Y.S.2d 490, 492 (N.Y. Sup. Ct. 1958)). Only when an alleged misrepresentation is "so obviously unimportant . . . that reasonable minds could not differ on the question of [its] importance," can a 12(b)(6) dismissal be granted for failure to plead the materiality of a misrepresentation. *Id.* (*quoting Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). *See also Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (misrepresentation is material "if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell [securities]") (*quoting Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994).

The "bespeaks caution doctrine" only permits adjudication of the materiality of a misstatement at the pleading stage where "the cautionary language [of the relevant investment documents] explicitly warns of or directly relates to the risk that brought about a plaintiff's loss." *In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171, 2006 WL 510526 at *11 (S.D.N.Y. Feb. 28, 2006). Even where the investment documents contain extensive cautionary language, dismissal of an alleged securities fraud claim for lack of materiality is not permitted if "it warned investors of a different contingency than that which plaintiffs allege was misrepresented." *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998).

Defendants correctly note that the "touchstone" of the "bespeaks caution" inquiry is "whether defendants' representations or omissions, underlined together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature

of the securities offered." *Halperin*, 295 F.3d at 357 (emphasis added).  Defendants' argument, however, merely plucks cautionary statements from the 2003 PPM, analyzes each in isolation, and ignores their collective meaning in the larger context of the Fund Documents.  Defendants' cannot rely on this narrow exception to the presumption of truth that SDCERA's allegations are entitled to, as they mischaracterize the misstatements alleged in the Complaint, which were unrelated to any of the risk disclosures defendants seek to hide behind.

**a.     The 2003 PPM Expressly Limits The Fraud<br>Defendants' Supposedly Unqualified Discretion.**

The Fraud Defendants ignore crucial qualifying language included in the 2003 PPM under the heading "**No Formal Diversification Policies,**" in particular, that the Manager's supposedly unfettered investment discretion will be exercised in a manner "consistent with the Fund's investment objective."  Burgos Aff., Ex. A at pp. 29-30 (emphasis added by Advisors, *see* Advisors's Mem. at p. 3, n. 5).  The 2003 PPM expressly defines the "Fund's investment objective" under a centered, capitalized and bold-faced heading,  "**THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES**," and the sub-heading, "**Investment Objective**":  "The Fund's investment objective is to achieve superior risk-adjusted returns."  *Id.* at p. 8 (heading emphasis original, underlining added).

And while the Fund Documents, as the Fraud Defendants indicate, state in several places that the Defendants are not subject to any specific limitations on their investment discretion (*see e.g.*, Advisors Mem. at p. 15 (quoting 2003 PPM statement that "[t]he Fund does not and will not maintain any **fixed** requirements for diversifying its portfolio . . .") (underlining original, boldface added)), such pronouncements are expressly and implicitly qualified by clauses affirmatively promising meaningful  risk management,  which the 2003 PPM expressly describes under the heading "**THE FUND'S INVESTMENT OBJECTIVE AND STRATEGIES**" and

25

the sub-heading, "**Risk Management**" (emphasis in original):

> Risk management is integral to the Manager's goal of identifying investment opportunities having superior risk/reward parameters.  Accordingly, the Manager seeks to continuously monitor the risk parameters and expected volatility of the Fund's overall portfolio and attempts to prevent over-concentration of the portfolio in any particular investment asset, strategy or market.  However, the Manager does not, in general, attempt to hedge all market or other risks inherent in the Fund's portfolio, and hedges certain risks, if at all, only partially.  Specifically, the Manager may determine that it is economically unattractive or otherwise undesirable to hedge certain risks (either with respect to particular positions or the Fund's overall portfolio) and instead rely on diversification to control such risks.

> *By investing in the Fund, subscribers are relying on the discretionary, market judgment of the Manager, trading in a wide range of strategies and markets, without being subject to diversification, leverage or any other form of trading policies.*

>     Burgos Aff., Ex. A at p. 12 (italics original).

The 2003 PPM thus describes "risk management" as an "integral" part of meeting the Fund's objective, and lists specific strategies that Advisors claimed it employed in pursuit of this objective, namely, (a) continuous monitoring of risk and volatility in the portfolio; (b) diversification; (c) attempts to prevent asset over-concentration; and, (d) where appropriate, hedging strategies.

The only reasonable interpretation of the italicized language (and similar discretionary language elsewhere in the Fund Documents) is that the Manager is not subject to any <u>specific</u> trading limitations  (such as a rule that the Fund portfolio must always be made up of a minimum of six distinct investments in no less than four separate markets).  This interpretation is consistent with the language under the "**No Formal Diversification Policies**" heading relied on by defendants, which merely states that the Fund is not subject to any "**fixed** requirements for diversifying its portfolio among issuers, industries, instruments, markets or strategies" (emphasis added), not that the fund may abandon risk-management or diversification altogether.  Neither paragraph, nor similar language elsewhere in the 2003 PPM, allows the Manager to abandon

meaningful (i.e., risk managing) diversification, which it has expressly promised to engage in as part of its attempts to meet the "Fund's investment objective."

These limits on defendants' supposedly limitless investment discretion are bolstered further by the express fundamental description of the Fund as "a <u>multi-strategy</u> private investment company that employs a diverse group of trading strategies," and which "does not focus on, nor is its trading limited to, any geographic area, industry sector, issuer credit rating or issuer market capitalization level."  Burgos Aff., Ex. A at p. 8.  Such representations mirrored those made by the Fraud Defendants to SDCERA and its agent in order to induce SDCERA's investment in the Fund.  They serve only to reinforce the specific promise made in the "**Risk Management**" clause that Advisors would employ diversification and monitoring to reduce volatility, prevent over-concentration of the Fund's assets in any one strategy, and achieve the Fund's objective of superior <u>risk adjusted</u> returns.

The express and implied promise that the Fund was being and would continue to be operated with meaningful, risk-controlling diversification was similarly reinforced by the pages of disclosures as to the particular risks of individual strategies and investments.  *See id.* at pp. 19-33.  Presumably these myriad risks are the reason Maounis told SDCERA they should invest in a diversified multi strategy fund in the first place, since diversification would decrease the risk that volatility or risk in one particular market could trounce the whole portfolio.  *See id.* at 12 (noting diversification is integral to preventing over-concentration of the portfolio in any particular investment).  As such, although there is no dispute that the 2003 PPM informed SDCERA of certain risks, general and specific, the overall impression formed from the entirety of the 2003 PPM is that <u>because</u> of these risks, the Fraud Defendants would maintain diversification in the portfolio and steer clear of destabilizing concentrations of assets in volatile securities.

     **b.**     **The Picture Of The Fund Painted By The 2003 PPM**
                 **Was Materially Different From The Reality Of Its**
                 **Operation.**

The Fraud Defendants fundamentally mischaracterize SDCERA's allegations as to why the 2003 PPM was misleading.  *See* Advisors's Mem. at p. 12.  Read as a whole, the Complaint alleges that both the 2003 PPM and the statements made by the Fraud Defendants prior to its execution included express representations that the Fund would take very specific steps to limit its exposure to two threats in particular:  over-concentration and volatility.  SDCERA has not alleged that defendants are liable for securities fraud merely because they invested in speculative or volatile instruments or markets after representing that it was not their policy to do so.  Rather, SDCERA has alleged that the Fraud Defendants expressly created the expectation that they would operate the Fund as a "multi-strategy fund," meaning that if in their discretion, they decided an investment in such products was prudent, the risk of such investment would be expressly counterbalanced by appropriate risk controls, which at a minimum meant either hedging strategies or meaningful diversification.  As Defendant Maounis said, the Fund supposedly "not trying to hit home runs."  Compl. at ¶ 44.  SDCERA has alleged that the performance of the Fund in the very first month it became an investor (the best single month in the Fund's history, a home run if there ever was one) proves that the oral and written representations it received to this effect were untrue when made to SDCERA:  the Fund was already being operated in a manner contrary to the reasonable expectations created by these statements.  (Compl. at ¶55.)

In a case with striking factual similarities to the present case, the Second Circuit held that the "bespeaks caution doctrine" was inapplicable where the investment documents created the express impression that particular risk management strategies would be used by an investment fund which the defendants knew or should have known were not in fact being used.  *See Hunt*,

159 F.3d 723.  In *Hunt*, plaintiffs invested in a mutual fund formed to invest in securities guaranteed by various foreign governments.  *Id*. at 724.  Following a devaluation of the Mexican Peso that caused a drastic decrease in the fund's value, plaintiffs sued the fund and its managers for violations of Section 10(b) and Rule 10b-5.  Among other alleged misrepresentations, plaintiffs alleged that the fund's prospectus did not adequately disclose the risks of the investment since it "misleadingly stated that the Fund manager intended to use hedging techniques to reduce currency risk when the defendants knew (or recklessly disregarded) that, as a practical matter, the Fund could not use hedging techniques to protect against currency fluctuations."  *Id*. at 724-25.  The District Court granted the defendants' motion to dismiss the complaint and denied plaintiff leave to replead, holding as to plaintiffs' hedging/risk disclosure claims that, "in combination with the other warnings contained in the prospectus, a reasonable investor should have been fully apprised of the risks that the Fund would be unable to effectively hedge its foreign investments," and as such, "due to the explicit warnings of such devices' possible unavailability and ineffectiveness, any misstatements or omissions were immaterial as a matter of law."  *Id.* at 726-27.

On appeal, the Second Circuit reversed this determination, finding that the disclosures did not, in fact, "bespeak caution," since "[t]he cautionary language contained in the prospectus . . . warned investors of a different contingency than that which plaintiffs allege was misrepresented."  *Id.*, at 729.  Specifically, the Second Circuit held:

The prospectu[s] warned that the Fund's hedging maneuvers might fail, not that the Fund would have no opportunity to use hedging maneuvers.  Plaintiffs allege the prospectuses were misleading as to the latter.  <u>That the prospectuses disclosed the possible inefficacy of hedges does not shield the Fund from liability for misrepresenting the availability of hedging opportunities.</u>  According to plaintiff's theory, investors who trusted the astuteness of the Fund's managers would be reassured as to their ability to reduce risk through hedging, notwithstanding the warning that their hedging efforts might be foiled, whereas in truth, according to the Amended Complaint, the Fund would have no opportunity to reduce the risk of currency fluctuation by hedging.

*Hunt*, 159 F.3d at 729 (emphasis added).

Just as in *Hunt*, the 2003 PPM contains a variety of risk disclosures and disclaimers as to the particular risks involved with investing, generally, and with particular strategies and investments they might choose to individually undertake.  *See* Burgos Aff., Ex. A at pp. 19-33. Even more so than in *Hunt*, however,  the disclosure of these specific risks reinforced the impression created by the 2003 PPM that they would be specifically and carefully managed in a way that they were obviously not. It does not, however, disclose (a) the risk that defendants might choose to abandon risk controls as to a particular investment (as the Complaint alleges was the case with Hunter's trades); (b) the risk that they might abandon both diversification <u>and</u> hedging as strategies to mitigate the risk to the rest of the Fund from any particular investment; and (c) the risk that they would undertake an investment for which risk controls were, in fact, not even possible, since Hunter's strategy employed rendered Advisors's positions completely illiquid and thus utterly exposed to market fluctuations.  SDCERA's claim bears especially strong resemblance to *Hunt* in light of this last point, since the crux of the court's decision in *Hunt* was the advertisement of risk controls as a soothing palliative, when in reality, the nature of the investment made the employment of risk controls impossible.  *Hunt*, 159 F.3d at 729.

As an example, the 2003 PPM notes that it might invest in "energy-based financial instruments," which are traded in markets that "may expose the Fund to unusually volatile

returns and illiquidity."  Burgos Aff., Ex. A at p. 27.  Aware as the Defendants obviously were of

the risks of these instruments – particularly volatility and illiquidity – the 2003 PPM makes

abundantly clear that no reasonable investor could have expected that they would invest so

heavily in them that the realization of the risks inherent in the investment would materially  alter

the Fund's fortunes one way or another – boom or bust.  The reasonable expectation created by

the 2003 PPM (and, of course, by the statements to the same effect made to SDCERA and its

representatives prior to its execution) is that the Fund would simply not expose itself to these

risks at the levels that it was already doing at the time SDCERA was induced to invest.  That is

the misrepresentation alleged by the Complaint, and there was no disclosure in the Fund

Documents or elsewhere of the risk that the defendants would disregard their stated investment

objective and risk management goals, which the Complaint alleges was the case.  (Compl. at ¶

7.)

### B.   SDCERA's Complaint Alleges Facts Supporting A Strong Inference That Each Of The Fraud Defendants Acted With Scienter

To plead a cause of action for securities fraud, a plaintiff must also allege "facts

evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud."  *Tellabs*,

127 S. Ct. at 2504 (internal quotes omitted).  Under the PSLRA, such facts must "giv[e] rise to a

strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2) (2000).

In its most recent examination of the PSLRA, the Supreme Court held that facts give rise

to a "strong inference" when the inference of scienter is "cogent and at least as compelling as

any opposing inference of nonfraudulent intent."  *Tellabs*, 127 S. Ct. at 2505.  While the "at least

as compelling" standard presents a higher pleading burden than the traditional Rule 12(b)(6) "all

reasonable inferences" standard of review, a plaintiff need not <u>prove</u> scienter at the pleading

stage, or even allege facts from which scienter may be deemed a probable conclusion.  *Id.* ("The inference . . . need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'") (*quoting Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)).  Rather, the allegations must only give rise to an inference of scienter that is not less compelling than any competing explanation.  SDCERA has alleged numerous facts that together easily meet its pleading burden as to each of the Fraud Defendants.

### 1.    SDCERA's Complaint Contains Allegations Of Improper Motive That Give Rise To A Strong Inference Of Scienter

The Fraud Defendants claim that SDCERA has failed to sufficiently allege that they possessed a motive to commit securities fraud from which an inference of scienter can be drawn.  *See* Advisors's Mem. at pp. 20-21; Maounis's Mem. at pp. 12-13; Winkler's Mem. at pp. 5-6; Jones's Mem. at pp. 15.  Each Fraud Defendant, however, relies on the same mischaracterization of the Second Circuit's decision in *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), i.e., that motive cannot be alleged through allegations of personal financial benefit.  In fact, as the Supreme Court expressly acknowledged in *Tellabs*, "personal financial gain may weigh <u>heavily</u> in favor of a scienter inference."  *Tellabs*, 127 S. Ct. at 2511 (emphasis added).

Accordingly, the Complaint properly alleges scienter through allegations that each of the Fraud Defendants derived very large, individual, financial benefits from their fraudulent misstatements.  For example, the Complaint alleges that Advisors paid itself a 20 percent performance fee on the early "profits" made by the Fund as a result of Hunter's risky trading strategy, and that bonuses were awarded to Maounis, Winkler, and Jones in conjunction with their operation of the Fund.  (Compl. ¶ 7.)  SDCERA also alleges that Advisors was using Hunter's larger profits to "scalp advisory fees on illusory mark to market 'profits.'"  (*Id.* at ¶ 63.)  Thus, the Complaint adequately alleges concrete benefits derived by each of the Fraud

Defendants as a result of their misrepresentations that induced SDCERA's $175 million

investment, which the Fraud Defendants used in their undisclosed scheme of making ever larger,

high stakes bets on volatile energy markets.  (*Id.*)

Moreover, the Complaint alleges that the Fraud Defendants were also motivated to keep

SDCERA's investment dollars in the Fund in order to allow the Fund to continue to report high

"paper" profits, which defendants, in turn, used to "scalp advisory fees."  (*Id.* at ¶¶ 7, 63.)

Specifically, the Complaint alleges that

> because Hunter was buying so many of the [natural gas] contracts, the large spread
> price was supported, even increased, by Hunter's purchases, resulting in Advisors
> reporting huge paper profits for the Fund. . . .  [And] because Hunter's positions were
> heavily leveraged, the prices could only be supported as long as the Fund's lenders
> were willing to lend the Fund money to buy the contracts.  When the financing was
> no longer available, Hunter could no longer prop up the price of his spread trades
> through additional purchases, and the market would inevitably collapse, which is
> exactly what happened in September 2006.

(*Id.* at ¶ 63.)  In essence, without funding, including SDCERA's capital investment, the Fraud

Defendants would not be able to reap the personal financial benefits that motivated them to

defraud SDCERA in the first place.  The inference of scienter from all of these facts is strong, as

the Fraud Defendants' motives of personal gain is "cogent and at least as compelling as any

opposing inference of nonfraudulent intent."  *Tellabs*, 127 S. Ct. at 2505.

### 2.    The Complaint Contains Allegations Of the Defendants' Recklessness That Also Give Rise to a Strong Inference of Scienter

In addition to alleging personal financial benefits as a motive to defraud, a plaintiff may

plead scienter by alleging that a defendant acted recklessly.  *Miller*, 473 F. Supp. 2d at 581.

Allegations of recklessness give rise to a strong inference of scienter when they allege that a

defendant's conduct was "highly unreasonable" and "represent[ed] an extreme departure from

the standards of ordinary care to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it." *Id.* (*citing In re Carter-Wallace, Inc.*

*Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).  SDCERA's Complaint is rife with such allegations.

The Complaint alleges that beginning prior to or when SDCERA was first solicited to

invest in the Fund, the Fund was already trading in an uncontrolled manner contrary to how the

Fraud Defendants represented to SDCERA that it was and would be run.  (Compl. ¶¶ 7

("[b]eginning in 2005, the Fund . . . was being run, either intentionally or negligently,[12] as a *de*

*facto* single-strategy natural gas fund, placing billions of dollars at risk in highly volatile markets

and with no exit strategy"), 8 ("[b]eginning in 2005 . . . defendants staked out enormous,

undisclosed, and extremely risky positions in the natural gas commodity trading markets".)[13]

The Complaint also contains precise allegations as to each Fraud Defendant's knowledge

of the falsity of their representations to SDCERA and the materiality of their omissions at the

time that they were made.  For example, the Complaint alleges that Advisors, Maounis, Winkler,

and Jones were each aware – and, in fact, were affirmatively and repeatedly warned by

Advisors's own risk management department – of the unjustifiable risks that were being taken by

Hunter, but Maounis, Winkler, and Jones overrode and/or ignored the warnings.  (*Id.* at ¶¶ 15,

62, 66, 70.)

