UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
SAN DIEGO COUNTY EMPLOYEES
RETIREMENT ASSOCIATION,

                        Plaintiff,

             -against-                      07 Civ. 2618 (DAB)
                                            MEMORANDUM & ORDER
NICHOLAS M. MAOUNIS, CHARLES H.
WINKLER, ROBERT W. JONES, BRIAN
HUNTER, and AMARANTH ADVISORS, LLC,

                        Defendants.
-----------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff San Diego County Employees Retirement Association

("SDCERA") brings this action against Defendants Nicholas M.

Maounis ("Maounis"), Charles H. Winkler ("Winkler"), Robert W.

Jones ("Jones"), Brian Hunter ("Hunter"), and Amaranth Advisors,

LLC ("Amaranth"), alleging federal securities fraud, common law

fraud, gross negligence, breach of contract, breach of fiduciary

duty, aiding and abetting breach of fiduciary duty, and

vicarious liability.  Plaintiff alleges that Defendants – the

founder, managers, and chief energy trader of hedge fund

Amaranth Partners, LLC (the "Fund") – fraudulently induced

Plaintiff into investment in the Fund, and into holding its

investment in the Fund, by making a number of oral and written

misrepresentations before and after investment, upon which

Plaintiff reasonably relied.  Specifically, Plaintiff alleges

that Defendants represented that the Fund was a multi-strategy

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/15/10

hedge fund that exercised sophisticated risk management controls, while in reality the Fund operated as a single-strategy natural gas fund and did not apply even basic risk management techniques.  Plaintiff alleges that the Fund collapsed in late September 2006 as a result of Defendants' fraud and other misconduct, resulting in a loss of over $6 billion in Fund value, including a loss of more than $150 million by SDCERA.

Each of the Defendants has moved individually to dismiss the Complaint pursuant to Rules 12(b)(6), 12(b)(1), 23.1, and 9(b).[1]  Defendant Hunter, a citizen and resident of Canada, has additionally moved to dismiss the Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2).  For the reasons set forth below, Defendant Hunter's Motion to Dismiss for lack of personal jurisdiction is DENIED.  All of Defendants' Motions to Dismiss are otherwise GRANTED in their entirety, pursuant to Fed. R. Civ. P. 12(b)(6) and 23.1.

---

[1] Defendants have moved separately but make the same substantive arguments for dismissal as to Count One (Securities Fraud), Count Two (Common Law Fraud), Count Three (Gross Negligence), Count Five (Breach of Fiduciary Duty), Count Six (Aiding and Abetting Breach of Fiduciary Duty), and Count Seven (Vicarious Liability).  Only Defendant Amaranth is charged in Count Four (Breach of Contract), and has moved to dismiss that claim.  For convenience, and because the arguments are most completely articulated by Amaranth, and referenced by the other Defendants, the Court refers to Defendant Amaranth's Memorandum of Law throughout this Memorandum and Order as "Def.'s Mem."

## I.   BACKGROUND

The following facts alleged in the Complaint in 07 Civ.
2618 (DAB) ("Compl.") are assumed to be true for purposes of the
Motions to Dismiss before the Court.  The LLC Agreement,
Subscription Agreement, and Confidential Private Placement
Memorandum ("PPM") referenced throughout this section are
incorporated by reference in the Complaint.  See Yak v. Bank
Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001).

Plaintiff SDCERA is an independent association established
by California's County Employees Retirement Law of 1937.
(Compl. ¶ 23.)  SDCERA collects and invests retirement funds in
order to provide retirement and associated benefits for
approximately 33,000 eligible employees, former employees, and
retirees of the County of San Diego and other participating
employers.  (Id.)  SDCERA manages a defined benefit plan
qualified under section 401(a) of the Internal Revenue Code.
(Id.)

Effective September 1, 2005, SDCERA invested $175 million
in Amaranth Partners LLC (the "Fund"), a Connecticut-based hedge
fund formed under Delaware's Limited Liability Company Act.
(Id. ¶ 2.)  Defendant Amaranth Advisors, LLC ("Amaranth"), a
Delaware limited liability company, is the managing member of
the Fund.  (Id. ¶ 24.)  Up until its collapse in September 2006,

3

the Fund was structured as an unregistered pooled investment, privately organized and administered by Amaranth, its professional investment manager.  (Id. ¶ 30.)  The principal office of the Fund and of Amaranth is located in Greenwich, Connecticut.  (Id.)

Defendant Nicholas M. Maounis ("Maounis") is the co-founder, managing member, principal, President, and Chief Investment Officer of Amaranth; Defendant Charles H. Winkler ("Winkler"), an attorney, is the Chief Operating Officer of Amaranth; and Defendant Robert W. Jones ("Jones") is Amaranth's Chief Risk Officer.  (Compl. ¶¶ 25-27.)  Upon information and belief, Maounis, Winkler, and Jones are residents of Greenwich, Connecticut.  (Id.)  Defendant Brian Hunter ("Hunter") was, at various times, a trader, co-Portfolio Manager, or Portfolio Manager at Amaranth for Amaranth's energy trading desk, and head of Amaranth's natural gas trading desk.  (Id. ¶ 28.)  Hunter is no longer employed by Amaranth.  (Id.)  Upon information and belief, Hunter is a resident of Calgary, Alberta, Canada.  (Id.)

In August 2002, SDCERA entered into a Consulting Engagement and Advisory Agreement with Rocaton Advisors, LLC ("Rocaton"), pursuant to which Rocaton provided SDCERA with investment advice.  (Compl. ¶ 38.)  In July 2004, SDCERA and Rocaton expanded this engagement to include hedge fund consulting.

4

(Id.)  In late December 2004 or early 2005, Rocaton introduced
the Fund to SDCERA.  (Id. ¶ 39.)  Plaintiff alleges that Rocaton
rated the Fund as a "buy" due to Amaranth's representations
regarding the Fund's diverse set of investment strategies and
rigorous risk management controls.  (Id. ¶¶ 39-40.)  Plaintiff
alleges that Rocaton met with Amaranth several times prior to
SDCERA's investment in the Fund.  (Id. ¶ 41.)  Plaintiff further
alleges that prior to investment, Amaranth "repeatedly
represented the Fund as being a highly diversified multi-
strategy hedge fund with a sophisticated and independent risk
management team and a broad base of diversified strategies with
a global focus."  (Id. ¶ 45.)

     In March 2005, as part of SDCERA's due diligence process,
SDCERA's in-house investment professionals, Chief Investment
Officer David Deutsch ("Deutsch") and Assistant Chief Investment
Officer Lisa Needle ("Needle") visited Amaranth's offices in
Connecticut, and met with Maounis, Winkler, and Jones, together
with a representative from Rocaton.  (Id.)  Plaintiff alleges
that during this meeting, Amaranth introduced the portfolio
managers of the Fund's assets to discuss their various
strategies, and represented that "energy trading" was only one
of five substantial sectors that the Fund was pursuing at that
time.  (Id. ¶ 42.)  At the meeting, Amaranth emphasized the

Fund's superior risk management controls, including the size of the Fund's 14-member risk management team, which Maounis, Winkler, and Jones told SDCERA was a proactive as well as reactive group.  (Id. ¶ 43.)

On July 21, 2005, Maounis personally attended and made a presentation about Amaranth and the Fund to SDCERA's Retirement Investment Board (the "Board") in San Diego, California. (Compl. ¶ 44.)  Plaintiff alleges that Maounis explained to the Board at that time, regarding Amaranth's methods for avoiding risk, that

> "When we analyze a bond or a stock, we're not looking for a 500, uh, a five times return on investment.  We want to make investments where if we spend a million dollars, we're sure we're going to make a million and a half dollars back.  We want to make that decision because that decision is in fact in the best interest of our investors . . . .  The most important thing for us is really to minimize the downside . . . .  We don't want to hit home runs, we want to get singles and doubles.  So we want to minimize that downside . . . . It's not okay to lose money in the year.  And that's really what we try to do . . . .  We're targeting high single-digit to low double-digit returns with small volatility.  That's what we're targeting."

(Id.)

Effective September 1, 2005, SDCERA invested $175 million in the Fund, thereby becoming a "member" of the Fund. (Compl. ¶ 50.)  Plaintiff alleges that it invested in the Fund in reliance on Amaranth's representations during SDCERA's due diligence

6

process, including those made by Maounis, Winkler and Jones to
SDCERA's investment professionals at the March 2005 meeting, and
the statements made by Maounis to SDCERA's Board at its July 21,
2005 meeting.  (Id.)  In order to invest, SDCERA became a party
to the Fund's LLC Agreement, which provided that Amaranth had
the sole power to manage and operate all aspects of the Fund's
investing and trading, received a Confidential Private Placement
Memorandum dated March 2003 ("PPM"), and executed the Fund's
Subscription Agreement.  (Id. ¶ 31.)  As a condition precedent
to investment, Amaranth required that all investors keep
confidential certain operating information.  (Id. ¶ 51.)  As
such, Amaranth executed a separate confidentiality agreement
with Rocaton, which permitted Rocaton to receive information
regarding the Fund's business and assets on behalf of SDCERA.
(Id.)