Moreover, defendants' trading strategies relied upon Hunter's deceptive and

unsustainable manipulation of the market, as expressly approved by each of the Fraud

---

[12]     Contrary to Maounis's suggestion, this use of the word "negligently" has no impact on
SDCERA's allegations of recklessness.  *See* Maounis's Mem. at p. 13.  Not only does the
paragraph allege intentional misconduct, which Maounis does not contest is sufficient, but the
sufficiency of SDCERA's recklessness allegations must be judged based on the context of the
entire complaint, not based on a single word.  *Tellabs*, 127 S. Ct. at 2509.

[13]     Thus, Advisors, Maounis, and Winkler are mistaken that SDCERA's Complaint lacks
allegations of recklessness prior to September 1, 2005, when SDCERA made its investment in
the Fund.  *See* Advisors's Mem. at p. 21; Maounis's Mem. at p. 13; Winkler's Mem. at p. 7.

Defendants.  (*Id.* at ¶ 63.)  There is no question that market manipulation is "highly

unreasonable, representing an extreme departure from the standards of ordinary care."  *Muller-*

*Paisner v. TIAA-CREF*, 446 F. Supp. 2d 221, 228 (S.D.N.Y. 2006) (Batts, J.).  *See ATSI*

*Commc'ns*, 2007 WL 1989336, at *7 (market manipulation is specifically prohibited by Section

10(b)).  Therefore, SDCERA's Complaint contains sufficient allegations of recklessness that

give rise to a strong inference of scienter.[14]

### C.    SDCERA's Securities Fraud Claims Are Pled With Particularity

The PSLRA requires both the facts of the misrepresentation itself and the facts from

which the inference of scienter are to be drawn to be stated with particularity.  *Tellabs*, 127 S. Ct.

at 2508.  Nonetheless, the particularity requirement of the PSLRA "does not require plaintiffs to

plead 'every single fact upon which their beliefs concerning false or misleading statements are

based.'"  *Xerion Partners I L.L.C. v. Resurgence Asset Mgmt., L.L.C.*, 474 F. Supp. 2d 505, 516

(S.D.N.Y. 2007) (*quoting Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.

1994)).[15]  Rather, the facts alleged in the complaint must simply be "'sufficient to support a

---

[14]    Advisors's argument that the risk disclosures contained in the 2003 PPM preclude
SDCERA from asserting pre-investment recklessness (*see* Advisors's Mem. at p. 21, n. 35)
suffers from the same deficiencies discussed above with respect to the elements of justified
reliance and materiality.  *See* discussion, *supra*, at Section II(A).

[15]    Jones is incorrect that under *Xerion*, "plaintiffs, like SDCERA, who allege that
defendants had access to contrary facts at the time they made allegedly misleading statements or
omissions 'must specifically identify the report or statements containing this information.'"
Jones's Mem. at p. 10.  A plaintiff's only burden is to state facts "sufficient to support a
reasonable belief as to the misleading nature of the statement or omission."  *Xerion*, 474 F. Supp.
2d at 516 (citing PSLRA, 15 U.S.C. § 78u-4(b)(1) (2000)).  In *Xerion*, the Court only relied on
cases concerning particularity within the context of the release of contradictory information in
subsequent reports because the alleged misstatement in that case regarded information released
in an earlier report that was then contradicted in a subsequent one.  *Id.*  Here, however,
SDCERA's allegations have nothing to do with the subsequent release of information in any

(continued…)

35

reasonable belief as to the misleading nature of the statement or omission.'" *Id.* (*quoting Shields*, 25 F.3d at 1128).

Advisors, Winkler, and Jones challenge SDCERA's Complaint as lacking the requisite particularity for failure to disclose the basis for its allegations made "on information and belief" (*see* Advisors's Mem. at pp. 21-23; Winkler's Mem. at p. 2; Jones's Mem. at p. 10), while Maounis, Winkler, and Jones each claim that SDCERA's Complaint does not identify specific misrepresentations made by each of them individually, and that certain misrepresentations asserted in the Complaint cannot satisfy the particularity burden because they are allegations of "group" statements. *See* Maounis's Mem. at pp. 7-8; Winkler's Mem. at pp. 3-4; Jones's Mem. at pp. 11-12. Each of these criticisms of the Complaint, however, is mistaken, and SDCERA's Complaint does meet the heightened pleading standards of the PSLRA.

### 1.    The Bases For SDCERA's Allegations Made "On Information And Belief" Are Expressly Set Forth In, Or Reasonably Inferred From, The Complaint

Advisors, Winkler, and Jones overstate the law concerning the standards for pleading with particularity in attacking the Complaint's allegations made "on information and belief." Allegations of fraud can be based "upon information and belief" where such matters are "peculiarly within the opposing party's knowledge." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986). While Advisors, Winkler, and Jones are not wrong that a complaint stating allegations made "on information and belief" must also state with particularity the factual basis upon which that belief is founded, courts "cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225 (1st

―――――――――――――――――――

(continued)

document; on the contrary, SDCERA alleges that all of the Fraud Defendants concealed their misstatements until the very end when they were exposed upon the Fund's collapse.

Cir. 1996).[16]  "At the early stages of litigation," therefore, the strict pleading burdens of the PSLRA are generally relaxed as to allegations concerning facts solely within the knowledge of another party.  *ATSI Commc'ns, Inc.*, 2007 WL 1989336, at *8.  Further, in assessing particularity, the Court must still "consider the complaint in its entirety" and not scrutinize individual allegations in isolation.  *Tellabs*, 127 S. Ct. at 2509.

Advisors, Winkler, and Jones argue that paragraphs 9, 11-12, 14-15, 37, 39-41, 46-47, 51, 56-58, 60, 63-67, 71, 74-75, 78, and 83 of SDCERA's Complaint are alleged "on information and belief" without stating with particularity the facts on which such belief is based.  (*See* Advisors's Mem. at pp. 22-23.)  The basis for each of these allegations, however, is either expressly stated or reasonably inferred from the Complaint, as follows:

- The allegations made "on information and belief" in paragraphs 39, 40-41, 51, 75, and 78 concern the Fraud Defendants' representations to or meetings with SDCERA's agent, Rocaton.  Therefore, the basis for these allegations is obviously SDCERA's communications with Rocaton, a fact easily inferred from SDCERA's allegation that Rocaton was SDCERA's agent charged with identifying suitable investment opportunities.  Moreover, because SDCERA was not on these calls, their actual content is within the knowledge of Defendants.  (Compl. ¶ 38.)

- The allegations made "on information and belief" in paragraphs 47 and 58 are statistics, and the paragraphs expressly mention the magazine articles from which they were taken.  Paragraph 9 also references statistics, and although they are without attribution in that paragraph, the same statistics are discussed in paragraph 59, where they are attributed to Industrial Energy Consumers of America.  Similarly, the allegations in paragraph 83 relate to NYMEX's warnings to Advisors, and it may be reasonably inferred that the source of this information is NYMEX itself or news reports or magazine articles reporting the same.

---

[16]    Advisors's assertion that the Complaint's allegations about the Fund's lack of risk management and controls are "conclusory" is absurd.  Advisors' Mem. at p. 22.  The Fund's collapse due to its well-publicized over-investment in these volatile securities and the absence of buyers to permit a market based exit strategy <u>necessarily</u> implies a failure of diversification, hedging, or other controls to mitigate the impact on the Fund as a whole from these risky investments.

- The allegations made "on information and belief" in paragraphs 9, 11-12, 14, 37, 60, 63, 65, and 74-75 concern the circumstances leading to the collapse of the Fund, circumstances which are – pending discovery – within the peculiar knowledge of defendants.  It can reasonably be inferred from the Complaint, when read in its entirety, that the basis for these allegations is the Fund's own announcements of its collapse and public reports concerning it.  The Complaint alleges particular defects in the trading behavior of defendants which SDCERA contends caused the Fund's collapse, and these defects are consistent with the allegations in these paragraphs. (*Id.* at ¶¶ 60-68.)

- The allegations made "on information and belief" in paragraphs 15, 46, 56-57, 64, 66-67, and 71 concern particular details about Advisors's employees and workplace and are all clearly taken from information gleaned from or obtained from former Advisors employees.  In fact, the Complaint expressly notes that information about the inner-workings of Advisors and the Fund was obtained from such sources.  (*Id.* at ¶ 56.)  It is thus a reasonable inference to be drawn from the Complaint that all references to such information came from those sources.

Accordingly, there is no mystery as to the basis for any of the Complaint's allegations made "on information and belief," all of which concern matters as to which SDCERA cannot be charged with having specific personal knowledge at this early stage of litigation.  The bases of SDCERA's "information and belief" allegations are thus adequately disclosed in the Complaint for purposes of defeating the motions to dismiss.

### 2. The Complaint Pleads Individual Misrepresentations By Maounis, Winkler, And Jones With Particularity

Maounis, Winkler, and Jones each incorrectly assert that the misrepresentations identified in paragraphs 5 and 33 of the Complaint are not properly pled as to each of them individually. *See* Maounis's Mem. at p. 8 & n. 15; Winkler's Mem. at pp. 3-4 (arguing that the "group pleading doctrine" is inapplicable to oral statements); Jones's Mem. at pp. 11-12 & n. 3 (same.) At a minimum, the Complaint alleges that (1) all three of these defendants were present at the March 2005 meeting where certain alleged misrepresentations were made (Compl. ¶¶ 5, 33, 41, 43); (2) the specific nature and content of the statements and omissions that were made (*id.*), and (3) why the statements were false at the time that they were made (or why omitted information

should have been provided to SDCERA).[17] (*See*, *e.g.*, *id.* at ¶¶ 7-8).  This level of specificity is sufficient to attribute the statements to Maounis, Winkler, and Jones individually and to withstand a motion to dismiss.  *See Internet Law Library, Inc. v. Southridge Capital Mgmt., L.L.C.*, 223 F. Supp. 2d 474, 481 (S.D.N.Y. 2002) (holding that defendants' argument attacking the allegation that three defendants made the same statement at the same time goes to the pleading's weight, not its sufficiency, and thus was an inappropriate basis for granting a motion to dismiss).

Significantly, none of these three defendants ever addresses the allegations set forth in paragraphs 48 and 49 of the Complaint, which concern the Fraud Defendants' <u>failure to disclose</u> to SDCERA that the Fund's energy trading desk employed – and would soon be run by – a trader who, just months before, had been constructively fired from his former employer for reckless energy trading that had wiped out an entire year's worth of gains in a mere week.  The Complaint's allegations of material omissions are, by definition, individually attributed – i.e., the obvious implication of alleging that <u>none</u> of the Fraud Defendants said "x" is that <u>each</u> of them individually failed to say "x."  These allegations, read along with the rest of the Complaint, meet all of the requirements for pleading fraud-by-omission with particularity.[18]  *See Adler v. Berg*

---

17      Maounis's attempt to disprove the falsity of his March 2005 (and July 2005) representations to SDCERA by pointing to the September 2005 Update is a red herring.  *See* Maounis's Mem at p. 10.  A document purporting to describe the Fund's operations in September 2005, by definition, is irrelevant as to the Fund's operation in March 2005 (or July 2005).   Furthermore, the September 2005 Update is also irrelevant to SDCERA's allegations that the Fund was operating without appropriate risk controls as of September 2005, given that the update's disclosure of capital allocation percentages are insufficient to determine whether the stated levels of diversification were sufficient to shield the Fund from the risks created by its investments in the volatile energy sector.

18      Furthermore, SDCERA alleges with particularity the moment and source of the revelation of Hunter's existence, namely, a 2006 (i.e., post-SDCERA's investment) announcement by

(continued…)

*Harmon Assocs.*, 892 F. Supp. 98, 101 (S.D.N.Y. 1995) ("[T]o support a claim of fraud by

omission, Rule 9(b) . . . requires that the complaint allege (1) what omissions they were, (2) the

person responsible for the failure to disclose, (3) the context of the omissions and the manner in

which they misled the plaintiffs, and (4) what defendant obtained through the fraud."").

Therefore, SDCERA's omission allegations alone, which are pled with the requisite degree of

particularity, are sufficient to withstand Maounis's, Winkler's, and Jones's motions to dismiss.

### 3.      Maounis's July 2005 Misrepresentations Are Not Excused as "Opinions Not Sincerely Held"

Maounis's argument that any misrepresentations he made at the July 21, 2005 SDCERA

Board meeting are excused for being "opinion[s] not sincerely held" overstates the law of this

narrow exception and ignores the broader scope of his misrepresentations.  On a motion to

dismiss a securities fraud claim, a court must view the complaint in its entirety, and except as to

allegations of scienter, must accord the plaintiff the benefit of all reasonable inferences to be

drawn from the facts alleged therein.  *Tellabs*, 127 S. Ct. at 2509.  Applying this standard, this

Court must reject Maounis's claim that paragraph 44 of the Complaint alleges only a single,

discrete misstatement.  *See* Maounis's Mem. at pp. 9-10 (quoting Compl. ¶ 44).

SDCERA's Complaint should be fairly read in its entirety as alleging that Maounis's

entire presentation to the SDCERA Board was knowingly designed as one component of a larger

fraudulent sales pitch – which included the false statements made to Rocaton prior to March

2005; the false statements made by all of the Fraud Defendants to SDCERA during SDCERA's

---

(continued)

Advisors that "Hunter would replace Harry Arora as the Portfolio Manager for the Fund's energy desk."  (Compl. ¶ 48.)  *See Xerion*, 474 F. Supp. 2d at 516 (citing cases stating that, for misstatements involving subsequently revealed, contradictory information, particularity can be pled by specific identification of the "reports or statements containing this information").

March 2005 due diligence visit; and the defective disclosures in the 2003 PPM – to lure

SDCERA into making an enormous investment in a recklessly managed fund set up to line the

pockets of its principals through the use of mark-to-market accounting of volatile securities as a

basis for awarding huge executive compensation.  Nit-picking a single, partial allegation as

Maounis does to arrive at his "opinion not sincerely held" position is inappropriate as a matter of

law, and misses the larger point of SDCERA's Complaint entirely.  *See Tellabs, supra.*

Nevertheless, it is absurd for Maounis to claim that he intended his July 2005 presentation during

a public Board meeting at which he knew the actual investment decision would be voted upon to

be mere casual commentary.

Maounis's substantive position is also unsupported by the cases he cites.  Particularly

unfavorable to Maounis is *San Leandro Emergency Medical Group Profit Sharing Plan v.

Phillip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996), which expressly recognized a material

difference between mere expressions of optimism and situations where a defendant "'hyped' a

specific plan, thereby inducing investors to believe that alternatives were excluded."  *Id.* at 810

(citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).  SDCERA's

Complaint alleges that Maounis's July 21, 2005 speech to the SDCERA Board and his other

representations concerning the Fund's investment strategy were just such "hype" designed to be

relied upon by SDCERA and to induce it to invest in the Fund.  Under such circumstances, *San

Leandro* supports SDCERA's claim that Maounis's statements were misleading.

Moreover, Maounis's specific misrepresentations about the operating parameters of the

Fund, the types of risks defendants would be taking, and the ways in which those risks would be

managed, as alleged in paragraph 44 of the Complaint, are far different from the bland platitudes

supporting a finding of an "opinion not sincerely held" in *Lasker v. N.Y. State Electric & Gas*

*Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (company stated it would not "compromise its financial integrity"), and *In re Azurix Corp. Securities Litigation*, 198 F. Supp. 2d 862, 888 (S.D. Tex. 2002) (management is "working . . . to maximize the returns on our existing businesses"). Maounis's July 21, 2005 misrepresentation thus cannot be excused as "opinions not sincerely held."

> **D.      SDCERA's Securities Fraud Claim Alleges Much More Than Mere "Corporate Mismanagement"**

The Fraud Defendants incorrectly claim that SDCERA's securities fraud claims are non-actionable assertions of "corporate mismanagement."  *See* Advisors's Mem. at pp. 19-20. SDCERA's claims are not comparable to those dismissed by the Court in *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004).  Specifically, in *Citigroup*, the plaintiff's allegations were limited to an after-the-fact critique of the management of the fund without any claim of fraudulent inducement, misstatement, or omission in the risk management disclosures. *Id.* at 375-78.  In contrast, SDCERA's claims that it was fraudulently induced to invest in the Fund by the Fraud Defendants' numerous misstatements and misleading omissions of material facts regarding the true nature of the Fund, the existence and utilization of Defendants' touted risk management policies and techniques, and Defendants' entire approach to trading at the time that the misrepresentations were made to SDCERA.  (Compl. ¶¶ 4-5, 36-37, 97-99.)  SDCERA's allegations, therefore, fall outside of the realm of "corporate mismanagement."  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 618 (S.D.N.Y. 2005) (finding complaint alleged securities fraud where it charged that defendants artificially inflated stock price by making misrepresentations and omissions that concealed the nature of the transactions the bank had conducted).  *See also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 99 (2d Cir. 2001) (rejecting argument that plaintiff's Section 10(b) claim alleged mere mismanagement

because "defendants allegedly made an affirmative misrepresentation to plaintiffs, as outside investors, concerning the quality of the proffered securities").

## III.   SDCERA'S COMPLAINT STATES CLAIMS FOR COMMON LAW FRAUD AGAINST THE FRAUD DEFENDANTS (COUNT II)

Contrary to the Fraud Defendants' arguments, Count II of SDCERA's Complaint sets forth well-pled claims against the Fraud Defendants for common law fraud arising out of their inducement of SDCERA to invest in the Fund (the "fraud-in-the-inducement" claims), as well as the Fraud Defendants' misrepresentations and omissions that caused SDCERA to forebear withdrawal of its investment (the "holder" claims).

### A.   SDCERA's Complaint States Common Law Fraud-In-The-Inducement Claims Against The Fraud Defendants

Citing the nearly identical pleading criteria for both securities fraud and common law fraud, the Fraud Defendants challenge SDCERA's common law fraud-in-the-inducement claims by relying upon the same flawed arguments used to attack SDCERA's securities fraud claims. *See* Advisors's Mem. at p. 23; Maounis's Mem. at p. 17; Winkler's Mem. at pp. 7-8. For the same reasons discussed in Section II, *supra*, SDCERA has adequately stated common law fraud claims against the Fraud Defendants arising out of the misrepresentations and omissions that they made to induce SDCERA to invest $175 million in the Fund.

### B.   SDCERA's Complaint Also States Common Law Fraud-Holder Claims Against The Fraud Defendants

The Fraud Defendants incorrectly argue that Connecticut law both governs and bars SDCERA's fraud-holder claims. The Fraud Defendants' also claim – incorrectly – that even under New York Law, SDCERA's fraud-holder claims are not well-pled because (1) SDCERA did not plead any post-investment misrepresentations by Winkler and Jones with the requisite particularity; (2) the Fraud Defendants' post-investment written and oral disclosures preclude

materiality and justified reliance; and (3) SDCERA's June 30, 2006 decision to withdraw only profits, as opposed to its capital investment as well, negates causation.  The Fraud Defendants also contend that SDCERA's allegations of fraudulent misrepresentations and omissions made by the Fraud Defendants after June 16, 2006 cannot support its common law fraud cause of action.  As shown below, not a single one of these arguments is availing.