     As part of the Subscription Agreement executed by SDCERA at
the time of investment, Plaintiff agreed to a number of
"Representations, Warranties and Acknowledgments" "[a]s an
inducement to the Fund to accept th[e] Subscription Agreement."
(Subscription Agreement at S-2, at Def.'s Mem., Ex. A.)  Among
these representations, Plaintiff warranted that it

>    "has been furnished a copy of the [PPM] and has
>    carefully read and understands the [PPM], has
>    evaluated the risks of a purchase of the Interest,
>    including the risks set forth in the [PPM] . . . and

> has relied solely on the information contained in the
> [PPM] in deciding whether to invest in the Fund
> (irrespective of any other materials and information
> furnished to [SDCERA] in connection with such
> investment)".

(Id.)

The cover page of the 2003 PPM, just below its title,
states in bold, capital letters, "THESE ARE SPECULATIVE
SECURITIES." (PPM, at Def.'s Mem., Ex. B.)  The second page of
the PPM lists the following "GENERAL NOTICES":

> THE    LIMITED    LIABILITY    COMPANY    INTERESTS
> ("INTERESTS")   IN   AMARANTH   PARTNERS   L.L.C.   (THE
> "FUND")   ARE   OFFERED   EXCLUSIVELY   TO   FINANCIALLY
> SOPHISTICATED,   HIGH   NET   WORTH   AND   INSTITUTIONAL
> INVESTORS CAPABLE OF EVALUATING THE MERITS AND RISKS
> OF AN INVESTMENT IN THE FUND. . . .
>
> NO   PERSON   HAS   BEEN   AUTHORIZED   TO   MAKE   ANY
> REPRESENTATIONS CONCERNING THE FUND OR THE INTERESTS
> OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM.   THE
> OFFEREE MUST SUBSCRIBE SOLELY ON THE BASIS OF THE
> INFORMATION SET FORTH HEREIN.
>
> THE   CONTENTS   OF   THIS   MEMORANDUM   SHOULD   NOT   BE
> CONSTRUED AS INVESTMENT, LEGAL OR TAX ADVICE.   THE
> OFFEREE IS URGED TO SEEK INDEPENDENT INVESTMENT,
> LEGAL AND TAX ADVICE CONCERNING THE CONSEQUENCES OF
> INVESTING IN THE FUND.
>
> THE   INTERESTS   ARE   SPECULATIVE,   ILLIQUID,   INVOLVE
> SUBSTANTIAL RISK, AND ARE A SUITABLE INVESTMENT ONLY
> FOR A LIMITED PORTION OF A PORTFOLIO.   INVESTORS
> COULD   LOSE   ALL   OR   SUBSTANTIALLY   ALL   OF   THEIR
> INVESTMENT IN THE FUND.
>
> SEE "RISK FACTORS."

(PPM at i.)

8

In its Summary of the Fund, the PPM states the following as
the Fund's "Investment Objective and Strategies"

> The investment objective of the Fund is to achieve
> superior risk-adjusted returns. The Manager
> [Amaranth] opportunistically employs a wide range of
> relative value, event-driven, directional and hybrid
> and other strategies in managing the Fund's portfolio
> on a global basis. There are no material limitations
> on the instruments, markets or countries in which the
> Fund may invest.
>
> There can be no assurance that the investment
> objective of the Fund will be achieved or that its
> strategies will be successful. Past performance is
> not necessarily indicative of future results, and
> investors must be prepared to lose all or
> substantially all of their investment in the Fund.

(Id. at 2) (emphasis as italics in the original.)  The PPM
Summary closes with a section entitled "Suitability/Risk
Factors", which states:

> All prospective investors, either individually or
> together with their professional advisers, must have
> the financial sophistication and expertise to evaluate
> the merits and risks of an investment in the Fund.
>
> The Interests are a speculative and illiquid
> investment. Investors must be prepared to lose all or
> substantially all of their investment in the Fund. In
> addition to the risks associated with the Fund's
> complex and leveraged trading strategies, the risks
> associated with an investment in the Fund include: (1)
> credit risks; (2) market risk; (3) legal risks; (4)
> operational risk; (5) documentation risk; (6)
> liquidity risk; (7) systematic risk; (8) concentration
> risk; and (9) settlement risk.

(Id. at 7) (emphasis as bold text in the original.)

9

As to "Investment Strategies", the PPM states that "[t]he Fund is a multi-strategy private investment company that employs a diverse group of trading strategies" and "trades globally in a broad range of equity and debt securities, derivatives and other financial instruments." (Id. at 8.)  The PPM qualifies that:

> Asset allocations among strategies are based on the Manager's ongoing analysis of prevailing market conditions.  The Fund does not focus on, nor is its trading limited to, any geographic area, industry sector, issuer credit rating or issuer market capitalization level.  The Manager is not subject to any formal diversification requirements, and the Fund's portfolio may from time to time be concentrated in a limited number of positions or strategies.

(Id.)

The PPM devotes more than fifteen pages to "RISK FACTORS" associated with investment in the Fund.  (See generally PPM at 19-33.)  Among "Market Risks", the PPM cautions potential investors that:

> All of the Manager's strategies are subject to some dimension of market risk . . . .  [D]ue in part to the degree of leverage which certain of the Manager's strategies employ, these strategies have from time to time incurred sudden and dramatic losses.

> The diversification of the Fund's positions and strategies may not always be significant and, even if significant, may not provide meaningful risk control, even though it may reduce the Fund's profit potential as a result of certain strategies being unprofitable while others are profitable.

(Id. at 20-21.)  As to "Strategy Risks", the PPM states:

> There can be no assurance that what is perceived by
> the Manager as an investment opportunity will not,
> in fact, result in substantial losses due to one or
> more of a wide variety of factors.   From time to
> time, the economic viability of an entire strategy
> may deteriorate, due to an excessive concentration
> of   investors   implementing   the   same   approach   or
> general economic events that disrupt the source of
> profits which the strategy seeks to exploit. . . .
> The Fund can only be successful if the Manager is
> able to invest successfully, and there can be no
> assurance that this will be the case.

(Id. at 22) (emphasis as italics in the original.)   Regarding

"Importance of Market Judgment", the PPM states that:

> Although   the   Manager   uses   quantitative   valuation
> models   in   evaluating   the   economic   components   of
> certain      prospective      trades,      the      Manager's
> quantitative   strategies   are   by   no   means   wholly
> systematic; the market judgment and discretion of
> the   Manager's   personnel   are   fundamental   to   the
> implementation of these strategies.   The greater the
> importance      of      subjective      factors,      the      more
> unpredictable a trading strategy becomes.

(Id. at 27.)   The PPM makes clear that the Manager is bound by "No

Formal Diversification Policies"; that is, that:

> Although diversification is an integral part of the
> Manager's overall portfolio risk management process,
> the Manager is not restricted as to the percentage
> of the Fund's assets that may be invested in any
> particular issuer, industry, instrument, market or
> strategy.   The Fund does not and will not maintain
> any   fixed   requirements   for   diversifying   its
> portfolio   among   issuers,   industries,   instruments,
> markets or strategies.   In attempting to maximize
> the Fund's returns, the Manager may concentrate the
> holdings of the Fund in those industries, companies,
> instruments or markets which, in the sole judgment
> of      the      Manager,      provide      the      best      profit
> opportunities consistent with the Fund's investment

> objective.   Consequently,   a   loss   in   any   such
> concentrated   position   could   ultimately   result   in
> significant losses to the Fund and a proportionately
> higher reduction in the Net Asset Value of the Fund
> than if its capital had been spread over a wide
> number of positions.

(Id. at 29-30.)   The PPM further discloses that the Manager

"intends to develop new strategies in the future . . . [and] is

not restricted from using the Fund's capital in developing and

incubating new strategies, even if the Manager has limited

experience in a new strategy."   (Id. at 30.)

   Among "Structural Risks", the PPM cautions investors as to

the "Restrictions on Capital Withdrawals".   (Id.)   Specifically,

the PPM states that "[i]rrespective of the success or failure of

the Manager's strategies, Members' inability to withdraw from

the Fund on short notice materially increases the risk of an

investment . . ."   (Id.)   The PPM describes three principal

methods by which members may make capital withdrawals from the

Fund: Anniversary Withdrawals, Annual Appreciation Withdrawals,

and Quarterly Withdrawals.   (Compl. ¶ 32; PPM at 4, at Def.'s

Mem., Ex. B.)   The option permitting withdrawal on the shortest

notice is the Quarterly Withdrawal, which permits members, upon

at least 45 days' written notice to the Fund, to make a capital

withdrawal as of any January 31, April 30, July 31, and October

31, subject to some limitations.  (PPM at 4, at Def.'s Mem., Ex.
B.)

        Plaintiff acknowledges that the PPM lists a number of risk
factors associated with investment in the Fund.  (Id. ¶ 37.)
Plaintiff alleges, however, that the PPM omits material
information and misrepresents the true nature of the risk
Defendants employed in their management of the Fund.  (Id.)
Specifically, Plaintiff alleges that the PPM "failed to disclose
that [Amaranth] would cease (or had ceased by the time plaintiff
made its investment) operating the Fund as a diverse multi-
strategy fund with sound risk controls (including the type of
controls specifically promised in the PPM), that it would become
(or had already become) a highly-concentrated natural gas fund.
. ."  (Id.)  Plaintiff alleges that these misrepresentations
were affirmed in an amended PPM distributed in January 2006, and
that Plaintiff relied on these misrepresentations in making and
holding its investment.  (Id. ¶ 36.)