**1.     Connecticut Law Does Not Bar SDCERA's Common Law Fraud - Fraud-Holder Claims**

The Fraud Defendants' sole support for their claim that Connecticut law does not recognize fraud-holder claims is *Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1018 (D. Conn. 1994).  *See* Advisors's Mem. at p. 23; Maounis's Mem. at p. 18 (citing Advisors's Mem.); Winkler's Mem. at p.8 (same); Jones's Mem. at p. 18.[19]  *Chanoff*, however, stands for nothing more than the unremarkable proposition that speculative damages are not actionable.  *Chanoff*, 857 F. Supp. At 1018.

In *Chanoff*, the plaintiffs alleged that the defendants' fraudulent concealment of certain material facts concerning the fiscal health of the company caused them to refrain from selling or hedging the corporation's stock.  *Id.* at 1014, 1017.  The court found that "there [wa]s not one precise point at which the defendants' duty to disclose information . . . attached, and in light of the difficulty in quantifying the value of earlier disclosure, the actual calculation of such damages would be intractable at best."  *Id.* at 1018.   Thus, the court held that "claims for damages based on the plaintiffs' failure to sell or hedge their stock are too speculative to be actionable" because under Connecticut law, "[i]t is an established principle that a plaintiff cannot

---

[19]     Defendants also cite a California state court case, *Small v. Fritz Cos.*, 132 Cal. Rptr. 2d 490 (Cal. 2003).  This case, however, merely cites *Chanoff*, without discussion or interpretation, after a "*but see*" signal in its discussion of the states that have concluded that forbearance from selling stock is sufficient reliance to support tort liability.

recover profits which might have been realized if he had not been deceived, <u>unless there is evidence by which such profits can be estimated with reasonable certainty</u>."  *Id.* at 1018-19 (internal quotes omitted, emphasis added).

The Fraud Defendants' mischaracterization of *Chanoff* is thus twofold:  Not only does *Chanoff* not hold that holder claims are barred by Connecticut law, but it actually expressly acknowledges that such claims, if properly supported, can be actionable.  Here, SDCERA's fraud-holder claim is readily distinguishable from the defective claim identified in *Chanoff* because SDCERA's damages are capable of calculation with a reasonable degree of certainty:  SDCERA alleges specific dates on which the Fraud Defendants' misrepresentations were made, as well as the dates on which it could have given notice to withdraw its investment.  (Compl. ¶¶ 2, 5, 10, 69-73, 76-81.)  *See also* Burgos Aff., Ex. D at pp. 29-36 (setting forth the applicable withdrawal deadlines).  While SDCERA also contends it was damaged by misrepresentations occurring after the notice deadlines, the alleged dates, combined with the readily ascertainable value of SDCERA's investment on a given date, provide a reasonable floor by which to calculate SDCERA's minimum damages, something not present in *Chanoff*.  Therefore, *Chanoff* provides no support for the Fraud Defendants' motions to dismiss Count II of the Complaint.

Because SDCERA's holder claims are cognizable under Connecticut law, as they also are under Delaware, New York, and California law,[20] this Court need not engage in a choice-of-law analysis and may apply New York law to SDCERA's common law fraud claims.  *See Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (in the absence of a true conflict of laws, New York courts are free to apply New York law).  *See also* Advisors's Mem.

---

[20]   *See Small v. Fritz Cos.*, 132 Cal. Rptr. 2d 490, 494-95 (Cal. 2003) (holder claims actionable under California law).

at pp. 23-25 & n.40 (acknowledging that New York and Delaware recognize the right to pursue holder claims and that New York law would be applicable as the forum state's laws "if Connecticut law does not apply").

### 2.  In the Event of a Conflict of Laws, California Law Would Govern SDCERA's Common Law Fraud-Holder Claims

Should the Court nevertheless decide that a choice-of-law analysis is necessary, it "must look to the choice-of-law rules of the state in which it sits – here New York – to resolve conflict-of-law questions." *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 269-70 (2d Cir. 1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Employing "interest analysis," New York courts give "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 481 (1963).  In practice, for conflicts concerning so-called "conduct-regulating" laws (including those pertaining to fraud and gross negligence), New York courts hold that "the substantive law of the state in which the injury is suffered, rather than the state where the fraudulent conduct was initiated, usually governs." *Bergeron v. Philip Morris, Inc.*, 100 F. Supp. 2d 164, 170 (E.D.N.Y. 2000) (*citing Sack v. Low*, 478 F.2d 360, 365 (2d Cir. 1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made.")); *Natural Res. Corp. v. Royal Res. Corp.*, 427 F. Supp. 880, 882 (S.D.N.Y. 1977) (fraud claims "arise where 'plaintiffs' pocketbooks are situated.'" (citation omitted)).

Because SDCERA's pocketbook is situated in California, SDCERA suffered injury in California as a result of the Fraud Defendants' fraudulent conduct.  (Compl. ¶ 23.) Consequently, California's law, not Connecticut's, governs SDCERA's fraud-holder claims

under a proper choice of-law analysis.[21]  Because California law recognizes fraud-holder claims, the Fraud Defendants' choice-of-law argument is not a basis for dismissal of these claims.

### 3.     SDCERA's Common Law Fraud-Holder Claims Are Well-Pled

The elements of a common law fraud claim are substantially similar to those of a Section 10(b) claim for securities fraud.  *See Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991).  A complaint must adequately plead that (1) the defendant made a misrepresentation or omission of a material fact; (2) with the intent to deceive the plaintiff; (3) the plaintiff justifiably relied upon the misrepresentation or omission; and (4) the defendant's misrepresentation or omission caused the plaintiff's injury.  *Id.*  As noted above, the sufficiency of such claims is assessed against the heightened pleading standards of FRCP 9(b), which requires that "the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b) (2006).

### a.     The post-investment misrepresentations are alleged in the Complaint with requisite particularity.

The Complaint alleges the following misrepresentations were made by the defendants to SDCERA in the post-investment period:

a)  "In the Spring and Summer of 2006, defendants increased the Fund's allocation to natural gas even after Maounis had personally assured Rocaton and SDCERA that the Fund was

---

[21]    The Complaint's invocation of only New York and Delaware state laws does not preclude application of another state's law, such as California's, to SDCERA's claims should the Court find it appropriate to do so.  *See AroChem*, 968 F.2d at 270 (including in a conflicts analysis an additional state that was not addressed in the parties' papers); *Bergeron*, 100 F. Supp. 2d at 166 (construing the plaintiffs' complaint to state claims under Massachusetts law and denying the defendants' motion to dismiss even though complaint had alleged only the application of New York law).  *See also Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 45-46 (2d Cir. 1997) ("[T]he failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters."); *Roselink Investors L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 226 (S.D.N.Y. 2004) (refusing to grant motion to dismiss based on complaint's invocation of incorrect state's law).

reducing its exposure to that market.  Winkler and Jones were complicit in Maounis' decisions, by action and inaction, and <u>never informed SDCERA that the Fund was investing so heavily in energy or in natural gas specifically</u>.  By May 2006, defendants knew or should have known that the Fund's natural gas positions were so large relative to the market and the market's illiquidity that they could not exit the Fund's positions without significantly impacting prices.  However, instead of planning a controlled unwind, and in an effort to sustain the illusion of profits, defendants sought to "prop up" the market and these spreads by taking even larger long positions in natural gas." (Compl. ¶ 12) (emphasis added).

b)  "[A]s late as August 2006, defendants Maounis and Advisors were still telling SDCERA that the risks from the Fund's energy trading portfolio had been appropriately decreased and hedged.  Consequently, SDCERA was kept in the dark as to the peril which the Fund actually faced and, thus, SDCERA forewent invoking its contractual right to demand redemption of its investment." (Compl. ¶ 17).

c)  "[N]o one from SDCERA met with Hunter or even knew about him until 2006, when Advisors announced that Hunter would replace Harry Arora as the Portfolio Manager for the Fund's energy desk.  This announcement was misleading [because] . . . At no time during the due diligence period did Maounis, Winkler, Jones, or Advisors provide any information to SDCERA about Hunter.  Consequently, SDCERA had no knowledge of Hunter's background, training, experience, or role at the Fund before investing in the Fund." (Compl. ¶¶ 48-49).

d)  "Maounis acknowledged the volatility of natural gas trading and emphasized to investors (including SDCERA) certain ways that Advisors purportedly controlled the risk of such trading.  In November 2005 correspondence to the Fund's investors with an update on October 2005 performance, Maounis stated that natural gas markets have 'pull-backs and volatile movements from time to time,' and that, therefore, Advisors 'continue[s] to play these markets largely from a relative value perspective, with great reliance on both options and spread transactions.'  In fact, these statements did not accurately characterize Advisors's natural gas investments." (Compl. ¶ 54).

e)  In telephonic communications with Rocaton on June 7, 2006, Advisors, Maounis, Jones, and Hunter represented the following (which Rocaton then relayed to SDCERA's Needle on June 13, 2006):

(a)  the primary driver of the drawdown was an "unprecedented" dry-up in liquidity in the natural gas market in the final two weeks of the month while Advisors was attempting to unwind its natural gas spreads through profit-taking and asset relocation;

(b)  the relationship between natural gas and fuel oil inverted as had never happened before;

(c)  as a result, Advisors had significantly recalibrated its risk models to incorporate this previously unforeseen degree of illiquidity and the inverse relationship between natural gas and fuel oil; and

48

        (d)       as a further result, Advisors would be reducing its notional energy exposure by approximately 50%.

               Upon information and belief, each of the[se] statements . . . was false (as Maounis, Winkler, Jones, Hunter and Advisors were aware). These statements, however, were relied upon by SDCERA in holding its investment and not considering exercise of its withdrawal rights." (Compl. ¶¶ 73-74).

f) In addition, the Complaint alleges that Advisors and each of the individual Defendants engaged in a post-investment pattern of deception designed to keep SDCERA from withdrawing its investment. (Compl. at ¶ 6). This pattern included making each of the statements and omission noted above, as well as disseminating additional misleading statements made in the 2006 PPM and the monthly Updates, each of which downplayed the true risks of the Fund, and failed to disclose the abandonment of, and unavailability of risk controls for the Fund's energy trading portfolio.

Each of the above allegations either identifies and/or quotes the particular individual making the statement (e.g., "Maounis had personally assured Rocaton and SDCERA that the Fund was reducing its exposure to that market"), alleges a failure to disclose information (e.g., "Winkler and Jones were complicit in Maounis' decisions, by action and inaction, and never informed SDCERA that the Fund was investing so heavily in energy or in natural gas specifically"), or alleges misrepresentations by each of Maounis, Winkler and Jones in a sufficiently particular manner as per the Court's decision in *Internet Law Library, Inc., supra*. These allegations are all pled with sufficient particularity for the reasons stated previously with respect to similar challenges raised by defendants with respect to SDCERA's securities fraud allegations. *See, supra*, Section II(C). SDCERA's allegations of scienter as to each defendant previously pled with respect to its securities fraud claim are equally applicable to the post investment misrepresentations. As such, these allegations regarding the defendants' motives to commit fraud and the recklessness with which the misrepresentations were made, too, are pled with particularity and give rise to a strong inference of scienter. *See, supra*, Section II(B).

        **b.**    **Whether information disclosed by the Fund during 2006 was sufficient to alert SDCERA to the Defendants'**

> **reckless trading is a question of fact not appropriate for adjudication on a motion to dismiss.**

The materiality of a particular misrepresentation is not an appropriate basis for a motion to dismiss.  *See Allen*, 945 F.2d at  45 (reversing grant of 12(b)(6) dismissal of fraud claim because "[a]s a general rule, it presents a question of fact for the jury to determine whether [a nondisclosure] was a material one or not.") (citations omitted).  Advisors's argument that information released in 2006 effectively apprised SDCERA of the Fund's engagement in mountains of unhedged energy trading is thus not ripe for consideration at this time by the Court.  *See* Advisors's Mem. at 25-28.  SDCERA has alleged that in addition to the statements contained in the documents cited by defendants, it was simultaneously being assured by Advisors that the exposure to volatile energy markets was decreasing.  (Compl. ¶¶ 33-37, 55, 71, 73).  These allegations must be accepted as true on a motion to dismiss, and as such, the defendants' challenges as to both materiality and reliance, to the extent they are based on the impact of the cited disclosures on SDCERA, must be rejected.  *See Roth*, 489 F.3d 499, 510 (on motion to dismiss, court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally").

> c.   **Neither the Fund's monthly performance updates nor the 2006 PPM apprised SDCERA of the true nature of the Fund's operations.**

Should the Court reach the materiality question, however, the disclosures cited by defendants serve, if anything, to bolster the materiality of the misrepresentations alleged in the Complaint.  Advisors argues that the monthly update letters sent by Maounis to the Fund's investors  "reiterated the risks in the Subscription Agreement and the 2003 PPM," thus precluding SDCERA's justifiable reliance on the alleged post-investment misrepresentations.

*See* Advisors's Mem. at pp. 25 – 27 (*citing* and *quoting* September 2005 Update, October 2005

Update, April 2006 Update, and May 2006 Update (together, "Updates")).  Advisors's

observation is correct, but is also the central flaw in their argument:  if the Updates merely

reiterated the disclosures of the Subscription Agreement and 2003 PPM, then they suffer from

the same defects previously identified as to those disclosures.  *See*, *supra*, Section II(A).

Moreover, the repetition of these same defective disclosures month after month – especially in

the context of SDCERA's expressions of concern over the volatility of the Fund's portfolio and

Advisors's continued reassurance that volatility was being reduced (Compl. at ¶ 71, describing

June 2, 2006 call between SDCERA and Advisors) – only intensified the materiality of the initial

misrepresentations, instilling in SDCERA a false sense of calm, when in fact the seeds of the

Fund's collapse had been planted and were beginning to germinate.

> **(1)   The September 2005 Update merely continued
> and reinforced the misrepresentations of the
> 2003 PPM.**

The September 2005 Update simply describes the alleged performance of the Fund's

various strategies and portfolios without emphasis as to any particular investment.  More

specifically, the Update provides no information from which an investor could conclude that any

particular investment could expose the fund to collapse, or that any particular strategy was not

appropriately hedged or risk-controlled via diversification, as the 2003 PPM represents was to

have been the case.  Tellingly, there is not a single additional risk disclosure in the September

2005 Update, meaning that the "total mix of information" as to risk was absolutely identical

following SDCERA's receipt of this document as it was when SDCERA first invested.[22]  *Basic,*

---

[22] Advisors' contention that the disclosure that 36% of the Fund's capital was allocated to
"volatility/energy trading" is a material disclosure is incorrect.  *See* Advisors's Mem. at 26.

(continued…)

*Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  In other words, the picture of the Fund presented

by the September 2005 Update is of the same multi-strategy, appropriately diversified and/or

hedged investment vehicle which SDCERA thought it was investing in.  Because the September

2005 Update does nothing to alter the total mix of information at SDCERA's disposal, it does

not affect the materiality of the post investment misrepresentations alleged in the Complaint or

SDCERA's justified reliance thereon.

> **(2)     The October 2005 Update merely continued and
> reinforced the misrepresentations of the 2003
> PPM.**

The reassuring tone of the October 2005 Update is the most obvious indication of the

defendants' error in asserting that this Update put SDCERA on notice of the risks associated

with the Fund's true strategies and operation.  As with the 2003 PPM and the September 2005

Update, the October Update discusses the Fund's energy investments as only one among many

strategies, reinforcing the impression of a diversified, risk-controlled fund.  *See* Burgos Aff., Ex.

G at pp 1-2 (discussing various strategies).  Advisors's Memorandum asserts that the October

2005 Update's reference to "losses in the midst of extreme volatility in the natural gas, power,

---

(continued)

SDCERA has alleged that it was misled by disclosures that conveyed an impression of
diversification and risk control, while in reality, the Fund's natural gas portfolio was already
being operated recklessly and in such a way that the risks of the Fund were much greater than
disclosed.  This particular disclosure does nothing to indicate one way or another whether that
level of investment in such strategies was appropriately risk-managed – or even the opposite, i.e.,
that it was not – nor does it disclose the nature of the investments at issue, i.e., natural gas
futures, stock in energy companies, etc.  Most importantly, the Complaint alleges that shortly
after this disclosure was made, Advisors represented – falsely – that the level of investment in
this sector would be <u>decreased</u> due to the level of volatility to which it exposed the Fund.  *See*
Compl. at ¶ 55.  If anything, SDCERA was lulled into thinking the Fund had learned a lesson
about investing too heavily in volatile markets .  In reality, the only lesson they appeared to have
learned was how to keep their investors placated enough to allow them to continue their reckless
betting on natural gas futures markets.

crude, and energy stock markets during the month" put SDCERA on notice as to the Fund's

exposure to these commodities.  *See* Advisors's Mem. at p. 26.  The remainder of the paragraph

not emphasized by Advisors, however, reinforces the impression originally created by the

defendants in the 2003 PPM and during the due diligence period prior to SDCERA's investment,

i.e., that Advisors will prudently and actively manage such volatility through continuous

monitoring, implementation of appropriate risk controls, hedging and diversification, all with an

eye toward minimizing over-concentration:

> Our relative value framework, **broad diversification** across commodities, and focus
> on the middle to back end of the curve . . . combined with a **reduction in overall
> exposure** post hurricanes Katrina and Rita – allowed us to hold up quite well in a
> very difficult market environment.  While we have a positive long term view towards
> natural gas, power, and crude from a fundamental perspective, **we are always
> mindful that these markets will have pull-backs and volatile movements from
> time to time**.  Accordingly, we continue to play these markets largely from a relative
> value perspective, with great reliance on both options and spread transactions.

> Burgos Aff., Ex. G. (emphasis added).

Thus, while the October 2005 Update discusses the volatile nature of these markets, it

more importantly expressly acknowledges this volatility in the context of promises to the Fund's

investors to limit the Fund's exposure to these risks.  Moreover, these promises are not limited to

just those made in the October 2005 Update, but rather must also include the defendants' other

misrepresentations, both written and oral, which came before this Update was released, and

which amplify the misleading nature of the Update.  Therein lies the fraudulent nature of the

statements made in this Update, and the reason why it does not affect the materiality of

defendants' other post investment misrepresentations or SDCERA's justified reliance them.