        In September 2005, the month that SDCERA became a member of
the Fund, Amaranth reported the best month in the Fund's
history, due to Hurricane Katrina's positive effect on
Amaranth's energy trading positions.  (Compl. ¶ 55.)  On October
10, 2005, during a conference call between representatives of
Amaranth and Rocaton, Amaranth stated that it would reduce

                                    13

capital attributed to energy trading from 36% to 25%.  (Id.)
That reduction was not completed.  (Id.)  Instead, Plaintiff
alleges that Defendant Maounis continued to allocate a large
amount of capital to natural gas trading into 2006.  (Id. ¶ 57.)
Plaintiff alleges that Maounis had the ultimate authority to
make decisions regarding the Fund's capital allocations, and
that Maounis did not discuss capital allocation issues with his
portfolio managers, but discussed them on "an almost daily
basis" with Defendant Winkler.  (Id. ¶ 56.)  Plaintiff alleges
that Winkler was intimately involved in all of Amaranth's
operations and key decisions, "needed to approve everything",
and was "extremely fastidious" in the way he ran Amaranth's
operations.  (Id.)

On March 29, 2006, Amaranth announced by email that the
then Portfolio Manager of its energy trading desk was leaving
Amaranth, and would be replaced by Defendant Hunter.  (Id. ¶
69.)  Hunter had joined Amaranth in 2004 as a natural gas
trader.  (Compl. ¶ 46.)  Before joining Amaranth, Hunter had
worked at Deutsche Bank where, Plaintiff alleges, his group lost
$51.2 million in one week in December 2003, eliminating more
than 70% of the Bank's energy trading profits for that year.
(Id.)  Upon information and belief, Plaintiff alleges that
Deutsche Bank consequently demoted Hunter from head trader to

14

analyst and denied him a bonus for 2003, leading Hunter to leave the Bank in April 2004, and file a lawsuit against the Bank in New York Supreme Court for constructive termination.  (Id.) Plaintiff alleges that Maounis, with the approval, knowledge, and participation of Winkler and Jones, hired Hunter in bad faith, aware of Hunter's history at Deutsche Bank.  (Id.) Because Hunter did not hold the title of Portfolio Manager during SDCERA's pre-investment, due diligence period, Plaintiff alleges that no one from SDCERA met with Hunter or even knew about him until Amaranth's March 2006 announcement that he would assume the role of Portfolio Manager for the Fund's energy desk. (Id. ¶ 48.)

On April 4, 2006, SDCERA spoke with Amaranth by telephone about Hunter's new role.  (Id. ¶ 70.)  During that call, Amaranth did not disclose Hunter's history at Deutsche Bank, alleged warnings from Amaranth risk management personnel regarding the "excessive risk" associated with Hunter's trading practices, or the departing energy Portfolio Manager's statement that he was "uncomfortable with [the] size and concentration" of Hunter's trading.  (Id.)

Plaintiff alleges that, with Maounis and Winkler's "blessing and knowledge", Hunter made increasingly larger and riskier natural gas trades in 2006 with increased capital

allocated to him by Amaranth and Maounis.  (Id. ¶ 58.)  Maounis
agreed that Hunter was to receive 15% of his gains, while other
portfolio managers were paid the industry standard of about 7%
to 12%.  (Id. ¶ 57.)  Plaintiff alleges that "Hunter's positions
became so large during the Spring of 2006 that Amaranth
effectively was the natural gas spread market", and HedgeWorld
USA, Inc. reported in 2006 that "[t]he natural gas market is not
that big.  [Amaranth] had billions of dollars levered.  The
notional amount they commended [sic] was tens of billions of
dollars. . . .  All hedge funds knew that they were dominating
the spread."  (Id.)  According to the non-profit organization,
Industrial Energy Consumers of America ("IECA"), at one point
Amaranth controlled at least 100,000 contracts, or the
equivalent of one trillion cubic feet of natural gas,
representing 54% of the monthly demand in the United States.
(Id. ¶ 59.)  Upon information and belief, Plaintiff alleges that
Amaranth "imposed no size thresholds, concentration limits, or
other measures to constrain Hunter's accumulation of natural
gas."  (Id. ¶ 60.)

        SDCERA received the April 2006 statement of its Fund
account in late May 2006.  (Compl. ¶ 71.)  The statement showed
that in the month of April alone, the Fund's value had increased
more than 13%.  (Id.)  In written correspondence to all

investors, which Rocaton received on May 15, 2006, Amaranth and
Maounis explained that the April profits were due to "extreme
volatility in the energy markets" and that "[a]s volatility
increased during the month, we took the opportunity to reduce
exposure in our natural gas . . . portfolio[] and realized
profits", a statement that Plaintiff alleges was false when
made.  (Id. ¶ 72.)  Concerned with the large and rapid Fund
value increase, SDCERA called Amaranth on June 2, 2006.  (Compl.
¶ 71.)  Steve Johnson of Amaranth represented during that call
that: (a) the April gain was followed by a 10% loss in May; (b)
the Fund volatility was caused by "an extreme tail event" (i.e.,
an event that will either almost certainly happen or not happen)
in the movement of natural gas prices; (c) Amaranth was having
the Fund cash out of its energy positions to reduce risk; and
(d) Amaranth was going to "move conservatively to capitalize the
risk of the positions on [the Fund's] books."  (Id.)  Plaintiff
alleges that these representations were false, and were known
and authorized by Defendants Maounis, Winkler, Jones and
Amaranth, who knew they were false.  (Id.)  On June 7, 2006,
Amaranth, Maounis, Jones, and Hunter represented to Rocaton
that: (a) an unprecedented dry-up of liquidity had occurred in
the natural gas market in the final two weeks of the month,
while Amaranth was attempting to unwind its natural gas spreads;

17

(b) the relationship between natural gas and fuel oil had inverted as never before; and (c) as a result, Amaranth had significantly recalibrated its risk models and would be reducing its notional energy exposure by approximately 50%.  (Id. ¶ 73.) SDCERA alleges that each of these statements was false, as Defendants were aware, and that SDCERA relied on these statements in continuing to hold its investment and not exercise its withdrawal rights.  (Id. ¶¶ 71 & 74.)

Contrary to the statements made and authorized by Defendants, Plaintiff alleges, Amaranth was not cashing the Fund out of its energy positions.  (Compl. ¶ 75.)  Rather, as of June 30, 2006, the Fund had increased its energy trading positions and had 56% (or $4.76 billion) of its capital allocated to energy trading.  (Id.)  Plaintiff alleges that while the Fund's paper profits in natural gas were significant, they could not be realized, as there was no possible exit to the investment because the Fund's positions were "too large for the market." (Id.)  In order to raise cash, Plaintiff alleges, Maounis, Winkler, and Jones had the Fund's traders in other areas, such as stocks and convertible bonds, reduce their positions, increasing the Fund's exposure to Hunter's trades. (Id.)

Rocaton received Amaranth's May 2006 performance report describing the Fund's May losses – the worst since the Fund's

18

inception – on June 22, 2006, later in the month than usual and after the June 16, 2006 withdrawal request deadline for July 31 withdrawals.  (Id. ¶ 76.)  SDCERA's staff did not receive the May report until even later.  (Id.)  In the report, Amaranth and Maounis stated that the losses were "humbling" and led them to "recalibrate how [they] assess risk".  (Id. ¶ 76.)  Plaintiff alleges that SDCERA did not notify Amaranth to withdraw its investment by June 16 because it was unaware of the May 2006 losses, and relied on Amaranth's assurances that it was reducing the risk of the Fund's natural gas trading.   (Id. ¶ 77.)  Had SDCERA known the truth, Plaintiff alleges, it would have requested a withdrawal of all of its assets in the Fund at that time.  (Id.)

On August 10, 2006, Rocaton participated in a phone conference with Defendants during which Defendants represented that, following the events of Spring 2006, Amaranth had dramatically reduced the notional exposure of its energy strategy.  (Id. ¶ 78.)  On August 14, 2006, after the collapse of an unrelated hedge fund that traded in natural gas, Amaranth again represented to SDCERA that Amaranth was reducing the Fund's energy exposure.  (Id. ¶ 79.)  In written correspondence to all investors received by Rocaton on August 18, 2006, Defendants reassured investors that Amaranth had "taken steps

19

since May to reposition our [natural gas] holdings . . . we are targeting a smaller allocation for natural gas in the future". (Id. ¶ 80.)  In reality, Plaintiff alleges that Amaranth was taking risks much greater than those expressed or implied by Defendants' representations, and acquiring additional energy positions.  (Id. ¶ 81.)  At times, Plaintiff alleges, the Fund's natural gas positions were so significant that the Fund "was the market", making the Fund's positions so illiquid that there was no party with whom to trade out the positions.  (Id.)  Plaintiff alleges that in August 2006, managers at the New York Mercantile Exchange ("NYMEX") became concerned over the size of the Fund's positions in natural gas, and informed Amaranth that the Fund's positions were too large.  (Id. ¶ 83.)  NYMEX's warning was, however, never conveyed to SDCERA or Rocaton.  (Id.)