### (3)    The 2006 PPM suffered from the same infirmities as its predecessor.

As Advisors notes, the 2006 PPM was at most only a "reittera[tion of] the focus on and

risks of energy trading" which the defendants had already made in prior statements.  Advisors's

Mem. at p. 26.  SDCERA has never questioned the disclosure of these risks, themselves, so the fact that they were reiterated is irrelevant.  Rather, SDCERA has alleged that it was misled as to the Defendants' management of these risks and the level of these risks that its investment was actually subjected to.  (Compl. at ¶ 4).  Just like the 2003 PPM, the 2006 PPM describes energy trading as merely one out of many strategies that the Defendants employed in their management of the Fund.  *See e.g.*, Burgos Aff., Ex. B at p. 24 ("energy trading" listed as only one of eight "principal strategies" used by Advisors to manage the Fund); pp. 26-27 ("Energy and Metals Trading" part of expressly non-inclusive list of eight examples of "illustrative trading strategies and techniques" used by Advisors in managing the Fund).  Just like the 2003 PPM, the 2006 PPM portrays the fund as having a primary emphasis on risk management through hedging and or diversification, both of which are expressly to be employed to control the fund's exposure to risk, volatility, and over-concentration.  *See, e.g., id.* ("The investment objective of the Fund is superior **risk-adjusted** returns.  The Fund employs **a diverse group of trading strategies**, trading a **broad range** of equity and debt securities, commodities, derivatives and other financial instruments") (emphasis added).  The continuity of the Fund's goals and operation vis-à-vis the Fund as described by the 2003 PPM is most clearly apparent in the 2006 PPM's "**Risk Management**" section (emphasis original):

> **Risk management is integral to Amaranth's goal of identifying investment opportunities having superior risk/reward parameters.**  Amaranth monitors the risk parameters and expected volatility of the Fund's overall portfolio and attempts to prevent over-concentration of the portfolio in any particular investment asset, strategy or market.  However, Amaranth does not, in general attempt to hedge all market or other risks inherent in the Fund's portfolio, and hedges certain risks, if at all, only partially.  Specifically, **Amaranth may determine that it is economically unattractive or otherwise undesirable, to hedge certain risks (either with respect to particular positions or the Fund's overall portfolio) and instead rely on diversification to control such risks.**

*Id.* at pp. 29-30 (emphasis added).

Thus, in language nearly identical to that found in the 2003 PPM, the 2006 PPM describes and reaffirms the Fund's relatively conservative investment objectives, the many strategies used by the Fund to achieve them, the risks associated with investment in the Fund, and the Fund's promise to use either hedging or diversification to prevent over exposure to volatility and over-concentration of assets.  Far from rendering the post-investment misrepresentations immaterial by virtue of new disclosures, the 2006 PPM is, itself, rife with misrepresentations as to the nature of, and defendants' operation of, the Fund.

**(4)**     **The April 2006 Update merely continued and reinforced the misrepresentations of the 2003 PPM.**

The April 2006 Update is no different from any of the other written misrepresentations made by Maounis and Advisors:  each mention of volatility and risk in the Fund's energy investments is countered with reassurances of ever-decreasing commitments to energy trading and to the Fund's overall diversification.  Advisors, for example, quotes the April Update's statement that "extreme volatility in the energy markets is primarily responsible for our out-performance[.]"  Advisors's Mem. at p. 26.  Advisors left off the clause concluding that particular sentence, which stated "we are proud of the fact that our other businesses have made strong contributions as well."  Burgos Aff., Ex. J at p. 1.  Furthermore, there is no information in the April update whatsoever from which an investor could conclude that the Fund was as deeply and recklessly exposed to the natural gas trading market as SDCERA alleges it was.  Even as to energy trading, the April 2006 Update lumps everything together into one paragraph discussing the Fund's "energy and commodities portfolios," a discussion which explains the Fund's outsize profits generation from these investing activities as due largely to "a profound increase in base metal prices (copper in particular) with an associated volatility spike."  *Id*.  In fact, as to natural gas, the April Update again repeats that the Fund has <u>decreased</u> its exposure.  *Id*. ("[A]s volatility

55

increased during the month, **we took the opportunity to reduce exposure in our natural gas and metals portfolios and realized profits**.") (emphasis added).  Once again, Advisors released an Update tailored to quelling the anxiety of any nervous investors who might have otherwise withdrawn their capital investments had they known the truth of the Fund's investments and the debacle they were each about face as these undisclosed trading practices led directly to the Fund's collapse.[23]

(5)   **The Impact of the May 2006 Amaranth Update
was expressly diminished by the Defendants'
June 2006 misrepresentations.**

Advisors did not receive the May 2006 update until after the June 16, 2006 deadline for withdrawal of its investment had already passed.  (Compl. at ¶ 76).  Consequently, any impact that its contents might have had on SDCERA's decision to withdraw its investment as a result of any additional risk disclosures contained therein is a moot question.  Still, if SDCERA had been given the information in the May 2006 Update sooner, it would have made no difference.  As with the other Updates, the May 2006 Update described facts that might have been taken as warning signs by investors but for other statements urging restraint and reliance on the Fund's risk controls.  For example, the very first paragraph of the Update notes that May 2006 was the Fund's "worst month since inception" due to "dislocations in certain relationships across the natural gas forward curve," but emphasizes that the Fund's natural gas "book" was "still the year's most profitable strategy."  Burgos Aff., Ex. K at p. 1.  The remainder of the May 2006

---

[23] This impression was further reinforced by Advisors' Steven Johnson on a call with SDCERA's Lisa Needle, made, as alleged in Complaint, out of concern that the outsize returns reported in the April Update reflected the Fund's over-exposure to volatile markets.  (Compl. at ¶ 71).  Johnson's false reassurances that "Advisors was having the Fund cash out of its energy positions to reduce risk" mitigated any impact the April results had on the "total mix of information" available to SDCERA regarding the Fund's exposure to investment in these markets.

56

Update is split between an explanation as to why the dismal May results should not be viewed as indicative of natural gas investment risk, and discussion of the Fund's other strategies, once again reinforcing the portrayal of the Fund as risk-averse and diversified. *See, id.* ("While this was a humbling experience that has led us to recalibrate how we assess risk in this business, we believe certain spread relationships involving natural gas remain disconnected from their fundamental value drivers.").  Nothing in the May 2006 Update disclosed the risk (by that time, reality) that the Fund would become so entrenched and concentrated in natural gas investments that a temporary shift in this single market could result in the collapse of the whole fund.  For that reason, it is yet another actionable misrepresentation by the defendants on which SDCERA justifiably relied to its detriment.

What little cautionary impact the May 2006 Update might have had was further countered by the information SDCERA was receiving on contemporaneous telephone calls with the Defendants.  As alleged, SDCERA or its agent, Rocaton, had calls with the Defendants on June 2 (with Steve Johnson of Advisors) and June 7 (With Maounis, Winkler and Jones) in which, once again, Advisors and the other Defendants actively minimized the risk of continued investment with the Fund.  (Compl. at ¶ 71) (noting Johnson said Advisors was having the Fund cash out of its energy positions to reduce risk); ¶ 73 (Advisors had recalibrated their energy risk models and would be decreasing notional energy exposure by 50%).

In other words, any so-called risk disclosures were affirmatively downplayed by further misrepresentations as to the actual nature of the Fund's investments and the risk management thereof.

d.    **SDCERA's Complaint Also Adequately Pleads Causation For Its Common Law Fraud-Holder Claims**

Plaintiffs asserting securities fraud claims are required to allege "transaction causation," meaning a causal link between the defendant's misconduct and the plaintiff's decision to buy or sell the security. *Emergent*, 343 F.3d at 197 (finding that plaintiff had sufficiently alleged connection between the investor's economic loss and corporation's failure to disclose its CEO's history of failed investment projects undertaken in collaboration with an individual who was barred from the securities industry by NASD). Transaction causation is established by showing that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the securities transaction in question. *Id.*

Maounis ignores the actual nature of the breach alleged in his erroneous argument that SDCERA's pre-June 16 knowledge of the Fund's May losses (as a result of the June 2 Needle-Johnson call) combined with SDCERA's awareness of the Fund's reliance on spread trading in the natural gas markets (Compl. at ¶87) eliminates the possibility that defendants' misrepresentations were the "but for" cause of SDCERA's damages. *See* Maounis Mem. at pp. 18-22. SDCERA's holder claims are predicated on allegations that the defendants misled SDCERA into thinking that the Fund was utilizing diversification, hedging and other risk controls to control its exposure to the risks associated with any of its investments. With respect to the Fund's energy investments, that meant (as per the 2003 and 2006 PPMs), volatility and over-concentration in particular. Regardless of what particular strategy or investment in the energy markets that Advisors was employing, SDCERA's reasonable expectation, fostered by the Defendants and the Fund Documents, was that there would be other strategies employed to mitigate the risks of energy trading, and that the Fund would never be allowed to become overexposed through over- concentration to the disclosed risks of energy trading. Thus, even SDCERA's knowledge of the fund's large loss in May 2006 did not operate as disclosure of the

true fraud:  that the Fund could collapse completely because of the defendants' abandonment of the risk-management strategies they had promised to employ.

> ### 4.   SDCERA's Allegations Of Misrepresentations And Omissions After June 16, 2006  Are Actionable

Also on the issue of causation, the Fraud Defendants incorrectly argue that the alleged misrepresentations made to SDCERA after June 16, 2006 are not actionable.  *See* Advisors's Mem. at pp. 28-29; Maounis's Mem. at p. 22 & n. 28; Winkler's Mem. at p. 8 & n. 4; Jones's Mem. at p. 20.  Because SDCERA could have taken steps to protect and recover its capital investment even after the passage of the June 16th withdrawal deadline, such as by bringing a lawsuit sooner (i.e., prior to the Fund's collapse), SDCERA may still seek recovery for the Fraud Defendants' post-June 16, 2006 misrepresentations and omissions that caused SDCERA not to do so.  *See Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (noting that shareholders may recover damages for a missed "opportunity to 'cut their losses' by shutting down operations before management can fritter away whatever valuable assets the corporation still possesses" (citing *In re Investors Funding Corp. of N.Y. Sec. Litig.*, 523 F. Supp. 533, 541 (S.D.N.Y. 1980) ("A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it"))).

For the foregoing reasons, this Court should deny the Fraud Defendants' motions to dismiss SDCERA's common law fraud cause of action (Count II).

## IV.   SDCERA'S CLAIMS FOR GROSS NEGLIGENCE (COUNTS III & VIII), BREACH OF FIDUCIARY DUTY (COUNT V), AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (COUNT VI) ARE   NOT DERIVATIVE

Defendants advance two arguments as to why SDCERA's gross negligence and breach of fiduciary duty claims are derivative and therefore subject to the special pleading requirements of FRCP 23.1:  (1) "The gravamen of SDCERA's . . . claims is that Amaranth allegedly

mismanaged assets of the Fund resulting in a decline in the value of the Fund"; and (2) "[a]ccordingly, any recovery on these claims must be shared proportionately by all of the Fund's investors, and not simply go to SDCERA." *See* Advisors's Mem. at pp. 30-31.[24]   Neither argument warrants the dismissal of SDCERA's gross negligence and breach of fiduciary duty claims because they are based on a misunderstanding of Delaware's standards for identifying derivative claims, a mischaracterization of the bases for SDCERA's claims, and a simplistic view of corporate law that overlooks important differences between run-of-the-mill corporations and the limited liability company structure of the Fund.   At a fundamental level, defendants disregard that SDCERA has alleged that its claims arise in large part from misrepresentations made directly, and only, to it (e.g., the 2005 and 2006 meetings and telephone calls between the Fraud Defendants and SDCERA).

### A.   The Delaware Supreme Court Has Expressly Disavowed The "Special Injury" Test  For Determining Whether A Claim Is Derivative Or Direct

In *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 & 1036-39 (Del. 2004), the Delaware Supreme Court expressly disavowed the "special injury" test or the "shared equal injury" concept, i.e., the notion "that an action cannot be direct if all stockholders are equally affected or unless the stockholder's injury is separate and distinct from that suffered by other stockholders."  Instead, the *Tooley* court held that the proper analysis for distinguishing between direct and derivative claims "must be based solely on the following questions:  Who

---

[24]   Without any meaningful debate, Maounis, Winkler, Jones, and Hunter all incorporate by reference Advisors's briefing on this issue to support their own motions to dismiss.  *See* Maounis's Mem. at p. 23; Winkler's Mem. at pp. 1, 11; Jones's Mem. at p. 2; Hunter's Mem. at pp. 14-15.  Although Advisors's motion does not address Count VI of SDCERA's Complaint, Winkler, Jones, and Hunter nevertheless rely on Advisors's briefing on the direct-versus-derivative issue in support of their contention that SDCERA's Aiding and Abetting breach of fiduciary duty claim against them is derivative.

suffered the alleged harm – the corporation or the suing stockholder individually – and who would receive the benefit of the recovery or other remedy?" *Id.* at 1035.  The court thus acknowledged that a plaintiff is not barred from pursuing an individual claim simply because the defendant's conduct also harmed the corporation and other shareholders.  *Id.* at 1039.

Although defendants quoted the test from *Tooley*, defendants nevertheless argue that SDCERA's gross negligence and breach of fiduciary duty claims are derivative because "any recovery on these claims must be shared proportionately by all of the Fund's investors, and not simply go to SDCERA" as only $130 million of the Fund's $6 billion loss in value was allocable to SDCERA's investment.  Advisors's Mem. at p. 30.  But defendants' argument erroneously harkens back to the now-discredited "special injury" test or the "shared equal injury" concept, which this Court should not credit in deciding defendants' motion to dismiss.[25]

As further explained below, under *Tooley*'s two-part inquiry, SDCERA's claims are individual and direct in nature as it is SDCERA, not the Fund, that suffered the alleged harm and would receive the benefit of any recovery because (1) the loss of SDCERA's individual investment was as a direct result of specific fraudulent misrepresentations and omissions of

---

[25]    Defendants cite several cases that rely upon the "special injury" test and "shared equal injury" concept to support their argument that SDCERA's gross negligence, breach of fiduciary duty, and Aiding and Abetting breach of fiduciary duty claims are derivative. *See* Advisors's Mem. at pp. 30 (*quoting In re Goldman Sachs Mut. Funds*, No. 04 Civ. 2567, 2006 WL 126772, at *5 (S.D.N.Y. Jan. 17, 2006) (quoting and relying heavily upon *In re Triarc Cos.*, 791 A.2d 872 (Del. Ch. 2001), which applied the "special injury" test in determining that the plaintiff's breach of fiduciary duty claim was derivative), 31 (citing *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308 (S.D.N.Y. 1997) (relying on *Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del. 1970), which was expressly rejected and overruled by *Tooley*, 845 A.2d at 1037, because of its "confusing and inaccurate" holding that "a suit must be maintained derivatively if the injury falls equally upon all stockholders"); Winkler's Mem. at p. 11 (also citing *ABF*, 957 F. Supp. 1308 at 1332.)  This Court should disregard defendants' arguments insofar as they are supported by case law that is no longer persuasive and do not reflect the currently applicable standards of Delaware law.

material fact made by defendants to SDCERA individually; and (2) to the extent that SDCERA's

claims are based in part on defendants' failure to exercise risk management controls and monitor

Hunter's trading activities, the structure and operation of the Fund nevertheless make

SDCERA's claims direct and not derivative in nature.

**B.     The Gravamen Of SDCERA's Claims Is Defendants' Fraudulent Misrepresentations And Omissions Made Directly And Individually To SDCERA**

As even defendants themselves urge this Court to do, this Court should "look at <u>all</u> of the

facts of the complaint  and determine for itself whether a direct claim exists."  Advisors's Mem.

at p. 29 (quoting *Dieterich v. Harrer*, 857 A.2d 1017, 1027-28 (Del. Ch. 2004) (emphasis

added)).  Indeed, a review of all of the facts of SDCERA's Complaint reveals the error in

defendants' oversimplification and mischaracterization of the "gravamen of SDCERA's gross

negligence and breach of fiduciary duty claims" as Advisors's "mismanage[ment of] assets of

the Fund resulting in a decline in the value of the Fund."  *Id.* at p. 30.

On the contrary, the "gravamen" of SDCERA's claims is that the specific

misrepresentations or omissions were made by defendants to SDCERA first to induce and then

later to retain SDCERA's commitment of capital to the Fund.  (*See, e.g.*, Compl. ¶¶ 5, 33, 41-44

[alleging that SDCERA was induced to invest in the Fund by specific misrepresentations made

by the Fraud Defendants directly and individually to SDCERA and SDCERA's Board of

Trustees about the Fund's goals and risk management); ¶¶ 38-43 (alleging specific

misrepresentations made to SDCERA's representative, Rocaton, as to the Fund's multi-strategy

nature and superior risk management system, on which SDCERA relied in making its investment

decision); ¶¶ 6, 10-11, 70-71 (alleging repeated occasions on which the Fraud Defendants falsely

reassured SDCERA, alone, as to the Fund's decreasing exposure to volatile energy markets and

knowingly omitted material information regarding Hunter's trading history and practices);  ¶ 17

(alleging that SDCERA's reliance on Defendants' statements caused it to forego exercising its individual contractual right to withdraw its capital investment from the Fund); ¶ 117 (alleging that "by deliberately misleading SDCERA as to the Fund's investment strategies and risk controls before and after SDCERA made its investment, [the Fraud Defendants] intentionally, knowingly, and in bad faith breached their fiduciary duties to SDCERA"); ¶¶ 122-23 (alleging that by "participating in telephone conference calls and meetings with SDCERA or SDCERA's representatives in which the other defendants knowingly and intentionally made fraudulent misrepresentations and omissions," Winkler, Jones, and Hunter "actively participated in, assisted in, and also had knowledge of the other defendants' breaches of fiduciary duties to SDCERA")).

Where the injury is alleged to affect the individual plaintiff –SDCERA– not the Fund, courts typically hold the plaintiff's claims are direct, not derivative.  For example, in *Anglo American Security Fund, L.P. v. S.R. Global International Fund, L.P.*, 829 A.2d 143, 153-54 (Del. Ch. 2003), which also involved claims arising out of the management of a hedge fund, the Delaware Chancery Court concluded that the limited partner plaintiffs had alleged a direct claim against the general partner of the fund with respect to damages resulting from the general partner's failure to timely disclose its $22 million withdrawal.  The Delaware Chancery Court reached a similar conclusion in another hedge fund case, *Albert v. Alex Brown Management Services, Inc.*, Nos. Civ.A. 762-N & 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) (holding that the plaintiffs' claim for breach of fiduciary duty, based on the manager defendants' failure to disclose material information and making other misleading and fraudulent statements, was direct because the plaintiffs' harm was that they had "lost their opportunity to request a withdrawal from the Funds from the Managers . . . .").