During the week of September 11, 2006, the Fund lost about $3.2 billion, or 35% of its assets, when natural gas prices fell ten percent (10%) in a single day.  (Compl. ¶ 85.)  Plaintiff alleges that a ten percent drop in natural gas prices is not necessarily large, but that what hurt the Fund was the number of positions it held relative to its capital base.  (Id.)  The Fund collapsed in mid-September.  (Id.)

SDCERA issued a written request for full redemption on September 18, 2006.  (Id. ¶ 89.)  On September 20, 2006,

20

Amaranth, Maounis, and Winkler accepted an offer for the Fund's natural gas positions from JP Morgan Chase ("JP Morgan") and Citadel Investment Group LLC ("Citadel").  (Id. ¶ 91.) Plaintiff alleges that the sale cost the Fund approximately $5 billion, with $2.5 billion due to trading losses and $2 to $2.5 billion in concession fees demanded by JP Morgan and Citadel. (Id.)  With the sale, the Fund's losses rose to $6 billion by the end of September.  (Id. ¶ 92.)  On September 29, 2006, Amaranth announced to investors that all redemption requests payable on September 30 and October 31, 2006, including Plaintiff's were "temporarily suspended."  (Id. ¶ 94.)  To date, Amaranth has not honored SDCERA's redemption request.  (Id.) The Fund has, however, made liquidating distributions, including $61 million to SDCERA as of March 2007.  (Id.)  Plaintiff alleges that "had defendants adequately managed risk as represented, the Fund would have been able to withstand the fall in prices in mid-September 2006" but because Defendants "leveraged the Fund's trading positions, instead of the Fund's capital base, and had not adequately hedged their bets . . . the Fund did not have enough cash to meet withdrawals and margin calls, and investors like SDCERA lost most of their capital." (Id. ¶ 95.)

## II. DISCUSSION

A.   Defendant Brian Hunter's Motion to Dismiss for Lack of

Personal Jurisdiction under Rule 12(b)(2)

Defendant Hunter moves to dismiss the Complaint for lack of

personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2).

Defendant argues that because he is a citizen and resident of

Canada, and did not conduct business in New York, there is no

basis for personal jurisdiction over him in this Court.

Courts typically consider a defendant's jurisdictional

motions before considering any other type of motions. See Steel

Co. v. Citizens for Better Environment, 523 U.S. 83, 94 (1998)

("'[w]ithout jurisdiction the court cannot proceed at all in any

cause'") (quoting Ex parte McCardle, 74 U.S. 506, 514, 19 L.Ed.

264 (1868)).  On a motion to dismiss for lack of personal

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff

bears the burden of making a prima facie showing that

jurisdiction exists.  Best Van Lines, Inc. v. Walker, 490 F.3d

239, 242 (2d Cir. 2007). In deciding such a motion, "a district

court has considerable procedural leeway," Marine Midland Bank,

N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981) (citations

omitted), and "may look to evidence outside the pleadings."

Seaweed, Inc. v. DMA Product & Design & Marketing LLC, 219

F.Supp. 2d 551 (S.D.N.Y. 2002).  The court may "determine the

22

motion on the basis of affidavits alone or it may permit
discovery in aid of the motion; or it may conduct an evidentiary
hearing on the merits of the motion." Id.  Plaintiff ultimately
bears the burden of establishing personal jurisdiction by a
preponderance of the evidence, either at an evidentiary hearing
or at trial.  A.I. Trade Fin., Inc. v. Petra Bank, 989 F.2d 76,
79 (2d Cir. 1993).  "But where the issue is addressed on
affidavits, all allegations are construed in the light most
favorable to the plaintiff and doubts are resolved in the
plaintiff's favor." Id.  Conclusory allegations lacking factual
specificity, however, do not satisfy plaintiff's burden.  Jazini
v. Nissan Motor Co., Ltd., 148 F.3d 181, 184-85 (2d Cir. 1998).

     As no jurisdictional discovery has occurred, and the Court
will decide Defendant's motion on the basis of affidavits, the
Court construes all allegations in the light most favorable to
Plaintiff.  See id.  Plaintiff alleges that Hunter, a resident
of Canada, is subject to personal jurisdiction under both
C.P.L.R. § 301, New York's general jurisdiction statute, and
C.P.L.R. § 302, New York's long-arm statute, because he traded
on the New York Mercantile Exchange ("NYMEX"), which is located
in this District.  (Compl. ¶¶ 20-21; Pl. Opp. to Hunter Mot. at
5-12.)

"Presence" in New York at the time the action is commenced
is the key to general jurisdiction under C.P.L.R. § 301.  FCNB
Spiegel Inc. v. Dimmick, 619 N.Y.S.2d 935, 937 (N.Y. Civ. Ct.
1994).  New York courts may exercise jurisdiction over non-
domiciliary defendants "doing business in New York" under § 301
based on the doctrine of "constructive presence."  Id. (citation
omitted).  A non-resident defendant is constructively present in
New York if it is "engaged in such a continuous and systematic
course of doing business here as to warrant a finding of its
presence in this jurisdiction."  Laufer v. Ostrow, 55 N.Y.2d
305, 309-10 (N.Y. 1982).  Personal jurisdiction over a non-
resident individual is proper only if the individual himself is
"doing business" in New York.  Id. at 313.  Where an individual
defendant is acting on behalf of a corporation, he does not
subject himself to personal jurisdiction under § 301.  Id.

Plaintiff contends that because Hunter derived pecuniary
benefit from the trades he conducted on the NYMEX on behalf of
Amaranth, Hunter was "doing business" on behalf of himself in
New York, warranting jurisdiction under C.P.L.R. § 301.  This
argument fails under New York law.  Hunter traded in the New
York market at all times as an employee of Amaranth, and the
trades were conducted within the scope of his work for Amaranth.
This is not enough to create personal jurisdiction over Hunter

24

individually under C.P.L.R. § 301.  See Laufer, 55 N.Y.2d at 313.

Hunter's trading on the NYMEX does, however, create a basis for personal jurisdiction under C.P.L.R. § 302, New York's long-arm statute.  C.P.L.R. § 302(a) provides that a court may exercise personal jurisdiction over any non-domiciliary if that party "transacts any business within the state" and if the claim arises from these business contacts.  D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006) (citation omitted). The showing necessary to find that a defendant "transacted business and is suable on a cause of action arising from that transaction" is "considerably less than that needed to establish defendant's 'doing business'" under C.P.L.R. § 301.  Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58-59 (2d Cir. 1985) (citations omitted).  To have transacted business in New York, a defendant must have "'purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws.'"  Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999) (quoting Parke-Bernet Galleries, Inc. v. Franklyn, 308 N.Y.S.2d 337, 341 (1970)) (alteration in original).  "To determine whether a party has 'transacted business' in New York, courts must look at the totality of

25

circumstances concerning the party's interactions with, and activities within, the state." Id.

Recently, in another case in this District against Hunter surrounding trades he made on the NYMEX while employed by Amaranth, the Honorable Judge Denny Chin denied Hunter's motion to dismiss for lack of personal jurisdiction. See U.S. Commodity Trading Com'n v. Amaranth Advisors, LLC et al., 554 F.Supp. 2d 523 (S.D.N.Y. 2000). In finding jurisdiction appropriate under C.P.L.R. § 302(a), Judge Chin found that because Hunter "personally placed orders through a NYMEX broker and directed Amaranth traders under his supervision to place orders to trade natural gas futures on NYMEX on February 24 and March 26 [2006] . . . . Hunter was clearly transacting business within the state, albeit by telephone from Canada, which is sufficient to support personal jurisdiction under New York's long-arm statute." Id. at 530 (citation omitted). As this case involves these and other trades made by Hunter for Amaranth from Canada on the NYMEX in early 2006, jurisdiction is appropriate under C.P.L.R. § 302(a) and U.S. Commodity Trading Com'n. See also In re Nat. Gas. Commodities Litig., 337 F.Supp. 2d. 498 (S.D.N.Y. 2001). Defendant Hunter's Motion to Dismiss for lack of personal jurisdiction is accordingly DENIED.[2]

---

[2] The exercise of personal jurisdiction must also comport with the Due Process Clause of the U.S. Constitution. D.H. Blair &

B.   <u>Legal Standard for a Motion to Dismiss Pursuant to Fed. R.</u>

     <u>Civ. P. 12(b)(6)</u>

     Defendants have moved to dismiss each Count of the

Complaint for failure to state a claim, pursuant to Fed. R. Civ.

P. 12(b)(6).   For a complaint to survive dismissal under Rule

12(b)(6), the plaintiff must plead "enough facts to state a

claim to relief that is plausible on its face."   <u>Bell Atl. Corp.</u>

<u>v. Twombly</u>, 550 U.S. 544, 570 (2007).   "A claim has facial

plausibility," the Supreme Court has explained,

> "when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged.   The
> plausibility standard is not akin to a 'probability
> requirement,' but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are 'merely
> consistent with' a defendant's liability, it 'stops
> short of the line between possibility and plausibility
> of 'entitlement to relief.'"