Similarly, in *Fraternity Fund Ltd. v. Beacon Hill Asset Management L.L.C.*, 376 F. Supp.

2d 385, 408-09 (S.D.N.Y. 2005),[26] another case involving a hedge fund, the plaintiffs' breach of

fiduciary duty claim was held to be a direct claim because "the alleged wrong was a fraud

committed on the shareholders and/or limited partners, rather than on the Funds."  Although the

court in *Fraternity Fund* recognized that "some mismanagement and self-dealing – which,

without more, would be wrongs to the Funds only – may have been involved.  But the principal

wrong here appears to have been a valuation fraud that injured plaintiffs, not the Funds."  *Id.* at

409 (citing *Coronado Dev. Corp. v. Millikin*, 22 N.Y.S.2d 670, 675 (Sup. Ct. N.Y. County 1940)

("[D]epreciation resulting from the dissemination of false information as to corporate assets or

business or management . . . necessarily constitutes a direct injury to individual stockholders and

is a wrong to them rather than to the corporation and may be redressed by suit by individual

stockholders suing in their own right").)

  Moreover, defendants' post-investment fraudulent misrepresentations and omissions of

material facts about their reckless trading practices and lack of risk controls directly impacted  a

contractual right of SDCERA that is not similarly a right of the Fund itself – i.e., defendants'

fraud deprived SDCERA of the opportunity to make a quarterly withdrawal of its capital before

the Fund's collapse by giving notice on or before June 16, 2006.  (Compl. ¶ 17.)  The

involvement of a contractual right that is not similarly a right of the corporate entity also

supports a finding that the plaintiff's claims are direct, not derivative.  *See Anglo Am.*, 829 A.2d

at 153-54 (holding that because the limited partners' negligence, breach of fiduciary duty, and

other claims seemed to implicate a contractual right of the limited partners that is not similarly a

right of the Fund itself – i.e., the right to withdraw their investment – the plaintiffs' claims were

---

[26] Although *Fraternity Fund* applied New York law, this case is still of considerable
persuasive authority in this action.  As defendants concede, "the standards to determine whether
a claim is derivative are the same in each of the relevant states."  Advisors's Mem. at p. 29, n.46.

direct and not derivative).  *Cf. In re Cencom Cable Income Partners, L.P. Litig.*, No. C.A. 14634, 2000 WL 130629, at *4 (Del. Ch. Jan. 27, 2000) (noting that it is "easily conceivable" that a failure to disclose cash flows underlying the valuations of the partnership assets "would bear directly upon each Limited Partner's individual judgment about how to vote on the challenged transaction").

### C. The Structure And Operation Of The Fund Also Render SDCERA's Claims Direct, Not Derivative

Although defendants cite several Delaware state cases in support of their argument that SDCERA's gross negligence and breach of fiduciary duty claims are derivative rather than direct, a majority of them deal with claims arising out of the traditional corporate/stockholder context.[27]  *See* Advisors's Mem. at pp. 30-31.  Significantly, defendants fail to cite or address the one Delaware state case that is most analogous to the case at hand: *Anglo American*, 829 A.2d 143.

In *Anglo American*, limited partners of a hedge fund, which was structured as a limited partnership, brought suit against the general partner, who was also the manager of the fund, after the general partner withdrew more than $22 million from its capital account and failed to report its withdrawal until after the deadline had passed for the limited partners to exercise their own

---

[27]   The only two cases cited by defendants that involve the hedge fund context are *ABF Capital Management v. Askin Capital Management*, 957 F. Supp. 1308 (S.D.N.Y. 1997), and *Albert v. Alex Brown Management Services, Inc.*, Nos. Civ.A. 762-N & 763-N, 2005 WL 2130607 (Del. Ch. Jun. 29, 2005).  However, as noted above, the continued vitality of cases like *ABF* that applied the "special injury" test and the "shared equal injury" concept is highly questionable after *Tooley*'s express disapproval of these approaches.  As to *Albert*, the Delaware Chancery Court actually held in that case that the plaintiffs' breach of fiduciary duty claim, which was in part based upon the defendant managers having made false and misleading statements to them and failed to disclose material information, constituted a direct claim because "the partnerships were not harmed by the alleged disclosure violations."  2005 WL 2130607, at *12.

withdrawal rights.  *Id.* at 148.  As discussed above, the plaintiff limited partners' claims of

breach of fiduciary duty and negligence, among others, alleged injuries resulting from the

general partner's fraud or nondisclosure.  *Id.* at 153-54.  The plaintiff limited partners also

alleged injuries that could be fairly characterized as a diminution in the value of the fund, which

the defendants argued rendered the plaintiffs' claims derivative, rather than direct, because all of

the limited partners seemingly suffered the same injuries in proportion to their *pro rata* interest

in the fund.  *Id.* at 147, 151.

 Although the *Anglo American* court acknowledged that "[t]he test for distinguishing

direct from derivative claims in the context of a limited partnership is substantially the same as

that used when the underlying entity is a corporation," the court also noted that "[a]pplication of

corporate law rules to disputes related to a limited partnership necessitates a bit of flexibility."

*Id.* at 149-50.  In reaching its conclusion that the limited partners' claims in that case were direct,

not derivative, the court found it significant that the structure of the hedge fund was such that

"losses confer only a fleeting injury to the Fund, one that is immediately and irrevocably passed

through to the partners" themselves.  *Id.* at 152.  Specifically, the Delaware Chancery Court

noted that:

> Due to the structure and operation of the Fund, whenever the value of the Fund is
> reduced, the injury accrues irrevocably and almost immediately to the current
> partners but will not harm those who later become partners . . . .  When an injured
> partner withdraws from the partnership, the partner's capital account has already been
> diminished by any and all diminutions of value to the Fund from the time of entering
> the partnership until the time of withdrawal.  There are no successors in interest to
> partners so injured because there are no "shares" sold to someone else, [*sic*] any
> withdrawing partner's interest in the entity is liquidated.  Any recovery obtained by
> the Fund in a derivative action cannot provide a remedy to wronged former partners
> nor to their (non-existent) successors in interest.

*Id.*

 In this case, defendants argue, just as the defendants did in *Anglo American*, that

SDCERA's gross negligence and breach of fiduciary duty claims are derivative because "any recovery on these claims must be shared proportionately by all of the Fund's investors." Advisors's Mem. at pp. 30-31.  However, as the court in *Anglo American* held, claims alleging injuries resulting from a diminution of fund value are not derivative merely because all of the limited partners suffer the same injuries in proportion to their *pro rata* interest in the fund.  *Anglo American,* 829 A.2d at 147, 151.  Rather, it is important to examine the structure and operation of the Fund at issue in this case, which, significantly, mirrors the characteristics of the hedge fund involved in *Anglo American* such that any diminution in the value of the Fund "confer[red] only a fleeting injury to the Fund . . . that is immediately and irrevocably passed through" to each investor via its own individual capital account to which there is no successor-in-interest.  *Id.* at 152.

Therefore, regardless of whether SDCERA's gross negligence, breach of fiduciary duty, and Aiding and Abetting breach of fiduciary duty claims are based on defendants' fraud or allege injuries amounting to the diminution of fund value, SDCERA's claims are direct, not derivative, under the *Tooley* two-part test because it is SDCERA, not the Fund, that suffered the alleged harm and would receive the benefit of any recovery.

## V.   THE COMPLAINT STATES VALID GROSS NEGLIGENCE CLAIMS AGAINST ALL DEFENDANTS

Each of the defendants argues that SDCERA's gross negligence claims must fail because they are barred under Connecticut law.  *See* Maounis's Mem. at p. 23; Winkler's Mem. at p. 11; Jones's Mem. at p. 2; Hunter's Mem. at p. 18.  Not only are defendants incorrect as to the applicability of Connecticut law, but they are also mistaken as to Connecticut law's recognition of a gross negligence cause of action.

Moreover, under any potentially applicable state's laws, the Complaint states valid claims

for gross negligence against all defendants, as SDCERA has alleged facts regarding the wrongful conduct of each defendant that meet the reckless indifference or reckless or deliberate disregard standard that constitutes gross negligence.  There is also no merit to any of defendants' other arguments as to why they cannot be held liable for gross negligence – i.e., that Advisors and Winkler are shielded from tort liability because generic investment risks were disclosed in the Fund documents; that the economic loss doctrine bars SDCERA's claim against Maounis; and that Hunter may not owe SDCERA a duty of care.  Therefore, defendants' motions to dismiss SDCERA's gross negligence counts should be denied.

### A.   Delaware Or New York Law, Not Connecticut Law, Applies To SDCERA's Gross  Negligence Claims

#### 1.   Connecticut In Fact Recognizes A Gross Negligence Claim

Contrary to defendants' assertions, Connecticut <u>does</u> recognize gross negligence as a valid cause of action.  *See Glorioso v. Police Dep't of Burlington*, 826 A.2d 271, 275 (Conn. Super. Ct. 2003).  Although the case cited by defendants, *Decker v. Roberts*, 3 A.2d 855, 858 (Conn. 1939), discusses the fact that Connecticut does not normally recognize distinct causes of action for different levels of negligence, *Glorioso* clarifies that gross negligence actually is recognized by Connecticut courts, even though it is usually not pled separately from general negligence.  *Glorioso*, 826 A.2d at 275 ("Abundant appellate authority supports the conclusion that gross negligence is recognized in Connecticut jurisprudence, even though there are few occasions for characterizing the level of negligence in stating a negligence claim.").  The *Glorioso* court also held that a plaintiff could specifically plead a cause of action for "gross negligence" when titling the claim as "negligence" might impact the plaintiff's rights to recover. *Id.* at 274-75 (validating cause of action for gross negligence where pleading "negligence" might trigger negligence immunity provisions that specifically exempt grossly negligent conduct).

Because Connecticut recognizes gross negligence as a claim,[28] the Defendants are incorrect that "[t]here is a substantive law conflict because New York and Delaware recognize claims for gross negligence." Advisors's Mem. at p. 32 & n.49. Where "the party urging a choice of law analysis fails to demonstrate a true conflict between New York and another state's laws, no choice of law analysis need be undertaken." *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 377 (S.D.N.Y. 2005) (quoting *Bass v. World Wrestling Fed'n Entm't, Inc.*, 129 F. Supp. 491, 504 (E.D.N.Y. 2001)). Consequently, the Court should apply New York law to this claim. *See Int'l Bus. Machs. Corp.*, 363 F.3d at 143 (where relevant laws of all potentially interested states are not actually in conflict, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.").

### 2. Delaware Law Is Applicable To SDCERA's Gross Negligence Claim Under The Internal Affairs Doctrine

Should this Court nevertheless decide to conduct a choice-of-law analysis, the applicable conflict of law principles of the forum state's laws (here, New York) require the application of Delaware law to SDCERA's gross negligence causes of action. *See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332-33 (2d Cir. 2005). Under the internal affairs

---

[28]     Moreover, Connecticut recognizes a cause of action for "willful, wanton or reckless misconduct." *See Decker*, 3 A.2d at 858 (negligence and wanton misconduct are separate causes of action). Wanton or reckless misconduct, like gross negligence in Delaware and New York, is conduct that indicates a reckless disregard for the rights of others. *See id.* at 857; *Dubary v. Irish*, 542 A.2d 711, 719 (Conn. 1988) . A claim for reckless misconduct must indicate the conduct that is alleged to be reckless. *See Bello v. Barden Corp.*, 180 F. Supp. 2d 300, 312 (D. Conn. 2002) (citing *Kostiuk v. Queally*, 267 A.2d 452, 453-54 (Conn. 1970)). Further, a duty of care must be established to support a claim for reckless misconduct. *Id.* Reckless misconduct, therefore, requires a duty and reckless conduct in breach of that duty, just as gross negligence does. The elements of causation and damages can be inferred as additional requirements for a claim of reckless misconduct, given that Connecticut appears to treat negligence as a lesser version of reckless misconduct. *See Bello*, 180 F. Supp. 2d at 312.

doctrine, only the state of incorporation has the authority to regulate a corporation's internal

affairs, i.e., matters peculiar to the relationships among or between the corporation and its

officers, directors, and shareholders. *See, e.g., First Nat'l City Bank v. Banco Para El Comercio*

*Exterior de Cuba*, 462 U.S. 611, 621 (1983); *Seybold v. Groenink*, No. 06 Civ. 772, 2007 WL

737502, at *5 (S.D.N.Y. Mar. 12, 2007) (also cited in Advisors's Mem. at p. 29 & n.46).

Because SDCERA's gross negligence claims deal squarely with the relationship between it and

Defendants, as well as the duty owed by Defendants to SDCERA in light of that relationship, the

internal affairs doctrine mandates the application of Delaware law to SDCERA's gross

negligence claims, as Delaware is the state of organization for both Advisors and the Fund.[29]

Under either New York or Delaware law, Counts III and VIII each state claims against

the Defendants for gross negligence.

### B.   The Complaint Alleges Facts That State Valid Gross Negligence Claims Against All Defendants

Despite the Complaint's numerous particular factual allegations of each of the

Defendants' reckless trading practices, deliberate disregard for even the most basic risk

management controls, and other unreasonable and gross misconduct, Defendants Advisors,

Winkler, and Hunter argue in their motions to dismiss that their respective conduct does not rise

---

[29]   Alternatively, with respect to SDCERA's gross negligence claim against Advisors, Delaware law is also applicable under New York's choice-of-law principle that where a plaintiff's tort claim arises out of or otherwise concerns a right created by a contract containing a choice-of-law provision, the parties' contractually chosen law will be applicable to govern the tort claim as well. *See Fin. One*, 414 F.3d at 336 (holding that where the plaintiff's right of setoff arose out of a contract, the set-off claim would be governed by the law selected in the parties' contractual choice-of-law provision). Because SDCERA's gross negligence claim asserts breaches of duties that would not have existed but for the relationship created by the LLC Agreement, which contains a choice-of-law provision providing for the application of Delaware law as the governing law for disputes arising thereunder (*see* Burgos Aff., Ex. D at pp. 75-76), the LLC Agreement's choice-of-law clause provides further support for the application of Delaware law to SDCERA's gross negligence claim.

to the level of gross negligence.[30]  *See* Advisors's Mem. at pp. 32-33; Winkler's Mem. at pp. 11-13; Hunter's Mem. at p. 19.[31]

All negligence claims include four elements: a duty owed to the plaintiff, a breach of that duty, injury to the plaintiff caused by that breach, and damages.  Gross negligence sets a higher bar for the negligent behavior.  The Delaware standard for gross negligence is reckless indifference, deliberate disregard or acting outside the bounds of reason.  *Gelfman v. Weeden Investors, L.P.*, 859 A.2d 89, 114, 114 n.26 (Del. Ch. 2004).  The standard in New York is, similarly, reckless indifference or reckless disregard.  *See, e.g.*, *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1371 (N.Y. 1992).[32]

## 1.   SDCERA Has Alleged More Than Enough Facts To State A Valid Gross Negligence Claim Against All Defendants

Advisors claims that it was not grossly negligent, even though it is responsible for its officers' and employees' fraudulent inducement, bad faith hiring of Hunter, reckless trading practices, failure to enforce any risk controls on Hunter, and post-investment misrepresentations to SDCERA.  Advisors claims three allegations in SDCERA's Complaint "demonstrate that [Advisors's] conduct was not reckless or smacking of intentional wrongdoing":  (1) that

---

[30]     Maounis does not make this argument in his motion to dismiss.

[31]     Both Advisors and Winkler cite *Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2005 WL 1907678, at *7 (S.D.N.Y. Aug. 10, 2005), for the proposition that SDCERA may not amend its complaint if any aspect of its gross negligence counts fails.  *See* Advisors's Mem. at p. 33; Winkler's Mem. at p. 12.  However, *Kinsey* merely stands for the common rule that a court need not grant leave to amend the complaint when the proposed amendment would be futile.  *Kinsey*, 2005 WL 1907678, at *2.  Neither Advisors nor Winkler gives any explanation why an amendment by SDCERA, if one were found necessary, would be futile.

[32]     There is also no substantive difference between the gross negligence standards in Delaware and New York, on the one hand, and Connecticut, on the other hand.  In Connecticut, the standard for gross negligence "is commonly defined as very great or excessive negligence, or as the want of, or failure to exercise, even slight or scant care or 'slight diligence'."  *Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 748 (Conn. 2005).

Advisors had a "14-member risk management team" (*see* Compl. ¶ 43); (2) that there existed "personnel in Advisors's risk management department who were assigned to oversee Hunter's trades" and that the risk department made "control recommendations" (*see id*. at ¶ 15); and (3) that "Hunter's trading positions were tracked internally and were marked to market daily (and were regularly reconciled)" by "a team of people" (*see id*. at ¶¶ 66-67).  Advisors, however, has taken the first two of these quotes completely out of context, and fails to recognize just how much the third allegation supports SDCERA's gross negligence claim.

First, the allegation of the Complaint regarding the "14-member risk management team" actually relates that <u>Advisors</u> touted their risk management system to SDCERA by claiming, among other things, that Advisors had a "14-member risk management team."  (Compl. ¶ 43.)  In fact, one of the central allegations of the Complaint is that despite this supposed group of risk experts, Advisors did not exercise any risk control at all for the energy trades which are at issue here.

Second, the snippet taken from paragraph 15 of SDCERA's Complaint that there existed "personnel in Advisors's risk management department who were assigned to oversee Hunter's trades" and "control recommendations" misleadingly edits out the rest of that allegation, which states that:

> Maounis knowingly, recklessly and in violation of his fiduciary duties overrode the risk department's control recommendations and encouraged Hunter to maintain or increase his bet on natural gas prices.  Upon information and belief, Winkler and Jones were also aware of Hunter's energy trading, yet they too failed to take steps to prevent Maounis's breach of his duties, and thereby actively participated in Maounis's breach of fiduciary duty and the similar breach by Advisors.

(*Id*. at ¶ 15.)  Even setting aside the specific context for these quotes, it is difficult to see how alleging the mere existence of personnel in a risk management team forecloses the possibility of

reckless misconduct by those team members or other Advisors officers or employees in forsaking risk control over Hunter's energy trades.