<u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (quoting <u>Twombly</u>,

550 U.S. at 556-57).   "[A] plaintiff's obligation to provide the

---

<u>Co.</u>, 462 F.3d at 104-05. Because the "application of N.Y.
C.P.L.R. § 302(a) meets due process requirements," it is
unnecessary to engage a separate due process analysis here, as
the Court has found jurisdiction appropriate under § 302(a). <u>Id.</u>
at 105; <u>see also United States v. Montreal Trust Co.</u>, 358 F.2d
239, 242 (2d Cir. 1966) (exercise of personal jurisdiction under
New York's long-arm statute does not present constitutional
issues because the jurisdictional reach of C.P.L.R. § 302(a)
over non-domiciliaries is narrower than that permitted under the
Due Process Clause).

grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court has stated:

> "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

Iqbal, 129 S.Ct. at 1950.

In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." Zdenek Marek v. Old Navy (Apparel) Inc., 348 F.Supp.2d 275, 279 (S.D.N.Y. 2004) (citing Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (internal quotations omitted)).


C.   Securities Fraud (Count One)

Plaintiff alleges that Defendants Maounis, Winkler, Jones, and Amaranth knowingly and intentionally made several misrepresentations and omissions of material fact in order to

28

induce SDCERA to invest in the Fund, in violation of Section
10(b) of the Securities and Exchange Act of 1934 ("Securities
Act"), and Rule 10b-5 promulgated thereunder.  (Compl. ¶ 97.)
Plaintiff alleges that these misrepresentations included oral
representations made to SDCERA and Rocaton at the March 2005
meeting at Amaranth, in Connecticut, and at the July 21, 2005
SDCERA Board meeting, as well as written representations made in
the PPM.  (Id.)  Plaintiff alleges that at the time the
misrepresentations were made, Defendants knew that they were
false, and intended that SDCERA would rely on the false
representations in deciding whether or not to invest in the
Fund.  (Id.)  Plaintiff claims that it reasonably relied on
Defendants' misrepresentations when it invested $175 million in
the Fund, and that, as a direct result of Defendants' fraud,
Plaintiff suffered damages in excess of $150 million.  (Id. ¶¶
99-100.)

     Defendants move to dismiss Plaintiff's securities fraud
claim for failure to state a claim,[3] arguing that Plaintiff
cannot claim to have reasonably relied on any oral
representations or omissions prior to its investment, because
Plaintiff agreed in the Subscription Agreement at the time of
investment that it would rely only on the representations made

---

[3] Defendants have also moved to dismiss Count One for failure to
plead with particularity, pursuant to Fed. R. Civ. P. 9(b).
Because the Court finds dismissal under Rule 12(b)(6) to be
appropriate, it does not reach Defendants' Rule 9(b) argument.

in the PPM in making its investment. Defendants argue that Plaintiff cannot claim to have been misled by representations in the PPM itself given the abundance of cautionary language contained in the PPM, which explicitly warned Plaintiff of the risks that brought about its loss.

Section 10(b) of the Securities Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits "mak[ing] an untrue statement of material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. . . ." 17 C.F.R. § 240.10b-5. To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plead "that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 491 (S.D.N.Y. 2005) (quoting Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003)). A statement or omission is "material" if there is "a substantial likelihood

30

that the disclosure of the omitted fact would have been viewed
by the reasonable investor as having significantly altered the
'total mix' of information made available." Halperin v. eBanker
USA.Com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) (quoting Basic
Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). Plaintiff must
establish that its reliance on any alleged misrepresentations or
omissions was reasonable. Emergent Capital Inv. Mgmt., LLC v.
Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003). In
assessing the reasonableness of a plaintiff's alleged reliance,
courts in this Circuit consider the entire context of the
transaction, including factors such as its complexity and
magnitude, the sophistication of the parties, and the content of
any agreements between them. Id. (citing Lazard Freres & Co. v.
Protective Life Ins. Co., 108 F.3d 1531, 1541-43 (2d Cir. 1997))
(additional citation omitted).

Defendants argue that the non-reliance provisions in the
Subscription Agreement foreclose a securities fraud claim by
Plaintiff surrounding alleged oral misrepresentations made by
Defendants to SDCERA prior to its investment. This Circuit has
held that in appropriate circumstances, sophisticated parties
may by certain contractual provisions waive rights to rely on
statements made outside an agreement, thereby precluding them
from later alleging fraud on the basis of such statements. See

31

Emergent Capital, 343 F.3d at 196.  To determine whether a
plaintiff's reliance was reasonable in light of such a merger or
waiver clause, the Court must look to "the entire context of the
transaction, including factors such as its complexity and
magnitude, the sophistication of the parties and the content of
any agreements between them."  Id. at 195.

SDCERA is a sophisticated investor, responsible for
collecting and investing retirement funds for approximately
33,000 eligible employees, former employees, and retirees of the
County of San Diego and other participating employers.  (Compl.
¶ 23.)  Before investing in the Fund, SDCERA retained the
services of an investment advisor, Rocaton, including consulting
services specific to investing in hedge funds.  (Id. ¶ 38.)  It
was Rocaton, SDCERA's professional investment advisor, that
initially introduced SDCERA to the Fund, and Plaintiff alleges
that Rocaton met with Amaranth several times before SDCERA made
its investment.  (Id. ¶¶ 39 & 41.)  Rocaton participated in
SDCERA's March 2005 meeting with Amaranth, and advised Plaintiff
throughout the due diligence period prior to investment.  (Id.)
Rocaton guided and assisted SDCERA through its investment, its
concomitant receipt of the PPM, and its execution of the Fund's
LLC Agreement, Subscription Agreement and a related

32

confidentiality agreement, which permitted Rocaton to receive

information on behalf of SDCERA.  (Id. ¶¶ 31 & 51.)

In executing the Subscription Agreement at the time of

investment, SDCERA agreed and represented that it

> "has been furnished a copy of the [PPM] and has
> carefully read and understands the [PPM], has
> evaluated the risks of a purchase of the Interest,
> including the risks set forth in the [PPM] . . . and
> has relied solely on the information contained in the
> [PPM] in deciding whether to invest in the Fund
> (irrespective of any other materials and information
> furnished to [SDCERA] in connection with such
> investment)"

(Subscription Agreement at S-2, at Def.'s Mem., Ex. A.)  The

General Notices of the PPM provided to Plaintiff further

included the following clause:

> "NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY
> REPRESENTATIONS CONCERNING THE FUND OR THE INTERESTS
> OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM.  THE
> OFFEREE MUST SUBSCRIBE SOLELY ON THE BASIS OF THE
> INFORMATION SET FORTH HEREIN."

(PPM at i, at Def.'s Mem., Ex. B.)  The language of these

contractual provisions is clear and unequivocal: SDCERA agreed

in executing the Subscription Agreement at the time of its

investment that it "ha[d] relied solely on the information

contained in the [PPM] in deciding whether to invest in the Fund

(irrespective of any other materials and information furnished

to [SDCERA] . . ."  (Subscription Agreement at S-2.)

Given the sophistication of SDCERA and its investment
advisor, and the clear, unambiguous language of the non-reliance
provisions at issue, the Court finds Plaintiff's purported
reliance on statements made before the execution of the
Subscription Agreement to be unreasonable as a matter of law.
See Dresner v. Utility.com, Inc., 371 F.Supp.2d 476, 492-93
(S.D.N.Y. 2005); see also Emergent Capital, 343 F.3d at 195;
Harsco Corp. v. Segui, 91 F.3d 337, 343 (2d Cir. 1996).
Plaintiff's securities fraud claim against Defendants is
therefore dismissed insofar as it relates to representations
made before the execution of the Subscription Agreement.

Regarding Plaintiff's claim surrounding alleged written
misrepresentations in the PPM, Defendants argue that the
"bespeaks caution" doctrine precludes this claim as a matter of
law, because the PPM was saturated with cautionary language that
warned Plaintiff of the precise risks that ultimately
precipitated its loss.  Under the "bespeaks caution" doctrine,
"[c]ertain alleged misrepresentations in a[n] . . . offering are
immaterial as a matter of law" and therefore not actionable
under Section 10(b), "because it cannot be said that any
reasonable investor could consider them important in light of
the adequate cautionary language set out in the same offering."

Halperin, 295 F.3d at 357 (citations omitted).  Accordingly, the
Second Circuit has stated that:

> "when cautionary language is present, we analyze the
> allegedly fraudulent materials in their entirety to
> determine whether a reasonable investor would have
> been misled.   The touchstone of the inquiry is not
> whether isolated statements within a document were
> true, but whether defendants' representations or
> omissions, considered together and in context, would
> affect the total mix of information and thereby
> mislead a reasonable investor regarding the nature of
> the securities offered."

Id.  A securities fraud claim brought under Section 10(b) must
be dismissed as a matter of law where the cautionary language
provided "explicitly warns of or directly relates to the risk
that brought about a plaintiff's loss", In re Salomon Analyst
Winstar Litig., 2006 WL 510526, at *11 (S.D.N.Y. Feb. 28, 2006)
and "no reasonable investor could have been misled about the
nature of the risk when he invested." Halperin, 295 F.3d at
360.