As for SDCERA's allegations that Hunter's trading positions were tracked, marked to market daily, and regularly reconciled (*id.* at ¶¶ 66-67), the fact that Advisors, through its employees, clearly knew the details of Hunter's reckless trading practices and yet not only did nothing to curb it, but actually endorsed and encouraged it, provides further support for SDCERA's validly stated claim of gross negligence against Advisors.  Indeed, on a motion to dismiss, "a court must read the complaint generously, and draw all inferences in favor of the pleader." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).  Therefore, Advisors's contention that it did not act in a grossly negligent manner must be rejected.

> **2.**     **Winkler Was Reckless In His Representations, Oversight And Decisions Regarding Hunter**

For the same reasons, this Court should disregard Winkler's evocation of the same three allegations in SDCERA's Complaint referenced by Advisors to support Winkler's claim that he "did not act recklessly." Winkler's Mem. at pp. 11-12 (*citing* Advisors's Mem. at pp. 32-33).

The Court should also reject Winkler's claim that SDCERA has pled no specific conduct by Winkler that rises to the level of gross negligence.  *See id.* at p. 13.  SDCERA's Complaint alleges that Winkler was the Chief Operating Officer at Advisors and that as such, he was "intimately involved in all of Advisors's operations and key decisions" (Compl. ¶ 56); that his "key decisions" included hiring Hunter despite Hunter's catastrophic trading history at Deutsche Bank and increasing Hunter's compensation, which further endorsed and encouraged Hunter's reckless trading methods (*id.* at ¶¶ 46, 57); and that he regularly discussed with Maounis the allocation of the Fund's capital and allowed Hunter to take reckless and extreme far-forward positions despite knowing, and repeatedly being warned of, the risks of taking such positions (*id.*

at ¶¶ 56, 62).  Moreover, SDCERA alleged that Winkler made false representations about the

Fund's multi-strategy nature and superior risk management system to SDCERA during

SDCERA's due diligence visit to Advisors's Connecticut office in March 2005.  (*Id.* at ¶¶ 41,

43.)  These allegations, particularly when examined in the light most favorable to Plaintiff as

they must be on a motion to dismiss, state a valid claim of gross negligence against Winkler.

> **3.     Hunter's Reckless Trading Was Grossly Negligent And In Breach of Duties He Owed to SDCERA**

Along with Advisors and Winkler, Hunter also makes the same arguments about the same

three misinterpreted allegations in SDCERA's Complaint.  *See* Hunter's Mem. at p. 19.  For

reasons discussed above with respect to Advisors, Hunter's argument also fails.

Hunter also suggests on page 15 of his motion to dismiss that he does not owe SDCERA

a duty of care because SDCERA is "one level removed."  However, under both New York and

Delaware law, a person may owe a common law duty of care based on the foreseeability of harm

to the injured individual and the degree of relationship.  *See, e.g.*, *Kuczynski v. McLaughlin*, 835

A.2d 150, 155 (Del. Super. Ct. 2003); *DeAngelis v. Lutheran Med. Ctr.*, 445 N.Y.S.2d 188, 192-

93 (N.Y. App. Div. 1981).  SDCERA's Complaint sets forth both the operating structure of the

Fund and Advisors's and Hunter's roles, as well as the direct and foreseeable impact Hunter's

trading had on SDCERA.  (Compl. ¶¶ 29-32.)  As a Portfolio Manager (*id.* at ¶ 28), Hunter could

not have been unaware that the assets he traded belonged to the Fund, and it was entirely

foreseeable that if Hunter's reckless trading resulted in the loss of more than half of the Fund's

annual energy profits, as it did when Hunter was an employee of Deutsche Bank, the Fund's

members would be harmed.  Moreover, the Fund had no real identity outside of the individual

investors comprising the Fund, who also had their own capital accounts that were impacted

immediately by every one of Hunter's trades.  *See* discussion, *supra*, at Section IV(C).  Thus, the

relationship between Hunter and individual investors like SDCERA was more than close enough to impose a duty on Hunter to perform his duties with due care.[33]

Hunter also argues in his motion to dismiss that his conduct cannot be deemed grossly negligent because SDCERA alleges that Advisors's management was aware of his reckless trading practices, but does not allege that Hunter disregarded any instructions from his superiors or Advisors's risk management team.  *See* Hunter's Mem. at p. 19.  Of course, SDCERA's Complaint also alleges that the superiors to whom Hunter points were in fact <u>complicit</u> in Hunter's reckless misconduct and encouraged him in the same, despite their knowledge of the unacceptable risks inherent in his trading strategies, so there would have been no instructions for Hunter to disregard.  (Compl. ¶¶ 15, 58, 60, 66.)  Therefore, it is absurd for Hunter to argue that he should be relieved from liability for his gross negligence merely because other bad actors knew about and encouraged his reckless misconduct.

### C.    Limited Disclaimers Regarding Portfolio Risk Do Not Shield Defendants From Liability For Their Reckless Conduct

Additionally, Advisors and Winkler argue in their motions to dismiss that they cannot be held liable for gross negligence because certain investment risks were disclosed in Fund documents such as the 2003 PPM and the Subscription Agreement.  *See* Advisors's Mem. at p. 33; Winkler's Mem. at p. 12.  This argument fails because the Complaint alleges that SDCERA's losses resulted from the gross negligence of Advisors and Winkler, not from any disclosed

---

[33]    Moreover, a contractually based duty may be grounds for a duty owed to a third party who relies on the work performed.  *See Patton v. Simone*, 626 A.2d 844, 849 (Del. Super. Ct. 1992) (recognizing Delaware's adoption of RESTATEMENT (SECOND) TORTS § 324A).  Given that the sole and entire purpose of Hunter's employment was to trade and manage the investment assets of the Fund's members, Hunter owed members like SDCERA every duty of care and diligence in exercising his duties that he owed Advisors, as the members were the real and intended beneficiaries of Hunter's efforts.

investment risk.  *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004), cited by both Advisors

and Winkler, is not to the contrary.  *Rombach* allows only that voluntary disclosure of low

earnings and other financial problems before financial statements were due from the defendants

weakened the argument that the defendants were acting recklessly in issuing earlier, positive

statements.  *Id.*  In contrast to Advisors's and Winkler's assertions, the defendants in *Rombach*

did not issue warnings of risk and then engage in potentially reckless behavior, which was then

nullified by the warnings.  Instead, the *Rombach* defendants were accused of making positive

statements when they had knowledge that the situation was more dire; the court appeared to

believe that the defendants' unprompted disclosures of the financial issues weighed against

claims that they recklessly or intentionally withheld negative information.  *Id.  Rombach* in no

event stands for the proposition that generic warnings as to potential, unintended losses insulate

any kind of later mischief or intentional misconduct from liability.

Advisors and Winkler appear to assert that the disclosure of some general risks – namely,

the possibility that the market may negatively impact an investment – will shield them from

liability for any and all conduct without limitation.  Even reading defendants' statements very

generously, the warnings in the Fund documents cannot be read to have put SDCERA on notice

that defendants could engage in grossly negligent or intentional misconduct with impunity.

Indeed, the LLC Agreement even specifically excepts "fraud, bad faith, gross negligence, [and]

reckless or intentional misconduct" from the clause limiting defendants' liability.  Burgos Aff.,

Ex. D at p. 14.  SDCERA no more contemplated the possibility that Defendants would act with

recklessness, deceit, or fraud than a skydiver would assume that he would be tossed out of the

plane without a parachute.  If Advisors's and Winkler's reasoning were adopted, then every

manner of ill could be excused by a brief warning that something bad might happen.  Such a total

abdication of responsibility for reckless conduct is not the law.

**D.      SDCERA's Gross Negligence Claim Is Not Barred By The Economic Loss Doctrine**

Maounis, alone, argues that the so-called "economic loss doctrine" bars SDCERA's gross negligence claims.  *See* Maounis's Mem. at pp. 23-24.  Maounis does not dispute – and the cases he cites acknowledge – however, that the economic loss doctrine only bars claims which are duplicative of or could be asserted as claims for breach of a contract between the parties .  *See Hartford Fire Ins. Co. v. Leninski*, No. CV970396097S, 2002 WL 31513608, *3-4 (Conn. Super. Ct. Oct. 29, 2002) (highlighting the fact that plaintiff's misrepresentation claim arose "entirely" out of the breach of contract, and pointing out that the tort claims are "for what is essentially a breach of contract"); *Brasby v. Morris*, No. C.A. 05C-10-022-RFS, 2007 WL 949485, *7-8 (Del. Super. Ct. Mar. 29, 2007) (determining that the plaintiffs' tort and contract claims are one and the same and that there is "no reason to extend tort law into areas that can be <u>adequately</u> governed by contract law" (emphasis added)).[34]  *See also Cocchiola Paving, Inc. v. Peterbuilt of S. Conn.*, No. CV010168579S, 2003 WL 1227557, at *7 (Conn. Super. Ct. Mar. 3, 2003) (tort claim not "based solely on the facts" of contract claim not barred by economic loss doctrine); *Madison Realty Partners 7, L.L.C. v. AG ISA, L.L.C.*, No. CIV.A. 18094, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (dismissing breach of fiduciary duty claims on the grounds that "the contract and fiduciary claims overlap completely since they are based on the same underlying conduct. Indeed, the complaint uses identical conduct as the basis for both legal claims.").

---

[34]      *BKM Enterprises, Inc. v. Budget Modular Workstations, Inc.*, No. CV054008900S, 2007 WL 806275 (Conn. Super. Ct. Feb. 21, 2007), also cited by Maounis, is to the same effect.  *Id.* at *2 (noting that the precluded  misrepresentation counts arose "out of the same breach of a contract for the sale of goods").  Moreover, *BKM* deals exclusively with the sale of goods under the UCC, and no statement in the opinion purports or implies that the economic loss doctrine applies to any actions except those for the sale of goods.  *Id.*

Maounis, however, is not a party to any of the agreements at issue in this case. Thus, even if, as he alleges, SDCERA's gross negligence claim is duplicative of its breach of contract claim against Advisors, it cannot be duplicative of a breach of contract claim against Maounis or any of the other individual defendants, since no such claim was alleged against them. (Compl. at ¶¶ 112-114).

Even as to the gross negligence claim asserted against Advisors, however, the economic loss doctrine is inapplicable. SDCERA's claim encompasses allegations of Advisors's breaches of duty that pre-dated the execution of the contract and thus cannot, by definition, be asserted as claims for breach of contract. *See e.g.*, Complaint at ¶¶ 45 (Advisors made allegedly false and misleading statements throughout the due diligence period), 37 (false and misleading statements made to SDCERA and its agent during due diligence were known to be untrue when made), 48-49 (material information about the hiring of Hunter by Advisors immediately after his having been being fired for reckless trading  was knowingly withheld from SDCERA). It is indisputable that these claims do not arise out of any contractual relationship, since when the alleged breaches occurred, no contract had yet been executed. The economic loss doctrine thus cannot be asserted to bar these claims against Advisors. *See Brasby*, 2007 WL 949485 at *7 (economic loss doctrine does not apply where fraud in the inducement is alleged).[35]

---

[35] Advisors does not argue for application of the economic loss doctrine on its own behalf, perhaps because it asserts instead that it is not a party to the Subscription Agreement. *See* Advisors's Mem. at p. 35-36. If this argument is found to be correct – which SDCERA disputes (*see*, *infra*, Section VIII), there would be no contract cause of action for a gross negligence claim to be duplicative of, and as such, the economic loss doctrine would have no effect on the viability of SDCERA's cause of action against Advisors as to any of the allegations of the Complaint.

## VI.   COUNT V OF THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE FRAUD DEFENDANTS

At the July 21, 2005 SDCERA Board meeting, Maounis declared, among other things, that "we have a fiduciary responsibility to our investors[.]"  (Compl. ¶ 44.)  Now, however, confronted by allegations that the Fund's collapse was caused by breaches of these same duties, Maounis and the other Fraud Defendants disingenuously disclaim the fiduciary responsibilities they once referred to as part of their sales pitch.  *See* Advisors's Mem. at pp. 33-35; Maounis's Mem. at pp. 23-24; Winkler's Mem. at pp. 12-13; Jones's Mem. at pp. 22-23.  Contrary to these suggestions, the Complaint alleges facts establishing that the Fraud Defendants each owed SDCERA duties of care, candor, good faith, and loyalty and, through their reckless conduct and misrepresentations, breached those duties.

### A.   Advisors Owed Fiduciary Duties to SDCERA[36]

To sufficiently allege a claim for breach of fiduciary against Advisors, SDCERA must show that a fiduciary duty existed, and that the fiduciary breached that duty.  *See Legatski v. Bethany Forest Assoc., Inc.*, No. 03C-10-011-RFS, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006).  Advisors asserts that no fiduciary duty existed because it was not obligated to provide SDCERA with any investment advice.  *See* Advisors's Mem. at p. 34.  Delaware law provides for the creation of fiduciary duties under a variety of circumstances, and SDCERA's claim does not, in any event, rely upon the receipt of investment advice.  Advisors's arguments

---

[36] SDCERA's breach of fiduciary duty claims are governed by Delaware law.  *Seybold v. Groenink*, No. 06 Civ. 772, 2007 WL 737502, at *5 (S.D.N.Y. Mar. 12, 2007) (finding that the internal affairs doctrine requires application of law of state of incorporation to breach of fiduciary duty claims); *see also Katz v. Emmett*, 641 N.Y.S.2d 131, 131 (N.Y. App. Div. 1996) (applying law of the state of incorporation to breach of fiduciary duty claims).  Those Defendants addressing the question of governing law agree.  *See* Advisors's Mem. at p. 34 & n. 50; Jones's Mem. at p. 22 & n. 6.

ignore that SDCERA has sufficiently alleged two independent bases that each create a fiduciary relationship between it and SDCERA:  first, that Advisors owed SDCERA a fiduciary duty as the managing member of the Fund (*see, e.g.*, Compl. ¶¶ 24, 29, 44, 121-123); and second, that a special relationship of trust existed between it and SDCERA (*see, e.g.*, *id.* at ¶¶ 29, 31, 44, 121-123).

### 1.    Advisors's Fiduciary Duties To SDCERA Arose From Its Position As Managing Member Of The Fund

There is no dispute that Advisors was the managing member of the Fund.  *See* Advisors's Mem. at p. 6.  *See also* Compl. ¶ 24, 31.  Under Delaware law, managers – especially managing members – owe fiduciary duties to the other members of an LLC.  *See Grace v. Morgan*, No. Civ.A. 03C05260JEB, 2004 WL 26858, at *2 (Del. Super. Ct. Jan. 6, 2004) (finding that managing member of the LLC had a fiduciary duty of fair dealing to individual LLC member); *In re Bigmar, Inc.*, No. Civ.A. 19289-NC, 2002 WL 550469, at *23 (Del. Ch. Apr. 5, 2002) (finding members of LLC owed fiduciary duty of candor to other member); *Solar Cells, Inc. v. True N. Partners, L.L.C.*, No. Civ.A. 19477, 2002 WL 749163, at *4 (Del. Ch. Apr. 25, 2002) (fiduciary duties of managers of LLC to member were not waived by operating agreement); *VGS, Inc. v. Castiel*, No. C.A. 17995, 2000 WL 1277372, at *4 (Del. Ch. Aug. 31, 2000), *aff'd*, 781 A.2d 696 (Del. 2001) (noting that individual managers of an LLC "each owed a duty of loyalty to the LLC, its investors and [the majority member]").  Thus, Advisors, by virtue of being the Fund's managing member, owed a fiduciary duty to SDCERA.

### 2.    Advisors's Total Control of the Fund Created a Special Relationship of Trust, and Thus, a Fiduciary Duty

Advisors also owed SDCERA fiduciary duties because a special relationship of trust existed between them arising out Advisors's full control of the Fund and its assets.  While courts will generally not recognize a fiduciary duty arising out of a straightforward, commercial

relationship, *see McMahon v. New Castle Assoc.*, 532 A.2d 601, 605 (Del. Ch. 1987), they will give credence to a fiduciary relationship arising from contract where "one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another," *Cheese Shop Int'l, Inc. v. Steele*, 303 A.2d 689, 690 (Del. Ch.), *rev'd on other grounds,* 311 A.2d 870 (Del. 1973).  Typically, such relationships of "special trust" arise in the following situations:

> (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first; (2) when one person assumes control and responsibility over another, [or] (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship . . . .

*Legatski*, 2006 WL 1229689, at *3

Accordingly, courts have not hesitated to recognize a fiduciary relationship arising between parties where one party places special trust in the other by permitting the other party to solely control the subject matter of the relationship.  *See*, *e.g.*, *Grace*, 2004 WL 26858, at *2 (finding more than arms-length relationship between LLC members where managing member hired engineer, oversaw planning and construction, and ensured goals of project met); *Madison Real Estate Immobbielien-Anlagegesellschaft Beschrankt Haftende KG v. Geno One Fin. Place L.P.*, No. Civ.A.1928-N, 2006 WL 456779, at *3 (Del. Ch. Feb. 22, 2006) (finding fiduciary relationship where agreement vested "sole and exclusive authority for the management of the partnership" in general partner); *Legatski*, 2006 WL 1229689, at *5 (finding builder had fiduciary relationship with landowner, where landowner had no input into process and gave total control to builder).

Here, SDCERA placed special trust in Advisors, thereby creating a fiduciary relationship when SDCERA invested in the Fund in reliance upon Advisors's representations.  As Advisors notes repeatedly, the PPMs, the Subscription Agreement, and the LLC Agreement required

SDCERA to submit entirely to Advisors's discretion over the management of its investment.

*See*, *e.g.*, Advisors's Mem. at p. 3.  Indeed, the LLC Agreement expressly provides that Advisors "shall have full and complete charge of all affairs of the [Fund].  The management and control of the [Fund's] business and its assets shall rest exclusively with [Advisors]."  Burgos Aff., Ex. D at p. 8-9; Compl. ¶ 31.  Furthermore, it expressly authorizes Advisors to "make all investment and trading decisions with respect to the acquisition and disposition . . . of Investment Assets . . . ." *Id.*  Thus, Advisors's stewardship of SDCERA's investment presents a classic example of a relationship of special trust governed by fiduciary duties.