     Because "[c]autionary language in securities offerings is
just about universal . . . the key question a district court
must decide when determining whether to grant a motion to
dismiss a securities fraud complaint is whether plaintiffs have
overcome the existence of such language." Id. at 359.
Plaintiffs can do this, as Plaintiff attempts to do here, by
showing that the cautionary language provided "did not expressly
warn of or did not directly relate to the risk that brought

about plaintiffs' loss." Id. (citing Hunt v. Alliance N.
American Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir.
1998)). Plaintiff claims here that although the PPM warned of
Amaranth's broad discretion in managing risks and diversifying
the Fund's investments, the PPM ultimately promised that
Defendants would operate the Fund with meaningful risk-
controlling diversification, and it was Defendants' abandonment
of that promise that precipitated Plaintiff's loss.

Rather than omitting or misrepresenting Defendants'
discretion in managing the Fund, the PPM and Subscription
Agreement loudly and repeatedly warn investors, including
Plaintiff, that Amaranth and its personnel entertain wide
discretion and are bound by no requirements of diversification
or risk control. The PPM discloses instantly that "[t]here are
no material limitations on the instruments, markets or countries
in which the Fund may invest". (PPM at 2.) Next to a statement
that the Fund is a "multi-strategy private investment company
that employs a diverse group of trading strategies", the PPM
qualifies that "[t]he Manager is not subject to any formal
diversification requirements, and the Fund's portfolio may from
time to time be concentrated in a limited number of positions or
strategies." (PPM at 8.) Among the many "RISK FACTORS"
associated with investment in the Fund, addressed by over

36

fifteen pages of the PPM, the PPM cautions investors

specifically that "[t]he diversification of the Fund's positions

and strategies may not always be significant and, even if

significant, may not provide meaningful risk control . . . "

(Id.) (emphasis added.)   The PPM further warns that:

> "There can be no assurance that what is perceived by
> the Manager as an investment opportunity will not, in
> fact, result in substantial losses due to one or more
> of a wide variety of factors.   From time to time, the
> economic    viability    of    an    entire    strategy    may
> deteriorate,    due    to    an    excessive    concentration    of
> investors    implementing    the    same    approach    or    general
> economic    events    that    disrupt    the    source    of    profits
> which the strategy seeks to exploit. . . .   The Fund
> can    only    be    successful    if    the    Manager    is    able    to
> invest    successfully,    and    there    can    be    no    assurance
> that this will be the case."

(Id. at 22.)   The PPM cautions as to the "Importance of Market

Judgment" that:

> "Although    the    Manager    uses    quantitative    valuation
> models    in    evaluating    the    economic    components    of
> certain prospective trades, the Manager's quantitative
> strategies    are    by    no    means    wholly    systematic;    the
> market    judgment    and    discretion    of    the    Manager's
> personnel    are    fundamental    to    the    implementation    of
> these    strategies.       The    greater    the    importance    of
> subjective    factors,    the    more    unpredictable    a    trading
> strategy becomes."

(Id. at 27) (emphases added.)   The PPM makes clear that the

Manager is bound by "No Formal Diversification Policies",

that is, that:

37

"Although diversification is an integral part of the
Manager's overall portfolio risk management process,
the Manager is not restricted as to the percentage of
the Fund's assets that may be invested in any
particular issuer, industry, instrument, market or
strategy. The Fund does not and will not maintain any
fixed requirements for diversifying its portfolio
among issuers, industries, instruments, markets or
strategies. In attempting to maximize the Fund's
returns, the Manager may concentrate the holdings of
the Fund in those industries, companies, instruments
or markets which, in the sole judgment of the Manager,
provide the best profit opportunities consistent with
the Fund's investment objective. Consequently, a loss
in any such concentrated position could ultimately
result in significant losses to the Fund and a
proportionately higher reduction in the Net Asset
Value of the Fund than if its capital had been spread
over a wide number of positions."

(Id. at 29-30) (emphases added.) Further, the PPM discloses

that the Manager "intends to develop new strategies in the

future . . . [and] is not restricted from using the Fund's

capital in developing and incubating new strategies, even if the

Manager has limited experience in a new strategy." (Id. at 30.)

The PPM warned Plaintiff, loud and clear, that Amaranth and

its personnel were not subject to any diversification

requirements, that diversification may not be significant, that

holdings may be concentrated, and that the Fund relied on the

subjective judgment and discretion of its management, creating a

significant risk of substantial loss. Plaintiff was warned of

the precise risks that it now claims precipitated its loss.

Indeed, rather than omit or obscure the risks attendant to

investment, and those that engendered the Fund's collapse, the

Court finds that the offering materials provided to SDCERA "not only bespeak caution . . . they shout it from the rooftops". Halperin, 295 F.3d at 360.  As such, Plaintiff cannot maintain a claim to securities fraud on these facts as a matter of law. Defendants' Motion to Dismiss Count One of the Complaint is GRANTED.


D.    Common Law Fraud (Count Two)

Plaintiff charges Defendants Maounis, Winkler, Jones and Amaranth with common law fraud, surrounding both Plaintiff's initial decision to invest in the Fund and its later decision not to withdraw its investment.  Plaintiff alleges that Defendants fraudulently induced SDCERA to invest and hold its investment through misrepresentations made before and after its investment. (Compl. ¶¶ 102-106.)[4]

Defendants move to dismiss Plaintiff's first common law fraud claim, surrounding Defendants' alleged inducement of Plaintiff into making its investment, on the same grounds that

---

[4] Plaintiff has not asserted a federal securities fraud claim surrounding its decision to hold its investment because Section 10(b) does not provide for such "holder" claims.  See First Equity Corp. of Fl. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir. 1989) (citing Blue Chips Stamps v. Manor Drug Stores, 421 U.S. 723, 743 (1975)) ("plaintiffs suing under Section 10(b) of the Securities Exchange Act of 1934 may recover only for losses that result from decisions to buy or to sell, not from decisions to hold or refrain from trading.").

they moved to dismiss Plaintiff's federal securities fraud
claim.   To state a claim for common law fraud in New York, a
plaintiff must allege "a material, false representation, an
intent to defraud thereby, and reasonable reliance on the
representation, causing damage to the plaintiff." Katara v.
D.E. Jones Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir.
1987).   Because the elements of common law fraud in New York are
"substantially identical to those governing § 10(b), the
identical analysis applies." Morse v. Weingarten, 777 F.Supp.
312, 319 (S.D.N.Y. 1991).   As such, the Court's finding that
Plaintiff's reliance upon Defendants' alleged misrepresentations
prior to investment was unreasonable as a matter of law defeats
Plaintiff's common law fraud claim alleging fraudulent
inducement into investment just as it defeated Plaintiff's
federal securities fraud claim.

Plaintiff's second claim to common law fraud is that
Defendants made written and oral misrepresentations to SDCERA
and Rocaton after Plaintiff's investment to induce Plaintiff to
hold its investment, and not exercise its withdrawal rights
under the Subscription Agreement.   (Compl. ¶ 105.)   Defendants
argue that there is a conflict of laws regarding this claim
among the states relevant to this action, and as Connecticut is
the state with the greatest interest, Connecticut law governs.
Because Connecticut law does not permit "holder" claims as a

matter of law, Defendants argue that dismissal of Plaintiff's common law fraud "holder" claim is warranted.

Federal courts typically apply the choice-of-law rules of the forum state.  See GlobalNet Fin. Com., Inc. v. Frank Crystal & Co., 449 F.3d 377, 382 (2d Cir. 2006).  Under New York choice-of-law rules, the first step is to determine whether there is a substantive conflict between the laws of the relevant jurisdictions.  Id.  In the case of a conflict, a choice-of-law analysis is appropriate.  Id.

In the case of Plaintiff's common law fraud "holder" claim, the Court finds that a conflict does exist between the laws of New York, Delaware, Connecticut, and California, the relevant states at issue.[5]  New York, Delaware, and California recognize the right to pursue "holder" claims, while Connecticut does not. Compare In re Worldcom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005) (citation omitted) ("New York recognizes a claim for fraud where investors were induced to retain securities in reliance on a defendant's misrepresentations"), In re Oracle Corp., 867 A.2d 904, 932 n.118 (Del. Ch. 2004) (Delaware law "is in tension with federal law" because it recognizes the possibility of a holder's recovery), and Small v.

---

[5] Plaintiff asserts in the Complaint that the laws of New York and Delaware govern this action.  (Compl. ¶ 1.)  California and Connecticut are the domiciliary states of Plaintiff and the Defendants charged in this Count.  (Id. ¶¶ 22-27.)

Fritz Cos., 132 Cal. Rptr. 2d 490, 494-95 (Cal. 2003)

("California recognizes a cause of action for stockholders
induced by fraud or negligent misrepresentation to refrain from
selling stock . . .") with Chanoff v. U.S. Surgical Corp., 857
F.Supp. 1011, 1018 (D. Conn.), aff'd, 31 F.3d 66 (2d Cir. 1995)
(under Connecticut law "claims for damages based on the
plaintiffs' failure to sell or hedge their stock are too
speculative to be actionable").  As such, a choice-of-law
analysis is necessary.