### B.    Maounis, Winkler, And Jones Each Owed SDCERA Fiduciary Duties As Officers Of Advisors

Directors and officers owe fiduciary duties to both the underlying corporation and to its shareholder or members.  *See*, *e.g.*, *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) (finding directors and officers of corporation owe fiduciary duties to corporation and to its shareholders). The Fund, however, has neither a board of directors, nor any officers; instead, it has only a Manager, Advisors, that had "full and complete charge of all affairs of the [Fund]."  Burgos Aff., Ex. D at p. 8. S*ee also* Compl. ¶ 31.  On the other hand, the Fund's Manager, Advisors, did have officers:  Maounis, President and Chief Investment Officer; Winkler, Chief Operating Officer; and Jones, Chief Risk Officer.  (Compl. ¶¶ 25-27.)  Thus, without any intervening layer of management or directorship provided by the Fund, Advisors's officers – Maounis, Winkler, and Jones – actually exercised the "full and complete charge of all affairs of the [Fund]," including stewardship over the members' individual capital accounts.  Burgos Aff., Ex. D at p. 8.  *See also* Compl. ¶¶ 31, 56, 66, 117.  Thus, Maounis, Jones, and Winkler, as officers of the Fund's Manager, owed fiduciary duties to SDCERA.  *See Malone*, 722 A.2d at 10.

**C.     SDCERA Had a Special Relationship of Trust With Each of Maounis, Winkler, and Jones, Individually**

As noted above, a fiduciary relationship arises in "a situation where one person reposes special trust in and reliance on the judgment of another . . . ."  *Cheese Shop Int'l.*, 303 A.2d at 690.  Not only did SDCERA place special trust in Advisors regarding its investment in the Fund, but also in Maounis, Winkler, and Jones, each of whom personally cultivated SDCERA's investment and held themselves out to have special expertise and experience in managing and controlling the risk of multi-strategy hedge funds.  In large part due to these claims of special expertise, SDCERA chose to become a member of the Fund and entrusted its investment to Maounis, Winkler, and Jones.  (Compl. ¶¶ 5, 13, 29, 41-45.)

To begin, as alleged in the Complaint, Maounis specifically engendered a special relationship of trust by affirming to SDCERA on July 21, 2005 that defendants "have a fiduciary responsibility to our investors."  (*Id.* at ¶ 44.)  SDCERA had every reason to believe such a relationship existed – as indeed one does – given that during SDCERA's due diligence meetings at Advisors's facilities, Maounis had repeatedly stressed Advisors's risk controls, diversification strategies, and commitment to producing consistent results in a low-risk environment.  (*Id.* at ¶¶ 5, 33.)  Moreover, Maounis's representations were supported by the 2003 PPM that declared that Maounis had extensive experience not only with personally trading multiple large portfolios, but also in supervising teams of traders and trading assistants.  *See* Burgos Aff., Ex. A at p. 12.  Such representations were important to SDCERA, especially since the 2003 PPM provided that Maounis would be "responsible for all investment functions (including the allocation of the Fund's capital among the various trading strategies employed by the Manager) and the overall management and supervision of the Manager." *Id.*  (Compl. ¶ 31.)  Where, as here, SDCERA placed trust in the faithful integrity of Maounis, who as a result gained superiority over

SDCERA, a special relationship of trust inures and a fiduciary relationship results.  *Legatski*, 2006 WL 1229689, at *3.

Similarly, Winkler's representations to SDCERA, as alleged in the Complaint, also establish a special relationship of trust creating a fiduciary duty.  Winkler, the Chief Operating Officer, was one of three principal Advisors personnel listed in the 2003 PPM.  *See* Burgos Aff., Ex. A at p. 13.  During SDCERA's March 2005 due diligence meeting, Winkler encouraged SDCERA's investment in the Fund by representing that its investment would be in the safe, capable hands of a team that employed proactive risk management and diversification policies.  (Compl. ¶ 33.)  Given that Winkler's PPM biography lauds his high-level experience with funds that had similar trading strategies as Advisors and emphasized his significant management background, SDCERA had no reason not to trust Winkler.  *See* Burgos Aff., Ex. A at p. 13.  (Compl. ¶¶ 43, 50.)  SDCERA placed its trust in Winkler as Advisors's overseer of its investment and relied on Winkler to act in its, and the Fund's, interests.  A fiduciary relationship arose.  *See Legatski*, 2006 WL 1229689, at *3.

Finally, Jones, despite his contentions otherwise, created a fiduciary relationship with SDCERA by promoting his own expertise in and Advisors's approach to risk management.  To be sure, Jones is singled out in the Complaint as being in charge of the Fund's overall risk management, one of the Fund's primary selling points to SDCERA.  (Compl. ¶ 40.)  Thus, Jones's representations concerning the Fund's proactive risk management team, which supposedly both oversaw and worked with the Fund's sector heads and portfolio managers, held great weight.  (*Id.* at ¶¶ 39, 43.)  The 2003 PPM further backed up Jones's representations by specifically touting his development of risk-limiting techniques, his scholarly work on the topic, and his consultation with the NYSE Chairman on operational risk issues.  *See* Burgos Aff., Ex. A

at p. 13.  SDCERA believed Jones when he touted the Fund's risk controls and put its trust and confidence in him to protect their investment.  (Compl. ¶ 50.)  Thus, Jones most certainly had superiority and influence over SDCERA and its investment, thereby also generating a fiduciary responsibility.  *See Legatski*, 2006 WL 1229689, at *3.

      **D.**    **The Fraud Defendants Breached The Duty Of Care**

Under Delaware law, a fiduciary is held to have breached the duty of care through conduct akin to gross negligence.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del. 2002).  Only Advisors and Winkler expressly deny that their conduct constituted breaches of fiduciary duty.  Advisors's Mem. at pp. 34-35; Winkler's Mem. at pp. 12-13.  Specifically, Advisors and Winkler argue that SDCERA has not pled conduct rising to the level of gross negligence.  *See* Advisors's Mem. at pp. 34-35.  As discussed for Counts III and VIII above, SDCERA has alleged sufficient facts to show that Advisors and Winkler, as well as Maounis and Jones, acted with reckless disregard constituting gross negligence.

Nonetheless, Advisors and Winkler assert that SDCERA cannot plead that they were grossly negligent, because both were empowered to act with complete discretion.  *See* Advisors's Mem. at p. 35.  Complete discretion, however, does not exculpate the Fraud Defendants from liability for breach of their fiduciary duties.  *See Miller v. Am. Real Estate Partners, L.P.*, No. CIV.A.16788, 2001 WL 1045643, at *8-9 (Del. Ch. Sept. 6, 2002) (finding that sole discretion clauses still require the managing members of LLCs to exercise discretion that will not breach fiduciary duties).  Indeed, it was the Fraud Defendants' complete control over the Fund that created their fiduciary duties in the first place and required them to exercise that control with care.  *See, e.g.*, *Madison*, 2006 WL 456779, at *3.

*Albert v. Alex Brown Management Services Inc.*, Nos. Civ. A 762-N & 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005), cited by Advisors, is not to the contrary.  *Albert* stands only

for the proposition that when faced with two <u>legitimate</u> courses of action, a fiduciary does not breach its duty by choosing one over the other. *Id.* at *4. Here, SDCERA does not take issue with Advisors's legitimate choices, but rather with its reckless abandonment of risk controls for the Fund's energy trading portfolio, despite promises otherwise. (Compl. ¶¶ 6-7, 13-14, 117.)

> **E.** **The Fraud Defendants Breached The Duty Of Candor**

The Complaint also alleges that the Fraud Defendants breached their fiduciary duties "by deliberately misleading SDCERA as to the Fund's investment strategies and risk controls before and after SDCERA made its investment." (Compl. ¶ 117.) Under Delaware law, fiduciaries are required to "provide full and fair disclosure of all material facts relating to any matter involving the [LLC.]" *See In re Bigmar, Inc.*, No. Civ. A. 19289-NC, 2002 WL 550469, at *23. Thus, SDCERA's allegations, for example, that the Fraud Defendants failed to disclose the true facts regarding Hunter's prominent trading role in the Fund, their failure to exercise oversight over his trades, and their continuous misrepresentations about the Fund's positions in natural gas sufficiently assert a breach of their duty of complete candor. (Compl. ¶¶ 12-15, 55-58, 71-75, 117.)

> **F.** **The Fraud Defendants Breached The Duty Of Good Faith And Fair Dealing**

In addition, the Fraud Defendants have breached their respective duties of good faith and fair dealing. (Compl. ¶ 118.) A fiduciary is deemed to have acted in bad faith whenever the action at issue was taken "for some purpose other than a genuine attempt to advance corporate welfare." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 753 (Del. Ch. 2005). SDCERA has alleged that the Fraud Defendants continued to misrepresent the Fund's natural gas position to maintain SDCERA's $175 million investment in that position and personally reap the benefits of that position in the market (before the Fund's natural gas position became the market) through bonuses and performance fees accruing to the Fraud Defendants. (Compl. ¶ 7.) Because the

Fraud Defendants sought to advance their own personal welfare, not the Fund's, SDCERA has adequately pled the Fraud Defendants breached their duty of good faith and fair dealing.

### G.    The LLC Agreement Does Not Limit Advisors's Fiduciary Duties

While Delaware law permits the members of an LLC to contractually modify the duties members owe to each other, fiduciary duties will not be deemed waived or modified except by express language in the LLC agreement specifically doing so. *See Sonet v. Timber Co., L.P.*, 722 A.2d 319, 322 (Del. Ch. 1998). *See also Douzinas v. American Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149-50 (Del. Ch. 2006) (under Delaware law, the LLC agreement defines the scope of any alterations of fiduciary duties). Any contractual language exculpating a party from fiduciary duties must do so clearly, plainly and unambiguously. *Sonet*, 722 A.2d at 322.

Here, no clear, plain and unambiguous language in the LLC Agreement absolves Advisors for breaches of fiduciary duty. Furthermore, the language in the LLC Agreement preserves claims against Advisors for fraud, bad faith, gross negligence, or reckless or intentional misconduct:

> No Manager Party shall have any liability . . . for: (i) any act performed, or the omission to perform any act, within the scope of the power and authority conferred on the Manager by this Agreement . . . except by reason of acts or omissions . . . Determined to constitute fraud, bad faith, gross negligence or reckless or intentional misconduct[.]

Burgos Aff., Ex. D at p. 14. No part of the paragraph refers to fiduciary duties or purports to limit them. Accordingly, the LLC Agreement's limitation of liability does not excuse Advisors for harm arising from its breach of fiduciary duty. *See Sonet*, 722 A.2d at 322.

### H.    SDCERA's Fiduciary Duty Claims Do Not Duplicate Its Fraud Claim

Finally, Jones argues that SDCERA's breach of fiduciary claims should be dismissed as duplicative of its fraud claims. *See* Jones's Mem. at p. 24. Jones is, however, mistaken: the theories and allegations of the claims are substantially different.

SDCERA bases its breach of fiduciary duty claims on Advisors's, Maounis's, Winkler's, and Jones's breaches of the duties of care, candor, loyalty, and good faith and fair dealing. While the fraud claims encompass the Fraud Defendants' misrepresentations, they do not address the reckless mismanagement of the LLC, which is encompassed by the claims for breach of the duty of care, loyalty, and good faith and fair dealing. Furthermore, SDCERA's breach of fiduciary duty claims require very different elements and proof than SDCERA's fraud claims: breach of fiduciary duty claims only require a showing that the defendant owed a duty to the plaintiff and that he breached that duty, *Legatski*, 2006 WL 1229689, at *3; on the other hand, fraud claims must be supported by scienter and reliance,[37] *see, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Likewise, SDCERA's claims for defendants' breach of the duty of candor do not require any showing of reliance, causation, or actual monetary damages. Rather, SDCERA must only establish that the alleged misrepresentation or omission was material. *See Malone*, 722 A.2d at 12.[38]

Therefore, the Fraud Defendants' motions to dismiss SDCERA's breach of fiduciary duty claims (Count V) must be denied.

## VII.   COUNT VI OF THE COMPLAINT STATES CLAIMS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST WINKLER, JONES, AND HUNTER

Under the governing Delaware law, the elements of a cause of action for aiding and

---

[37]    Jones is also incorrect that SDCERA must plead breach of fiduciary duty with particularity. *See Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 101 (S.D.N.Y. 2004) (recognizing that breach of fiduciary duty pleading negligence as opposed to fraud is not subject to Rule 9(b)); *Rahl v. Bande*, 328 B.R. 387, 413 (S.D.N.Y. 2005) (rejecting application of Rule 9(b) pleading standards to plaintiff's breach of fiduciary duty claims that were not premised on allegations of fraud).

[38]    *But see Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157-58 (Del. 2004).

abetting a breach of fiduciary duty are: (1) a fiduciary relationship; (2) breach of that

relationship; (3) knowing participation by the defendant in the breach; and (4) damages

proximately caused by the breach.  *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

Defendants Hunter, Winkler and Jones each refer to arguments against the underlying breach of

fiduciary duty claim (including their incorrect assertion that the claim is derivative) as reasons

why Count VI should be dismissed as well.[39]  Individually, Hunter challenges the "knowing

participation" element of SDCERA's claim, and asserts the claim must be dismissed against him

because (1) he was never informed of any complaints regarding his trading practices or any

violations of Advisor's policies, and (2) he cannot have aided and abetted Winkler's and Jones'

breaches because his trading activities were the "result" of their supposed breaches.   Hunter

Mem. at 17.  Both arguments are disingenuous, and SDCERA's claims are well-pled.[40]

A.    **SDCERA Has Alleged Winkler's Knowing Participation in Advisors's And
Maounis's Breaches Of Their Fiduciary Duties**

The Complaint contains numerous specific allegations in support of Winkler's specific

liability to SDCERA for aiding and abetting Maounis's and Advisors's breaches.  In particular,

the Complaint alleges that Winkler participated in meetings and telephone conferences in which

he knowingly remained silent and failed to correct false and misleading statements or omissions

made by Maounis and Advisors regarding diversification, reduction of the natural gas allocation,

and use of adequate risk controls (Compl. ¶¶ 33, 41, 43, 78); that Winkler knew about, approved,

---

[39]  *See* Winkler Mem. at 13-14; Hunter Mem. at 16-17; Jones Mem. at p. 23, n. 8.  As previously noted, the Complaint does sufficiently allege that Advisors and Maounis owed fiduciary duties to SDCERA.  *See, supra*, Section V.

[40]  Hunter cites both New York and Delaware law without making an argument as to which law should apply.  (Hunter's Mem. at pp. 15-16.)  However, aiding and abetting of fiduciary duty claims are governed by Delaware law under the internal affairs doctrine.  *See Seybold* 2007 WL 737502, at *5.

and participated in Maounis's hiring of Hunter despite Hunter's history at Deutsche Bank (*id.* at ¶ 46); that Winkler was intimately involved in all of Advisors's operations and key decisions, including decisions relating to Hunter's compensation, and even discussed capital allocation issues with Maounis on an almost daily basis, which resulted in Maounis's continued allocation of a large amount of the Fund's capital to Hunter's reckless natural gas trading (*id.* at ¶¶ 56-57); and that despite being warned of the risks of Hunter's reckless positions, Winkler, along with Advisors and Maounis, continued to encourage and enable Hunter's trading without any risk controls in place (*id.* at ¶¶ 62, 65).  (*See also id.* at ¶ 123.).

### B.    SDCERA Has Also Adequately Alleged Its Aiding and Abetting Breach Of Fiduciary Duty Claim Against Jones

Jones's only individual argument against SDCERA's aiding and abetting claim asserts that SDCERA "has done nothing more than state the elements of the cause of action."  Jones's Mem. at p. 23.  On the contrary, the Complaint alleges particular actions by Jones evidencing his knowing participation in Maounis's and Advisors's breaches.  For example, SDCERA alleges that Jones was an active participant during SDCERA's due diligence visit to Advisors's office in March 2005, and that he knowingly failed to correct the false and misleading statements or omissions made by Maounis and Advisors to SDCERA.  (Compl. at ¶¶ 33, 41-43.)  Similarly, SDCERA alleges that Jones knowingly failed to correct misleading statements and omissions by the other Defendants during the June 7, 2006 and August 10, 2006 telephone conferences with Rocaton, and at the July 21, 2005 meeting in San Diego.  (Compl. at ¶¶ 73-75, 78, 81.)  Furthermore, SDCERA has alleged that Jones, as Chief Risk Officer, was responsible for overseeing the risk exposure of all of Advisors's portfolios, including Hunter's trading practices.  (Compl. at ¶¶ 15, 27, 39, 66.)  The Complaint further alleges that Jones failed to act when Maounis overrode the risk department's control recommendations regarding Hunter, and in fact,

knowingly assisted Advisors and Maounis in encouraging Hunter's reckless trading practices by failing to apply the same standards of risk control to Hunter's trading as were apparently applied to other aspects of the Fund's portfolio.  (*Id.* at ¶¶ 15, 65.)  The Complaint thus alleges each element of a cause of action for aiding and abetting breach of fiduciary duty against Jones.

### C.   SDCERA Has Also Adequately Alleged That Hunter Aided and Abetted All Of The Fraud Defendants' Breaches Of Their Fiduciary Duties To SDCERA

Whether or not anyone complained to Hunter about his trading practices is immaterial. SDCERA's allegations of breach of fiduciary duty are that the Defendants knew or should have known that their disclosures to SDCERA were inadequate, and that their trading strategies were reckless.  (Compl. at ¶¶ 115-119).  *See also, supra* Section VI.  The Complaint alleges that Hunter was in possession of this same knowledge, i.e., he knew what was being told to investors such as SDCERA (*see e.g.,* Compl. at ¶ 73, alleging Hunter was on one of the telephone calls in which misrepresentations were made to SDCERA); he knew that it was not true (*see e.g.*, Compl. at ¶ 74); and he knew that the trading strategies he was employing on behalf of Advisors were reckless (*see e.g.*, Compl. at ¶¶ 46, 63, noting recklessness of Hunter's trades and the fact that he had been fired from his previous employer for reckless energy trading that led to extreme losses).

Hunter's second argument is merely a restatement of the first.  Aiding and abetting a breach of fiduciary duty is premised on the notion of an underlying breach by someone else.  The cause of action, therefore, is supported – not defeated – by allegations that the complained-of conduct was a part of someone else's breach of duty.  Hunter is thus correct in one respect:  the breach of fiduciary duty that is derived from his trading activity is a breach by Advisors, Maounis, Winkler and Jones.  The breach, however, would not have occurred but for Hunter's

91

knowingly reckless trading, which the other defendants allowed to occur.[41] The Complaint

alleges all of the necessary elements for an aiding and abetting cause of action against Hunter.