     For tort claims, including fraud, New York courts apply an
"interest analysis", giving "controlling effect to the law of
the jurisdiction which, because of its relationship or contact
with the occurrence or the parties, has the greatest concern
with the specific issue raised in the litigation."  Babcock v.
Jackson, 12 N.Y.2d 473, 481 (1963); see GlobalNet, 449 F.3d at
384.  The significant contacts are generally the parties'
domiciles and the locus of the tort.  Cromer Finance Ltd. v.
Berger, 137 F.Supp. 2d 452, 492 (S.D.N.Y. 2001).  When the law
is one which regulates conduct, "the law of the jurisdiction
where the tort occurred will generally apply because that
jurisdiction has the greatest interest in regulating behavior
within its borders."  GlobalNet, 449 F.3d at 384.  For claims
based on fraud, the locus of the fraud is "the place where the
injury was inflicted, as opposed to the place where the

fraudulent act originated", which "is usually where the
plaintiff is located." Cromer, 137 F.Supp. 2d at 492 (citation
and internal quotation marks omitted).

Plaintiff argues that because SDCERA is located in
California, and California is where Plaintiff suffered its loss,
California law applies to Plaintiff's common law fraud "holder"
claim. (Pl. Opp. at 46-47.) Defendants maintain that
Connecticut law applies, given that the majority of the facts
giving rise to the alleged fraud and injury occurred in
Connecticut. (Def.'s Mem. at 24-25.) While for the purpose of
"interest analysis", the tort is thought to have "occurred"
"where the injury was inflicted", which is "usually where the
plaintiff is located" rather than "where the fraudulent act
originated", injury in this case "has occurred in locations with
only limited connection to the conduct at issue, while a
substantial portion of the fraudulent conduct has occurred" in
another locus, Connecticut. Cromer, 137 F.Supp. 2d at 492. In
such a case, "the plaintiffs' location is not a dispositive
factor," and "other occurrences and contacts within each
jurisdiction that relate to the conflict of law" are
appropriately considered. Pension Committee of Univ. of
Montreal Pension Plan v. Banc of America Securities, LLC, 446
F.Supp. 2d 163, 193 (S.D.N.Y. 2006). The jurisdiction with the
greatest concentration of occurrences and contacts with the

issues presented in this litigation is clearly Connecticut. Amaranth and the Fund operated out of offices in Connecticut, and each of the individual Defendants worked from Amaranth's Connecticut office, including Hunter, who worked in Connecticut until he began to trade from Amaranth's Calgary office in 2006. Defendants' alleged misrepresentations were made from Amaranth's Connecticut offices, including alleged oral representations made during conference and telephone calls with Plaintiff, and written reports generated to investors in 2006.  Because occurrences in Connecticut and the Parties' contacts with that forum bear the most relation to the torts at issue, Connecticut has the greatest interest in applying its law with respect to these Defendants, who are alleged to have executed a number of torts within the state, to "serve as a check against such misconduct."  Id. at 195. As such, the Court finds that Connecticut law governs Plaintiff's common law fraud "holder" claim.  Because such claims are "too speculative to be actionable" in Connecticut, Chanoff, 857 F.Supp. 1011, 1018 (D.Conn.), aff'd, 31 F.3d 66 (2d Cir. 1994); see In re Worldcom, Inc. Sec. Litig., 336 F.Supp. 2d 310, 320 (S.D.N.Y. 2004), Plaintiff's claim fails as a matter of law.

Defendants' Motion to Dismiss Count Two of the Complaint is GRANTED.

E.    Gross Negligence (Counts Three and Eight), Breach of

       Fiduciary Duty (Count Five), and Aiding and Abetting Breach

       of Fiduciary Duty (Count Six)

Defendants argue that Plaintiff's Gross Negligence and

Breach of Fiduciary claims, asserted in Counts Three, Five, Six,

and Eight of the Complaint are derivative claims, and must

therefore be dismissed due to Plaintiff's lack of standing,

pursuant to Rules 12(b)(1), 12(b)(6), and 23.1 of the Federal

Rules of Civil Procedure.[6]

Plaintiff alleges in Count Eight that Defendant Hunter

breached a duty of care to SDCERA by failing to perform his jobs

as energy trader, co-Portfolio Manager, and Portfolio Manager

with diligence.  (Compl. ¶ 131.)  Plaintiff alleges in Count

Three that Defendants Maounis, Winkler, and Jones acted with

---

[6] The Court notes that under these circumstances, standing can be
raised on either a Rule 12(b)(1) or a Rule 12(b)(6) motion, RBCI
Holdings, Inc. v. Drinks Americas Holdings, Ltd., 2008 WL
759339, at *3  (S.D.N.Y. 2008) (citations omitted), and
Defendants raise it under both rules here.  Where standing goes
to the existence of a case or controversy, a prerequisite to
jurisdiction, it is proper for the district court to first
consider standing on a Rule 12(b)(1) motion before considering
issues that maybe inextricably intertwined with the merits.  Id.
The distinction is largely immaterial here, where the issue of
standing is relevant to only four of Plaintiff's eight claims,
and the Court is not required to make any jurisdictional
findings of fact in reaching its determination as to Plaintiff's
standing to bring these claims.  See e.g., Winn v. Schafer, 499
F.Supp.2d 390, 395 (S.D.N.Y.2007).  As such, the Court operates
under Rule 12(b)(6) and does not detail the Rule 12(b)(1) legal
standard.

gross negligence when they failed to control for risk and
monitor Defendant Hunter's trading activities, despite knowledge
of Hunter's history, and the risk and volatility of his
investments. (Compl. ¶ 110.)  Plaintiff alleges in Count Five
that Defendants Amaranth, Maounis, Winkler, and Jones breached
fiduciary duties to act honestly, openly, fairly, and in the
best interests of SDCERA "[b]y failing to properly manage the
Fund, failing to exercise proper risk management and control
over Hunter, concentrating the Fund's exposure in the natural
gas sector, and by deliberately misleading SDCERA as to the
Fund's investment strategies and risk controls before and after
SDCERA made its investment." (Id. ¶ 117.)  In Count Six,
Plaintiff alleges that Defendants Hunter, Winkler, and Jones
aided and abetted these breaches of fiduciary duty. (Id. ¶¶
122-23.)

Because the Fund was incorporated in Delaware, the Court
applies Delaware law to determine whether the suit may be
brought directly on behalf of investors or whether it must be
brought derivatively. See Debussy LLC v. Deutsche Bank AG, 2006
WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) ("When deciding issues
of 'shareholder standing,' that is, whether claims should be
brought directly or derivatively, courts must look to the law of
the fund's state of incorporation.") (citation omitted).  Under
Delaware law, to determine whether a claim is properly

characterized as direct or derivative, the court examines two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." Tooley v. Donaldson, Lufkin & Jenrete, Inc., 845 A.2d 1031, 1033 (Del. 2004). To constitute a direct claim, the "claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation." Id. at 1039. In conducting its analysis, the court must not rely on a plaintiff's characterization of his claims in the complaint, but rather, "must look to all the facts of the complaint and determine for itself whether a direct claim exists." Dietrich v. Harrer, 857 A.2d 1017, 1027 (Del.Ch. 2004); see also In re Syncor International Corp. Shareholders Litig., 857 A.2d 994, 997 (Del.Ch. 2004) ("under Tooley, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint.").

The gravamen of Plaintiff's gross negligence claims is that Defendants acted recklessly when they failed to manage the Fund's trading activities, and that Plaintiff lost over $150 million when the Fund collapsed as a result. Plaintiff cannot

prevail on such claims without showing that the Fund itself was
injured – in fact, that it collapsed.  Plaintiff's loss, like
that of all other investors in the Fund, was incidental to the
Fund's financial ruin.  Plaintiff itself asserts in the
Complaint that "[a]s a result of Defendants' fraud and other
misconduct, the Fund collapsed in late-September 2006, resulting
in a loss of over $6 billion in Fund value, and causing SDCERA
to lose more than $150 million."  (Compl. ¶ 4) (emphasis added.)
Recovery on a gross negligence claim belongs to the Fund, and
must be shared proportionately by all the Fund's investors.
"Essentially [] claim[s] for mismanagement" of the Fund,
Plaintiff's gross negligence claims are "paradigmatic derivative
claim[s]."  See Albert v. Alex Brown Management Services, 2005
WL 2130607, at *13 (Del.Ch. 2005); see also Kramer v. W. Pac.
Indus., Inc., 546 A.2d 348, 353 (Del. 1988).

　　　Plaintiff's breach of fiduciary duty claims allege
essentially that by failing to manage properly the Fund, and by
misleading SDCERA regarding the Fund's investment strategies,
Defendants breached their fiduciary duties to Plaintiff, and/or
aided and abetted these breaches of fiduciary duty, resulting in
a loss of over $150 million to SDCERA when the Fund collapsed.
The first allegation – that Defendants broke fiduciary duties to
SDCERA by failing to manage properly the Fund – is, like
Plaintiff's gross negligence claims, a classic claim of fund

mismanagement that belongs to the Fund, and is therefore
derivative.   See Debussy, 2006 WL 800956, at *3 ("When the duty
implicated in a breach of duty claim is the normal duty to
manage the affairs of the corporation . . . [t]hat duty is owed
to the corporation and not separately or independently to the
stockholders.   Therefore, the injury flowing from a claim of
mismanagement - although admittedly here not by a corporate
board of directors but rather by the portfolio manager of the
Trust's assets - is a wrong to the corporation.") (citing
Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del.Ch. 2004);
Agostino v. Hicks, 845 A.2d 1110, 1123 (Del.Ch. 2004) (internal
quotation marks omitted)).