## VIII.   COUNT VI OF THE COMPLAINT STATES A CLAIM AGAINST ADVISORS FOR BREACH OF CONTRACT (COUNT IV)

The Complaint contains allegations as to each of the required elements of a breach of

contract claim.  *See Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991)

(complaint must allege "the terms of the contract, each element of the alleged breach and the

resultant damages in a plain and simple fashion").[42]  Consequently, Advisors's motion to dismiss

Count VI must be denied.

### A.   By Acknowledging And Directly Benefiting From The Subscription Agreement, Advisors Is Bound By It Terms

Advisors decries any liability to SDCERA under the Subscription Agreement because it

claims not to have signed the Agreement in its "individual" capacity, but rather only in its

capacity as Manager of the Fund.  *See* Advisors's Mem. at pp. 35-36.  Advisors, however, was a

signatory to the LLC Agreement, which explicitly states that "[t]his [LLC] Agreement, together

with the Subscription Agreement . . . sets forth the entire agreement and understanding of the

parties."  Burgos Aff., Ex. D at p. 42.   Thus, Advisors specifically acknowledged that its entire

agreement with SDCERA included the Subscription Agreement and it is therefore bound by its

terms.

Second, even apart from the LLC Agreement, Advisors is independently bound to the

---

[41] Hunter's arguments are directed only at SDCERA's allegations of breaches of fiduciary duty by Winkler and Jones.  *See* Hunter's Mem. at pp. 17-18.  Count VI of SDCERA's Complaint, however, alleges that Hunter (along with Winkler and Jones) also aided and abetted Maounis's and Advisors's breaches of fiduciary duty.  (Compl. ¶121.)

[42]     The contract at issue in this claim, the Subscription Agreement, provides that New York law governs claims arising thereunder.  Burgos Aff., Ex. C at p. S-9.

terms of the Subscription Agreement, which it expressly endorsed and benefited from.  Under the

Subscription Agreement, Advisors has the unqualified right in its individual capacity (<u>not</u> in its

capacity as a representative of the Fund) to accept or reject the Subscription Agreement in whole

or in part.  *See* Burgos Aff., Ex. C at p. 2.  Advisors, however, neither rejected the Subscription

Agreement nor objected to any part thereof.  Instead, Advisors accepted the Subscription

Agreement, along with SDCERA's $175 million investment, from which Advisors then

proceeded to benefit (again, in its individual, not representative, capacity) by reaping high

performance fees on its investment of SDCERA's contributed capital.  By ratifying the

Subscription Agreement and benefiting from it, Advisors cannot now claim that it was not a

party to it.  *See Jaywyn Video Prods., Ltd. v. Servicing All Media, Inc.*, 179 A.D.2d 397, 398

("[D]efendants have ratified the agreement by adhering to it and deriving benefit from it without

objection").  *See also Birger v. Tuner*, 104 Misc. 2d 63, 68 (N.Y. Civ. Ct. 1980) (finding

nonsignatory to contract liable where he directly benefited from it); *Am. Bureau of Shipping v.*

*Tencara Shipyard S.P.A.*, 170 F.3d 349, 352-53 (2d Cir. 1999) (finding non-signatory bound by

an arbitration provision because the nonsignatory received a "direct benefit" from the contract).

**1.    The Subscription Agreement Must Be Interpreted In Conjunction With The 2003 PPM**

Advisors also challenges SDCERA's breach of contract claim on the grounds that

SDCERA has not pled a breach of any contractual obligation and cannot do so based on the 2003

PPM.  *See* Advisors's Mem. at p. 37.  SDCERA, however, has legitimately pled a breach of

contract claim based on the terms of the 2003 PPM, which was expressly incorporated by

93

reference into the Subscription Agreement.  *See* Burgos Aff., Ex. C at p. S-2.[43]  *See Ronan*

*Assocs., Inc. v. Local 94094A-94B*, 24 F.3d 447, 449 (2d Cir. 1994) (parties to an agreement are

free to incorporate by reference and bind themselves to terms found in other documents).

Section 3(b) of the Subscription Agreement, entitled, "Representations, Warranties and

Acknowledgements," states, in part, that "[t]he Subscriber . . . further understands that the only

disclosures for which the Fund or any Manager Party accepts any responsibility relating to the

Subscriber's investment <u>are those set forth in the [2003 PPM</u> as supplemented by the Supplement

dated December 2003<u>]</u>."  *Id.* at pp. S-2 - S-3.  Accordingly, the terms of the 2003 PPM are

incorporated into the Subscription Agreement, since it would be impossible to determine

Advisors's liability for breach of the Subscription Agreement without reference to the terms of

the PPM.  *See PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (any paper

sufficiently described and referred to in an agreement may be made part of the agreement as if

incorporated therein, so long as the paper is identified beyond reasonable doubt).

> ## 2.    Advisors Breached The Subscription Agreement By Failing To Honor Its Disclosures In The 2003 PPM

SDCERA has alleged that Advisors contracted to "allocate capital and manage the Fund

as if it were a diverse multi-strategy hedge fund with sound risk management policies," and that

Advisors breached those promises by "concentrating the Fund's exposure in the energy sector,

and by failing to manage the Fund properly."  (Compl. ¶ 113.)  In doing so, SDCERA has

identified throughout the Complaint numerous specific promises that Advisors made in the 2003

---

[43]Advisors cites *Insurance Co. of North America v. Johnson*, 959 F.2d 240 (1992), for the proposition that SDCERA cannot base its claim on the 2003 PPM.  That case, however, was decided under California, not New York, law.  Furthermore, the court there failed to consider, as courts in New York do, whether "there would have been no bargain whatever if any promise or set of promises had been stricken" from the agreement as a whole.  *See id.* at *3.

PPM  (*see*, *e.g.*, *id*. at ¶¶ 33-36), as well as the manner in which Advisors breached those terms (*see*, *e.g.*, *id*. at ¶¶ 37, 58, 63-65).  Finally, SDCERA has set forth its damages from these breaches as at least $130 million.  (*Id.* at ¶ 114.)  Accordingly, SDCERA has pled a cause of action for breach of contract.

### B.   The LLC Agreement's Limitation Of Liability Clause Does Not Excuse Advisors's Breach

Advisors also seeks to avoid liability for its breaches of contract through the limitation of liability clause in the LLC Agreement.  *See* Advisors's Mem. at pp. 36-37.  To the extent this limitation of liability provision absolves Advisors for its breaches of contract, it would do so only for those breaches arising out its acts or omissions within the scope of the LLC Agreement.  *See* Burgos Aff., Ex. D at p. 14.)  Here, SDCERA claims that Advisors breached the Subscription Agreement and the 2003 PPM; consequently, the LLC Agreement's limitation of liability provision cannot shield Advisors from SDCERA's claim.

Nor can Advisors claim that the parties have incorporated the LLC Agreement's limitation of liability provision into the Subscription Agreement.  It is well-settled that clauses relating to the resolution of disputes can only be incorporated into an agreement by language that is "sufficiently specific" to ensure that the parties intended the provision to apply.  *CooperVision, Inc. v. Intek Integration Techs., Inc.*, 7 Misc. 3d 592, 600 (N.Y. Sup. Ct. 2005).  While the Subscription Agreement acknowledges that the LLC Agreement is part of the entire agreement between the parties, it does not contain the "sufficiently specific" language necessary to incorporate the LLC Agreement's limitation of liability clause.  *See generally* Burgos Aff., Ex. C.  Indeed, the very wording of the LLC Agreement's limitation of liability clause, restricting its application to "this Agreement," establishes that it does not apply to the Subscription Agreement or 2003 PPM.  Burgos Aff., Ex. D at p. 14.  *See also Sempra Energy*

*Trading Corp. v. Algoma Steel, Inc.*, No. 00 Civ. 9227 (GEL), 2001 WL 282684, at *6 (S.D.N.Y. Mar. 22, 2001) (finding forum selection clause referring to "proceedings related to this Agreement" supported applying clause only to agreement containing the clause).  Thus, the LLC Agreement's limitation of liability clause does not bar SDCERA's breach of contract claim.

### C.    SDCERA's Breach Of The Implied Covenant Of Good Faith And Fair Dealing Claim Is Distinct From Its Breach Of Contract Claim

Finally, Advisors argues that SDCERA's breach of the implied covenant of good faith and fair dealing claim cannot survive because it is duplicative of SDCERA's breach of contract claim.  *See* Advisors's Mem. at pp. 38-39.  Under New York law, the covenant of good faith and fair dealing precludes each party from engaging in any conduct that deprives the other party of its bargained-for benefits in the agreement.  *See CVC Claims Litig. L.L.C. v. Citicorp Venture Capital Ltd.*, No. 03 Civ. 7936, 2006 WL 1379596, at *5 (S.D.N.Y. May 18, 2006).  A party breaches the covenant when it acts in a manner that deprives the other party of a benefit under the agreement, even though that action is not expressly barred by any contractual provision.  *Id*.

Here, SDCERA's Complaint alleges not only that Advisors breached its explicit contractual duties in the 2003 PPM and the Subscription Agreement, but also knowingly misled SDCERA after its investment by continuously misrepresenting the Fund's natural gas holdings and lack of risk controls to deter SDCERA from exercising its contractual right of withdrawal. (Compl. ¶¶ 6, 69-77, 113; Burgos Aff., Ex. A at pp. 4, 37-38.)  Although Advisors's misrepresentations are not explicitly barred by the terms of the 2003 PPM, they clearly deprived SDCERA of its contractual right to withdraw the appreciation on its investment, as well as its capital, at times most advantageous to SDCERA.  Thus, Advisors divested SDCERA of a bargained-for benefit of the agreements.  As a result, SDCERA's claim that Advisors breached the implied covenant of good faith and fair dealing must survive Advisors's motion to dismiss.

IX.    THE COMPLAINT STATES CLAIMS FOR VICARIOUS LIABILITY AGAINST
       THE FRAUD DEFENDANTS (COUNT VII)

Despite being Hunter's immediate supervisors, and imbued with authority and control

over him that they lamentably failed to exercise, the Fraud Defendants all repudiate any

responsibility for failing to prevent Hunter's grossly negligent trading and aiding and abetting of

breach of fiduciary duty.  *See* Advisors's Mem. at pp. 39-40; Maounis's Mem. at p. 25;

Winkler's Mem. at pp. 14-15; Jones's Mem. at p. 21.  Under the doctrine of *respondeat superior*,

however, an employer such as Advisors is vicariously liable for torts committed by its employees

acting within the scope of their employment.  *See Higazy v. Millennium Hotel & Resorts, CDL

(NY) L.L.C.*, 346 F. Supp. 2d 430, 453 (S.D.N.Y. 2004).  Moreover, this vicarious liability

extends to Maounis, Winkler, and Jones individually because each directed, controlled, or

permitted Hunter's gross negligence in his investment decisions and his aiding and abetting of

the Fraud Defendants' breach of fiduciary duties.  *See*, *e.g.*, *Connell v. Hayden*, 443 N.Y.S.2d ,

397-398 (N.Y. Sup. Ct. 1981); *Ventres v. Goodspeed Airport*, L.L.C., 881 A.2d 937, 962  (Conn.

2005); *People v. Toomey*, 203 Cal. Rptr. 642, 651 (Cal. Ct. App. 1984).  SDCERA has

sufficiently alleged that Defendants Advisors, Maounis, Winkler, and Jones are each liable for

Hunter's tortious conduct (Compl. at ¶¶ 126-129).  Accordingly, defendants' motions to dismiss

must be denied.

       A.    **Advisors, As Hunter's Employer, Is Vicariously Liable For His Torts Within
             The Scope Of His Employment**

As Hunter's employer, Advisors is vicariously liable for torts committed by Hunter

acting within the scope of his employment.  *See Higazy*, 346 F. Supp. 2d at 453.  Advisors does

not contest that Hunter's actions alleged in the Complaint were within the scope of his

employment.  (*See* Advisors's Mem. at pp. 39-40.)  Nor does Advisors contest, since it cannot,

that if SDCERA states a claim against Hunter for either gross negligence or aiding and abetting

breach of fiduciary duty, then it will be liable vicariously for these torts as well.  *See Id* ..

Rather, Advisors only argues that SDCERA has failed to state a valid tort claim against Hunter,

leaving no predicate claim upon which to base Advisors's vicarious liability.  (*See* Advisors's

Mem. at pp. 39-40.)  As discussed, *supra*, however, SDCERA has alleged viable causes of action

against Hunter for gross negligence and aiding and abetting the Fraud Defendants' breach of

fiduciary duty.  Therefore, SDCERA has alleged a viable predicate claim for vicarious liability

against Advisors.

> **B.      As Maounis, Winkler, And Jones Directed, Controlled, Or Permitted
>           Hunter's Torts, They Are Also Vicariously Liable**

Maounis and Winkler seek to evade liability for Hunter's torts by asserting that vicarious

liability only attaches to the corporation, not its owner or officers.[44]  *See* Maounis's Mem. at p.

25; Winkler's Mem. at pp. 14-15.  For this general proposition, Maounis relies upon *Meyer v.*

*Holley*, 537 U.S. 280 (2003).  *Meyer*, however, expressly leaves open the possibility of liability

against individual corporate officers under "special circumstances."  *Meyer*, 537 U.S. at 286

("[I]n the absence of special circumstances it is the corporation . . . who is the principal or

employer . . . subject to vicarious liability by its employers or agents" (emphasis added)).

Although the *Meyer* court did not elaborate on these "special circumstances," other cases

establish that such special circumstances exist in SDCERA's case.  Where courts have refused to

impose vicarious liability upon a supervisor, they do so because the ordinary supervisor "lacks

the right to select, control and discharge the employee."  *See Connell*, 443 N.Y.S.2d at 397

---

[44] Jones neither makes this argument nor incorporates it by reference into his brief.  Instead,
Jones only argues that he cannot be liable for Hunter's torts because Hunter cannot be held liable
for gross negligence under Connecticut law.  *See* Jones's Mem. at p. 21.  As established in
Section V(B)(3), *supra*, however, Hunter may be held liable for gross negligence under
Connecticut law.  Thus, Jones, like Maounis and Winkler, is liable for Hunter's torts.

("[T]he right to select, control, and discharge the employee . . . is essential to the imposition of vicarious liability[.]")  On the other hand, numerous courts have imposed vicarious liability, or acknowledged situations where such liability may be imposed, where the supervisor controls, directs, or permits the tortious conduct of the employee.  *See id.* (noting vicarious liability would arise where an employee adopts and controls the work of another employee); *Ventres*, 881 A.2d at 962 (finding officer of LLC vicariously liable where he personally directed employee to cut down trees on another's property); *Toomey*, 203 Cal. Rptr. at 651 (finding managing officer of corporation personally liable for subordinates' misleading statements because he had overall control of the business's operations); *Keams v. Tempe Technical Inst., Inc.*, 993 F. Supp. 714, 725 (D. Ariz. 1997) (listing three bases of officer liability for torts of employee as "participation, knowledge amounting to acquiescence, or negligent management and supervision.").

Here, SDCERA has alleged such special circumstances to make Maounis, Winkler, and Jones vicariously liable for Hunter's conduct.  Specifically, SDCERA has alleged that Maounis, Winkler, and Jones directed the overall operations of the Fund (Compl. ¶ 3), hired Hunter (*id.* at ¶ 46), permitted Hunter to take highly-leveraged and unhedged positions that endangered investors' investments in the Fund (*id.* at ¶ 13), directed additional capital to Hunter for his natural gas trades (*id.* at ¶ 56), and allowed Hunter to make increasingly larger natural gas trades such that the Fund was effectively the market (*id.* at ¶ 57).  Each of these actions is sufficient to make Maounis, Winkler, and Jones personally liable for Hunter's torts.  Consequently, SDCERA has alleged a valid claim for vicarious liability against each of the Fraud Defendants.

## X.   ALTERNATIVELY, SDCERA SHOULD BE GRANTED LEAVE TO AMEND ITS COMPLAINT

In the event that the Court were to find that any of the Counts of the Complaint has failed to state a claim, SDCERA should be granted leave to file an amended complaint pursuant to Fed.

R. Civ. P. 15(a).  As the Rule indicates, leave to amend "shall be freely given when justice so requires." *Id.*  Both the Second Circuit and this Court have repeatedly held that when claims are found deficient on a motion to dismiss, "the usual practice is to grant leave to amend the complaint."  *Rozani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (remanding with instructions to grant leave to amend); *see also Kalnit*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.") (*quoting Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).  Dismissal without such leave is typically reserved for situations where the Court previously granted leave to amend.  *See Rozani*, 899 F.2d at 198 (concluding district court abused its discretion in dismissing complaint without leave to amend where plaintiff had not previously been given leave to amend); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (same).

Courts should be especially liberal in granting leave to amend in cases of dismissed securities fraud claims.  *See, Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *Luce*, 802 F.2d at 56 (noting with regard to dismissal of plaintiff's 10b-5 claims that "[c]omplaints dismissed under Rule 9(b) [for failure to plead with particularity] are 'almost always' dismissed with leave to amend").  Similarly, courts freely grant leave to amend 10b-5 claims where plaintiffs' allegations regarding scienter are deemed deficient.  *See, e.g., Devaney v. Chester*, 813 F.2d 566, 568-69 (2d Cir. 1987) (ruling plaintiff whose 10b-5 complaint pled scienter with a single assertion that one of the defendants had "knowledge" of the inaccuracy of information accompanying prospectus must be given an opportunity to amend).  *Id.* at 569.

SDCERA should, therefore, be given the opportunity to amend its complaint in the event the Court were to grant any of the defendants' Motions to dismiss.

**CONCLUSION**

For the foregoing reasons, as well as those stated in plaintiff's separate Memorandum of

Law with respect to the jurisdictional issues raised by defendant Hunter, Plaintiff SDCERA

respectfully requests that the Court deny each of the defendants' motions to dismiss its

Complaint, and to grant such other relief as the Court deems just and proper.

Dated:  New York, New York
        August 14, 2007

                                   CROWELL & MORING LLP


                                   By:____/s/ Steven D. Greenblatt_____
                                         William J. McSherry, Jr. (WM1194)
                                         Steven D. Greenblatt (SG5105)
                                         153 East 53rd Street
                                         New York, New York 10022
                                         Tel. No.:  212-223-4000
                                         Fax No.:  212-223-4134

                                         CROWELL & MORING LLP
                                         Steven P. Rice
                                         Queena Hu
                                         3 Park Plaza, 20th Floor
                                         Irvine, California 92614
                                         Tel. No.:  949-263-8400
                                         Fax No.:  949-263-8414

                                         Attorneys for Plaintiff San Diego County
                                         Employees Retirement Association