        Plaintiff's second breach of fiduciary duty claim – that
Defendants breached fiduciary duties to SDCERA by making
misrepresentations to Plaintiff before and after its investment
– is less straightforward, but also derivative under Tooley.
While Plaintiff claims it was individually wronged by
Defendants' misrepresentations, "[t]o the extent that plaintiff
was deprived of accurate information upon which to base its
investment decisions . . . [plaintiff] experienced an injury
suffered by all" Fund investors when the Fund collapsed, in
proportion to their share of investment.   Smith v. Waste
Management Inc., 407 F.3d 381, 385 (5th Cir. 2005) (quoting Manzo
v. Rite Aid, 2002 WL 31926606, at *5 (Del.Ch. 2002)).

Plaintiff's claim is derivative, because the misrepresentations that allegedly caused its losses injured not just Plaintiff, but the Fund as a whole.  See Smith, 407 F.3d at 384-85 (5th Cir. 2005); compare from Albert, 2005 WL 2130607 at *13 (finding claims for breach of fiduciary duty based on non-disclosure of information to be direct where "the unitholders, not the partnerships, suffered the alleged harm.").  Plaintiff has not alleged that Defendants aimed their misconduct specifically at SDCERA, uniquely or with any particular animus, and not at other investors.  Indeed, the Fund lost $6 billion, and Plaintiff invested only $175 million, so Plaintiff could not possibly be alone in the alleged deceptions.  Without such a showing, Plaintiff's breach of fiduciary duty claims remain derivative.  See Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC, 922 A.2d 1169, 1179-80 (citing Production Resources Group v. NCT Group, 863 A.2d 772 (Del.Ch. 2004)).

Because SDCERA did not make pre-suit demand or plead facts excusing such demand for its derivative claims, these claims must be dismissed.  See Fed. R. Civ. P. 23.1.  Defendants' Motion to Dismiss Counts Three, Five, Six, and Eight of the Complaint is GRANTED.

F.    Breach of Contract (Count Four)

Plaintiff alleges in Count Four of the Complaint that
Amaranth is liable for breach of contract, to wit, breach of the
Subscription Agreement and LLC Agreement.  (Compl. ¶ 113.)
Plaintiff alleges that, pursuant to these contracts and the PPM,
Amaranth agreed "to allocate capital and manage the Fund as if
it were a diverse multi-strategy hedge fund with sound risk
management policies."  (Id.)  Plaintiff alleges that Amaranth
willfully and knowingly breached the terms of its contracts with
SDCERA, as well as the implied covenant of good faith and fair
dealing, by instead "concentrating the Fund's exposure in the
energy sector, and . . . failing to manage the Fund properly by,
inter alia, failing to exercise proper risk controls."  (Id.)
Defendant Amaranth argues that it is not a party to the
Subscription Agreement because it signed the Agreement on behalf
of the Fund as Manager, and not on behalf of itself
individually.  Defendant asserts that the LLC Agreement contains
a provision that expressly precludes liability against Amaranth
as Manager for breach of contract.  (Def.'s Mem. at 35-37).
Defendant further submits that Plaintiff has failed to cite a
specific term within either agreement that Amaranth allegedly
breached, and that Plaintiff's breach of contract claim fails as
a matter of law.  (Id. at 37).

Plaintiff does not contest that the limitation of liability provision in the LLC agreement absolves Amaranth of any breach of contract arising out of that Agreement.  (Pl.'s Opp. at 95.) The Court therefore analyses Plaintiff's breach of contract claim as it pertains to the Subscription Agreement only.

The Subscription Agreement, executed by the Fund and Plaintiff at the time of investment, contains a clause providing that the laws of the State of New York govern the contract. (See Subscription Agreement at S-9, at Def.'s Mem., Ex. A.) Under New York law, "it is well-settled that an individual who signs a contract on behalf of a corporation, indicates her representative capacity on the contract, and exhibits no intention to assume personal liability for the corporation's breaches is not subject to personal liability." Hudson Venture Partners, LP v. Patriot Aviation Group, Inc., 1999 WL 76803, at *6 (S.D.N.Y. Feb. 17, 1999).  "A corporate agent who signs a contract within the authority of his official capacity 'will not be personally bound unless there is clear and explicit evidence that the agent intended to substitute his personal liability for that of his principal or that fraud is involved.'" Tsegaye v. Impol Aluminum Corp., 2003 WL 221743, at *6 (S.D.N.Y. 2003) (quoting In re Estate of Gifford, 144 A.D.2d 742, 535 N.Y.S.2d 154, 156 (App.Div. 1988)).  The Subscription Agreement was executed between Amaranth Partners, LLC – the "Fund" – and

SDCERA, the Subscriber, and is signed by SDCERA and "Amaranth Partners LLC By: Amaranth Advisors LLC, its Manager." (See Subscription Agreement, Execution Pages (Entities)-10, at Def.'s Mem., Ex. A) (emphasis added.)  Defendant Winkler, Chief Operating Officer of Amaranth, signed for Amaranth on behalf of the Fund.  (Id.)  Among the "Subscription Instructions" on the second page of the Agreement, the Agreement states,

> The Manager reserves the right to reject Subscription Agreements in whole or in part.  This Subscription Agreement is not accepted by the Fund until the Manager has executed a counterpart of the Execution Pages of this Subscription Agreement on behalf of the Fund and returned them to the Subscriber.

(Subscription Agreement at 2, at Def.'s Mem., Ex. A) (emphasis added.)  Plaintiff has offered no evidence that Amaranth intended to substitute its personal liability for that of the Fund.  Therefore, Defendant cannot be bound by the Subscription Agreement as a matter of law, and Plaintiff's breach of contract claim is dismissed.[7]

---

[7] Even were Amaranth bound under the Subscription Agreement Plaintiff's breach of contract claim would fail, as Plaintiff has not identified any specific term of the Agreement that Defendant violated.  To establish a claim of breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the [plaintiff], (3) breach of contract by the [defendant], and (4) damages."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  Plaintiff must "plead facts surrounding the formation of the contract such as the date the parties entered into the contract, the major terms of the contract, the parties to the contract, and that the

Further, as "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim", Goldblatt v. Englander Commc'ns, L.L.C., 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007) (citing Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002)), Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is likewise dismissed. Defendant's Motion to Dismiss Count Four is GRANTED.

G.    Vicarious Liability (Count Seven)

In Count Seven of the Complaint, Plaintiff alleges that Defendants Maounis, Winkler, Jones, and Amaranth are vicariously

---

party to be bound assented to the contract." Fuji Photo Film U.S.A., Inc. v. McNulty, 2009 WL 3754359, at *3 (S.D.N.Y. Nov. 4, 2009) (citing Berman v. Sugo LLC, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008)). Plaintiff must allege the specific provisions of the contract upon which the breach of contract claim is based, as "[a] claim for breach of contract cannot be sustained by a conclusory statement that the accused breached a contract." Id. at *3. In its Complaint, Plaintiff alleges obliquely that, pursuant to the Subscription Agreement, Amaranth "agreed to allocate capital and manage the Fund as if it were a diverse multi-strategy hedge fund with sound risk management policies" and that Amaranth "breached the terms of its contracts with SDCERA" by "failing to manage the Fund properly by, inter alia, failing to exercise proper risk controls." (Compl. ¶ 113.) The Court finds no contractual obligation in the Subscription Agreement that would sustain Plaintiff's claim to breach of contract under New York law. Rather, as the Court discussed in dismissing Plaintiff's securities fraud claim, supra, the Subscription Agreement and PPM put Plaintiff on due notice that Amaranth had broad discretion and no formal requirements with regard to its investment and risk management strategies.

liable for the wrongful acts and omissions made by Hunter within the scope of his employment by Defendants.  (Compl. ¶ 127.) Defendants have correctly argued, and Plaintiff concedes (Pl.'s Opp. at 98) that a "viable cause of action against the employee . . . is a condition precedent to imputing vicarious liability for such negligence to the employer pursuant to the theory of respondeat superior." Greco v. Univ. of Del., 619 A.2d 900, 903 (Del. 1993).  As all the prior Counts of the Complaint have been dismissed, Plaintiff has failed to state a viable cause of action against Hunter.  Therefore, Defendants' Motion to Dismiss Count Seven of the Complaint is GRANTED.

### III. CONCLUSION

For the foregoing reasons, Defendant Hunter's Motion to Dismiss the Complaint for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2) is DENIED.  Each Defendant's Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 23.1 is GRANTED in its entirety.  The Clerk of Court is directed to close the docket in this case.

SO ORDERED.

Dated:    New York, New York
          March 15, 2010

                                        Deborah A. Batts
                                   United States District Judge